**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| THE DISTRICT OF COLUMBIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 8:17-cv-1596-PJM |
| DONALD J. TRUMP, in his official capacity as President of the United States, | |
| *Defendant*. | |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................4

ARGUMENT ......................................................................................................................7

I.   THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS ......................7

    A.   Requirements for Article III Standing at the Pleading Stage...................................8

    B.   Plaintiffs Have Not Demonstrated That They Have Standing Based on
        Alleged Injuries to Their Sovereign Interests. ........................................................9

        1.   Maryland's alleged loss of political power in joining the Union...............10

        2.   Maryland's alleged loss of tax revenues....................................................12

        3.   Maryland's and D.C.'s enforcement of their laws and the
            "intolerable dilemma" they allegedly face.................................................16

    C.   Plaintiffs Have Not Established Standing Based on Alleged Injuries to
        Their Quasi-Sovereign Interests. ...........................................................................19

    D.   Plaintiffs Have Not Established Standing Based on Alleged Injuries to Their
        Proprietary Interests ...............................................................................................22

II.  PLAINTIFFS HAVE NO CAUSE OF ACTION UNDER THE EMOLUMENTS
    CLAUSES AND EQUITY REQUIRES DISMISSAL......................................................26

III. PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE
    EMOLUMENTS CLAUSES ...........................................................................................30

    A.   The Emoluments Clauses Prohibit Benefits Arising from the U.S.
        Official's Provision of Service Pursuant to an Office or Employment ................30

        1.   The text of the Emoluments Clauses .........................................................31

        2.   Adoption and historical interpretation of the Clauses...............................38

            i.   Adoption of the Emoluments Clauses .................................................38

            ii.  Historical interpretation of the Clauses ..............................................41

3.      Application of the Clauses since the founding era......................................45

B.      Plaintiffs' Arguments in Support of Their Interpretation Have No Merit ............50

IV.     THE RELIEF SOUGHT BY PLAINTIFFS IS UNCONSTITUTIONAL. .......................54

CONCLUSION......................................................................................................................56

# TABLE OF AUTHORITIES

**CASES**             **PAGE(S)**

*Air Courier Conference of Am. v. Postal Workers*,
498 U.S. 517 (1991) ............................................................................................... 28

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
458 U.S. 592 (1982) ......................................................................................... *passim*

*Allen v. Wright*,
468 U.S. 737 (1984) ........................................................................................... 9, 15

*Almy v. Sebelius*,
679 F.3d 297 (4th Cir. 2012) ................................................................................ 19

*Arias v. DynCorp*,
752 F.3d 1011 (D.C. Cir. 2014) ........................................................................... 13

*Armstrong v. Exceptional Child Center, Inc.*,
135 S. Ct. 1378 (2015) ............................................................................. 26, 27, 36

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................... 9

*Barahona v. Holder*,
691 F.3d 349 (4th Cir. 2012) ................................................................................ 51

*Beck v. McDonald*,
848 F.3d 262 (4th Cir. 2017) ................................................................................ 18

*Beecham v. United States*,
511 U.S. 368 (1994) .............................................................................................. 33

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................... 9

*CGM, LLC v. BellSouth Telecomms., Inc.*,
664 F.3d 46 (4th Cir. 2011) ................................................................................... 7

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ............................................................................................... 14

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ............................................................................. 8, 14, 17, 18

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987)................................................................................................ 28

*Clinton v. Jones*,
    520 U.S. 681 (1997)................................................................................................ 56

*Ctr. for Reprod. Law & Policy v. Bush*,
    304 F.3d 183 (2d Cir. 2002)................................................................................... 28

*District of Columbia ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co.*,
    797 F.2d 1041 (D.C. Cir. 1986) ............................................................................. 17

*Doe v. Va. Dep't of State Police*,
    713 F.3d 745 (4th Cir. 2013) .................................................................................. 15

*Dole v. United Steelworkers of Am.*,
    494 U.S. 26 (1990).................................................................................................. 33

*eBay, Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006)................................................................................................ 27

*In re Edmond*,
    934 F.2d 1304 (4th Cir. 1991) ................................................................................ 19

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) .................................................................................... 6

*Evans v. B.F. Perkins Co.*,
    166 F.3d 642 (4th Cir. 1999) .................................................................................... 8

*Florida v. Mellon*,
    273 U.S. 12 (1927).................................................................................................. 13

*Frank Krasner Enterprises, Ltd. v. Montgomery County*,
    401 F.3d 230 (4th Cir. 2005) .................................................................................. 15

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)...................................................................................... 4, 54, 56

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010)........................................................................................ 26, 27

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
    565 U.S. 606 (2012)................................................................................................ 27

*George v. Tenn. Copper Co.*,
  206 U.S. 230 (1907) ............................................................................................. 19

*Griffin v. Oceanic Contractors, Inc.*,
  458 U.S. 564 (1982) ............................................................................................. 51

*Hedges v. Dixon Cty.*,
  150 U.S. 182 (1893) ............................................................................................. 28

*Hodges v. Abraham*,
  300 F.3d 432 (4th Cir. 2002) ......................................................................... 19, 20

*Holmes v. Jennison*,
  39 U.S. 540 (1840) ............................................................................................... 36

*Hoyt v. United States*,
  51 U.S. 109 (1850) ........................................................................................... 31, 32

*Int'l Refugee Assistance Project v. Trump*,
  857 F.3d 557 (4th Cir. 2017) ............................................................................... 55

*Jarecki v. G.D. Searle & Co.*,
  367 U.S. 303 (1961) ............................................................................................. 36

*Kentucky v. Graham*,
  473 U.S. 159 (1985) ............................................................................................. 20

*Kerns v. United States*,
  585 F.3d 187 (4th Cir. 2009) ................................................................................. 9

*Ex parte Levitt*,
  302 U.S. 633 (1937) ............................................................................................. 22

*Loving v. United States*,
  517 U.S. 748 (1996) .......................................................................................... 4, 56

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................... 8, 14, 22

*Marbury v. Madison*,
  5 U.S. 137 (1803) ................................................................................................. 36

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ........................................................................................ 11, 20

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ................................................................................................ 10, 19

*Massachusetts v. Microsoft Corp.*,
    373 F.3d 1199 (D.C. Cir. 2004) ............................................................................... 27

*Mayo v. United States*,
    319 U.S. 441 (1943) ................................................................................................ 17

*McCulloch v. Maryland*,
    17 U.S. 316 (1819) .................................................................................................. 30

*McLean v. United States*,
    226 U.S. 374 (1912) ................................................................................................ 32

*Md. People's Counsel v. FERC*,
    760 F.2d 318 (D.C. Cir. 1985) ................................................................................ 20

*Mich. Corr. Org. v. Mich. Dep't of Corr.*,
    774 F.3d 895 (6th Cir. 2014) ............................................................................. 26, 27

*Miller v. Brown*,
    462 F.3d 312 (4th Cir. 2006) .................................................................................... 7

*Mirant Potomac River, LLC v. EPA*,
    577 F.3d 223 (4th Cir. 2009) .................................................................................. 15

*Mississippi v. Johnson*,
    71 U.S. 475 (1867) ........................................................................................ 4, 54, 55

*Missouri ex rel. Koster v. Harris*,
    847 F.3d 646 (9th Cir. 2017) .................................................................................. 21

*Mistretta v. United States*,
    488 U.S. 361 (1989) ........................................................................................... 30, 44

*Morrison v. Work*,
    266 U.S. 481 (1925) ................................................................................................ 27

*Municipal Ass'n of S.C. v. USAA Gen. Indem. Co.*,
    709 F.3d 276 (4th Cir. 2013) .................................................................................. 17

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982) .................................................................................................. 17

*New Jersey v. Sargent,*
   269 U.S. 328 (1926) ........................................................................................ 10

*New York v. United States,*
   505 U.S. 144 (1992) ........................................................................................ 11

*Newdow v. Roberts,*
   603 F.3d 1002 (D.C. Cir. 2010) ..................................................................... 55

*Nixon v. Fitzgerald,*
   457 U.S. 731 (1982) ................................................................................. 55, 56

*Nixon v. United States,*
   506 U.S. 224 (1993) ........................................................................................ 35

*NLRB v. Noel Canning,*
   134 S. Ct. 2550 (2014) .............................................................................. 30, 44

*Paterson v. Texas,*
   308 F.3d 448 (5th Cir. 2002) .......................................................................... 22

*Pennsylvania v. Kleppe,*
   533 F.2d 668 (D.C. Cir. 1976) ....................................................................... 13

*Phillips v. LCI Int'l, Inc.,*
   190 F.3d 609 (4th Cir. 1999) ............................................................................ 6

*Raines v. Byrd,*
   521 U.S. 811 (1997) .............................................................................. 8, 9, 11

*Reid v. Prince George's Cty. Bd. of Educ.,*
   60 F. Supp. 3d 601 (D. Md. 2014) ................................................................... 9

*Rodriguez v. United States,*
   480 U.S. 522 (1987) ........................................................................................ 51

*Sanchez-Espinoza v. Reagan,*
   770 F.2d 202 (D.C. Cir. 1985) ....................................................................... 27

*Schlesinger v. Reservists Comm. to Stop the War,*
   418 U.S. 208 (1974) ........................................................................................ 22

*Settles v. U.S. Parole Comm'n,*
   429 F.3d 1098 (D.C. Cir. 2005) ..................................................................... 17

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976).................................................................. 16

*Small v. United States*,
   544 U.S. 385 (2005)................................................................ 51

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966)................................................................ 20

*South Dakota v. Yankton Sioux Tribe*,
   522 U.S. 329 (1998)................................................................ 51

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016)....................................................... 8, 9, 11

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996)................................................... 55

*Texas v. ICC*,
   258 U.S. 158 (1922).............................................................. 10

*Thomas v. The Salvation Army S. Territory*,
   841 F.3d 632 (4th Cir. 2016) ................................................. 14, 25

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
   484 U.S. 365 (1988)................................................................ 36

*United States v. Hartwell*,
   73 U.S. 385 (1867)................................................................ 31

*United States v. Hill*,
   120 U.S. 169 (1889)................................................................ 32

*United States v. Palmer*,
   16 U.S. 610 (1818)................................................................ 51

*United States v. Ripley*,
   32 U.S. 18 (1833)................................................................. 32

*United States v. Stevens*,
   559 U.S. 460 (2010)................................................................ 35

*Va. Office for Prot. & Advocacy v. Stewart*,
   563 U.S. 247 (2011)................................................................ 27

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) ............................................................................................ 9, 28

*Virginia ex rel. Cuccinelli v. Sebelius*,
  656 F.3d 253 (4th Cir. 2011) ................................................................................... 10

*Virginia v. Tennessee*,
  148 U.S. 503 (1893) ............................................................................................ 35, 36

*Warth v. Seldin*,
  422 U.S. 490 (1975) ................................................................................................... 28

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ................................................................................................... 27

*West Virginia v. HHS*,
  145 F. Supp. 3d 94  (D.D.C. 2015) ......................................................................... 11

*Williams* v. Taylor,
  529 U.S. 362 (2000) ................................................................................................... 36

*Wyoming v. Dep't of Interior*,
  674 F.3d 1220 (10th Cir. 2012) ............................................................................... 13

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992) ................................................................................................... 13

## STATUTES

5 U.S.C. § 115 ............................................................................................................... 47

5 U.S.C. § 7341 ............................................................................................................. 47

5 U.S.C. § 7342 ............................................................................................................. 47

10 U.S.C. § 1060 ........................................................................................................... 50

22 U.S.C. § 3641 ........................................................................................................... 50

37 U.S.C. § 908 ............................................................................................................. 50

40 U.S.C. § 3312 ........................................................................................................... 18

1 Stat. 130 (1790) ......................................................................................................... 43

Pub. L. No. 97-295, 96 Stat. 1287 (1982)......................................................................... 50

Pub. L. No. 89-554, § 7341, 80 Stat. 378 (1966)............................................................... 47

An act authorizing the persons therein named to accept of certain decorations and
   presents therein named, from foreign governments, and for other purposes,
   21 Stat. 603 (1881)........................................................................................................ 46

An Act for allowing a Compensation to the President and Vice President of the
   United States,
   1 Stat. 72 (1789).......................................................................................................... 32

National Defense Authorization Act for Fiscal Year 1994,
   Pub. L. No. 103-160, § 1058, 107 Stat. 1547, 1834 ................................................. 50

Panama Canal Commission Authorization Act for Fiscal Year 1994,
   Pub. L. No. 103-160, tit. XXXV, § 3504, 107 Stat. 1547, 1965 .............................. 50

Thirty-Day Embargo,
   1 Stat. 400 (1794)........................................................................................................ 42

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 6, cl. 2............................................................................................ 34

U.S. Const. art. I, § 8, cl. 17.......................................................................................... 17

U.S. Const. art. I, § 9, cl. 8................................................................................. 1, 29, 30, 51

U.S. Const. art. I, § 10, cl. 3.......................................................................................... 36

U.S. Const. art. II, § 1, cl. 7 ...................................................................................... 1, 33

**FEDERAL RULES OF CIVIL PROCEDURE**

Rule 12(b)(1)................................................................................................................ 7, 8

Rule 12(b)(6)................................................................................................................... 9

**CONGRESSIONAL MATERIALS**

1 American State Papers, 7th Cong., 1st Sess., Misc. 307–08 (1802)
   https://memory.loc.gov/ammem/amlaw/lwsplink.html ............................................. 31

2 American State Papers, 15th Cong., 1st Sess., Misc. 477–78 (1818)
   https://memory.loc.gov/ammem/amlaw/lwsplink.html ........................................... 45

8 Annals of Cong. 1582–93 (1798).................................................................................... 46

20 Annals of Cong. 672 (1810)......................................................................................... 45

21 Annals of Cong. 2050–51 (1810) ................................................................................ 45

159 Cong. Rec. S5,116-22 (daily ed. June 25, 2013) ................................................... 53

*Confirmation of Nelson A. Rockefeller as Vice President of the United States*,
   H.R. Rep. No. 93-1609 (1974)..................................................................................... 52

H.R. Rep. No. 23-302 (1834)........................................................................................... 46

*Nomination of Nelson A. Rockefeller of New York to be Vice President of the United States*,
   S. Exec. Doc. No. 93-34 (1974).................................................................................. 52

*Nomination of Penny Pritzker to be Secretary of the U.S. Department of Commerce: Hearing Before the S. Comm. on Commerce, Science, and Transportation*,
   Hrg. 113-619, 113th Cong. (2013).............................................................................. 53

Proposing an Amendment to the Constitution,
   S.J. Res. 2, 11th Cong., 2 Stat. 613 (1810) .............................................................. 45

S. Exec. Doc. No. 23-49 (1834)....................................................................................... 46

S. Exec. Doc. No. 37-23 (1862) ...................................................................................... 46

## OFFICE OF COMPTROLLER GENERAL OPINIONS

*Assistant Comptroller General Weitzel to the Attorney General*,
   34 Comp. Gen. 331 (1955) ........................................................................................... 49

*Dr. R. Edward Bellamy, USPHS, Ret.*,
   B-175166, 1978 WL 10026 (Comp. Gen. Apr. 7, 1978)......................................... 48

*Major Stephen M. Hartnett, USMC, Ret.*,
   65 Comp. Gen. 382 (1986) *aff'd by* 69 Comp. Gen. 175 (1990)............................ 48

*Retired Marine Corps Officers*,
   B-217096, 1985 WL 52377 (Comp. Gen. Mar. 11, 1985)..................................... 48

*The Honorable George J. Mitchell U.S. Senate*,
   B-207467, B-207467, 1983 WL 27823 (Comp. Gen. Jan. 18, 1983) ...................................... 47

*To C.C. Gordon, USCG*,
   44 Comp. Gen. 130 (1964) ...................................................................................... 48

*To Mr. Harvey E. Ward, USCG, Ret.*,
   B-154213, 1964 WL 1865 (Comp. Gen. Dec. 28, 1964) ........................................... 48

*To N.R. Breningstall, Dep't of the Air Force*,
   53 Comp. Gen 753 (1974) ....................................................................................... 48

*To the Secretary of Health, Education and Welfare*,
   51 Comp. Gen. 780 (1972) ...................................................................................... 48

*To the Secretary of the Air Force*,
   49 Comp. Gen. 819 (1970) ...................................................................................... 48

## ATTORNEY GENERAL OPINIONS

*Foreign Diplomatic Commission*,
   13 Op. Att'y Gen. 537 (1871) ............................................................................. 47, 48

*Marshal of Florida*,
   6 Op. Att'y Gen. 409 (1854) ............................................................................... 47, 48

## OFFICE OF LEGAL COUNSEL OPINIONS

*Application of the Emoluments Clause of the Constitution and the Foreign Gifts
   and Decorations Act*,
   6 Op. O.L.C. 156 (1982) ......................................................................................... 48

*Application of Emoluments Clause to Part-Time Consultant for the Nuclear
   Regulatory Commission*,
   10 Op. O.L.C. 96 (1986) ......................................................................................... 48

*Applicability of Emoluments Clause to Employment of Government Employees by
   Foreign Public Universities*,
   18 Op. O.L.C. 13 (1994) ......................................................................................... 52

*Applicability of the Emoluments Clause to Non-Gov't Members of ACUS*,
   17 Op. O.L.C. 114 (1993) ....................................................................................... 49

Memorandum for S. A. Andretta, Administrative Assistant Attorney General, from
    J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment of
    Compensation to Individual in Receipt of Compensation from a Foreign Government*
    (Oct. 4, 1954), https://www.justice.gov/olc/page/file/935721/download .......................... 49, 50

Mem. Op. for the Chairman of ACUS from David J. Barron, Acting Assistant
    Attorney General,
    2010 WL 2516024 (June 3, 2010) ........................................................................... 49

*President Reagan's Ability to Receive Retirement Benefits from the State of California*,
    5 Op. O.L.C. 187 (1981). ........................................................................................ 48

## HISTORICAL MATERIALS

*A Complete Dictionary of the English Language* (2d ed. 1789) .................................... 35

1 *A Digest of the International Law of the United States*
    (Francis Wharton ed., 1886) ..................................................................... 38, 46

*A New General English Dictionary* (18th ed. 1754) .................................................... 35

*Barclay's A Complete and Universal English Dictionary on a New Plan* (1774) ........... 32, 34, 37

Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793),
    http://founders.archives.gov/documents/Washington/05-14-02-0074 ............................... 12, 43

4 *Revolutionary Diplomatic Correspondence of the United States*
    (Francis Wharton ed., 1889) ...................................................................... 39

George Cochrane Hazelton, *The National Capitol* (1894) .......................................... 43

George Taylor, Arrangements between English and Southern Merchants (June 1790),
    http://founders.archives.gov/documents/Jefferson/01-16-02-0308-0003 ................................. 42

James Madison, *The Debates in the Federal Convention of 1787 Which Framed
    the Constitution of the United States of America*
    (Gaillard Hunt & James Brown Scott eds., 1920) .................................................. 12, 38, 40, 44

1 John Trusler, *The Difference, Between Words, Esteemed Synonymous, in the
    English Language; And, the Proper Choice of them determined* (1766) ................................. 34

1–5 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption
    of the Federal Constitution* (2d ed. 1891) ...................................................... 12

1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption
    of the Federal Constitution* (2d ed. 1891) ....................................................... 12, 44

3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (2d ed. 1891).........................................................................*passim*

18 *Journals of the Continental Congress, 1774–1789* (Gaillard Hunt ed., 1910) ........................ 39

23 *Journals of the Continental Congress, 1774–1789* (Gaillard Hunt ed., 1914) ........................ 32

30 *Journals of the Continental Congress, 1774–1789* (John C. Fitzpatrick ed., 1934)................ 39

Letter from Commissioners for the District of Columbia to George Washington (Sept. 16, 1793), https://founders.archives.gov/documents/Washington/05-14-02-0068 ........ 43

Letter from George Washington to Bushrod Washington (July 27, 1789), http://founders.archives.gov/documents/Washington/05-03-02-0189 ..................................... 44

Letter from George Washington to Catherine Sawbridge Macaulay Graham (Jan. 9, 1790), http://founders.archives.gov/documents/Washington/05-04-02-0363.............. 44

Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0289 .......... 43

Letter from George Washington to James Anderson (Jan. 8, 1797), http://founders.archives.gov/documents/Washington/99-01-02-00159 ................................... 42

Letter from George Washington to James Madison (May 5, 1789), http://founders.archives.gov/documents/Washington/05-02-02-0157 ..................................... 44

Letter from George Washington to William Pearce (Jan. 12, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0050 ..................................... 42

Letter from George Washington to William Pearce (Apr. 20, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0488 ..................................... 42

Letter from John Q. Adams, Secretary of State, to Richard Rush, Minister to Great Britain (Nov. 6, 1817) ....................................................................................................................... 38

Letter from Thomas Johnson, David Stuart, and Daniel Carroll as the Commissioners for the District of Columbia to George Washington (Mar. 23, 1794), https://founders.archives.gov/documents/Washington/05-15-02-0331 ................................... 43

Letter from William Pearce to George Washington (Nov. 11, 1794), http://founders.archives.gov/documents/Washington/05-17-02-0111 ..................................... 42

Letter from William Temple Franklin to Thomas Jefferson (Apr. 27, 1790), http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0003 ................................ 39

xiv

Md. Code Ann., Decl. of Rts. Art. 32 (1776) ............................................................... 12

President George Washington, Inaugural Address of 1789 (Apr. 30, 1789),
    https://www.archives.gov/exhibits/american_originals/inaugtxt.html ..................... 32

*The Federalist* No. 73 (Jacob E. Cooke ed., 1961)....................................................... 40

5 *The Papers of James Monroe* (Daniel Preston ed., 2014) ......................................... 42

Thomas Jefferson, Notes of Presents Given to American Diplomats by Foreign
    Governments, ca. 1791,
    http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0004 ................ 39

## SECONDARY AUTHORITIES

Akhil Amar, *America's Unwritten Constitution* 309 (2012) ......................................... 44

Alf J. Mapp, Jr., *Thomas Jefferson: Passionate Pilgrim* (1991) .................................... 42

Bruce Chadwick, *James & Dolley Madison* (2014) ..................................................... 42

Curt E. Conklin, *The Case of the Phantom Thirteenth Amendment: A Historical and
    Bibliographic Nightmare*, 88 L. Lib. J. 121 (1996) .................................................. 45

David O. Stewart, *Madison's Gift* (2015)..................................................................... 42

6 Douglas Southall Freeman, *George Washington: A Biography* (1954) ...................... 41

Gerald W. Gawalt, *James Monroe, Presidential Planter*, 101 Va. Mag. Hist. &
    Biography 251 (1993)............................................................................................ 42

Leonard D. White, *The Federalists: A Study in Administrative History* (1st ed. 1948) ......... 31, 41

Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American
    Government, 1780-1940* (2013)............................................................................. 39

Restatement (Third) of the Law Governing Lawyers § 123, cmt. b ............................... 49

Robert A. Nowlan, *The American Presidents, Washington to Tyler* (2012) ................... 42

Robert Ralph Davis, Jr., *Diplomatic Gifts and Emoluments: The Early National
    Experience*, 32 The Historian 376 (1970)....................................................... 38, 39, 46

Robert W. Blythe et al., National Park Service, *Charles Pinckney National Historic Site Historic Resource Study* (Aug. 2000), https://www.nps.gov/chpi/learn/historyculture/ upload/CHPI_HRS.pdf ................................ 41

11 *The Works of Thomas Jefferson* (Paul Leicester Ford ed., 1905) ........................................... 42

## OTHER AUTHORITIES

AAA, *AAA/CAA Five Diamond Hotels* (Jan. 27, 2017), http://www.aaa.biz/Travel_Information/Diamonds/Awards/2017/ January%202017%20-%205D%20Hotels.pdf ......................................................................... 23

*About National Harbor*, National Harbor, https://www.nationalharbor.com/about/ (last visited Sept. 29, 2017) ..................................................................................... 12

*The Barnhart Dictionary of Etymology* (1988) ........................................................................... 35

Beijing Normal University, Library Catalog, http://www.lib.bnu.edu.cn/ .................................... 52

*Bethesda North Marriott Hotel & Conference Center*, AAA, http://www.aaa.com/travelinfo/maryland/rockville/hotels/bethesda-north-marriott-hotel--conference-center-147205.html (last visited Sept. 29, 2017) ......................................... 23

Black's Law Dictionary (10th ed. 2014) .................................................................................... 34

Carnegie Library at Mt. Vernon Square, *Policies and Procedures*, http://www.dcconvention.com/Attachments/Carnegie/Policies-and-Procedures.aspx ............. 25

*DC Armory*, Events DC, http://www.eventsdc.com/Venues/DCArmory.aspx (last visited Sept. 29, 2017) ..................................................................................... 24

*Discover the Dinosaurs Unleashed*, Events DC, http://www.eventsdc.com/Events/ Discover_the_Dinosaurs_Unleashed-(1).aspx (last visited Sept. 29, 2017) ............................ 24

Donald Trump's News Conference: Full Transcript and Video, N.Y. Times (Jan. 11, 2017), http://nyti.ms/2jG86w8) ................................................................. 5

*Exciting Upcoming Events*, Events DC, http://www.eventsdc.com/UpcomingEvents.aspx (last visited Sept. 29, 2017) ..................................................................................... 24

Form 10-K of Hyatt Hotels Corporation (2016), *available at* http://s2.q4cdn.com/278413729/files/doc_financials/q4_2016/ Hyatt-Q4-2016-Form-10-K.pdf .................................................................................... 53

Ground Lease by and between the United States of American and Trump Old Post
    Office LLC, § 32.1(a) (Aug. 5, 2013),
    https://www.gsa.gov/portal/getMediaData?mediaId=233119 .................................................. 23

GSA Old Post Office Building Redevelopment, Final Environmental Assessment
    (May 2013),  http://oporedevelopment.com/wp-content/uploads/2013/01/OPO_EA_
    Public_Review_FEA_508.pdf. ............................................................................................ 18

HPRP Actions, June 22 Agenda (June 22, 2017),
    https://planning.dc.gov/sites/default/files/dc/sites/op/publication//attachments/
    HPRB%20ACTIONS%20%20June%2022%20and%20June%2029%20%202017.pdf…….. 25

Historic Preservation Review Board, Staff Report and Recommendation, Central
    Public Library (Carnegie Library) (June 29, 2017),
    https://planning.dc.gov/sites/default/files/dc/sites/op/publication/attachments/Historic
    %20Landmark%20801%20K%20Street%20NW%20Carnegie%20Library%20HPA
    %2017%20415.pdf………………………………………………………………………… 25

John Kelly, *D.C. Historical Society will move to the Newseum for a year*, Was. Post (July 3,
    2017), https://www.washingtonpost.com/news/local/wp/2017/06/29/d-c-historical-society-
    will-move-to-the-newseum-for-a-year/?utm_term=.cc6eb5b990d1 ........................................ 25

Karen Goff, *'Big and loud' not the intention with flagship D.C. Apple store in the
    Carnegie Library*, Wash. Bus. J. (May 22, 2017),
    https://www.bizjournals.com/washington/news/2017/05/22/big-and-loud-not-the-
    intention-with-flagship-d-c.html .............................................................................................. 25

Literary Hall, *Map of Carnegie Library*, Events DC, http://www.eventsdc.com/
    Attachments/Carnegie/carnegie-library-rate-sheet-temp.aspx (last visited
    Sept. 29, 2017) ....................................................................................................................... 25

Model Rules of Prof'l Conduct r. 1.10 cmt. (Am. Bar Ass'n 1983)............................................ 49

National Park Service, Ash Lawn-Highland,
    https://www.nps.gov/nr/travel/journey/hig.htm (last visited Sept. 29, 2017).......................... 42

National Park Service, *Historic Jamestown, Tobacco: Colonial Cultivation Methods*,
    https://www.nps.gov/jame/learn/historyculture/tobacco-colonial-cultivation-
    methods.htm (last visited Sept. 29, 2017)................................................................................. 42

National Register of Historic Places Registration Form, George Washington's
    Gristmill, § 8, p. 9 (2003), http://www.dhr.virginia.gov/registers/Counties/Fairfax/
    029-0330_George_Washington_Grist_Mill_2003_Final_Nomination.pdf............................. 42

National Register of Historic Places Registration Form, George Washington's
    Gristmill, § 8, p. 9 (2003), http://www.dhr.virginia.gov/registers/Counties/Fairfax/
    029-0330_George_Washington_Grist_Mill_2003_Final_Nomination.pdf............................. 38

*National Title IX Holiday Invitational Conference and Classic*, Events DC,
   http://www.eventsdc.com/Events /National_Title_IX_Holiday_Invitational_
   Confere-(1).aspx (last visited Sept. 29, 2017) .......................................................... 24

*Our Venues*, Events DC, http://www.eventsdc.com/Venues.aspx
   (last visited Sept. 29, 2017) .................................................................................. 24

*The Oxford Dictionary of English Etymology* (1966) .................................................. 35

Oxford English Dictionary, Oxford University Press, *Emolument*, OED Online (Dec. 2016),
   http://www.oed.com/view/Entry/61242 .............................................................. 34, 35

Oxford English Dictionary, Oxford University Press, *Guide to the Third Edition of the OED*,
   OED Online ................................................................................................................ 35

Oxford English Dictionary, Oxford University Press, *Present*, OED Online (Dec. 2016),
   http://www.oed.com/view/Entry/150677 .................................................................. 37

1 *Oxford English Dictionary* (1st ed. 1884) .................................................................. 35

Peking University, Library Catalog, http://lib.pku.edu.cn/portal/en ............................ 52

Presidential Ballroom, *Capacity Charts*, Trump International Hotel,
   https://www.trumphotels.com/washington-dc/capacity-chart (last visited Sept. 29, 2017) ..... 25

Secretary Pritzker's ethics agreement, *available at* Office of Government Ethics,
   Financial Disclosure, https://www.oge.gov ............................................................... 53

Secretary Penny Pritzker's financial disclosures for years 2014, 2015, 2016,
   *available at* Office of Government Ethics, Financial Disclosure,
   https://www.oge.gov/ ................................................................................................ 53

*Ten Facts about the Gristmill*, George Washington's Mount Vernon, at Fact 9,
   http://www.mountvernon.org/the-estate-gardens/gristmill/ten-facts-about-the-gristmill
   (last visited Sept. 29, 2017) .................................................................................... 42

*The President and Vice President's 2015 Financial Disclosure Forms*,
   President Barack Obama White House (May 16, 2016),
   https://obamawhitehouse.archives.gov/blog/2016/05/16/president-and-vice-
   presidents-2015-financial-disclosure-forms ........................................................... 51

University of Melbourne, Library Catalog, http://library.unimelb.edu.au/ .................. 52

University of Ottawa, Library Catalog, http://biblio.uottawa.ca/en ........................... 52

*Walter E. Washington Convention Center*, Events DC,
   http://www.dcconvention.com/Venues/ConventionCenter.aspx (last visited
   Sept. 29, 2017). ................................................................................................................ 24

Walter W. Skeat, An Etymological Dictionary of the English Language (1888) ......................... 35

*Washington, DC Fact Sheet*, DC Press,
   https://washington.org/DC-information/washington-dc-fact-sheet
   (last visited Sept. 29, 2017) ............................................................................................. 15

**INTRODUCTION**

Plaintiffs, the District of Columbia ("D.C.") and the State of Maryland, bring this suit seeking the extraordinary relief of a declaration and an injunction against the sitting President of the United States for alleged violations of the Foreign and Domestic Emoluments Clauses of the Constitution.  The Foreign Emoluments Clause prohibits federal officials holding "Office[s] of Profit or Trust" from "accept[ing] of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State" without the consent of the Congress.  U.S. Const. art. I, § 9, cl. 8.  The Domestic Emoluments Clause provides that the President shall receive "for his Services" a fixed compensation during his tenure and not "any other Emolument from the United States, or any of them."  U.S. Const. art. II, § 1, cl. 7.

Plaintiffs read these Emoluments Clauses expansively to cover any benefit derived from any business dealings with a foreign, federal, or state instrumentality by an entity in which the President has a financial interest.  According to Plaintiffs, impermissible "Emoluments" would include, among other things, payments by a foreign or domestic government instrumentality for goods, food, hotel stays, licensing agreements, real estate leases, and condominium common charges, or an instrumentality's grant of trademarks, licenses, permits, approvals, tax credits, and real estate leases.  Plaintiffs' broad-brush claims effectively assert that the Constitution disqualifies the President from serving as President while maintaining ownership interests in his commercial businesses.

Those claims falter on threshold grounds: neither Plaintiff has alleged an injury that would support Article III standing and, thus, this Court's exercise of Article III jurisdiction.  As the Supreme Court has emphasized, no principle is more fundamental to the judiciary's proper role in our system of government than the requirement of an actual case or controversy.  Plaintiffs assert injuries to a wide-range of sovereign, quasi-sovereign, and proprietary interests, all of which fail to meet the bedrock standing requirement because they are either not cognizable, purely conclusory, or entirely speculative.  Maryland's claim that it would not have joined the Union had it known that the Emoluments Clauses would be interpreted to allow the President to

have ownership interests in private businesses that have dealings with foreign governments is not judicially cognizable, whether the injury is characterized as a loss of the State's political power or as an abstract disagreement with the President's interpretation of the Constitution.  Maryland and D.C. also claim that they face an "intolerable dilemma"—that they are forced to either grant the President's businesses exemptions from their environmental, zoning, and land use laws or deny such exemptions and suffer retaliation from the President, which could include the loss of federal funds.  But such alleged injuries are speculative and purely hypothetical because Plaintiffs do not allege any pending requests for exemptions from the President's businesses.  In fact, within the two jurisdictions, the President has an ownership interest in only one active business, the Trump International Hotel, which is located on federal government property and is not subject to D.C.'s environmental, zoning, or land use regulations.  Moreover, Plaintiffs' feared retaliation is based on speculative and implausible allegations that multiple federal government actors will scheme to withhold federal funds from them if they do not grant special treatment to the President's businesses.

Plaintiffs further allege a range of injuries—loss of tax revenues, harm to the economic well-being of their residents, and harm to Plaintiffs' own businesses—that are premised on alleged business competition with the Trump International Hotel.  These claims also are speculative because first, they assume that the operation of a single luxury hotel in downtown Washington, D.C. would have an extraordinarily wide-ranging impact on D.C.'s and Maryland's economies, and second, they are necessarily dependent on the independent choices of third-party customers not before the Court.  Indeed, none of Plaintiffs' own events venues that allegedly compete with the Trump International Hotel is a luxury hotel centrally located in D.C.; rather, those venues range from a domed arena, a large scale convention center, to a suburban hotel and conference center.  It is highly doubtful that the economic ripple effect of the Trump International Hotel would have any perceptible impact on these venues or on significant segments of D.C.'s and Maryland's populations.  Thus, even if the President ceases to own interests in the Trump International Hotel, there is no reason to believe that such cessation would

2

benefit Plaintiffs' venues or significant segments of Plaintiffs' residents.  For similar reasons, and particularly given the dependence on the independent actions of third-party government consumers not before the Court, Plaintiffs' alleged injuries are not fairly traceable to the President's alleged constitutional violations or likely to be redressed by a favorable decision from the Court.

The Complaint is also deficient in several other respects.  First, Plaintiffs do not have a cause of action under the Clauses to seek the relief requested and this is not an appropriate case to imply a cause of action in equity.  Instead, equity requires dismissal for numerous reasons, and this Court should exercise its discretion to do so.

Second, the Complaint fails to state a claim upon which relief can be granted.  Plaintiffs' expansive reading of the Emoluments Clauses is contrary to the original understanding of the Clauses and to historical practice.  The term "Emolument" in this context refers to benefits arising from personal service in an employment or equivalent relationship.  Thus, under the Foreign Emoluments Clause, the prohibited foreign benefit must be conferred on the covered official in exchange for services rendered by the official in his capacity as such or in a capacity akin to an employee of the foreign government.  And under the Domestic Emoluments Clause, the federal or state benefit must arise from the President's service as President.  This construction accords with relevant historical sources; the practices of public officials ranging from George Washington to Nelson Rockefeller; and Congress's interpretation of the Foreign Emoluments Clause, as evidenced by the various laws by which Congress provided advance consent to arrangements it perceived to be covered by the Clause.  What is more, it is not inconsistent with public determinations rendered by government components charged with determining the Clauses' applicability.  While Plaintiffs also allege that various foreign benefits arising from commercial transactions or by operation of law also constitute "presents" under the Foreign Emoluments Clause, that interpretation is unnatural and nothing indicates that the Framers would have intended the Clause to be applied in that way.

Finally, the relief sought by Plaintiffs is unconstitutional.  Suing the President in his official capacity, Plaintiffs seek an injunction essentially ordering the President to divest his business interests or otherwise take steps to comply with Plaintiffs' interpretation of the Constitution.  Plaintiffs effectively seek to impose a condition on the President's ability to serve as the President and to carry out the duties he is duly elected to perform.  However, the Supreme Court has long held that courts have no power to issue such injunctions against the President in an official-capacity suit.  *See Mississippi v. Johnson*, 71 U.S. 475, 501 (1867) (finding "no jurisdiction of a bill to enjoin the President in the performance of his official duties").  Moreover, the requested relief would "distract [the President] from his constitutional responsibility to 'take Care that the Laws be faithfully executed,'" *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring), when "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties," *Loving v. United States*, 517 U.S. 748, 757 (1996).  Given the President's unique status in the constitutional scheme, the Framers envisioned only political means to ensure a President's compliance with constitutional provisions such as the Emoluments Clauses, not official-capacity injunctions against the President.

## BACKGROUND

Plaintiffs are the District of Columbia and the State of Maryland.  They allege that the President owns and controls hundreds of businesses throughout the world, including some doing business as The Trump Organization, Compl. ¶ 29, ECF No. 1, and that he violates the Emoluments Clauses whenever such businesses receive "anything of value" from an instrumentality of a foreign, federal, state, or local government, *id.* ¶¶ 2, 9, 134–36, 140–41. According to Plaintiffs, the Foreign Emoluments Clause's references to "present" and "Emolument" "cover anything of value, including without limitation monetary and non-monetary gifts or transactions, transactions granting special treatment, and transactions above marginal cost."  *Id.* ¶ 134.  They also assert that the Domestic Emoluments Clause's reference to "any other Emolument" similarly covers "monetary and non-monetary payments or transactions, transactions granting special treatment, and transactions above marginal cost."  *Id.* ¶ 140.

4

Accordingly, in Plaintiffs' view, the Foreign Emoluments Clause prohibits rental payments for units in the Trump Tower by China, *id.* ¶¶ 48–51; foreign-government payments for the purchase of goods, food, and services at hotels and restaurants run by businesses in which the President has financial interests, *id.* ¶¶ 34–46, 52, 63; Chinese trademarks issued to such businesses, *id.* ¶¶ 64–70; royalty payments from foreign government-owned broadcast stations for television programs produced by businesses in which the President has financial interests, *id.* ¶¶ 71–72; permits, approvals, and licenses provided to businesses in the United Arab Emirates and Indonesia in which the President has financial interests, *id.* ¶¶ 73–77; and condominium common charges for units in the Trump World Tower owned by the governments of Saudi Arabia, India, Afghanistan, and Qatar, *id.* ¶¶ 53–61.  As for the Domestic Emoluments Clause, Plaintiffs assert that it prohibits The Trump Organization's lease of the Old Post Office Building in Washington, D.C., from the federal government for the site of the Trump International Hotel, *id.* ¶¶ 86; a potential historic-preservation tax credit for that hotel, *id.* ¶¶ 87–88; the State Department's alleged promotion on its websites of the Mar-a-Lago club owned by The Trump Organization, *id.* ¶¶ 92–96; and investments by public pension funds in an investment fund that pays one of the President's companies to run a hotel in New York, *id.* ¶ 99.

According to Plaintiffs, "[n]o plan announced by the defendant or his attorneys as of the date of this filing can make this conduct constitutional or otherwise remedy these constitutional violations."  *Id.* ¶¶ 138, 143.  Plaintiffs cite the then President-elect's announcement on January 11, 2017, that he had disposed of his publicly traded or easily liquidated investments; that his illiquid investments and business assets—such as golf clubs, commercial rental property, resorts, and hotels—had been or would be conveyed to a trust; and that he would resign from all official positions he held with The Trump Organization and related entities and would relinquish leadership and management of those entities to his adult sons and another Trump Organization executive.  *See id.* ¶ 30 (citing *Donald Trump's News Conference: Full Transcript and Video,*

N.Y. Times (Jan. 11, 2017), http://nyti.ms/2jG86w8).[1]  Among other measures designed to avoid even the appearance of a conflict of interest, the then President-elect also pledged to donate all profits from foreign governments' patronage of his hotels and similar businesses to the U.S. Treasury.  Plaintiffs contend that this plan, despite all of the protections noted above, was insufficient because it "did not include [the President] relinquishing *ownership* of his businesses or establishing a blind trust."  *Id.*

Plaintiffs allege that their sovereign, quasi-sovereign, and proprietary interests have been injured by the President's alleged violations of the Emoluments Clauses.  *Id.* ¶ 103.  Maryland asserts injury to its interest "in preserving its role as a separate sovereign and securing observance of the terms under which it participates in the federal system."  *Id.* ¶ 14.  It contends that the prohibitions in the Emoluments Clauses were "material inducements to [its] entering the union," and thus, Maryland allegedly "retains its power to bring suit to enforce [the prohibitions] today."  *Id.* ¶¶ 104–06.  Maryland also alleges injury in the form of reduced tax revenue on the theory that competition from the Trump International Hotel in Washington, D.C., causes businesses to be diverted from Maryland-based entities, such as the hotels, restaurants, shops, and casino located at the National Harbor in Prince George's County.  *Id.* ¶¶ 14, 116–18.

Both Maryland and D.C. additionally allege that they have an interest in avoiding harm arising from "perceived and/or actual pressure to grant special treatment" to the President's businesses.  *Id.* ¶ 14.  They seek to "vindicate their role as governments in our constitutional scheme" to prevent this harm.  *Id.* ¶ 112.  Specifically, they allege that the President's alleged violations of the Emoluments Clauses present them with "an intolerable dilemma": they are pressured to either (1) grant the President's businesses exemptions and waivers from their

---

[1] In determining whether a plaintiff has stated a claim, the Court may consider "documents attached or incorporated into the complaint."  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011); *see also id.* ("'a court may consider [a document outside the complaint] in determining whether to dismiss the complaint' where the document 'was integral to and explicitly relied on in the complaint' and there was no authenticity challenge") (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)) (alteration in original).

"environmental protection, zoning, and land use regulations" and suffer the potential consequences of "lost revenue and compromised enforcement" of those regulations or (2) deny the requests for exemptions and waivers and "be placed at a disadvantage vis-à-vis states and other government entities that have granted or will agree to such concessions." *Id.* ¶ 110.  In particular, they allege that such denials would jeopardize the substantial federal funds flowing to, and significant federal expenditures in, Maryland and D.C.  *Id.* ¶ 111.

Plaintiffs further allege injury to their quasi-sovereign interests, claiming that the President's alleged violations of the Emoluments Clauses "tilt[] the competitive playing field toward" the President's businesses to the detriment of D.C.'s and Maryland's residents and economies. *Id.* ¶¶ 113–14.  Finally, they allege harms to their proprietary interests in events venues that purportedly compete with the Trump International Hotel. *Id.* ¶¶ 119–33.  Those venues include the Walter E. Washington Convention Center, the D.C. Armory, and the Carnegie Library in D.C. and the Bethesda North Marriott Hotel and Conference Center in Maryland. According to Plaintiffs, these venues have suffered "competitive injuries" and "economic loss" due to the President's ownership interest in the Trump International Hotel.  D.C. additionally alleges that it is injured by "the loss of the economic value of its brands." *Id.* ¶¶ 128–29.

Plaintiffs seek a declaratory judgment stating that the President has violated and will continue to violate the Foreign and Domestic Emoluments Clauses and an injunction prohibiting the President from further violations. *Id.* at 44 (Prayer for Relief (a), (b)).

## ARGUMENT

## I.      THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS.

This action should be dismissed for lack of subject matter jurisdiction because Plaintiffs have not met their burden to establish Article III standing.  A motion to dismiss for lack of Article III standing is properly considered under Rule 12(b)(1) because "'Article III gives federal courts jurisdiction only over cases and controversies,' and standing is 'an integral component of the case or controversy requirement.'"  *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011) (quoting *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006)).  To survive a

Rule 12(b)(1) motion to dismiss, the "plaintiff has the burden of proving that subject matter jurisdiction exists." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).  In reviewing a Rule 12(b)(1) motion, the district court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.*

## A.      Requirements for Article III Standing at the Pleading Stage

Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies."  The Supreme Court has explained that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted).  One element of this constitutional limitation is that a plaintiff must establish that he has standing to sue.  *Raines v. Byrd*, 521 U.S. 811, 818 (1997). The requirement is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper*, 568 U.S. at 408.  Because the relaxation of the standing inquiry "is directly related to the expansion of judicial power," the inquiry is "especially rigorous" when reaching the merits would force the judiciary "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* at 408–09.

To establish "the irreducible constitutional minimum of standing" at the pleading stage, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), Plaintiffs must "clearly . . . allege facts demonstrating" that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  An "injury in fact" is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 1548 (quoting *Lujan*, 504 U.S. at 560).  The injury must be "legally and judicially cognizable," and the dispute must be one that "is traditionally thought to be capable of resolution through the judicial process." *Raines*, 521 U.S.

8

at 819; *see also Spokeo*, 136 S. Ct. at 1547.  The requirement of "actual injury redressable by the court" is to ensure that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).  Moreover, "under Article III, 'federal courts may exercise power only in the last resort, and as a necessity.'"  *Raines*, 521 U.S. at 819 (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)).

Finally, although the Federal Rules' pleading standard does not require detailed factual allegations, it still "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint that offers "mere conclusory statements" or "'naked assertion[s]' devoid of 'further factual enhancement'" is insufficient to overcome a motion to dismiss.  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).[2]  That is, Plaintiffs must do more than "offer[] 'labels and conclusions,'" *id.* (quoting *Twombly*, 550 U.S. at 555), and any inference in Plaintiffs' favor must be "reasonable" and based on "more than a sheer possibility" that particular facts are true, *id.*

As discussed below, Plaintiffs have failed to clearly allege facts demonstrating that they have suffered a cognizable injury that is fairly traceable to the President's alleged violations of the Emoluments Clauses and likely to be redressed by a favorable decision here.

### B.     Plaintiffs Have Not Demonstrated That They Have Standing Based on Alleged Injuries to Their Sovereign Interests.

Plaintiffs collectively advance three theories of standing based on alleged injuries to their sovereign or governmental interests.  None of them confers standing on Plaintiffs.

---

[2] Although *Twombly* and *Iqbal* set forth the standard for considering the plausibility of allegations pursuant to Rule 12(b)(6), the same standard applies in assessing the sufficiency of allegations of injury for purposes of a Rule 12(b)(1) challenge to standing.  *See Reid v. Prince George's Cty. Bd. of Educ.*, 60 F. Supp. 3d 601, 605 (D. Md. 2014) (citing *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)).

### 1. Maryland's alleged loss of political power in joining the Union

First, Maryland alleges that its interest as a sovereign is injured by the President's alleged violations of the Emoluments Clauses because the prohibitions in those Clauses were "material inducements to [Maryland's] entering the union." Compl. ¶ 106. Maryland thus seeks to "enforc[e] the terms upon which it agreed to enter the Union." *Id.* ¶ 104.

Maryland's claim is not judicially cognizable because Maryland may not ask the Court "to adjudicate . . . abstract questions of political power, of sovereignty, of government." *Massachusetts v. Mellon*, 262 U.S. 447, 484–85 (1923). As the Fourth Circuit has said, "[t]he Constitution does not permit a federal court to answer such questions." *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 271–72 (4th Cir. 2011) (citing *Massachusetts v. Mellon*, 262 U.S. at 485); *see also id.* at 270 (no injury to sovereign interest from alleged conflict between a federal law and a state law that purported to immunize the State's citizens from the federal law; the State "lacks the sovereign authority to nullify federal law" and thus, the state law "reflect[ed] no exercise of 'sovereign power'").

Indeed, the Supreme Court has consistently found alleged abstract injuries to a State's sovereignty not judicially cognizable. *See, e.g.*, *Massachusetts v. Mellon*, 262 U.S. at 483–85 (State had no standing to challenge constitutionality of federal statute on the theory that "Congress ha[d] usurped the reserved powers of the several states by the mere enactment of the statute"); *New Jersey v. Sargent*, 269 U.S. 328, 337 (1926) (allegations that provisions of federal law "go beyond the power of Congress and impinge on that of the state . . . do not suffice as a basis for invoking an exercise of judicial power"); *Texas v. ICC*, 258 U.S. 158, 162–63 (1922) (state's claim that federal law unconstitutionally infringed on powers reserved to the States raised merely "an abstract question of legislative power" and "d[id] not present a case or controversy").

Maryland cannot end-run this well-established law by dressing up its abstract legal objection as injury in the form of detrimental reliance in joining the Union. Its novel and far-reaching claim that a State can seek to enforce what it purportedly bargained for when entering

10

the Union is well outside the traditional bounds of Article III standing doctrine. *See Raines*, 521 U.S. at 819 (Article III requires the dispute to be one that "is traditionally thought to be capable of resolution through the judicial process"); *Spokeo*, 136 S. Ct. at 1547 (Article III standing doctrine was developed "to ensure that federal courts do not exceed their authority as it has been traditionally understood"); *see also West Virginia v. HHS*, 145 F. Supp. 3d 94, 99–102 (D.D.C. 2015) (State's claimed injury of "increased political accountability" is "rooted in abstract concepts of federalism and state sovereignty" and "not among the traditional kinds of injuries that the Supreme Court has recognized as sufficient to confer standing on a State"), *aff'd by* 827 F.3d 81 (D.C. Cir. 2016), *cert. denied* 137 S. Ct. 1614 (2017). If such an alleged injury is cognizable, then a State would be able to challenge many federal actions on the basis that it would not have joined the Union had it known that the federal government would act in such a manner. That is not the law. In fact, a State's injuries are judicially cognizable only in narrow circumstances, such as when there are injuries to a State's interests in enforcing its laws or maintaining its borders, *see Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982), in "preserv[ing] its sovereign territory," *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007), and in not being commandeered by the federal government, *New York v. United States*, 505 U.S. 144 (1992).

Even if Maryland's alleged detrimental reliance is judicially cognizable, Maryland also has not alleged sufficient facts supporting the claim. The Complaint contains no plausible allegations that delegates to Maryland's ratifying convention in 1788 held the State's current view of the Emoluments Clauses, much less that such view was material to their decision to ratify the Constitution. Maryland alleges that because the Maryland Declaration of Rights, contained in the Maryland Constitution of 1776, included a "precursor" to the Emoluments Clauses, Maryland was "material[ly] induce[d]" to join the Union by the Clauses. Compl. ¶¶ 104–06. The "precursor," however, said nothing about emoluments; rather, it prohibited a public official from "receiv[ing] any *present* from any foreign prince or state, or [from] the United States, or from any of them," and further prohibited any person from holding more than

one office of profit.  *See* Md. Code Ann., Decl. of Rts. Art. 32 (1776) (emphasis added).

Maryland alleges no facts to support its inferential leap from this language to the conclusion that

Maryland's present-day interpretation of the term "Emolument" in the Emoluments Clauses

induced Maryland to ratify the Constitution in 1788.  In fact, no such causal connection can be

gleaned from the records of the constitutional convention or the Maryland state ratifying

convention.[3]  The conduct of at least two leading Marylanders at the time of the Nation's

founding—Daniel Carroll, a Maryland delegate to the federal constitutional convention,[4] and

Thomas Johnson, a voting member at the state ratification convention[5]—further casts significant

doubt that Maryland's present-day interpretation comports with its original understanding in

1788.  As discussed in greater detail below, both of those Marylanders were Commissioners of

the District of Columbia who sold public land to President George Washington in his capacity as

a private citizen,[6] and neither raised any concerns that such transactions conferred prohibited

"Emoluments" on President Washington under the Domestic Emoluments Clause.

### 2.      Maryland's alleged loss of tax revenues

Maryland also contends that the President's alleged violations of the Emoluments

Clauses injure its sovereign interest in preserving tax revenues, particularly those that may

accrue to the State from the hotels, restaurants, MGM casino, marina, and shops at the National

Harbor, a 350-acre resort development in Prince George's County.  Compl. ¶¶ 116–18.[7]

Maryland's theory is that the President's ownership interest in the Trump International Hotel

---

[3] *See generally* 1–5 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (2d ed. 1891) [hereinafter *Debates in the Several State Conventions*]; James Madison, *The Debates in the Federal Convention of 1787 Which Framed the Constitution of the United States of America* (Hunt and Scott, ed. 1920) [hereinafter *Debates in the Federal Convention*].

[4] *Debates in the Federal Convention* at lxxxiv.

[5] 1 *Debates in the Several State Conventions* at 324.

[6] *See* Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793), http://founders.archives.gov/documents/Washington/05-14-02-0074.

[7] *About National Harbor*, National Harbor, https://www.nationalharbor.com/about/ (last visited Sept. 29, 2017).

"impairs National Harbor's ability to attract visitors and guests" and that such "competitive injury" "will diminish the [tax] revenues on which the state and local governments depend." *Id.* ¶¶ 117–18.  Maryland especially cites the percentages of proceeds it receives from the video lottery terminals and table games at the MGM casino, which opened in December 2016. *Id.* ¶ 117.

Maryland's theory of loss of tax revenues suffers from multiple defects.  First, in contrast with a "direct injury in the form of a loss of *specific* tax revenues," the general "impairment of state tax revenues [is] not . . . recognized as sufficient injury-in-fact to support state standing" in a suit against the Federal Government because of "the unavoidable economic repercussions of virtually all federal policies." *Wyoming v. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (citing *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)); *Arias v. DynCorp*, 752 F.3d 1011, 1015 (D.C. Cir. 2014) ("Lost tax revenue is generally not cognizable as an injury-in-fact for purposes of standing."); *cf. Wyoming v. Oklahoma*, 502 U.S. 437, 445, 447–50 (1992) (Wyoming had standing to challenge an Oklahoma statute because the statute had directly caused Wyoming to lose hundreds of thousands of dollars in severance taxes from specific Wyoming companies affected by the statute).  Thus, in *Florida v. Mellon*, 273 U.S. 12 (1927), the Supreme Court held that the state had no standing to challenge a federal statute where "[t]he claim of immediate injury to the state rests upon the allegation that the [statute] will have the result of inducing potential taxpayers to withdraw property from the state, thereby diminishing the subjects upon which the state power of taxation may operate." *Id.* at 17–18.  The Court found that "the anticipated result is purely speculative, and, at most, only remote and indirect." *Id.* at 18.  The same is true here.

Second, Plaintiffs have not alleged that the businesses at the National Harbor have any past patronage by government funded and affiliated customers, that those businesses compete with the Trump International Hotel for such customers, or that they have lost such customers. *See* Compl. ¶¶ 116–18.  Instead, the Complaint offers only the conclusory allegations that businesses at the National Harbor compete with the Trump International Hotel in general and

13

that Maryland's tax coffers are diminished as a result of such competition.  *See id.*  Thus, even if

the Trump International Hotel ceased to have any government funded and affiliated customers,

the Complaint provides no basis to say that this would remedy any injury suffered by Maryland.

*See Lujan*, 504 U.S. at 560–61 (plaintiff must show "a causal connection between the injury and

the conduct complained of" and must also show that the injury would "likely" be "redressed by a

favorable decision").

Third, Maryland's claim of present and future injury is speculative given the apparent

differences between the Trump International Hotel and the hotels and businesses at the National

Harbor.  The National Harbor has amenities such as (most notably) the MGM casino, a Ferris

wheel, shopping, and sports activities at the National Harbor marina, and it is implausible that

foreign or domestic government funded customers who are attracted to such activities would

instead turn to the Trump International Hotel.  Even if there were an objectively reasonable

likelihood that such customers would be lured away from National Harbor's attractions to

purportedly curry favor with the President—and there is not—that still would not be enough for

Maryland to establish standing.  The Supreme Court has rejected the "objectively reasonable

likelihood" standard, *Clapper*, *see* 568 U.S. at 410, and has required that a "threatened injury

must be *certainly impending* to constitute injury in fact," *id.* at 409.  Notably, a showing of

certainly impending injury is necessary where, as here, the plaintiff seeks only equitable relief.

*See Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, 638 (4th Cir. 2016) (no injunctive

relief where there is no "threat of future harm"—i.e., where there is "'no showing of any real or

immediate threat that the plaintiff will be wronged again'") (quoting *City of Los Angeles v.

Lyons*, 461 U.S. 95, 111 (1983)).

Fourth, Maryland's claim of future loss of tax revenues is based on a "speculative chain

of possibilities," *Clapper*, 568 U.S. at 410, including "speculation about the decisions of

independent actors" and their perceptions about the value of patronizing the Trump International

Hotel, *id.* at 414.  It is dependent on speculation that third-party government customers would

necessarily eliminate other hotels as options in an area where there are numerous competitors—

roughly 130 hotels in Washington, D.C. and close to 700 hotels in the Greater Washington, D.C., metropolitan area[8]—and that they would then choose the Trump International Hotel as opposed to hotels at the National Harbor.  Such a speculative chain of possibilities is insufficient to establish injury in fact.

Fifth, Maryland cannot meet the traceability and redressability prongs of the standing requirement because its claim of injury is necessarily dependent on third parties' independent choices.  Indeed, as will also be discussed later, the same defect infects Plaintiffs' other standing theories based on alleged injuries to their quasi-sovereign and propriety interests.

Consistent with Supreme Court precedent, the Fourth Circuit has held that the "traceability and redressability prongs [of standing] become problematic when third persons not party to the litigation must act in order for an injury to arise or be cured." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013).  "An injury sufficient to meet the causation and redressability elements of the standing inquiry must result from the actions of the respondent, not from the actions of a third party beyond the Court's control."  *Id.* (quoting *Mirant Potomac River, LLC v. EPA*, 577 F.3d 223, 226 (4th Cir. 2009)).

Thus, for example, in *Frank Krasner Enterprises, Ltd. v. Montgomery County*, 401 F.3d 230, 236 (4th Cir. 2005), a third-party facility refused to rent space to the plaintiff for his gun show because of a county law that prohibited any county money from flowing to the facility if it hosted gun shows.  The court held that the plaintiff's claim against the county failed the traceability and redressability prongs because his injury stemmed from the third-party facility's refusal to rent space to him, not the county law that made the choice "easy" for the facility or "perhaps prohibitively" more expensive for the facility to rent space to plaintiff.  *Id.* at 232–33, 236.  Moreover, the court found that it could not compel the non-party facility to rent space to the plaintiff.  *Id.* at 236; *see also Allen v. Wright*, 468 U.S. 737, 739–40, 758 (1984) (parents had no standing to challenge government's grant of tax-exempt status to racially discriminatory

---

[8] *Washington, DC Fact Sheet*, DC Press, https://washington.org/DC-information/washington-dc-fact-sheet (last visited Sept. 29, 2017).

private schools because, among other things, it was speculative "whether withdrawal of [the] tax exemption from any particular school would lead the school to change its policies"); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 33, 42–44 (1976) (indigent plaintiffs had no standing to challenge favorable tax benefits to hospitals that offered only emergency-room services to indigents because even if the rules were modified, it was "just as plausible" that the hospitals "would elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services").

Here, it is speculative that third-party government consumers using government funds would necessarily stop patronizing the Trump International Hotel and switch to businesses at the National Harbor, even if Maryland ultimately prevails on the merits of its claims. These third-party actors' decisions necessarily are influenced by many factors beyond the control of this Court, including the numerous options available to them, budgetary constraints, and views about the value of patronizing a hotel affiliated with the President. Indeed, they may choose to continue patronizing the same businesses, including the Trump International Hotel, regardless of the outcome of this lawsuit. In other words, there is no reason to believe that granting the requested relief would have any perceptible impact on Maryland's tax revenues—or, as will be discussed later, on D.C.'s or Maryland's proprietary or quasi-sovereign interests for that matter.

### 3. Maryland's and D.C.'s enforcement of their laws and the "intolerable dilemma" they allegedly face.

Citing the President's alleged violation of the Domestic Emoluments Clause, both Maryland and D.C. also seek to avoid "being compelled . . . to confer private financial benefits on the President in order to compete for influence and favor." Compl. ¶ 107. This convoluted theory of injury is that they have an interest in enforcing their laws on "taxation, environmental protection, zoning, and land use as they relate to real property that [the President] or the 'Trump Organization' may own or seek to acquire," *id.* ¶ 108; that the President's businesses surely would seek exemptions from such laws; and that Maryland and D.C. would then face "an intolerable dilemma to either (1) grant the [Trump] Organization's requests for concessions,

exemptions, waivers, and variances, and the like and suffer the consequences, potentially including lost revenue and compromised enforcement of environmental protection, zoning, and land use regulation, or (2) deny such requests and be placed at a disadvantage vis-à-vis states and other government entities that have granted or will agree to such concessions." *Id.* ¶ 110.[9]  The disadvantage, Plaintiffs allege, could include jeopardy to the substantial federal funds flowing to, and the significant federal expenditures in, Maryland and D.C.  *Id.* ¶ 111.

This theory of injury is built on a "speculative chain of possibilities" and does not establish that Maryland and D.C. will suffer any "certainly impending" injury.  *Clapper*, 568 U.S. at 410, 414.  To begin with, Maryland does not allege that it is faced with any actual or threatened need to grant "special treatment" to any real property or business the President may own in Maryland.  Although the Complaint identifies Trump International Realty as registered to do business in Maryland, it does not allege that the company is actually doing business in Maryland, let alone that it is imminently seeking any exemptions or waivers from Maryland.  *See* Compl. ¶ 108.  As for the Trump International Hotel located in D.C.—the only other business identified in the Complaint as falling within the Plaintiffs' jurisdictions—D.C. can have no legitimate fear that it will be "harmed by perceived and/or actual pressure to grant special treatment" to the Hotel as to D.C.'s zoning, land use, or environmental laws.  *Id.* ¶ 14.  The Old Post Office Building ("OPO"), which the Hotel occupies, is federal property under the jurisdiction of the General Services Administration ("GSA") and not subject to local regulation. *See id.* ¶ 80; *Mayo v. United States*, 319 U.S. 441, 445, 446 (1943) ("activities of the Federal Government are free from regulation by any state"); *Municipal Ass'n of S.C. v. USAA Gen.*

---

[9] While this theory is based on injuries to Plaintiffs' "sovereign" interests, the District of Columbia is not a sovereign and has no sovereign interest to claim as against the Federal Government.  *See* Const. art. I, § 8, cl. 17; *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 76 (1982); *District of Columbia ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co.*, 797 F.2d 1041, 1046 (D.C. Cir. 1986) (Congress acts "as sovereign of the District of Columbia"); *cf. Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005) ("the District of Columbia, . . . as a municipality, enjoys no sovereign immunity").  Its claim of injury to its "governmental" interest here is not cognizable for this reason as well.

*Indem. Co.*, 709 F.3d 276, 283 (4th Cir. 2013) (same); *see also* 40 U.S.C. § 3312 (in managing federal property, GSA should comply with nationally recognized building codes and consider local zoning law as appropriate); GSA Old Post Office Building Redevelopment, Final Environmental Assessment, at 70 (May 2013) ("The OPO, a federally owned property in the District of Columbia, is not subject to local zoning regulation.").[10]

To be sure, the Trump International Hotel is subject to D.C.'s other laws, but D.C. does not allege that the Hotel is currently seeking waivers or exemptions as to such laws.  And even if the Hotel were to do so, to the extent these laws provide for waivers and exemptions by their own terms, D.C. cannot plausibly claim any injury based on proper grants of waivers and exemptions under such laws.  Indeed, Plaintiffs have not alleged that such waivers and exemptions would constitute "Emoluments" to the President under Plaintiffs' interpretation of "Emolument."  And if D.C. chooses to grant the hypothetical requests for special treatment in contravention of its own laws, any resulting injury would be "self-inflicted."  *See Clapper*, 568 U.S. at 415–17 (plaintiffs' costly measures to avoid government surveillance they believed reasonably likely were "self-inflicted" because the feared government surveillance was not certainly impending); *see also Beck v. McDonald*, 848 F.3d 262, 276–77 (4th Cir. 2017), *cert. denied* 137 S. Ct. 2307 (2017).

Indeed, it is purely conjectural that other jurisdictions would grant variances and "special treatment" to the President's businesses contrary to those jurisdictions' laws in order to curry favor with the President.  Equally speculative is Plaintiffs' suggestion that the President would retaliate against Plaintiffs when they do not do the same by curtailing federal funding to, and federal expenditure in, their jurisdictions.  Compl. ¶¶ 110–11.  In addition to lacking any factual basis, this asserted injury depends on an attenuated chain of possibilities and would require the cooperation of multiple actors from the Legislative and Executive Branches.  Not only are such speculations insufficient to establish certainly impending injury, but they plainly run afoul of the

---

[10] *Available at* http://oporedevelopment.com/wp-content/uploads/2013/01/OPO_EA_Public_Review_FEA_508.pdf.

18

Court's obligation to presume that independent government actors will faithfully and lawfully discharge their duties.  *See Almy v. Sebelius*, 679 F.3d 297, 309 (4th Cir. 2012) ("presumption of regularity" applies "in the absence of clear evidence to the contrary").

In sum, Plaintiffs' allegations of injury to sovereign interests fall far short of meeting the Article III standing requirement.

### C.     Plaintiffs Have Not Established Standing Based on Alleged Injuries to Their Quasi- Sovereign Interests.

D.C. and Maryland also seek to vindicate their interests in "preventing economic injury to their residents and their economies."  Compl. ¶ 113.  When a State sues to protect its "interest in the health and well-being—both physical and economic—of [the State's] residents in general," it is suing as *parens patriae* and is asserting its quasi-sovereign interests.  *In re Edmond*, 934 F.2d 1304, 1310 (4th Cir. 1991) (quoting *Snapp*, 458 U.S. at 607).  Examples include suits to abate a public nuisance, to maintain access to natural resources, and to protect residents from the effects of discrimination or from another state's discriminatory economic policies.  *Snapp*, 458 U.S. at 602–04; *see, e.g.*, *George v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907) (Holmes, J.) ("[T]he State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain.  It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air.").

But "[t]he Supreme Court has clearly established that a *parens patriae* action cannot be maintained against the Federal Government."  *Hodges v. Abraham*, 300 F.3d 432, 444 (4th Cir. 2002) (state suit challenging federal agency's alleged failure to comply with federal law; holding that "if [the governor] seeks only to protect the health and well-being of the residents of [his state], his action is of the parens patriae variety, and it may not be pursued" against the federal government).  As the Court explained, "it is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government.  In that field it is the United States, and not the State, which represents them as parens patriae."  *Massachusetts v. Mellon*, 262 U.S. at 485–86; *see also Snapp*, 458 U.S. at 610 n.16 ("A State does not have

standing as *parens patriae* to bring an action against the Federal Government.”); *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) (State lacked standing as *parens patriae* to invoke the Due Process Clause or the Bill of Attainder Clause against the federal government to challenge federal law). And a suit against a federal official in his official capacity is treated as a suit against the United States itself. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

To be sure, Congress sometimes may grant States a procedural right to protect against concrete injuries to the States’ interests from federal action, and such interests may include quasi-sovereign interests. *Md. People’s Counsel v. FERC*, 760 F.2d 318, 322 (D.C. Cir. 1985) (Scalia, J.). In *Massachusetts v. EPA*, for example, Massachusetts was able to challenge the Environmental Protection Agency’s denial of the State’s petition for rulemaking because Congress has authorized such actions. 549 U.S. at 516, 520. The Court held that such “authorization is of critical importance to the standing inquiry,” *id.* at 516, because rather than asserting a right on behalf of its citizens, Massachusetts was asserting “its rights under federal law (which it has standing to do),” *id.* at 520 n.17. Moreover, the Court found that Massachusetts had sufficiently alleged concrete injuries to the State’s interests given the “uncontested” evidence that its coastal land “ha[d] already [been] harmed and [would] continue to [be] harm[ed]” by the environmental effects that were the subject of its petition for rulemaking. *Id.* at 526. “Because the commonwealth owns a substantial portion of the state’s coastal property,” the Court held that “it has alleged a particularized injury in its capacity as a landowner.” *Id.* at 522; *see also Hodges*, 300 F.3d at 444 (holding that although state governor could not sue the Federal Government to protect the health and well-being of the state’s residents as *parens patriae*, he had a right under the National Environmental Policy Act to protect against concrete injuries to the State’s “land, streams, and drinking water”). Here, Congress has not vested Plaintiffs with any right to challenge the President’s alleged violations of the Emoluments Clauses and, thus, Plaintiffs’ *parens patriae* suit against the federal government may not be maintained.

Plaintiffs' assertion of *parens patriae* standing fails for an additional reason: Plaintiffs have not adequately alleged any concrete injuries to any quasi-sovereign interests.  To allege a quasi-sovereign interest and maintain a *parens patriae* suit, the State must be "more than a nominal party" and the alleged injury to its citizens must be suffered by "a sufficiently substantial segment of its population," not simply an "identifiable group of individual residents." *Snapp*, 458 U.S. at 607; *see, e.g.*, *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 654–55 (9th Cir. 2017) (allegation of price impact on eggs not sufficient to establish a substantial effect on the general population because eggs, as an "ordinary consumer commodity," "lacks the central economic significance to a state" and because egg farmers "directly affected" by the challenged laws were "capable of pursuing their own interests"); *cf. Snapp*, 458 U.S. at 609 (although only 787 jobs were at stake, Puerto Rico had a quasi-sovereign interest in protecting its citizens against the "political, social, and moral damage" of "invidious discrimination . . . along ethnic lines" in a federal employment scheme in which Puerto Rico participated with states).

But the Complaint contains no such plausible allegation.  Plaintiffs claim generally that their residents and economies are injured by the President's alleged violations of the Emoluments Clauses because the violations allegedly "tilt[] the competitive playing field toward his businesses," thus "generat[ing] a range of market distortions that restrict and curtail opportunity, diminish revenues and earnings, and hamper competition" in the hospitality and restaurant industries.  Compl. ¶ 114.  But much like Maryland's alleged injuries to its tax coffers discussed above, these allegations do not adequately allege an imminent and concrete injury.  Nor do they plausibly support the proposition that the operation of a single luxury hotel (with one restaurant and one bar in that hotel) in downtown D.C. would have such an extraordinary economic impact on D.C.'s and Maryland's residents and economies.  That is, any competitive injury to D.C.'s or Maryland's businesses by the Trump International Hotel, even if adequately pled, is insufficient to support D.C.'s and Maryland's claims to standing as *parens patriae*

because those injuries would only be suffered by a discrete group of competitors of the Hotel, not a broad segment of the public.[11]

Finally, even if Plaintiffs could overcome all of these defects, Plaintiffs' quasi-sovereign interest theory of injury would still fail to satisfy the traceability and redressability prongs of standing.  As discussed in detail above, the alleged injuries are dependent on the choices and actions of third parties beyond the control of this Court.  Thus, they are neither traceable to the President's alleged conduct nor redressable by a decision from this Court.

In sum, D.C. and Maryland are mere nominal parties and cannot claim any quasi-sovereign interests in injuries allegedly caused by the operation of the Trump International Hotel.

### D.    Plaintiffs Have Not Established Standing Based on Alleged Injuries to Their Proprietary Interests.

Finally, Plaintiffs' alleged injuries to their proprietary interests in certain properties and venues that purportedly compete with the Trump International Hotel also fail to support their standing.  D.C. alleges that the President's alleged constitutional violations have "resulted in a competitive injury to the Walter E. Washington Convention Center, the D.C. Armory, and the Carnegie Library," which are operated by an instrumentality of D.C.  Compl. ¶ 128.  Moreover, D.C. asserts that the "economic value of its brands is diminished in comparison to [the

---

[11] Plaintiffs also allege that they have "compelling interests in ensuring that the Foreign and Domestic Emoluments Clauses are enforced" and that the Clauses "protect their residents as designed."  Compl. ¶¶ 11, 12.  To the extent these allegations are intended to support Plaintiffs' standing, they merely allege a generalized grievance because the relief no more benefits the plaintiff than it does the public at large.  *Lujan*, 504 U.S. at 573–74 (a plaintiff "seeking relief that no more directly and tangibly benefits him than it does the public at large does not state an Article III case or controversy" (punctuation omitted)); *see, e.g.*, *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 212, 217 (1974) (no standing where the asserted injury reflected "only the generalized interest of all citizens in constitutional governance"); *Ex parte Levitt*, 302 U.S. 633, 633 (1937) (no standing where the plaintiff had "merely a general interest common to all members of the public").  Plaintiffs also cannot sue on behalf of their residents in asserting these allegations because they have not "articulate[d] an interest apart from the interests of particular private parties."  *Snapp*, 458 U.S. at 607; *see also Paterson v. Texas*, 308 F.3d 448, 451 (5th Cir. 2002) ("As for the State's argument that it represents the interests of Texas class members, we know of no authority that would give it standing in a representative capacity.").

President's] brand." *Id.* ¶ 129. Maryland alleges that it has a proprietary interest in the Bethesda North Marriott Hotel and Conference Center and that the alleged constitutional violations have placed that facility as well as other unspecified facilities at a "competitive advantage [*sic*]," causing Maryland to suffer "economic loss." *Id.* ¶ 130.

Beyond these conclusory allegations of injury, however, the Complaint offers no facts to allow the Court to infer that the facilities identified by Plaintiffs are direct competitors of the Trump International Hotel, let alone how they have been injured by competition with the Trump International Hotel for government-funded customers. Only one of the facilities—the Bethesda North Marriott Hotel and Conference Center—is a hotel. And whereas the Trump International Hotel is a "world-class luxury" hotel located in downtown, D.C.,[12] the Bethesda North Marriott is a three-diamond hotel over 13 miles away in suburban Maryland.[13] Not only do the two hotels likely attract different clientele, but as discussed above, a prospective customer has numerous other options in the greater Washington, D.C. metropolitan area. Accordingly, it is speculative at best that the Bethesda North Marriott Hotel and Conference Center is in direct competition with the Trump International Hotel generally, let alone that the actions of state, federal, and foreign government customers (whose business is alleged to trigger concerns subject to the Emoluments Clauses) would materially impact that purported competition. Indeed, it is more plausible that a state or federal government agency, with limited budgets, might opt for the less expensive Marriott as the venue for its events, and less plausible that a foreign government wishing to have

---

[12] GSA's lease requires the Trump International Hotel to meet a "world-class luxury standard." *See* Ground Lease by and between the United States of American and Trump Old Post Office LLC, § 32.1(a) (Aug. 5, 2013), https://www.gsa.gov/portal/getMediaData?mediaId=233119. Indeed, several Trump-named hotels in the United States and Canada are five-diamond hotels according to AAA's well-known hotel ratings. *See* AAA, *AAA/CAA Five Diamond Hotels* 2 (Jan. 27, 2017), http://www.aaa.biz/Travel_Information/Diamonds/Awards/2017/ January%202017%20-%205D%20Hotels.pdf.

[13] *Bethesda North Marriott Hotel & Conference Center*, AAA, http://www.aaa.com/travelinfo/maryland/rockville/hotels/bethesda-north-marriott-hotel-- conference-center-147205.html (last visited Sept. 29, 2017).

a function in the heart of Washington, D.C. would choose a conference center attached to a three-diamond hotel in a suburban location over *any* other luxury hotel centrally located in D.C.

Equally deficient are D.C.'s allegations of injury to its "brands" and its proprietary interest in the Washington Convention Center, the D.C. Armory, and the Carnegie Library.  *Id.* ¶¶ 119–29.  The Complaint offers no factual enhancement to explain how the operation of the Trump International Hotel has any effect on D.C.'s "brands."  In fact, the wide-range of venues D.C. operates—from baseball and other stadiums, an open-air pavilion, to the facilities identified in the Complaint[14]—are nothing like a luxury hotel.  The D.C. Armory is a domed, 10,000 seat arena,[15] which has hosted events like dinosaur exhibits and basketball tournaments.[16]  The Washington Convention Center is a 2.3 million-square-foot facility[17] that has hosted events ranging from auto shows, comics conventions, gymnastics tournaments, to bar examinations.[18]  These two venues have very different attributes from the Trump International Hotel, and thus, it is not surprising that the Complaint does not allege that foreign or domestic government business has been diverted from these two venues to the Hotel since the President took office.  As for the Carnegie Library, the Complaint does not allege that the Library, a historic landmark with a unique history, has lost business to the Trump International Hotel.  This is not surprising because the two facilities have substantial differences.  For example, the Hotel has in-house catering and

---

[14] *See Our Venues*, Events DC, http://www.eventsdc.com/Venues.aspx (last visited Sept. 29, 2017).

[15] *DC Armory*, Events DC, http://www.eventsdc.com/Venues/DCArmory.aspx (last visited Sept. 29, 2017).

[16] *See Discover the Dinosaurs Unleashed*, Events DC, http://www.eventsdc.com/Events/Discover_the_Dinosaurs_Unleashed-(1).aspx (last visited Sept. 29, 2017); *National Title IX Holiday Invitational Conference and Classic*, Events DC, http://www.eventsdc.com/Events/National_Title_IX_Holiday_Invitational_Confere-(1).aspx (last visited Sept. 29, 2017).

[17] *Walter E. Washington Convention Center*, Events DC, http://www.dcconvention.com/Venues/ConventionCenter.aspx (last visited Sept. 29, 2017).

[18] *See Exciting Upcoming Events*, Events DC, http://www.eventsdc.com/UpcomingEvents.aspx (last visited Sept. 29, 2017).

hotel accommodations for event attendees, whereas the Library does not,[19] and the largest event space at the Hotel is over three times bigger than the largest event space at the Library.[20]  In any event, the Carnegie Library has been closed for renovation, after which it will become primarily a flagship Apple Store, with the Store expected to take up most of the building.[21]  *See Thomas*, 841 F.3d at 638 (no injunctive relief where there is no "threat of future harm").

In relying on the mere presence of their events facilities in the Greater Washington, D.C. metropolitan area to support their claim of injury, Plaintiffs fail to recognize that competition for hospitality and events business is necessarily dependent upon many factors, including the supply and demand conditions; the quality and type of services and venues offered; costs; and locations. In addition, competition between these venues ultimately turns on the independent choices of potential customers.  For Plaintiffs to have any possibility of an injury resulting from the alleged constitutional violations, one of the Plaintiffs' facilities as well as the Trump International Hotel would first need to offer the kind of services that would place them in direct competition for the business of a government-affiliated and funded actor; other venues that are possible choices would have to be eliminated as well; and the government actor would then need to decide to use

---

[19] Carnegie Library at Mt. Vernon Square, *Policies and Procedures*, http://www.dcconvention.com/Attachments/Carnegie/Policies-and-Procedures.aspx (stating that food and beverage is not provided by Events DC but instead by a "service partner").

[20] *Compare* size of Presidential Ballroom, *Capacity Charts*, Trump International Hotel, https://www.trumphotels.com/washington-dc/capacity-chart (last visited Sept. 29, 2017) *with* Literary Hall, *Map of Carnegie Library*, Events DC, http://www.eventsdc.com/Attachments/ Carnegie/carnegie-library-rate-sheet-temp.aspx (last visited Sept. 29, 2017).

[21] HPRP Actions, June 22 Agenda (June 22, 2017), https://planning.dc.gov/sites/default/files/dc /sites/op/publication/attachments/HPRB%20ACTIONS%20%20June%2022%20and%20June%2 029%20%202017.pdf; Historic Preservation Review Board, Staff Report and Recommendation, Central Public Library (Carnegie Library) (June 29, 2017), https://planning.dc.gov/sites/default/ files/dc/sites/op/publication/attachments/Historic%20Landmark%20801%20K%20Street%20N W%20Carnegie%20Library%20HPA%2017%20415.pdf; John Kelly, *D.C. Historical Society will move to the Newseum for a year*, Was. Post (July 3, 2017), https://www.washingtonpost.com /news/local/wp/2017/06/29/d-c-historical-society-will-move-to-the-newseum-for-a-year/?utm_term=.cc6eb5b990d1; Karen Goff, *'Big and loud' not the intention with flagship D.C. Apple store in the Carnegie Library*, Wash. Bus. J. (May 22, 2017), https://www.bizjournals.com/washington/news/2017/05/22/big-and-loud-not-the-intention-with-flagship-d-c.html.

the Trump International Hotel instead of one of the Plaintiffs' facilities.  Given the myriad differences in the nature, amenities, and costs of venues in the Maryland and D.C. region, and the different reasons why a government customer might choose a given venue, it is simply speculative that Plaintiffs would suffer injury to their proprietary interests.  And, as already discussed, the injuries are necessarily dependent on third parties' choices and actions that are beyond the Court's control, and thus, Plaintiffs also cannot establish the traceability and redressability prongs of the standing requirement.

In sum, Plaintiffs have no standing to pursue their claims in this case.

## II.    PLAINTIFFS HAVE NO CAUSE OF ACTION UNDER THE EMOLUMENTS CLAUSES AND EQUITY REQUIRES DISMISSAL.

Plaintiffs also lack a cause of action to seek relief against the President under the Emoluments Clauses.  The Foreign Emoluments Clause is designed to prevent foreign influence by setting forth a rule of conduct for federal officeholders in dealings with foreign governments.  Similarly, the Domestic Emoluments Clause seeks to ensure the independence of the President by regulating his relationship with federal and state governments.  While the Clauses have a significant role in ensuring good governance, they are not a source of federal rights such that the Court may imply a cause of action under them.  *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) (Supremacy Clause not "a source of any federal rights" because it simply "instructs courts what to do when state and federal law clash" and does not create a private right of action allowing "affected parties a constitutional . . . right" to enforce federal laws against States); *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014) ("Private parties who act in compliance with federal law may use *Ex parte Young* as a *shield* against the enforcement of contrary (and thus preempted) state laws . . .  But matters differ when litigants wield *Ex parte Young* as a cause-of-action-creating *sword*.") (citations omitted).

To be sure, the Supreme Court has indicated that "relief may be given in a court of equity" to enjoin unconstitutional actions by public officials.  *Armstrong*, 135 S. Ct. at 1384 (citation omitted); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S.

477, 491 n.2 (2010).  But such ability to enjoin officials' unconstitutional actions is available

only in "a proper case," *Armstrong*, 135 S. Ct. at 1384; an equitable injunction is a "judge-made

remedy," *id.*, and "[t]he decision to grant or deny [] injunctive relief is an act of equitable

discretion by the district court," *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see

also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).  That is, the relief is not granted

as a matter of right but is subject to the court's "broad discretionary power to withhold equitable

relief as it reasonably sees fit."  *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1214 (D.C.

Cir. 2004); *Morrison v. Work*, 266 U.S. 481, 490 (1925) (an injunction "is an extraordinary

remedial process, which is granted, not as a matter of right, but in the exercise of a sound judicial

discretion"); *see, e.g.*, *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (suit

seeking declaratory and injunctive relief in litigation involving the conduct of U.S. diplomatic

relations with a foreign state; concluding that "[w]hether or not this is . . . a matter so entirely

committed to the care of the political branches as to preclude our considering the issue at all, we

think it at least requires the withholding of discretionary relief").

       Here, the circumstances do not support a cause of action in equity.  First, Plaintiffs are

not preemptively asserting a defense to a potential enforcement action against them by the

Government, which is the paradigmatic situation where implied equitable claims against the

Government have been recognized.  *See*, *e.g.*, *Free Enter. Fund*, 561 U.S. at 487 (accounting

firms subject to pervasive regulatory control by regulatory entity brought suit after a formal

investigation of one of the firms was initiated); *Mich. Corr. Org.*, 774 F.3d at 906 (explaining

that for plaintiffs in the pre-enforcement context, "an existing cause of action for that relief

exists: an equitable anti-suit injunction," and "[a]s classically understood, anti-suit injunctions

permit potential defendants in legal actions to raise in equity a defense available at law");

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 620 (2012) (Roberts, C.J.,

dissenting) (rejecting, while answering a question not addressed by the majority, a putative

equitable cause of action under the Supremacy Clause because "the respondents are not subject

to or threatened with any enforcement proceeding like the one in *Ex parte Young*"); *Va. Office

27

*for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring) (*Ex parte Young* "was nothing more than the pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law").

Second, equity "may not be used to create new substantive rights," *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 823 (4th Cir. 2004) (citing *Hedges v. Dixon Cty.*, 150 U.S. 182, 192 (1893)), and the Emoluments Clauses do not create any personal or judicially enforceable rights. Quite aside from that fact, the injuries asserted by Plaintiffs do not fall within even the generalized zone of interests of the Clauses.  The zone of interests test "serve[s] to limit the role of the courts in resolving public disputes" by asking "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).  Even when the Article III standing requirements have been met, a plaintiff still must "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statut[e] [or constitutional guarantee] whose violation forms the legal basis for his complaint." *Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523–24 (1991) (emphasis in original) (citation omitted); *Valley Forge Christian Coll.*, 454 U.S. at 475 (test applies to claims under the Constitution); *see, e.g.*, *Ctr. for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 195–96 (2d Cir. 2002) (Sotomayor, J.) (plaintiffs' alleged injury did not fall within the zone of interests protected by the Due Process Clause because their "harm is derivative of" due process-type harms and concerns First Amendment interests).  The Supreme Court has also indicated that the zone of interests test may be even more rigorous when a plaintiff is asserting an implied cause of action rather than relying on the "generous review provisions of the APA." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987) (citation omitted).

Here, as discussed further below, the Emoluments Clauses were intended to guard generally against the corruption of, and foreign influence on, federal officials and to ensure the independence of the President.  To the extent that they could be seen to create private rights in

any circumstances, they do not confer any right for businesses to avoid commercial competition from businesses in which the President holds financial interests.  Plaintiffs' alleged injuries arising from such competition—whether through loss of tax revenues or loss of profit by their residents' businesses or by businesses in which they have proprietary interests—are thus outside of the zone of interests of the Clauses.  As for Maryland's claim that the Clauses were material inducements to its decision to join the Union, the asserted injury of loss of political power, too, is outside of the Domestic Emoluments Clause's zone of interests.  The same is true with respect to D.C.'s and Maryland's claim that they could be coerced into providing "Emoluments" in the form of "special treatment" to the President's businesses.  The fact that Plaintiffs, at a minimum, likely fail to satisfy the zone of interests test thus strongly counsels against implying a cause of action in equity under the Emoluments Clauses here.

Third, Plaintiffs can obtain relief only by suing the President himself, which (if not legally foreclosed, *see infra* Section IV) is at a minimum grounds for extreme equitable restraint.  Indeed, because of the President's unique constitutional status, at the Virginia ratifying convention when discussing the Foreign Emoluments Clause being another source of constraint on the President, Edmund J. Randolph, who was the first Attorney General of the United States, mentioned only political means for redressing a President's violation.  *See* 3 *Debates in the Several State Conventions* 486.

Finally, Congress is far better equipped than the courts to address whether particular arrangements violate the Foreign Emoluments Clause.  The Constitution vests in Congress the power to waive Foreign Emoluments Clause violations, U.S. Const. art. I, § 9, cl. 8, and, as explained below, Congress has exercised that power in deliberating whether to provide consent in specific circumstances.  If Congress disagrees with the President (or any other public official) regarding the applicability of the Foreign Emoluments Clause in individual cases, it has ample means for pressing its view.  The same is true with respect to any perceived violation of the Domestic Emoluments Clause by the President.  Equity counsels restraint in abrogating a centuries-long tradition of resolving emoluments-related issues through these political processes.

### III.      PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE EMOLUMENTS CLAUSES.

Plaintiffs in any event fail to state a claim upon which relief can be granted.  Plaintiffs'

interpretation of the term "Emolument" as covering "anything of value" received by any

business in which the President has a financial interest from any foreign, federal, or state

government instrumentality exceeds the Clauses' intended scope and meaning.  Neither the text

nor the history of the Foreign Emoluments Clause shows that the term "Emolument" was

intended to reach benefits arising from a President's private business pursuits having nothing to

do with his service to a foreign power in his capacity as President or in a capacity akin to an

employee of the foreign power.  Similarly, nothing indicates that the term "Emolument" in the

Domestic Emoluments Clause was intended to reach benefits having nothing to do with the

President's service as President.  Were Plaintiffs' interpretation correct, Presidents from the very

beginning of the Republic, including George Washington, would have received prohibited

"Emoluments."  *Cf. NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014) ("in interpreting [a

constitutional provision], the Court puts significant weight upon historical practice"); *Mistretta v.

United States*, 488 U.S. 361, 401 (1989); *McCulloch v. Maryland*, 17 U.S. 316, 401 (1819).

### A.      The Emoluments Clauses Prohibit Benefits Arising from the U.S. Official's Provision of Service Pursuant to an Office or Employment.

The Foreign Emoluments Clause of the Constitution provides:

> [N]o Person holding any Office of Profit or Trust under [the United States], shall,
> without the Consent of the Congress, accept of any present, Emolument, Office,
> or Title, of any kind whatever, from any King, Prince, or foreign State.

U.S. Const. art. I, § 9, cl. 8.  And the Domestic Emoluments Clause provides:

> The President shall, at stated Times, receive for his Services, a Compensation,
> which shall neither be increased nor diminished during the Period for which he
> shall have been elected, and he shall not receive within that Period any other
> Emolument from the United States, or any of them.

*Id.*, art. II, § 1, cl. 7.  Plaintiffs define the term "Emolument" and "present" in the Foreign

Emoluments Clause to collectively cover "anything of value, including without limitation

monetary and non-monetary gifts or transactions, transactions granting special treatment, and transactions above marginal cost." Compl. ¶ 134. Plaintiffs similarly define the term "any other Emolument" under the Domestic Emoluments Clause to "cover[] remuneration beyond the President's 'Compensation' as set by Congress, including monetary and non-monetary payments or transactions, transactions granting special treatment, and transactions above marginal cost." Compl. ¶ 140. These overbroad definitions constitute Plaintiffs' core legal error.

As explained below, the Emoluments Clauses only prohibit the receipt of compensation for services rendered by an official in an official capacity or in an employment (or equivalent) relationship with a foreign government, and the receipt of honors and gifts by an officeholder from a foreign government. It is not a blanket prohibition on commercial transactions with foreign governments by businesses in which the official has a financial interest.

### 1.    The text of the Emoluments Clauses

At the time of the Nation's founding, and in the decades following, an "emolument" was a common characteristic of a federal office, *see United States v. Hartwell*, 73 U.S. 385, 393 (1867), and comprehensively described "every species of compensation or pecuniary profit derived from *a discharge of the duties of the office*," *Hoyt v. United States*, 51 U.S. 109, 135 (1850) (emphasis added). At the time, most federal officials were not paid salaries in the modern sense. Leonard D. White, *The Federalists: A Study in Administrative History* 298 (1st ed. 1948) (discussing compensation for federal officials in the early Republic). Following English precedent and as dictated by contemporary convenience, most federal employees were compensated by fees for services rendered. *See id.*; *see, e.g.*, 1 American State Papers, 7th Cong., 1st Sess., Misc. 307–08 (1802) (schedule of diplomatic consuls' "fees and emoluments").[22] Their compensation could also include commissions and other privileges and benefits. *See, e.g.*, 23 *Journals of the Continental Congress, 1774–1789*, at 670 (Gaillard Hunt ed., 1914) (Postmaster General authorized by the Act of 1782, which continued in force after

---

[22] *Available at* https://memory.loc.gov/ammem/amlaw/lwsplink.html.

1789, to fix the fees of postmasters and to allow commissions on the postage received); *Hoyt*, 51 U.S. at 135 (customs collector's "emoluments" included fees for services rendered, commissions on duties, and a share of the fines, penalties, and forfeitures); *United States v. Ripley*, 32 U.S. 18, 18 (1833) (determining whether the "pay and emoluments" to which a military officer's "rank entitled him" included commission on moneys that passed through his hands and were disbursed by him for the supplies of the troops).[23]  The term emolument could also mean salary for the minority of officials who did receive one.  George Washington, for example, used the term to refer to his salary in his first inaugural address, when he declined "any share in the personal emoluments, which may be indispensably included in a permanent provision for the Executive Department."[24]  *See also McLean v. United States*, 226 U.S. 374, 382 (1912) (army officer's emoluments included salary, pay for two servants, and forage for two horses).

　　　　In light of this common usage in the founding era and for many decades thereafter, the term "Emolument" in the Emoluments Clauses should be interpreted to refer to a "profit arising from an office or employ."  *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774).  That is, the benefit must be predicated on services rendered in an official capacity or an employment (or equivalent) relationship and be given in exchange for the provision of a service in that relationship.  For example, a federal official would receive an emolument if he or she was paid by a foreign government to take certain official actions.  Similarly, if a covered official became an employee or entered into an employment-like relationship with a foreign government, such as if a federal government attorney provided legal advice to a foreign government instrumentality, then any compensation or benefit he receives for such service would

---

[23] Federal employees were then required to account for the "fees and emoluments" they received from private individuals for whom they performed services and from the Government if any.  *See United States v. Hill,* 120 U.S. 169, 174 (1889) (reprinting form used to account for all receipts).

[24] President George Washington, Inaugural Address of 1789 (Apr. 30, 1789), https://www.archives.gov/exhibits/american_originals/inaugtxt.html.  Congress subsequently set the Presidential salary at $25,000 per year.  *See An Act for allowing a Compensation to the President and Vice President of the United States*, 1 Stat. 72 (1789).

be an emolument.  In either case, the benefit would be predicated on the official's rendering of services pursuant to an office or employment.

The interpretation that an "Emolument" refers to profit arising an official's provision of service is consistent with the nature of the other prohibited categories in the Foreign Emoluments Clause: present, office, and title, which are all things personally conferred or bestowed on a U.S. official holding an "Office of Profit or Trust."  *See Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."); *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990).  Thus, as relevant here, the term "Emolument" in the Foreign Emoluments Clause covers benefits arising from services the President provides to the foreign state either as President (*e.g.*, making executive decisions favorable to the paying foreign power) or in a capacity akin to an employee of a foreign state (*e.g.*, serving as a consultant to a foreign power).  It does not reach benefits arising from commercial transactions engaged in by businesses in which the President has a financial interest, particularly where, as here, a plaintiff has not plausibly alleged that the officeholder is using the businesses as a conduit to receive benefits from foreign governments in exchange for his official action or personal service.

The text of the Domestic Emoluments Clause bolsters that interpretation.  The term "Compensation" in the Domestic Emoluments Clause is qualified by "for his Services" as President.  U.S. Const. art. II, § 1, cl. 7.  That qualification must also apply to "any other Emolument"—as noted, compensation was long considered a species of emolument—and the Clause's usage of "other" between "for his Services" and "Emolument" confirms that "Compensation" and "Emolument" are intended to be read in parallel.  Thus properly construed, an "Emolument" under the Domestic Emoluments Clause must arise from the President's service as President.  The Clause thus fulfills its natural purpose of ensuring that a President's compensation and other benefits remain unaltered during his tenure, but does not preclude a President from acting on the same terms as any other citizen in transacting business with a federal or state instrumentality, such as entering into a lease or applying for a tax credit.

Further textual support is found in the *only other* instance in which the term "Emolument" is used in the Constitution, where it is likewise associated with an office and refers to compensation arising from that office. The Incompatibility Clause prohibits a Senator or Representative from assuming "any civil Office . . . which shall have been created, or the Emoluments whereof shall have been encreased" during his or her tenure. U.S. Const. art. I, § 6, cl. 2. The Clause treats an "Emolument" as an aspect of an "Office" that may be "encreased" by Congress, expressly tying it to the official's employment and duties. In other words, the term "Emolument" is used consistently throughout the Constitution—in each constitutional provision in which the term appears, the term is tied to holding office. The Foreign Emoluments Clause differs from the other two Clauses only in that the prohibited benefit in the latter two Clauses is tied to services rendered in specific federal offices, whereas under the Foreign Emoluments Clause, the benefit could be tied to services rendered as a federal official or in a capacity akin to an employee of the foreign government.

The use of the term "Emolument" to refer to the receipt of value for one's services rendered in an official position or in an employment relationship is also consistent with contemporaneous dictionary definitions. One source from 1766 explained that "[e]molument relates to commissions and employments; intimating, not only the salaries, but, all other perquisites."[25] Another source from 1774 defined the term to mean "profit arising from an office or employ."[26] The Oxford English Dictionary ("OED"), citing examples as far back as 1480, 1650, and 1743, provides as one of two definitions: "[p]rofit or gain arising from station, office, or employment; dues; reward, remuneration, salary."[27] Indeed, the definition is closely related to

---

[25] 1 John Trusler, *The Difference, Between Words, Esteemed Synonymous, in the English Language; And, the Proper Choice of them determined* 154–55 (1766) (emphasis omitted).

[26] *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774).

[27] Oxford University Press, *Emolument*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/61242. Today, the Black's Law Dictionary (10th ed. 2014) provides a single definition of "[a]ny advantage, profit, or gain received as a result of one's employment or one's holding of office." Consideration of contemporary definitions can also be appropriate. *See Nixon v. United States*, 506 U.S. 224, 229–30 (1993) (considering both

the etymology of emolument, which is profit from labor, or more specifically, from grinding

corn."[28]  It is not surprising then that the definition was the first to be used in the English

language, as shown by the OED's listing of that definition first.[29]  The OED lists each definition

in the order it appeared in the English language to "illustrate the word's development over

time."[30]

To be sure, Plaintiffs' definition of the term as encompassing "anything of value"

resembles a broader definition that also existed at the time of the founding.  For example, one

dictionary defined the term "emolument" to mean "benefit," "advantage," or "profit."[31]  But the

law has long been clear that where a word is capable of different meanings or "[w]here any

particular word is obscure or of doubtful meaning, taken by itself," the "obscurity or doubt may

be removed by reference to associated words."  *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893);

*see also United States v. Stevens*, 559 U.S. 460, 474 (2010) ("an ambiguous term may be given

more precise content by the neighboring words with which it is associated").  "It is a familiar

rule in the construction of terms to apply to them the meaning naturally attaching to them from

their context."  *Virginia*, 148 U.S. at 519.  This doctrine, referred to as *noscitur a sociis*, thus

---

contemporary and late 18th century definitions in interpreting the term "try" in Article I, Section 3, Clause 6 of the Constitution).

[28] Walter W. Skeat, *An Etymological Dictionary of the English Language* 189 (1888) (emolument: "profit, what is gained by labour"); *The Barnhart Dictionary of Etymology* 326 (1988) (emolument: "*n.* profit from an office or position.  1435, *in Proceedings of the Privy Council*; borrowed through Middle French *émolument*, and directly from Latin *émolumentum* profit, gain, (originally) payment to a miller for grinding corn, from *émolere* grind out (*é*-out + *molere* to grind; see MEAL grain)"); *The Oxford Dictionary of English Etymology* 310 (1966) (similar).

[29] Oxford University Press, *Emolument*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/61242.

[30] Oxford University Press, *Guide to the Third Edition of the OED*, OED Online; *see also* 1 *Oxford English Dictionary* xi (1st ed. 1884) (stating that a definition is "placed first which was actually the earliest in the language: the others follow in the order in which they appear to have arisen").

[31] *A New General English Dictionary* (18th ed. 1754); *see also A Complete Dictionary of the English Language* (2d ed. 1789) (emolument means "[p]rofit, advantage").

"avoid[s] the giving of unintended breadth" to a statute, *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961), or a constitutional provision, *see, e.g.*, *Virginia*, 148 U.S. at 519.[32]  As discussed above, the term "Emolument," when read harmoniously with the rest of the Clause, has the natural meaning of the narrower definition of profit arising from an official's services rendered pursuant to an office or employ.

Moreover, Plaintiffs' interpretation of the term "Emolument" to mean "*anything* of value" would subsume the term "present" in the Foreign Emoluments Clause and render it redundant.  Indeed, Plaintiffs do not differentiate between the two terms and allege that benefits arising from the transactions alleged in the Complaint may constitute either emoluments *or* presents.  *See* Compl. ¶¶ 25, 69, 72, 78, 134–35.  The Supreme Court has long held that "[i]n expounding the Constitution of the United States, every word must have its due force, and appropriate meaning; for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added."  *Holmes v. Jennison*, 39 U.S. 540, 570–71 (1840); *see also Marbury v. Madison*, 5 U.S. 137, 174 (1803) (rejecting interpretation of constitutional provision that would result in "surplusage"); *Williams* v. *Taylor*, 529 U.S. 362, 404 (2000) ("[A] cardinal principle of statutory construction [is] that we must give effect, if possible, to every clause and word of a statute.") (citation omitted).  The Foreign Emoluments Clause treats an "Emolument"

---

[32] In *Virginia v. Tennessee*, for example, the Court applied the maxim to interpret the Compact Clause, which prohibits a State from entering into "any Agreement or Compact with another State" without the consent of Congress.  U.S. Const. art. I, § 10, cl. 3.  Although "[t]he terms 'agreement' or 'compact,' taken by themselves, are sufficiently comprehensive to embrace all forms of stipulation, written or verbal, and relating to all kinds of subjects," *Virginia*, 148 U.S. at 517–18, the Court held that they must be given "the meaning naturally attaching to them from their context," *id.* at 519.  And, "[l]ooking at the clause in which the terms 'compact' or 'agreement' appear," the Court found it evident that the prohibition is directed to only those agreements and compacts tending to increase the States' political power, and not those having nothing to do with the interest of the national government.  *Id.*; *cf. Armstrong*, 135 S. Ct. at 1383; *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in a context that makes its meaning clear . . . .").

36

as something distinct from other potential types of benefits (a "present," an "Office," or a "Title"), indicating that it is not all-encompassing.

The Foreign Emoluments Clause's prohibition on the receipt of a "present" from a foreign government likewise cannot be understood to encompass any possible thing of value that an officeholder might receive in any capacity.  It would be unnatural to describe a public official's receipt of benefits from private commercial transactions by businesses in which he owns an interest as "accept[ing] of [a] present," and nothing indicates that the Framers would have intended the Clause to be applied in that way.  At the time of the Nation's founding (as it is now), a "present" was defined as "[s]omething bestowed on another without price or exchange; the act of giving." *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774); *see also* Oxford English Dictionary, Oxford University Press, *Present*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/150677 ("present" is cross-referenced as a "gift" meaning "[s]omething, the possession of which is transferred to another without the expectation or receipt of an equivalent; a donation, present").  Nor can the term "present" naturally be read to include benefits and legal entitlements tendered to a U.S. official by operation of law, such as foreign trademarks, licenses, permits, and approvals granted to an official's private business, as Plaintiffs allege, *see* Compl. ¶¶ 69, 78.[33]  Furthermore, as with a broad interpretation of the term "Emolument," a broad interpretation of the term "present" would unnecessarily construe the phrase "present, Emolument, Office, or Title" to contain substantial redundancies.  In order to avoid such redundancies—and to give effect to the *noscitur a sociis* canon—the term

---

[33] Plaintiffs allege that the Chinese trademarks granted to the President's business organization were illegal and gratuitous because Chinese law allegedly prohibits awarding trademarks that are the same as or similar to the name of foreign leaders.  Compl. ¶ 67.  But even the sources upon which Plaintiffs rely support the propositions that (1) the Chinese government had begun clearing the way for granting the trademarks as early as September 2016 after years of litigation, *see id.* at 21 n.42, and (2) the Chinese trademark policy prohibiting the use of a political leader's name may be intended to apply to third-party applicants (so as not to disparage the political leader), not a political leader applying for his own name, *see id.* at 21 n.46.

"Emolument" should be understood as office- and employment-specific and the term "present" should be given its natural meaning of gift bestowed without price or exchange.

### 2.      Adoption and historical interpretation of the Clauses

The adoption and historical interpretation of the Emoluments Clauses are consistent with the office- and employment-specific construction of the term "Emolument" and with the term "present" being construed to mean gifts tendered without any consideration.

### i.      Adoption of the Emoluments Clauses

The Foreign Emoluments Clause has its origin in the sixth article of the Articles of Confederation of 1781, which contained the identical proscription, without the current Clause's proviso authorizing a congressional waiver.  The prohibition was adopted against the backdrop of "[a] custom [then] prevail[ing] among the European sovereigns, upon the conclusion of treaties, of bestowing presents of jewelry or other articles of pecuniary value upon the minister of the power with which they were negotiated," with "[t]he same usage [being] repeated upon the minister's taking leave at the termination of his mission."[34]  The prohibition was prompted by an incident involving a foreign government's gift to a U.S. ambassador, and the concern that, as a result of such gifts, U.S. ministers could be subject to foreign influence.  *See Debates in the Federal Convention* 455 (noting that the Clause was proposed by Charles Pinckney, who "urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence").  Edmund J. Randolph, who had attended the Constitutional Convention, explained at the Virginia ratification convention that:

---

[34] 1 *A Digest of the International Law of the United States* 757 (Francis Wharton ed., 1886) [hereinafter Wharton's Digest] (quoting letter from John Q. Adams, Secretary of State, to Richard Rush, Minister to Great Britain (Nov. 6, 1817)); *see also* Robert Ralph Davis, Jr., *Diplomatic Gifts and Emoluments: The Early National Experience*, 32 The Historian 376, 376–78 (1970).

> The [prohibition] restrains any person in office from accepting of any present or
> emolument, title or office, from any foreign prince or state . . . .  This restriction is
> provided to prevent corruption.  All men have a natural inherent right of receiving
> emoluments from any one, unless they be restrained by the regulations of the
> community.  An accident which actually happened operated in producing the
> restriction.  A box was presented to our ambassador by the king of our allies.  It
> was thought proper, in order to exclude corruption and foreign influence, to
> prohibit any one in office from receiving or holding any *emoluments* from foreign
> states.  I believe that if, at that moment, when we were in harmony with the king
> of France, we had supposed that he was corrupting our ambassador, it might have
> disturbed that confidence, and diminished that mutual friendship, which
> contributed to carry us through the war.[35]

The "accident" noted by Randolph appeared to be related to gifts King Louis XVI of France

bestowed on American diplomats Arthur Lee, Silas Deane, and Benjamin Franklin for

successfully negotiating the Franco-American alliance treaty of 1778.[36]  They each received a

gold snuff box with the picture of Louis XVI set with diamonds.[37]  Upon Lee's return to the

United States in 1780, he asked the Continental Congress whether he could keep the gift and was

given permission to do so.[38]  Thomas Jefferson noted that this episode "formed the subsequent

rule."[39]  When Franklin took leave of the French Court in 1785, he also received a miniature

portrait of the King set with 408 diamonds,[40] which he later received permission to keep.[41]

---

[35] 3 *Debates in the Several State Conventions* at 465–66.

[36] Thomas Jefferson, Notes of Presents Given to American Diplomats by Foreign Governments, ca. 1791 [hereinafter Notes of Presents], http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0004; Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780–1940*, at 79 (2013); *id.* (noting also that the prohibition as contained in the Articles of Confederation had little effect).

[37] Jefferson, Notes of Presents, *supra*; Davis, *Diplomatic Gifts and Emoluments*, *supra*, at 379–80.

[38] Letter from Arthur Lee to the President of Congress (Oct. 7, 1780), *in* 4 *Revolutionary Diplomatic Correspondence of the United States* 85-86 (Francis Wharton ed., 1889); 18 *Journals of the Continental Congress, 1774–1789*, at 1114–15 (Gaillard Hunt ed., 1910) (consent of Continental Congress).

[39] Jefferson, Notes of Presents, *supra*.

[40] Letter from William Temple Franklin to Thomas Jefferson (Apr. 27, 1790), http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0003.

[41] *See* 30 *Journals of the Continental Congress, 1774–1789*, at 95 (John C. Fitzpatrick ed., 1934).

The history and purpose of the Domestic Emoluments Clause, like the history and purpose of the Foreign Emoluments Clause, is devoid of concern about private commercial business arrangements. Benjamin Franklin advocated that the President should not receive any "salary, stipend[,] fee or reward whatsoever" for his services. *See Debates in the Federal Convention* at 43–46. The delegates decided instead that the President would receive a fixed compensation during his tenure. *Id.* at 103, 294, 326. Franklin and John Rutledge then proposed that the President not receive "any other emolument" from the federal government or any of the States. *Id.* at 571. Alexander Hamilton wrote in *The Federalist* that the Clause's purpose was to ensure that the President can have "no pecuniary inducement to renounce or desert the independence intended for him by the Constitution." *The Federalist* No. 73, at 494 (Jacob E. Cooke ed., 1961). Under the Clause, he explained, "[n]either the Union, nor any of its members, will be at liberty to give, nor will [the President] be at liberty to receive, any other emolument than that which may have been determined by the first act." *Id*. at 493–94. In other words, the evils sought to be prevented by the Clause are inducements in the forms of pecuniary compensation and other benefits for the President's services *as President*, as such benefits would pose the greatest danger of undermining the President's independence.

Historical context reinforces a bounded understanding of the Emoluments Clauses. A theme throughout the Constitutional Convention and the ensuing debate over the ratification of the Constitution was the tension between the concern that public officials would be influenced by pecuniary inducements, on the one hand, and the need to adequately compensate capable persons who otherwise may not have sufficient means to assume public office, on the other. *See, e.g.*, *Debates in the Federal Convention* at 43–46; *id.* at 402 ("the Legislature would make their own wages . . . too low, so that men ever so fit could not serve unless they were at the same time rich"); 3 *Debates in the Several State Conventions* at 371–72; *id.* at 388 (contrasting the President with the king of England, who "has a more permanent interest"; "His stock, his family, is to continue in possession of the same emolument."); *id.* at 484 ("it is not many years ago—since the revolution—that a foreign power offered emoluments to persons holding offices

40

under our government"); 1 *id.* at 440 ("It is asserted that it will be very difficult to find men sufficiently qualified as legislators without the inducement of emolument. I do believe that men of genius will be deterred, unless possessed of great virtues."); 3 *id.* at 368 ("the principal source of corruption in representatives is the hope or expectation of offices and emoluments"). The Framers settled on having fixed compensation and emoluments for the President for the duration of his office; restricting the legislators' ability to assume those offices whose emoluments were increased during the legislators' tenure; and prohibiting public officials' receipt of foreign gifts, emoluments, offices, or titles. There was no discussion about constraints on private business pursuits by public officials (or the need to relinquish ownership interests in private businesses), despite the fact that, as discussed below, such private business pursuits were common at the time of the Nation's founding.

### ii.        Historical interpretation of the Clauses

Historical evidence confirms that the Emoluments Clauses were not designed to reach commercial transactions that a President (or other federal official) may engage in as an ordinary citizen through his business enterprises. At the time of the Nation's founding, government officials were not given generous compensations, and many federal officials were employed with the understanding that they would continue to have income from private pursuits. *See* White, *The Federalists*, *supra*, at 291–92, 296. Charles Pinckney, who was credited with proposing the Foreign Emoluments Clause, maintained half a dozen plantations in South Carolina while holding various public offices.[42] Presidents who were plantation owners similarly continued their agriculture businesses, exporting cash crops overseas. George Washington, who had left his nephew in charge of his highly successful business,[43] required "weekly reports" from his

---

[42] *See* Robert W. Blythe et al., National Park Service, *Charles Pinckney National Historic Site Historic Resource Study* 24–25 (Aug. 2000), https://www.nps.gov/chpi/learn/historyculture/upload/CHPI_HRS.pdf.

[43] 6 Douglas Southall Freeman, *George Washington: A Biography* 160 (1954).

farm managers at Mount Vernon,[44] and responded with detailed instructions.[45]  From his

Presidential office, he wrote business plans, including those for his gristmill, from which he

exported flour and cornmeal to "England, Portugal, and the island of Jamaica."[46]  Thomas

Jefferson maintained his farm and nail factory at Monticello and exported his tobacco crop to

Great Britain.[47]  James Madison had a tobacco plantation in Montpelier,[48] and James Monroe's

3,500 acre Highland plantation grew timber, tobacco, and grain.[49]  While Madison's and

Monroe's farm records apparently have not survived,[50] the export of farm products such as

tobacco to England and elsewhere had been common since colonial times.[51]  Had the Framers

---

[44] *See, e.g.*, Letter from William Pearce to George Washington (Nov. 11, 1794), http://founders.archives.gov/documents/Washington/05-17-02-0111.

[45] *See, e.g.*, Letter from George Washington to William Pearce (Jan. 12, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0050; Letter from George Washington to James Anderson (Jan. 8, 1797), http://founders.archives.gov/documents/Washington/99-01-02-00159.

[46] *Ten Facts about the Gristmill*, George Washington's Mount Vernon, Fact 9, http://www.mountvernon.org/the-estate-gardens/gristmill/ten-facts-about-the-gristmill (last visited Sept. 29, 2017); National Register of Historic Places Registration Form, George Washington's Gristmill, § 8, at 9 (2003), http://www.dhr.virginia.gov/registers/Counties/Fairfax/029-0330_George_Washington_Grist_Mill_2003_Final_Nomination.pdf; Letter from George Washington to William Pearce (Apr. 20, 1794) (asking Pearce not to grind any more wheat until instructed otherwise because of an embargo against ships sailing to foreign ports), http://founders.archives.gov/documents/Washington/05-15-02-0488; *see also* Thirty-Day Embargo, 1 Stat. 400 (1794).

[47] Letter from Thomas Jefferson to William A. Burwell (Nov. 22, 1808), *in* 11 *The Works of Thomas Jefferson* 75–76 (Paul Leicester Ford ed., 1905); *see also* Alf J. Mapp, Jr., *Thomas Jefferson: Passionate Pilgrim* 19, 57 (1991).

[48] Bruce Chadwick, *James & Dolley Madison* 167 (2014); Robert A. Nowlan, *The American Presidents, Washington to Tyler* 179 (2012).

[49] Gerald W. Gawalt, *James Monroe, Presidential Planter*, 101 Va. Mag. Hist. & Biography 251, 262–63 (1993); National Park Service, *Ash Lawn-Highland*, https://www.nps.gov/nr/travel/journey/hig.htm (last visited Sept. 29, 2017).

[50] *See* David O. Stewart, *Madison's Gift* 396 n.1 (2015); 5 *The Papers of James Monroe* xviii (Daniel Preston ed., 2014).

[51] *See, e.g.*, George Taylor, Arrangements between English and Southern Merchants (June 1790), http://founders.archives.gov/documents/Jefferson/01-16-02-0308-0003; National Park Service, *Historic Jamestowne, Tobacco: Colonial Cultivation Methods*,

intended the Emoluments Clauses to encompass benefits arising from a federal official's private commercial transactions with a foreign state, or in case of a President, with a foreign, federal, or state instrumentality, surely someone would have raised concerns about whether foreign governments or government-owned corporations may have been among the customers of the farm and other products regularly exported by early Presidents. Yet, there is no evidence of these Presidents taking any steps to ensure that they were not transacting business with a foreign or domestic government instrumentality. And one can reasonably expect that they would have taken such steps because many of them were involved in drafting or ratifying the Constitution.

Moreover, George Washington directly transacted business with the federal government while President. For example, he bought several lots of public land in the then-Territory of Columbia in a public sale.[52] Washington himself had authorized the public sale, and the sale was conducted by the Commissioners of the District of Columbia,[53] who were appointed by Washington, *see* 1 Stat. 130 (1790).[54] In writing to the Commissioners to inquire about his prospect of being permitted to purchase more lots, Washington stated that he had "no desire . . . to stand on a different footing from every other purchaser."[55] But no concern was raised that such transactions conferred a benefit, and thus a prohibited emolument, on Washington. The absence of any such concern is especially telling because one of the three Commissioners had (like Washington himself) attended the Constitutional Convention,[56] and the other two had voted

---

https://www.nps.gov/jame/learn/historyculture/tobacco-colonial-cultivation-methods.htm (last visited Sept. 29, 2017).

[52] *See* Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793), http://founders.archives.gov/documents/Washington/05-14-02-0074.

[53] *See* Letter from Commissioners for the District of Columbia to George Washington (Sept. 16, 1793), https://founders.archives.gov/documents/Washington/05-14-02-0068.

[54] *See also* George Cochrane Hazelton, *The National Capitol* 2–3 (1914).

[55] *See* Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0289.

[56] *See* Letter from Thomas Johnson, David Stuart, and Daniel Carroll as the Commissioners for the District of Columbia to George Washington (Mar. 23, 1794),

in the state ratification conventions.[57]  In addition, Washington was especially careful about his conduct being beyond reproach in part because he recognized that as the first President, his conduct could be precedent-setting.  *See* Letter from George Washington to Bushrod Washington (July 27, 1789) ("[m]y political conduct . . . must be exceedingly circumspect and proof against just criticism, for the Eyes of Argus are upon me, and no slip will pass unnoticed . . . .");[58] Letter from George Washington to James Madison (May 5, 1789) ("As the first of everything, in *our situation* will serve to establish a Precedent, it is devoutly wished on my part, that these precedents may be fixed on true principles.").[59]  Indeed, Washington's conduct especially has been accorded significant weight.  Akhil Amar, *America's Unwritten Constitution* 309 (2012) ("Washington set precedents from his earliest moments [as President] . . . .  Over the ensuing centuries, the constitutional understandings that crystallized during the Washington administration have enjoyed special authority over a wide range of issues.").  And as the Supreme Court has taught, "significant weight" must be placed on "historical practice," *Noel Canning*, 134 S. Ct. 2550, at 2559, including on "contemporaneous practice by the Founders themselves," *Mistretta*, 488 U.S. at 399.

Plaintiffs' expansive construction of the Emoluments Clauses is further undermined by a proposed constitutional amendment that would have extended the prohibitions of the Foreign Emoluments Clause to all private citizens.  In 1810, Congress passed a resolution to forward the following proposed amendment to the States for ratification:

---

https://founders.archives.gov/documents/Washington/05-15-02-0331; *Debates in the Federal Convention* at lxxxiv (Carroll).

[57] *See* 1 *Debates in the Several State Conventions* at 324 (Johnson); 3 *id.* at 654 (Stuart).

[58] *Available at* http://founders.archives.gov/documents/Washington/05-03-02-0189.

[59] *Available at* http://founders.archives.gov/documents/Washington/05-02-02-0157.  *See also* Letter from George Washington to Catherine Sawbridge Macaulay Graham (Jan. 9, 1790) ("In our progress towards political happiness my station is new; and, if I may use the expression, I walk on untrodden ground. There is scarcely any action, whose motives may not be subject to a double interpretation.  There is scarcely any part of my conduct wch [sic] may not hereafter be drawn into precedent."), http://founders.archives.gov/documents/Washington/05-04-02-0363.

> If any citizen of the United States shall accept, claim, receive or retain any title of nobility or honour, or shall, without the consent of Congress, accept and retain any present, pension, office or emolument of any kind whatever, from any emperor, king, prince or foreign power, such person shall cease to be a citizen of the United States, and shall be incapable of holding any office of trust or profit under them, or either of them.

Proposing an Amendment to the Constitution, S.J. Res. 2, 11th Cong., 2 Stat. 613 (1810).

Although no floor debates were recorded to shed light on the purpose of the proposed amendment, it is implausible that this amendment was intended or understood as providing for the revocation of the citizenship of anyone engaging in commerce with foreign governments or their instrumentalities.  Such a radical interpretation is all the more unlikely because the proposed constitutional amendment had overwhelming support in Congress,[60] and was only two States short of ratification.[61]  Even if the proposed amendment were a manifestation of an anti-foreign attitude also speculated to exist at that time,[62] it is inconceivable that Congress and nearly three-fourths of the States intended to strip the citizenship of, for example, those hotel owners whose customers included visiting foreign diplomats using government funds.

### 3.       Application of the Clauses since the founding era

For over two centuries, the Emoluments Clauses have been interpreted and applied in an office- and employment-specific manner, without infringing on the ability of Presidents or other officeholders to have private business interests, when there is no indication that the official is using such businesses as a conduit to receive compensation for service to a foreign government in an official capacity or in an employment-like capacity.  In line with its drafting history, the Foreign Emoluments Clause was invoked most often, for the several decades following its adoption, in the context of foreign-government gifts tendered to U.S. diplomats or officials.  *See*

---

[60] 20 Annals of Cong. 672 (1810) (19 to 5 in the Senate); 21 Annals of Cong. 2050–51 (1810) (87 to 3 in the House).

[61] 2 American State Papers, 15th Cong., 1st Sess., Misc. 477–78 (1818), *available at* https://memory.loc.gov/ammem/amlaw/lwsplink.html.

[62] Curt E. Conklin, *The Case of the Phantom Thirteenth Amendment: A Historical and Bibliographic Nightmare*, 88 L. Lib. J. 121, 124 (1996).

Wharton's Digest at 757–59.  The first request made under the Constitution for congressional

consent to retain such gifts was Thomas Pinckney's request in 1798 to keep gifts he received

from the courts of Madrid and London on the termination of his missions to those places.[63]  The

Senate gave its consent but the House refused for policy reasons.[64]  In 1817, Secretary of State

John Quincy Adams instructed diplomats that "every offer of [a gift from a foreign sovereign]

which may in future be made to any public minister or other officer of this Government abroad,

will be respectfully but decisively declined."  Wharton's Digest at 757; *see also* H.R. Rep. No.

23-302, at 4 (1834) (Secretary of State Louis McLane giving the same instruction to U.S.

diplomats in 1834).  But rather than always declining foreign gifts, U.S. diplomats sometimes

accepted foreign presents on behalf of the United States so as not to cause offense or

compromise the efficacy of their agency or their personal safety.  Wharton's Digest at 758 (citing

a March 4, 1834 report from the Committee on Foreign Affairs).  "The presents in such cases,

when not perishable, [were] deposited in the State Department, or, when not susceptible of such

deposit (as with horses), sold, and the proceeds sent to the Treasury."  *Id.*  The practice by U.S.-

based officials was similar.  *See, e.g.*, S. Exec. Doc. No. 23-49, at 2–3 (1834) (listing foreign

gifts received by U.S. officials and deposited with the Department of State); H.R. Rep. No. 23-

302, at 2 (noting that Thomas Jefferson, while President, had received horses as presents from a

foreign government, which he then sold, depositing the money into the Treasury); S. Exec. Doc.

No. 37-23, at 6–7 (1862) (reprinting Abraham Lincoln's letter to the King of Siam accepting the

King's gifts to him on behalf of the American people).

　　By 1881, Congress enacted the first law relating to the Foreign Emoluments Clause.  *See*

An act authorizing the persons therein named to accept of certain decorations and presents

therein named, from foreign governments, and for other purposes, ch. 32, § 3, 21 Stat. 603

(1881).  Consistent with preexisting practice, the focus of the law was on the issue of foreign

---

[63] *See* 8 Annals of Cong. 1582–93 (1798); Wharton's Digest at 757; Davis, *Diplomatic Gifts and Emoluments, supra*, at 379.

[64] *Id.*

gifts, and the law required that all presents, decorations, or other things "conferred or presented by any foreign government" to U.S. officials shall be tendered through the Department of State. *Id.* at 604; *see also* 5 U.S.C. § 115 (1925–26) (same); Pub. L. No. 89-554, 80 Stat. 378, 526–27 (1966) (re-codifying same provision at 5 U.S.C. § 7341) ("A present, decoration, or other thing presented or conferred by a foreign government to an employee, a Member of Congress, the President, or a member of a uniformed service shall be tendered through the Department of State"); Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 (providing advance Congressional consent for U.S. officials to accept "gifts and decorations" from foreign governments under certain limited circumstances).

While gifts from foreign governments dominated the early history of the Foreign Emoluments Clause, at least by the mid-19th century the Clause had also been invoked by the Attorney General to prohibit U.S. officials from accepting foreign "Offices" or compensation for personal services rendered directly to a foreign government. *See, e.g.*, *Marshal of Florida*, 6 Op. Att'y Gen. 409 (1854) (Marshal for the Southern District of Florida could not hold the office of commercial agent of France); *Foreign Diplomatic Commission*, 13 Op. Att'y Gen. 537, 538 (1871) (American minister to one foreign power could not accept a diplomatic commission to the same foreign power from another foreign power). By way of contrast, the Government is not aware of any instance in this era where the Clause was applied to business transactions outside of government by private commercial entities in which a U.S. official had a financial interest.

More modern applications of the Emoluments Clauses by the Comptroller General of the United States and the Office of Legal Counsel of the Department of Justice ("OLC")—the two government components charged with interpreting the Clauses' application—are to similar effect. Both components determined, for example, that while in office, President Ronald Reagan could receive retirement benefits from the State of California, where he had served as the Governor, without violating the Domestic Emoluments Clause's prohibition against the receipt of "Emoluments" from a State. *See The Honorable George J. Mitchell U.S. Senate*, B-207467, 1983 WL 27823, at *3 (Comp. Gen. Jan. 18, 1983) (President Reagan's pension from California

47

could not "be construed as being in any manner received in consequence of his possession of the Presidency"); *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 192 (1981) ("those [retirement] benefits are not emoluments in the constitutional sense" nor does their receipt "violate the spirit of the Constitution").

Indeed, in every published OLC or Comptroller General opinion in which proposed conduct was determined to involve prohibited emoluments, the determination involved an employment relationship (or a relationship akin to an employment relationship) with the foreign government.  *See, e.g.*, *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 97 (1986) (agency consultant could not accept employment with a private corporation to perform work on a contract with a foreign government); *Application. of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158–59 (1982) (agency employee could not, on his leave time, work for an American consulting firm, which was under contract with a foreign government, to perform work on that contract); *To the Secretary of the Air Force*, 49 Comp. Gen. 819, 819 (1970) (Air Force officer could not retain proceeds from the sale of contraband seized by the Republic of Colombia based upon information furnished by the officer while temporarily attached to the Colombian Air Force for training); *Retired Marine Corps Officers*, B-217096, 1985 WL 52377, at *4 (Comp. Gen. Mar. 11, 1985) (retired Marine Corps officers who were attorneys employed by or served as "of counsel" to a law firm could not serve as legal counsel for the Office of the Saudi Military Attache without congressional consent); *Major Stephen M. Hartnett, USMC, Ret.*, 65 Comp. Gen. 382 (1986), *aff'd by* 69 Comp. Gen. 175 (1990); *To C.C. Gordon, USCG*, 44 Comp. Gen. 130 (1964), *aff'd by To Mr. Harvey E. Ward, USCG, Ret.*, B-154213, 1964 WL 1865 (Comp. Gen. Dec. 28, 1964); *To the Secretary of Health, Education and Welfare*, 51 Comp. Gen. 780 (1972), *aff'd by Dr. R. Edward Bellamy, USPHS, Ret.*, B-175166, 1978 WL 10026 (Comp. Gen. Apr. 7, 1978); *To N.R. Breningstall, Dep't of the Air Force*, 53 Comp. Gen 753 (1974); *see also Marshal of Florida*, 6 Op. Att'y Gen. at 409; *Foreign Diplomatic Commission*, 13 Op. Att'y Gen. at 538.

48

The issues in these opinions often revolved around the nature of compensation from the foreign government and the U.S. official's precise employment relationship with the foreign government. *Compare* Memorandum for S. A. Andretta, Administrative Assistant Attorney General, from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment of Compensation to Individual in Receipt of Compensation from a Foreign Government* (Oct. 4, 1954) [hereinafter *Payment of Compensation*] (concluding that annuity payments made by the German Government to a federal official that were payable to other former German civil servants were prohibited by the Foreign Emoluments Clause),[65] *with Assistant Comptroller General Weitzel to the Attorney General*, 34 Comp. Gen. 331, 335 (1955) (acceptance of annuity payments made by the German Government to a federal official as damages for injuries inflicted by the Nazi regime while he was a former citizen and public official of Germany did not violate the Foreign Emoluments Clause).[66]

Congress's recent exercise of its constitutional authority to exempt particular activities from the scope of the Foreign Emoluments Clause is likewise inconsistent with viewing the Clause to reach private business arrangements having nothing to do with an official's personal

---

[65] *Available at* https://www.justice.gov/olc/page/file/935721/download.

[66] One published opinion interpreted the Foreign Emoluments Clause to reach beyond a U.S. official's own personal service to encompass an employment relationship between a foreign government and the U.S. official's law partners, in circumstances where the official and his law partners shared a "community of interest." *See Applicability of the Emoluments Clause to Non-Gov't Members of ACUS*, 17 Op. O.L.C. 114, 119 (1993) (non-paid, non-government members of the Administrative Conference of the United States ("ACUS") prohibited from receiving a distribution from their law partnerships that included revenues from foreign governments), *modified by* Mem. Op. for the Chairman of ACUS from David J. Barron, Acting Assistant Attorney General, 2010 WL 2516024 (June 3, 2010), https://www.justice.gov/file/18411/download (non-paid, nongovernment members of ACUS not subject to the Emoluments Clause because they do not hold "Office[s] of Profit or Trust"). Situations involving law partners and their profit sharing are distinct from the financial interests at issue in this case. *See* Restatement (Third) of the Law Governing Lawyers § 123, cmt. b; Model Rules of Prof'l Conduct r. 1.10 cmt. (Am. Bar Ass'n 1983) (imputation of conflicts of interest within a law firm is based on the "premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated").

service to a foreign power.  In recent decades, Congress has enacted Foreign Emoluments

Clause-related laws to allow retired members of the armed forces and Reservists—who are

holders of "Office[s] of Profit or Trust" because they may be recalled to active duty—to accept

certain foreign civil or military employment under specified conditions.  *See* Pub. L. No. 97-295,

96 Stat. 1287 (1982), *codified at* 37 U.S.C. § 908 (providing general consent to civil

employment); National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, §

1058, 107 Stat. 1547, 1834 (1993), *codified at* 10 U.S.C. § 1060 (providing general consent to

employment by military forces of a newly democratic nation).  It also has enacted laws to

provide consent to other government employees' employment by foreign governments.  *See*, *e.g.*,

Panama Canal Commission Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, tit.

XXXV, § 3504, 107 Stat. 1547, 1965 (1993), *codified at* 22 U.S.C. § 3641 note (providing

consent under the Foreign Emoluments Clause to civil employment, and compensation for that

employment, of alien employees of the Panama Canal Commission by the Government of

Panama).  Had Congress understood the Foreign Emoluments Clause to reach more broadly than

compensation arising from personal services rendered to a foreign government, it surely would

have exempted a wider range of activities.  Moreover, it is implausible that Congress would have

exempted direct personal services to foreign governments yet left in place the prohibition on

more attenuated interactions, such as holding a financial interest in a business that sells to foreign

officials.

  **B.**  **Plaintiffs' Arguments in Support of Their Interpretation Have No Merit.**

  In arguing that "Emolument" means "anything of value," Plaintiffs cite the Foreign

Emoluments Clause's prohibition on accepting an "Emolument . . . of any kind whatever."  *See*

Compl. ¶ 25.  Plaintiffs' emphasis on that language is largely circular.  The phrase "of any kind

whatever" does not expand the meaning of "Emolument," but instead reflects an emphasis that

the Clause does not exempt any type of "Emolument," *see Payment of Compensation* at 8 (in

interpreting the term "Emolument," noting that "the phrase 'of any kind whatever' was intended

to cover compensation of any sort arising out of an employment relationship with a foreign

state"), just like the phrase is intended to emphasize the Clause's prohibition against the receipt of any kind of "present," "Office," and "Title."  That emphasis sheds no light on the antecedent question of what constitutes an "Emolument" in the first place.[67]

Plaintiffs' reliance on the purposes of the Emoluments Clauses is similarly misplaced. Although the Clauses were intended to combat corruption and foreign influence and to ensure Presidential independence, *see* Compl. ¶¶ 6–8, 24, 27–28, the text, original understanding, and historical practice provide no support for Plaintiffs' inferential leap from the Clauses' purposes to a blanket prohibition on receiving "anything of value," regardless of context.  "[N]o legislation," including the Constitution, "pursues its purposes at all costs," *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam).  Indeed, as noted above, even as the Framers weighed their concerns that public officials would be influenced by pecuniary inducements, they gave no indication that they intended to require officeholders to divest their private commercial businesses in order to assume federal office.  And yet, it was common at the time for federal officials to have private business pursuits.

Plaintiffs' definition also would create absurd consequences.  *Cf. South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 346 (1998) (construing statute to avoid an "absurd conclusion"); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *accord Barahona v. Holder*, 691 F.3d 349, 358 (4th Cir. 2012).  For example, under Plaintiffs' theory, a President could not hold United States Treasury bonds while in office because the accrued interest would be benefits "from the United States" under the Domestic Emoluments Clause.[68]  Likewise, royalties from

---

[67] *See Small v. United States*, 544 U.S. 385, 388 (2005) ("[t]he word 'any' considered alone cannot answer th[e] question" of how narrowly or broadly to interpret a statute); *United States v. Palmer*, 16 U.S. 610, 631 (1818) (Marshall, C.J.) ("general words," such as the word "'any,'" must "be limited" in their application "to those objects to which the legislature intended to apply them").

[68] President Obama, for example, owned U.S. Treasury notes and bills during his tenure.  *The President and Vice President's 2015 Financial Disclosure Forms*, President Barack Obama

foreign book sales received by a President or covered official while in office would offend the Foreign Emoluments Clause if any of them were attributable to purchase by a foreign government instrumentality, such as a foreign public university.  *See Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 15 (1994) (foreign public universities are "presumptively foreign states under the [Foreign] Emoluments Clause").[69]

And if the term "Emolument" means "anything of value" from a government instrumentality, then mere stock holdings by a covered official in companies that conduct business globally would also violate the Foreign Emoluments Clause, since some of those companies' earnings would be attributable to business with foreign governments.  Before this suit, that conclusion had never been contemplated.  For example, Vice President Nelson A. Rockefeller had stock holdings in major oil companies such as Exxon, Standard Oil of California and Indiana, and Texaco, as well as in other corporations that conducted business globally, including Dow Chemical, General Electric, and 3-M.  Although these companies surely received some benefit from business with foreign governments, no Foreign Emoluments Clause concern was raised in the Senate or House committee reports concerning his confirmation, despite extensive discussions of those holdings.[70]  Similarly, during her time in office, former Commerce Secretary Penny Pritzker owned a large quantity of stock in the Hyatt Hotels Corporation, which

---

White House (May 16, 2016), https://obamawhitehouse.archives.gov/blog/2016/05/16/president-and-vice-presidents-2015-financial-disclosure-forms (last visited Sept. 29, 2017) (containing links to President Obama's financial disclosure reports from 2010 to 2015).

[69] For 2009, President Obama reported foreign income of approximately $1.6 million (*see* https://obamawhitehouse.archives.gov/sites/default/files/president-obama-2010-complete-return.pdf), which likely included royalties from the sale of his books.  Many foreign public universities have President Obama's books in their library collection.  *See, e.g.*, University of Melbourne, Library Catalog, http://library.unimelb.edu.au/; University of Ottawa, Library Catalog, http://biblio.uottawa.ca/en; Beijing Normal University, Library Catalog, http://www.lib.bnu.edu.cn/; Peking University, Library Catalog, http://lib.pku.edu.cn/portal/en.

[70] *See Nomination of Nelson A. Rockefeller of New York to be Vice President of the United States*, S. Exec. Doc. No. 93-34, at 28 (1974); *Confirmation of Nelson A. Rockefeller as Vice President of the United States*, H.R. Rep. No. 93-1609, at 39–40 (1974).

is substantially owned by her family and has hundreds of establishments throughout the world.[71] No issue concerning the Foreign Emoluments Clause arose,[72] even though the Secretary surely derived benefits from foreign governments' patronage of Hyatt Hotels worldwide and from any permits, licenses, and approvals those governments granted to Hyatt Hotels for those hotels to operate in their respective countries.  Under Plaintiffs' theory, such holdings would be in violation of the Foreign Emoluments Clause as well.

Moreover, if Plaintiffs were correct that permits, approvals, and licenses granted by a foreign government constitute "emoluments" or "presents," *see* Compl. ¶¶ 73–78, then a U.S. official with overseas property that is subject to foreign licensure requirements would violate the Foreign Emoluments Clause as well.  Retired members of the armed forces, who are subject to the Foreign Emoluments Clause, would face similar problems if they were to live or to do business abroad.  As noted, Congress has consented in specified conditions to foreign employment and receipt of compensation by retired military personnel in connection with such employment, but not to receipt of licenses, permits, and other foreign-government "benefits" that retired military personnel might need to take advantage of that consent.  And under Plaintiffs' theory, a retired military officer also would not be able to own stock in a company, such as a hospitality establishment, *in the United States*, unless the establishment turns away all foreign government customers.

---

[71] *See* Secretary Penny Pritzker's financial disclosures for years 2014, 2015, 2016, *available at* Office of Government Ethics, Financial Disclosure, https://www.oge.gov/; Hyatt Hotels Corporation, Form 10-K at F-41 (2016), http://s2.q4cdn.com/278413729/files/doc_financials/q4_2016/Hyatt-Q4-2016-Form-10-K.pdf.

[72] No concerns about the Foreign Emoluments Clause were raised during Secretary Pritzker's confirmation hearing before the Senate Committee on Commerce, Science, and Transportation, nor during the floor debate preceding her confirmation vote.  *See Nomination of Penny Pritzker to be Secretary of the U.S. Department of Commerce: Hearing Before the S. Comm. on Commerce, Science, and Transportation*, S. Hrg. 113-619, 113th Cong. (2013); 159 Cong. Rec. S5,119-22 (daily ed. June 25, 2013).  Moreover, Secretary Pritzker was confirmed by a vote of 97 for and one against.  *See id.*  Finally, nothing concerning the Foreign Emoluments Clause was raised in Secretary Pritzker's ethics agreement with the Department of Commerce.  *See* Secretary Pritzker's ethics agreement, *available at* Office of Government Ethics, Financial Disclosure, https://www.oge.gov/.

In short, Plaintiffs' proposed definition of "Emolument" would impose new, stringent limits on the activities and stock holdings of every holder of a federal "Office of Profit or Trust" in all three Branches of the Government, including every active and retired military officer and Member of Congress.  And no President, Member of Congress, or military officer could hold stock in any chain of hotels that is patronized by any representative of a foreign government who was traveling on official business.  Nor could any of them hold stock in any company that does business with any foreign government or government-owned corporation.

Plaintiffs have not stated a claim under the Emoluments Clauses, and the case should be dismissed.

## IV.    THE RELIEF SOUGHT BY PLAINTIFFS IS UNCONSTITUTIONAL.

Finally, Plaintiffs seek an unconstitutional remedy: an injunction against the President in his official capacity effectively seeking to impose a condition on the President's ability to serve as President and to perform the duties he is duly elected to perform.  In *Mississippi v. Johnson*, for example, the Supreme Court held it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties."  71 U.S. at 500–01 ("The Congress is the legislative department of the government; the President is the executive department.  Neither can be restrained in its action by the judicial department.").[73]  A plurality of the Court later reiterated that principle in *Franklin v. Massachusetts*.  *See* 505 U.S. at 802–03 ("[I]n general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'") (quoting *Johnson*, 71 U.S. at 501).  The plurality in *Franklin* found it "extraordinary" that the district court in that case had issued an injunction against the President and two other government officials.  *Id.* at 802, 806.  "At the threshold," it said, "the District Court should have evaluated whether injunctive relief against the President was available, and, if not, whether

---

[73] The Supreme Court has left open the question whether the President might be subject to an injunction requiring the performance of a purely "ministerial" duty.  *See Johnson*, 71 U.S. at 500–01.  However, the relief sought in this case—forcing the President to restructure his financial affairs in order to comply with Plaintiffs' interpretation of the Constitution—cannot fairly be described as purely "ministerial."

appellees' injuries were nonetheless redressable." *Id.* at 803.  The plurality ultimately did not address whether injunctive relief against the President was appropriate in the circumstances of that case because it found that the alleged injury was likely to be redressed by declaratory relief against the Secretary of Commerce alone.  *Id.*

In this case, however, the President is the only defendant here and injunctive relief is sought directly against him.  In the 150 years since the Supreme Court decided *Johnson*, no court has issued an injunction against the President in his official capacity where he was the sole defendant.  Justice Scalia explained in his concurrence in *Franklin* that, under *Johnson*, courts may impose neither injunctive nor declaratory relief against the President in his official capacity. *Id.* at 827–28 (noting that such principle is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history").  He reasoned that just as the President is absolutely immune from official capacity damages suits, so is he immune from efforts to enjoin him in his official capacity.  *Id.* at 827 ("[m]any of the reasons [the Court] gave in *Nixon v. Fitzgerald*, [457 U.S. 731, 749 (1982)], for acknowledging an absolute Presidential immunity from civil damages for official acts apply with equal, if not greater, force to requests for declaratory or injunctive relief in official-capacity suits that challenge the President's performance of executive functions").  The lower courts have often applied this settled principle.  *See*, *e.g.*, *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996) ("similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [the] request for a declaratory judgment"); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("[w]ith regard to the President, courts do not have jurisdiction to enjoin him"); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 557, 605 (4th Cir. 2017) ("we find that the district court erred in issuing an injunction against the President himself"), *cert. granted*, 137 S. Ct. 2080, 2089 (2017).

The *Johnson* case is supported by the President's unique position atop the Article II hierarchy.  Courts have "recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint."  *Fitzgerald*, 457 U.S. at 753.  The President

"occupies a unique position in the constitutional scheme" and is "the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Id.* at 749–50; *Franklin*, 505 U.S. at 827 (Scalia, J., concurring) (referring to the President and Congress as the "principals in whom the executive and legislative powers are ultimately vested").

Such restraint is particularly warranted in circumstances where, as here, Plaintiffs seek relief that would require detailed superintendence of the President's affairs.  Plaintiffs challenge everything from a single diplomat's payment for hospitality services to any trademarks, permits, licenses, and approvals that may be granted by foreign governments in connection with the commercial activities of the President's business organization in numerous countries.  Any relief directed at those activities would ensnare the President in prolonged litigation over any number of transactions, "distract[ing] [the President] from his constitutional responsibility to 'take Care that the Laws be faithfully executed,'" *id.* at 828 (Scalia, J., concurring), even though "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties," *Loving*, 517 U.S. at 757; *see also Clinton v. Jones*, 520 U.S. 681, 714 (1997) (Breyer, J., concurring) ("Article II implicitly grants an official inviolability to the President while he is in the discharge of the duties of his office, and that this inviolability must be broad enough to permit him to perform his official duties without obstruction or impediment.").  In sum, this Court cannot issue the requested injunctive relief against the President.

## CONCLUSION

For the foregoing reasons, the President respectfully requests that the Court dismiss this case for lack of subject matter jurisdiction or for failure to state a claim.

Dated:  September 29, 2017

Respectfully Submitted:

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

/s/ *Jean Lin*
JEAN LIN
Special Counsel
JAMES R. POWERS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20530
Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that September 29, 2017, I electronically filed a copy of the foregoing.

Notice of this filing will be sent via email to all parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *Jean Lin*
JEAN LIN