## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Greenbelt Division

THE DISTRICT OF COLUMBIA and
THE STATE OF MARYLAND,

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America,

*Defendant.*

Civil Action No. 8:17-cv-01596-PJM

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

BRIAN E. FROSH
Attorney General of Maryland

STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
PATRICK B. HUGHES
Federal Bar No. 19492
phughes@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
T: (410) 576-6325 | F: (410) 576-6955

NORMAN EISEN
NOAH D. BOOKBINDER*
nbookbinder@citizensforethics.org
STUART C. MCPHAIL*
smcphail@citizensforethics.org
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
455 Massachusetts Avenue, NW
Washington, DC 20001
T: (202) 408-5565 | F: (202) 588-5020


* admitted pro hac vice


November 7, 2017

KARL A. RACINE
Attorney General for the District of Columbia

NATALIE O. LUDAWAY
Chief Deputy Attorney General
Federal Bar No. 12533
natalie.ludaway@dc.gov
STEPHANIE E. LITOS*
Senior Counsel to the Attorney General
stephanie.litos@dc.gov
441 Fourth Street, NW
Washington, DC 20001
T: (202) 724-1521 | F: (202) 730-1837

DEEPAK GUPTA*
deepak@guptawessler.com
JONATHAN E. TAYLOR*
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
T: (202) 888-1741 | F: (202) 888-7792

JOSEPH M. SELLERS*
jsellers@cohenmilstein.com
CHRISTINE E. WEBBER*
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, NW
Washington, DC 20005
T: (202) 408-4600 | F: (202) 408-4699

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Table of authorities ......................................................................................................... ii

Introduction ..................................................................................................................... 1

Relevant legal standards ................................................................................................. 4

Argument .......................................................................................................................... 5

    I.   Maryland and the District of Columbia have Article III standing. ............................... 5

        A.   Maryland and the District have standing to vindicate their constitutional interests not to compete with other governments' payments to the President. ........................................................................................................... 7

        B.   Maryland has standing because of its lost tax revenue ..................................... 14

        C.   Maryland and the District of Columbia each have standing to protect their proprietary interests. ................................................................. 22

        D.   Both Maryland and the District have standing as *parens patriae*. ..................... 25

    II.   The District of Columbia and the State of Maryland have stated claims under the Foreign and Domestic Emoluments Clauses. ...................................................... 29

        A.   The complaint states a claim under the Emoluments Clauses because the best reading of "emolument" is "profit" or "gain" of any kind. ...................... 31

        B.   The complaint states a claim under the Emoluments Clauses even if the narrower, less common definition of "emolument" were to apply. .......................................................................................... 38

        C.   The President's cramped reading of "emolument"—as limited to payments received as part of a bribe or for services that he personally performs—lacks any justification and should be rejected. ............................................................................................ 41

    III.   The President's other arguments are meritless. ........................................................ 50

        A.   Maryland and the District have a cause of action to seek equitable relief. ............................................................................................................... 50

        B.   The equitable relief sought does not violate the separation of powers. ........................................................................................................ 55

Conclusion ...................................................................................................................... 60

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Watson,*
10 F.3d 915 (1st Cir. 1993) ............................................................ 21, 25

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) ............................................................ *passim*

*Al-Marri v. Rumsfeld,*
360 F.3d 707 (7th Cir. 2004) ............................................................ 60

*American Institute of Certified Public Accountants v. IRS,*
804 F.3d 1193 (D.C. Cir. 2015) ............................................................ 4

*American Insurance Association v. Garamendi,*
539 U.S. 396 (2003) ............................................................ 52

*American Trucking Associations, Inc. v. City of Los Angeles,*
133 S. Ct. 2096 (2013) ............................................................ 51

*Arias v. Dyncorp,*
752 F.3d 1011 (D.C. Cir. 2014) ............................................................ 20

*Arizona State Legislature v. Arizona Independent Redistricting Commission,*
135 S. Ct. 2652 (2015) ............................................................ 7, 26, 27

*Arizona v. Inter Tribal Council of Arizona, Inc.,*
133 S. Ct. 2247 (2013) ............................................................ 51

*Arizona v. United States,*
567 U.S. 387 (2012) ............................................................ 36, 51

*Armstrong v. Exceptional Child Center, Inc.,*
135 S. Ct. 1378 (2015) ............................................................ 51

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................ 28

*Balfour Beatty Infrastructure, Inc. v. Mayor and City Council of Baltimore,*
855 F.3d 247 (4th Cir. 2017) ............................................................ 3, 5, 25, 29

*Bank of America Corp. v. City of Miami,*
137 S. Ct. 1296 (2017) ............................................................ 53

*Beck v. McDonald,*
848 F.3d 262 (4th Cir. 2017) ............................................................ 5, 28

*Berry v. Reagan,*
  No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ............................................ 57

*Bishop v. Bartlett,*
  575 F.3d 419 (4th Cir. 2009) ............................................................................ 4

*Bond v. United States,*
  564 U.S. 211 (2011) ............................................................................... 53, 55

*Bostic v. Schaefer,*
  760 F.3d 352 (4th Cir. 2014) .............................................................................. 5, 22

*Boumediene v. Bush,*
  553 U.S. 723 (2008) ............................................................................... 57, 60

*Bromley v. Smith,*
  1 Simons 8 (Ch. 1826) ............................................................................... 52

*Brown v. Maryland,*
  25 U.S. 419 (1827) ............................................................................... 55

*Canton R. Co. v. Rogan,*
  340 U.S. 511 (1951) ............................................................................... 54

*Carroll v. Safford,*
  44 U.S. (3 How.) 441 (1845) ............................................................................... 51

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
  511 U.S. 164 (1994) ............................................................................... 46

*Cherichel v. Holder,*
  591 F.3d 1002 (8th Cir. 2010) ............................................................................... 36

*Citizens for Responsibility & Ethics in Washington v. Trump,*
  No. 17-458 (S.D.N.Y. 2017) ............................................................... 30, 38, 48

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ............................................................................... 31

*City of Trenton v. New Jersey,*
  262 U.S. 182 (1923) ............................................................................... 18

*Clapper v. Amnesty International USA,*
  568 U.S. 398 (2013) ............................................................................... 11, 20

*Clark v. City of Washington,*
  25 U.S. (12 Wheat.) 40 (1827) ............................................................................... 32

*Clarke v. Securities Industry Association,*
    479 U.S. 388 (1987) ................................................................... 53

*Clinton v. Jones,*
    520 U.S. 681 (1997) ............................................................. 56, 59

*Clinton v. New York,*
    524 U.S. 417 (1998) ................................................................... 57

*Cooksey v. Futrell,*
    721 F.3d 226 (4th Cir. 2013) ....................................................... 5

*Cooper v. Alden,*
    Harrington's Ch. Rep. (Mich. Ch. 1838) .................................... 52

*Cooper v. Texas Alcoholic Beverage Commission,*
    820 F.3d 730 (5th Cir. 2016) ...................................................... 21

*Correctional Services Corp. v. Malesko,*
    534 U.S. 61 (2001) ................................................................... 50

*Danvers Motor Co. v. Ford Motor Co.,*
    432 F.3d 286 (3d Cir. 2005) ...................................................... 28

*Department of Revenue v. James B. Beam Distilling Co.,*
    377 U.S. 341 (1964) ................................................................... 54

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ............................................................. 31, 32

*District of Columbia v. John R. Thompson Co.,*
    346 U.S. 100 (1953) ..................................................................... 6

*Foster v. Love,*
    522 U.S. 67 (1997) ................................................................... 51

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ...........................................................*passim*

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
    561 U.S. 477 (2010) ....................................................... 37, 46, 52

*Gardner v. Trustees of Village of Newburgh,*
    2 Johns. Ch. Rep. 162 (N.Y. Ch. 1816) ..................................... 52

*Georgia v. Pennsylvania Railroad Co.,*
    324 U.S. 439 (1945) ...........................................................*passim*

*Georgia v. Stanton,*
    73 U.S. (6 Wall.) 50 (1867) ................................................................................ 58

*Gilman v. City of Philadelphia,*
    70 U.S. (3 Wall.) 713 (1865) ........................................................................ 51, 53

*Golden State Transit Corp. v. City of Los Angeles,*
    493 U.S. 103 (1989) .......................................................................................... 52

*Griffin v. United States,*
    935 F. Supp. 1 (D.D.C. 1995) ........................................................................... 44

*Hawaii v. Standard Oil Co.,*
    405 U.S. 251 (1972) .......................................................................................... 24

*Hill v. Wallace,*
    259 U.S. 44 (1922) ............................................................................................ 53

*Himley v. Rose,*
    9 U.S. (5 Cranch) 313 (1809) ........................................................................... 32

*Hodges v. Abraham,*
    300 F.3d 432 (4th Cir. 2002) ............................................................................ 27

*Hoyt v. United States,*
    51 U.S. (10 How.) 109 (1850) ........................................................................... 42

*Hughes v. Trustees of Morden College,*
    1 Vesey 188 (Ch. 1748) .................................................................................... 52

*INS v. Chadha,*
    462 U.S. 919 (1983) .......................................................................................... 53

*International Brotherhood of Teamsters v. U.S. Department of Transportation,*
    724 F.3d 206 (D.C. Cir. 2013) .......................................................................... 21

*Jenifer v. Lord Proprietary,*
    1 H. & McH. 535 (Provincial Ct., Md. 1774) .................................................. 14

*LaRoque v. Holder,*
    650 F.3d 777 (D.C. Cir. 2011) .......................................................................... 52

*Lexmark International, Inc. v. Static Control Components, Inc.,*
    134 S. Ct. 1377 (2014) ...................................................................................... 53

*Mackie v. Bush,*
    809 F. Supp. 144 (D.D.C.) .......................................................................... 57, 60

*Mackie v. Clinton,*
  10 F.3d 13 (D.C. Cir. 1993) ............................................................... 57

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) ...................................................... 57, 60

*Massachusetts v. Bull HN Information Systems, Inc.,*
  16 F. Supp. 2d 90 (D. Mass. 1998) .................................................. 28

*Massachusetts v. EPA,*
  549 U.S 497 (2007) ................................................................*passim*

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) .......................................................... 13, 26, 27

*McDonnell v. United States,*
  136 S. Ct. 2355 (2016) ..................................................................... 42

*McLean v. United States,*
  226 U.S. 374 (1912) ........................................................................ 42

*Mississippi v. Johnson,*
  71 U.S. 475 (1867) ...................................................................... 57, 58

*Mississippi v. Stanton,*
  154 U.S. 554 (1893) ........................................................................ 58

*Mount Evans Co. v. Madigan,*
  14 F.3d 1444 (10th Cir. 1994) ......................................................... 23

*National Treasury Employees Union v. Nixon,*
  492 F.2d 587 (D.C. Cir. 1974) .............................................. 56, 57, 58

*New Jersey v. Sargent,*
  269 U.S. 328 (1926) ........................................................................ 13

*New York Times Co. v. U.S. Department of Justice,*
  138 F. Supp. 3d. 462 (S.D.N.Y. 2015) ............................................. 36

*Newell v. Com.,*
  2 Va. 88 (1795). ............................................................................... 14

*Nixon v. Fitzgerald,*
  457 U.S. 731 (1982) .......................................................... 56, 57, 59, 60

*Nixon v. Sampson,*
  389 F. Supp. 107 (D.D.C. 1975) ...................................................... 44

*NLRB v. Noel Canning,*
  134 S. Ct. 2550 (2014) ................................................................ 31, 32, 36

*Northeastern Florida Chapter of Associated General Contractors of America v. Jacksonville,*
  508 U.S. 656 (1993) ........................................................................ 24, 25

*Pennsylvania v. Kleppe,*
  533 F.2d 668 (D.C. Cir. 1976) ................................................................ 20

*Pierce v. Society of Sisters,*
  268 U.S. 510 (1925) ................................................................................ 51

*Polar Tankers, Inc. v. City of Valdez,*
  557 U.S. 1 (2009) .................................................................................... 54

*Price v. Charlotte,*
  93 F.3d 1241 (4th Cir. 1996) ................................................................ 24

*Printz v. United States,*
  521 U.S. 898 (1997) ................................................................................ 52

*Public Citizen v. Burke,*
  655 F. Supp. 318 (D.D.C. 1987). .......................................................... 36

*Rankin v. Huskisson,*
  4 Simons 13 (Ch. 1830) .......................................................................... 52

*Shelby County v. Holder,*
  133 S. Ct. 2612 (2013) .............................................................................. 8

*Sherley v. Sebelius,*
  610 F.3d 69 (D.C. Cir. 2010) .................................................................. 25

*South Carolina v. Katzenbach,*
  383 U.S. 301 (1966) ................................................................................ 27

*South-Central Timber Development, Inc. v. Wunnicke,*
  467 U.S. 82 (1984) .................................................................................. 52

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ........................................................................ 7, 12

*Susan B. Anthony List v. Driehaus,*
  134 S. Ct. 2334 (2014) ...................................................................... 20, 55

*Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996) .......................................................... 56, 59

*Texas v. ICC,*
    258 U.S. 158 (1922) ............................................................................................................. 13

*TrafficSchool.com, Inc. v. Edriver Inc.,*
    653 F.3d 820 (9th Cir. 2011) .............................................................................................. 25

*Trustees of Dartmouth College v. Woodward,*
    17 U.S. (4 Wheat.) 518 (1819) .......................................................................................... 32

*U.S. Steel Corp. v. Multistate Tax Commission,*
    434 U.S. 452 (1978) ........................................................................................................... 53

*United States v. Arizona,*
    641 F.3d 339 (9th Cir. 2011) .............................................................................................. 36

*United States v. Burr,*
    25 F. Cas. 187 (No. 14,694) (CC Va. 1807) ..................................................................... 57

*United States v. Hill,*
    120 U.S. 169 (1887) ........................................................................................................... 42

*United States v. Lee,*
    106 U.S. 196 (1882) ........................................................................................................... 60

*United States v. Nixon,*
    418 U.S. 683 (1974) ........................................................................................................... 57

*United States v. Ripley,*
    32 U.S. (7 Pet.) 18 (1833) ................................................................................................. 42

*United States v. Sprague,*
    282 U.S. 716 (1931) ........................................................................................................... 31

*United States v. Stanley,*
    483 U.S. 669 (1987) ........................................................................................................... 50

*Virginia ex rel. Cuccinelli v. Sebelius,*
    656 F.3d 253 (4th Cir. 2011) ............................................................................... 13, 14, 27

*W.C. & A.N. Miller Dev. Co. v. Continental Cas. Co.,*
    814 F.3d 171 (4th Cir. 2015) ............................................................................................... 5

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) ...................................................................................................*passim*

*Wyoming v. U.S. Department of Interior,*
    674 F.3d 1220 (10th Cir. 2012) ......................................................................................... 21

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ................................................................ 56

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
  132 S. Ct. 1421 (2012) .......................................................... 54, 55

## Statutes and Constitutional Provisions

5 U.S.C. § 7342(a)(1)(E) ............................................................ 33

D.C. Code § 1-201.01 ................................................................ 6

D.C. Code § 1-203.02 ................................................................ 6

Pa. Const. of 1776, art. 5 .......................................................... 31

U.S. Const. art. I, § 9, cl. 8 ........................................................ 1, 33

U.S. Const. art. II, § 1, cl. 7 ................................................. 1, 11, 35, 54

U.S. Const. art. II, § 4 .............................................................. 42

U.S. Const. art. II, § 6 cl. 2 ........................................................ 41

U.S. Const. art. VI, cl. 2 ........................................................... 14

## Office of Legal Counsel Opinions

*Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission
  of International Historians,*
  11 Op. O.L.C. 89 (1987) ...................................................... 36, 48

*Applicability of the Emoluments Clause to Employment of Government Employees by Foreign
  Public Universities,*
  18 Op. O.L.C. 13 (1994) ................................................. 29, 33, 34

*Applicability of the Emoluments Clause to Non-Gonverment Members of ACUS,*
  17 Op. O.L.C. 114 (1993) ......................................................*passim*

*Applicability of the Emoluments Clause to Nongovernmental Members of ACUS,*
  2010 WL 2516024 (June 3, 2010) ............................................ 47

*Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory
  Commission,*
  10 Op. O.L.C. 96 (1986) ........................................................... 34

*Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations
  Act,*
  6 Op. O.L.C. 156 (1982) ...................................................... 36, 48

*Authority of Foreign Law Enforcement Agents to Carry Weapons in the United States*,
12 Op. O.L.C. 67 (1988) ............................................................................................. 34

*Gifts from Foreign Prince-Officer-Constitutional Prohibition*,
24 Op. Att'y Gen. 116 (1902) ................................................................................. 29, 36

Memorandum for Andrew F. Gehmann, Exec. Assistant, Office of the Attorney
Gen., from Norbert A. Schlei, Assistant Attorney General, O.L.C., *Re: Invitation
by Italian Government to officials of the Immigration & Naturalization Service & a Member
of the White House Staff*, (Oct. 16, 1962), https://goo.gl/Cp4paG ................................. 34

Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from
Samuel A. Alito, Jr., Deputy Assistant Attorney General, O.L.C., *Re:
Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement
with the University of New South Wales* (May 23, 1986), http://politi.co/2us47bu .............. 36, 42, 49

Memorandum for the Counsel to the President, Office of Legal Counsel,
*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the
President's Receipt of the Nobel Peace Prize*, 2009 WL 6365082 (Dec. 7, 2009) .............................. 33

Memorandum Opinion for the Special Assistant to the President, Office of Legal
Counsel, *Proposal That the President Accept Honorary Irish Citizenship* 278 (May 10,
1963), https://goo.gl/CEfHeS ................................................................................. 33

*President Reagan's Ability to Receive Retirement Benefits from the State of California*,
5 Op. O.L.C. 187 (1981) ......................................................................................... 35, 37, 49

**Office of Comptroller General Opinions**

49 Comp. Gen. 819 (1970) ......................................................................................... 33

Comp. Gen. B-207467, 1983 WL 27823, at *3 (1983) ................................................................ 37, 40

*Retired Marine Corps Officers*, Comp. Gen. B-217096, 1985 WL 52377 (Mar. 11, 1985) .................. 48, 49

**Historical Materials**

5 Annals of Cong. 1583 (1798) ..................................................................................... 33, 42

Letter from George Washington to the Commissioners for the District of
Columbia (Mar. 23, 1794), https://goo.gl/Ugn7N1 .............................................................. 45

*The Federalist* No. 73 (Alexander Hamilton) .................................................................. *passim*

**Books, Articles, and Other Authorities**

Akhil Reed Amar,
*America's Constitution: A Biography* (2005) .................................................................. 8

x

Nathan Bailey, *An Universal Etymological English Dictionary* (20th ed. 1763),
https://goo.gl/n2oB7r ............................................................................................. 31

Nathan Barclay, *A Complete and Universal English Dictionary on a New Plan* (1774) ............ 30, 32, 38, 41

Geraldine Baum, Tom Hamburger & Michael J. Mishak, *Trump has thrived with
government's generosity*, L.A. Times, May 11, 2011, http://lat.ms/1UGMtc8. ........................... 13

Paul Blumenthal & Jessica Schulberg, *Bahrain to Hold Major Celebration at Donald
Trump's D.C. Hotel*, HuffPost Politics (Nov. 29, 2016), https://goo.gl/H4y1dm ...................... 17

Jane Chong, *Reading the Office of Legal Counsel on Emoluments: Do Super-Rich Presidents
Get a Pass?*, Lawfare, July 1, 2017, https://goo.gl/mr7h17 ............................................. 50

Robert J. Delahunty, *Compensation*, in *The Heritage Guide to the Constitution* (2d ed.
2014) .......................................................................................................................... 54

*Embassy of the Kingdom of Bahrain in Washington Celebrates National Day*, Kingdom of
Bahrain Ministry of Foreign Affairs (Dec. 14, 2012), https://goo.gl/5GVR5R .................... 17

3 Max Farrand, *The Records of the Federal Convention of 1787* ......................................... 9

GSA, *FY 2018 Congressional Justification* (May 23, 2017), *at* https://goo.gl/kYif2a ...................... 39

1 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785),
https://goo.gl/K83Mze ......................................................................................................... 31

*List of Metropolitan Statistical Areas*, Wikipedia (last edited Oct. 2 2017),
https://goo.gl/zW5qnV. ......................................................................................................... 13

Dean M. Macomber, *A Review of the Ancillary Facility Elements of Applicant Proposals for
the Prince George's County, Maryland Casino License*, Dec. 15, 2013,
https://goo.gl/e3DUmq ......................................................................................................... 23

Jerry L. Mashaw, *Federal Administration and Administrative Law in the Gilded Age*, 119
Yale L.J. 1362 (2010) ......................................................................................................... 58

Calvin Massey, *State Standing After* Massachusetts v. EPA, 61 Fla. L. Rev. 249 (2009) ...................... 7

John Mikhail, *A Note on the Original Meaning of "Emolument"*, Balkinization, Jan. 18,
2017, https://goo.gl/ZeoYYp ............................................................................................. 32

John Mikhail, *"Emoluments" in Blackstone's Commentaries*, Balkinization, May 28, 2017,
https://goo.gl/jRRYrP ......................................................................................................... 32

John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries,
1523–1806* (June 30, 2017), *at* https://ssrn.com/abstract=2995693 ...................................... 31, 32

Kevin Miller & Scott Thistle, *Luxury hotels, fine dining for LePage on taxpayers' dime*, Portland Press Herald, July 23, 2017, https://goo.gl/xPxeeP ............................................. 8, 39

John Mitford, *A Treatise on the Pleadings in Suits in the Court of Chancery by English Bill* (2d ed. 1787) ................................................................................................................... 51

Jonathan O'Connell, *Trump Organization projected $2 million loss for D.C. hotel; it profited $2 million instead*, Chicago Tribune (Aug. 10, 2017), https://goo.gl/TYCCEn ...................................................................................................... 18

Jonathan O'Connell, David A. Fahrenthold, and Matea Gold, *Trump sons, planning expansion of family business, look to leverage campaign experience*, Washington Post, Mar. 4, 2017, https://goo.gl/g3xi7r. ......................................................................... 13

OCE Report, Review No. 17-1147 (June 2, 2017), https://goo.gl/XhVqkd ............................ 37, 38

Nick Penzenstadler, *Trump refiles lawsuit to lower taxes on D.C. hotel*, USA Today, Nov. 17, 2016, https://goo.gl/jVrjz1. ...................................................................................... 12

Sambides, *Leaked report advises Trump to open Maine monument to commercial forestry*, Bangor Daily News, Sept. 18, 2017, https://goo.gl/Un5cmK. ................................................. 8

Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612 (1997) ................................................................................................................ 57

Zephyr Teachout, *Corruption in America: From Benjamin Franklin's Snuff Box to Citizens United* 38 (2014) ................................................................................................................... 35

Jeremy Venook, *Could Trump's Financial Ties Have Influenced His Phone Call With Erdogan?*, Atlantic, Apr. 18, 2017, https://goo.gl/f7bv96 ............................................... 43

Hui-yong Yu & Caleb Melby, *Trump Hotels, Amid Calls to Divest, Instead Plans U.S. Expansion*, Bloomberg, Jan. 25, 2017, https://goo.gl/EH2e5D. .............................................. 12

# INTRODUCTION

This case arises from the injuries caused to the District of Columbia, the State of Maryland, and their residents by the choice of President Donald J. Trump to receive profits and favors from foreign and domestic governments while he holds office. That conduct violates two express provisions of the U.S. Constitution. The Foreign Emoluments Clause bars federal officeholders from accepting "any present" or "Emolument" of "any kind whatever" from any foreign country, absent "the consent of the Congress." U.S. Const. art. I, § 9, cl. 8. Its purpose is to guard against "foreign influence of every sort." 3 Story, *Commentaries on the Constitution of the United States* 202 (1833). The Domestic Emoluments Clause similarly forbids the President from "receiv[ing] . . . any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. It protects States from having to compete with one another—and with the federal government—to influence the President "by appealing to his avarice." *The Federalist* No. 73 (Hamilton). Together, these clauses help ensure that the President serves with undivided loyalty to the American people, and the American people only.

Previous presidents have taken great care to comply with these core anti-corruption provisions. President Trump, however, has done the opposite. He has not only continued to accept financial benefits from governments, but has actively targeted their business, thereby fostering a market for influence over the nation's Chief Executive. President Trump has even personally encouraged this business by announcing, for all the world to know, that when governments "buy [things] from [him]," he "like[s] them very much." Compl. ¶ 55.

His target audience appears to have gotten the message. Shortly after the election, foreign diplomats voiced their intentions to begin staying at the Trump International Hotel in the District of Columbia. They declared that now "all the delegations will go there" so they "can tell the new president, 'I love your new hotel!'" Compl. ¶ 39. And they have done exactly that. The

1

Trump International Hotel immediately began drawing business away from its competitors following the election. The Embassy of Kuwait, for instance, moved its National Day celebration from the Four Seasons Hotel to the President's hotel, paying up to $60,000 for the event space— and reportedly did so under pressure from the Trump Organization. Compl. ¶ 40. Other foreign and domestic government officials have patronized the Trump International Hotel and many have done so because he is now President. *See, e.g.*, Compl. ¶¶ 34–46. Nor are the emoluments limited to governmental business at his properties. The President's hotel is in clear violation of its lease with the General Services Administration, which expressly forbids any elected federal official from benefiting from the lease. Yet within weeks of taking office, President Trump appointed a new GSA administrator, under whom the GSA issued a letter allowing the hotel to continue with the lease, notwithstanding the plainly contrary lease language—a decision that has resulted in millions of dollars in profits for the President. Compl. ¶¶ 80–86.

In defense of his actions, President Trump argues that the payments and benefits he has received from governments—and the untold financial rewards he will continue to receive from them—raise no concern under the Emoluments Clauses. He reads the Constitution as prohibiting only two kinds of benefits: (1) bribes made "in exchange for his official action," and (2) "compensation" for "services" he personally renders. ECF 21-1 ("Def. Br.") 32–33.

This cramped and novel interpretation should be rejected for several reasons. As an initial matter, it finds no support in the meaning of the word "emolument" or its surrounding text, which makes clear that the word should be given a broad sweep. At the Founding, the common definition of the word was "profit" or "gain." The allegations here plainly make out a violation under this definition. But the complaint states a claim even under the other, rarer definition that the President purports to employ—"profit arising from an office" or "a person's trade" or

"business"—a definition that does not support the additional limitations he grafts onto the word. The Court therefore need not parse competing definitions to resolve this motion.

Even if the President's interpretation of the text were plausible, it would undermine the Framers' purpose and lead to untenable results. If his view were to become the law, any federal official could accept unlimited payments from foreign governments so long as there was no clear evidence of quid pro quo, and so long as the official was careful to hire someone else to perform the agreed-upon services on his or her behalf. That is not what the Framers intended.

Finally, the President's bribery-or-personal-services-only interpretation contradicts two centuries of history and a robust body of precedent from the Office of Legal Counsel and the Comptroller General, administered by ethics lawyers every day. That precedent makes clear that the Emoluments Clauses apply even when the President does "not personally" perform any services and regardless of whether or not he accepts profits directly *or* through an entity he owns. 17 Op. O.L.C. 114, 117 (1993). The President could have avoided this controversy by complying with this precedent, fully disclosing his finances, and taking steps to resolve any potential conflicts of interest, as prior presidents have.

Instead, President Trump seeks to evade the issue entirely by questioning the standing of the District of Columbia and the State of Maryland to bring suit. Maryland and the District, however, are entitled to proceed unless the Court finds that, accepting their merits arguments as true, the "material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Balfour Beatty Infrastructure, Inc. v. Mayor and City Council of Balt.*, 855 F.3d 247, 251 (4th Cir. 2017). Maryland and the District have amply satisfied this standard, supporting their allegations with investigative news reports and declarations by prominent industry experts.

As their submissions demonstrate, Maryland and the District have standing to bring this suit for four independent reasons. *First*, the Emoluments Clauses insulate them from having to

compete with other governments for the President's favor. By accepting money or favors from States, the federal government, and foreign governments, President Trump is "discriminatorily den[ying]" the District and Maryland their "rightful status within the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982). Maryland and the District are particularly well positioned to vindicate these interests in light of their proximity to the Trump International Hotel—the epicenter of the President's Emoluments Clause violations. *Second*, the President's violations have caused Maryland "a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). The President's actions are shifting business away from Maryland enterprises in its hospitality sector and causing corresponding injury to Maryland's tax base. *Third*, the District and Maryland each have "proprietary interests" in their own "business venture[s]," *Snapp*, 458 U.S. at 601, which are injured by the Trump International Hotel's "competitive advantage" over them. *Am. Inst. of Certified Pub. Accountants v. IRS*, 804 F.3d 1193, 1198 (D.C. Cir. 2015). And finally, the District and Maryland have standing as *parens patriae* to protect the interests of their resident business owners and employees who are put at a "disadvantage in competitive markets," *Georgia v. Pa. R. Co.*, 324 U.S. 439, 450 (1945), because they cannot offer the opportunity for clients to ingratiate themselves with the President.

These injuries provide especially strong grounds for Article III standing in light of the Supreme Court's longstanding recognition that "States are not normal litigants for the purposes of invoking federal jurisdiction" and are given "special solicitude" in the standing analysis. *Massachusetts v. EPA*, 549 U.S 497, 518–20 (2007). Maryland and the District have standing, and their allegations readily state a claim for relief. The President's motion should be denied.

## RELEVANT LEGAL STANDARDS

As the parties invoking the jurisdiction of a federal court, Maryland and the District have the burden of establishing standing. *Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009). At this stage

of the proceedings, "[i]n reviewing the standing question, the court must . . . assume that on the merits the plaintiffs would be successful in their claims." *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013). Where the defendant argues that the complaint "fails to allege facts upon which subject matter jurisdiction can be based," the court affords "the same procedural protection" as with a Rule 12(b)(6) motion and assumes the truth of the complaint's allegations. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). Where the defendant argues that the jurisdictional allegations are not true, the court assumes the truth of all allegations "for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Id.* In any event, a Rule 12(b)(1) motion to dismiss "should be granted only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Balfour Beatty Infrastructure*, 855 F.3d at 251. For each claim, if either the District or Maryland has standing, the claim may proceed. *Bostic v. Schaefer*, 760 F.3d at 370 ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *W.C. & A.N. Miller Dev. Co. v. Continental Cas. Co.*, 814 F.3d 171, 176 (4th Cir. 2015).

## ARGUMENT

## I. Maryland and the District of Columbia have Article III standing.

The President argues that this case should be dismissed for lack of standing, claiming that "a State's injuries are judicially cognizable only in narrow circumstances, such as when there are injuries to a State's interests in enforcing its laws or maintaining its borders." Def. Br. 11. To the contrary, the Supreme Court has recognized that States have standing to sue in a wide range of circumstances, based on their varied roles and activities. States' standing may rest not only on "the same interests as other similarly situated" private parties (as when they "participate in a

5

business venture") but also on their special status within the federal system and their role as protectors of their residents' welfare. *Snapp*, 458 U.S. at 601–03, 607.[1]

Here, Maryland and the District have standing based on injuries to several broad categories of interests: sovereign interests, quasi-sovereign interests, and proprietary interests. *See Massachusetts*, 549 U.S. at 518–21; *Snapp*, 548 U.S. at 607–08. First, Maryland and the District's quasi-sovereign interests are harmed by President Trump's flouting of a constitutional norm specifically designed to protect their "position among [their] sister States," and the "terms under which [they] participate[] in the federal system."[2] *Snapp*, 548 U.S. at 605–06, 608 (quoting *Georgia*, 324 U.S. at 450–51). Second, Maryland's sovereign interests are harmed by the loss of "tax revenues [that] are directly linked," *Wyoming*, 502 U.S. at 450, to foreign and domestic officials' patronage of the Trump International Hotel rather than Maryland businesses. Third, Maryland and the District's "proprietary interests" in their "business venture[s]" are injured when business is diverted from entities that they themselves own or in which they have a direct stake. *Snapp*, 458 U.S. at 601. And finally, Maryland and the District have standing as *parens patriae* to protect the "prosperity and welfare" of their residents by challenging actions that put them "at a decided

---

[1] The President argues that the District of Columbia is not a sovereign, and so cannot assert sovereign interests. But the District is able to assert quasi-sovereign interests, which are all it claims here. *See, e.g., Snapp*, 458 U.S. at 608 n.15 (recognizing that Puerto Rico "has a claim to represent its quasi-sovereign interests in federal court at least as strong as that of any State").

[2] The District's government and its residents are protected by the Emoluments Clauses even though it is not a State. The District of Columbia Home Rule Act establishes an independent government that has an interest in not competing with other governments' payments to the President, in addition to proprietary and *parens patriae* interests. D.C. Code § 1-201.01 *et seq.* Indeed, the legislative authority delegated to the District government—authority over "rightful subjects of legislation"—is "as broad as the police power of a state." *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 109–10 (1953); *see* D.C. Code § 1-203.02 (delegating legislative power that, with inapplicable exceptions, "extend[s] to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this chapter subject to all the restrictions and limitations imposed upon the states by the 10th section of the 1st article of the Constitution of the United States").

disadvantage in competitive markets." *Georgia*, 324 U.S. at 450–52. These injuries are all traceable to the President's acceptance of emoluments, and are "likely to be redressed by" the equitable relief that Maryland and the District seek here. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Maryland and the District therefore have standing to bring this suit. Standing in this case is all the more firm in light of the Supreme Court's recognition that "States are not normal litigants for the purposes of invoking federal jurisdiction" and are given "special solicitude" in the standing analysis. *Massachusetts*, 549 U.S at 518–20 (2007) (stressing that "[i]t is of considerable relevance that the party seeking review here is a sovereign State"); *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 n.10 (2015); *see generally* Massey, *State Standing After* Massachusetts v. EPA, 61 Fla. L. Rev. 249 (2009). Because "[a] State is entitled to assess its needs, and decide which concerns of its citizens warrant its protection and intervention," a federal court should not lightly "superimpose its judgment for that of a State with respect to the substantiality or legitimacy" of its concerns. *Snapp*, 458 U.S. at 612 (Brennan, J., concurring).

### A. Maryland and the District have standing to vindicate their constitutional interests not to compete with other governments' payments to the President.

The Supreme Court has recognized that governments have standing to defend their "interest in securing observance of the terms under which [they] participate[] in the federal system" and to protect themselves against being "discriminatorily denied" their "rightful status." *Snapp*, 458 U.S. at 607–08. The President has directly harmed that interest by violating constitutional provisions that protect Maryland and the District from having to compete for influence with governments willing to pay the President, and from the effects of that influence.

The Domestic Emoluments Clause is a foundational provision that protects against corruption, prevents conflict among the States, and safeguards States' independence from each other, from Congress, and from the Executive. The Clause safeguards one of the most important

tenets of our constitutional order: the "fundamental principle of *equal* sovereignty among the States." *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2623 (2013) (emphasis in original) (internal quotation marks omitted). As the Supreme Court has explained, "the constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Id.* When that equality is threatened by unlawful acts, States may vindicate their constitutional interests in federal court. *See, e.g.*, *Georgia*, 324 U.S. at 451 (providing that a State may sue when a legal wrong "relegates her to an inferior economic position among her sister States"). And that equality is necessarily threatened when States' disproportionate financial clout can be converted to disproportionate political influence over the nation's Chief Executive. Reflecting that concern, the Domestic Emoluments Clause "prohibit[s] individual states from greasing a president's palm." Amar, *America's Constitution: A Biography* 182 (2005).

President Trump has ignored this prohibition. As alleged in the complaint, state and local government officials have patronized his businesses since he became President and will continue to do so. *See* Compl. ¶¶ 98–99. The Governor of Maine and his staff, for instance, spent at least $35,000 in state funds on trips to the District of Columbia to meet with the President's administration this winter and spring, during which the Governor and other state officers stayed at the President's hotel and enjoyed expensive meals at the hotel's restaurant.[3] On one of those trips, President Trump and Governor LePage appeared together at a news conference at which the President announced plans to review federal regulations whose repeal would permit commercial logging in large swaths of Maine's forests.[4]

---

[3] Miller & Thistle, *Luxury hotels, fine dining for LePage on taxpayers' dime*, Portland Press Herald, July 23, 2017, https://goo.gl/xPxeeP.

[4] *See* Miller & Thistle, *Luxury hotels*; Sambides, *Leaked report advises Trump to open Maine monument to commercial forestry*, Bangor Daily News, Sept. 18, 2017, https://goo.gl/Un5cmK.

The President's receipt of this money injures Maryland and the District by "discriminatorily den[ying]" them their "rightful status within the federal system." *Snapp*, 458 U.S. at 607. The federal system protected by the Domestic Emoluments Clause is one that grants Maryland and the District freedom to make budgetary, political, and policy decisions without concern that other governments will gain an unfair advantage by ingratiating themselves with the President via money or other benefits. Maryland and the District thus have standing to protect their "position among . . . sister States," *Georgia*, 324 U.S. at 451.

President Trump also denies Maryland and the District the security of the "terms under which [they] participate[] in the federal system" by violating the Foreign Emoluments Clause. *Snapp*, 458 U.S. at 608. The Foreign Emoluments Clause protects one of the central "benefits that are to flow from participation in the federal system," *id.*, namely, a federal government that is responsive to the States and citizens of the United States rather than the desires of foreign powers. States are able to enforce their quasi-sovereign interests in federal court in part because they "surrender[ed] certain sovereign prerogatives" when they entered the Union, including the ability to use force against or enter into diplomatic relations with foreign sovereigns. *Massachusetts*, 549 U.S. at 519. The Foreign Emoluments Clause is one of the few safeguards provided to the States "to exclude corruption and foreign influence" from the federal government. 3 Farrand, *The Records of the Federal Convention of 1787*, at 327. Such problems are ones they "would likely attempt to address through [their] sovereign lawmaking powers," *Snapp*, 458 U.S. at 607, but cannot because they have yielded that authority to the federal government.

Maryland and the District are uniquely well positioned to bring this suit. Visiting officials from domestic and foreign governments regularly stay at hotels owned by residents of Maryland and the District, eat and host events at restaurants owned by residents of Maryland and the District, and patronize local businesses owned by residents of Maryland and the District. *See infra*

9

I-B, C, and D. And Maryland and the District, like many governments, own and operate event centers and other enterprises that cater to visiting government officials. Maryland, the District, and their residents all stand to lose by virtue of their direct proximity to the President, which means that they are the ones who are injured when a foreign dignitary or domestic official chooses to move a meeting or event down the street to President Trump's Hotel. Maryland and the District are also particularly susceptible to injury from impermissible influence on the President because of their disproportionate economic stake in federal budgetary allocations. For fiscal year 2018, for instance, federal funds constitute 25% of the District's budget and nearly 30% of Maryland's budget. *See* Compl. ¶ 111.

These injuries are made possible because of another underlying violation of the Domestic Emoluments Clause. President Trump's Hotel has a 60-year lease agreement with the General Services Administration, which provides that "No . . . elected official of the Government of the United States . . . shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom." Compl. ¶¶ 80–82. Despite the obvious applicability of that provision to the President (an elected official who benefits from the lease), after the President replaced the acting administrator of the GSA, the GSA reversed its prior representations to members of Congress and concluded that the Trump Hotel was in full compliance with the lease. *Id.* ¶ 83–84. This emolument bestowed upon the President in turn enables the many emoluments he accepts from foreign and domestic officials through their patronage of that hotel. As Maryland and the District allege, it has now been well established that violations of the Emoluments Clauses are occurring and are taking business away from their residents, their proprietary interests, and Maryland's sovereign interest in tax revenue. *See* Compl. ¶¶ 37–46, 80–88, 100–102, 113–133.

President Trump argues that Maryland and the District nonetheless are uninjured because they cannot point to specific ways in which they are "faced with any actual or threatened

need" to give the President money or other benefits. Def. Br. 16–17. His stance, in other words, is that a State is not injured by the President's acceptance of emoluments from others if the President has not proactively demanded them from the State itself. That position cannot be squared with the text of the Domestic Emoluments Clause, which states that the President "shall not receive" emoluments from the States, not that he "shall not ask" for them. U.S. Const. art. II, § 1, cl. 7. It is also contrary to the purpose of the Clause, which is a preventive rule that protects States from the prospect of others "tempt[ing]" the President "by largesses, to surrender . . . his judgment to their inclinations." *The Federalist* No. 73. States are injured when someone else's payment to the President causes an opportunity for favoritism; the injury is not restricted to those from whom the President solicits favors. The Clause protects plaintiffs' "rightful status within the federal system," *Snapp*, 458 U.S. at 607, by forbidding any State from using money or other benefits to influence the President. States are denied that rightful status when the President accepts forbidden payments—they do not have to wait for the President to ask them to join in.

The President repeats this error when he argues that it would be only a "self-inflicted injury" for Maryland and the District to grant his businesses waivers or exemptions, or that they are merely "speculating" that he would retaliate against them for failing to do so. Def. Br. 18 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415–17 (2013)). As Maryland and the District have alleged, the Emoluments Clauses reflect a determination by the Framers that improper influence can often be impossible to detect after the fact, and so it must be prevented from arising in the first place. *See* Compl. ¶¶ 3–7. The injury that Maryland and the District complain of, therefore, is not the cost of granting waivers or exemptions; nor are plaintiffs asserting that they will necessarily be retaliated against in some way. Instead, their injury is the violation of their constitutionally protected quasi-sovereign interest in avoiding entirely any pressure to compete with others for the President's favor by giving him money or other valuable dispensations.

11

Because this injury occurs when the President accepts emoluments in violation of the Constitution, there is no doubt that it is an injury that is traceable to the President and will be redressed by the equitable relief that Maryland and the District seek. *See Spokeo*, 136 S. Ct. at 1547.

In any event, even if Maryland and the District had to point to specific incidents or circumstances in which they face the threatened need to grant special treatment to the President's businesses, they have done so: the Court need look no further than the District's experience with the Trump International Hotel. The President claims (at 17) that the District "can have no legitimate fear" of pressure to grant favors or special treatment to the hotel because it is on federal property and not subject to local regulation. But just one week after the election, the President's company re-filed a previously dismissed lawsuit against the District, seeking a reduction in its tax bill for the hotel.[5] The District now faces a scenario in which it is being sued by a business owned by the most powerful policymaker in the country, who is demanding money while his business is simultaneously collecting money from other governments. It is exactly this kind of situation that the Domestic Emoluments Clause was designed to prevent.

Maryland and the District have also alleged that the President has created ongoing opportunities to be granted special treatment as to the domestic expansion of his hotel empire. *See* Compl. ¶¶ 108–09. Days after the President's inauguration, the Chief Executive Officer of Trump Hotels declared ambitious plans to expand the company's business via a nationwide chain of lower-priced properties.[6] News reports indicate that the company has "signed at least 17 letters of intent" with potential developers in cities throughout the country, including Dallas, Nashville,

---

[5] Penzenstadler, *Trump refiles lawsuit to lower taxes on D.C. hotel*, USA Today, Nov. 17, 2016, https://goo.gl/jVrjz1.

[6] Yu & Melby, *Trump Hotels, Amid Calls to Divest, Instead Plans U.S. Expansion*, Bloomberg, Jan. 25, 2017, https://goo.gl/EH2e5D.

and Seattle.[7] The company has indicated that it would like to be in "all of" the nation's 26 major metropolitan areas,[8] a list that includes both the Baltimore metro area and the Washington, D.C. metro area.[9] And as Maryland and the District have alleged, the President's businesses have an established pattern of aggressively seeking relief from the laws and regulations of the States and localities where they build.[10] The net effect is that President Trump's private business enterprises have created an ongoing national market for favors and dispensations, with Maryland and the District in the middle.

The President's other attempts to rebut Maryland and the District's standing on the basis of injuries to their rightful federal status are equally unavailing. The President argues that Maryland's claim to enforce the Constitution's terms presents "abstract questions" rather than "a case or controversy," citing a trio of cases from the 1920s. Def. Br. 10 (citing *Texas v. ICC*, 258 U.S. 158, 162–63 (1922); *Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923); and *New Jersey v. Sargent*, 269 U.S. 328, 337 (1926)). But those cases in no way demonstrate that cases where States seek to enforce their constitutional interests *as sovereigns and governments* inherently present questions that are too "abstract." The President cites *Virginia ex rel. Cuccinelli v. Sebelius*, which itself lists a variety of cases since the 1920s in which States had standing on the basis of sovereign and other interests. 656 F.3d 253, 269–70 (4th Cir. 2011). As the Fourth Circuit notes in that case, the relevant consideration is whether the State asserts an interest that is "*capable* of producing injury-in-fact." *Id.* at 270

---

[7] O'Connell, Fahrenthold, & Gold, *Trump sons, planning expansion of family business, look to leverage campaign experience*, Wash. Post, Mar. 4, 2017, https://goo.gl/g3xi7r.

[8] Yu & Melby, *Trump Hotels*.

[9] *List of Metropolitan Statistical Areas*, Wikipedia (last edited Oct. 2 2017), https://goo.gl/zW5qnV.

[10] Compl. ¶ 109; Baum, Hamburger & Mishak, *Trump has thrived with government's generosity*, L.A. Times, May 11, 2011, http://lat.ms/1UGMtc8.

(emphasis added). And long after the cases the President cites, the Supreme Court stated explicitly that a State's "interest in securing observance of the terms under which it participates in the federal system" is one of the "kinds of interests that a State may pursue" for standing purposes. *Snapp*, 458 U.S. at 601–608.

Finally, the President contends that Maryland cannot seek to vindicate its constitutional interests under the Emoluments Clauses because it has provided no evidence that the Clauses were material to its decision to enter the Union. Def. Br. 11. It is clear that the Founding-era State and residents of Maryland cared strongly about the prevention of corruption in government, and included precursors to the Emoluments Clauses in Maryland's 1776 Declaration of Rights. *See* Compl. ¶ 104.[11] But Maryland's emphasis of this history in the Complaint does not imply that enforcement of the Clauses somehow depends on how important they were regarded by the States at ratification. The Constitution, once ratified, became "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. No provision of the Constitution is rendered unenforceable because a plaintiff does not prove a "causal connection," Def. Br. 12, between the provision's inclusion in the Constitution and the Constitution's ratification. President Trump cannot evade the requirements of the Emoluments Clauses by conjecturing that Maryland might have ratified the Constitution even in the Clauses' absence.

**B.   Maryland has standing because of its lost tax revenue.**

Maryland also has standing because it has suffered "a direct injury in the form of a loss of specific tax revenues." *Wyoming*, 502 U.S. at 448. Maryland has substantiated its allegations by submitting declarations from two experts: Rachel Roginsky, an expert with more than 30 years of

---

[11]   In addition to incorporating anti-corruption provisions into their constitutions, Maryland and its sister jurisdictions routinely pursued these interests by bringing actions in court. *See, e.g., Jenifer v. Lord Proprietary*, 1 H. & McH. 535 (Provincial Ct., Md. 1774); *Newell v. Commonwealth*, 2 Va. 88 (1795).

experience in the hospitality industry who has authored industry-leading textbooks, and Dr. Christopher Muller, the former Dean of the Boston University School of Hospitality Administration, who has more than 30 years of experience in restaurant management, consulting, and teaching. *See* Roginsky Decl. ¶¶ 1–12; Muller Decl. ¶¶ 1–9.

As Maryland has alleged—and as these declarations support—there is a thriving hospitality industry in the State, constituting a substantial part of Maryland's economy and tax base. This industry includes many direct competitors with the Trump International Hotel. Compl. ¶¶ 113–18. These Maryland competitors have similar price points to the Trump International Hotel, offer similar amenities, are of a similar class, and are located nearby. As a result, they "attract overlapping pools" of customers. Roginsky Decl. ¶ 24. When foreign or domestic government patronage is diverted from Maryland's businesses to the President's, Maryland suffers a corresponding direct loss in tax revenue. Not only do taxes generate revenue from many government bookings themselves, but every booking necessarily results in additional purchases of food, labor, and other goods and services that generate tax revenue for Maryland as well. *See* Roginsky Decl. ¶ 24.

Numerous high-end hotels in Maryland, including the MGM National Harbor Hotel and the Gaylord National Resort and Convention Center, "compete with the Trump Hotel to host meetings and special events." Roginsky Decl. ¶ 24. The MGM Hotel, for instance, is a AAA four-diamond hotel with deluxe amenities, as is the Trump International Hotel. *Id.* ¶ 42. The MGM Hotel has a 16,000-square-foot ballroom; the Trump International Hotel has a 13,200-square-foot ballroom. *Id.* ¶ 41. The MGM Hotel has 28,000 square feet of meeting and event spaces; the Trump International Hotel has 38,000 square feet of meeting and event spaces. *Id.* A three-course dinner at the MGM hotel costs in the range of $90–$110; a three-course dinner at the President's Hotel costs in the range of $95 to $105. *Id.* ¶ 45. While the MGM Hotel is located just

outside the District of Columbia's borders, both it and the Trump International Hotel are easily accessible from many parts of the District. *Id.* ¶ 39. The two hotels are approximately ten miles apart, meaning that they compete for the same "demand generators" in the area, such as local government agencies or other groups from around the nation or the world who seek meeting spaces in and around the District of Columbia. *Id.* ¶ 39.

Similarly, the Gaylord National Resort and Convention Center is also a direct competitor of the Trump International Hotel. The Gaylord is another AAA four-diamond hotel, one of only twenty in the area (including the President's Hotel and the MGM Hotel). Roginsky Decl. ¶ 42. Both the Gaylord and the Trump International Hotel offer comparable "full-service, higher-end hotel facilities," including ballrooms and event spaces. *Id.* ¶ 51. A three-course dinner at the Gaylord is in the price range of $87 to $120, also comparable to the Trump Hotel's $95 to $105. *Id.* ¶ 55. And the Gaylord has recently hosted events for both foreign and domestic government agencies, such as the IRS and the Saudi Arabian Cultural Mission. *Id.* ¶ 48.

There are also many high-end restaurants in Maryland that compete with the Trump International Hotel. The MGM Hotel itself has several restaurants run by celebrity chefs, including Jose Andres and Marcus Samuelsson; the Trump Hotel's BLT Prime is run by celebrity chef David Burke. Roginsky Decl. ¶ 42; Muller Decl. ¶ 29. These restaurants compete directly both for hotel guests and for patrons not staying at either hotel. Muller Decl. ¶¶ 97, 103; Roginsky Decl. ¶ 10. Outside of the National Harbor complex, there are high-end restaurants in Chevy Chase and Bethesda that also compete with the Trump International Hotel for meals, meetings, and events. Muller Decl. ¶ 26. In total, Dr. Muller points to fifteen restaurants in Maryland that compete with the Trump International Hotel in the market for fine dining, event space, or both, and he estimates that there are "considerably more." *Id.* ¶¶ 26, 104–23.

16

The Maryland competitors—hotels, event spaces, and restaurants—all compete with the President's companies for the business of state, federal, and foreign governments. Within the few miles between the Trump Hotel and this array of competitors, there are 177 foreign embassies and 61 federal buildings. *Id.* ¶ 124; Roginsky Decl. ¶ 57. These businesses constitute a significant portion of the economic demand in the region. Roginsky Decl. ¶¶ 57–64. For instance, the federal government spent approximately $177 million on high-budget conferences in fiscal year 2016— which itself is only a fraction of its total spending on events. *Id.* ¶ 58. The Washington, D.C., metro area, including the Maryland suburbs of the District, hosted roughly 30% of those high-budget meetings. *Id.* Foreign governments also generate a large quantity of meetings, dinners, and receptions, hosting events throughout the year, often at hotels and restaurants in the metro area. *Id.* ¶ 63. This business generates a substantial amount of tax revenue for Maryland.

There is clear evidence that a significant volume of government business has shifted to the Trump Hotel from its competitors as a result of the President's election. For example, Kuwait took its National Day celebration from the Four Seasons to the Trump Hotel, paying the President's business an estimated $40,000 to $60,000. Compl. ¶ 40. And Bahrain had celebrated its National Day with an event at the Ritz Carlton multiple times in previous years, but moved the celebration to the Trump Hotel after the President was elected. Roginsky Decl. ¶ 63.[12] The Trump Hotel has specifically hired a "director of diplomatic sales" to pitch foreign governments and their agents. Compl. ¶ 37. One diplomat told the *Washington Post*, "[b]elieve me, all the

---

[12] *See also* Blumenthal & Schulberg, *Bahrain to Hold Major Celebration at Donald Trump's D.C. Hotel*, HuffPost Politics (Nov. 29, 2016), https://goo.gl/H4y1dm (noting that Bahrain's 2015 National Day Celebration was held at the Ritz Carlton); *Embassy of the Kingdom of Bahrain in Washington Celebrates National Day*, Kingdom of Bahrain Ministry of Foreign Affairs (Dec. 14, 2012), https://goo.gl/5GVR5R (noting that Bahrain's 2012 National Day Celebration was held at the Ritz Carlton).

delegations will go there." *Id.* ¶ 39. Another said it would be "rude" to visit the President and say "I am staying at your competitor." *Id.* The uptick in business that resulted in part from this widespread attitude among foreign officials surprised even the Trump Hotel; its parent company, the Trump Organization, had projected a $2.1 million loss during the first four months of 2017.[13] Instead, it turned a $1.97 million profit.[14]

All that money—roughly an extra $1 million each month—came from somewhere. As patrons flock to the Trump Hotel from its competitors, there is a corresponding loss of actual and potential tax revenues for Maryland that is directly traceable to President Trump's violations of the Emoluments Clauses. The President asserts that Maryland's allegations are too "general" to support state standing because the State has failed to point to "specific tax revenues" that would constitute a "direct injury." Def. Br. 13 (emphasis omitted). That is false. Maryland and its counties receive taxes from the Maryland competitors via both a sales tax that applies to hotels and restaurants, *see* Md. Code Ann., Tax–Gen. §§ 11-102, 11-104, and occupancy taxes that apply only to hotels.[15] Maryland pointed to these specific taxes in its Complaint, *see* Compl. ¶ 116–18.

Maryland receives these tax revenues both directly from government bookings and from the transactions that necessarily occur as a result of those bookings. Consider the expenses if the Economic Development and Tourism Division of the Texas Governor's Office hosts a

---

[13] O'Connell, *Trump Organization projected $2 million loss for D.C. hotel; it profited $2 million instead*, Chicago Tribune, Aug. 10, 2017, https://goo.gl/TYCCEn.

[14] O'Connell, *Trump Organization projected $2 million loss for D.C. hotel*.

[15] Maryland's state code authorizes hotel occupancy taxes to be assessed at the county level. *See* Md. Code Ann., Local Gov't § 20-432. All of the counties in the greater Baltimore–Washington, D.C., area levy a hotel occupancy tax. *See, e.g.*, Montgomery County, Md., Code § 52-16 (Montgomery County 7% hotel occupancy tax). A decrease in county tax revenue is an injury to Maryland just like a decrease in taxes assessed directly by the State, as its counties are "merely . . . department[s] of the state." *City of Trenton v. New Jersey*, 262 U.S. 182, 187 (1923).

roundtable at the Gaylord Hotel and Convention Center to promote investment in Texas. In addition to the taxes levied on booking lodging space and meeting space, either the Economic Development Division or the Gaylord will pay taxes on food, decorations, and other supplies, and will generate commissions and wages for planners and staff. Government bookings for meals, meetings, and events generate numerous transactions within the hospitality industry, many of which produce tax revenue for Maryland through the sales tax, hotel occupancy tax, or both.

As a result, when government officials choose to go to the Trump Hotel rather than one of the Maryland competitors, Maryland suffers "a direct injury in the form of a loss of specific tax revenues." *Wyoming*, 502 U.S. at 448. When such a choice is influenced by the fact that the President owns the Trump Hotel, it means that the President's violation of the Emoluments Clauses causes Maryland's loss of tax revenue.

As the Supreme Court held in *Wyoming*, such a "loss of specific tax revenues" is a sufficient injury for Article III standing. *Id.* In that case, Wyoming sued Oklahoma to challenge a new Oklahoma law requiring utility companies to use at least 10% Oklahoma-mined coal. *Id.* at 444–45. Oklahoma's utilities had been customers of Wyoming's coal-mining companies, and Wyoming drew tax revenue from coal mining. As a result, Oklahoma's new law caused Wyoming to lose some of that tax revenue because the law caused the utility companies to shift some of their coal purchases from Wyoming coal to Oklahoma coal. *Id.* The Court acknowledged that States cannot have standing based on an alleged injury to their economy that causes "a decline in general tax revenues." *Id.* at 448–51. But the Court held that it was "beyond peradventure" that Wyoming had standing, because an action that "directly affect[ed] Wyoming's ability to collect severance tax revenues" was a sufficient injury. *Id.* at 448. The Court also rejected Oklahoma's argument that the tax revenues involved were "*de minimis*," declining to make jurisdiction turn "on the amount in controversy." *Id.* at 452–53.

19

So too with respect to Maryland's claims here. Maryland does not allege a decline in general tax revenues from an economic downturn.[16] Instead, it points to a "loss of specific tax revenues," *id.* at 448: the revenue from its sales and room-rental taxes on the hotels, restaurants, and event spaces that compete with the Trump International Hotel for government business. Compl. ¶¶ 116–18. Nor are Maryland's allegations "speculative" or "conclusory." Def. Br. 13–14. Maryland has provided strong evidence that many Maryland enterprises compete directly with the President's businesses, and it has plausibly alleged that it loses tax revenue as a result of the President's acceptance of emoluments from domestic and foreign governments.

The President argues that Maryland lacks standing because its injury is not "certainly impending" and its claims depend on the actions of third parties. Def. Br. 14–15 (citing *Clapper*, 568 U.S. at 409). This argument suffers from two flaws. First, "certainly impending" is not the correct standard. As the Supreme Court reaffirmed one year after *Clapper*, "an allegation of future injury may suffice" if there is "a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) . Second, injury that depends on the actions of third parties presents an obstacle to standing only when it involves "guesswork" rendering the claim "too speculative for Article III purposes." *Clapper, USA*, 568 U.S. at 409, 413. In cases like this one, where an injury is based on an unlawful advantage given to a competing business, courts rarely hesitate to find that these standards are met. The existence of third party customers does not generally pose a problem to finding injury, traceability, or redressability if a court determines that

---

[16] The President cites *Arias v. Dyncorp*, 752 F.3d 1011 (D.C. Cir. 2014), for the proposition that "[l]ost tax revenue is generally not cognizable as an injury-in-fact for purposes of standing." Def. Br. 13. *Arias*, in turn, cites a single case in support of that assertion—*Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976). The Supreme Court mentioned *Kleppe* in *Wyoming v. Oklahoma*, and concluded that it did not apply where "a loss of specific tax revenues" was involved rather than a claim that actions "injured a State's economy and thereby caused a decline in general tax revenues." 502 U.S. at 448.

there is genuine competition—even though in those cases, as in this case, the actions of third-party customers are necessary for any claim of competitor injury. *See, e.g.*, *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 212 (D.C. Cir. 2013) (emphasizing that the "causation and redressability requirements of Article III standing are easily satisfied" where, absent the defendant's actions, the relevant entities "would not be subject to increased competition"); *Cooper v. Texas Alcoholic Beverage Comm'n*, 820 F.3d 730, 738 (5th Cir. 2016).

As in those cases, Maryland's standing with respect to its tax revenue is based on "basic economic" logic. *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993). The Trump International Hotel, which is in the same market for government business as the Maryland competitors, receives a competitive advantage because it provides the opportunity to give a financial benefit to the President of the United States. That lost business for the Maryland competitors corresponds to reduced tax revenue. Maryland's burden to prove redressability and traceability is thus satisfied because its injury—lost tax revenues—stems from the competitive disadvantage the Maryland competitors face due to the President's violations of the Emoluments Clauses.[17] The Supreme Court has recognized that "[e]ven a small probability of injury is sufficient to create a case or controversy" so long as "the relief sought would, if granted, reduce the probability." *Massachusetts*, 549 U.S. at 525 n.23. Maryland has provided more than enough factual matter to render it plausible that (1) specific businesses in Maryland compete with the Trump Hotel for government patrons and (2) some of those patrons have patronized and will continue to patronize the Trump

---

[17] *Wyoming v. U.S. Department of Interior*, which the President cites in his defense, is inapposite. *See* 674 F.3d 1220 (10th Cir. 2012). In that case, Wyoming and one of its counties challenged a federal policy limiting snowmobile use in national parks, arguing that reductions in snowmobile use in Yellowstone park would result in lost tax revenue. *Id.* at 1226–27. But the court noted that, in fact, the evidence that the State and county relied on showed *increases* in tax revenues in some parts of the park. *Id.* at 1233. Unsurprisingly, then, the court concluded that Wyoming's claim of lost revenue was too speculative.

Hotel because it is owned by the President. Because Maryland draws significant tax revenue from the Maryland competitors, the State has plausibly alleged that it has lost specific tax revenues as a result of the President's violations of the Emoluments Clauses. And this injury is "likely to be redressed by the requested relief." *Bostic*, 760 F.3d at 370. Government officials have said specifically that they will stay at the Trump Hotel so they can tell the President "I love your new hotel!" Compl. ¶ 39. And President Trump has made it known that he looks favorably on those who give him money. *Id.* ¶ 55 ("They buy apartments from me. . . . Am I supposed to dislike them? I like them very much."). A court order enjoining the President from receiving emoluments would certainly "reduce[] to some extent" the likelihood that government officials would patronize the Trump Hotel over its competitors in Maryland, which is all that is necessary for Maryland to show that it has standing. *Massachusetts*, 549 U.S. at 526.

Maryland has plausibly alleged an injury to its sovereign interests that is cognizable under Article III, is caused by the President's actions, and is redressable by court order. The State therefore has standing to pursue this action on the basis of its lost tax revenue.

### C.  Maryland and the District of Columbia each have standing to protect their proprietary interests.

In addition, Maryland and the District each have discrete proprietary interests in entities that compete with the Trump International Hotel. *See Snapp*, 458 U.S. at 601–02. ("[L]ike other associations and private parties, a State is bound to have a variety of proprietary interests. . . . And like other such proprietors, it may at times need to pursue those interests in court."). Each therefore has standing to protect those interests.

The District of Columbia owns the Walter E. Washington Convention Center, which competes with the Trump Hotel for certain events. *See* Roginsky Decl. ¶¶ 28–36; Compl. ¶ 120. Although the Convention Center has a higher capacity for high-volume events, both the

Convention Center and the Trump Hotel host events and meetings for up to 1,200 people. Roginsky Decl. ¶ 31. For such events, both venues offer an overlapping array of services, such as high-end catering, the capacity to provide themed receptions, and high-ceilinged meeting rooms. *Id.* They are less than a mile apart, and both are just a stone's throw away from some of the region's most desirable museums, historical sites, and restaurants. They are also both easily accessible to major law firms and lobbying firms, federal agencies, foreign embassies, and other large sources of potential revenue. *Id.* ¶¶ 30, 57. The Convention Center and the Trump Hotel are thus competitors for the business of government officials and agencies looking to host certain events and meetings in the District of Columbia. *Id.* ¶¶ 36, 64.

Maryland, too, has proprietary interests that are harmed by the President's actions. As a matter of statute, Maryland has a direct financial interest in the MGM National Harbor casino. *See* Md. Code Ann., State Gov't § 9-1A-26(a)(1). Under Maryland law, "all proceeds" from the gambling operations at the MGM Casino belong immediately to the State of Maryland as soon as they are generated and "shall be electronically transferred daily into the State Lottery Fund." *Id.* Because the statute entitles the State to ownership of these proceeds, they constitute the State's income in the first instance, unlike a tax imposed on a private business' income or sales. The State thus has a direct proprietary interest in the business of the Casino that is distinct from its tax interest in other businesses. *Cf. Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1451 (10th Cir. 1994) (noting that a county had standing by virtue of its interest in a revenue-sharing agreement).[18]

---

[18] As noted by a consultant who evaluated the casino license applications for the Maryland Lottery and Gaming Control Commission, locating the casino at the pre-existing National Harbor development gives MGM the "ability to leverage" the neighboring hotels and restaurants. Dean M. Macomber, *A Review of the Ancillary Facility Elements of Applicant Proposals for the Prince George's County, Maryland Casino License*, Dec. 15, 2013, https://goo.gl/e3DUmq. Moreover, the MGM National Harbor resort development is subject to a Community Benefit Agreement with the government of Prince George's County, an agreement designed to advance the County's

*(footnote continued on next page)*

The casino, which draws patrons staying at the hotels or dining at the restaurants in National Harbor, is integrated into the MGM Hotel and adjacent to the Gaylord Hotel. Roginsky Decl. ¶¶ 37–38. Government officials who choose the MGM Hotel or the Gaylord Hotel for lodging or an event "are more likely to spend money at the MGM Casino than they would if their special event or meeting were held at the Trump Hotel or if they stayed overnight at the Trump Hotel." *Id.* ¶ 25. And when they do, Maryland sees a direct financial benefit. When government officials patronize the Trump Hotel rather than these competitors, Maryland is more likely to lose some amount of revenue. "[E]ven a small probability of injury is sufficient to create a case or controversy," *Massachusetts*, 549 U.S. at 525 n.23, and so this injury to Maryland's revenue interests is a sufficient basis for standing here.

As proprietors of these entities, Maryland and the District can and do offer high-end options with top-notch services and amenities, but they cannot offer the opportunity to ingratiate their customers with the President of the United States. Maryland and the District thus have standing by virtue of their "inability to compete on an equal footing" with the Trump Hotel for the business of foreign and domestic governments. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656 (1993); *see also Price v. Charlotte*, 93 F.3d 1241, 1248 (4th Cir. 1996) (finding plaintiffs to have standing where a constitutional violation meant that they were "not competing on a level playing field"). Each is harmed in its "capacity as a consumer in the marketplace" for government business, and has proprietary standing to sue. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 n.14 (1972).

The President's response—that this injury is merely "speculative" because government customers might choose to patronize other businesses than those in which Maryland and the

---

interests in creating and retaining jobs for County residents and promoting economic development. Compl. ¶ 117.

24

District have a proprietary interest—is wholly insufficient. Def. Br. 26. The injury that Maryland and the District complain of is not the "inability to obtain the benefit" of government business, but the injury to their "opportunity to compete" for that business. *Ne. Fla. Chapter of Assoc. General Contractors of Am.*, 508 U.S. at 666. Such competitor injury has been recognized as a firm basis for standing in many cases. *Adams*, 10 F.3d at 921–23; *see also TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 825 (9th Cir. 2011); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007). Maryland and the District need not provide a balance sheet with "lost sales data" they can link directly to the President. *TrafficSchool.com*, 653 F.3d at 825. They need only show that their "position in the relevant marketplace [is] affected adversely." *Adams*, 10 F.3d at 922; *see also Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010) (noting that a plaintiff need only "show an actual or imminent increase in competition"). Once they make a showing that they are competing in the same marketplace as the Trump Hotel, courts may infer that "[s]ales gained by one are thus likely to come at the other's expense," and the plaintiffs thus "have a stake in the outcome of the suit" that suffices for Article III standing. *TrafficSchool.com*, 653 F.3d at 825–26. Maryland and the District have satisfied this standard.

### D. Both Maryland and the District have standing as *parens patriae*.

In addition to pursuing their own interests, governments may also sue as *parens patriae* to protect the welfare of their citizens. *Snapp*, 458 U.S. at 607. The Supreme Court has recognized "the long development of cases" allowing governments to litigate as *parens patriae* "to protect quasi-sovereign interests." *Massachusetts*, 549 U.S. 520 n.17. Although a *parens patriae* suit may not be brought against the federal government to protect "citizens from the operation of federal statutes," governments do have standing to "assert [their] rights under federal law." *Id.* Governments may assert *parens patriae* standing "not only in cases involving boundaries and jurisdiction over lands," *id.*, but also to safeguard the "prosperity and welfare" of their residents

by challenging actions that put them "at a decided disadvantage in competitive markets." *Georgia*, 324 U.S. at 450. *Parens patriae* actions are "inherent in the supreme power of every State," and are "often necessary to be exercised in the interests of humanity." *Snapp*, 458 U.S. at 600.

The interests of Maryland and the District in this case are just as substantial as Puerto Rico's interests that the Supreme Court recognized in *Snapp*. Each government has an interest in assuring its residents that it will enforce the fundamental anti-corruption provisions of the Constitution, particularly where the President's violations cause "a decided disadvantage in competitive markets" for local residents. *Georgia*, 324 U.S. at 450. The President's actions directly impact a significant sector of plaintiffs' economies. There are at least 17 high-end restaurants and hotels in Maryland that compete with the Trump International Hotel; the number in the District is much higher. *See* Roginsky Decl. ¶ 24; Muller Decl. ¶¶ 24–26. Maryland and the District have a substantial "interest in securing [these] residents from the harmful effects" of the President's violations of the Emoluments Clauses. *Snapp*, 458 U.S. at 609. And as discussed above, the injury to this interest—the competitive disadvantage faced as a result of the President's unlawful actions—is both caused by the President and redressable by court order. The District and Maryland thus have standing to bring this action as *parens patriae*.

The President makes much of the principle that a State may not bring an action as *parens patriae* "to protect citizens of the United States from the operation of the statutes thereof," *Mellon*, 262 U.S. at 485. *See* Def. Br. 19–22. But this exception does not apply here. *Mellon*, the case from which the President's claimed exception arises, is clear that the exception does "not go so far as to say that a state may never intervene by suit to protect its citizens" from unconstitutional acts, 262 U.S. at 485, and when a state sues the federal government, whether it has standing "depend[s] on the kind of claim that the state advances." *Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. at 2664 n.10 (quoting Fallon, et al., *Hart and Wechsler's The Federal Courts and the Federal System* 263–66

(6th ed. 2009)). In this case, as the President himself states, his receipt of money via his privately owned business has "nothing to do with the President's service as President." Def. Br. 30. The justification for preventing states from challenging as *parens patriae* the constitutionality of a duly enacted federal statute is therefore absent. *See Mellon*, 262 U.S. at 486. The plaintiffs do not challenge a statute passed by Congress or any other action taken under the "sovereign prerogative of the federal government." *Cuccinelli*, 656 F.3d at 269. Instead, they challenge the President's acceptance of money via private transactions while serving as President of the United States. Unlike every case the President cites—and, indeed, all the cases applying the exception the President wishes to invoke—there is no credible case here that the President's challenged actions are ones in which he is acting as "the United States . . . represent[ing] citizens as *parens patriae*." *Id.* (internal brackets omitted); *cf. id.* (challenging constitutionality of a federal statute); *Hodges v. Abraham*, 300 F.3d 432, 436 (4th Cir. 2002) (challenging federal agency action under the National Environmental Policy Act); *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) (challenging constitutionality of a federal statute). The Supreme Court specifically clarified in *Massachusetts v. EPA* that the *Mellon* line of cases does not prevent a State from "assert[ing] its rights under federal law (which it has standing to do)." 549 U.S. at 520 n.17; *see also Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. at 2664 n.10 (noting that *Mellon* is "hard to reconcile" with subsequent cases"). The *Mellon* exception should not be allowed to swallow this default rule.

The President also argues that plaintiffs have alleged harm to only a narrow segment of their population that is too insubstantial to ground a *parens patriae* action. Def. Br. 21. But in *Snapp*, the Supreme Court reversed the lower court's decision that "the relatively small number of individuals" involved—in that case, 787 people applying for temporary farm work—was a basis to reject a *parens patriae* suit by the Commonwealth of Puerto Rico. 458 U.S. at 599. The Court called it "too narrow a view of the interests at stake" to simply count the number of people

involved, and instead held that "a State has a substantial interest in assuring its residents that it will act to protect them from" the unlawful acts alleged, "[r]egardless of the possibly limited effect of the alleged financial loss at issue here." *Id.* at 609; *see Massachusetts v. Bull HN Info. Sys., Inc.*, 16 F. Supp. 2d 90, 98–101 (D. Mass. 1998) (finding that violations affecting approximately 50 people affected a sufficiently "substantial segment" of the population).

The number of residents of Maryland and the District who are employed by the businesses discussed above is surely greater than the 787 individuals affected by the defendant's actions in *Snapp*. All of these companies' bottom lines are impacted because none of them can offer the opportunity to patronize the President's business. And the business generated by many of these companies is also more likely to redound to the benefit of the residents of Maryland and the District, as money spent at local independent retailers is much more likely to stay within the local economy than money spent at businesses like the Trump Hotel that are part of larger national or international companies. Muller Decl. ¶¶ 20–22. Maryland and the District have therefore demonstrated that the interests at stake in this litigation are substantial, both for them and their residents. They accordingly have standing to bring this action as *parens patriae*.

*   *   *

The standing inquiry "is not Mount Everest." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (Alito, J.). The District and Maryland have more than met their burden at the pleadings stage. They have provided both expert declarations and investigative news reports that are more than "sufficient 'factual matter' to render" their allegations "plausible." *Beck*, 848 F.3d at 270 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Their submissions demonstrate that the Trump International Hotel competes with private businesses like the MGM Hotel and proprietary interests like the Washington Convention Center, and that business has shifted to the Trump International Hotel from its competitors. And they have shown that President Trump has

28

received emoluments from state, federal, and foreign governments because of this increased business to the Trump International Hotel. At the very least, Maryland and the District's allegations and evidence mean that "the material jurisdictional facts are . . . in dispute," and therefore that the President is not "entitled to prevail as a matter of law." *Balfour Beatty Infrastructure*, 855 F.3d at 251.

## II.  The District of Columbia and the State of Maryland have stated claims under the Foreign and Domestic Emoluments Clauses.

On the merits, the District and Maryland claim that President Trump is violating the Emoluments Clauses by accepting profits and other benefits from foreign and domestic governments through his business enterprise. These allegations state a claim as to both Clauses for two reasons.

*First*, the Clauses prohibit the President's acceptance of any "emolument" from a foreign or domestic government, and the best reading of that word is that it includes all profits and other benefits that he accepts through the businesses he owns. That is the reading most consistent with the word's original meaning (defined in all Founding-era dictionaries as "profit," "gain," or "advantage"). It is the reading that gives full effect to the surrounding constitutional text, which is "both sweeping and unqualified." 18 Op. O.L.C. 13, 17 (1994). It is the reading that best achieves the Clauses' prophylactic purposes: to protect against "*every* kind of influence by foreign governments," 24 Op. Att'y Gen. 116, 117 (1902) (emphasis added), and to prevent the President from being exposed to any "pecuniary inducement" to betray "the independence intended for him by the Constitution" in favor of particular States or components of the federal government. *The Federalist* No. 73. And it is the reading most in step with the robust body of precedent from OLC and the Comptroller General.

*Second*, even if this Court were to instead apply the narrower, and rarer, definition of "emolument" on which the President relies (at 32)—"profit arising from an office or employ," Barclay, *A Complete and Universal English Dictionary on a New Plan* (1774)—the complaint would still state a claim. "Employ" was defined to include "a person's trade, [or] business," *id.*, which encompasses the President's businesses. Moreover, the complaint contains a number of specific allegations showing that the President is accepting profits and other benefits from governments that at least plausibly result from his "office" as President. That is sufficient to make out a claim.

Seemingly recognizing that problem, President Trump advances his own gloss on the definition that is narrower still. On his view, he is forbidden from accepting profits and payments only if one of two things can be shown: (1) that he is being "paid by a foreign [or domestic] government to take certain official actions" (tantamount to accepting a bribe), or (2) that he is receiving the money for "personal services rendered directly" to a foreign or domestic government in "an employment or equivalent relationship" (a prohibition that could easily be circumvented by hiring others to perform the same services). Def. Br. 3, 32, 47.[19]

This bribery-or-personal-services-only interpretation of the Clauses should be rejected. It finds no support in the meaning of the word "emolument" or the surrounding constitutional text. It would eviscerate the Clauses' purposes by allowing any president to accept unlimited amounts of governmental money so long as the money is funneled through a business that he owns. And it runs counter to the considered understanding of OLC and the Comptroller General.

---

[19] Notably, the President's "bribery" gloss is narrower than his original position—that "emolument" covers "the receipt of value . . . for a position held" and excludes his acceptance of profits "unrelated to his office." ECF No. 35 in *Citizens for Responsibility & Ethics in Washington v. Trump*, No. 17-458, at 29–31 (S.D.N.Y. June 9, 2017); *see also id.* at 26 (arguing that the Clauses do not cover profits from transactions that "hav[e] nothing to do with his office").

30

### A. The complaint states a claim under the Emoluments Clauses because the best reading of "emolument" is "profit" or "gain" of any kind.

*Text and purpose.* In interpreting the Emoluments Clauses, this Court should "begin with [the] text." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997). This textual analysis is "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). In determining the normal or ordinary meaning of a word, especially a word in a constitutional provision that has not yet been interpreted by a court, the Court should look first to Founding-era dictionaries. *See NLRB v. Noel Canning*, 134 S. Ct. 2550, 2561 (2014) (assessing the meaning of the word "recess" by referring to Founding-era dictionaries).

Both Clauses prohibit the acceptance of "emoluments" from governments, so the threshold inquiry here focuses on the meaning of that word. At the Founding, the word had two definitions. The first—and by far the most common definition—was that it meant "profit," "gain," or "advantage." *See, e.g.*, 1 Johnson, *A Dictionary of the English Language* (6th ed. 1785), https://goo.gl/K83Mze ("Profit; advantage."); Bailey, *An Universal Etymological English Dictionary* (20th ed. 1763), https://goo.gl/n2oB7r ("Advantage, Profit."). According to a recent survey, "every English dictionary definition of 'emolument' from 1604 to 1806" includes this broad meaning. Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries, 1523–1806*, 1–2 (June 30, 2017), *available at* https://ssrn.com/abstract=2995693.

Reflecting the dominance of this definition, the word was often used during the Founding era in this broad sense—including by the drafters of state constitutions, Blackstone, Supreme Court justices, and the Framers themselves. *See, e.g.*, Pa. Const. of 1776, art. 5 ("[G]overnment is . . . instituted . . . not for the particular emolument or advantage of any single man."); Mikhail,

*"Emoluments" in Blackstone's Commentaries*, Balkinization, May 28, 2017, https://goo.gl/jRRYrP (listing examples in which Blackstone used the word to mean "family inheritance, private employment, and private ownership of land"); Mikhail, *A Note on the Original Meaning of "Emolument"*, Balkinization, Jan. 18, 2017, https://goo.gl/ZeoYYp (providing examples of the Framers—including Jefferson, Washington, and Madison—using the word to refer to "the consequences of ordinary business dealings"); *Himley v. Rose*, 9 U.S. (5 Cranch) 313, 318–19 (1809) (Johnson, J.) ("profits and advantages" from land ownership); *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 688 (1819) (Story, J.) ("benefit"); *Clark v. City of Wash.*, 25 U.S. (12 Wheat.) 40 (1827) (Marshall, C.J.) ("profit" or "benefit" from lottery "proceeds").

A second, much less prevalent definition of "emolument" also existed. It was associated with a particular kind of benefit: "profit arising from an office or employ," with "employ" defined as "a person's trade, [or] business." Barclay, *A Complete and Universal English Dictionary*. This definition—cited by the President (at 32)—was not nearly as common at the Founding. Whereas the primary definition appears in every Founding-era dictionary, the secondary definition "appears in less than 8% of these dictionaries." Mikhail, *The Definition of "Emolument"*, at 1–2.

In choosing between these two potential definitions, there is every reason to believe that the Framers intended the broader, more common one to apply. Not only is that the "ordinary" meaning that would have been most understandable to the people at the time, *Heller*, 554 U.S. at 576, but it is also the definition that best fits with the surrounding text and best accomplishes the Clauses' anti-corruption purposes. Indeed, even if the meaning of emolument were "ambiguous," the purposes of the Clauses would "demand[] the broader interpretation." *Noel Canning*, 134 S. Ct. at 2561. Here, that means applying the Clauses to the President's acceptance of profits and other benefits from foreign and domestic governments.

Take the Foreign Emoluments Clause first: It provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8.[20] "The language of [this] Clause is both sweeping and unqualified." 18 Op. O.L.C. at 17. It prohibits the acceptance of four distinct yet overlapping categories of benefits: presents, emoluments, offices, and titles. And this prohibition applies to "any" such benefit "of any kind whatever," with "no express or implied exception," 17 Op. O.L.C. at 121, making clear that "the drafters intended the prohibition to have the broadest possible scope and applicability," 49 Comp. Gen. 819, 821 (1970).

Rather than create any textual exceptions, the Framers designed the Clause so that it would presumptively bar the acceptance of any emolument, subject only to Congress's ability to grant consent and thereby "permit exceptions that qualify [its] absolute prohibition or that temper any harshness it may cause." 17 Op. O.L.C. at 121. This design feature allows federal officeholders to receive profits from foreign governments only if they first "make known to the world" the specific benefits they wish to accept, and Congress provides its consent. 5 Annals of Cong. 1583 (1798) (Bayard). Absent such consent, the Clause bars the acceptance of "any"

_____

[20] Although an amicus advances the idiosyncratic argument that the President is not subject to the Foreign Emoluments Clause, the President himself does not advance this reading, which would conflict with OLC's and Congress's longstanding position and cannot be reconciled with the Clause's text, purpose, or history. *See* Memorandum for the Counsel to the President, Office of Legal Counsel, *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, 2009 WL 6365082, *4 (Dec. 7, 2009) (applying Clause to President Obama and observing that "[t]he President surely holds an Office of Profit or Trust" (brackets omitted)); Memorandum Opinion for the Special Assistant to the President, Office of Legal Counsel, *Proposal That the President Accept Honorary Irish Citizenship* 278 (May 10, 1963), https://goo.gl/CEfHeS (applying Clause to President Kennedy); 5 U.S.C. § 7342(a)(1)(E) (recognizing that the bar on foreign presents covers "the President and Vice President" and consenting to certain presents).

emolument from a foreign state "of any kind whatever"—a clear textual directive to use the broadest plausible definition, including the ordinary definition.[21]

The Framers included this textual directive for good reason. "Those who hold offices under the United States must give the government their unclouded judgment," and serve with undivided loyalty to the American people. 18 Op. O.L.C. at 18. The Clause thus seeks to prevent any possibility of "undue influence and corruption by foreign governments—a danger of which the Framers were acutely aware." *Id.* at 15. It reflects the Framers' insight that a "prophylactic provision" was necessary because every person is susceptible to being influenced—in myriad, often imperceptible ways—when receiving gifts, profits, offices, and titles. 10 Op. O.L.C. 96, 98 (1986). To "fulfill that purpose," the Clause "must be read broadly," 12 Op. O.L.C. 67, 68 (1988), as being "directed against *every possible kind* of influence by foreign governments," Memorandum for Andrew F. Gehmann, Exec. Assistant, Office of the Attorney Gen., from Norbert A. Schlei, Assistant Attorney General, O.L.C., *Re: Invitation by Italian Government to officials of the Immigration & Naturalization Service & a Member of the White House Staff*, at 2 (Oct. 16, 1962), https://goo.gl/Cp4paG (emphasis added); *see also* 10 Op. O.L.C. at 98 ("Although no court has yet construed the Emoluments Clause, its expansive language and underlying purpose . . . strongly suggest that it be given broad scope."). This means that the ordinary definition of emolument should apply, and the Clause should prohibit any profits that President accepts from a foreign state, including profits accepted through his businesses.[22]

---

[21] Although the President tries to give some meaning to the phrase "of any kind whatever," saying (at 50) that it simply "reflects an emphasis that the Clause does not exempt any type of 'Emolument,'" that emphasis is already made clear by the separate use of the word "any."

[22] Contrary to the President's contention (at 36–37), applying this ordinary definition would not create intolerable redundancies with the Clause's separate ban on "presents." This word was likely included to ensure that the Clause would cover the acceptance of unreciprocated,

*(footnote continued on next page)*

Now take the Domestic Emoluments Clause: It entitles the President to receive "a Compensation" while in office (a fixed salary and benefits) and forbids him from "receiv[ing] within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. As with its foreign counterpart, there are no exceptions to this prohibition, and no indications that the Framers meant to exclude the general definition of emolument.

By including such broad language—prohibiting the President's receipt of "any other Emolument" from the federal government or a State—the Framers intended "to prevent Congress or any of the states from attempting to influence the President through financial awards or penalties." 5 Op. O.L.C. 187, 189 (1981). They sought, in other words, to eliminate any "pecuniary inducement" he might have to betray what the Constitution insists be his exclusive duty: serving the people of the United States. *The Federalist* No. 73. The Framers worried that giving any official, federal or state, the ability to affect the President's financial circumstances could "tempt him by largesses" and cause him "to surrender" his "judgment to their inclinations," while forcing States to compete with each other (and with the federal government) in an effort to "appeal[] to his avarice." *Id.* The Framers sought to prevent this scenario through a broad prohibition on any emoluments from domestic governments.[23] Here, too, there is every indication that the Framers wanted the normal definition of that word to apply.

***Practice and history.*** The normal definition is also consistent with the "settled practice" and understanding of the federal government, as fleshed out in legal opinions from

---

possibly unsolicited "gifts" commonly given as a matter of European custom. Teachout, *Corruption in America: From Benjamin Franklin's Snuff Box to Citizens United* 1–5 (2014). The Framers' decision to use broad and overlapping categories—with expansive modifiers—demonstrates their desire to make certain that they were prohibiting all profits, benefits, and gifts (monetary or otherwise).

[23] Because the Domestic Emoluments Clause's prohibition applies to Congress as well, it makes sense that the Framers would not have allowed Congress to consent to the President's receipt of otherwise impermissible emoluments, as it did with the Foreign Emoluments Clause.

OLC and the Comptroller General.[24] *See Noel Canning*, 134 S. Ct. at 2564; 11 Op. O.L.C. 89, 90 (1987) ("Consistent with its expansive language and underlying purpose," the Foreign Emoluments Clause "has been interpreted as being 'particularly directed against every kind of influence by foreign governments upon [federal] officers.'" (quoting 24 Op. Att'y Gen. at 117)).

OLC and the Comptroller General have consistently interpreted the word "emolument" to cover "any profits" accepted from a foreign or domestic government. 17 Op. O.L.C. at 119. They have reached this conclusion even when the recipient had no "direct personal contact or relationship between the [federal officer] and a foreign government," *id.*, and even when the amount accepted was small, *see, e.g.*, 6 Op. O.L.C. 156, 156–59 (1982) (finding that the Foreign Emoluments Clause prohibits a $150 consulting fee); *see also* Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, O.L.C., *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales*, at 5 (May 23, 1986) ("Alito Memo"), http://politi.co/2us47bu (applying the Foreign Emoluments Clause to the acceptance of a $150 fee for reviewing a Ph.D. thesis, but ultimately concluding that the fee could not "be said to be from a 'foreign state'" and did not raise the concerns that "we must presume exists whenever a gift or emolument comes directly from a foreign government or one of its instrumentalities").

As the President notes (at 47–48), OLC has interpreted the word "emolument," in the Domestic Emoluments Clause, to exclude President Reagan's retirement benefits from his service

---

[24]Although not binding on courts, OLC opinions are entitled to considerable weight because they "reflect[] the legal position of the executive branch" and "provid[e] binding interpretive guidance for executive agencies." *United States v. Arizona*, 641 F.3d 339, 385 n.16 (9th Cir. 2011), *aff'd in part, rev'd in part, Arizona v. United States*, 567 U.S. 387 (2012); *see also Cherichel v. Holder*, 591 F.3d 1002, 1016 & n.17 (8th Cir. 2010); *N.Y. Times Co. v. U.S. Dep't of Justice*, 138 F. Supp. 3d 462, 478 (S.D.N.Y. 2015); *Public Citizen v. Burke*, 655 F. Supp. 318, 321–22 (D.D.C. 1987).

as California governor because they were "vested rights" rather than "gratuities which the state is free to withdraw." 5 Op. O.L.C. at 187, 187–88; *see also* Comp. Gen. B-207467, 1983 WL 27823, at *3 (1983) (reaching same conclusion because pension was "previously earned," "fully vested," and "set by statute"). But this conclusion is consistent with defining emolument to mean "profit" or "gain," because a legal entitlement that was fully vested *before* winning office is not a profit or gain "received" or "accepted" while *in* office. It is also consistent with the Clause's purpose.

The President does not point to any opinion from either OLC or the Comptroller General concluding that profits received while in office are not emoluments. Nor does he identify any historical precedent for his acceptance of profits and other lucrative benefits from foreign and domestic governments. Sometimes "the most telling indication of [a] severe constitutional problem" with a novel assertion of authority by the Executive "is the lack of historical precedent." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (*PCAOB*) (internal quotation marks omitted). So it is here.

The President has no answer, moreover, to the most recent and analogous opinion on point. Several months ago, the Office of Congressional Ethics (OCE) directly addressed whether a federal officeholder's acceptance of profit derived from the rental of rooms to a foreign government may run afoul of the Foreign Emoluments Clause. *See* OCE Report, Review No. 17-1147 (June 2, 2017), https://goo.gl/XhVqkd. It answered yes. Applying some of the same OLC precedent mentioned above, OCE concluded that "[t]here is no exception or limitation" on the meaning of "emolument" for when an officeholder "generates the profit from a fair market value commercial transaction"; that "the term 'emoluments' is not limited to payments from a foreign government that result from an individual's official duties"; and that "the receipt of profit from a

foreign government for rental property may implicate the constitutional prohibition against receipt of 'any emolument' of 'any kind whatever' from a foreign state." *Id.* at 12–13.[25]

In light of the many indicators of text, structure, purpose, and practice—all of which point in the same direction—the general definition of "emolument" should apply, and the Clauses should be read to encompass profits from foreign or domestic governments accepted by the President through voluntary commercial transactions with his businesses. President Trump does not deny that, on this reading, the complaint unquestionably makes out ongoing violations.

**B. The complaint states a claim under the Emoluments Clauses even if the narrower, less common definition of "emolument" were to apply.**

At this stage, however, the Court need not definitely resolve the meaning of emolument because the complaint makes out claims even under the rarer definition. As noted, this definition (as the President points out) covers any "profit arising from an office or employ"—which is to say, profit arising from an office or "a person's trade, [or] business." Barclay, *A Complete and Universal English Dictionary*; *see* Def. Mem. 32 (quoting this definition).

That definition is easily satisfied here. The complaint alleges that foreign diplomats have stated that "all the delegations will go" to President Trump's properties as a way of currying favor with him now that he is President, and that his District of Columbia hotel has directly targeted their business by "hir[ing] a 'director of diplomatic sales" and "specifically market[ing] itself to the diplomatic community." Compl. ¶¶ 37–39. The complaint also alleges that "[t]hese statements have become reality." *Id.* ¶ 40 (Embassy of Kuwait moved event from Four Seasons to

---

[25] Although the President offers no response to OCE's opinion here, he has elsewhere conceded key parts of its analysis. Just last month, he said that he "would be willing to concede" that payments can constitute emoluments even if they are "funneled through some business." Tr. in *CREW v. Trump* at 34. He has also conceded that fair-market commercial transactions—like buying "a million dollars worth" of a product—"could" run afoul of the Constitution. *Id.* at 32.

Trump Hotel after election); *id.* ¶ 41 (Saudi Arabian agents' hotel stays and meals). These benefits, as alleged, meet the narrower definition in two independent ways: They plausibly arise out of President Trump's position as President (or to use his words, they have something "to do" with the fact that he is President, Def. Br. 30). And they plainly arise out of his business.

The Domestic Emoluments Clause allegations also meet the narrower definition. One example is the lease for the Trump International Hotel, under which the President is now both landlord and tenant. The complaint alleges that (1) the President, within days of taking office, replaced the acting GSA administrator; (2) then, seven weeks later, the President released a proposed 2018 budget "increasing GSA's funding, while cutting all (or nearly all) other non-defense-related agencies' budgets"; and (3) one week after that, the GSA issued a letter stating that President Trump's business is in "full compliance" with the lease—even though the lease, by its terms, forbids any "elected [federal] official" from sharing or benefiting from the lease. Compl. ¶¶ 80–86.[26] This alleged emolument—forgiving a clear breach of the lease, thus allowing the President's hotel to continue in operation, generating millions in profits—flows directly from his position as President. Indeed, the emolument could not have been provided if he were *not* President. And the other benefits that he has received (or will soon receive) from federal agencies or state governments also satisfy the narrower definition because they too are alleged to arise out of his business and his position as President. *See, e.g.*, *id.* ¶ 98; Miller & Thistle, *Luxury hotels, fine dining for LePage on taxpayers' dime* (detailing thousands of dollars spent by Maine to stay at the President's hotels and dine in his restaurants as the State's governor attended meetings with top Trump Administration officials).

---

[26] *See also* GSA, *FY 2018 Congressional Justification*, at GSA-10 (May 23, 2017), *available at* https://goo.gl/kYif2a (listing a FY 2018 request exceeding the FY 2017 budget, as included in a continuing resolution, by more than $33 million).

The narrower definition is also satisfied by the allegations that the President has profited from foreign and domestic governments by increasing his prices after the election. As the complaint alleges: "Since the defendant's inauguration as President, goods and services sold by his various Trump businesses have sold at a premium," and "these goods and services provide (or have the potential to provide) a unique benefit: access to, influence on, and the goodwill of the President of the United States." Compl. ¶ 100. The complaint also provides specifics: Soon after the election, guest room rates at the Trump International Hotel increased, and the Mar-a-Lago initiation fee doubled to $200,000. *Id.* ¶¶ 101–02. These profits are related to his presidency and arise out of his business.

What these examples show is that, as applied to the President of the United States, there is little practical difference between the two definitions. When the President interacts with domestic governments or foreign nations, he does not do so as an "ordinary citizen," Def. Br. 41, but as a head of state whom they have a powerful incentive to influence in any way possible. Thus, when the President receives profits from foreign or domestic governments—whether directly or through a business that he owns—they are at least plausibly "received in consequence of his possession of the Presidency." 1983 WL 27823, at *3. As a result, even if this Court were to apply the narrower definition, the complaint makes out a claim.[27]

---

[27] The complaint also alleges that the President is accepting "presents" from foreign governments. It highlights, in particular, his sudden receipt of valuable trademark protection from the Chinese government within a month of becoming president, after ten years of failure. *See* Compl. ¶¶ 64–70. As alleged, this chain of events supports a plausible allegation that the trademarks are a present, and the President's only response (buried in a footnote) comes nowhere near justifying dismissal. *See* Def. Br. 37 n.33 (musing about what "may be intended" by Chinese trademark policy). Moreover, many of the additional allegations—including that the President is receiving discretionary permits and approvals from foreign governments, as well as payments ostensibly made for hospitality services for which his businesses now charge a premium—have been properly pleaded as prohibited "presents." Compl. ¶¶ 29–78, 100–02, 134–39.

**C.   The President's cramped reading of "emolument"—as limited to payments received as part of a bribe or for services that he personally performs—lacks any justification and should be rejected.**

President Trump does not deny the complaint's allegation that he is accepting profits and other benefits from foreign and domestic governments through his businesses. Nor does he deny that the complaint plausibly alleges that at least some of these profits are the direct result of him being President, and that all of them arise out of his business. Instead, he advocates for additional limitations on the definition of emolument that lack any textual foundation, would eviscerate the purposes of the Clauses, and have no basis in precedent.

*Text.* Starting with the text, although the President purports to ground his reading in the narrower definition of emolument ("profit arising from an office or employ"), he rewrites it to capture only those benefits received "in exchange for his official action or personal services." Def. Br. 32–33. That departure cannot be reconciled with the fact that "profit arising from an office" includes any money that is received as a consequence of holding the office; it is not limited to compensation received in exchange for a specific official act. And "employ" encompasses "a person's trade, [or] business," Barclay, *A Complete and Universal English Dictionary*; it is not restricted to the provision of "personal services rendered directly to a foreign government." Def. Br. 47.

The limitations that the President grafts onto the narrower definition are particularly inappropriate because they are entirely unsupported by the surrounding text, which (for the reasons discussed above) imbue emolument with a broad meaning.[28]

---

[28] The President claims (at 34) that the Incompatibility Clause supports his interpretation. But that Clause, instead of containing *expansive* modifiers like "any" and "of any kind whatever," contains a *restrictive* modifier. U.S. Const. art. II, § 6, cl. 2 ("No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments *whereof* shall have been encreased during such time." (emphasis added)). Likewise, the cases on which the President relies (at 31–32) address the meaning of "emolument" in statutes containing restrictive modifiers. *See*

*(footnote continued on next page)*

***Purpose.*** Even if President Trump's limitations were plausible as a textual matter, they would be foreclosed by considerations of purpose. As explained above, the Foreign Emoluments Clause sought to "lock up every door to foreign influence." 5 Annals of Cong. 1584 (1798) (Claiborne). The President's interpretation of the Clause, however, would blow the doors wide open, and in doing so erode the Clause's prophylactic structure. Indeed, the President does not even attempt to explain why his two proposed limitations—quid pro quo and personal services—further the Clause's purposes. That is not surprising; they do not. Bribery is difficult to establish (and separately dealt with by the Constitution, *see* U.S. Const. art. II, § 4), while a personal-services requirement is easy to circumvent. *See McDonnell v. United States*, 136 S. Ct. 2355 (2016) (illustrating difficulties of proof in the bribery context). Nor does the President deny that the benefits he receives from foreign states, as alleged, "raise the kind of concern (viz., the potential for 'corruption and foreign influence') that motivated the Framers in enacting the constitutional provision." Alito Memo, at 5.

Nor could he. In public statements, President Trump has repeatedly demonstrated the enduring wisdom of the Clause's central insight—that our leaders "might be biased, and [their] loyalty divided, if they received financial benefits from a foreign government." 17 Op. O.L.C. at 122. He has said of Saudi Arabia: "I get along great with all of them. They buy apartments from me. . . . They spend $40 million, $50 million. Am I supposed to dislike them? I like them very much." Compl. ¶ 55. He has shared a similar sentiment about China: "I love China! The biggest bank in the world is from China. You know where their United States headquarters is located? In

---

*Hoyt v. United States*, 51 U.S. (10 How.) 109, 135 (1850) ("emoluments of office"); *McLean v. United States*, 226 U.S. 374, 377 (1912) ("emoluments . . . due . . . as a major"); *United States v. Hill*, 120 U.S. 169 (1887) ("emoluments of his office"); *United States v. Ripley*, 32 U.S. (7 Pet.) 18, 18 (1833) ("emoluments to which his rank entitled him").

this building, in Trump Tower." *Id.* ¶ 50; *see also* Venook, *Could Trump's Financial Ties Have Influenced His Phone Call With Erdogan?*, Atlantic, Apr. 18, 2017, https://goo.gl/f7bv96 ("I have a little conflict of interest because I have a major, major building in Istanbul.").

If foreign governments could spend "$50 million" to "buy" things from the President so that he would "like them very much," the Clause's purpose would be obliterated. The President does not deny that, under his interpretation, the Clause would prohibit a federal officeholder from accepting a $5 tip to personally serve a foreign diplomat breakfast at a restaurant, but she could accept unlimited amounts of money if she owned the restaurant and had those same services performed by her employees. *See* ECF No. 94 (Def. Reply) in *CREW v. Trump*, No. 17-458, at 22 n.15. (S.D.N.Y. Sept. 22, 2017) (acknowledging this result in related litigation and saying that "the Clause is directed at the provision of personal service by the officeholder"). By the same token, on the President's interpretation, the Clause would allow a foreign head of state to present him with a $100,000 check, made out to the Trump International Hotel, as payment for a block of suites and event space at the hotel. But the answer would be different if the President were to escort the head of state to the hotel, personally open the door, serve him a drink, show him around, take his bags to his room, and then deposit the check himself before leaving. It is implausible that the Framers would have wanted the Clause to work in this way.

The problems with the President's interpretation of "emolument" are no less glaring in the context of the Domestic Emoluments Clause. Because that Clause prohibits only emoluments and not presents, the President's definition would leave a gaping hole in the Clause's coverage. If the Clause covered only bribery (an impeachable offense) and payments for personal services, it would allow States and the federal government to make large cash payments to the President so long as they were ostensibly in exchange for nothing in particular. That cannot be right.

Like the Foreign Emoluments Clause, the Domestic Emoluments Clause is a prophylactic anti-corruption provision. As already explained, it rests on the Framers' keen understanding of human nature and the potential of money to warp a person's judgment—that "power over a man's support is a power over his will." *The Federalist* No. 73. The Framers knew from history that "examples would not be wanting, even in this country, of the intimidation or seduction of the Executive by the terrors or allurements of [] pecuniary arrangements." *Id.*

The Domestic Emoluments Clause sought to prevent those ends by preventing their beginnings. It would, in Alexander Hamilton's words, protect "the independence intended for [the President] by the Constitution," and ensure that neither the federal government nor the States could "weaken his fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice." *Id.*  The Framers "feared that if the office offered both power and profit, the persons who sought the office would 'not be the wise and moderate,'" or "'the men fittest for trust.'" *Nixon v. Sampson*, 389 F. Supp. 107, 137 (D.D.C. 1975); *see also Griffin v. United States*, 935 F. Supp. 1, 4 (D.D.C. 1995) ("This provision addressed the Framers' concern that the President should not have the ability to convert his or her office for profit.").

Those precise concerns are implicated here. The plaintiffs allege that the President receives or will receive numerous financial benefits from States and federal agencies—including special treatment from GSA as to the Old Post Office lease, discretionary tax credits, and payments from state and federal entities to businesses he owns. *See* Compl. ¶¶ 79–99. Such benefits are in the heartland of the Clause's scope.

***History and practice.*** With no justification that is rooted in the text or purpose, President Trump tries to salvage his interpretation by reference to history and practice. In doing so, he relies almost entirely on inferences drawn from evidence that does not exist or events that did not happen: (1) a lack of evidence showing that the Framers were concerned about presidents

44

doing business with governments; (2) a failed constitutional amendment; and (3) the absence of an OLC opinion confronting this precise scenario. Each of these arguments is misplaced.

The President first relies on the fact that some early presidents had "private business interests" exporting agricultural products, and "there is no evidence of these Presidents taking any steps to ensure that they were not transacting business with a foreign or domestic governmental instrumentality." Def. Br. 45, 51. But there is also no evidence that "foreign governments or government-owned corporations" were in fact "among the customers of the farm and other products regularly exported by early Presidents." Def. Br. 43. Nor does President Trump identify any historical example of a president actually accepting profits from a foreign state. And the one historical example he gives of a potential domestic emolument is easily distinguishable: It involved a public sale at auction of property from the Territory of Columbia purchased by George Washington, who later made clear that he had no desire to "stand on a different footing from every other purchaser," and was "ready to relinquish" the property if necessary. *See* Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), https://goo.gl/Ugn7N1.

The President next relies on a failed amendment proposed just before the War of 1812 that would have stripped the citizenship of anyone who, "without the consent of Congress, accept[ed] and retain[ed] any . . . emolument of any kind whatever, from any . . . foreign power." Def. Br. 45. The President says that this amendment, even though it did not pass, supports his interpretation of "emolument" because it would have been "radical" for this amendment to cover profits from "engaging in commerce with foreign governments or their instrumentalities." *Id.* That indeed would have been an extreme result, which might be why it never became law. But it would have been extreme even under the President's interpretation of emolument: the bartender at the Trump Hotel would have lost his citizenship for accepting a tip from a foreign

official, as would a taxi driver for doing the same. Accordingly, whatever can be made of the failed amendment, it does not help the President here. *Cf. Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994) (refusing to give weight to "failed legislative proposals").

Finally, the President turns briefly to OLC and Comptroller General opinions. But instead of explaining why his position is consistent with the reasoning OLC and the Comptroller General have set forth in their opinions, he focuses on the absence of an opinion confronting a situation quite like this one. *See* Def. Br. 48–49. The scope and scale of President Trump's business ventures is certainly unprecedented, but the lack of a comparable historical example cuts *against* the constitutionality of his conduct. *See PCAOB*, 561 U.S. at 505. Moreover, it is a mistake to read anything into the fact that the OLC and Comptroller General opinions typically involve emoluments stemming from employment relationships. The officeholders who request opinions from OLC or the Comptroller General tend to be people who make their living by providing professional services. So it makes sense that the opinions would reflect this fact.

The President's claim that these opinions affirmatively support his cramped view is meritless. Both OLC and the Comptroller General have rejected his argument that a federal officer must "personally" provide services to a government to violate the Emoluments Clauses or that he can hide behind the corporate form by having an entity he owns accept profits from foreign governments.

In a 1993 opinion—which President Trump relegates to a footnote (at 49 n.66), OLC examined whether the Foreign Emoluments Clause applies to federal officers who are also partners in law firms that do business with foreign governments. 17 Op. O.L.C. at 117–19. As partners, the officers were entitled to receive a "proportionate share" of "client revenues," including "any profits" earned from foreign governments. *Id.* The question was whether they could receive the profits without congressional consent, on the theory that the officers did "not

personally represent foreign governmental clients and ha[d] no dealings with them," and were not "subject to the foreign government's 'control.'" *Id.*

OLC expressly rejected the argument that the Clause is inapplicable simply because there was no "direct personal contact or relationship between the [federal officer] and a foreign government." *Id.* at 119. OLC also found that the lack of "control" was "not decisive." *Id.* "More important," OLC stressed, was that the profits "would be a function of the amount paid to the firm by the foreign government," making the partnership effectively "a conduit for that government." *Id.* Because an "identifiable portion" of the member's profits "could fairly be attributed to a foreign government," OLC concluded that "acceptance of that portion" would "constitute a prohibited emolument," requiring congressional consent. *Id.* at 119–20.[29]

The President does not even attempt to harmonize his position with the reasoning of this opinion, or to explain why the concerns of the Clause were triggered in that scenario but not here. And his attempts to shoehorn the opinion into the tailor-made category of "akin to an employment relationship" are unpersuasive. Def. Br. 48–49 & n.66. The opinion itself distinguished OLC's "precedents in the employment area" as "not directly on point." 17 Op. O.L.C. at 119. And there is no plausible reason why the Clause would cover profits from foreign-government clients only as to one type of business (a law firm), but not another.

Other OLC opinions similarly undercut the President's view. In one opinion, for example, OLC made clear that "[t]he applicability of the Emoluments Clause" does not turn on whether an official is actually "subjected to improper foreign influence," 11 Op. O.L.C. at 91

---

[29] Although OLC later reconsidered this opinion, it did so only as to whether a member of the Administrative Conference holds an "Office of Profit or Trust"—not as to what constitutes acceptance of an impermissible emolument. *See Applicability of the Emoluments Clause to Nongovernmental Members of ACUS*, 2010 WL 2516024 (June 3, 2010).

n.5—in square conflict with the President's bribery limitation.[30] In another opinion, OLC found that the Clause prohibited a Nuclear Regulatory Commission employee from accepting $150 to review a foreign-government-funded project "for an American consulting firm." 6 Op. O.L.C. at 156. OLC refused to "conclude that the interposition" of the consulting firm "relieve[d] the NRC employee of the obligations imposed by the Emoluments Clause." *Id.* at 158–59.

The same reasoning applies here. If the corporate form does not immunize the President's acceptance of profits from foreign states, and he concedes that he cannot provide personal services to those governments, he should not be permitted to accept the profits simply because he owns the company that sells its services to them. On the President's view, the NRC employee would have been in the clear if, instead of being a mere employee, he *owned* the firm— in which case he could have earned unlimited profits from foreign states. That cannot be the law, and no OLC opinion suggests that it is.

Nor does any Comptroller General opinion. To the contrary, the Comptroller General's longstanding approach makes clear that the existence of a corporation does not immunize the receipt of profits from foreign governments where "there is such unity of interest and ownership that the separate personalities of the corporation and its shareholders no longer exist," or under other circumstances where "equity dictates." *In re Shaffer*, 62 Comp. Gen. 432, 434 (1983); *accord Retired Marine Corps Officers*, Comp. Gen. B-217096, 1985 WL 52377, at *1 (Mar. 11, 1985).

This does not mean, as the President asserts, that mutual funds or "mere stock holdings by a covered official in companies that conduct business globally would also violate the Foreign Emoluments Clause." Def. Br. 52. Rather, what this precedent illustrates is that OLC and the

---

[30] The President's own counsel has also undercut his bribery limitation, having conceded that the meaning of emolument does not depend on any "subjective intentions." Tr. in *CREW v. Trump*, at 24.

Comptroller General take a functionalist approach as to whether a particular emolument may be deemed "accepted" by a federal officeholder and given by a "foreign state," while consistently interpreting "emolument" to encompass any profits and gains of any kind. *See* 1985 WL 52377, at *3 ("[W]e base our determinations on the actual relationship involved and not merely on form."); Alito Memo, at 3–5 (engaging in a pragmatic, purpose-driven inquiry into whether an emolument "can be said to be from a 'foreign state'").[31]

Nor does this precedent require reading the Clause to "encompass any possible thing of value that an officeholder might receive in any capacity," Def. Br. 37, including even non-discretionary benefits fixed long before a federal official took office and became subject to the Clause. That is neither OLC's position nor the Comptroller General's position, nor is it the plaintiffs' contention. As noted, OLC has instead interpreted the word "emolument" to exclude President Reagan's gubernatorial retirement benefits because they were "vested rights" already earned—a conclusion that is consistent with defining emolument to mean profit or gain "received" or "accepted" while in office. 5 Op. O.L.C. at 187–88. This OLC opinion also implicitly rejected the President's argument (at 33) that the Domestic Emoluments Clause applies only to benefits received "for his Services" as president. If the argument were correct, this would have been the most straightforward way of resolving the issue. But OLC did not say that

---

[31] The President hypothesizes in passing (at 52 & n.69) that some "foreign public universities" might have purchased a copy of a book by President Obama as part of "their library collection," and that this might have occurred while he was in office. But that possibility, even if true, would raise a very different question from any presented here: whether a payment from a foreign university to a foreign wholesaler who then pays an American publisher, who ultimately provides fractional royalties to an American officeholder, would constitute "acceptance" of an emolument by that officeholder from a "foreign state." *See* Alito Memo, at 3–5 (finding that a $150 payment from an Australian public university to review a Ph.D. thesis could not "be said to be from a 'foreign state'").

President Reagan could accept the pension for that reason. Instead, OLC assumed that "any other Emolument" includes financial benefits not received as compensation for being president.

In sum, the President's bribery-or-personal-services-only interpretation "marks a decisive break from the more conscientious approach long espoused by both the Comptroller General and the Office of Legal Counsel," and thus finds no support in precedent. Chong, *Reading the Office of Legal Counsel on Emoluments: Do Super-Rich Presidents Get a Pass?*, Lawfare, July 1, 2017, https://goo.gl/mr7h17. It should be rejected, and provides no basis on which to dismiss this suit.

## III.     The President's other arguments are meritless.

The President also maintains that this case should be dismissed even if he is violating the Constitution and causing the plaintiffs harm. He makes two arguments in support of this contention: (1) the plaintiffs lack a cause of action, and (2) the equitable relief sought would violate the constitutional separation of powers. He is wrong on both counts.

### A.   Maryland and the District have a cause of action to seek equitable relief.

The President first challenges the plaintiffs' ability to bring this case in equity, arguing (at 26) that the Emoluments Clauses "are not a source of federal rights such that the Court may imply a cause of action under them." But the plaintiffs are not relying on the Clauses as a "source of federal rights." Nor are they asking the Court to imply a new cause of action. Their position, rather, is that this case may proceed under the Court's traditional equitable jurisdiction.

Equitable actions have "long been recognized as the proper means" to prevent public officials "from acting unconstitutionally." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). Because such actions seek simply "to halt or prevent [a] constitutional violation rather than the award of money damages," they do "not ask the Court to imply a new cause of action." *United States v. Stanley*, 483 U.S. 669, 683 (1987). To the contrary, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and

reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925) ("Prevention of impending injury by unlawful action is a well-recognized function of courts of equity."); *Gilman v. City of Phila.*, 70 U.S. (3 Wall.) 713, 723–24 (1865) (holding that "a court of equity will interpose by injunction" to prevent "specific injury to an individual" caused by an act that is "repugnant to the Constitution"); *Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845) (expressing "no doubt" that "relief may be given in a court of equity" to "prevent an injurious act by a public officer"); Mitford, *A Treatise on the Pleadings in Suits in the Court of Chancery by English Bill* 43 (2d ed. 1787) (noting that equitable relief traditionally required only "that the acts complained of are contrary to equity, and tend to the injury of the complainants, and that they have no remedy, or not a complete remedy, without the assistance of the court").

The President concedes that equitable actions have long been available "to enjoin unconstitutional actions by public officials," Def. Mem. 26, but he offers several reasons why he thinks this Court should impose a new limitation to "displace the equitable relief that is traditionally available." *Armstrong*, 135 S. Ct. at 1385. None is persuasive.

*First*, he points to the fact that the plaintiffs "are not preemptively asserting a defense to a potential enforcement action." Def. Br. 27. But he cites no decision limiting the availability of equitable relief to the pre-enforcement context, and for good reason: This proposed limitation contravenes both precedent and history—precedent, because the Supreme Court has repeatedly (and recently) allowed plaintiffs to bring equitable actions even though they were not subject to a potential enforcement action[32]; and history, because courts in equity traditionally did the same.[33]

---

[32] *See, e.g.*, *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 133 S. Ct. 2096, 2104 (2013); *Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247, 2251 (2013); *Arizona v. United States*, 567 U.S. at 415; *Foster v. Love*, 522 U.S. 67, 68–70, 74 (1997); *Gilman*, 70 U.S. (3 Wall.) at 721–22.

51

*Second*, the President relies on the fact that the Emoluments Clauses create no individual rights, but instead serve anti-corruption and structural ends. The suggestion here is that federal courts' equity jurisdiction should exclude actions alleging violations of the Constitution's structural provisions. Def. Br. 28. The Supreme Court, however, has squarely rejected that notion. *See PCAOB*, 561 U.S. at 491 n.2. In *PCAOB*, the Court was asked to forbid a "private right of action directly under the Constitution to challenge governmental action" that violates structural provisions. *Id.* The Court refused. It found that there is "no reason" and "no authority" supporting the view that claims to enforce structural provisions "should be treated differently than every other constitutional claim." *Id.*; *see also Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 119 (1989) (Kennedy, J., dissenting) (noting that plaintiffs alleging structural violations may "seek[] declaratory and equitable relief in the federal district courts through their powers under federal jurisdictional statutes," because "[t]hese statutes do not limit jurisdiction to those who can show the deprivation of a right, privilege, or immunity secured by federal law" (citing 28 U.S.C. §§ 1331, 2201, 2202)); *LaRoque v. Holder*, 650 F.3d 777, 792–93 (D.C. Cir. 2011).

Even before *PCAOB*, the Supreme Court routinely allowed plaintiffs to sue for equitable relief to prevent the violation of a structural provision. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 412–13 (2003) (foreign-affairs power); *Printz v. United States*, 521 U.S. 898, 918 (1997) (anti-commandeering principle derived from "the structure of the Constitution"); *South-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 86–87 (1984) (Commerce Clause); *INS v. Chadha*, 462 U.S. 919,

---

[33] *See, e.g.*, *Hughes v. Trs. of Morden Coll.*, 1 Vesey 188 (Ch. 1748) (injunction to prevent digging); *Gardner v. Trs. of Newburgh*, 2 Johns. Ch. Rep. 162 (N.Y. Ch. 1816) (injunction against diversion of stream); *Belknap v. Belknap*, 2 Johns. Ch. Rep. 463 (N.Y. Ch. 1817) (similar); *Bromley v. Smith*, 1 Simons 8 (Ch. 1826) (injunction to prevent misuse of funds); *Rankin v. Huskisson*, 4 Simons 13 (Ch. 1830) (injunction prohibiting building construction); *Cooper v. Alden*, Harrington's Ch. Rep., 72 (Mich. Ch. 1838) (similar).

935–36 (1983) (bicameralism and presentment); *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 458 (1978) (Compact Clause); *Hill v. Wallace*, 259 U.S. 44, 48 (1922) (Commerce Clause); *Gilman*, 70 U.S. (3 Wall.) 713 (same). In fact, these kinds of suits "have been the principal source of judicial decisions concerning separation of powers and checks and balances." *Bond v. United States*, 564 U.S. 211, 222 (2011). The upshot of this unbroken line of precedent is that, "[i]f the constitutional structure of our Government . . . is compromised," those "who suffer otherwise justiciable injury may object." *Id.* at 223.

The President cannot avoid this conclusion by invoking the zone-of-interests test. To begin, it is doubtful that this test has any application to constitutional claims after the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). Although the test had been "previously classified as an aspect of 'prudential standing,'" the Supreme Court has now "found that label inapt." *Id.* at 1387 & n.3. The test is instead a question of statutory interpretation: "Whether a plaintiff comes within the 'zone of interests' is an issue that requires [courts] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 1387. Even then, "[t]he test is not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). Plaintiffs need only show that they "arguably" fall within the zone of protected interests. *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1301 (2017).

If the Court were to apply it, the zone-of-interest test would pose no barrier to review here. The President does not cite any case in which a court dismissed, on zone-of-interest grounds, an otherwise cognizable claim seeking to prevent the violation of a structural constitutional provision. That is not surprising. Because States are protected by the Constitution's structure, "they are not disabled from relying on [structural provisions] in otherwise justiciable cases and controversies." *Bond*, 564 U.S. at 223. And even if some version of the test were to apply

53

here, the plaintiffs would easily satisfy it. That is especially true with respect to the Domestic Emoluments Clause, which exists to protect "the United States" and "any of them" from having to compete with one another to curry favor with the President, U.S. Const. art. II, § 1, cl. 7, and thereby "helps to ensure presidential impartiality among particular members or regions of the Union." Delahunty, *Compensation*, in *The Heritage Guide to the Constitution* 251, 251 (2d ed. 2014). The interests that the plaintiffs seek to vindicate are thus at the very heart of the Clause, and the President barely attempts to argue otherwise. If the Emoluments Clauses provide no protection even to the plaintiffs in this case, it is hard to imagine who would fall within the Clauses' zone of interests on the President's view. Erecting a test in which *no one* may bring suit to stop flagrant unconstitutional conduct, even those who suffer direct harm as a result, makes no sense as an equitable matter and finds no support in the case law.

*Finally*, the President argues that this Court should refrain from exercising equitable authority over the plaintiffs' Foreign Emoluments Clause claim because "[t]he Constitution vests in Congress the power to waive Foreign Emoluments Clause violations." This is akin to an argument that the Clause is not justiciable because the consent-of-Congress provision expresses "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012). But that provision— which is inapplicable to the Domestic Emoluments Clause—does no such thing. It simply allows Congress to authorize the receipt of presents or emoluments that would otherwise be prohibited; it does not remove the Clause from the scope of judicial review. If it did, the Supreme Court could not have decided cases involving other clauses in the Constitution that contain indistinguishable consent-of-Congress provisions. *See Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 6 (2009) (Tonnage Clause); *Dep't of Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341, 342–43 (1964) (Export-Import Clause); *Canton R. Co. v. Rogan*, 340 U.S. 511 (1951) (same); *Brown v. Maryland*, 25 U.S.

419, 421–22 (1827) (same). The President's reading would also turn the Foreign Emoluments Clause on its head: A clause that *bans* emoluments unless Congress permits them would be inverted to *permit* emoluments unless Congress bans them. This case therefore does not fall within the tiny handful of cases that raise a political question—as distinct from a question with mere "political implications," *Zivotofsky*, 132 S. Ct. at 1428—and thus warrant a departure from the settled rule that "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014).

If anything, the allocation of power to Congress to authorize the receipt of otherwise impermissible presents or emoluments only underscores the Clause's importance as a separation-of-powers provision, which in turn only underscores the need for the availability of judicial review. *See Bond*, 564 U.S. at 222–26. There is no branch of government "better equipped than the courts" to decide constitutional default rules in cognizable cases. Def. Br. 29. And if Congress were to find that an exception to that default rule is warranted here, it could choose to authorize any of the President's "particular arrangements" with foreign governments, whatever they may be. *Id.* The potential for congressional action is no reason for this Court to stay its hand.[34]

**B. The equitable relief sought does not violate the separation of powers.**

In a final bid to evade judicial review, the President argues at (54–56) that this Court may not redress his violations because doing so would amount to "an unconstitutional remedy." That is incorrect. Far from barring judicial review, the separation-of-powers principles he invokes instead illustrate why such review is necessary here.

---

[34] The President also argues (at 29) that his status as President should restrict this Court's equitable jurisdiction. This is simply a variation of his argument that equitable relief against the President is unavailable, and it fails for the reasons discussed in the section that follows.

The Supreme Court has "long held" that federal courts "ha[ve] the authority to determine whether [the President] has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997). As part of this authority, courts have the power to restrain unconstitutional presidential action—either through injunctive relief, *see, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584 (1952), or declaratory relief, *see, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992).

"In most cases," of course, courts can issue such relief "against subordinate officials," obviating the need for relief against the President himself. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). That is what happened in *Youngstown*, for example, when the Supreme Court invalidated President Truman's "order directing the Secretary of Commerce to take possession of and operate most of the Nation's steel mills." 343 U.S. at 582. "Although the President was not a party, the Court enjoined the Secretary of Commerce from executing a direct Presidential order," *Nixon v. Fitzgerald*, 457 U.S. 731, 754 n.36 (1982), and thus "understood its [opinion] effectively to restrain the president," *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 611 (D.C. Cir. 1974) (*NTEU*); *see also Clinton*, 520 U.S. at 703 ("[W]e exercised our Article III jurisdiction to decide whether [the President's] official conduct conformed to the law.").

The President does not deny that issuing equitable relief of this sort is fully consistent with the constitutional separation of powers. Yet he claims that the equitable relief sought in this case is impermissible because it is "directly against" the President rather than a subordinate official. Def. Br. 55. What he fails to acknowledge is that this is "one of those rare instances" when "only injunctive relief against the President himself will redress [the plaintiffs'] injury." *Swan*, 100 F.3d at 978. The President cites no case in which a court held that it was unable to issue equitable relief against the President, for separation-of-powers reasons, even though subordinate officials could not be sued and such relief was thus necessary to prevent ongoing constitutional violations. As the D.C. Circuit has explained, "it would be exalting form over substance if the President's

56

acts were held to be beyond the reach of judicial scrutiny when he himself is the defendant, but held within judicial control" when "federal officials subordinate to the President . . . can be named as a defendant." *NTEU*, 492 F.2d at 613–15 (allowing case against the President to proceed where "no federal official other than the President [could] be properly named as defendant"); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done that the propriety or impropriety of issuing a mandamus, is to be determined.").

Such a formalistic distinction also ignores the "settled law" that courts are not precluded from "exercis[ing] jurisdiction over the President." *Fitzgerald*, 457 U.S. at 753–54 (listing examples); *see Boumediene v. Bush*, 553 U.S. 723 (2008) (habeas corpus); *Clinton v. New York*, 524 U.S. 417 (1998) (declaratory relief); *United States v. Nixon*, 418 U.S. 683 (1974) (subpoena); *United States v. Burr*, 25 F. Cas. 187 (No. 14,694) (CC Va. 1807) (Marshall, C.J.) (subpoena); *see also generally* Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612 (1997). The President implicitly tries to distinguish these cases by relying on the fact that the President was not the "sole defendant" in some of them, and the relief was not technically injunctive. Def. Br. 55. But he does not explain why these distinctions should matter for separation-of-powers purposes. And the plaintiffs here are seeking not only injunctive relief but also declaratory relief, which can provide sufficient redress on its own. *See Franklin*, 505 U.S. at 803. At any rate, contrary to the President's claim, district courts have "issued an injunction against the President" when "he was the sole defendant." Def. Br. 55; *see, e.g., Mackie v. Bush*, 809 F. Supp. 144, 148 (D.D.C.), *vacated as moot sub nom. Mackie v. Clinton,* 10 F.3d 13 (D.C. Cir. 1993); *Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983). This Court may do the same here.

Ultimately, President Trump's argument rests on an untenably broad reading of *Mississippi v. Johnson*, 71 U.S. 475 (1867), a post-Civil-War case brought by the State of Mississippi to

restrain President Johnson from enforcing the Reconstruction Acts, which required him to exercise his powers as Commander in Chief to place former confederate states under military control. The Supreme Court declined to reach the merits, in part for reasons suggesting that the Court thought the case raised "a nonjusticiable political question." *NTEU*, 492 F.2d at 614; *see Mississippi v. Johnson*, 71 U.S. at 500–01; *see also* Mashaw, *Federal Administration and Administrative Law in the Gilded Age*, 119 Yale L.J. 1362, 1401 n.123 (2010) ("*Mississippi v. Johnson* was, in essence, a political question case."). Indeed, after the Court dismissed the case, Mississippi refiled the suit against the Secretary of War, as did Georgia, and "[t]he Court dismissed both suits on the ground that they presented a nonjusticiable political question." *NTEU*, 492 F.2d at 614 (discussing *Georgia v. Stanton*, 73 U.S. (6 Wall.) 50 (1867); *Mississippi v. Stanton*, 154 U.S. 554 (1893) (decided 1868)). This case, by contrast, presents no political question, and the President does not put forth any reasoned argument to the contrary.

Even setting aside the political-question component of the Supreme Court's analysis, this case does not run afoul of *Mississippi v. Johnson*'s "general" pronouncement that courts may not "'enjoin the President in the performance of his official duties.'" *Franklin*, 505 U.S. at 802–03 (quoting *Mississippi v. Johnson*, 71 U.S. at 501). That is true for three independent reasons.

*First*, the Court in *Mississippi v. Johnson* addressed only the exercise of a President's "purely executive and political" powers, so the case should not be read to block any injunction against a President, no matter the circumstances. *See* 71 U.S. at 499 (assessing injunction's impact on duties to "assign generals" and "detail sufficient military force," which fall "under the supervision of the President as commander-in-chief"). In contrast to the discretionary question it faced, the Court expressly distinguished cases involving "a simple, definite duty" that is "imposed by law," and "to which nothing is left to discretion," where injunctive relief is appropriate. *Id.* at 498.

58

President Trump baldly asserts that the duty in this case is like the President's duties as Commander in Chief, in that it "cannot be fairly described as purely 'ministerial.'" Def. Br. 54 n.73. That is mistaken. The duty imposed here does not involve the discretionary exercise of the President's "executive or political" powers. The Foreign Emoluments Clause applies to every federal officer who occupies an "Office of Profit or Trust," not just the President. And both Clauses flatly prohibit the receipt of benefits—a rule that leaves no room for discretion. Because "the President is bound to abide by the requirements" of these Clauses, his obligation to comply with them "is ministerial and not discretionary." *Swan*, 100 F.3d at 977. Enforcing that obligation here does not require the Court to superintend the discharge of his executive or political functions, or "to perform any function that might in some way be described as 'executive.'" *Clinton*, 520 U.S. at 701. The plaintiffs are simply asking the Court to exercise its "core Article III jurisdiction to decide cases and controversies," *id.* , which does not in any way trench "on the authority and functions of the Executive Branch," *Fitzgerald*, 457 U.S. at 754.

*Second*, Maryland and the District are not seeking "an injunction requiring the President to take specified executive acts." *Franklin*, 505 U.S. at 827 (Scalia, J., concurring). They are seeking a declaration that the President is violating the Emoluments Clauses and, should the Court later deem it appropriate, an injunction preventing his continued violations insofar as they cause harm to Maryland and the District. How President Trump would choose to comply with the Court's orders, however, would be up to him.

*Finally*, the broad statement in *Mississippi v. Johnson* (later reiterated in *Franklin*) that courts, when possible, should not issue injunctive relief directly against the President is not an absolute command; it is a "general" rule. *Franklin*, 505 U.S. at 802–03. As previously explained, this general rule embodies the principle that "[s]uits contesting actions of the executive branch should be brought against the President's subordinates." *Al-Marri v. Rumsfeld*, 360 F.3d 707, 708 (7th Cir.

2004); *see also Franklin*, 505 U.S. at 803 (reaffirming that "injunctive relief against executive officials" is "within the courts' power"); *id.* at 828 (Scalia, J., concurring) ("[Denying relief against the President does not] in any way suggest[] that Presidential action is *unreviewable*. Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."). But the President's violations in this case are specific to him and involve no inferior officers who could be enjoined. So here, the President's position amounts to an argument that his unconstitutional conduct is *unreviewable*. No court has embraced reasoning that supports that alarming conclusion, and doing so here "would permit a striking anomaly in our tripartite system of government," allowing "the President, not this Court, [to] say 'what the law is.'" *Boumediene*, 553 U.S. at 765 (quoting *Marbury*, 5 U.S. (1 Cranch) at 177)). This Court should not allow that result. "[I]t has been firmly established that the courts may exercise authority over the President" when "necessary for the performance of the Judiciary's constitutional function." *Mackie*, 809 F. Supp. at 146. By denying the President's motion to dismiss, the Court would act not "in derogation of the separation of powers, but to maintain their proper balance," *Fitzgerald*, 457 U.S. at 754, and thereby reaffirm the basic principle that, in this country, the President is not "above the law," *United States v. Lee*, 106 U.S. 196, 222 (1882).

## CONCLUSION

The President's motion to dismiss should be denied.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Steven M. Sullivan
STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
PATRICK B. HUGHES
Federal Bar No. 19492
phughes@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
T: (410) 576-6325
F: (410) 576-6955


NORMAN EISEN
NOAH D. BOOKBINDER*
nbookbinder@citizensforethics.org
STUART C. McPHAIL*
smcphail@citizensforethics.org
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
455 Massachusetts Avenue, NW
Washington, DC 20001
T: (202) 408-5565
F: (202) 588-5020


JOSEPH M. SELLERS
jsellers@cohenmilstein.com
CHRISTINE E. WEBBER*
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, NW
Washington, DC 20005
T: (202) 408-4600
F: (202) 408-4699


* admitted pro hac vice

November 7, 2017

KARL A. RACINE
Attorney General for the District of Columbia
NATALIE O. LUDAWAY
Chief Deputy Attorney General
Federal Bar No. 12533
natalie.ludaway@dc.gov

/s/ Stephanie E. Litos
STEPHANIE E. LITOS*
Senior Counsel to the Attorney General
stephanie.litos@dc.gov
441 Fourth Street, NW
Washington, DC 20001
T: (202) 724-1521
F: (202) 730-1837


/s/ Deepak Gupta
DEEPAK GUPTA*
deepak@guptawessler.com
JONATHAN E. TAYLOR*
GUPTA WESSLER PLLC
1900 L Street, NW
Suite 312
Washington, DC 20036
T: (202) 888-1741
F: (202) 888-7792

Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2017, I electronically filed the foregoing brief with the Clerk of the Court of the District Court of Maryland by using the CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

*/s/ Joseph M. Sellers*
Joseph M. Sellers