**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

THE DISTRICT OF COLUMBIA AND
THE STATE OF MARYLAND,

                          Plaintiffs,                    Civil Action No. 8:17-cv-01596 (PJM)

v.

DONALD J. TRUMP, in his official capacity
as President of the United States of America,

                          Defendant.

**BRIEF OF FORMER NATIONAL SECURITY OFFICIALS
AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Harold Hongju Koh          Phillip Spector (MD Bar No. 20147)
RULE OF LAW CLINIC         MESSING & SPECTOR LLP
Yale Law School            1200 Steuart St. #2112
127 Wall Street, P.O. Box 208215   Baltimore MD 21230
New Haven, CT 06520-8215   202-277-8173
203-432-4932               ps@messingspector.com
harold.koh@ylsclinics.org

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................................................**iii**

**INTEREST OF AMICI CURIAE** ......................................................................................... **1**

**ARGUMENT** ......................................................................................................................... **1**

    I.    The Foreign Emoluments Clause seeks to protect U.S. national security and foreign policy interests by requiring Congress' notice and approval of the President's private business dealings with foreign governments ......................................................................................... 4

    II.    A reading of the Foreign Emoluments Clause that encompasses private business dealings with foreign governments is essential to U.S. national security and foreign policy interests in the modern era. ............................................................................................. 12

**CONCLUSION** ........................................................................................................... **15**

**APPENDIX: List of *Amici Curiae*** ........................................................................... **16**

# TABLE OF AUTHORITIES

**CASES**

*Am. Ins. Ass'n. v. Garamendi,* 539 U.S. 396 (2003) ...................................................... 8

*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936) ................................ 8

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076 (2015) .................................... 8

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 9, cl. 8 .......................................................................................... 2

**STATUTES AND LEGISLATIVE MATERIALS**

5 U.S.C. § 7342 (2012) ............................................................................................... 12

18 U.S.C. § 201 (2012) ................................................................................................. 9

18 U.S.C. § 203 (2012) ................................................................................................. 9

18 U.S.C. § 205 (2012) ................................................................................................. 9

18 U.S.C. § 207 (2012) ............................................................................................ 9, 10

18 U.S.C. § 208 (2012) ................................................................................................. 9

18 U.S.C. § 209 (2012) ............................................................................................... 12

18 U.S.C. § 219 (2012) ............................................................................................... 10

18 U.S.C. § 210 (2012) ................................................................................................. 9

18 U.S.C. § 211 (2012) ................................................................................................. 9

22 U.S.C. § 612 .......................................................................................................... 10

37 U.S.C. § 908 .......................................................................................................... 15

5 U.S.C. § 7342 (2012) ............................................................................................... 15

DAVID ROBERTSON, DEBATES AND OTHER PROCEEDINGS OF THE CONVENTION OF VIRGINIA (2d ed. 1805) (1788) ......................................................................................................... 6

RECORDS OF THE FEDERAL CONVENTION OF 1787 (Max Farrand ed., 1911) ........................... 5, 6

**EXECUTIVE MATERIALS**

5 C.F.R. § 2635.502 (2017). .................................................................................. 10

*Applicability of Foreign Emoluments Clause to Emp't of Gov't Emps. by Foreign Pub. Univs.*,
   18 Op. O.L.C. 13 (1994). ................................................................................ 6

*Application of Foreign Emoluments Clause to Part-Time Consultant for the Nuclear
   Regulatory Comm'n*, 10 Op. O.L.C. 96 (1986) .................................................. 6, 7

*Applicability of the Emoluments Clause to Non-Government Members of ACUS,* 17 Op.
   O.L.C. 114 (1993) ........................................................................................... 6, 7

Brief for the United States as Amicus Curiae, *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) ....... 13

*Committee on Foreign Investment in U.S.: Process Overview*, U.S. Dep't of the Treasury
   (Dec. 1, 2010) ................................................................................................ 10

*FOCI FAQs*, U.S. Dep't of Def. .............................................................................. 10

*Gifts from Foreign Prince-Officer-Constitutional Prohibition*, 24 Op. Att'y Gen. 116 (1902) ..... 7

*In re: Major Stephen M. Hartnett, USMC, Retired*, 65 Comp. Gen. 382 (1986) .......................... 7

Letter from Laurence H. Silberman, Acting Att'y Gen., to Howard W. Cannon, Chairman,
   Comm. on Rules and Admin., U.S. Senate (Sept. 20, 1974), .................................... 11

*Office of Overseas Prosecutorial Development Assistance and Training*, U.S. Dep't of Just. ..... 12

*To the Sec'y of the Air Force*, 49 Comp. Gen. 819 (1970) ........................................... 7

*The U.S. Global Anticorruption Agenda*, The White House (Sept. 24, 2015) ............................ 13

*U.S. Anti-Corruption Efforts*, U.S. Dep't of St. .......................................................... 12

**OTHER AUTHORITIES**

*Annex to the Recommendation of the Council on OECD Guidelines for Managing Conflict of
   Interest in the Public Service*, Org. for Econ. Co-operation and Dev. (2003) ........................ 13

Clyde L. Grose, *Louis XIV's Financial Relations with Charles II and the English Parliament*,
   1 J. MOD. HIST. 177, 200-01 (1929) ........................................................................ 5

*Conflicts of Interest and the Presidency*, CRS Legal Sidebar (Oct. 14, 2016) ............................ 11

Jack Maskell, Cong. Research Serv., R43365, Financial Assets and Conflict of Interest
   Regulation in the Executive Branch (2014) ................................................................ 12

LAWRENCE LESSIG, REPUBLIC, LOST: HOW MONEY CORRUPTS CONGRESS—AND A PLAN
  TO STOP IT (2011) ............................................................................................ 5

Letter from George Washington to Robert Howe (Aug. 17, 1979) ................................. 4

Mary Dudziak, *Desegregation as a Cold War Imperative*, 41 STAN. L. REV. 61 (1988) ............. 13

ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE, TO THE
  CONSTITUTION AND LAWS, OF THE FEDERAL GOVERNMENT OF THE UNITED STATES (William
  Young Birch and Abraham Small, 1803) ................................................................. 5

The Association of the Bar of the City of New York, Special Committee on Congressional
  Ethics, James C. Kirby, Executive Director, Congress and the Public Trust (1970) ................ 12

Theodoric Meyer and Matthew Nussbaum, *Trump Reports Assets of at Least $1.4 Billion in
  Financial Disclosure*, Politico (June 16, 2017) ...................................................... 11

ZEPHYR TEACHOUT, CORRUPTION IN AMERICA: FROM BENJAMIN FRANKLIN'S SNUFF BOX TO
  CITIZENS UNITED (2014) ...................................................................................... 6

### INTEREST OF *AMICI CURIAE*[1]

Amici curiae are former national security, foreign policy, and intelligence officials who have worked at the senior-most levels of the U.S. government for Presidents of both major political parties.  Through their decades of public service, amici are intimately familiar with the need for the Executive to act decisively, with one voice, on behalf of the nation.  For the same reason, amici understand the critical importance of—and while in office sought scrupulously to obey—rigorous ethical rules to protect against undue influence in the national security and foreign policy making process.

Amici respectfully submit this brief to lend the Court their perspective on why such strict ethical standards are so important to the national security and foreign policy interests of the United States.  The need for such standards supports reading the Foreign Emoluments Clause broadly enough to encompass private financial interactions with foreign governments.  Such a reading would allow Congress to exercise its oversight to ensure that no foreign influences improperly interfere with American policy, in a manner that does not undercut, but rather supports the Executive's wise exercise of national security and foreign policy prerogative.

### ARGUMENT

Amici take no position on the facts of this case.  But on this motion to dismiss, where Plaintiffs' factual allegations must be taken as true, one issue for decision is whether the facts alleged would make out an actionable claim under the correct legal reading of the Foreign

---

[1] Amici affirm that no counsel for any party authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person, other than amici, their members, and counsel, contributed money that was intended to fund preparing or submitting this brief.  The views expressed by Yale Law School's legal clinics are not necessarily those of the Yale Law School.

Emoluments Clause.  Plantiffs allege that the President has accepted something of value from a

foreign government without either notification of or approval by Congress.   If they can prove

that claim, then under the correct reading of the Foreign Emoluments Clause, they have stated a

claim upon which legal relief can be granted.  Amici write to address the significant national

security and foreign policy implications of this question.

The Foreign Emoluments Clause, U.S. Const. art. I, § 9, cl. 8, declares that

> "No Title of Nobility shall be granted by the United States: And no Person
> holding any Office of Profit or Trust under them, shall, without the Consent of the
> Congress, accept of any present, Emolument, Office, or Title, of any kind
> whatever, from any King, Prince, or foreign State."

By so saying, the Framers sought to prevent the undue influence of foreign governments

in our national security and foreign policy.  The Foreign Emoluments Clause does not bar

foreign payments *per se*.  Instead, on its face, it defines a constitutional *process* to ensure that

U.S. policymakers act solely in the nation's interest by (1) requiring *notification* of and *approval*

by Congress prior to (2) *acceptance* of value from a foreign government (3) by the President or

other federal officials.

Defendant would substitute for this approach a much narrower rule that allows the

President to accept value from a foreign government in a broad sweep of cases without any

process at all, including either notification of or approval by Congress.  Defendant concedes only

that the President may not receive certain gifts or compensation for services rendered in an

official capacity or as an employee of a foreign government.  But the Defendant's overly narrow

reading would allow:  (1) without any congressional oversight whatsoever, (2) acceptance of

value from private business deals involving foreign governments or instrumentalities (3) by the

President or other federal official in a manner that adds to their personal enrichment.  The

Defendant's constricted reading of the Foreign Emoluments Clause to exclude private financial

dealings would undermine our existing national security and foreign policy process and eviscerate the Clause's prophylactic function.

Defendant's reading of the Foreign Emoluments Clause would give the President license to engage in a wide range of financial entanglements that could leave vulnerable even the most important national security and foreign policy interests of the United States.  The Defendant's reading would permit a nation that plays a central role in the balance of power in the Middle East, one of the most fraught regions for U.S. national security in the world, to curry favor with the President by purchasing real estate from one of his companies.  Their reading would allow a rising superpower with whom the U.S. is engaged in a wide range of sensitive security and trade relations to pursue an advantage by granting intellectual property benefits to the President immediately upon his taking office.  Defendant's reading would allow a nation with one of the largest economies in Latin America, a region with critical interests for the U.S. in areas ranging from oil to trade to immigration, to approve a regulatory deal that personally enriches the President.

These are not hypothetical examples, but rather, specific allegations in the Plaintiffs' complaint involving Saudi Arabia, China and Argentina.  As federal officials, we scrupulously avoided these sorts of private transactions with foreign governments, precisely because they would expose the U.S. to actual or perceived interference with U.S. national security and foreign policy. We also held the many government officials we supervised to the same standard.  And when we entered the Executive Branch with private financial holdings that could give rise to conflicts of interest, we: (a) fully disclosed those relations, including in the ethics and national security clearance process, (b) recused ourselves from participating in national security or foreign policy matters related to those interests, and (c) took steps to avoid even an appearance

of impropriety, including the foreswearing of income, (d) all unless we obtained a waiver or approval from the appropriate official under the appropriate laws and regulations.  All of these were legal requirements that, however cumbersome, we understood were necessary and appropriate to fully safeguard our country's national security interests.

Allowing large streams of foreign government funds to go undisclosed and unreviewed would create a risk of undue influence through the entanglement of private funds and public decisions.  It would undermine U.S. anti-corruption and good governance efforts around the globe as a key tenet of U.S. national security and foreign policy, and it would inject confusion and fragmentation into our diplomatic relations by allowing foreign officials multiple opportunities for leverage in our national security and foreign policy.  Our security decisions should be based on national interest, not private gain; the venues for foreign policy and national security decision making should be embassies and diplomatic meetings, not corporate board rooms and private resorts; the means should be diplomatic engagement, not unreported financial relationships.  The Framers of the U.S. Constitution wrote the Foreign Emoluments Clause precisely to protect these sound foreign policy practices.  This Court should resist Defendant's efforts to gut it.

I.      **The Foreign Emoluments Clause seeks to protect U.S. national security and foreign policy interests by requiring Congress' notice and approval of the President's private business dealings with foreign governments.**

The Founders believed, in the words of George Washington, that "[f]ew men have virtue to withstand the highest bidder."[2]  They were especially concerned that foreign nations would use financial or other means to interfere in our national security and foreign policy decisions.

---

[2] Letter from George Washington to Robert Howe (Aug. 17, 1979), http://rotunda.upress.virginia.edu/founders/GEWN-03-22-02-0139.

Elbridge Gerry, a delegate to the Constitutional Convention, emphasized, "Foreign powers will intermeddle in our affairs, and spare no expence [sic] to influence them."[3]  Alexander Hamilton warned that "[f]oreign powers also will not be idle spectators.  They will interpose, the confusion will increase, and a dissolution of the Union ensue."[4]

To guard against these very real dangers, the Framers of the U.S. Constitution developed the Foreign Emoluments Clause.  Delegate Charles Pinckney introduced the Clause with the explanation that it was meant to "preserve foreign Ministers & other officers of the U.S. independent of external influence."[5]  An influential early American edition of Blackstone's Commentaries described the motivation behind the Foreign Emolument Clause as follows: "Corruption is too subtle a poison to be approached, without injury.  Nothing can be more dangerous to any state, than influence from without, because it must be invariably bottomed upon corruption from within."[6]

---

[3] 2 RECORDS OF THE FEDERAL CONVENTION OF 1787, at 268 (Max Farrand ed., 1911).

[4] 1 *id.* at 285.  An elected president posed an even greater risk: Madison noted that a president, as opposed to a hereditary monarch, would lack "that permanent stake in the public interest which would place him out of the reach of foreign corruption."  1 RECORDS OF THE FEDERAL CONVENTION, *supra* note 3, at 138.  Even the British, however, were aware of the threat of external corruption:  After dissolving Parliament, Charles II received payments from France, which raised concerns among some about Britain's dependence on the French.  *See* LAWRENCE LESSIG, REPUBLIC, LOST: HOW MONEY CORRUPTS CONGRESS—AND A PLAN TO STOP IT 19 (2011); *see also* ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE, TO THE CONSTITUTION AND LAWS, OF THE FEDERAL GOVERNMENT OF THE UNITED STATES (William Young Birch and Abraham Small, 1803) ("In the reign of Charles the second of England, that prince, and almost all his officers of state were either actual pensioners of the court France, or supposed to be under its influence . . . . The reign of that monarch has been . . . disgraceful to his memory."); Clyde L. Grose, *Louis XIV's Financial Relations with Charles II and the English Parliament*, 1 J. MOD. HIST. 177, 200-01 (1929) (noting that Charles II received funds from France after dissolving Parliament).

[5] 2 RECORDS OF THE FEDERAL CONVENTION, *supra* note 3, at 389.

[6] ST. GEORGE TUCKER, *supra* note 4, at  295.

The leading historical incident that motivated the inclusion of the Foreign Emoluments Clause in the Constitution was the King of France's presentation of a snuff box to Benjamin Franklin and other U.S. envoys.[7] These gifts focused America's attention on the need for constitutional guardrails on the ability of foreign powers to transfer items of value to influence U.S. national security. Delegate Edmund Randolph would later explain, "if at that moment, when we were in harmony with the king of France, we had supposed that he was corrupting our ambassador, it might have disturbed that confidence, and diminished that mutual friendship, which contributed to carry us through the war."[8] To address this concern, Randolph observed, "[i]t was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states."[9]

Consistent with this purpose, the Framers wrote a Foreign Emoluments Clause that is sweeping in its scope. The broad constitutional language that emerged prohibited the acceptance by those holding offices of trust of emoluments "of any kind whatever". The Justice Department's Office of Legal Counsel has interpreted the Clause to be "sweeping and unqualified"[10] and "directed against every kind of influence by foreign governments upon officers of the United States."[11] Or as the Comptroller General has explained, "it seems clear

---

[7] *See* 3 RECORDS OF THE FEDERAL CONVENTION, *supra* note 3, at 327 n.1 (citations omitted); *see also* DAVID ROBERTSON, DEBATES AND OTHER PROCEEDINGS OF THE CONVENTION OF VIRGINIA 330-31 (2d ed. 1805) (1788) (recording Edmund Randolph's referring to a snuff box as the motivation for the Foreign Emoluments Clause); ZEPHYR TEACHOUT, CORRUPTION IN AMERICA: FROM BENJAMIN FRANKLIN'S SNUFF BOX TO CITIZENS UNITED (2014) 1-5, 23, 27 (2014) (discussing the French practice of giving snuff boxes to ambassadors and the concerns that generated).

[8] ROBERTSON, *supra* note 7, at 330-31 (1788) (recording the statement of Randolph).

[9] *Id.* at 330.

[10] *Applicability of Foreign Emoluments Clause to Emp't of Gov't Emps. by Foreign Pub. Univs.*, 18 Op. O.L.C. 13, 17 (1994).

[11] *Application of Foreign Emoluments Clause to Part-Time Consultant for the Nuclear*

from the wording of the constitutional provision that the drafters intended the prohibition to have the broadest possible scope and applicability."[12]

Two points about the Clause deserve special emphasis. First, in their effort to protect the nation's security, the Framers never drew the line that Defendant would now draw between forbidden services rendered in an official or employee capacity versus permissible private business deals with a foreign government. A President's public and private financial entanglements with a foreign government produce the same problems, which the Founders identified two centuries ago: foreign governments will "spare no expense" to interfere in our national security and foreign policy decision-making, our enemies will exert "external influence" on our foreign ministers and other officials, and our allies will find their "mutual friendship" with us "diminished" by even the appearance of impropriety. Yet the Defendant would have this Court believe that the Founders intended to prohibit a foreign nation from *giving* a snuff box to an ambassador, in order to protect against undue interference in our national security, but

---

*Regulatory Comm'n*, 10 Op. O.L.C. 96, 98 (1986) (quoting *Gifts from Foreign Prince-Officer-Constitutional Prohibition*, 24 Op. Att'y Gen. 116, 117 (1902)); *see also Application of Foreign Emoluments Clause to Part-Time Consultant*, 10 Op. O.L.C. at 98 ("Although no court has yet construed the Foreign Emoluments Clause, its expansive language and underlying purpose, as explained by Governor Randolph, strongly suggest that it be given broad scope."); *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 122 (1993) (explaining that the Foreign Emoluments Clause purpose reflects the view that "[t]hose who hold offices under the United States must give the government their uncompromised loyalty" and "[t]hat judgment might be biased, and that loyalty divided, if they received financial benefits from a foreign government"). In addition to quoting Randolph, many of the opinions also cite a 1902 opinion in which the Solicitor General wrote, "[i]t is evident from the brief comments on this provision, and the established practice in our diplomatic intercourse that [the Foreign Emoluments Clause's] language has been viewed as particularly directed against every kind of influence by foreign governments upon officers of the United States, based on our historic policies as a nation." *Gifts from Foreign Prince-Officer-Constitutional Prohibition*, 24 OP. Att'y Gen. at 117 (emphasis omitted) (citations omitted).

[12] *To the Sec'y of the Air Force*, 49 Comp. Gen. 819, 821 (1970); *see also In re: Major Stephen M. Hartnett, USMC, Retired*, 65 Comp. Gen. 382, 385-86 (1986) ("We . . . have concluded that this provision requires the broadest possible scope and application.").

intended to leave the foreign nation entirely free to *purchase* countless snuff boxes from that same ambassador (or the company he owns).

Second, the Founders created *a constitutional process* to implement their purpose: when the President chooses to accept something of value from a foreign government, the Clause does not ban the transaction outright.  Rather, it simply requires the *consent of the Congress*.  By so doing, the Clause strikes a thoughtful constitutional compromise, enabling Congress to protect against potential presidential abuse in the national security realm, without unduly restricting the President's ability to conduct national security affairs.

In our prior roles, amici have participated in countless urgent national security decisions in the national security, diplomatic, and intelligence spheres.  Amici fully appreciate and acknowledge the need for the Executive to act expeditiously without congressional involvement to address urgent national security or foreign policy threats.  But the President can claim no similar need to act without congressional participation when it comes to the ethical implications of his own private commercial transactions.  This is not an area where the Executive must "speak . . . with one voice," *Am. Ins. Ass'n. v. Garamendi,* 539 U.S. 396, 424 (2003) (citations omitted), or where "secrecy" by federal officials is necessary or desirable, *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936).  Nor is it an area where the President can credibly claim superior military or policy expertise, *id.*, or that he is "better positioned to take . . . decisive, unequivocal action," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2086 (2015).

Instead, this is an area where the consultative process enshrined in the Foreign Emoluments Clause provides a critical, balanced check.  It ensures that the Executive will exercise its national security and foreign policy authority solely for the nation's good.  It enables Congress and the American people to evaluate whether foreign money has improperly influenced

otherwise opaque national security decision-making.  And it does so while ensuring that the President always coordinates our national security and foreign policy—if Congress refuses to grant its consent to a transaction of value involving a foreign government, the President cannot accept the transaction, but he can continue to engage in policy-making.  Indeed, this constitutional process is all the more important precisely because the President possesses such concentrated foreign policy powers.  To remove the consent of Congress from all cases involving private financial transactions would upset the constitutional balance. It would grant the President broad national security policy authority without the attendant congressional oversight required to ensure transparency and accountability in a sweeping category of financial deals involving foreign governments.

Since 1789, multiple Congresses have built on the Foreign Emolument Clause's constitutional foundation to develop a framework of conflict-of-interest laws and regulations to guard against the influence of foreign nations in our policy making.  Like the Foreign Emoluments Clause, this framework regulates both the private financial relationships and the official acts of U.S. officials who serve the public trust.  And like the Foreign Emoluments Clause, these laws in many cases are premised on the same scheme of *notification* and *approval*: they create processes to encourage transparency and bring potential conflicts of interest to light, yet offer officials an opportunity to clear the conflicts and to continue working on particular matters with a superior's approval.

Amici have all given public service under these laws.  We have complied with the federal statute prohibiting executive branch officials from participating in matters that will affect their private financial interests (with a waiver and public disclosure in cases where the interest is

deemed unlikely to affect the integrity of their services).[13]  We have complied with regulations

that require recusal where a financial interest would create even an appearance of bias (with a

waiver available if we inform the agency and receive authorization from an agency official).[14]

As public officials, we complied with laws prohibiting us from acting as agents of a foreign

government.[15]  As former officials, we have obeyed laws that restrict the capacity of a former

official to represent or assist a foreign government in the year after leaving office[16] and require

citizens who otherwise serve as such agents to publicly register their clients with the U.S.

government.[17]

Through these laws and others,[18] Congresses over the years have affirmed what our

Founders understood from the start: our national security and foreign policy interests demand a

---

[13] 18 U.S.C. § 208 (2012). This provision is part of a larger anti-corruption segment of the United States Code. Surrounding sections criminalize giving public officials bribes, *id.* §§ 201, 210; taking bribes, *id.* §§ 203, 211; the pursuit of a claim by a current government employee when the government is an adverse party, *id.* § 205; and the involvement by ex-government employees in matters in which they had previously "participated personally and substantially," *id.* § 207.

[14] *See* 5 C.F.R. § 2635.502 (2017).

[15] 18 U.S.C. § 219 (2012).

[16] *Id.* § 207(f).

[17] 22 U.S.C. § 612.

[18] *See, e.g.*, 5 U.S.C. § 7342; 18 U.S.C. § 209; *supra* note 13.  There are also other examples of disclosure and approval statutory or regulatory schemes that are designed specifically to prevent foreign government influence in national security matters.  In one regulatory regime overseen by the Department of the Treasury, companies contemplating mergers with or sales to foreign corporations in circumstances that could give rise to national security concerns must receive clearance from an inter-agency process.  *See Committee on Foreign Investment in U.S. [CFIUS]: Process Overview*, U.S. Dep't of the Treasury (Dec. 1, 2010), http://www.treasury.gov/resource-center/international/foreign-investment/Pages/cfius-overview.aspx (providing an overview of the CFIUS process).  Under another regime operated by the Department of Defense, a company under foreign ownership, control of influence may not receive a facility security clearance (and a company with such a clearance must report to the U.S. government that it is preparing to engage in a transaction with a foreign counterpart).  *See FOCI FAQs*, U.S. Dep't of Def., http://www.dss.mil/isp/foci/foci_faqs.html (providing an overview of the National Industrial Security Program process).

balanced set of guardrails against conflicts of interests from overseas business entanglements with foreign governments.  These guardrails prevent undue influence, while allowing such interactions in particular cases where there is disclosure and approval.  However, the Department of Justice previously has taken the view that many of these statutory guardrails do not constitutionally apply to the President due to separation of powers concerns, saying their impact is either to "disable him from performing some of the functions prescribed by the Constitution or to establish a qualification for his serving as President (to wit, elimination of financial conflicts) beyond those contained in the Constitution."[19]  The Defendant now asks the Court to take the additional step of reading private business transactions entirely out of the Foreign Emoluments Clause—a constitutional provision that embodies these same separation of powers concerns.  For the Court to do so would create a significant legal vacuum that exposes our national security policy to the very foreign influences that both the Founders and subsequent Congresses tried to counteract.

---

[19] Letter from Laurence H. Silberman, Acting Att'y Gen., to Howard W. Cannon, Chairman, Comm. on Rules and Admin., U.S. Senate 4 (Sept. 20, 1974), http://fas.org/irp/agency/doj/olc/092074.pdf (discussing 18 U.S.C. § 208 (1970)); *see also Conflicts of Interest and the Presidency*, CRS Legal Sidebar (Oct. 14, 2016), http://fas.org/sgp/crs/misc/conflicts.pdf ("The Supreme Court has let stand a lower court decision recognizing the constitutionality of financial disclosures by elected officials under ethics laws. The Court also has generally upheld the constitutionality of campaign finance disclosure requirements as substantially related to the governmental interest of safeguarding the integrity of the electoral process by promoting transparency and accountability. Imposing any more formal restrictions on the President may require a constitutional amendment, given the concern that statutory limitations such as disqualification could impede constitutional duties and raise separation of powers concerns.").  The President has submitted a financial disclosure under 5 U.S.C. app. § 101(d), (f)(1) (2012), but that disclosure does not identify for Congress or any other audience the financial dealings the President has with foreign governments.  Theodoric Meyer and Matthew Nussbaum, *Trump Reports Assets of at Least $1.4 Billion in Financial Disclosure*, Politico (June 16, 2017), http://www.politico.com/story/2017/06/16/us-ethics-office-releases-trumps-financial-disclosure-239649.

II.     **A reading of the Foreign Emoluments Clause that encompasses private business dealings with foreign governments is essential to U.S. national security and foreign policy interests in the modern era.**

A reading of the Foreign Emoluments Clause that excludes private business entanglements with foreign governments could harm our national security and foreign policy in several ways.  First, and most obvious, the United States is engaged in a range of highly sensitive interactions throughout the world in a fraught national security and foreign policy climate.  Our adversaries and even our allies seek every advantage that is available on the international stage.  A coherent national response to these threats requires our officials' undivided attention and commitment to serving our national interest.  Allowing private business deals with foreign governments to go undisclosed, unapproved, and unmonitored creates substantial danger that national security or foreign policy decisions, "consciously or otherwise, will be motivated by something other than the public's interest."[20]

Second, leaving private business transactions unreviewed creates an appearance of impropriety that undermines our global interests.  Across administrations of both parties, the United States has fought against corruption around the globe as a core tenet of its foreign policy, on the grounds that it "saps economic growth, hinders development, destabilizes governments, undermines democracy, and provides openings for dangerous groups like criminals, traffickers, and terrorists."[21]  The United States has been a global leader in these efforts, devoting roughly $1

---

[20] Jack Maskell, Cong. Research Serv., R43365, Financial Assets and Conflict of Interest Regulation in the Executive Branch 1 (2014) (quoting The Association of the Bar of the City of New York, Special Committee on Congressional Ethics, James C. Kirby, Executive Director, Congress and the Public Trust, 38-39 (1970)).

[21] *U.S. Anti-Corruption Efforts*, U.S. Dep't of St., http://www.state.gov/anticorruption/ (accessed Nov. 1, 2017). USAID similarly funds anti-corruption efforts abroad, and the Justice Department's Office of Overseas Prosecutorial Development Assistance and Training works to promote anti-corruption abroad through the training of foreign prosecutors. *Office of Overseas*

billion per year to anti-corruption and related programs.[22] A central aspect of these global efforts involves ensuring that government officials do not entangle their official interests with their private business dealings.[23]  Allowing our own President to engage in precisely such entanglements corrodes this pillar of U.S. foreign policy, by acknowledging that our legal system will tolerate the very same self-dealing that we condemn whenever we see it abroad.[24]  And if a foreign nation sees the United States taking an action on the international stage and is unsure whether the step is being taken because it is in the rigorously assessed national security interests of the country or the momentary financial interests of a single official, the foreign nation will begin to question the strength and durability of the U.S. commitment to that course of action.

Third, allowing the President to engage in undisclosed, unapproved private business deals with foreign governments will confuse and fragment the channels by which foreign policy and national security policy is made.  If they do not like the answer they receive on a diplomatic track, foreign governments looking to secure favorable policy outcomes from the U.S.

---

*Prosecutorial Development Assistance and Training*, U.S. Dep't of Just., http://www.justice.gov/criminal-opdat.

[22] *The U.S. Global Anticorruption Agenda*, The White House (Sept. 24, 2015), http://obamawhitehouse.archives.gov/the-press-office/2014/09/24/fact-sheet-us-global-anticorruption-agenda.

[23] *See, e.g.*, *Annex to the Recommendation of the Council on OECD Guidelines for Managing Conflict of Interest in the Public Service*, Org. for Econ. Co-operation and Dev. [OECD] 2 (2003), http://www.oecd.org/governance/ethics/2957360.pdf ("Governments are increasingly expected to ensure that public officials do not allow their private interests and affiliations to compromise official decision-making and public management.").

[24] The potential for domestic affairs to undermine our stated foreign policy interests has, of course, previously affected judicial determinations involving purely domestic issues. *See generally* Mary Dudziak, *Desegregation as a Cold War Imperative*, 41 STAN. L. REV. 61, 65 (1988) (noting that "[a]ccording to the Department [of Justice], [*Brown v. Board of Education*] was important because '[t]he United States is trying to prove to the people of the world, of every nationality, race and color, that a free democracy is the most civilized and most secure form of government yet devised by men") (quoting Brief for the United States as Amicus Curiae at 6, Brown v. Bd. of Educ., 347 U.S. 483 (1954)).

government will start to think that they can pursue a more favorable answer on a business track.

Inevitably, these diplomatic and business tracks will include different officials with different

interests and views, and will lead to different conversations.  At the very least, this splintering of

the channels of national security and foreign policy relations will undermine our government's

capacity to speak with one voice.  Splintered channels of national security decision-making will

confuse the consistency and clarity of our messages to other countries and hamstring the

effectiveness of our policy decisions.

If anything, giving the Foreign Emoluments Clause its full and natural reading is more

important today than ever before.  Nor has the broad, prophylactic function rule of the Clause

ever been more important.  The global economy has drawn together more tightly, creating

countless more opportunities for foreign governments to use private transactions and

relationships to influence our economic health.  At the same time, the global nature of modern

national security and foreign policy challenges, from terrorism to cyber threats to climate

change, has compelled the United States to engage the world through a web of security, trade and

other relations.  This growing interdependence has created a greater opportunity than ever for

U.S. officials to engage in financial entanglements with foreign government actors, along with a

greater risk than ever that those private relations will compromise U.S. security and foreign

policy interests.

Defendant never disputes that the Foreign Emoluments Clause was designed expressly to

protect U.S. national security and foreign policy interests throughout the world.  And yet, their

papers to this Court never actually address the grave national security or foreign policy

consequences of their narrow reading of the Clause.  The Defendant claims that a narrow rule is

needed because otherwise too many transactions would be barred—at least, without consent

14

from Congress.[25]  But Congress can address this concern, as it has in the past, by exempting any transaction, or category of transactions, from the Clause *once the President discloses them to Congress*.[26]  More to the point, the appropriate judicial response to a violation of a constitutional provision that threatens our national security is not to ignore it and seek to artificially narrow the provision; it is to set into motion the constitutional checks and balances—here, disclosure and consent—that the Founders themselves expressly designed to address that issue.[27]

## CONCLUSION

For all of the foregoing reasons, Defendant's motion to dismiss should be denied.

Respectfully submitted,

<table>
<tr><td></td><td>_____/s/_____</td></tr>
<tr><td>Harold Hongju Koh</td><td>Phillip Spector (MD Bar No. 20147)</td></tr>
<tr><td>RULE OF LAW CLINIC</td><td>MESSING & SPECTOR LLP</td></tr>
<tr><td>Yale Law School</td><td>1200 Steuart St. #2112</td></tr>
<tr><td>127 Wall Street, P.O. Box 208215</td><td>Baltimore MD 21230</td></tr>
<tr><td>New Haven, CT 06520-8215</td><td>202-277-8173</td></tr>
<tr><td>203-432-4932</td><td></td></tr>
</table>

*Counsel for Amici Curiae*[28]

---

[25] *See* Def. Mem. 51-54.

[26] *See, e.g.*, Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 (2012); 37 U.S.C. § 908. *See also* Def. Mem. 50.

[27] At the very least, where, as here, the official engages in knowing and, indeed, purposeful financial transactions involving foreign governments, the national security and foreign policy concerns loom especially large, because the risk of undue influence at its height.

[28] We are grateful to the student members of the Yale Law School Rule of Law Clinic—Colleen Culbertson, Alexandra Mahler-Haug, Adeel Mohammadi, Joseph Schottenfeld, and Nathaniel Zelinsky—for their contributions to this submission.

## APPENDIX: List of *Amici Curiae*

1.      Madeleine K. Albright served as Secretary of State from 1997 to 2001. A refugee and naturalized American citizen, she served as U.S. Permanent Representative to the United Nations from 1993 to 1997. She has also been a member of the Central Intelligence Agency External Advisory Board since 2009 and of the Defense Policy Board since 2011, in which capacities she has received assessments of threats facing the United States.

2.      Bruce Andrews served as Deputy Secretary of Commerce from 2014 to January 20, 2017.

3.      Daniel Benjamin served as Ambassador-at-Large for Counterterrorism at the U.S. Department of State from 2009 to 2012.

4.      Antony Blinken served as Deputy Secretary of State from 2015 to January 20, 2017. He previously served as Deputy National Security Advisor to the President of the United States from 2013 to 2015.

5.      William J. Burns served as Deputy Secretary of State from 2011 to 2014. He previously served as Under Secretary of State for Political Affairs from 2008 to 2011, as U.S. Ambassador to Russia from 2005 to 2008, as Assistant Secretary of State for Near Eastern Affairs from 2001 to 2005, and as U.S. Ambassador to Jordan from 1998 to 2001.

6.      Bathsheba N. Crocker served as Assistant Secretary of State for International Organization Affairs from 2014 to 2017.

7.      Ryan Crocker served as U.S. Ambassador to Afghanistan from 2011 to 2012, as U.S. Ambassador to Iraq from 2007 to 2009, as U.S. Ambassador to Pakistan from 2004 to 2007, as U.S. Ambassador to Syria from 1998 to 2001, as U.S. Ambassador to Kuwait from 1994 to 1997, and U.S. Ambassador to Lebanon from 1990 to 1993.

8.      Daniel Feldman served as U.S. Special Representative for Afghanistan and Pakistan from 2014 to 2015, Deputy U.S. Special Representative for Afghanistan and Pakistan from 2009 to 2014, and previously Director for Multilateral and Humanitarian Affairs at the National Security Council.

9.      Joshua A. Geltzer served as Senior Director for Counterterrorism at the National Security Council from 2015 to 2017.  Previously, he served as Deputy Legal Advisor to the National Security Council and as Counsel to the Assistant Attorney General for National Security at the Department of Justice.

10.     Suzy George served as Deputy Assistant to the President and Chief of Staff and Executive Secretary to the National Security Council from 2014 to 2017.

11.     Chuck Hagel served as Secretary of Defense from 2013 to 2015, and previously served as Co-Chair of the President's Intelligence Advisory Board. From 1997 to 2009, he served

16

as U.S. Senator for Nebraska, and as a senior member of the Senate Foreign Relations and Intelligence Committees.

12.     Heather A. Higginbottom served as Deputy Secretary of State for Management and Resources from 2013 to 2017.

13.     Christopher R. Hill served as Assistant Secretary of State for East Asian and Pacific Affairs from 2005 to 2009. He also served as U.S. Ambassador to Macedonia, Poland, the Republic of Korea, and Iraq.

14.     John F. Kerry served as Secretary of State from 2013 to January 20, 2017.

15.     Prem Kumar served as Senior Director for the Middle East and North Africa on the National Security Council staff of the White House from 2013 to 2015.

16.     James C. O'Brien served as Special Presidential Envoy for Hostage Affairs from 2015 to January 20, 2017. He served in the U.S. Department of State from 1989 to 2001, including as Principal Deputy Director of Policy Planning and as Special Presidential Envoy for the Balkans.

17.     Jeffrey Prescott served as Special Assistant to the President and Senior Director for Iran, Iraq, Syria and the Gulf States from 2015 to 2017, and as Deputy National Security Advisor to the Vice President from 2013 to 2015.

18.     Kori Schake served as the Deputy Director for Policy Planning at the U.S. Department of State from December 2007 to May 2008. Previously, she was the director for Defense Strategy and Requirements on the National Security Council in President George W. Bush's first term.

19.     Eric P. Schwartz served as Assistant Secretary of State for Population, Refugees and Migration from 2009 to 2011. From 1993 to 2001, he was responsible for refugee and humanitarian issues on the National Security Council, ultimately serving as Special Assistant to the President for National Security Affairs and Senior Director for Multilateral and Humanitarian Affairs.

20.     Wendy R. Sherman served as Under Secretary of State for Political Affairs from 2011 to 2015.

21.     Vikram Singh served as Deputy Special Representative for Afghanistan and Pakistan from 2010 to 2011 and as Deputy Assistant Secretary of Defense for Southeast Asia from 2012 to 2014.

22.     James B. Steinberg served as Deputy National Security Adviser from 1996 to 2000 and as Deputy Secretary of State from 2009 to 2011.

## CERTIFICATE OF SERVICE

I, Phillip Spector, hereby certify that on November 14, 2017, the foregoing document was filed and served through the CM/ECF system.

Respectfully submitted,

_____ /s/_____
Phillip Spector (MD Bar No. 20147)
MESSING & SPECTOR LLP
1200 Steuart Street #2112
Baltimore, MD  21230
*Counsel for Amici Curiae*