IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THE DISTRICT OF COLUMBIA, ET AL.,

   *Plaintiffs*,

      v.

DONALD J. TRUMP,
President of the United States, in
his official capacity,

    *Defendant*.

No. 8:17-cv-1596-PJM

**BRIEF OF *AMICI CURIAE* ADMINISTRATIVE LAW, CONSTITUTIONAL LAW, AND FEDERAL COURTS SCHOLARS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

REGINA KLINE
JEAN M. ZACHARIASIEWICZ
Brown, Goldstein & Levy, LLP
120 E. Baltimore St., Ste. 1700
Baltimore, MD 21202
rkline@browngold.com
jmz@browngold.com

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

SUMMARY OF ARGUMENT ................................................................................................. 2

ARGUMENT ............................................................................................................................ 3

I.      THE PLAINTIFFS HAVE ESTABLISHED COMPETITOR STANDING ...................... 3

     A.      As direct competitors, the plaintiffs have demonstrated an injury in fact .............. 4

     B.      The plaintiffs' competitive injuries are traceable to the defendant's alleged violations of the Emoluments Clauses .................................................................. 8

     C.      The plaintiffs' competitive injuries would be redressed by a court order ............ 10

II.      THE PLAINTIFFS HAVE STANDING TO VINDICATE THEIR INTEREST IN A FAIR OPPORTUNITY TO INFLUENCE NATIONAL GOVERNANCE ..................... 12

     A.      States have standing to vindicate constitutional provisions protecting their opportunity to influence national political outcomes ........................................... 14

     B.      The Domestic Emoluments Clause protects states against dilution of their influence in the national governing process ......................................................... 16

CONCLUSION ...................................................................................................................... 21

APPENDIX A ...................................................................................................................... A-1

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Watson*,
    10 F.3d 915 (1st Cir. 1993).................................................................................. 10

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982).................................................................................. 14, 18

*Allen v. Wright*,
    468 U.S. 737 (1984).................................................................................. 10

*Am. Humanist Ass'n v. Md.-Nat'l Capital Park & Planning Comm'n*,
    303 F.R.D. 266 (D. Md. 2014).................................................................................. 1

*Becker v. FEC*,
    230 F.3d 381 (1st Cir. 2000).................................................................................. 4

*Bond v. United States*,
    564 U.S. 211 (2011).................................................................................. 3

*Bristol-Myers Squibb Co. v. Shalala*,
    91 F.3d 1493 (D.C. Cir. 1996).................................................................................. 10, 19

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987).................................................................................. 2

*Clinton v. Jones*,
    520 U.S. 681 (1997).................................................................................. 12

*Ctr. for Reprod. Law v. Bush*,
    304 F.3d 183 (2d Cir. 2002).................................................................................. 4

*DEK Energy Co. v. FERC*,
    248 F.3d 1192 (D.C. Cir. 2001).................................................................................. 6

*District of Columbia v. ExxonMobil Oil Corp.*,
    No. 14–CV–633, 2017 WL 4977514 (D.C. Nov. 2, 2017).................................................................................. 18

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992).................................................................................. 2, 3

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) ................................................................................................ 3, 20

*Gottlieb v. FEC*,
   143 F.3d 618 (D.C. Cir. 1998) ................................................................................. 4

*In re U.S. Catholic Conf.*,
   885 F.2d 1020 (2d Cir. 1989) ................................................................................. 4

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*,
   724 F.3d 206 (D.C. Cir. 2013) ................................................................................ 9

*Inv. Co. Inst. v. Camp*,
   401 U.S. 617 (1971) ........................................................................................ 2, 4, 6

*La. Energy & Power Auth. v. FERC*,
   141 F.3d 364 (D.C. Cir. 1998) ................................................................................ 5

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014) ......................................................................................... 4, 9

*Libertarian Party of Va. v. Judd*,
   718 F.3d 308 (4th Cir. 2013) ................................................................................ 19

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ............................................................................................... 14

*Metro R. Co. v. District of Columbia*,
   132 U.S. 1 (1889) .................................................................................................... 18

*Mississippi v. Johnson*,
   71 U.S. (4 Wall.) 475 (1867) ................................................................................. 11

*Missouri v. Holland*,
   252 U.S. 416 (1920) ................................................................................ 3, 13, 15, 20

*Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*,
   522 U.S. 479 (1998) .................................................................................................. 2

*Nat'l Treasury Employees Union v. Nixon*,
   492 F.2d 587 (D.C. Cir. 1974) ............................................................................... 12

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
   508 U.S. 656 (1993) ............................................................................................ 5, 19

*New World Radio, Inc. v. FCC,*
   294 F.3d 164 (D.C. Cir. 2002) ............................................................................ 6, 10

*New York v. United States,*
   505 U.S. 144 (1992) ................................................................................................ 15

*Nixon v. Fitzgerald,*
   457 U.S. 731 (1982) ................................................................................................ 11

*Oregon v. Mitchell,*
   400 U.S. 112 (1970) ................................................................................................ 15

*Perpich v. Dep't of Def.,*
   496 U.S. 334 (1990) ................................................................................................ 15

*Sherley v. Sebelius,*
   610 F.3d 69 (D.C. Cir. 2010) .............................................................................. 9, 19

*Simon v. E. Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976) .................................................................................................. 10

*South Carolina v. Katzenbach,*
   383 U.S. 301 (1966) ................................................................................................ 15

*Spokeo, Inc. v. Robins,*
   136 S. Ct. 1540 (2016) .............................................................................................. 3

*United States v. Carroll,*
   667 F.3d 742 (6th Cir. 2012) ................................................................................. 10

*United Transp. Union v. ICC,*
   891 F.2d 908 (D.C. Cir. 1989) ............................................................................... 10

*Utah v. Evans,*
   536 U.S. 452 (2002) ................................................................................... 2, 3, 16, 17

*Virginia ex rel. Cuccinelli v. Sebelius,*
   656 F.3d 253 (4th Cir. 2011) ............................................................................ 14, 15

*Warth v. Seldin*,
422 U.S. 490 (1975) ................................................................................................................ 3

**Other Authorities**

Ann Woolhandler & Michael G. Collins, *State Standing*, 81 Va. L. Rev. 387 (1995) .................. 15

Anna Giaritelli, *Republican Governors Association Paid Trump Resort $400K for Trip*,
Wash. Exam'r (July 19, 2017) .............................................................................................. 14

Brian Ross, *When Bahrain Books Trump Ballroom, Critics See Attempt to Curry Favor*,
ABC News (Dec. 7, 2016) ..................................................................................................... 7

*Donald Trump's New York Times Interview: Full Transcript*, N.Y. Times (Nov. 23, 2016) .......... 8

Kevin Miller & Scott Thistle, *Luxury Hotels, Fine Dining for LePage on Taxpayers' Dime*,
Portland Press Herald (July 23, 2017) ................................................................................. 14

Michael Neibauer, *AAA Awards Three New Hotels with Four Diamond Rating, Including
Trump International*, Wash. Bus. J. (June 8, 2017) ............................................................. 8

Michael S. Rosenwald, *For Local Businesses, the Chance to Reach a Global Market*,
Wash. Post, Sept. 28, 2006, at T8 ......................................................................................... 7

Robert Delahunty, *Compensation*, *in* The Heritage Guide to the Constitution (2d ed., David F.
Forte & Matthew Spalding eds., 2014) ................................................................................ 17

Seth Davis, *Implied Public Rights of Action*, 114 Colum. L. Rev. 1 (2014) ................................ 20

*The Federalist No. 73* (Alexander Hamilton), *in* The Federalist: A Commentary on the
Constitution of the United States (Robert Scigliano ed., Random House, 2000) ................ 17

Zephyr Teachout, *The Anti-Corruption Principle*, 94 Cornell L. Rev. 341 (2009) ..................... 17

**Constitutional Provisions**

U.S. Const. amend. XXIII ........................................................................................................... 18
U.S. Const. art I, § 2, cl. 3 ........................................................................................................... 15
U.S. Const. art. I, § 9, cl. 8 .......................................................................................................... 21
U.S. Const. art. II, § 1, cl. 7 .................................................................................................... 16, 21

## PRELIMINARY STATEMENT

This case concerns the application of the Foreign and Domestic Emoluments Clauses to the President of the United States—an issue that is rarely litigated in federal court. But it also involves the justiciability of constitutional claims brought by business owners and state governments—and, in this respect, it implicates questions of federal jurisdiction and federalism that arise frequently. *Amici* believe that the defendant's motion to dismiss misconstrues Supreme Court and court of appeals case law concerning competitor standing, state standing, and the availability of rights of action to enforce constitutional law. The defendant's arguments—if accepted—would curtail access to the federal courts both for private parties and for states seeking to enforce the Constitution's guarantees.

*Amici* are scholars of administrative law, constitutional law, and federal courts who teach and research in these subjects. They have a professional interest in the proper construction of constitutional limits on federal jurisdiction. A full list of *amici* is contained in Appendix A.

*Amici* are uniquely positioned to alert the Court to relevant legal arguments and precedents that bear on the justiciability of claims brought here by the District of Columbia and the State of Maryland. *Amici* provide a scholarly perspective on the larger ramifications of the Court's decision for federal jurisdiction in constitutional cases involving business owners and state governments as plaintiffs. *See Am. Humanist Ass'n v. Md.-Nat'l Capital Park & Planning Comm'n*, 303 F.R.D. 266, 269 (D. Md. 2014) ("'[T]he aid of *amici curiae* has been allowed at the trial level where they provide helpful analysis of the law . . . .'" (quoting *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 728 (D. Md. 1996))).

## SUMMARY OF ARGUMENT

On the merits, this case presents questions about the scope of the Emoluments Clauses that the Supreme Court and the Fourth Circuit have yet to resolve. The threshold question of standing, however, is one on which the Supreme Court and courts of appeals have provided clear guidance. And those cases firmly establish that both the District of Columbia and the State of Maryland have standing to challenge President Donald J. Trump's asserted violations of the Foreign and Domestic Emoluments Clauses.

First, the Supreme Court's competitor standing cases confirm that a plaintiff with a proprietary interest in a business enterprise may sue to block a direct competitor from receiving an illegal market advantage. *See Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co. ("NCUA")*, 522 U.S. 479, 488 (1998); *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 n.13 (1987); *Inv. Co. Inst. v. Camp*, 401 U.S. 617, 620 (1971). The District of Columbia and the State of Maryland hold proprietary interests in enterprises that compete directly with the Trump International Hotel in Washington, D.C. They assert that the Trump hotel has gained an illegal market advantage by virtue of the defendant's violations of the Emoluments Clauses. Under the competitor standing doctrine, the plaintiffs' injuries are constitutionally cognizable.

Second, the Supreme Court's cases recognize that a state has standing to challenge actions by federal officials that dilute the state's influence over national political outcomes in violation of a discrete constitutional protection. Specifically, the Court has recognized that states have standing to enforce constitutional provisions that guarantee that "comparative state political power . . . reflect[s] comparative population, not comparative wealth." *See Utah v. Evans*, 536 U.S. 452, 459-64, 477 (2002); *accord Franklin v. Massachusetts*, 505 U.S. 788, 801-03 (1992) (plurality opinion); *id.* at 807 (Stevens, J., concurring in part and dissenting in part). The

Domestic Emoluments Clause is one such provision: it ensures that states compete for influence over the Executive through constitutionally sanctioned channels and not through financial inducements. As in *Franklin* and *Evans*, the plaintiffs have standing to challenge actions by the defendant that dilute their influence over national governance in contravention of an explicit constitutional guarantee.

Finally, the District of Columbia and the State of Maryland have a cause of action to seek equitable relief for violations of the Emoluments Clauses. The Supreme Court has long recognized a cause of action for violations of constitutional provisions. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (compiling cases). This cause of action applies with full force to federalism guarantees such as the Domestic Emoluments Clause. *See Missouri v. Holland*, 252 U.S. 416, 431 (1920). When, as here, plaintiffs suffer cognizable harms as a result of alleged violations of the Constitution's structural provisions, they may enforce those provisions in federal court. *See Bond v. United States*, 564 U.S. 211, 223 (2011).

## ARGUMENT

## I.     THE PLAINTIFFS HAVE ESTABLISHED COMPETITOR STANDING.

As in any federal case, plaintiffs that sue on the basis of competitive harm must show that they meet the three conditions for constitutional standing: that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The allegations in the plaintiffs' complaint amply satisfy all three requirements. *Cf. Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("For purposes of ruling on a motion to dismiss for

want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint.").

### A.      As direct competitors, the plaintiffs have demonstrated an injury in fact.

The plaintiffs have alleged that businesses in which they hold proprietary interests compete against the Trump International Hotel for foreign, federal, and state government customers. They also allege that the defendant has violated the Emoluments Clauses by accepting payments from governmental clients at those competitor properties. The violation of the Emoluments Clauses thus causes competitive injury to the plaintiffs.

It is well settled that businesses have standing to challenge illegal actions that provide a competitive advantage to other enterprises in the same market. *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 (2014) (finding business competitor has standing to sue for harms caused by false advertising); *NCUA*, 522 U.S. at 488 (reaffirming that "competitors of financial institutions have standing to challenge agency action relaxing statutory restrictions on the activities of those institutions"). To establish competitor standing, a plaintiff must show that she is "sufficiently injured by the competition . . . to create a case or controversy." *See Clarke*, 479 U.S. at 397 n.13; *Inv. Co. Inst.*, 401 U.S. at 620. Courts of appeals have interpreted this requirement to mean that a plaintiff must show that she "personally competes in the same arena" with the party who has received an illegal benefit or whose presence in the market is unlawful. *See Ctr. for Reprod. Law v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002); *Becker v. FEC*, 230 F.3d 381, 387 n.5 (1st Cir. 2000); *Gottlieb v. FEC*, 143 F.3d 618, 621 (D.C. Cir. 1998); *In re U.S. Catholic Conf.*, 885 F.2d 1020, 1029 (2d Cir. 1989).

This "same arena" standard does not, however, require a plaintiff to identify a specific customer whose business she has lost to the defendant. Plaintiffs can "establish their

constitutional standing by showing that the challenged action authorizes allegedly illegal transactions that have the clear and immediate *potential* to compete with the [plaintiffs]' own sales." *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (Garland, J.) (emphasis in original). Thus, "[t]hey need not wait for specific, allegedly illegal transactions to hurt them competitively." *Id.* As the Supreme Court has said in an analogous context, "the 'injury in fact' is the inability to compete on an equal footing . . . , not the loss of a contract." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656 (1993).

The Supreme Court's competitor standing cases serve to illustrate. For example, in *National Credit Union Administration*, the Supreme Court held that plaintiff banks had standing to challenge a regulator's ruling that allowed AT&T Family Federal Credit Union to enroll members who were employees of companies other than AT&T. The Court did not ask whether any of the plaintiff banks' customers worked for a company whose employees the AT&T credit union sought to enroll. It was enough that the AT&T credit union competed in the same market as the banks. *See NCUA*, 522 U.S. at 488 n.4 (explaining that banks "have suffered an injury-in-fact because the NCUA's interpretation allows persons who *might* otherwise be their customers to be members, and therefore customers" of the AT&T credit union (emphasis added)). Likewise, in *Clarke*, the Court held that a trade association of securities brokers, underwriters, and investment bankers had standing to challenge a regulatory decision allowing Security Pacific National Bank of Los Angeles to offer discount brokerage services to the public at nonbranch offices. The Court did not ask whether any members of the trade association sold discount services in close proximity to Security Pacific's locations; again, it was enough that the association's members offered services similar to Security Pacific's nationwide. *See Clarke*, 479 U.S. at 392–393 & n.5. And so too in *Investment Company Institute*, the Court held that mutual

fund companies and securities dealers had standing to challenge a regulatory decision allowing

national banks to operate collective investment funds even in the absence of evidence that any of

the petitioners had lost clients to a national bank. *See Inv. Co. Inst.*, 401 U.S. at 621 (stating that

"[t]here can be no real question . . . of the petitioners' standing" in light of the Court's prior

competitor standing cases).

Sometimes, to be sure, courts have held that the allegedly illegal competition occurs in a

market so far removed from the plaintiff's that the plaintiff cannot be said to have suffered any

competitive injury. *See, e.g., DEK Energy Co. v. FERC*, 248 F.3d 1192, 1196 (D.C. Cir. 2001)

(no standing where plaintiff sought to challenge agency action giving rise to "vague probability"

that natural gas would "arrive at a point several hundreds of miles from [plaintiff]'s market");

*Gottlieb*, 143 F.3d at 621 (no standing for political action committee to challenge candidate's

receipt of matching funds because "[o]nly another candidate could make such a claim"). Yet

even in these cases, the test is simply whether the plaintiff does in fact "compete[] in the same

arena with the same party to whom the government has bestowed the assertedly illegal benefit."

*Id.* Where government action "provides benefits to an existing competitor or expands the number

of entrants in the [plaintiff]'s market," then the plaintiff satisfies the "same arena" test without

any need to show actual loss of customers or sales. *See New World Radio, Inc. v. FCC*, 294 F.3d

164, 172 (D.C. Cir. 2002).

The District of Columbia and the State of Maryland both compete in the "same arena" as

the Trump International Hotel. The District of Columbia owns the Walter E. Washington

Convention Center, less than a ten-block walk from the Trump International Hotel.[1] The

Convention Center features one 14,000 square-foot ballroom as well as two 19,000 square-foot

---

[1] *See* https://goo.gl/Lqdyad (Google map showing walking route between Trump International Hotel and Walter E. Washington Convention Center).

ballrooms, which can (but need not) be combined into a single 52,000 square-foot space.[2] Trump

International Hotel, for its part, boasts a 13,200 square foot "Presidential Ballroom,"[3] where it

has hosted various embassy events.[4] However one defines the relevant "arena," a 13,200 square-

foot ballroom and a 14,000 square-foot ballroom within ten blocks of each other certainly

compete in the same one.

　　As for Maryland, the State has a proprietary interest in the Montgomery County

Conference Center in Bethesda, home to a 23,000 square-foot ballroom roughly a half-hour drive

from the Trump International Hotel.[5] The defendant argues that the Bethesda ballroom does not

compete in the same arena as the Trump International Hotel because the Bethesda ballroom is in

a "suburban" location and the attached hotel has only a "three-diamond" rating. *See* Dkt. 21,

Mot. to Dismiss 23. But the ballroom has hosted embassy events in the past;[6] it is just as easily

accessible by public transportation from embassy locations as the Trump International Hotel;[7]

and though it has been awarded one fewer diamond by the AAA than the Trump International

---

[2] Walter E. Washington Convention Center Event Planning Guide, https://goo.gl/t2eUUG (last visited Nov. 6, 2017) (see p. 73).

[3] Trump International Hotel, Meetings and Events, https://goo.gl/wRMyJt (last visited Nov. 6, 2017).

[4] *See* Brian Ross, *When Bahrain Books Trump Ballroom, Critics See Attempt to Curry Favor*, ABC News (Dec. 7, 2016), *available at* https://goo.gl/98hn3t.

[5] Conference & Visitors Bureau of Montgomery County, MD, Inc., Montgomery County Conference Center, https://goo.gl/fT1Wd8 (last visited Nov. 12, 2017); *see* https://goo.gl/PwMaic (Google map showing 28- to 40-minute driving route from Trump International Hotel to Bethesda North Marriott Hotel and Conference Center).

[6] *See, e.g.*, Michael S. Rosenwald, *For Local Businesses, the Chance to Reach a Global Market*, Wash. Post, Sept. 28, 2006, at T8.

[7] For example, the Bethesda ballroom and the Trump International Hotel are both a 20- to 30-minute Metro ride from the Embassy of Bahrain. *See* https://goo.gl/ayQJXa (Google map showing 26-minute Metro route from Embassy of the Kingdom of Bahrain to Bethesda North Marriott Hotel and Conference Center); https://goo.gl/gUo9dj (Google map showing 22-minute Metro route from Embassy of the Kingdom of Bahrain to Trump International Hotel); *see also* Ross, *When Bahrain Books Trump Ballroom, Critics See Attempt to Curry Favor*, *supra* note 4.

Hotel,[8] Article III standing does not hinge on the difference between AAA three-diamond and AAA four-diamond ratings.

That the Washington, D.C., area is home to several other meeting facilities does not undermine the plaintiffs' competitor standing. First of all, there are very few other facilities in or around Washington with ballrooms of at least 13,000 square feet. (Aside from the properties owned by the parties, only about two dozen facilities within ten miles of the District fit that description.[9]) Moreover, the presence of other competitors in the market does not vitiate competitor standing. Indeed, there were thousands of banks at the time of *NCUA*, and thousands of securities brokers at the time of *Clarke*; yet the Court nonetheless found that the plaintiffs in those cases faced a genuine competitive threat from new entrants enjoying allegedly illegal advantages. *See NCUA*, 522 U.S. at 488; *Clarke*, 479 U.S. at 394, 409. The threat to the plaintiffs' market share here is especially acute because the defendant enjoys an advantage available to no other market participant: access to the power of a national office. *See Donald Trump's New York Times Interview: Full Transcript*, N.Y. Times (Nov. 23, 2016), https://goo.gl/mr5AuZ (noting that "because I'm president," the Trump brand "is certainly a hotter brand than it was before").

### B.   The plaintiffs' competitive injuries are traceable to the defendant's alleged violations of the Emoluments Clauses.

Once a plaintiff establishes an injury based on illegal competition, the causation prong of the constitutional standing test is "easily satisfied." *See Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 212 (D.C. Cir. 2013). And so it is here. The plaintiffs' injuries are

---

[8] *See* Michael Neibauer, *AAA Awards Three New Hotels with Four Diamond Rating, Including Trump International*, Wash. Bus. J. (June 8, 2017), *available at* https://goo.gl/38eQpM.

[9] *See* Cvnet Supplier Network, *Washington, DC, United States*, https://goo.gl/xcaUAi (last visited Nov. 12, 2017).

directly traceable to the conduct of the defendant, who—in alleged violation of the Emoluments Clauses—has continued to compete with the plaintiffs for the business of government clients.

The defendant suggests that the plaintiffs cannot satisfy the causation requirement because their injuries "are necessarily dependent on third parties' choices and actions," i.e., on the decisions of customers to patronize the Trump International Hotel rather than plaintiffs' properties. *See* Dkt. 21, Mot. to Dismiss 26. But that argument fails for two independent reasons. First, it mischaracterizes the plaintiffs' injuries as being related only to the actions of customers, and thus ignores the fact that mere exposure to illegal competition itself constitutes an injury. *See Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010) (plaintiffs experience "actual, here-and-now injury" when defendant's actions "have intensified the competition for a share in a fixed amount of money" and thus have compelled plaintiffs "to invest more time and resources").

Second, plaintiffs can and routinely do satisfy the causation requirement for constitutional standing even when their injuries depend in some sense on the actions of third parties. Indeed, all competitor standing cases necessarily involve third parties' actions. For example, a competitor may sue for false advertising even though "[i]n a sense, of course, all commercial injuries from false advertising are derivative of those suffered by consumers who are deceived by the advertising." *Lexmark*, 134 S. Ct. at 1391; *see also id.* ("intervening step of consumer deception" does not deprive competitor of ability to sue). The relevant question is whether the plaintiff's injuries can be fairly traced through the third party's intervening action back to the defendant's conduct. In some circumstances, the "links in the chain of causation between the [defendant's] conduct and the asserted injury" will be "too weak for the chain of causation as a whole to sustain [the plaintiff's] standing." *See Allen v. Wright*, 468 U.S. 737, 759 (1984); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42–43 (1976) (causation

requirement not satisfied where third party's action is "independent" of defendant's conduct). But in "'garden variety competitor standing cases,'" courts "simply acknowledge a chain of causation 'firmly rooted in the basic law of economics.'" *New World Radio*, 294 F.3d at 172 (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989)); *accord Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993).

The plaintiffs ask this Court to acknowledge nothing more than such a basic chain of causation here. If the defendant ceases to accept business from government clients, or ceases to benefit personally from such business, the plaintiffs no longer will face a rival who enjoys the advantages attendant upon occupying a national office when wooing customers. The plaintiffs will need to invest less time and energy to attract government clients; they will face a more level competitive playing field; and they likely will have more business in the end. But regardless of how many customers and how many sales the defendant diverts from the plaintiffs, the very fact that the defendant's illegal conduct causes the plaintiffs to face increased competition is sufficient to satisfy the causation prong for constitutional standing. *See Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1499 (D.C. Cir. 1996) (injury in competitor standing cases "is not lost sales, per se," but "exposure to competition" that is allegedly illegal).

**C.      The plaintiffs' competitive injuries would be redressed by a court order.**

Just as the plaintiffs' injuries are caused by the defendant's illegal conduct, so too can they be redressed by a court order directed at the defendant. *See United States v. Carroll*, 667 F.3d 742, 745 (6th Cir. 2012) (noting that the causation and redressability elements of constitutional standing "often go hand in hand"). In addition to declaratory relief, the plaintiffs seek a court order enjoining the defendant from violating the Emoluments Clauses in the future.

10

Because the relevant harm is illegal competition, an injunction stopping the defendant from continuing that illegal competition would straightforwardly redress the plaintiffs' injuries.

Such a remedy would not be inconsistent with the general rule that federal courts lack jurisdiction to "enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867). The defendant has no official duty to own and operate a global network of hotels, restaurants, and other businesses while he is President, and he certainly has no duty to accept emoluments from government clients while in office. The defendant's acceptance of payments as a business owner thus does not fall within even "the 'outer perimeter' of his official responsibility" as President. *Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982). Because the illegal conduct that the plaintiffs seek to stop lies outside the scope of the President's official duties, the holding of *Mississippi v. Johnson* does not apply here. *See also Nixon*, 457 U.S. at 759 (Burger, C.J., concurring) (Presidents "are not immune for acts outside official duties").

Moreover, the holding in *Mississippi v. Johnson*, by its own terms, only bars a court from enjoining the President with respect to matters that the law leaves to his discretion. Where there is "no room for the exercise of judgment" on the President's part, *Mississippi v. Johnson*'s limitation on the courts' equitable powers does not apply. *See Mississippi*, 71 U.S. (4 Wall.) at 499. The present case thus lies beyond the scope of *Mississippi v. Johnson*'s holding. The President may not receive payments from foreign governments absent authorization from Congress, and under no conditions may he receive emoluments from the states or from the federal government (other than his statutory compensation). These are not matters left to his discretion or to the exercise of his judgment. Thus, *Mississippi v. Johnson* does not stand in the way of a remedy. *See Nat'l Treasury Employees Union v. Nixon*, 492 F.2d 587, 611 (D.C. Cir.

11

1974) (noting that "the Judicial power, by compulsory process or otherwise," includes the ability "to prohibit the Executive from engaging in actions contrary to law").

The captioning of the plaintiffs' complaint as a suit against the defendant in his "official capacity" does not alter this analysis. That caption accurately reflects the reality that the defendant's conduct is illegal by virtue of the fact that he is President. If he were not a federal official, he could continue to receive payments from foreign governments. And if he were not the President, he could continue to receive emoluments from federal and state government clients—at least without running afoul of the Domestic Emoluments Clause. The fact that the Emoluments Clauses prohibit the President from receiving illegal payments through his hotels and other businesses does not make the receipt of those emoluments part of his official responsibilities.

In any event, regardless of how the case is captioned, the plaintiffs' prayer for relief by its terms does not seek to direct the defendant in his performance of his official duties, alter the actions of the Executive Branch, or constrain the defendant's successors in office. Although the defendant's status as President gives rise to the illegality at issue, a judicial remedy that redresses the plaintiffs' injuries would not require the President to take any action—or decline to take any action—pursuant to his official duties. All he would have to do is to cease accepting emoluments from government clients. These are not official acts. *See Clinton v. Jones*, 520 U.S. 681, 694 (1997).

## II.   THE PLAINTIFFS HAVE STANDING TO VINDICATE THEIR INTEREST IN A FAIR OPPORTUNITY TO INFLUENCE NATIONAL GOVERNANCE.

A state may sue in federal court when the federal government violates a constitutional provision that specifically protects the state's rights or interests. *See, e.g.*, *Holland*, 252 U.S. at 430-31 (granting state standing to sue federal government for violation of Tenth Amendment).

12

The Domestic Emoluments Clause is one of those specific constitutional guarantees. The clause serves to ensure that no state can acquire disproportionate influence over the President through the payment of emoluments. *See* President Reagan's Ability to Receive Retirement Benefits from the State of California, 5 Op. O.L.C. 187, 189 (1981) (observing that the "basic purpose[]" of the Domestic Emoluments Clause is "to prevent Congress or any of the states from attempting to influence the President through financial awards or penalties"). The clause thus aims to preserve a level playing field among states seeking to influence national political outcomes, and states have standing to sue when that constitutional guarantee is violated.

The plaintiffs specifically allege that they have been "placed at a disadvantage vis-à-vis other states" that have provided emoluments to the defendant while the plaintiffs have not. Dkt. 1, Compl. ¶ 110. Their submissions identify several instances in which the defendant has accepted payments from state officials. For example, at least seven states allegedly hold interests through their public pension funds in an entity that owns the Trump SoHo New York and pays a Trump company to run that hotel. *Id.* ¶ 99. In addition, other states' officials have allegedly made payments to the defendant that have flowed through his various businesses. According to press reports, Governor Paul LePage of Maine and his staff stayed at Trump International Hotel in spring 2017 and paid more than $2,000 for rooms, food, and valet parking. Dkt. 46, Opp. to Mot. to Dismiss 8 (citing Kevin Miller & Scott Thistle, *Luxury Hotels, Fine Dining for LePage on Taxpayers' Dime*, Portland Press Herald (July 23, 2017), *available at* https://goo.gl/xPxeeP). Meanwhile, the Republican Governors Association reportedly spent more than $400,000 in April

and June 2017 to host meetings at Trump National Doral Golf Club in Miami, with some of those expenses initially paid out of state treasuries initially.[10]

The injuries suffered by the State of Maryland and the District of Columbia on account of these payments provide a second, independent basis for standing. Although the plaintiffs have competitor standing to challenge violations of the Emoluments Clauses due to business activities at the defendant's Washington, D.C. hotel specifically, this second basis for standing allows the plaintiffs to challenge the defendant's receipt of emoluments from other states at all properties where these alleged illegal payments have been made. Maryland and the District of Columbia are harmed by the defendant's receipt of domestic emoluments wherever those violations occur.

A.     **States have standing to vindicate constitutional provisions protecting their opportunity to influence national political outcomes.**

It is well settled that states have Article III standing to challenge actions by federal officials that harm states' governmental interests. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007) (noting state's "stake in protecting its quasi-sovereign interests" and according "special solicitude" to state in standing analysis); *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 268 (4th Cir. 2011) (compiling cases in which courts have held that states may sue to vindicate a variety of governmental interests). Specifically, a state has a cognizable interest in "securing observance of the terms under which it participates in the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607-08 (1982). Although a state lacks a judicially cognizable interest in immunizing its citizens from federal law, it has Article III standing to sue the federal government to redress its own "sovereign injury." *Virginia ex rel. Cuccinelli*, 656 F.3d at 269-70.

---

[10] Anna Giaritelli, *Republican Governors Association Paid Trump Resort $400K for Trip*, Wash. Exam'r (July 19, 2017), *available at* https://goo.gl/PNY55e; *see also* Miller and Thistle, *supra*.

Courts, therefore, have held that states have Article III standing to enforce constitutional

provisions that protect state sovereignty or that guarantee states a voice in national political

processes. For example, states may sue to protect their right under Article I, section 4 to "control

their own elections." *Oregon v. Mitchell*, 400 U.S. 112, 117-18 & n.2 (1970). They also may sue

to protect their authority under Article I, section 8, clause 16 to appoint officers and train

members of their state militias. *See Perpich v. Dep't of Def.*, 496 U.S. 334, 337 (1990) (reaching

merits of state's challenge). They may sue under the Tenth Amendment to protect state law and

state legislative processes. *See, e.g.*, *Holland*, 252 U.S. at 430-31; *New York v. United States*, 505

U.S. 144, 149 (1992). And they may sue to challenge a federal statute on the grounds that it

exceeds the scope of Congress's power under the Fifteenth Amendment. *See South Carolina v.*

*Katzenbach*, 383 U.S. 301, 324 (1966). *See generally* Ann Woolhandler & Michael G. Collins,

*State Standing*, 81 Va. L. Rev. 387, 494 (1995) (explaining that Supreme Court has found "a

state's own constitutional rights at issue for standing purposes when the state's claim implicates

a specific constitutional provision relating to state powers").

Most analogous here, the Supreme Court has recognized that a state suffers a

constitutionally cognizable injury when seats in the House of Representatives and votes in the

Electoral College are shifted away from that state and to another in violation of the Census

Clause. *See* U.S. Const. art I, § 2, cl. 3. Thus, in *Franklin*, the Court held that Massachusetts had

standing to challenge an apportionment procedure that shifted one representative from it to

Washington State. 505 U.S. at 791, 801-04; *id.* at 807 (Stevens, J., concurring in part and

dissenting in part). And in *Evans*, the Court held that Utah had standing to challenge the Census

Bureau's use of a methodology that led to a shift of one representative from it to North Carolina.

536 U.S. at 464. The Census Clause's aim, the *Evans* Court explained, was to ensure that

"comparative state political power in the House would reflect comparative population, not comparative wealth." *Id.* at 477. The Court acknowledged that Utah could sue to enforce the Census Clause's comparative-population guarantee. *See id.* at 464; *see also id.* at 474 (reaching merits of state's Census Clause challenge).

Taken together, *Franklin* and *Evans* establish that states have standing to challenge actions by federal officials that dilute their opportunity to influence national political outcomes and that contravene a discrete constitutional provision. To be clear, this does not mean that any state can sue whenever it is dissatisfied with the outcomes of national politics. What it does mean is that each state has a right to seek redress when its opportunity to influence national political outcomes is diminished through constitutionally improper means. *See Evans*, 536 U.S. at 460. And as explained below, the State of Maryland and the District of Columbia face a real threat to their political influence by virtue of the defendant's allegedly unconstitutional acceptance of domestic emoluments.

**B.     The Domestic Emoluments Clause protects states against dilution of their influence in the national governing process.**

The Domestic Emoluments Clause provides that the President, while in office, "shall . . . receive" a fixed salary and "shall not receive . . . any other Emolument from the United States, *or from any of them*." U.S. Const. art. II, § 1, cl. 7 (emphasis added). The clause is meant to ensure that the President will "have no pecuniary inducement to renounce or desert the independence intended for him by the Constitution." *The Federalist No. 73* (Alexander Hamilton), *in* The Federalist: A Commentary on the Constitution of the United States 469 (Robert Scigliano ed., Random House, 2000). It is also meant to "prevent the President from becoming overly dependent upon . . . a particular state." Zephyr Teachout, *The Anti-Corruption Principle*, 94 Cornell L. Rev. 341, 365 (2009). In this respect, the clause serves an important

federalism function, as it "helps to ensure presidential impartiality among particular members or regions of the Union." Robert Delahunty, *Compensation*, *in* The Heritage Guide to the Constitution 251, 251 (2d ed., David F. Forte & Matthew Spalding eds., 2014).

Seen in this light, the Domestic Emoluments Clause plays a role similar to the Census Clause: both provisions protect the states' opportunity to influence national governance. More specifically, both clauses seek to ensure that a state's opportunity to influence national political outcomes will not reflect "comparative wealth," *Evans*, 536 U.S. at 477, or be "skewed for . . . financial purposes," *id.* at 500 (Thomas, J., dissenting). And the injuries alleged in the Census Clause cases closely resemble the injuries alleged by the plaintiffs here. In *Franklin* and *Evans*, Massachusetts and Utah claimed that the defendants' violations of a specific constitutional provision deprived those states of influence over the Executive through the loss of an Electoral College vote and over the Legislature through the loss of a seat in the House of Representatives. Here, Maryland and the District of Columbia claim that the defendant's violations of a specific constitutional provision cause the plaintiffs to lose influence over the President because other states have offered him financial inducements while the plaintiffs have not. As in *Franklin* and *Evans*, the plaintiffs have Article III standing to vindicate their interests in a national governing process not distorted by constitutional violations.

Maryland, as a sovereign state, asserts a constitutionally cognizable interest in avoiding "unfair competition" for political influence with other states. Dkt. 1, Compl. ¶ 109. The District of Columbia, as a "distinct political community," *see Metro R. Co. v. District of Columbia*, 132 U.S. 1, 9 (1889), has a similar interest in the avoidance of unfair competition. Under the Twenty-third Amendment, the District is guaranteed a say in national governance through the selection of at least three "electors of President and Vice President." U.S. Const. amend. XXIII.

Yet its influence is diluted when other states seek to sway the President through extraconstitutional channels by paying him emoluments in violation of Article II, section 1, clause 7.[11]

The plaintiffs' equal opportunity to influence the Executive has been undermined as a result of the defendant's financial entanglements.[12] The injury is akin to the loss of influence that a state suffers when a seat in the Electoral College is reallocated from it to another. And these two plaintiffs are especially vulnerable to injuries resulting from the defendant's alleged Domestic Emoluments Clause violations because of their unusual financial dependence on the federal government. *See* Dkt. 1, Compl. ¶ 111 (explaining that Maryland's economy ranks fourth, and the District of Columbia's ranks first, in per capita federal government expenditures).

The causation and redressability analysis with regard to the plaintiffs' political-influence claim tracks that for competitor standing. The causation element of Article III standing "necessitates only that the alleged injury be fairly traceable to the complained-of action."

---

[11] The District is not the only distinct political community other than a state that has Article III standing to vindicate governmental interests. Territories, for example, may have Article III standing to vindicate governmental interests just as states do. *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 608 (treating Commonwealth of Puerto Rico as indistinguishable from state for Article III standing purposes).

The District's unique political status does not preclude it from having distinct governmental interests. *See generally District of Columbia v. ExxonMobil Oil Corp.*, No. 14–CV–633, 2017 WL 4977514, at *7 (D.C. Nov. 2, 2017) (noting that the District "is a sovereign for many purposes"). Although it is unlike a state in some respects, the District "is a separate political community in a certain sense, and in that sense may be called a state." *Metro R. Co.*, 132 U.S. at 9. Most importantly for present purposes, the District competes with other states for influence over the President through constitutionally recognized channels, and its opportunity to influence is diluted when other states seek to influence the President through avenues that the Constitution explicitly proscribes.

[12] Contrary to the defendant's suggestion, Maryland need not show "detrimental reliance in joining the Union" to allege an injury-in-fact to its sovereign interests under the Domestic Emoluments Clause. *See* Dkt. 21, Mot. to Dismiss 10. The State's injury instead arises from the present-day dilution of its opportunity to influence the Executive, which in turn arises from the defendant's allegedly unconstitutional acceptance of emoluments from other states.

*Libertarian Party of Va. v. Judd*, 718 F.3d 308, 315 (4th Cir. 2013) (internal quotation marks omitted). The defendant has accepted allegedly unconstitutional payments from several other states, and his acceptance of these emoluments has subjected the plaintiffs to unfair competition for influence over presidential decisions. The Domestic Emoluments Clause was premised on the assumption that payments such as these would bias the President towards states that offer them and against those that do not. As for redressability, a court order preventing the defendant from continuing to accept such emoluments would allow the plaintiffs to escape the "intolerable dilemma" that they now face: either grant emoluments to the defendant or suffer the consequences of unfair competition. *See* Dkt. 1, Compl. ¶ 110.

The defendant suggests that the plaintiffs cannot satisfy the constitutional standing requirements because they have not alleged that the defendant has demanded any special treatment from them or threatened to retaliate against them for not providing unconstitutional emoluments. *See* Dkt. 21, Mot. to Dismiss 17-18. But the Court in *Franklin* and *Evans* did not require states to prove that the loss of an opportunity to influence the national political process had caused them any harm beyond that. Moreover, the defendant's acceptance of unconstitutional emoluments has already exposed the plaintiffs to unfair and unconstitutional competition with other states. That exposure to illegal competition is itself a constitutionally cognizable injury. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 666; *Bristol-Myers Squibb Co.*, 91 F.3d at 1499; *Sherley*, 610 F.3d at 74.

## III. THE PLAINTIFFS HAVE A CAUSE OF ACTION TO SEEK EQUITABLE RELIEF FOR VIOLATIONS OF THE EMOLUMENTS CLAUSES.

The defendant argues that the plaintiffs lack a cause of action because they are "not preemptively asserting a defense" to a federal enforcement action and because they do not fall within the zone of interests of the Emoluments Clauses. Dkt. 21, Mot. to Dismiss 27-28. Both

arguments fail: longstanding precedent confirms that state plaintiffs may seek injunctive relief to enforce specific constitutional provisions that protect their interests against the federal government.

The Supreme Court has long recognized that states may sue the federal government to enforce specific textual commitments to state sovereignty through equitable relief. *See, e.g.*, *Holland*, 252 U.S. at 431 (holding that state may bring action for equitable relief against federal executive official to prevent "an unconstitutional interference with the rights reserved to the States by the Tenth Amendment"). This precedent is but a specific application of the longstanding rule that allows a cause of action in equity for violations of constitutional provisions. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); Seth Davis, *Implied Public Rights of Action*, 114 Colum. L. Rev. 1, 75-84 (2014). This cause of action is not limited to cases in which the states preemptively assert a defense to federal enforcement against them. *See Holland*, 252 U.S. at 431.

The plaintiffs also fall squarely within the zone of interests that the Emoluments Clauses protect. Together, the Emoluments Clauses were intended to ensure that the federal government—and the President in particular—would be responsive to the interests of the states and their citizens, and not unduly influenced by "any king, prince, or foreign state" or by any U.S. state that sought to wield its wealth to its own political advantage. *See* U.S. Const. art. I, § 9, cl. 8; *id.* art. II, § 1, cl. 7. The clauses also were intended to prevent the President from using his position of power in ways that enrich himself while making the states and their citizens worse off. *See* David Robertson, Debates and Other Proceedings of the Convention of Virginia 330 (2d ed. 1805) (1788) (statement of Edmund Randolph) (Foreign Emoluments Clause intended "to prevent corruption"); *The Federalist No. 73* (Alexander Hamilton), *in* The Federalist: A

20

Commentary on the Constitution of the United States, *supra*, at 469 (Domestic Emoluments Clause seeks to ensure that neither Congress nor the states can "corrupt [the President's] integrity by appealing to his avarice"). The plaintiffs here argue that they and their citizens have been made worse off (financially and otherwise) because the President has used his position of power in ways that enrich himself, and that the President's acceptance of domestic emoluments has pitted them against other states. Their interests in avoiding these harms come well within the zone of interests shielded by both Clauses.

## CONCLUSION

Under settled Supreme Court and court of appeals case law, the plaintiffs have Article III standing to sue on the basis of competitive harm and on the basis of injury to their opportunity to influence the Executive through constitutionally recognized channels. *Amici* urge this Court to hold that the plaintiffs' claims are justiciable and to resolve them on the merits.

Dated: November 14, 2017

Respectfully submitted,

_____/s/_____
REGINA KLINE
JEAN M. ZACHARIASIEWICZ
Brown, Goldstein & Levy, LLP
120 E. Baltimore St., Ste. 1700
Baltimore, MD 21202
rkline@browngold.com
jmz@browngold.com

## APPENDIX A

*Amici* are scholars of administrative law, constitutional law, and federal jurisdiction. Their titles and institutional affiliations are listed for identification purposes only.

Bruce Ackerman
Sterling Professor of Law and Political Science
Yale University

Matthew D. Adler
Richard A. Horvitz Professor of Law
Duke Law School

Zachary D. Clopton
Assistant Professor of Law
Cornell Law School

Cary Coglianese
Edward B. Shils Professor of Law
University of Pennsylvania Law School

Seth Davis
Assistant Professor of Law
University of California, Irvine School of Law

Frank Deale
Professor of Law
City University of New York Law School

Michael C. Dorf
Robert S. Stevens Professor of Law
Cornell Law School

Daniel Farber
Sho Sato Professor of Law
University of California, Berkeley School of Law

Daniel Hemel
Assistant Professor of Law
University of Chicago Law School

Aziz Huq
Frank and Bernice J. Greenberg Professor of Law
University of Chicago Law School

Evan Tsen Lee
Professor of Law
University of California, Hastings College of Law

Jonathan S. Masur
John P. Wilson Professor of Law
University of Chicago Law School

Jon D. Michaels
Professor of Law
University of California, Los Angeles School of Law

Sandra L. Rierson
Associate Professor of Law
Thomas Jefferson School of Law

Eli Savit
Adjunct Professor of Law
University of Michigan Law School

Peter M. Shane
Jacob E. Davis & Jacob E. Davis II Chair in Law
Ohio State University Moritz College of Law

Joan Steinman
University Distinguished Professor and Professor of Law
Chicago-Kent College of Law, Illinois Institute of Technology

Arthur D. Wolf
Professor of Law
Western New England University School of Law

Brian Wolfman
Associate Professor of Law and Director of the Appellate Courts Immersion Clinic
Georgetown University Law Center