**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| THE DISTRICT OF COLUMBIA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> *Defendant*. | No. 8:17-cv-1596-PJM |

**<u>DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...............................................................................................................1

ARGUMENT ....................................................................................................................2

I.    THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS .......................2

    A.    Plaintiffs Have Not Alleged Cognizable Injuries to Their Sovereign,
        Quasi-Sovereign, or Proprietary Interests .................................................2

        1.    Sovereign interests ...........................................................................2

        2.    Quasi-sovereign interests .................................................................7

        3.    Proprietary interests .........................................................................8

    B.    Plaintiffs' Allegations of Injury Do Not Satisfy the Competitor Standing
        Doctrine..........................................................................................................9

II.   PLAINTIFFS HAVE NO CAUSE OF ACTION UNDER THE EMOLUMENTS
    CLAUSES AND EQUITY REQUIRES DISMISSAL.......................................................14

III.  PLAINTIFFS HAVE FAILED TO STATE A CLAIM .................................................16

    A.    Plaintiffs' Interpretation of the Text of the Emoluments Clauses is
        Overbroad and Unreasonable.......................................................................16

    B.    The Purposes of the Emoluments Clauses Do Not Compel Plaintiffs'
        Broad Reading of the Clauses......................................................................21

    C.    The President's Position is not Inconsistent with Prior Interpretations
        of the Emoluments Clauses..........................................................................22

    D.    Historical Background Refutes Plaintiffs' Interpretation of the Clauses, and
        Absurd Results Would Flow From Their Interpretation...............................25

    E.    Plaintiffs Do Not State a Claim Under the President's Interpretation ...................27

IV.   THE RELIEF SOUGHT BY PLAINTIFFS WOULD BE UNCONSTITUTIONAL.......29

CONCLUSION..................................................................................................................30

# TABLE OF AUTHORITIES

**CASES**                                                                                      **PAGE(S)**

*Adams v. Watson,*
   10 F.3d 915 (1st Cir. 1993) ................................................................. 12

*Agostini v. Felton,*
   521 U.S. 203 (1997) ......................................................................... 15

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
   458 U.S. 592 (1982) ......................................................................... 7, 8

*Am. Ins. Ass'n v. Garamendi,*
   539 U.S. 396 (2003) ......................................................................... 14

*Beck v. McDonald,*
   848 F.3d 262 (4th Cir. 2017) ............................................................. 9

*Berry v. Reagan,*
   No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ........................... 29

*Bond v. United States,*
   564 U.S. 211 (2011) ......................................................................... 14

*Bosley v. Baltimore Cty., Md.,*
   804 F. Supp. 744 (D. Md. 1992) ....................................................... 15

*Boumediene v. Bush,*
   553 U.S. 723 (2008) ......................................................................... 29

*City of Boerne v. Flores,*
   521 U.S. 507 (1997) ......................................................................... 20

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ......................................................................... 8

*Coalition for Competitive Electricity, Dynegy Inc. v. Zibelman,*
   ---F. Supp. 3d---, No. 16-cv-8164, 2017 WL 3172866 (S.D.N.Y. July 25, 2017) .................. 16

*Cooper v. Tex. Alcoholic Beverage Comm'n,*
   820 F.3d 730 (5th Cir. 2016) ............................................................. 13

*Davis v. Mich. Dep't of Treasury,*
   489 U.S. 803 (1989) ......................................................................... 17

*DEK Energy Co. v. FERC*,
    248 F.3d 1192 (D.C. Cir. 2001) ........................................................................ 10

*Delta Air Lines, Inc. v. Export-Import Bank*,
    85 F. Supp. 3d 250 (D.D.C. 2015) ................................................................... 10

*El Paso Nat. Gas Co. v. FERC*,
    50 F.3d 23 (D.C. Cir. 1995) .............................................................................. 10

*Florida v. Mellon*,
    273 U.S. 12 (1927) ............................................................................................. 4

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................................... 29, 30

*Georgia v. Pennsylvania Railroad Co.*,
    324 U.S. 439 (1945) ........................................................................................... 5

*Gilman v. Philadelphia*,
    70 U.S. 713 (1865) ........................................................................................... 15

*Hedges v. Obama*,
    724 F.3d 170 (2d Cir. 2013) .............................................................................. 9

*Hill v. Wallace*,
    259 U.S. 44 (1992) ........................................................................................... 15

*Hodges v. Abraham*,
    300 F.3d 432 (4th Cir. 2002) ............................................................................ 7

*INS v. Chadha*,
    462 U.S. 919 (1983) ......................................................................................... 15

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*,
    724 F.3d 206 (D.C. Cir. 2013) ......................................................................... 13

*Investment Co. Inst. v. Camp*,
    401 U.S. 617 (1971) ......................................................................................... 10

*King v. Burwell*,
    135 S. Ct. 2480 (2015) ..................................................................................... 17

*Kucana v. Holder*,
    558 U.S. 233 (2010) ......................................................................................... 21

*LaRoque v. Holder*,
   650 F.3d 777 (D.C. Cir. 2011) ........................................................................ 14

*Lexmark International, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014) ................................................................................... 15

*Mackie v. Bush*,
   809 F. Supp. 144 (D.D.C. 1993) ..................................................................... 29

*Mackie v. Clinton*,
   10 F.3d 13 (D.C. Cir. 1993) ........................................................................... 29

*Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*,
   805 F.3d 98 (3d Cir. 2015) ............................................................................. 15

*Massachusetts v. Bull HN Information Sys., Inc.*,
   16 F. Supp. 2d 90 (D. Mass. 1998) ................................................................... 8

*Massachusetts v. EPA*,
   549 U.S. 497 (2000) ......................................................................................... 7

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ......................................................................................... 7

*Mississippi v. Johnson*,
   71 U.S. 475 (1867) .............................................................................. 2, 29, 30

*Mistretta v. United States*,
   488 U.S. 361 (1989) ....................................................................................... 26

*Nat'l Treasury Employees Union v. Nixon*,
   492 F.2d 587 (D.C. Cir. 1974) ........................................................................ 29

*Ne. Fla. Chapter of the Associated General Contractors of Am. v. City of Jacksonville*,
   508 U.S. 656 (1993) ....................................................................................... 11

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ...................................................................... 29

*New World Radio, Inc. v. FCC*,
   294 F.3d 164 (D.C. Cir. 2002) ........................................................................ 13

*NicSand, Inc. v. 3M Co.*,
   507 F.3d 442 (6th Cir. 2007) .......................................................................... 13

*NLRB v. Noel Canning*,
    134 S. Ct. 2550 (2014) ................................................................................................ 26

*Olekanma v. Wolfe*,
    Civil Action No. DKC 15-0984, 2016 WL 430178 (D. Md. Feb. 4, 2016) .............................. 6

*Price v. City of Charlotte, N.C.*,
    93 F.3d 1241 (4th Cir. 1996) ....................................................................................... 11

*Printz v. United States*,
    521 U.S. 898 (1997) ..................................................................................................... 14

*Sea-Land Serv., Inc. v. Dole*,
    723 F.2d 975 (D.C. Cir. 1983) .................................................................................... 10

*Sherley v. Sebelius*,
    610 F.3d 69 (D.C. Cir. 2010) ........................................................................... 9, 10, 13

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ......................................................................................................... 5

*South-Central Timber Development, Inc. v. Wunnicke*,
    467 U.S. 82 (1984) ....................................................................................................... 14

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ................................................................................................ 13

*State National Bank of Big Spring v. Lew*,
    795 F.3d 48 (D.C. Cir. 2015) ...................................................................................... 12

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014) .................................................................................................. 8

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) .............................................................................. 29, 30

*Texas v. United States*,
    523 U.S. 296 (1998) ................................................................................................... 5, 6

*TrafficSchool.com, Inc. v. Edriver Inc.*,
    653 F.3d 820 (9th Cir. 2011) ...................................................................................... 13

*U.S. Steel Corp. v. Multistate Tax Comm'n*,
    434 U.S. 452 (1978) ..................................................................................................... 15

*United Transp. Union*, v. ICC,
  891 F.2d 908 (D.C. Cir. 1989) .......................................................................... 10

*US Airline Pilots Ass'n v. Awappa, LLC*,
  615 F.3d 312 (4th Cir. 2010) ............................................................................. 11

*Virginia ex rel. Cuccinelli v. Sebelius*,
  656 F.3d 253 (4th Cir. 2011) ............................................................................... 3

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992) ......................................................................................... 3, 4

## STATUTES

15 U.S.C. § 1125(a) ............................................................................................... 13

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 6, cl. 2 .................................................................................... 20

U.S. Const. art. II, § 1, cl. 7 ................................................................................... 20

## CONGRESSIONAL MATERIALS

Office of Congressional Ethics, U.S. House of Representative, Review No. 17-1147,
  *Available at* https://oce.house.gov/sites/congressionalethics.house.gov/files/migrated/
  wp-content/uploads/2017/09/Referral-OCE-Rev.-17-1147-Bordallo_FINAL-FOR-
  REFERRAL.pdf ............................................................................................... 24

## OFFICE OF COMPTROLLER GENERAL OPINIONS

*Matter of Lieutenant Colonel Marvin S. Shaffer*,
  62 Comp. Gen. 432 (June 2, 1983) .................................................................... 23

*Retired Marine Corps Officers*,
  B-217096, 1985 WL 52377 (Comp. Gen. Mar. 11, 1985) ................................... 23

*To the Secretary of the Air Force*,
  49 Comp. Gen. 819 (1970) ................................................................................. 25

## OFFICE OF LEGAL COUNSEL OPINIONS

*Application of the Emoluments Clause of the Constitution and the Foreign Gifts
and Decorations Act*,
6 Op. O.L.C. 156 (1982) .................................................................................. 22, 25

*Applicability of Emoluments Clause to Proposed Serv. of Gov't Emp. on Comm'n
of Int'l Historians*,
11 Op. O.L.C. 89 (1987) .................................................................................. 23, 25

*Applicability of Emoluments Clause Employment of Government Employees by
Foreign Public Universities*,
18 Op. O.L.C. 13 (1994) ........................................................................................ 25

*Applicability of the Emoluments Clause to Non-Gov't Members of ACUS*,
17 Op. O.L.C. 114 (1993) ...................................................................................... 23

Memorandum from H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A.
Alito, Jr., Deputy Assistant Attorney General, O.L.C., *Re: Emoluments Clause
Questions raised by NASA Scientist's Proposed Consulting Arrangement with the
University of New South Wales*, at 1 (May 23, 1986), *available at*
https://www.politico.com/f/?id=00000158-b547-db1e-a1f9-ff7f60920001 ............................ 22

## HISTORICAL MATERIALS

Letter from George Washington to the Commissioners for the District of Columbia
(Mar. 14, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0289 .......... 25

## OTHER AUTHORITIES

Allen Reddick, *The Making of Johnson's Dictionary, 1746–1773* (1996) ................................... 18

Gregory E. Maggs, *A Concise Guide to Using Dictionaries from the Founding Era to
Determine the Original Meaning of the Constitution*,
82 Geo. Wash. L. Rev. 358 (2014) ........................................................................................ 18

GSA, *FY 2017 Congressional Justification*, at GSA-8 (Feb. 9, 2016),
https://www.gsa.gov/portal/getMediaData?mediaId=123414 .................................................. 28

GSA, *FY 2018 Congressional Justification*, at GSA-10 (May 23, 2017),
https://www.gsa.gov/portal/getMediaData?mediaId=162214 .................................................. 28

Hui-yong Yu & Caleb Melby, *Trump Hotels, Amid Calls to Divest, Instead Plans
U.S. Expansion*, Bloomberg Pursuits (Jan. 25, 2017),
ttps://www.bloomberg.com/news/articles/2017-01-25 ............................................................. 6

James Phillips & Sara White, *The Meaning of Emolument(s) in 18th-Century American English: A Corpus Linguistic Analysis*, 59 So. Texas L. Rev. __ (Forthcoming 2018), https://ssrn.com/abstract=3036938 .......................................................................................... 17

John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries, 1523-1806*, at 8 (July 9, 2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2995693 .......................................... 17, 18

Model Rules of Prof'l Conduct r. 1.10 cmt. (Am. Bar Ass'n 1983) ............................................ 24

Restatement (Third) of the Law Governing Lawyers § 123, cmt. B ........................................... 24

Samuel A. Thumma & Jeffrey L. Kirchmeier, *The Lexicon Has Become a Fortress: The United States Supreme Court's Use of Dictionaries*, 47 Buff. L. Rev. 227 (1999) .................................................................................................... 18

# INTRODUCTION

The President's Motion to Dismiss ("Mot.") (ECF No. 21) established that the Complaint should be dismissed for four essential reasons.  First, Plaintiffs lack standing to bring this lawsuit. Despite asserting injuries to a wide-range of sovereign, quasi-sovereign, and proprietary interests, Plaintiffs have not shown that their alleged injuries are judicially cognizable, concrete, or certainly impending.  Second, Plaintiffs do not have a cause of action under the Emoluments Clauses, and this is not a proper case for inferring a cause of action in equity.  Third, Plaintiffs' interpretation of the Clauses is overbroad and unmoored from the text of the Constitution, history, and actual practice.  Plaintiffs accordingly have failed to state a claim upon which relief can be granted.  Finally, this Court is without jurisdiction to issue the requested injunctive relief against a sitting President in the circumstances presented by this case.  Plaintiffs' Opposition ("Opp'n") (ECF No. 46) does not meaningfully rebut any of these arguments.

First, Plaintiffs' continued insistence on vindicating abstract notions of state sovereignty fails because the alleged injury to a State's political power is not judicially cognizable.  Plaintiffs are also unable to overcome the bar against *parens patriae* suits by States against the Federal Government.  In addition, Plaintiffs' competition-based standing theories also fail because, among other reasons, the relevant market is too diffuse to permit an inference of certainly impending injury to any particular business based on the law of economics.

Second, Plaintiffs offer no persuasive response to the President's showing that they lack a cause of action under the Emoluments Clauses, and numerous factors counsel against inferring a cause of action in equity.  Most notably, Plaintiffs' asserted injuries are outside the zone of interests of the Clauses, and their suggestion that the zone-of-interests test no longer applies to constitutional claims is wrong.

Third, Plaintiffs have not stated a claim that the President violates the Emoluments Clauses whenever a business in which he owns an interest engages in a transaction with a foreign or domestic government.  As shown in the President's Motion, the term "Emolument" in the Emoluments Clauses refers to profits arising from office or employ, and the prohibited benefits

must be tendered in exchange for the President's service.  Plaintiffs' primary rebuttal is to cite a number of founding-era dictionaries that contain a broad definition of emolument—as including any profit, gain, or advantage—and a number of  where the term was used in accordance with that definition.  But even Plaintiffs do not contend that theirs was the only definition in use at the time of the founding; indeed, the very dictionaries Plaintiffs cite contain other definitions and confirm the etymological roots of the President's analysis.  The President's interpretation is further supported by the context of the Constitution's three uses of the term "Emolument"—each of which is tied to the holding of a federal office—as well as evidence of historical practices and the absurd results that flow from Plaintiffs' interpretation.  And despite Plaintiffs' arguments to the contrary, the President's interpretation of the Clauses also serves their purposes.

Finally, Plaintiffs suggest that the President has misinterpreted *Mississippi v. Johnson*, 71 U.S. 475, 501 (1867), to bar injunctions against the President.  But that is wrong, as is shown by Supreme Court and other decisions interpreting *Johnson.*  And, contrary to Plaintiffs' arguments, this case does not concern a ministerial duty: the wide-ranging injunction Plaintiffs seek would require the exercise of significant planning and judgment and would impose substantial burdens on the President.

## ARGUMENT

## I.    THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS.

### A.    Plaintiffs Have Not Alleged Cognizable Injuries to Their Sovereign, Quasi-Sovereign, or Proprietary Interests.

#### 1.    Sovereign interests

As the President's Motion demonstrated, Maryland has not alleged facts sufficient to support standing based on alleged injuries to its sovereign interests.[1]  Mot. at 10–12.  First, Maryland's alleged loss of political power in joining the Union is an abstract injury to its sovereignty that is not judicially cognizable, despite Maryland's attempt to dress it up in the form

---

[1] Although D.C. alleges similar injuries to its "sovereign" interests as Maryland, *see* Opp'n at 9, it concedes that it is "not a sovereign" and "cannot assert sovereign interests," *see id.* at 6 n.1.

of detrimental reliance in joining the Union.  And no historical evidence supports Plaintiffs' assertion that the Emoluments Clauses were "material inducements to [Maryland's] entering the union."  Compl. ¶ 106.

In response, Maryland insists that it can enforce the Emoluments Clauses because Maryland "surrendered certain sovereign prerogatives when [it] entered the Union," Opp'n at 9 (citation omitted), and those Clauses were designed to protect Maryland's "rightful status within the federal system," *id.* at 11.  But there is no legal support for the proposition that a State can press its abstract views about the meaning of a constitutional provision against the Federal Government by alleging detrimental reliance in joining the Union or any other abstract theories of sovereignty.  States have no special right to serve as "roving constitutional watchdog[s]," litigating any issue, "no matter how generalized or quintessentially political." *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 267–68, 272 (4th Cir. 2011); *see also* Mot. at 22 n.11.  Like other plaintiffs, States must follow "settled jurisdictional constraints," *Virginia*, 656 F.3d at 272, and Maryland's asserted injury is well outside the traditional bounds of the Article III standing doctrine, *see* Mot. at 10–11.

In any event, Maryland does not dispute the lack of historical factual basis for its "material inducement" assertion, arguing that "a 'causal connection' . . . between the provision's inclusion in the Constitution and the Constitution's ratification" is unnecessary.  Opp'n at 14.  But it is Maryland that seeks to establish its standing by relying on the allegation that it would not have joined the Union but for the inducement of the Emoluments Clauses.  *See* Compl. ¶ 106.  Without a causal connection, a theory of standing premised on such a connection fails.

Second, Maryland's alleged impairment of tax revenues continues to be far too general to confer standing.  *See* Mot. 12–16.  Maryland contends that it will lose specific tax revenues because hotels, restaurants, and event venues in Maryland will likely lose business to the Trump International Hotel, thus reducing the State's revenues from certain taxes levied on these businesses.  But *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), on which Plaintiffs rely, only underscores the inadequacy of Maryland's allegations.  *Wyoming* involved "[u]nrebutted

evidence" of an Oklahoma statute directly impairing Wyoming's ability to collect severance tax revenues from specific Wyoming companies affected by the statute.  *Id.* at 445; *see id.* 447 ("It is undisputed that since . . . the effective date of the Act, purchases by Oklahoma electric utilities of Wyoming-mined coal, as a percentage of their total coal purchases, have declined."); *id.* at 448 (distinguishing cases involving federal actions that had injured a state's economy and "thereby caused a decline in general tax revenues").  In contrast, there is no such evidence of direct impact on Maryland's tax revenues here, only Maryland's speculation regarding future possible injury.  Such an "anticipated result is purely speculative, and, at most, only remote and indirect." *Florida v. Mellon*, 273 U.S. 12, 18 (1927) (State had no standing to challenge federal inheritance tax on the basis that the tax would induce taxpayers to withdraw property from the State, thus diminishing the State's tax revenue).

In fact, Maryland cannot show that any injury is likely to result at all.  Although it points to an alleged "uptick in business" at the Trump International Hotel as evidence of its injury, Opp'n at 18, there is no showing of any corresponding losses actually suffered by Maryland, let alone losses attributable to the Trump International Hotel.  Restaurant and hotel competition is not a zero-sum game (*i.e.*, each market participant's gain or loss is exactly balanced by the losses or gains of the other participants), and there is no basis to conclude that Maryland will necessarily lose tax revenues as a result of the President's alleged receipt of prohibited emoluments—as opposed to any number of other economic factors unrelated to any patronage of the President's hotel by government officials.  That fact necessarily distinguishes this case from *Wyoming*.  And as the President has also shown, *see* Mot. at 15–16, under Fourth Circuit precedent, Plaintiffs cannot show that their injury is redressable by the Court.  Even if Maryland were to prevail on the merits of its claim, it is pure speculation to assert that third-party government consumers would stop patronizing the Hotel and take their business to establishments in Maryland.  Maryland has no answer to these fatal defects in its theory, beyond relying on the competitor standing doctrine, which is inapplicable here, as discussed below.

Third, Plaintiffs' "intolerable dilemma" theory of injury fails.  This theory is that Maryland and D.C. face the dilemma of either granting the President's hypothetical requests for concessions and exemptions from their laws or being placed at a disadvantage vis-à-vis other States that agree to such concessions.  Such a claim of injury is speculative—it is predicated on not only the existence of possible future requests for such concessions but also a farfetched conspiracy among federal officials to withhold federal funds from Plaintiffs.  *See* Mot. at 16–17.

In response, Plaintiffs concede that they are not claiming any injury based on the "cost of granting waivers or exemptions" or alleging "that they will necessarily be retaliated against in some way."  Opp'n at 11.  Instead, they recast their claim as an injury to a purported interest in "avoiding entirely any pressure to compete with others for the President's favor by giving him money or other valuable dispensations."  *Id.*  But this asserted injury is at most an "abstract[]" "threat to federalism," which is insufficient to support a State's standing, *Texas v. United States*, 523 U.S. 296, 302 (1998); *see also* Mot. at 10, just as abstract concerns do not support standing in other contexts, *see, e.g.*, *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976).

Plaintiffs rely primarily on *Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439 (1945), for the proposition that there is a judicially cognizable interest in maintaining the "constitutional equality of the States."  Opp'n at 8 (citation omitted).  But that case does not support such a proposition.  Instead, it is a classic antitrust case brought by Georgia against railroad companies that allegedly conspired to fix rates for transportation of freight by railroad "to and from Georgia so as to prefer the ports of other States over the ports of Georgia."  *Georgia*, 324 U.S. at 443. The Court found *parens patriae* standing because the complaint alleged that "the economy of Georgia and the welfare of her citizens have seriously suffered as the result of this alleged conspiracy."  *Id.* at 450–51.  The Court reasoned that "Georgia's interest is not remote; it is immediate" because "discriminatory rates fastened on a region have a . . . permanent and insidious quality," limiting "the opportunities of her people" and "relegat[ing] her to an inferior economic position among her sister States," among other things.  *Id.* at 451.  In holding that a

State has a quasi-sovereign interest in preventing the evils of a price-fixing conspiracy, *Georgia* in no way suggests that Maryland has a judicially cognizable injury here.

In an effort to bolster their "intolerable dilemma" theory of injury, Plaintiffs attempt to introduce two new facts not alleged in the Complaint. *See* Opp'n at 12–13. That attempt is unavailing. As an initial matter, "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Olekanma v. Wolfe*, Civil Action No. DKC 15-0984, 2016 WL 430178, at *4 (D. Md. Feb. 4, 2016) (citation omitted). And in any event, even if the Court were to consider them, these new factual allegations do not support Plaintiffs' standing claims. First, Plaintiffs allege that the Trump Organization plans to open a chain of hotels and that the Organization "would like [the hotels] to be in all of the nation's 26 major metropolitan areas," including D.C. and Baltimore. Opp'n at 13.[2] If such a hotel were to open in their jurisdictions, Plaintiffs suggest, they would likely receive exemption requests and be pressured to grant them. This type of speculation is far from sufficient to establish standing. Moreover, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. at 300.

Second, Plaintiffs cite a lawsuit filed by the Trump International Hotel challenging a D.C. property tax assessment. Opp'n at 12. The notion that the D.C. courts would be pressured to rule in favor of the Hotel because of the President's ownership interest in the Hotel is highly speculative. And if the D.C. courts rule in the Hotel's favor *pursuant to D.C. law*, there could be no plausible claim of injury. *See* Mot. at 18. In any event, this D.C. tax dispute provides no support for Maryland's "intolerable dilemma" claim, given that the Complaint fails to allege that any business affiliated with the President is currently operating in Maryland.

---

[2] The article Plaintiffs' cite merely quotes the Hotel's CEO as saying that he does not "see any reason that we couldn't be in all of [these markets] eventually." Hui-yong Yu & Caleb Melby, *Trump Hotels, Amid Calls to Divest, Instead Plans U.S. Expansion*, Bloomberg Pursuits (Jan. 25, 2017 2:35 PM), https://www.bloomberg.com/news/articles/2017-01-25/trump-hotels-to-triple-locations-in-u-s-expansion-ceo-says.

### 2. Quasi-sovereign interests

The President's Motion established that Plaintiffs have no standing to maintain a *parens patriae* suit against the Federal Government for alleged economic injury to their citizens because the Supreme Court has long held that "'it is no part of [a State's] duty or power'" to do so.  Mot. at 19 (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923)).  Moreover, Plaintiffs' claims concern the commercial activities of only *one* hotel, *one* restaurant, and *one* bar, which do not plausibly meet the requisite showing for *parens patriae* standing that an injury be suffered by "a sufficiently substantial segment of [a State's] population."  *Id.* at 21 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982)).

Plaintiffs maintain that they nevertheless may pursue a *parens patriae* suit against the Federal Government because they are not seeking to challenge any federal statute or sovereign prerogative but only the President's private conduct.  Opp'n at 27.  But a suit against a federal official in his official capacity is a suit against the United States itself.  *See* Mot. at 20.  And Plaintiffs' suit seeks to vindicate injuries to their citizens allegedly caused by the President's purported violations of the Constitution as President, making it quintessentially a (prohibited) *parens patriae* suit.  *See Hodges v. Abraham*, 300 F.3d 432, 436–37, 444 (4th Cir. 2002) (holding, in a challenge to federal agency action allegedly in violation of federal law, that a State could not maintain suit as *parens patriae*); *see also* Mot. at 19–20 (citing cases).

Plaintiffs also insist that a State may maintain a *parens patriae* suit by "asserting its rights under federal law."  Opp'n at 27 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 n.1 (2000)).  But as the President's opening brief explained, a State may only assert such rights when Congress has expressly granted a procedural right to the States to protect against concrete injuries to their interests from federal action, as in *Massachusetts v. EPA*.  Mot. at 20.  Here, no similar congressional authorization to sue—which the Supreme Court has held "is of critical importance to the standing inquiry," *Massachusetts*, 549 U.S. at 516—exists.  Thus, Plaintiffs have no standing to assert any purported injury on this basis.

Plaintiffs also attempt to refute the inescapable conclusion that any alleged injury affects, at most, only an "identifiable group of individual residents," *Snapp*, 458 U.S. at 607, and is thus insufficient to establish *parens patriae* standing.  Plaintiffs argue that in *Snapp* and *Massachusetts v. Bull HN Information Systems, Inc.*, 16 F. Supp. 2d 90, 100–01 (D. Mass. 1998), only 787 and 50 people, respectively, were affected.  But both cases turned on the fact that the States were seeking to redress invidious discrimination, which had a widespread impact and which the States have a unique governmental interest in stopping.  *See Snapp*, 458 U.S. at 609 (rejecting reliance on the "possibly limited effect of the alleged financial loss at issue here" as "too narrow a view of the interests at stake" and recognizing a "state interest in securing residents from the harmful effects of discrimination," which "carr[ies] a universal sting"); *Bull*, 16 F. Supp. 2d at 100–01 (declining to decide whether impact on 50 individuals was sufficiently substantial and finding standing on the basis that the alleged discriminatory conduct "stings all older workers in the same way that all Puerto Ricans were stigmatized in *Snapp*").  Here, by contrast, Plaintiffs' theory of injury is premised on discrete (if speculative) financial injuries allegedly stemming from the operation of a single hotel.

### 3.    Proprietary interests

The President's Motion further established that Plaintiffs' claimed harm to their proprietary interests fails to satisfy all three prongs of the standing requirement.  Mot. at 22–26.  Plaintiffs do not allege that any of their own establishments has actually lost business to the Trump International Hotel or that they will suffer "certainly impending" loss.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  And any alleged injuries necessarily will depend on the actions of third parties not before the Court—a factor that in itself precludes findings of traceability and redressability.  *See* Mot. at 15–16, 26.

Plaintiffs contend that an allegation of injury suffices to establish standing if there is a "substantial risk" that the harm will occur.  *See* Opp'n at 20.  But the Complaint does not meet even that standard given the speculative nature of Plaintiffs' claimed injury.  Moreover, that standard, imported from *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014),

generally only applies to pre-enforcement challenges where a plaintiff's injury stems from a threatened prosecution.  *See Hedges v. Obama*, 724 F.3d 170, 196–97, 199–200 (2d Cir. 2013) (in pre-enforcement challenges, the courts will "presume that the government will enforce the law").  Outside of that context, the Fourth Circuit has also addressed this standard where a plaintiff's alleged injury is based on an increased risk of future harm that necessitates incurring costs to prevent such harm.  In *Beck v. McDonald*, 848 F.3d 262 (4th Cir. 2017), *cert. denied*, 137 S. Ct. 2307 (2017), for example, the court held that plaintiffs, whose personal information was compromised, failed to show "certainly impending" injury based on chances of future identity theft because "a threatened event can be 'reasonabl[y] likel[y]' to occur but still be insufficiently 'imminent' to constitute an injury-in-fact."  *Id.* at 275; *see also id.* at 272 (the requirement of "certainly impending" injury is "well-established" and "hardly novel").  The court then commented that it could "also" find standing based on a "'substantial risk' that the harm will occur, which in turn *may prompt a party to reasonably incur costs to mitigate or avoid that harm*," but it ultimately found that the plaintiffs fell short of their burden.  *Id.* at 275 (emphasis added).  Because this case involves neither a threat of enforcement action nor any allegation that Plaintiffs have incurred costs to mitigate any alleged violation, Plaintiffs may not avail themselves of the "substantial risk" standard.

### B.   Plaintiffs' Allegations of Injury Do Not Satisfy the Competitor Standing Doctrine.

Apparently recognizing that they are otherwise unable to establish Article III standing, Plaintiffs fall back on the competitor standing doctrine.  *See* Opp'n at 24–25.  That doctrine, however, is inapplicable here.

The competitor standing doctrine applies only in the narrow circumstances where, given the relevant market characteristics and the nature of the competition, the challenged government action has caused "an actual or imminent increase in competition, which increase . . . will almost certainly cause an injury in fact" by virtue of the laws of economics.  *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010).  "The nub of the 'competitive standing' doctrine is that when a

challenged agency action authorizes allegedly illegal transactions that *will almost surely* cause petitioner to lose business, there is no need to wait for injury from specific transactions to claim standing." *El Paso Nat. Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995) (emphasis added). By contrast, courts routinely reject claims to competitor standing that are "conjectural" or fail to demonstrate that an agency decision "will almost surely" cause a plaintiff competitive injury. *DEK Energy Co. v. FERC*, 248 F.3d 1192, 1196 (D.C. Cir. 2001); *see also United Transp. Union v. ICC*, 891 F.2d 908, 913 n.7 (D.C. Cir. 1989) (in assessing competitor standing, court need not "accept allegations founded solely on the complainant's speculation").[3]

Here, Plaintiffs cannot satisfy "the basic requirement common to all [competitor standing] cases," *Sherley*, 610 F.3d at 73, namely that the President's ownership interest in the Trump International Hotel would cause an increase in competition such that the laws of economics allow an inference of almost certain injury to Plaintiffs' proprietary interests.  As the President's opening brief explained, competition in the hospitality industry depends on a large number of variables, as well as the independent choices of third parties not before the Court. Mot. at 25–26.  No law of economics suggests that in markets so diffuse and competitive—there are approximately 130 hotels in Washington, D.C., and nearly 700 hotels in the Greater Washington, D.C., metropolitan area—any particular hospitality establishment or event venue in D.C. or Maryland would lose business to the Trump International Hotel, its one restaurant, and one bar.  *See Delta Air Lines, Inc. v. Export-Import Bank*, 85 F. Supp. 3d 250, 266 (D.D.C. 2015) (no competitor standing where "numerous factual questions remain unresolved and undeveloped,

---

[3] Accordingly, the doctrine is applicable most often in contexts where government regulators alter market competition either by increasing or decreasing competition. *See, e.g., Investment Co. Inst. v. Camp*, 401 U.S. 617, 620 (1971) (investment company plaintiffs had standing to challenge rule permitting banks to operate collective investment funds); *Sea-Land Serv., Inc. v. Dole*, 723 F.2d 975, 977 (D.C. Cir. 1983) (operator of vessel had standing to challenge government approval of another company to operate in same routes in which the plaintiff already operated); *Sherley*, 610 F.3d at 72 (grant applicants competing for the same, limited pool of grant money have standing when the challenged government action increased the number of applicants).  This is so because market manipulation by a government regulator often has a direct and predictable impact on the market; in fact, that is often the intent of such regulation.

many of which are necessary for determining if and how Plaintiffs might suffer an injury-in-fact from the [agency's] allegedly wrongful conduct").

Plaintiffs, however, characterize the competitor standing doctrine in terms so permissive that a mere showing of competitor status and some "competitive advantage" to the defendant would suffice. Opp'n at 4, 21. According to Plaintiffs, because the President's establishments necessarily have a competitive advantage by virtue of his ownership interest,[4] Plaintiffs need only show that certain D.C. and Maryland establishments are competitors with the Trump International Hotel (and its one restaurant and one bar). *Id.* Their declarations thus seek to establish the existence of such competition. Decl. of Rachel J. Roginsky, ISHC, ¶¶ 23–56, ECF No. 47; Decl. of Christopher C. Muller, Ph.D., ¶¶ 23–123, ECF No. 48. But adopting Plaintiffs' skewed interpretation of competitor standing would allow the exception to swallow the rule— that an injury-in-fact must be non-speculative and certainly impending to support Article III standing. Indeed, the cases Plaintiffs cite refute their skewed interpretation of the doctrine.

As an initial matter, the only Fourth Circuit case Plaintiffs cite, *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996), is not a competitor standing decision. *Price* arose in the distinct context of an equal protection challenge, where the government's discriminatory treatment of the plaintiff is itself the cognizable injury. *See id.* at 1248 (plaintiffs' injury premised on the "denial of equal protection" under the law, not the fact that they were denied promotions). The same is true with *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993), which Plaintiffs cite alongside *Price*, *see* Opp'n at 24. 508 U.S. at 666 (equal protection challenge to ordinance according preferential treatment to certain minority-owned businesses in awarding city contracts). Unlike those cases, Plaintiffs' asserted injuries do not arise from the government's alleged discriminatory treatment of parties.

---

[4] Plaintiffs seem to suggest that the President has conceded the facts alleged in the Complaint. Opp'n at 41. That is not so. The President's Motion merely applies the standard applicable at this stage. *See US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010).

Rather, they stem from the alleged potential outcome of independent choices by third-party government consumers in a market where the Trump International Hotel is a participant.

Even the out-of-circuit competitor standing cases Plaintiffs cite confirm that Plaintiffs have no competitor standing. *Adams v. Watson*, 10 F.3d 915 (1st Cir. 1993), was a challenge brought by out-of-state dairy farmers to a Massachusetts milk pricing order that required Massachusetts dairy distributors to pay a fee into a fund from which only Massachusetts dairy farmers could receive distributions. *Id.* at 916–17, 919–20. The court held that this kind of "competitive advantage bestowed on [plaintiff's] direct competitor[s]" by the government rendered it "obvious" that injury would result because it "plainly disadvantages the plaintiff's competitive position in the relevant marketplace." *Id.* at 922. The court distinguished the case from a situation where "injury and cause are not obvious," in which case "the plaintiff must plead their existence in his complaint with a fair degree of specificity" and "must demonstrate a realistic danger" of sustaining injury. The court explained that this could be shown through application of "standard principles of supply and demand." *Id.* at 922–23.

The facts presented here are readily distinguishable. Consideration of the basic laws of supply and demand enabled the court in *Adams* to view the government's monetary subsidization of one set of competitors as a market distortion that inevitably would lead to competitive advantage for one group of competitors and economic injury to the other. But there is no such connection here between the conduct complained of and the claimed economic injury to hospitality establishments in D.C. and Maryland. Instead, Plaintiffs hypothesize an injury based on the possible behavior of unknown third-party consumers and their subjective views about the President, including the desirability of patronizing his establishments in a metropolitan market containing hundreds of other similar establishments.

The inapplicability of the competitor standing doctrine when the claimed injury depends on the subjective views of third parties is illustrated by *State National Bank of Big Spring v. Lew*, 795 F.3d 48 (D.C. Cir. 2015). There, the plaintiff challenged a regulatory designation of its competitor financial institution as "too big to fail" on the basis that such a "reputational subsidy"

allowed the competitor to raise money at lower costs than it otherwise could have. *See id.* at 54, 55. The court found no competitor standing, however, because the link between the alleged reputational benefit to the competitor and any harm to the plaintiff was "simply too attenuated and speculative to show the causation necessary to support standing." *Id.* at 55. Likewise here, no Article III injury may be presumed because the claimed injury depends on speculation about third parties' perceptions of the value of patronizing the President's businesses. *Cf. New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (alleged injury dependent on the "independent actions of third parties" is unlike that in competitor standing cases where the court may "simply acknowledge a chain of causation firmly rooted in the basic law of economics").

Plaintiffs also cite other authority falling into categories entirely distinct from this case. One group of cases involves government regulation permitting or encouraging new entrants to the market—*i.e.*, increased competition caused by the government acting as a regulator.[5] But here Plaintiffs do not allege that the government has allowed new entrants. Another case cited by Plaintiffs involves past injury, which presents a very different situation from competitor standing cases that infer future injury solely on the basis of market conditions and laws of supply and demand. *See NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 448–49 (6th Cir. 2007) (plaintiff "was injured" when it lost various accounts to the defendant). Still another case involves claims arising under the Lanham Act. *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011). That Act protects persons engaged in commerce against unfair competition and authorizes anyone believing that he or she is "likely" to be injured to bring suit. *See* 15 U.S.C. § 1125(a). "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Spokeo, Inc. v. Robins*, 136 S. Ct.

---

[5] *See Cooper v. Tex. Alcoholic Beverage Comm'n*, 820 F.3d 730, 737–38 (5th Cir. 2016) (removal of a state residency restriction on mixed-beverage permits), *cert. denied*, 137 S. Ct. 494 (2016); *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 211–12 (D.C. Cir. 2013) ("pilot program allow[ed] Mexico-domiciled trucks to compete with members of" plaintiffs); *Sherley*, 610 F.3d at 73.

1540, 1549 (2016).  Here, Plaintiffs invoke no statute that might relax their burden to meet the injury-in-fact requirement.

In sum, Plaintiffs have not established that they have competitor standing and because they otherwise fail to establish standing on any other basis, *see* Mot. at 15–16, their claims should be dismissed on standing grounds alone.

## II.   PLAINTIFFS HAVE NO CAUSE OF ACTION UNDER THE EMOLUMENTS CLAUSES AND EQUITY REQUIRES DISMISSAL.

The President's Motion also demonstrated that Plaintiffs lack a cause of action under the Emoluments Clauses and that equity counsels against this Court granting relief in this case.  *See* Mot. at 26–29.  In particular, the President showed that the paradigmatic situation where courts have recognized implied equitable claims against the Government is when a plaintiff preemptively asserts a defense to a potential enforcement action.  Plaintiffs' only response is that the Supreme Court has never limited equitable causes of action to such circumstances, Opp'n at 51, a proposition not in dispute.  But as previously explained, equitable relief is not granted as a matter of right, and equity indicates that this is not a proper case for such relief because, among other things, the Emoluments Clauses were not meant to protect against commercial competition or unequal treatment among the States.  *See* Mot. at 26–29.  Rather, the Clauses were intended to guard generally against the corruption of, and foreign influence on, federal officials and to ensure the independence of the President.

Plaintiffs also rely on cases involving structural constitutional violations such as *Bond v. United States*, 564 U.S. 211, 223 (2011), and *LaRoque v. Holder*, 650 F.3d 777, 793 (D.C. Cir. 2011), where Congress allegedly exceeded the limits on its legislative power in a manner that exposed the plaintiffs to injurious regulation.[6]  But unlike the criminal defendant in *Bond*, who

---

[6] Indeed, except for one case, all of the authority on which Plaintiffs rely for this argument involved a plaintiff being subjected to the injurious effects of allegedly unconstitutional regulation.  *See* Opp'n at 52–53; *see Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 401, 412 (2003) (state statute regulating plaintiff insurers); *Printz v. United States*, 521 U.S. 898, 902 (1997) (federal statute commanding action by plaintiff law enforcement official); *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 84 (1984) (state statute regulating plaintiff's timber

was prosecuted under a statute allegedly enacted in contravention of the Tenth Amendment, and unlike the political candidate in *LaRoque*, who was forced to run under a more burdensome electoral regime, Plaintiffs are not exposed to regulation or enforcement action by the President's alleged receipt of prohibited emoluments.  Those cases are inapposite.

Plaintiffs also imply that the zone-of-interests test no longer applies after the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).  But the *Lexmark* Court did not abrogate the zone-of-interests test; it merely explained that the test is not an issue of prudential standing but a way "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 1387.  The Court noted that a statute ordinarily provides a cause of action "only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.* at 1388.  Likewise, a plaintiff whose alleged interests fall outside the zone of interests of a *constitutional* provision ordinarily lack a right to sue, and *Lexmark* does not purport to overrule prior Supreme Court precedent so holding. *See* Mot. at 28; *see, e.g.*, *Bosley v. Baltimore Cty.*, 804 F. Supp. 744, 751 (D. Md. 1992) (procedural due process), *aff'd by* 986 F.2d 1412 (4th Cir. 1993).  Indeed, even if *Lexmark* were in tension with that prior precedent, the Supreme Court has repeatedly admonished that lower courts must continue to follow its precedent unless and until overturned. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997).  It is unsurprising then that post-*Lexmark*, courts continue to apply the zone-of-interests test to constitutional claims. *See, e.g.*, *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 805 F.3d 98, 105, 110 (3d Cir. 2015) (affirming dismissal of Tonnage Clause claim); *Coal.*

---

exports); *INS v. Chadha*, 462 U.S. 919, 928 (1983) (congressional action pursuant to which plaintiff was to be deported); *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 458 (1978) (challenge to multistate governmental entity's authority to audit plaintiff taxpayers); *Hill v. Wallace*, 259 U.S. 44, 45 (1992) (federal statute imposing a tax on plaintiff's trade in commodity).  The only exception, *Gilman v. Philadelphia*, 70 U.S. 713 (1865), does not even involve an equitable cause of action.  That case concerned a nuisance claim—a common law tort—and a request for an injunction to prevent the irreparable harm caused by the nuisance. *Id.* at 719–20, 722–24.  The Court ultimately concluded that the complaint failed to state a claim. *Id.* at 732.

*for Competitive Elec., Dynegy Inc. v. Zibelman*, ---F. Supp. 3d---, No. 16-cv-8164, 2017 WL 3172866, at *19–*21 (S.D.N.Y. July 25, 2017) (dismissing dormant Commerce Clause claim), *appeal filed* Aug. 25, 2017.[7]

## III.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM.

### A.   Plaintiffs' Interpretation of the Text of the Emoluments Clauses is Overbroad and Unreasonable.

The President's opening brief showed that, in light of the common usage in the founding era and thereafter, the term "Emolument" in the Emoluments Clauses refers to a "profit arising from an office or employ"—essentially, profit from labor. *See* Mot. at 30–38.  That definition fits most appropriately within the context of the Foreign Emoluments Clause and is harmonious with the other prohibited categories in the Clause (present, office, and title), all of which are things conferred or bestowed on an officeholder personally.  Moreover, this reading avoids rendering any portion of the Clause superfluous, whereas Plaintiffs' definitions of "present" and "Emolument" contain substantial redundancies, as Plaintiffs themselves recognize, *see* Opp'n at 34 n.22.[8]  Applying the same definition of "Emolument" to the Domestic Emoluments Clause likewise indicates that benefits from a federal or state instrumentality are prohibited only when they are in exchange for the President's service as President.  The Complaint does not plausibly allege any violations under these interpretations, and Plaintiffs' rejoinders are unpersuasive.

---

[7] Finally, Plaintiffs argue that their claims should not be dismissed pursuant to the political question doctrine. Opp'n at 54–55.  The President, however, did not invoke the doctrine; he merely argued that Congress's consent power under the Foreign Emoluments Clause and the inherently political nature of the judgments associated with the Clause are another factor counseling against the Court inferring a cause of action in equity here. *See* Mot. at 29.

[8] Plaintiffs err in contending that profits arising from the commercial transactions alleged in the complaint may also constitute "presents" under the Foreign Emoluments Clause.  Opp'n at 40 n.27.  Not only does that interpretation render the terms "present" and "Emolument" redundant, but it defies a common sense understanding of "present."  As the President's Motion showed, a prohibited "present" is "something bestowed on another without price or exchange," and cannot naturally be read to include benefits arising from commercial transactions or accruing by operation of law. *See* Mot. at 37–38.  Thus, for example, trademarks received by an official from a foreign government would not be "presents."

First, Plaintiffs argue that their proposed definition of "Emolument" as "anything of value" comports with the original public meaning of the Clauses.  They cite founding-era documents where the term was used in accordance with that definition, *see* Opp'n at 30, 31, 33, and rely on an article that found that the President's proposed definition appears in "only 8%" of the 40 dictionaries catalogued for the period of 1604 to 1806.  *Id.* at 32 (citing John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries, 1523-1806*, at 8 (July 9, 2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2995693).  But mechanical counting of dictionaries is unpersuasive.  It is a fundamental canon of construction that a term "cannot be construed in a vacuum" and "must be read in [its] context."  *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context") (citation omitted).  Here, even Plaintiffs do not dispute that the President's proposed definition existed during the founding era.  Thus, the relevant question is not how many dictionaries provide one of the two available definitions, but rather which of those definitions should be applied in the context of a constitutional restriction on federal officeholders.  As the President's Motion demonstrated, *see* Mot. at 30–50, the context provided by the Constitution— read in concert with the history of the Emoluments Clauses and founding-era practices—shows that Plaintiffs' reading of the term "Emolument" to encompass "anything of value" is meritless.

In any event, Plaintiffs' reliance on the Mikhail article is misplaced given its limitations for the interpretive task here.  The article's conclusions have been criticized as "based on inaccurate assumptions about [founding-era] dictionaries and about the semantic inquiry at hand."[9]  First, the article fails to account for context or for frequency of usage.  As a more thorough treatment found, in instances where "the recipient of the emolument is an officer, regardless of the corpus [of documents analyzed], the narrower sense of *emolument* is the one

---

[9] *See* James Phillips & Sara White, *The Meaning of Emolument(s) in 18th-Century American English: A Corpus Linguistic Analysis*, 59 So. Texas L. Rev. __ (Forthcoming 2018), https://ssrn.com/abstract=3036938, at 13.

overwhelmingly used."[10]  Second, the Mikhail article accords an ahistorical precision to dictionary entries.  Lexicographers of the time "could not and did not engage in a systematic attempt to discern all of the meanings of words."[11]  Thus, founding-era dictionaries may not have recorded all meanings of the words listed, but rather, may have simply chosen to include the broadest meaning that would encompass other meanings.[12]  Similarly, dictionaries may have copied one another, rendering a simple tallying of definitions across sources misleading.[13]  And, in any event, founding-era dictionaries also were generally more prescriptive about how language *should* be used, rather than descriptive of how it was actually used at the time.[14]

Moreover, putting aside the article's limited utility in this context, the Mikhail article's underlying sources ultimately support the President's position.  The dictionaries cited demonstrate that the President's definition is closely related to the etymology of emolument, which is profit from labor, or more specifically, from grinding corn.  As confirmed by these dictionaries, the term "emolument" derives from the Latin "emolumentum," *see* Mikhail, *supra*, at A-6–A-9, nos. 4, 11, 15, 21, 23, 35, which was the combination of "mola," meaning "a mill," and "emole," meaning "to grind thoroughly," *id.* nos. 15, 35.  *See also* Mot. at 35 & n.28 (citing etymological dictionaries).  Excerpts from six of the dictionaries cited by Mikhail thus include variations of the definition of "profit gotten properly by grist; hence, by any labor and cost," Mikhail, *supra*, no. 15; *see also id.* nos. 5, 7, 8, 11, 15, 35.  By focusing narrowly on dictionaries that define "emolument" as "profit arising from office or employ," Plaintiffs ignore these

---

[10] *Id*. at 38.

[11] *See* Gregory E. Maggs, *A Concise Guide to Using Dictionaries from the Founding Era to Determine the Original Meaning of the Constitution*, 82 Geo. Wash. L. Rev. 358, 371 (2014).
[12] *Id.*

[13] *See, e.g.*, Allen Reddick, *The Making of Johnson's Dictionary, 1746–1773*, at 11 (1996); Maggs, *supra* note 8, at 382.

[14] Samuel A. Thumma & Jeffrey L. Kirchmeier, *The Lexicon Has Become a Fortress: The United States Supreme Court's Use of Dictionaries*, 47 Buff. L. Rev. 227, 242 (1999).

etymologically rooted definitions and thus significantly understate the percentage of dictionaries having a definition supporting the President's position.

Plaintiffs also argue that the Foreign Emoluments Clause's prohibition on "any" "Emolument" "of any kind whatever" compels their broader definition of "Emolument." Opp'n at 33–34. As the President showed in his opening brief, however, the phrase "of any kind whatever" merely emphasizes the Clause's reach—every kind of emolument, present, office, or title—and is not a basis to choose which definition of emolument most appropriately applies. Mot. at 50–51. Indeed, founding-era government officials were compensated in a number of different ways, including through fees for services rendered; commissions; shares of fines, penalties, and forfeitures; the usage of horses; pay for servants; and, in some instances, salaries. *Id.* at 31–32. The phrase "of any kind whatever" ensures that every *type* of the identified compensation are captured by the Clause. As for the Clause's first use of the word "any" ("any . . . Emolument"), it is meant to be numeric—*no* prohibited emoluments may be received by a covered official without the consent of Congress.

Plaintiffs next argue that even if the President's proposed definition of "Emolument" were correct, there would be no legitimate basis to limit "Emoluments" to benefits received for services rendered. *See* Opp'n at 41. As discussed above, however, the provision of personal service or labor is rooted in the very origin of the word "emolument," given its etymology relating to profits arising from labor. The President's opening brief cited historical sources and legal interpretations for the proposition that "emolument" refers to "every species of compensation or pecuniary profit derived from a discharge of the duties of the office," Mot. at 31 (citation omitted), and relates "to commissions and employments; intimating, not only the salaries, but, all other perquisites," *id.* at 34 (citation omitted).

Separately, Plaintiffs argue that the phrase "any other Emolument" in the Domestic Emoluments Clause indicates that the Clause should be read as broadly as possible because it was intended to eliminate any pecuniary inducement operating on the President. Opp'n at 35. The Clause provides that the President shall receive "for his Services" a fixed "Compensation"

"during the Period for which he shall have been elected" and that "he shall not receive within that Period *any other Emolument* from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7 (emphasis added). The term "Emolument" in this Clause refers *only* to compensation and other benefits for his services as President. Mot. at 33. Thus, the reference to "any *other* Emolument" further demonstrates that "Compensation" is a type of "Emolument" and that the two terms should be read in concert—meaning that the President may not receive additional benefits as compensation for his services while in office. Moreover, the phrase "for his Services" clearly qualifies both "Compensation" and "any other Emolument." As Plaintiffs themselves acknowledge, constitutional interpretation should begin with text, *see* Opp'n at 31 (citing *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997)), yet they ignore the very textual cues that provide meaning to the term "Emolument."

Equally unavailing is Plaintiffs' argument that the Incompatibility Clause, the only other constitutional provision that also contains the term "Emolument," bolsters their reading of the Foreign Emoluments Clause. The Incompatibility Clause provides that no member of Congress "shall, during the Time for which he was elected, be appointed to any civil Office . . . the Emoluments whereof shall have been encreased during such time." U.S. Const. art. I, § 6, cl. 2. Plaintiffs argue that by using a "restrictive modifier"—*i.e.*, "the Emoluments whereof"—the Incompatibility Clause highlights the expansiveness of the Foreign Emoluments Clause, which includes no such office-related limitation. Opp'n at 41 n.28. Contrary to Plaintiffs' argument, the Incompatibility Clause actually underscores that "Emolument" refers to compensation for an officeholder's service. The Foreign Emoluments Clause does not reference any specific office because it has a broader reach than the Incompatibility Clause—it regulates not only compensation or benefits arising from holding federal office but also any employment-like relationship between a foreign government and a covered official. And it makes littles sense that the term "Emolument" would have different meanings throughout the Constitution, when all three clauses containing the term are tied to holding office and regulate the conduct of officeholders.

20

**B.      The Purposes of the Emoluments Clauses Do Not Compel Plaintiffs' Broad Reading of the Clauses.**

Plaintiffs further argue that to effectuate the Emoluments Clauses' purposes of protecting against undue influence by foreign and domestic governments and ensuring Presidential independence, the Clauses must be read as broadly as possible.  The President's interpretation, they contend, would "obliterate[]" the Clauses' purposes.  Opp'n at 42–43.  Not so.  To begin, "no law pursues its purpose at all costs, and . . . the textual limitations upon a law's scope are no less a part of its 'purpose' than its substantive authorizations."  *Kucana v. Holder*, 558 U.S. 233, 252 (2010).  Accordingly, the fact that the Framers were concerned about undue influence and Presidential independence does not compel the conclusion that the Emoluments Clauses must be read so expansively as to include private business pursuits by officeholders.  Indeed, while the Framers weighed concerns that public officials would be influenced by pecuniary inducements, it was common at the time for federal officials to have private business pursuits.  Yet the Framers said nothing about requiring officials to divest their private commercial interests in order to assume federal office.  *See* Mot. at 27–28.  Moreover, the President's reading serves the Clauses' purposes of preventing foreign influence and ensuring Presidential independence by focusing on whether the President's personal service or official conduct is actually at issue in a transaction.

Nor is Plaintiffs' would-be silver bullet—that the President's interpretation permits him to profit from foreign and domestic government transactions—persuasive.  Opp'n at 42–43.  The Emoluments Clauses are not comprehensive conflict-of-interest provisions covering every conceivable type of activity that may raise an appearance of impropriety.  The Clauses only identify specific categories of benefits that officeholders may not accept, each of which has different characteristics.

Plaintiffs also posit that, under the President's reading, he would be prohibited from personally providing hospitality services to a foreign diplomat (*e.g.*, serving a drink) but, counterintuitively, would be permitted to accept a check made out to the Hotel for a substantial sum of money for a block of rooms.  *See* Opp'n at 43.  But the Foreign Emoluments Clause is

directed at profits arising from the provision of service by the officeholder pursuant to his office or employment-like relationship with the foreign government.  It is that sort of relationship that puts an officeholder in closest contact with a foreign government, thereby giving rise to the greatest potential risk of corruption.  Simply owning interests in a hospitality establishment does not create that kind of relationship.  In any event, the President's opening brief recognized that payments to the President's businesses may raise concerns under the Clauses if the business is merely being used as a conduit to receive benefits in exchange for the President's service.  The Complaint contains no plausible allegations to that effect.

### C. The President's Position is not Inconsistent with Prior Interpretations of the Emoluments Clauses.

Plaintiffs also cite opinions by the Office of Legal Counsel ("OLC") and Comptroller General for the proposition that any profit accepted from a foreign or domestic government is prohibited by the Clauses.  Opp'n at 36–38.  As fully demonstrated in his opening Motion, however, the President's position is not inconsistent with the conclusions of published OLC and Comptroller General opinions.  Mot. at 47–49.  Notably, while those opinions do not specifically require an employment-like relationship in assessing particular situations under the Clauses, the facts underlying those opinions already involved such an employment relationship.  For example, two of the OLC opinions cited by Plaintiffs involved *personal service* rendered by the federal official to the foreign government in his private capacity. [15]  OLC's conclusion that the arrangement was prohibited is not inconsistent with the President's view of the Clause.

---

[15] *See Application of the Emoluments Clause of the Constitution & the Foreign Gifts & Decorations Act*, 6 Op. O.L.C. 156, 156–57 (1982) (a Nuclear Regulatory Commission employee could not "on his leave time" work for an American consulting firm on a project for the Mexican government where the firm secured the contract based solely on the employee's expertise and would pay the employee using foreign funds); *see also* Memorandum from H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, O.L.C., *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales*, at 1 (May 23, 1986), *available at* https://www.politico.com/f/?id=00000158-b547-db1e-a1f9-ff7f60920001 (Clause could apply to NASA scientist accepting fee for performing consulting services for a foreign university).

22

Plaintiffs are similarly mistaken in suggesting that the President's interpretation is in tension with OLC and Comptroller General opinions holding that the use of a corporate entity to pass through foreign benefits would not shield an officeholder from Foreign Emoluments Clause violations. Opp'n at 48. That is incorrect. Under the President's view, the Clause would indeed prohibit an arrangement whereby the President provided services in his official capacity or in an employee-like capacity to a foreign government in exchange for payments, even if such payments were passed through a company the President owned. This position is not inconsistent with the Comptroller General and OLC opinions cited by Plaintiffs (*see id.* at 36, 48), each of which involved the provision of service by an officeholder, with the question being whether a foreign government should be deemed the source of payment for such service despite the existence of corporate intermediaries. *See, e.g., Matter of Lieutenant Colonel Marvin S. Shaffer*, 62 Comp. Gen. 432, 434 (June 2, 1983) (retired military officer could be employed by domestic corporation, whose controlling interest was held by a foreign-government-controlled corporation, because the domestic corporation had a separate identity and was not an agent of the foreign government); *Retired Marine Corps Officers*, B-217096, 1985 WL 52377, at *1 (Comp. Gen. Mar. 11, 1985) (retired military officer employed by an incorporated law firm could not perform legal service for a foreign government because "an attorney's professional relationship with his clients remains unchanged notwithstanding the existence of a professional corporation").[16]

Plaintiffs also cite *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 119 (1993), where OLC determined that members of the Administrative Conference of the United States ("ACUS") could not receive a distribution from

---

[16] Plaintiffs incorrectly assert that the President's interpretation requires a finding that an officeholder is "subjected to improper foreign influence." Opp'n at 47. The President's interpretation—like that of the Plaintiffs—requires a blanket prohibition without any factual assessment of actual foreign influence. *Cf. Applicability of Emoluments Clause to Proposed Serv. of Gov't Emp. on Comm'n of Int'l Historians*, 11 Op. O.L.C. 89, 90–91 & n.5 (1987) (official could not obtain an "office" from a foreign government even though he would not necessarily be subject to improper influence).

their law partnerships that included revenues from foreign governments.  Plaintiffs contend that this opinion shows that no personal contact or relationship with a foreign government is required for a benefit to be a prohibited emolument.  Opp'n at 36, 46–47.  But that opinion concerned services provided by an ACUS member's law partners, and situations involving law partners and their profit sharing are unique and distinct from the financial interests at issue in this case.  As previously explained, "a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client" and "each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated."  Mot. at 49–50 n.66 (citing Model Rules of Prof'l Conduct r. 1.10 cmt. (Am. Bar Ass'n 1983); Restatement (Third) of the Law Governing Lawyers § 123, cmt. B)).  Given that the officeholder is bound by the same duty of loyalty to the client as his law partners, OLC's conclusion that he may not share his partners' profits from a foreign government is not inconsistent with the President's interpretation of the Foreign Emoluments Clause.  Again, the President does not contend that payments made through a corporate structure could never constitute prohibited emoluments.

Plaintiffs further argue that OLC's opinion concerning President Ronald Reagan's state retirement benefits implicitly rejects the President position.  According to Plaintiffs, although received by President Reagan while he was in office, the retirement benefits did not run afoul of the Domestic Emoluments Clause because they vested before he was elected.  Opp'n at 49.  But there is no doubt that the retirement benefits fell within Plaintiffs' "anything of value" definition of an "Emolument."  Moreover, in addition to noting that the retirement benefits were previously earned and vested, OLC also stressed that these were benefits "for which [the President] no longer ha[d] to perform any services."  5 O.L.C. Op. 187, 190 (1981).  Thus, OLC's opinion does not undercut the President's interpretation of the Domestic Emoluments Clause.

Lastly, Plaintiffs cite a report by a House ethics office finding that the delegate from the territory of Guam may have violated the Foreign Emoluments Clause by renting a house to a

foreign mission.[17]  Opp'n at 37.  The report purports to apply the House Ethics Manual's "unambiguous[]" definition of "Emolument" as "any 'profit, gain, or compensation *for services rendered*,'" Report at 12 (emphasis added)—a definition consistent with the President's interpretation.  It also purports to rely on OLC and Comptroller General opinions, *see id.* at 12–13, none of which is inconsistent with the President's position because all involved employment-like relationships with foreign governments.  *See* Mot. at 48–49.[18]

### D.  Historical Background Refutes Plaintiffs' Interpretation of the Clauses, and Absurd Results Would Flow From Their Interpretation.

The President's Motion also showed that his interpretation is consistent with the practices of early Presidents and that such practices contradict Plaintiffs' interpretation.  Mot. at 41–42.  For example, the Motion put forth evidence of (1) President George Washington purchasing public land from the Federal Government as a private citizen without any concerns about violating the Domestic Emoluments Clause, and (2) early Presidents engaging in commerce and exporting their farm products overseas without any emoluments concerns.

Plaintiffs' responses are unpersuasive.  First, Plaintiffs argue that President Washington's business transaction with the Federal Government was distinguishable because it was a public sale; Washington indicated that he "had no desire to 'stand on a different footing from every other purchaser'"; and he was supposedly "'ready to relinquish' the property if necessary" (although he did not say so).  *See* Opp'n at 45 (citing Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), http://founders.archives.gov/documents /Washington/05-15-02-0289).  But Plaintiffs do not explain why these factors would

---

[17] Office of Congressional Ethics, U.S. House of Representative, Review No. 17-1147, *available at* https://oce.house.gov/sites/congressionalethics.house.gov/files/migrated/wp-content/uploads/2017/09/Referral-OCE-Rev.-17-1147-Bordallo_FINAL-FOR-REFERRAL.pdf.

[18] *See* Report at 12–13 (citing *Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. at 90; *Applicability of Emoluments Clause to Emp't of Gov't Emps. by Foreign Pub. Univs.*, 18 Op. O.L.C. 13, 18 (1994); *Application of Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156 (1982); *To the Sec'y of the Air Force*, 49 Comp. Gen. 819, 819 (1970)).

exempt Washington's transactions from the broad scope of the Domestic Emoluments Clause as they interpret it, which permits no exceptions. In fact, Plaintiffs' interpretation of the term "Emolument" is directly undermined by Washington's conduct. President Washington's actions have been accorded great weight in constitutional interpretation, *see* Mot. at 44, and the Supreme Court has also taught that "significant weight" must be placed on "historical practice," *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014), including on "contemporaneous practice by the Founders themselves," *Mistretta v. United States*, 488 U.S. 361, 399 (1989).

Plaintiffs also argue that the President has not put forth evidence clearly indicating that the early Presidents actually sold their farm products to foreign or domestic governments. Opp'n at 45. But while the extant farm records of those early Presidents are limited and inconclusive on the question, there is no question that private business pursuits by federal officials, including by early Presidents, were common at the Nation's founding. It is reasonable to infer that at least some of their transactions may have been with government actors, including foreign state-chartered trading companies. Given this possibility, it is telling that there is *no* historical record of any concerns being raised about possible emoluments violations by Presidents if they were to transact business with foreign or domestic governments.

That the Clauses were not intended to prohibit such transactions is further confirmed by the proposed 1810 constitutional amendment, which would have extended the prohibitions of the Foreign Emoluments Clause to all citizens. If Plaintiffs' definition of "Emolument" were correct, that amendment would have precluded all citizens from transacting business with any foreign government. On this point, Plaintiffs note only that the proposed amendment ultimately was not ratified and that the amendment would have had harsh consequences in some circumstances under the President's interpretation as well. Opp'n at 45–46. But the proposed amendment enjoyed sweeping support in Congress—passing 19 to 5 in the Senate and 87 to 3 in the House—and 12 states ratified the amendment, only 2 states short of ultimate ratification. Mot. at 45 & nn.60–61. Particularly given that extensive support, the 1810 proposed amendment

is additional strong historical evidence that the term "Emolument" as used in the Clauses could not have had the broad meaning Plaintiffs propose.

The President's Motion also showed that Plaintiffs' definition would lead to absurd results. Mot. at 51–52. For example, under Plaintiffs' interpretation, the Foreign Emoluments Clause would prohibit retired military officers from obtaining necessary permits or licenses while living abroad and officeholders (including the President and Members of Congress) from owning stock in companies conducting business globally. And the Domestic Emoluments Clause would prevent Presidents from owning Treasury bonds while in office. Plaintiffs have no meaningful response to these absurd results. As for the other absurd results discussed in the President's Motion, Plaintiffs' response is to disclaim their own theory—*i.e.*, that the Clauses encompass "all profit and other benefits"—by arguing that benefits derived from mutual funds and stock holdings are permissible and by invoking a "functionalist" and "pragmatic, purpose-driven inquiry" for assessing the scope of the term "Emolument." Opp'n at 48–49. But Plaintiffs cannot have it both ways. Their arguments are contrary to their own sweeping prophylactic theory that the Clauses cover "anything of value," Compl. ¶ 24, as well as their own insistence that the Foreign Emoluments Clause "presumptively bar[s] the acceptance of any emolument, subject only to Congress's ability to grant consent." Opp'n at 33.[19]

### E.      Plaintiffs Do Not State a Claim Under the President's Interpretation.

Finally, Plaintiffs argue that they have stated a claim even under the President's interpretation of the Emoluments Clauses because benefits arising from the President's business interests would be benefits arising from "employ." *See* Opp'n at 41–44. But as already explained, the prohibited benefit must arise in connection with the President's service as

---

[19] In attempting to explain the inconsistency of their theory, Plaintiffs argue that certain benefits may be outside of the Clause's scope even though they are "Emoluments" within the meaning of the Clause because some benefits should not be deemed "accepted" "from" a foreign state as those terms are defined in the Clause. *See* Opp'n at 49 n.31. Even if Plaintiffs were correct, their theory still fails to explain the many benefits routinely accepted by officeholders that are unquestionably "accepted" "from" a foreign state, such as a retired military officer's receipt of a drivers' license or a permit to conduct business in a foreign country.

President or in an employment like relationship with a foreign government.  Merely owning an interest in a business that transacts business with a foreign government does not create this kind of relationship.  Plaintiffs also contend that the President's interpretation of the Clauses would cover instances where a foreign or domestic government actor unilaterally seeks to influence the President through a commercial transaction with the President's businesses.  Opp'n at 38–39. Not so.  An "Emolument" must be tendered in exchange for personal services rendered by the officeholder, in light of the original public meaning of the term, including its etymological roots as compensation for labor.  Mot. at 30–50.  The Complaint contains no plausible allegations of such exchange.  For similar reasons, Plaintiffs' assertion that prices at the President's businesses have increased, *see* Opp'n at 40, do not state a claim because a benefit must have more than some connection to the President to constitute an "Emolument."

Plaintiffs further argue that they have stated a plausible Domestic Emoluments Clause claim because they have alleged that GSA forgave the President's alleged breach of the Old Post Office Building lease due to "[his] position as president."  *Id.* at 39.  But Plaintiffs have made no factual allegations plausibly supporting their assertion that the GSA's purported forgiveness was to compensate for the President's service as President.  Although they claim that the President increased the budget request for GSA in exchange for such a determination, *see id.*, the budget request actually represented a total decrease of roughly $80 million from FY 2017 to FY 2018, which subsumed the requested increase in the significantly smaller discretionary budget authority.[20]  Plaintiffs' new allegations regarding domestic governments that have engaged or will engage in commercial transactions with the President's businesses similarly do not state a claim.  Opp'n at 8, 39.  The mere fact that a government consumer chooses to engage in a commercial transaction because the other party is a business owned by the President is

---

[20] *Compare* GSA, *FY 2017 Congressional Justification*, at GSA-8 (Feb. 9, 2016), https://www.gsa.gov/portal/getMediaData?mediaId=123414 (FY 2017 appropriations request of $10,540,077 thousand), *with* GSA, *FY 2018 Congressional Justification*, at GSA-10 (May 23, 2017), https://www.gsa.gov/portal/getMediaData?mediaId=162214 (FY 2018 appropriations request of $10,459,953 thousand).

insufficient to trigger the Domestic Emoluments Clause; there must be plausible allegations that the President has performed an official act in exchange. There are none.

For the foregoing reasons, Plaintiffs have failed to state any plausible claim for relief.

## IV.    THE RELIEF SOUGHT BY PLAINTIFFS WOULD BE UNCONSTITUTIONAL.

The President's Motion also explained why this Court has no jurisdiction to issue the requested relief under *Johnson*, 71 U.S. 475. Mot. at 54–56. Plaintiffs distinguish *Johnson* as a political question case and suggest that it does not bar an injunction against the President in the performance of his official duties. But that is wrong and, indeed, the Supreme Court and other courts have cited *Johnson* for this exact rule. *See, e.g.*, *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("courts do not have jurisdiction to enjoin" the President) (citing *Johnson*, 71 U.S. at 501); *see also Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality op.); *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).

Plaintiffs also cite cases that involve only temporary injunctive relief[21] or purely ministerial duties, *see Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 606 (D.C. Cir. 1974). Although *Johnson* did "le[ave] open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty," *Franklin*, 505 U.S. at 802, Plaintiffs' request for permanent injunctive relief does not involve a purely ministerial duty. Were Plaintiffs' interpretation of the Emoluments Clauses correct, an injunction to require the President's compliance would require significant "judgment" and "planning" and would hardly be "ministerial." *See Swan*, 100 F.3d at 977. Moreover, even if Plaintiffs' proposed injunction would affect only ministerial duties, this Court should still exercise utmost restraint in deciding whether to enjoin a sitting President. The Supreme Court has never done so, nor even addressed the significant separation-of-powers concerns that would arise from such an

---

[21] *See Mackie v. Bush*, 809 F. Supp. 144, 146 (D.D.C. 1993) (temporary relief to preserve the Court's jurisdiction or status quo with no discussion of *Johnson*), *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993); *Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) (same); *Boumediene v. Bush*, 553 U.S. 723 (2008) (no injunction was issued against the President).

injunction.  Similarly, the D.C. Circuit recognized in *Swan* that it had "never attempted to exercise power to order the President to perform a ministerial duty" and that it is "painfully obvious" why courts should be "hesitant to grant such relief": doing so "at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers."  *Id.* at 978.

Plaintiffs also argue that *Johnson* is inapplicable because Plaintiffs are not seeking to require the President to take specified executive action.  The relief requested, however, implicates the essential concerns underlying *Johnson* because it would effectively impose a condition on the President's ability to serve as President and to perform the duties he was duly elected to perform.  This necessarily touches on core "executive and political" duties.  *See Johnson*, 71 U.S. at 499.

Finally, Plaintiffs argue that *Johnson*'s rule is sapped of its vitality in situations where there is no subordinate official who could be enjoined from carrying out the President's directive.  *See* Opp'n at 59–60.  But one of the few sources they cite, Justice Scalia's concurrence in *Franklin*, 505 U.S. 788, suggests that where there are no subordinate officials to enjoin, a court would have no jurisdiction to issue an injunction.  As Justice Scalia explained in *Franklin*, "[the Court] cannot remedy appellees' asserted injury without ordering declaratory or injunctive relief against appellant President Bush, and since [the Court] ha[s] no power to do that," the "appellees' constitutional claims should be dismissed."  *Id.* at 829 (Scalia, J., concurring).  Accordingly, this Court cannot granted the requested relief here.

## CONCLUSION

For the foregoing reasons and those stated in the President's Memorandum of Law in Support of his Motion to Dismiss, the President respectfully requests that the Court dismiss this case for lack of subject matter jurisdiction or for failure to state a claim.

Dated:  December 1, 2017     Respectfully Submitted:


CHAD A. READLER
Principal Deputy Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

/s/ *Jean Lin*    
JEAN LIN
Special Counsel
JAMES R. POWERS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20530
Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that December 1, 2017, I electronically filed a copy of the foregoing.

Notice of this filing will be sent via email to all parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *Jean Lin*
JEAN LIN