## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Greenbelt Division

|  |  |
|---|---|
| THE DISTRICT OF COLUMBIA and THE STATE OF MARYLAND, *Plaintiffs,* <br><br> v. <br><br> DONALD J. TRUMP, President of the United States of America, in his official capacity and in his individual capacity, *Defendant.* | Civil Action No. 8:17-cv-01596-PJM |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS OF DEFENDANT IN HIS INDIVIDUAL CAPACITY

BRIAN E. FROSH
Attorney General of Maryland

STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
LEAH J. TULIN
Federal Bar No. 20083
ltulin@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
T: (410) 576-6325 | F: (410) 576-6955

NORMAN EISEN
NOAH D. BOOKBINDER*
nbookbinder@citizensforethics.org
STUART C. MCPHAIL*
smcphail@citizensforethics.org
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
455 Massachusetts Avenue, NW
Washington, DC 20001
T: (202) 408-5565 | F: (202) 588-5020

KARL A. RACINE
Attorney General for the District of Columbia

NATALIE O. LUDAWAY
Chief Deputy Attorney General
Federal Bar No. 12533
STEPHANIE E. LITOS*
Senior Counsel to the Attorney General
stephanie.litos@dc.gov
441 Fourth Street, NW
Washington, DC 20001
T: (202) 724-6650 | F: (202) 741-0647

DEEPAK GUPTA*
deepak@guptawessler.com
DANIEL TOWNSEND
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
T: (202) 888-1741 | F: (202) 888-7792

JOSEPH M. SELLERS*
jsellers@cohenmilstein.com
CHRISTINE E. WEBBER*
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, NW
Washington, DC 20005
T: (202) 408-4600 | F: (202) 408-4699

* admitted pro hac vice

May 18, 2018

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Table of Contents .................................................................................................................i

Table of Authorities ............................................................................................................ii

Introduction and Summary of Argument ..........................................................................1

Argument..............................................................................................................................4

    I.    The District of Maryland Is a Proper Venue for this Action. ....................................4

    II.   This Court Has Personal Jurisdiction over the President. .........................................9

        A.    The President Has Purposefully Availed Himself of the Privilege of Conducting Activities in Maryland. ..................................................................11

        B.    The Plaintiffs' Claims Arise out of the President's Contacts.............................17

        C.    The Exercise of Personal Jurisdiction Would Be Constitutionally Reasonable. ....................................................................................................... 21

    III.  Maryland and the District's Claims May Be Brought against the President in His Individual Capacity. ........................................................................................... 23

        A.    The President is Not Immune from this Suit. ................................................... 23

        B.    Maryland and the District of Columbia Have a Cause of Action against the President in His Individual Capacity. .............................................27

        C.    The Emoluments Clauses Apply to the President in His Individual Capacity. .........................................................................................................31

Conclusion......................................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Aggarao v. MOL Ship Management Co., Ltd.,*
    675 F.3d 355 (4th Cir. 2012) ................................................................................................. 4

*Air Products & Controls, Inc. v. Safetech International, Inc.,*
    503 F.3d 544 (6th Cir. 2007) ............................................................................................... 17

*Armstrong v. Exceptional Child Center, Inc.,*
    135 S. Ct. 1378 (2015) ............................................................................................... 29, 34

*Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory,"*
    283 F.3d 208 (4th Cir. 2002) ................................................................................................. 9

*Bell v. Hood,*
    327 U.S. 678 (1946) ....................................................................................... 29, 30, 31

*Biggs v. Meadows,*
    66 F.3d 56 (4th Cir. 1995) .................................................................................................. 32

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,*
    403 U.S. 388 (1971) ........................................................................................................ 27

*Bond v. Messerman,*
    391 Md. 706 (2006) ............................................................................................................ 9

*Bond v. United States,*
    564 U.S. 211 (2011) ......................................................................................................... 28

*Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County,*
    137 S. Ct. 1773 (2017) ..................................................................................... 11, 17, 20, 21

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985) ................................................................................................... 21, 22

*Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.,*
    334 F.3d 390 (4th Cir. 2003) ......................................................................................... 9, 11

*CareFirst, Inc. v. Taylor,*
    235 F. Supp. 3d 724 (D. Md. 2017) ...................................................................................... 4

*Chamber of Commerce of U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ............................................................................................ 31

*Chambers v. Chambers,*
    No. RWT 11-765, 2011 WL 3512140 (D. Md. Aug. 8, 2011) ........................................................ 8

*Christian Science Board of Directors of First Church of Christ, Scientist v. Nolan,*
    259 F.3d 209 (4th Cir. 2001) ............................................................................................. 21

*Ciena Corp. v. Jarrard,*
  203 F.3d 312 (4th Cir. 2000) ............................................................................. 7

*City and County of San Francisco v. Sheehan,*
  135 S. Ct. 1765 (2015) ..................................................................................... 32

*Clean Air Council v. Mallory,*
  226 F. Supp. 2d 705 (E.D. Pa. 2002) ............................................................... 30

*Clinton v. Jones,*
  520 U.S. 681 (1997) ..................................................................................... *passim*

*Coleman v. Calvert County,*
  No. GJH-15-920, 2016 WL 5335477 (D. Md., Sept. 22, 2016) ...................... 33

*Columbia Briargate Co. v. First National Bank of Dallas,*
  713 F.2d 1052 (4th Cir. 1983) ......................................................................... 15

*CoStar Realty Information, Inc. v. Field,*
  612 F. Supp. 2d 660 (D. Md. 2009) ................................................................. 10

*Denver & R.G.W. Railroad Co. v. Brotherhood of Railroad Trainmen,*
  387 U.S. 556 (1967) .......................................................................................... 8

*Edmonson v. Leesville Concrete Co., Inc.,*
  500 U.S. 614 (1991) ......................................................................................... 32

*Ellicott Machine Corp. v. John Holland Party Ltd.,*
  995 F.2d 474 (4th Cir. 1993) ....................................................................... 9, 21

*Ex Parte Young,*
  209 U.S. 123 (1908) .................................................................................... 29, 31

*Ferri v. Ackerman,*
  444 U.S. 193 (1979) ............................................................................. 25, 26, 27

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
  561 U.S. 477 (2010) .............................................................................. 28, 29, 31

*George v. Kay,*
  632 F.2d 1103 (4th Cir. 1980) ......................................................................... 23

*Gibbs v. County of Delaware,*
  No. RWT 15-1012, 2015 WL 6150939 (D. Md. Oct. 15, 2015) ...................... 10

*Gold v. Gold,*
  No. JKB-17-0483, 2017 WL 4310093 (D. Md. Sept. 28, 2017) ...................... 10

*Gregoire v. Biddle,*
  177 F.2d 579 (2d Cir. 1949) ............................................................................ 26

*Jason Pharmaceuticals, Inc. v. Jianas Brothers Packaging Co., Inc.*,
  94 Md. App. 425 (1993) .................................................................................10

*Jeffers Handbell Supply, Inc. v. Schulmerich Bells, LLC*,
  No. 16-03918, 2017 WL 3582235 (D.S.C. Aug. 18, 2017)....................................... 7

*Johnson v. City of Shelby*,
  135 S. Ct. 346 (2014)..................................................................................4

*Jones v. Custom Truck & Equipment, LLC*,
  No. 10-cv-611, 2011 WL 250997 (E.D. Va. Jan. 25, 2011) .......................................8

*Jones v. Koons Automotive, Inc.*,
  752 F. Supp. 2d 670 (D. Md. 2010) ..................................................................4

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984)......................................................................15, 21, 22

*Kentucky v. Graham*,
  473 U.S. 159 (1985)..................................................................................34, 35

*Larson v. Domestic & Foreign Commerce Corp.*,
  337 U.S. 682 (1949) .........................................................................31, 34, 35

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*,
  507 U.S. 163 (1993)....................................................................................32

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013) ..........................................................................17

*Lobato v. Herndon*,
  No. GJH-15-2978, 2017 WL 1185202 (D. Md. Mar. 29, 2017) .......................................9

*Loving v. U.S.*,
  517 U.S. 748 (1996)....................................................................................24

*Mackey v. Compass Marketing, Inc.*,
  391 Md. 117 (2006)......................................................................................9

*Magic Toyota, Inc. v. Southeast Toyota District, Inc.*,
  784 F. Supp. 306 (D.S.C. 1992) .......................................................................15

*McBurney v. Cuccinelli*,
  616 F.3d 393 (4th Cir. 2010) .........................................................................30

*Metropolitan Regional Information Systems, Inc. v. American Home Realty Network, Inc.*,
  888 F. Supp. 2d 691 (D. Md. 2012)....................................................11, 12, 15, 17

*Mitrano v. Hawes*,
  377 F.3d 402 (4th Cir. 2004) ...........................................................................4

*Monument Builders of Greater Kansas City, Inc. v. American Cemetery Association of Kansas,*
 891 F.2d 1473 (10th Cir. 1989) ................................................................................ 5

*Nixon v. Fitzgerald,*
 457 U.S. 731 (1982) ........................................................... 23, 24, 25, 26

*Perdue Foods LLC v. BRF S.A.,*
 814 F.3d 185 (4th Cir. 2016) ................................................................................ 11

*Phil. Co. v. Stimson,*
 223 U.S. 605 (1912) ................................................................................ 30

*Planet Technologies, Inc. v. Planit Technology Group, LLC,*
 735 F. Supp. 2d 397 (D. Md. 2010) ...................................................... 12, 15

*Robroy Industries, Inc. v. Schwalbach,*
 No. 05-1732, 2006 WL 1437173 (W.D. Pa. Feb. 15, 2006) ........................ 6

*Saravia v. Sessions,*
 280 F. Supp. 3d 1168 (N.D. Cal. 2017) ................................................ 8

*Seidel v. Kirby,*
 No. 17-0292, __ F. Supp. 3d __, 2017 WL 4865486 (D. Md. Oct. 27, 2017) .................. 8

*Shields v. Utah Idaho Cent. R. Co.,*
 305 U.S. 177 (1938) ................................................................................ 31

*Shoppers Food Warehouse v. Moreno,*
 746 A.2d 320 (D.C. 2000) ................................................................ 14, 20

*Simmat v. U.S. Bureau of Prisons,*
 413 F.3d 1225 (10th Cir. 2005) .......................................................... 28

*Stevens v. New York,*
 691 F. Supp. 2d 392 (S.D.N.Y. 2009) ................................................ 30

*Structural Preservation Systems, LLC v. Andrews,*
 931 F. Supp. 2d 667 (D. Md. 2013) ...................................................... 2

*Tire Engineering & Distribution, LLC v. Shandong Linglong Rubber Co., Ltd.*
 682 F.3d 292 (4th Cir. 2012) .............................................................. 17

*Uffner v. La Reunion Francaise, S.A.,*
 244 F.3d 38 (1st Cir. 2001) ................................................................ 8

*United Tactical Systems LLC v. Real Action Paintball, Inc.,*
 108 F. Supp. 3d 733 (N.D. Cal. 2015) ................................................ 5

*Universal Leather, LLC v. Koro AR, S.A.,*
 773 F.3d 553 (4th Cir. 2014) .......................................................... *passim*

*Victors v. Kronmiller,*
  553 F. Supp. 2d 533 (D. Md. 2008) ...................................................... 30

*Vollette v. Watson,*
  937 F.Supp.2d 706 (E.D. Va. 2013).............................................. 32, 33

*Whiting v. Hogan,*
  855 F. Supp. 2d 1266 (D.N.M. 2012) ................................................ 5

*Woodke v. Dahm,*
  70 F.3d 983 (8th Cir. 1995)................................................................ 6

*Young Again Products, Inc. v. Acord,*
  459 F. App'x 294 (4th Cir. 2011) ....................................................... 7

*Zeneca Ltd. v. Pharmachemie B.V.,*
  No. S 96-884, 1996 WL 873910 (D. Md. Sept. 27, 1996) ..................... 22

*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017) .......................................................... 27, 28, 29

## Statutes and constitutional provisions

U.S. const. art. I § 9, cl. 8 ................................................................... 33

U.S. const. art. II § 1, cl. 6 .................................................................. 33

5 U.S.C. § 702 ...................................................................................... 30

28 U.S.C. § 1391(b) ........................................................................... 4, 8

28 U.S.C. § 1391(b)(2) ................................................................... *passim*

Md. Code Ann., Cts. & Jud. Proc. § 6-103(a) ...................................... 17

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1) .................................. 10

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(4) .................................. 11

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(5) .................................. 13

## Other authorities

Chase Cook,
  *Trump Discusses His Presidential Campaign at Linthicum GOP Dinner*, Capital Gazette
  (June 23, 2015), *available at* http://bit.ly/2Hy7zbO ................................ 12

Richard H. Fallon, Daniel J. Meltzer & L. David Shapiro,
  *Hart & Wechsler's Federal Courts & the Federal System* (7th ed.) ................ 30

Robert Lang,
    *Trump Criticizes Bush, Democrats in Maryland GOP Speech*, *WBAL News Radio 1090*
    (June 23, 2015), *available at* http://bit.ly/2Jvrg4q ........................................................................ 12

Jonathan O'Connell,
    *Trump: Make America great again (and stay at my hotel!)*, The Washington Post
    (Oct. 12, 2016).........................................................................................................................14

Charles A. Wright & Arthur A. Miller,
    14D Fed. Prac. & Proc. Juris. § 3806 (4th ed.) ........................................................................ 8

Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A.
    Alito, Jr., Deputy Assistant Attorney General, O.L.C., Re: Emoluments Clause
    Questions raised by NASA Scientist's Proposed Consulting Arrangement with the
    University of New South Wales (May 23, 1986), http://politi.co/2us47bu.............................. 33

*Remarks by President Trump at the Conservative Political Action Conference*,
    WhiteHouse.gov, *available at* http://bit.ly/2jnLUbH ............................................................ 12

*Trump Draws Thousands to Hagerstown Airport Rally*, HeraldMailMedia.com
    (Apr. 24, 2016), *available at* http://bit.ly/2HvcpuA .................................................................. 12

*Trump's hands-on management style to be tested by presidency*,
    Los Angeles Daily News (Aug. 28, 2017) ................................................................................16

*Updated: Trump Re-Issues Message to "Take the Country" Back at Rally in Worcester County*,
    WBOC 16 (Apr. 21, 2016), *available at* http://bit.ly/2KhfID7 .................................................... 12

## INTRODUCTION AND SUMMARY OF ARGUMENT

President Donald J. Trump has challenged the ability of the State of Maryland and the District of Columbia to sue him in his individual capacity in this Court.[1] According to the President, this Court is not a proper venue and does not have personal jurisdiction over him. The President further argues that, even assuming that venue and jurisdiction are appropriate, he is nonetheless immune from suit, the plaintiffs have no cause of action, and the Emoluments Clauses do not apply to him in his individual capacity. The President's arguments fail at every step. The connections between his actions, the plaintiffs' claims, and the State of Maryland make both venue and jurisdiction appropriate. His arguments on the merits disregard longstanding case law that supports an action to enjoin a federal official in his individual capacity from violating the Constitution. The motion to dismiss should be denied.

First, the events giving rise to the plaintiffs' claims make this Court a proper venue. Maryland businesses face increased economic competition stemming from the President's acceptance of constitutionally prohibited emoluments from foreign and domestic government officials. Any business diverted from Maryland establishments constitutes an "event[] or omission[] giving rise" to the claims in this lawsuit. 28 U.S.C. § 1391(b)(2). Although the President claims otherwise, it is entirely proper to consider the injuries that have occurred in Maryland when evaluating whether venue is appropriate. As this Court has recognized, Maryland has suffered injuries to its quasi-sovereign, proprietary, and *parens patriae* interests—all of which support venue in this Court.

---

[1] As reflected in their motion to amend and their amended complaint, Maryland and the District continue to believe it is appropriate to bring this suit against the President in his official capacity as well as his individual capacity. *See* ECF No. 90-1 at 2; ECF No. 90-2 (Am. Compl.) at 9. Because this brief is a response to a motion brought by the President in his individual capacity, its references to "the President" are to the President in his individual capacity unless otherwise noted.

Second, this Court has personal jurisdiction over the President. At this stage, the plaintiffs need make only a prima facie showing of the President's minimum contacts with Maryland. That requirement is easily satisfied here. The President has personally promoted his hotel by touting it to a newspaper received by at least 148,000 Maryland households every day. He also visits Maryland regularly and personally conducts business with Marylanders. In his own words: "I've been here so many times, and . . . we work very closely with the people of Maryland."[2] The President travels to Maryland for speeches, fundraisers, and other events where he engages with foreign and domestic government officials. After some of these events, attendees leave Maryland to patronize the Trump International Hotel in the District of Columbia. Indeed, there are at least two documented instances of Nigel Farage, a foreign official, attending an event with the President at the Gaylord Hotel in Maryland, and then leaving the event to go to the Trump International Hotel rather than staying to patronize a Maryland restaurant or bar. The President's contacts with Maryland, in other words, substantiate the plaintiffs' claims that he uses his official platform to promote his interests with foreign and domestic governments, thereby diverting money from Maryland businesses to himself. That is sufficient to establish personal jurisdiction in this Court. Personal jurisdiction is also bolstered both by the Court's close proximity to the White House, which means that travel to the courthouse would not be a burden, and by the fact that the Court

---

[2] Declaration of Brandon Brockmyer (hereafter, "Brockmyer Decl."), ¶ 3; Exh. 2. The President repeatedly argues that the plaintiffs have failed to establish venue and personal jurisdiction solely by reference to the allegations in the complaint. *See, e.g.*, Pres. Br. 9. But at this stage of the proceedings, the Court may consider briefing, affidavits, and declarations in addition to the complaint. *See, e.g.*, *Structural Pres. Sys., LLC v. Andrews*, 931 F. Supp. 2d 667, 671 (D. Md. 2013) ("Under either Rule 12(b)(2) or (3), the court is permitted to consider evidence outside the pleadings in resolving [a] motion [to dismiss]."). The plaintiffs therefore rely on evidence outside the pleadings in their discussion of both venue and personal jurisdiction.

is already proceeding on the official-capacity claims, which means that exercising jurisdiction would save judicial resources.

Third, the President is not immune from suit. The Supreme Court has "never suggested that the President, or any other official, has an immunity that extends beyond the scope of any action taken in an official capacity." *Clinton v. Jones*, 520 U.S. 681, 694 (1997). To the contrary, precedent establishes that the President's immunity does not extend to violations of the law that arise out of his private actions in managing his personal finances and business. The immunity doctrine on which the President relies is designed to safeguard public officials' ability to carry out their *official* functions. But the President's acceptance of foreign and domestic emoluments via his hotel is not an official function of his office.

Fourth, the President fares no better when he claims that the Emoluments Clauses do not apply to him in his individual capacity and that Maryland and the District do not have a cause of action against him in that capacity. It is well established that there is a cause of action in equity for federal courts to enjoin violations of the Constitution. This Court's standing opinion recognized such a cause of action, and there is no reason that the cause of action should be less available against the President in his individual capacity than in his official capacity. To the contrary, courts have repeatedly recognized individual-capacity actions as a valid device for enjoining the conduct of government officials.

Finally, the President has provided no sound basis for concluding that the Emoluments Clauses do not apply to the President in his individual capacity. The text and nature of the Clauses suggest that they apply: as this suit demonstrates, private, out-of-office activities are an obvious way to accept emoluments. It would be illogical to interpret the Emoluments Clauses as applying to defendants in only one legal capacity, when other provisions of the Constitution are regularly held to apply to government officials in both or either capacity. The President's arguments, if taken

seriously, would call into question a wide swath of constitutional litigation. This Court should reject those arguments and deny the motion to dismiss.

## ARGUMENT

### I.   THE DISTRICT OF MARYLAND IS A PROPER VENUE FOR THIS ACTION.

Venue is proper in the District of Maryland because "a substantial part of the events or omissions giving rise to the claim[s]" are ongoing in Maryland. 28 U.S.C. § 1391(b)(2).[3] At this stage of the proceedings, the venue inquiry is not a high bar. Maryland and the District need "make only a prima facie showing of proper venue," and this Court must "view the facts in the light most favorable to the plaintiff[s]." *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 366 (4th Cir. 2012). Courts reviewing a claim of improper venue do not "focus only on those matters that are in dispute or that directly led to the filing of the action." *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004). Instead, to determine whether venue is appropriate, courts consider "the entire sequence of events underlying the claim." *Id.* And because "it is possible for venue to be proper in more than one judicial district," *id.*, the Court need not identify the "best venue," but must determine only whether the plaintiffs' chosen venue is minimally sufficient, *CareFirst, Inc. v. Taylor*, 235 F. Supp. 3d 724, 732 (D. Md. 2017).

The plaintiffs' allegations readily satisfy those standards. As this Court noted in its recent ruling on standing, the plaintiffs have alleged that "there are at least 15 'high-end' restaurants and hotels in Maryland . . . that can be said to either directly compete with the [Trump International]

---

[3] Maryland and the District of Columbia agree with the President that the statute governing venue for their individual-capacity action is 28 U.S.C. § 1391(b). *See* Mem. in Supp. of Mot. to Dismiss on Behalf of Def. in his Individual Capacity (hereafter, "Pres. Br."), ECF No. 112-1, at 5. It is of no moment that the Amended Complaint does not include a citation to that provision of the statute. *See, e.g., Johnson v. City of Shelby*, 135 S. Ct. 346, 346–47 (2014) (plaintiff's pleadings need not identify all relevant statutes); *Jones v. Koons Auto., Inc.*, 752 F. Supp. 2d 670, 680 (D. Md. 2010) (evaluating venue under § 1391 where pleading did not cite to statute).

Hotel's restaurant, BLT Prime, or with the Hotel itself." ECF No. 101 ("Standing Op.") at 28–29 (citing Roginsky Decl. ¶ 24; Muller Decl. ¶¶ 24–26). "[A] large number of Maryland . . . residents are being affected and will continue to be affected when foreign and state governments choose to stay, host events, or dine at the Hotel rather than at comparable Maryland" establishments. *Id.* at 29. Maryland itself also has proprietary interests in property that competes with the Trump International Hotel. *Id.* at 23. Thus, any business diverted from Maryland entities to the Trump International Hotel is an "event[] or omission[] giving rise" to the claims in this lawsuit. 28 U.S.C. § 1391(b)(2); *see Monument Builders of Greater Kansas City, Inc. v. Am. Cemetery Ass'n of Kansas*, 891 F.2d 1473, 1478 (10th Cir. 1989) (holding venue proper in Kansas where claim arose "from the alleged [Missouri-based] illegal conduct's adverse impact on consumer welfare within the relevant market" that covered both Kansas and Missouri); *United Tactical Sys. LLC v. Real Action Paintball, Inc.*, 108 F. Supp. 3d 733, 754–55 (N.D. Cal. 2015) (holding venue proper in California where defendant's anticompetitive conduct in Indiana interfered with business in California); *see also Whiting v. Hogan*, 855 F. Supp. 2d 1266, 1283 (D.N.M. 2012) (citing *Monument Builders* favorably after the 1990 amendments to the venue statute). These Maryland-specific events or omissions amply support venue in this District. And as this Court has recognized, Standing Op. at 15–19, Maryland's quasi-sovereign interest in its rightful role in the federal system provides an additional, independent basis for this suit, and this interest encompasses the entire jurisdiction of the State.

Although the State of Maryland has standing based on injuries to its populace (which is located in Maryland), its proprietary establishments (which are located in Maryland), and its quasi-sovereign interests (which exist throughout Maryland), the President insists that venue is nevertheless improper in the District of Maryland because "the forum state's role in the dispute" is not "substantial." Pres. Br. 6. That argument disregards not only the events or omissions in Maryland that give rise to the lawsuit, but also the key distinction that one of the two co-plaintiffs

is *Maryland itself*. This Court has already found that Maryland's interests in bringing this suit are substantial enough to provide Article III standing and are based in property, events, and omissions that are situated in Maryland.

To bolster his contrary claim, the President mischaracterizes this Court's opinion on the plaintiffs' standing. He claims that this Court's ruling that the plaintiffs lack standing to challenge "the operations of the Trump Organization . . . outside the District of Columbia" means that "[n]one of the events or property giving rise to this dispute . . . are in Maryland." Pres. Br. 6–7 (citing Standing Op. at 38). But that is not what this Court ruled. Instead, the holding that the President references addressed the Court's concern that Maryland and the District may not rely on "Trump Organization operations everywhere and anywhere" to sustain their action, as events in Florida or China were not linked to "immediate or impending injury" in Maryland or the District of Columbia. Standing Op. at 38. This Court neither held nor suggested that the Trump Organization's activities in the District of Columbia are unrelated to events or omissions in Maryland, such as the diversion of business from Maryland to the Trump International Hotel. To the contrary, this Court found that, based on the plaintiffs' allegations, "a large number of Maryland . . . residents are being affected and will continue to be affected when foreign and state governments choose to stay, host events, or dine at the Hotel rather than at comparable Maryland . . . establishments." *Id.* at 29.

The President's only other argument relies on reasoning from non-binding cases that the Fourth Circuit has never adopted, including one decision that has been heavily criticized. The President argues that it is improper to rely on "the location where the harm is felt" in determining venue, because "Congress meant to require courts to focus on relevant activities of the defendant, not of the plaintiff." Pres. Br. 6–7 (quoting *Woodke v. Dahm*, 70 F.3d 983, 985–86 (8th Cir. 1995); *Robroy Indus., Inc. v. Schwalbach*, No. 05-1732, 2006 WL 1437173, at *7 (W.D. Pa. Feb. 15, 2006)). As an initial

matter, even if the President were correct, venue would still be appropriate in light of the Maryland "events or omissions" that implicate the President, as described above. Moreover, even if the President is correct that the location where harm is felt is not dispositive for venue purposes, it is certainly relevant. *See, e.g.*, *Young Again Prod., Inc. v. Acord*, 459 F. App'x 294, 306–07 (4th Cir. 2011) (noting that venue is "proper in the district where the injury caused by the breach of contract would be felt") (citing *Ciena Corp. v. Jarrard*, 203 F.3d 312, 318 (4th Cir. 2000)). As noted above, this Court has already found that the plaintiffs have alleged facts sufficient to show that Maryland and its residents have been harmed by the President's constitutional violations. In addition to being the locus of some of the harms caused by those alleged violations, Maryland is a location where other "events or omissions giving rise to the claim" have occurred, namely, the decisions by various government officials not to patronize Maryland businesses.[4]

But this Court should not follow the reasoning of the cases the President cites, as that reasoning has been heavily criticized. In fact, numerous courts have rejected the President's argument. *See Jeffers Handbell Supply, Inc. v. Schulmerich Bells, LLC*, No. 16-03918, 2017 WL 3582235, at *7 (D.S.C. Aug. 18, 2017) (collecting cases disagreeing with the rationale in *Woodke*). As one district court within the Fourth Circuit recently put it, *Woodke*—the Eighth Circuit case on which the President relies—"is an unfortunate example of judges auguring the intent of lawmakers from sources outside the text of the statute . . . and then enforcing the perceived intent underlying the statute rather than enforcing its text." *Id.* Contrary to the President's argument, nothing in the text

---

[4] In the section below regarding personal jurisdiction, for instance, the plaintiffs refer to a foreign official attending a conference in Maryland and choosing to leave afterward to go to the Trump International Hotel rather than stay in Maryland. That action is clearly an example of an "event[] or omission[] giving rise to the claim" that Maryland and the District have brought, 28 U.S.C. § 1391(b)(2), and Maryland was the site of a substantial part of the activity: the initial attendance at the conference, the decision to leave, and the resulting diversion of money from Maryland establishments.

of the venue statute, 28 U.S.C. § 1391(b), directs courts "to focus on relevant activities of the defendant, not of the plaintiff." Pres. Br. 7. In any event, an injury such as the cancellation of a booking (or the failure to make a customary booking) certainly constitutes an "event[] or omission[]." 28 U.S.C. § 1391(b)(2). For these and similar reasons, the First, Second, Third, and Sixth Circuits have all rejected the reasoning in *Woodke. See Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 n.6 (1st Cir. 2001) (collecting cases). This Court has rejected that reasoning on multiple occasions as well. *See, e.g., Chambers v. Chambers*, No. RWT 11-765, 2011 WL 3512140, at *6 (D. Md. Aug. 8, 2011) ("Plaintiff's injury is likely to be felt in Maryland. Therefore, a substantial part of the events that give rise to Plaintiff's claims occurred within this Court's jurisdiction."); *Seidel v. Kirby*, No. 17-0292, __ F. Supp. 3d __, 2017 WL 4865486, at *5 (D. Md. Oct. 27, 2017) ("When considering transactional venue for torts cases, courts will generally consider both where the activities arose *and* where the harm was felt." (emphasis in original) (citing Charles A. Wright & Arthur A. Miller, 14D Fed. Prac. & Proc. Juris. § 3806 (4th ed.)). This Court should follow this wealth of authority.

Finally, even if venue were not appropriate under § 1391(b), this Court may exercise pendent venue over the plaintiffs' claims against the President in his individual capacity because those claims "arise out of a common nucleus of operative fact" with the claims against the President in his official capacity. *Jones v. Custom Truck & Equip., LLC*, No. 10-cv-611, 2011 WL 250997, at *6 (E.D. Va. Jan. 25, 2011); *see also Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1192 (N.D. Cal. 2017) (noting that pendent venue "can apply with equal force where closely related claims against additional defendants are at issue"). "[V]enue is primarily a matter of convenience of litigants and witnesses." *Denver & R.G.W. R.R. Co. v. Brotherhood of R.R. Trainmen*, 387 U.S. 556, 560 (1967). It would be more convenient both for this Court and for the litigants to have this suit proceed against the President in both capacities here. For all these reasons, the District of Maryland is an appropriate venue for this case.

8

## II.    THIS COURT HAS PERSONAL JURISDICTION OVER THE PRESIDENT.

The President also argues that, even if the State of Maryland has standing to bring this suit against him and venue is proper in Maryland, he is not subject to personal jurisdiction in Maryland in his individual capacity. Pres. Br. 8–13. That argument ignores the President's repeated contacts with Maryland that relate to the claims in this case. The President has an active presence in Maryland; he has personally promoted his District of Columbia hotel to hundreds of thousands of Marylanders; and he has engaged with domestic and foreign government officials at events in Maryland where attendees periodically decamp to the Trump International Hotel in the District. These contacts are sufficient to justify personal jurisdiction in this case, and all of the relevant factors in the personal-jurisdiction inquiry weigh in favor of exercising jurisdiction.

Federal courts apply the rules for personal jurisdiction of the state in which they sit. *See* Fed. R. Civ. P. 4(k)(1)(A). In Maryland, personal jurisdiction is permissible under the State's long-arm statute "to the full extent allowable under the Due Process Clause" of the Fourteenth Amendment to the U.S. Constitution. *Bond v. Messerman*, 391 Md. 706, 721 (2006). There is mixed case law about what, exactly, this means for federal courts in Maryland. For years, the Fourth Circuit has said that because Maryland's long-arm statute "expands the exercise of personal jurisdiction to the limits allowed by the Due Process Clause," the statutory and constitutional inquiries merge. *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory,"* 283 F.3d 208, 212–13 (4th Cir. 2002); *see also, e.g.*, *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396–97 (4th Cir. 2003) (applying a single, "merge[d]" inquiry); *Ellicott Mach. Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993) ("[O]ur normal two-step inquiry merges into one."); *Lobato v. Herndon*, No. GJH-15-2978, 2017 WL 1185202, at *4 (D. Md. Mar. 29, 2017) (citing *CareFirst* in applying a one-step inquiry). But since a 2006 Maryland Court of Appeals decision stated that courts cannot "simply dispense with analysis under the long-arm statute," *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 141 n.6 (2006),

some federal courts have undertaken to analyze both the long-arm statute and the Due Process Clause in a two-part inquiry. *See, e.g.*, *Gold v. Gold*, No. JKB-17-0483, 2017 WL 4310093, at \*2 (D. Md. Sept. 28, 2017); *Gibbs v. Cnty. of Delaware*, No. RWT 15-1012, 2015 WL 6150939, at \*2 (D. Md. Oct. 15, 2015).

Regardless of whether the inquiry is performed in two steps or one, this Court has personal jurisdiction over the President in his individual capacity. As pertinent here, application of the long-arm statute is straightforward: the statute confers personal jurisdiction over any person who, "directly or by an agent," "[t]ransacts any business or performs any character of work or service in the State." Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1). The President himself has performed "work or service in the State." He has conducted numerous campaign rallies in the State, and he has continued to give headline speeches at private political events in the State since he was elected.[5] Additionally, he has transacted business in the State through agents. For example, the Trump International Hotel has contracted with multiple Maryland companies for a range of services including electrical, plumbing, HVAC work, and sewer and water services.[6] Actions that "culminate in purposeful activity within the state" suffice for personal jurisdiction, in addition to the President's performance of work or services in which he physically travels to the State of Maryland. *CoStar Realty Info., Inc. v. Field*, 612 F. Supp. 2d 660, 671 (D. Md. 2009); *see also Jason Pharms., Inc. v. Jianas Bros. Packaging Co., Inc.*, 94 Md. App. 425 (1993) (holding that out-of-state company contracting with Maryland company was sufficient to trigger personal jurisdiction under Maryland's long-arm statute). Moreover, personal jurisdiction is also appropriate under Maryland's statute because the President has caused "injury in the State," Md. Code Ann., Cts. &

---

[5] Brockmyer Decl. ¶¶ 4–6, 10–11, 20–21; Exhs. 3–5, 9–10, 19–20.
[6] Brockmyer Decl. ¶¶ 48–53; Exhs. 47–52.

Jud. Proc. § 6-103(b)(4), *see* Standing Op. at 24–25, 28–29, and "regularly does or solicits business" or "engages in [a] persistent course of conduct in the State," § 6-103(b)(4), as discussed below.

The relevant constitutional analysis likewise demonstrates that personal jurisdiction is appropriate here. "In determining whether personal jurisdiction is present" for purposes of the Due Process Clause, "a court must consider a variety of interests," including "the interests of the forum state" and "the burden on the defendant." *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cnty.*, 137 S. Ct. 1773, 1780 (2017). The Fourth Circuit has instructed courts to establish whether specific personal jurisdiction would be appropriate in a particular case by evaluating "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016).[7] "[F]airness is the touchstone of the jurisdictional inquiry," *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 559 (4th Cir. 2014), and the "'primary concern' is 'the burden on the defendant'" of litigating the case in the forum at issue. *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (citation omitted). When "the principle of 'fair play and substantial justice'" is not offended, "[e]ven a single contact may be sufficient to create jurisdiction." *Carefirst of Md.*, 334 F.3d at 397 (citation omitted). Here, all of these considerations demonstrate that the Court has personal jurisdiction over the President in his individual capacity.

A.   **The President Has Purposefully Availed Himself of the Privilege of Conducting Activities in Maryland.**

The purposeful availment inquiry is "flexible," and is based on the premise that someone who has enjoyed the privileges of a forum state "bears the reciprocal obligation of answering to

---

[7] The plaintiffs are not relying on general personal jurisdiction for purposes of this opposition. *See generally Bristol-Myers Squibb*, 137 S. Ct. at 1779–80 (explaining the difference between general and specific jurisdiction).

11

legal proceedings there." *Universal Leather*, 773 F.3d at 559–60. Many factors are relevant to the question of whether a party has "minimum contacts" with a given state sufficient to justify personal jurisdiction, including, for instance, whether a party has been present in the forum state and whether a party has solicited business in the forum state. *Id.* at 559. Where a business is involved, this Court looks to whether an individual "directed or personally participated" in the business's activities to determine whether to impute the business activities to the individual for purposes of personal jurisdiction. *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 888 F. Supp. 2d 691, 700 (D. Md. 2012) (discussing *Planet Techs., Inc. v. Planit Tech. Group, LLC*, 735 F. Supp. 2d 397 (D. Md. 2010)).

These factors demonstrate that the President has more than sufficient contacts with Maryland to justify personal jurisdiction. Over the last several years, the President has made multiple visits to Maryland to interact with thousands of people at campaign rallies, fundraisers, and political conferences.[8] *See, e.g.*, *Trump Draws Thousands to Hagerstown Airport Rally*, HeraldMailMedia.com (Apr. 24, 2016), *available at* http://bit.ly/2HvcpuA; *Remarks by President Trump at the Conservative Political Action Conference*, WhiteHouse.gov, *available at* http://bit.ly/2jnLUbH; Chase Cook, *Trump Discusses His Presidential Campaign at Linthicum GOP Dinner*, Capital Gazette (June 23, 2015), *available at* http://bit.ly/2Hy7zbO; Robert Lang, *Trump Criticizes Bush, Democrats in Maryland GOP Speech*, *WBAL News Radio 1090* (June 23, 2015), *available at* http://bit.ly/2Jvrg4q; *Updated: Trump Re-Issues Message to "Take the Country" Back at Rally in Worcester County*, WBOC 16 (Apr. 21, 2016), *available at* http://bit.ly/2KhfID7; *CPAC 2018 Agenda*, American Conservative Union, *available at* https://bit.ly/2Gu0Tdz.[9]

---

[8] Brockmyer Decl. ¶¶ 2–6, 10–11, 20–21; Exhs. 1–5, 9–10, 19–20.
[9] These sources may be found at Brockmyer Decl. ¶¶ 2–5, 10, 23; Exhs. 1–4, 9, 22.

At these events, the President has repeatedly referenced his close personal and professional ties to Maryland. For example, at one fundraiser for the Maryland Republican Party, the President emphasized that "[w]e've had a great relationship to Maryland. I've been here so many times, and I have so many friends . . . we work very closely with the people of Maryland. So we've just had a really spectacular relationship to the people of Maryland."[10] At another, he noted that "I know Baltimore, I have so many friends . . . I'm in Baltimore a lot."[11] The President also regularly visits Maryland on official business, spending days on end at Camp David, in Western Maryland, which the White House website describes as "the President's country residence" and "an ideal place to host foreign leaders."[12] He also has made trips to Joint Base Andrews in Prince George's County to address troops or to board flights to visit his golf club in Bedminster, New Jersey.[13] *See* Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(5) (conferring long-arm jurisdiction over a person who "[h]as an interest in, *uses*, or possesses real property in the State" (emphasis added)). Such repeated "in-person contact[s] with the resident[s] of the forum in the forum state" "significantly impact[] the outcome of a personal jurisdiction analysis." *Universal Leather*, 773 F.3d at 562.

Moreover, the President has targeted Maryland residents when personally promoting the Trump International Hotel. On the campaign trail, the President regularly pitched his new hotel, including to local media in the Washington, D.C. metropolitan area.[14] As one reporter put it, there were, in effect, "two parallel Trump campaigns: a formal bid to be elected president and a somewhat less conspicuous effort to promote the 263-room hotel." Jonathan O'Connell, *Trump:*

---

[10] Brockmyer Decl. ¶ 3; Exh. 2.

[11] Brockmyer Decl. ¶ 2; Exh. 1.

[12] Brockmyer Decl. ¶¶ 7, 8; Exhs. 6, 7.

[13] Brockmyer Decl. ¶ 9; Exh. 8.

[14] Brockmyer Decl. ¶¶ 40, 62–64; Exhs. 39, 61–63.

*Make America great again (and stay at my hotel!)*, The Washington Post (Oct. 12, 2016), *available at* https://wapo.st/2KAr7NK; *see also* Megan Cloherty, *Trump Hotel in Old Post Office set to open in the fall*, WTOP (Mar. 21, 2016), *available at* https://bit.ly/2KDSarp ("As Trump updated a crush of local and national reporters on the state of the newest hotel, he said he'll land on Pennsylvania Avenue one way or another . . . .").[15]

As part of this personal promotional campaign, for example, the President touted his hotel in two exclusive interviews with the Washington Post, a newspaper that sends 41% of its print copies to Maryland and is read by more than 148,000 Marylanders every day.[16] In the interviews, he told readers that his hotel had "the best location in Washington," and that it would be "one of the great hotels in the world."[17] An exclusive interview with one of the area's main newspapers is unquestionably a relevant "reach[] into the forum state to solicit or initiate business" for purposes of establishing minimum contacts. *Universal Leather*, 773 F.3d at 560. Because the Washington Post is the "major circulation newspaper" in "[t]he Metropolitan Washington, D.C. area," which "functions, in many respects as a unified legal and commercial community," the District of Columbia Court of Appeals has held that advertisements in the Washington Post were sufficient to confer personal jurisdiction over a nearby Maryland retailer. *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 332 (D.C. 2000). Indeed, the Washington Post has more than three times as many customers in Maryland than in the District.[18] If promotional material in the Washington Post can serve as a "fair warning" for a Maryland defendant to be sued in Washington, D.C., it is also reasonable for it to serve as a basis for a District of Columbia-based defendant to be sued across

---

[15] These sources may be found at Brockmyer Decl. ¶¶ 40, 62; Exhs. 39, 61.

[16] Brockmyer Decl. ¶¶ 37–39; Exhs. 36–37, 38 at 8.

[17] Brockmyer Decl. ¶¶ 37–38; Exhs. 36–37.

[18] Brockmyer Decl. ¶ 39; Exh. 38 at 8.

the border in Prince George's County. *Id.; cf. Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) (holding that, where a magazine had a monthly in-state circulation of 10,000 to 15,000 copies, personal jurisdiction based on its contents was appropriate).

In addition, the Trump International Hotel has had numerous contacts with Maryland that can fairly be considered when evaluating whether personal jurisdiction is appropriate as to the President in his individual capacity. Although the President argues that his businesses' contacts cannot be attributed to him for purposes of personal jurisdiction, Pres. Br. 10, courts have found such attribution to be fair when the relevant individual "directed or personally participated" in the business activity at issue. *Metro. Reg'l Info. Sys.*, 888 F. Supp. 2d at 700; *see also Columbia Briargate Co. v. First Nat'l Bank of Dallas*, 713 F.2d 1052, 1064 (4th Cir. 1983) (noting that a corporate agent's "direct personal involvement" may subject that agent to personal jurisdiction under a long-arm statute). Corporate officers and agents may be subject to jurisdiction based on actions they "'inspire or participate in,'" even when those actions are "'performed in the name of the corporation.'" *Planet Techs.*, 735 F. Supp. 2d at 402 (citation omitted); *see also Magic Toyota, Inc. v. Se. Toyota Dist., Inc.*, 784 F. Supp. 306, 315 (D.S.C. 1992) (holding that a showing of "some direct, personal involvement in some decision or action which is causally related to the plaintiffs' alleged injuries" is enough to attribute actions taken on behalf of a corporation to an out-of-state defendant).

The Trump International Hotel has had extensive contacts with Maryland. For example, the hotel has contracted with multiple Maryland businesses to provide essential services such as heating and air conditioning, sewage and water, and plumbing;[19] the hotel's restaurant and catering both feature Maryland-sourced menu items, such as fresh Maryland crabs and oysters;[20]

---

[19] Brockmyer Decl. ¶¶ 48–53; Exhs. 47–52.
[20] Brockmyer Decl. ¶¶ 59–60; Exhs. 58–59.

and his hotel regularly contracts with Maryland residents and businesses to host their events.[21] The President has not been a passive corporate official in his hotel's operations; to the contrary, there is ample evidence that the President, his campaign, and the hotel have often worked hand-in-glove, and that he has been directly involved in the hotel's operations, including in contractual relationships with Maryland businesses. The hotel's soft opening and grand opening were scheduled to accommodate the President's campaign scheduling.[22] The hotel accelerated its opening to assist with the President's televised campaign events, and, in doing so, arranged for expedited electrical work with a Maryland contractor, Freestate Electrical.[23] And when the hotel allegedly failed to pay one of its Maryland contractors, that contractor's attorney told a reporter that "Trump actually called my client the day before the inauguration and they reached an agreement over the phone."[24] *See generally Trump's hands-on management style to be tested by presidency,* Los Angeles Daily News (Aug. 28, 2017) (discussing Trump's "hands-on, minutiae-obsessed management style"). Finally, the President has personally touted his ties to Maryland and promoted his business in Maryland-targeted publications.[25]

The President thus has made many recent "in-person visits" with Maryland, as well as "solicitations" to and "in-person contact" with Maryland residents and businesses. *Universal Leather,* 773 F.3d at 562. The combined weight of these factors is enough to satisfy the requisite prima facie

---

[21] The Trump International Hotel has, for instance, hosted events with The Yellow Ribbon Fund, a Maryland corporation; Plaster for Congress, a Maryland congressional campaign; and the District of Columbia and Maryland chapter of the Commercial Real Estate Development Association. Brockmyer Decl. ¶¶ 54–58; Exhs. 53–57.

[22] Brockmyer Decl. ¶¶ 51–52; Exhs. 50–51.

[23] *Id.*

[24] Brockmyer Decl. ¶¶ 49–50; Exhs. 48–49; *see also* Brockmyer Decl. ¶ 61; Exh. 60 (reporting that when a restauranteur based in the District broke his contract with the hotel, the President "personally seiz[ed]" the prospective tenant's collateral).

[25] Brockmyer Decl. ¶¶ 2–3, 37–39; Exhs. 1–2, 36–38.

showing that the President "purposefully availed [himself] of the privilege of doing business" in Maryland. *Id.* at 561.

### B.  The Plaintiffs' Claims Arise out of the President's Contacts.

The President's contacts with Maryland also have the necessary "affiliation" with "the underlying controversy" of this lawsuit to justify personal jurisdiction. *Bristol-Myers Squibb*, 137 S. Ct. at 1781; *see also Metro. Reg'l Info. Sys.*, 888 F. Supp. at 698 ("The Maryland long-arm statute limits specific jurisdiction to cases where the cause of action 'aris[es] from any act enumerated' in the statute itself." (quoting Md. Code Ann., Cts. & Jud. Proc. § 6-103(a))). The contacts discussed above relate to the underlying claims here: the President's creation, operation, and promotion of a luxury hotel, restaurant, and event space through which he accepts unlawful payment.[26] Indeed, the President has attended—and headlined—events in Maryland with foreign and domestic government officials, the very set of potential customers around which this suit revolves.[27] Some of those events have even taken place at the specific competitor properties identified in the plaintiffs' complaint and expert declarations.[28] After some of those events, attendees—including at least one

---

[26] A contact need not relate to every element of a claim to suffice for purposes of establishing personal jurisdiction. *See, e.g.*, *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., Ltd.* 682 F.3d 292, 303 (4th Cir. 2012) (finding contacts sufficient where they related to an "important part" of the claim at issue); *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007) (finding that a claim arose out of a contact where "[o]ne element" of the cause of action was connected to the contact); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169–70 (2d Cir. 2013) (noting general consistency between constitutional due process and New York's long-arm statute, which requires only that "at least one element" of a claim "arises from the New York contacts").

[27] Brockmyer Decl. ¶¶ 10–12, 20–22; Exhs. 9–11, 19–21.

[28] Brockmyer Decl. ¶¶ 10–11; 20–21; Exhs. 9–10; 19–20.

foreign government official—patronized the Trump International Hotel instead of closer, comparable properties in Maryland.[29]

Particularly illustrative of the contacts between the President and Maryland are the two instances in the last eighteen months that the President has headlined the Conservative Political Action Conference. That conference was held in 2017 and 2018 at the Gaylord Hotel in Maryland, a competitor with the Trump International Hotel for meetings, events, and overnight guests. *See* Declaration of Rachel Roginsky, ECF No. 47 ("Roginsky Decl.") at 12. The Gaylord also features a luxury, fine dining steakhouse in its lobby, the Old Hickory Steakhouse, which the plaintiffs have identified as a competitor with the luxury, fine dining steakhouse BLT Prime, located in the lobby of the Trump International Hotel. *See* Declaration of Christopher Muller, Ph.D., ECF No. 48 ("Muller Decl.") at 18. The Trump International Hotel can be reached from the Gaylord by a 15-minute taxi ride. The Gaylord is also part of National Harbor, a complex of high-end attractions and restaurants that competes with the Trump International Hotel for luxury events and other business. *Id.*

The President's contacts with Maryland at the Conservative Political Action Conference, moreover, are not just minimally related to the plaintiffs' claims. To the contrary, they serve both to substantiate the plaintiffs' allegations under the Emoluments Clauses, and to highlight the Trump International Hotel's competition with Maryland enterprises for foreign and domestic government business. When President Trump attended that conference and gave keynote speeches in 2017 and 2018, he was joined at the Gaylord by dozens of high-ranking domestic and foreign government officials, including many state governors, legislators, and attorneys general.[30] News

---

[29] Brockmyer Decl. ¶¶ 13–19, 23–36; Exhs. 12–18, 22–35.

[30] *See, e.g.*, Brockmyer Decl. ¶¶ 10–12, 20–22; Exhs. 9–11, 19–21.

reports as well as posts on social media demonstrate that, during and after the event, many of the conference's attendees visited the Trump International Hotel rather than remain at the Gaylord or patronize comparable restaurants at National Harbor.[31] For example, at least one of the attendees who went to the Trump International Hotel during the conference was a foreign government official: Nigel Farage, a Member of the European Parliament, who in both 2017 and 2018 attended the conference in Maryland at which the President spoke. During both conferences, Mr. Farage crossed the Maryland-District of Columbia line into the District to patronize the Trump International Hotel.[32]

The President thus has contacts in Maryland that mirror the pattern of activity alleged in the plaintiffs' complaint and giving rise to their claims: The President visits an event at a property in Maryland; he engages with high-ranking foreign and domestic officials at a conference; and then conference attendees, including at least one foreign official, leave Maryland and patronize the President's business rather than a Maryland establishment. That activity is at the heart of the plaintiffs' allegations that the President has "received presents or emoluments from foreign states or instrumentalities and federal agencies, and state and local governments in the form of payments to [his] hotels, restaurants, and other properties," and that the President "has used his position as President to boost this patronage of his enterprises." Am. Compl. ¶ 13.

These visits to the President's hotel were not mere coincidences. The President himself has acknowledged his tendency to favor government officials who spend money at his establishments. For example, the President has said that when foreign governments give him money through his businesses, he "like[s] them very much." *Id.*  ¶ 55. And, as the plaintiffs' complaint alleges at length,

---

[31] Brockmyer Decl. ¶¶ 13–19, 23–36; Exhs. 12–18, 22–35.
[32] Brockmyer Decl. ¶¶ 13–17, 23–27, 31; Exhs. 12–16, 22–26, 30.

the President is not shy about promoting his private businesses. *Id.* at 12–31. As discussed above, the President has granted exclusive interviews to media read daily by more than 148,000 Marylanders, and used the interviews to promote his hotel.[33] He also has promoted his business through his own frequent patronage, through comments made in campaign stops or speeches, and through tweets that are regularly read by thousands of Marylanders.[34]

More broadly, the President's contacts with Maryland are related to the plaintiffs' claims because Maryland is home to a substantial segment of the international diplomatic community. In part because Maryland is so close to the District of Columbia, many countries have consulates or ambassador residences in the State.[35] One recent count, for instance, indicates that 23 countries have ambassador residences in Maryland.[36] When the President promotes his hotel to people in Maryland, whether in person or through the media, he is not just targeting domestic residents, but also foreign government officials.

For all these reasons, the President's contacts therefore have the necessary "affiliation between the forum and the underlying controversy." *Bristol-Myers Squibb*, 137 S. Ct. at 1781. Finding sufficient "affiliation between the forum and the underlying controversy" is particularly appropriate in this case because, as noted above, "[t]he Metropolitan Washington, D.C. area functions, in many respects, as a unified legal and commercial community." *Shoppers Food*, 746 A.2d at 332. The forum's ties to the controversy are even stronger than would otherwise be the case, because the allegations here involve not merely the general local marketplace but the specific local market for luxury hotels and restaurants that cater to high-ranking government officials. As the

---

[33] Brockmyer Decl. ¶¶ 37–39; Exhs. 36–38.

[34] Brockmyer Decl. ¶¶ 40–47, 66; Exhs. 39–46, 65; Am. Compl. at 12–31.

[35] Brockmyer Decl. ¶¶ 67–69; Exhs. 66–68.

[36] Brockmyer Decl. ¶ 67; Exh. 66.

plaintiffs have demonstrated, participation in this market puts Maryland hotels and restaurants in direct competition with the President's District of Columbia hotel for foreign and domestic government business. *See, e.g.*, Muller Decl. at 5; Roginsky Decl. at 8–9. And because plaintiffs' claims relate to at least some of the President's contacts with Maryland, plaintiffs may pursue redress for injury caused by the President's other activities outside the State. *Bristol-Myers Squibb*, 137 S. Ct. at 1782 (discussing *Keeton*, 465 U.S. 770).

### C.      The Exercise of Personal Jurisdiction Would Be Constitutionally Reasonable.

Finally, the exercise of personal jurisdiction in Maryland is constitutionally reasonable based on the relevant factors, namely, "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, [and] the interstate judicial system's interest in obtaining the most efficient resolution of controversies." *Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 217 (4th Cir. 2001) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). Each one of these factors weighs strongly in favor of personal jurisdiction in this case.

"'[T]he burden on the defendant,'" which the Supreme Court has recently emphasized is the "'primary concern'" in assessing personal jurisdiction, cuts strongly in favor of jurisdiction in Maryland. *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (citation omitted). Maryland is adjacent to the District of Columbia, and this Court is only thirteen miles away from the White House—a shorter distance than many of this Court's other litigants travel to and from the Greenbelt courthouse on any typical weekday. This short geographic distance demonstrates the minimal burden to the President in facing a lawsuit in Maryland as opposed to, for example, the District of Columbia. *Cf. Ellicott Mach. Corp.*, 995 F.2d at 480–81 (finding burden where defendant would have to travel from

Australia to Maryland for trial). The President cannot credibly claim that this Court's exercise of jurisdiction presents a burden.

Next, the forum state's interest and the plaintiff's interest both weigh strongly in favor of finding personal jurisdiction. This Court's standing opinion has already recognized Maryland's interests: it has quasi-sovereign, proprietary, and *parens patriae* interests at stake in this lawsuit, in addition to its inherent "significant interest in redressing injuries" that occur within its borders. *Keeton*, 465 U.S. at 776.

Finally, the judicial system's "interest in obtaining the most efficient resolution of controversies" also weighs strongly in favor of this Court's jurisdiction. *Burger King*, 471 U.S. at 477. This Court has jurisdiction over the plaintiffs' lawsuit against the President in his official capacity, and the claims against him in his individual capacity rest on identical facts and allegations, as well as similar legal arguments. *See generally* Am. Compl.; Standing Op. It would therefore be much more efficient to allow this suit to proceed against the President in his official and individual capacities within the same forum, rather than require an individual-capacity suit to be brought in a different forum. *See, e.g.*, *Zeneca Ltd. v. Pharmachemie B.V.*, No. S 96-884, 1996 WL 873910, at *5 (D. Md. Sept. 27, 1996) ("[B]y exercising jurisdiction . . . this Court therefore aids Maryland in promoting efficient, consolidated proceedings.").

In sum, this Court has personal jurisdiction over the President in his individual capacity. The President has personally traveled to Maryland many times; he has spent his trips there engaging with government officials who have then followed him back to his hotel; and he has personally promoted his hotel to hundreds of thousands of Marylanders (including the many foreign ambassador residences in Maryland). This Court's jurisdiction would efficiently resolve this dispute, and would not meaningfully burden the President.

### III.   MARYLAND AND THE DISTRICT'S CLAIMS MAY BE BROUGHT AGAINST THE PRESIDENT IN HIS INDIVIDUAL CAPACITY.

In addition to his contentions regarding jurisdiction and venue, the President makes another set of arguments designed to prevent this Court from proceeding against him in his individual capacity.[37] He claims that he is immune from the suit; that the plaintiffs have no cause of action to bring the suit; and that the Emoluments Clauses simply do not apply to him in his individual capacity. Each of those arguments lacks merit.

### A.   The President is Not Immune from this Suit.

The President's assertion of absolute immunity is premised on an interpretation of *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), that is overbroad and that the Supreme Court itself has explicitly rejected. Contrary to the President's assertion, *Nixon* does not hold that absolute immunity protects the President from liability arising from all "actions taken while in office." Pres. Br. 25 (citing *Nixon*, 457 U.S. at 748–56). As the Fourth Circuit has explained, "[t]he grant of absolute immunity to any federal official is not tantamount to granting absolute license to act as he chooses." *George v. Kay*, 632 F.2d 1103, 1105 (4th Cir. 1980). Rather, immunity available to government officials is subject to limitations, even when the immunity is characterized as "absolute," and even when the official asserting it is the President. Thus, the Supreme Court has "never suggested that the President, or any other official, has an immunity that extends beyond the scope of any action taken in an official capacity." *Clinton v. Jones*, 520 U.S. 681, 694 (1997).

Instead, absolute immunity applies only to "damages liability predicated on his *official* acts." *Nixon*, 457 U.S. at 749 (emphasis added); *see also George*, 632 F.2d at 1105 ("[T]he immunity is only absolute insofar as the acts complained of are within the scope of the official's authority.").

_____

[37] As noted above, Maryland and the District continue to believe it is appropriate to bring this suit against the President in his official capacity as well as his individual capacity. *See supra* note 1.

Maryland and the District do not seek to impose "damages liability predicated on [the President's] official acts." The complaint includes no prayer for damages and, as this Court noted in its ruling regarding the plaintiffs' standing, "it is clear that the gist of the Amended Complaint is that the President's purported receipt of emoluments . . . has nothing at all to do with his 'official duties.'" Standing Op. at 27. Under *Clinton v. Jones*, that suffices to establish that absolute immunity does not bar plaintiffs' claims.

The inapplicability of absolute immunity is further confirmed by applying the "functional approach" described in *Clinton v. Jones*. 520 U.S. at 694. This approach reflects the determination that "immunities are grounded in the nature of the function performed, not the identity of the actor who performed it," *Id.* at 695 (citation omitted). In *Nixon*, the alleged misconduct was the President's involvement in a reorganization of the Air Force that eliminated the plaintiff's job. *See* 457 U.S. at 733–41. That conduct fell squarely within the President's "supervisory and policy responsibilities," *id.* at 750, both with respect to his control over the Air Force and his responsibility for government personnel decisions writ large. *See, e.g.*, *Loving v. U.S.*, 517 U.S. 748, 772 (1996) ("The President's duties as Commander in Chief . . . require him to take responsible and continuing action to superintend the military.").

This case, in contrast, is nothing like *Nixon*. The cornerstone of this suit is the President's receipt of "payments, benefits, and other valuable consideration from foreign governments and persons acting on their behalf, as well as federal agencies and state governments." Am. Compl. ¶ 9. The President has received emoluments through government officials renting rooms and event space at his hotel and eating at the restaurant in his hotel, and by the federal government waiving a requirement on its lease of property to his hotel. Am. Compl. ¶¶ 34–46; 80–88.

The receipt of financial benefits via these means was not an action "within the outer perimeter of the President's official responsibilities." *Clinton v. Jones*, 520 U.S. at 686. To the

contrary, the actions underpinning the alleged constitutional violations have "nothing at all to do with [the] 'official duties'" of the President. *See* Standing Op. at 27. A functional analysis therefore confirms that absolute immunity does not protect the President from this suit because Maryland and the District have alleged misconduct far afield from "acts in performance of particular functions of his office." *Clinton v. Jones*, 520 U.S. at 694.[38]

Contrary to the President's contention, *see* Pres. Br. 26–27, the conclusion that absolute immunity does not apply follows from the immunity's underlying purposes. Absolute immunity is a set of rules created by the courts to protect government officials' ability to deal "impartially with the public at large." *Clinton v. Jones*, 520 U.S. at 693 (quoting *Ferri v. Ackerman*, 444 U.S. 193, 203 (1979)). "The point of immunity for such officials" is to prevent lawsuits "that would conflict with their resolve to perform their designated functions in a principled fashion." *Id.* By shielding officials from lawsuits, absolute immunity prevents an officeholder from being "unduly cautious in the discharge of his official duties." *Nixon*, 457 U.S. at 752 n.32. Absolute immunity is thus a doctrine focused on protecting officeholders' ability to carry out their official duties.

As the Supreme Court has concluded, "[t]his reasoning provides no support for an immunity for *unofficial* conduct." *Clinton v. Jones*, 520 U.S. at 694 (emphasis in original). Because unofficial conduct is, by definition, not related to the functions of the office, it should not be shielded by an immunity intended to protect the office. As Judge Learned Hand observed, it goes "without saying" that where an official acts "for any other personal motive not connected with the public

---

[38] The President tries to distinguish *Clinton v. Jones* by saying that it was not about "absolute presidential immunity" but was instead about "temporary presidential immunity," a term that appears neither in *Clinton v. Jones* nor in any other case that the plaintiffs have been able to locate. Pres. Br. 26 n.3. Even though the absolute immunity that President Clinton sought in *Clinton v. Jones* would have lasted only while he was in office, the Court's discussion of immunity in that case is obviously concerned with the absolute immunity established in *Nixon*. *See Clinton v. Jones*, 520 U.S. at 689–709 & nn.8–43 (citing *Nixon* fifteen times).

good," that official "should not escape liability for the injuries he may so cause." *Ferri*, 444 U.S. at 203 n.20 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, J.)). Because of this concern, the Supreme Court has held that "the sphere of protected action must be related closely to the immunity's justifying purposes." *Nixon*, 457 U.S. at 755.

The President does not point to any alleged misconduct that he considers to be the discharge of an official duty. Instead, he says that this suit is "triggered only because of his Office," and therefore absolute immunity applies. Pres. Br. 26. But the Supreme Court has specifically rejected that argument. As it held in *Clinton v. Jones*, the President has no "immunity from suit for unofficial acts grounded purely in the identity of his office." 520 U.S. at 695. For absolute immunity to protect the President, the alleged misconduct must involve the "performance of particular functions of his office." *Id.* at 694 (citing *Nixon*, 457 U.S. at 755). To assert, as the President does, that absolute immunity applies because, as a general matter, he "exercis[es] the official duties of the Presidency," Pres. Br. 27, would be to obliterate the functional approach that the Supreme Court has mandated. *See Clinton v. Jones*, 520 U.S. at 694–95.

Nor is it true, as the President claims, that "[t]he concerns animating *Nixon* are at their apex" here. Pres. Br. 27. The Supreme Court has observed that "[t]he burden on the President's time and energy" from the review of his "*unofficial* conduct" "cannot be considered as onerous as the direct burden imposed by judicial review and the occasional invalidation of his *official* actions." *Clinton v. Jones*, 520 U.S. at 705 (emphasis added). "Sitting Presidents have responded to court orders to provide testimony and other information with sufficient frequency that such interactions between the Judicial and Executive branches can scarcely be thought a novelty." *Id.* at 704.

Finally, the President points to no case in which the Supreme Court has extended the President's absolute immunity to a suit that, like this one, requested only injunctive relief rather than damages. This distinction is significant because, as the Supreme Court recently explained, the

"risk of personal damages liability is more likely to cause an official to second-guess difficult but necessary decisions" than "a claim seeking injunctive or other equitable relief." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017). Because the "sphere of protected action" in an immunity case "must be related closely to the immunity's justifying purposes," *Clinton v. Jones*, 520 U.S. at 694, this Court should decline the President's request to extend his immunity to an area where the justifications for that immunity are weaker.

In sum, Maryland and the District have alleged that the President's unofficial actions have violated the Emoluments Clauses. *See* Am. Compl. ¶¶ 34–46; 80–88. These actions were driven by a "personal motive not connected with the public good," and the President "should not escape liability for the injuries he may so cause." *Ferri*, 444 U.S. at 203 n.20 (quoting Hand, J). The President's alleged misconduct was not conducted pursuant to the "particular functions of his office," and absolute immunity therefore does not apply. *Clinton v. Jones*, 520 U.S. at 694.

## B.   Maryland and the District of Columbia Have a Cause of Action Against the President in His Individual Capacity.

The President argues that, even if he is not immune from suit, there is "no cause of action to sue the President in his individual capacity under the Emoluments Clause[s]." Pres. Br. 17. That conclusion rests, however, on the incorrect assumption that Maryland and the District are relying on the implied cause of action established in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See* Pres. Br. 17–24; ECF No. 100 ("DOJ Statement of Interest") at 7–10. But Maryland and the District have never relied on a *Bivens* theory in this case. Rather, as in their official capacity suit, Maryland and the District have alleged a cause of action based on the Court's "equitable jurisdiction . . . to enjoin unconstitutional actions by federal officials," which this Court acknowledged in its recent opinion on standing. Standing Op. at 42. That cause of action

applies to individual-capacity and official-capacity claims alike. Therefore, the plaintiffs'
individual-capacity claim may proceed.

This case differs from the *Bivens* line of cases, which generally involve lawsuits that seek
damages against federal officials for alleged violations of individual rights. *See, e.g.*, *Ziglar*, 137 S. Ct.
1843. Because, as noted above, cases that seek to hold officials personally liable for money damages
may be "likely to cause an official to second-guess difficult but necessary decisions," the Supreme
Court has expressed reluctance to extend *Bivens* to new contexts. *Id.* at 1855–64. The President's
motion to dismiss devotes many words to the limitations on *Bivens* cases before ultimately
concluding that "[a]llowing Plaintiffs to proceed with this complex and unprecedented *Bivens*
action under the Emoluments Clauses would run afoul of the Supreme Court's recent and clear
instructions." Pres. Br. 24.

That conclusion is mistaken because Maryland and the District have advanced an
argument that is distinct from *Bivens* in two critical respects: (1) the plaintiffs seek only prospective
relief, not damages; and (2) they bring this case not to remedy a violation of individual rights but,
as this Court observed, "to prevent violation of a structural provision of the Constitution." Standing
Op. at 42. The plaintiffs' cause of action therefore draws on a different line of cases, some of which
this Court has already cited and discussed. *See id.* (citing *Bond v. United States*, 564 U.S. 211, 225–26
(2011); *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010)). The President's
*Bivens* arguments are thus inapposite.[39]

---

[39] It is true that "[s]ome courts have characterized constitutional claims to enjoin federal
officials as *Bivens* claims." *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1231 (10th Cir. 2005). But
the Supreme Court has not described the *Bivens* line of cases as applying to a plaintiff seeking only
an injunctive remedy, and has instead characterized *Bivens* as providing a cause of action for "an
implied damages remedy." *Ziglar*, 137 S. Ct. at 1855. If, however, *Bivens* were available for
prospective relief, the President's arguments would similarly be inapplicable because, as discussed
above, the *Bivens* line is predicated on the idea that "[t]he risk of personal damages liability is more

Instead, this case invokes the "ability to sue to enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) (citing *Ex Parte Young*, 209 U.S. 123, 150–51 (1908)). The Supreme Court has recognized this cause of action as "the creation of courts of equity" and part of the "long history of judicial review of illegal executive action, tracing back to England." *Id.*; *see also* Standing Op. at 42 ("Precedent makes clear that a plaintiff may bring claims to enjoin unconstitutional actions by federal officials and that they may do so to prevent violation of a structural provision of the Constitution."). This cause of action, which is perhaps most familiar from *Ex Parte Young*, exists "not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials." *Armstrong*, 135 S. Ct. at 1384. Unlike the *Bivens* remedy, this cause of action provides for prospective relief, including an injunction, rather than damages. *Id.*

This case therefore presents no need to engage in the kind of "special factors" analysis required in *Bivens* actions. *See* Pres. Br. 21–24. For *Bivens* actions, federal courts are instructed not to permit a remedy in a new context "if there are 'special factors counselling hesitation.'" *Ziglar*, 137 S. Ct. at 1857 (citation omitted). By contrast, with respect to this equitable cause of action, the Supreme Court has emphasized that when a particular constitutional clause presents "a new situation not yet encountered by the Court," the novelty of the occasion does not mean that claims arising under the provision "should be treated differently than every other constitutional claim," in which "it is established practice . . . to sustain the jurisdiction of federal courts to issue injunctions." *Free Enter. Fund*, 561 U.S. at 483 & 491 n.2 (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).

---

likely" to interfere with government officials' duties "than a claim seeking injunctive or other equitable relief." *Id.* at 1861.

That courts have not previously enjoined violations of the Emoluments Clauses therefore does not warrant any deviation from this "established practice." *See id.*

This equitable cause of action empowers the District and Maryland to sue the President in his individual capacity. Under this cause of action, plaintiffs may seek injunctions against government officials in both their individual capacities and their official capacities. In the *Ex Parte Young* line of cases, for instance, courts regularly hear claims against state officials in their "individual capacity to enjoin" action that violates federal law. *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010); *see, e.g.*, *Victors v. Kronmiller*, 553 F. Supp. 2d 533, 550 (D. Md. 2008); *Stevens v. New York*, 691 F. Supp. 2d 392, 392 (S.D.N.Y. 2009); *Clean Air Council v. Mallory*, 226 F. Supp. 2d 705, 712 (E.D. Pa. 2002). *Ex Parte Young*'s holding permitting injunctive relief "is equally applicable to a Federal officer." *Phil. Co. v. Stimson*, 223 U.S. 605, 620 (1912); *see also* Fallon, Meltzer & Shapiro, *Hart & Wechsler's Federal Courts & the Federal System* 892 (7th ed.) (noting that "[t]he principle that the Constitution creates a cause of action against governmental officials for injunctive relief . . . has also come to apply" in suits against federal officials).

As a practical matter, suits against federal officials in their individual capacities tend not to arise because of the sovereign-immunity waiver contained in the Administrative Procedure Act (APA), 5 U.S.C. § 702 (waiving sovereign immunity from suits "seeking relief other than money damages" against "an agency or an officer or employee thereof"), which has made it less necessary to resort to the legal fiction of the individual-capacity suit. Fallon, Meltzer & Shapiro, *supra*, at 892 (noting that this cause of action is of "limited current practical significance" when it comes to challenging federal action). But that does not mean that such a suit would be inappropriate where, as here, the APA does not apply. Before the APA was enacted, the Supreme Court explicitly instructed that such an *Ex parte Young*-style suit against a federal official "is not a suit against the United States." *Phil. Co.*, 223 U.S. at 620; *see also Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322,

1329 (D.C. Cir. 1996) (deeming it unnecessary to decide whether APA's waiver of sovereign immunity applied to a claim challenging the President's statutory authority to issue an Executive Order because "under *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949), if the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit," there being "no sovereign immunity to waive"). Such a suit can therefore be considered a suit against a federal official in his or her individual capacity, just as analogous suits against state officials are often considered to be against those officials in their individual capacities.

This conclusion is supported by the Supreme Court's repeated recognition of an equitable constitutional cause of action in multiple cases, which together stand for the proposition that "courts will be alert to adjust their remedies so as to grant the necessary relief." *Bell*, 327 U.S. at 684; *see also Ex Parte Young*, 209 U.S. at 150 (holding that, despite the Court's obligation to "give to the 11th Amendment all the effect it naturally would have," nevertheless "individuals who, as officers of the state, are clothed with some duty . . . may be enjoined by a Federal court of equity from" unconstitutional actions); *Shields v. Utah Idaho Cent. R. Co.*, 305 U.S. 177, 183 (1938) ("Equity jurisdiction may be invoked when it is essential to the protection of the rights asserted."); *Free Enter. Fund*, 561 U.S. at 491 n.2. As *Ex Parte Young* itself demonstrates, the legal fiction of the distinction between individual- and official-capacity suits was created to *facilitate* relief against official misconduct. 209 U.S. at 150. That distinction should not be wielded to deny a cause of action that has been established for more than a century.

### C.     The Emoluments Clauses Apply to the President in His Individual Capacity.

Finally, the President argues that even if the plaintiffs have a cause of action, they have failed to state a claim against him in his individual capacity because, "[a] claim under the

31

Emoluments Clauses must be brought against the President in his official capacity." Pres. Br. 14. The President provides no persuasive reasoning or case law to support his argument, which runs counter to how other provisions of the Constitution are routinely litigated. The Constitution is not normally construed as restricting government officials to suit in only one capacity or another, and it should not be so construed here. Instead, examining "the nature of the plaintiff[s'] claims" and "the relief sought" demonstrates that it is appropriate for Maryland and the District to bring their claims against the President in his individual capacity as well as his official capacity. *Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995).

The President stakes his argument on the fact that "[b]y their terms, these Clauses apply only to persons holding" offices of profit or trust under the United States. Pres. Br. 14. That premise may be true, but the language of the Clauses does not resolve whether a claim may be brought against the President in his official or individual capacity. Most constitutional provisions— including the frequently litigated First, Fourth, Fifth, and Fourteenth Amendments—apply only to state actors. *See, e.g.*, *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 620 (1991) ("[T]he conduct of private parties lies beyond the Constitution's scope in most instances."). Yet lawsuits under these provisions regularly proceed against public officials as individual-capacity suits, official-capacity suits, or both at once. *See, e.g.*, *City and Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015) (individual-capacity suit brought under Fourth Amendment); *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) (official-capacity suit brought under Fourth Amendment); *Vollette v. Watson*, 937 F.Supp. 2d 706, 730 (E.D. Va. 2013) (allowing Fourth Amendment and First Amendment claims to proceed against government officials in both capacities). The President's argument that if he had not "assumed the duties of [his] office, no claim would lie against him under the Emoluments Clauses," Pres. Br. 15, would be equally true of a police officer who becomes a defendant in an unreasonable-search case brought under the Fourth Amendment. Still, such

claims may (and sometimes must) be brought against police officers in their individual capacity. *See, e.g.*, *Coleman v. Calvert Cnty.*, No. GJH-15-920, 2016 WL 5335477, *10–*11 (D. Md., Sept. 22, 2016) (granting judgment on official-capacity claims on the basis of sovereign immunity, but allowing individual-capacity claims to proceed).

These ubiquitous counterexamples in run-of-the-mill constitutional litigation disprove most of the President's reasoning. Such lawsuits also "can occur only by virtue of the person holding [government] office and exercising those official duties," and the "underlying conduct . . . would not otherwise" be a violation of the Constitution in those lawsuits as well. Pres. Br. 16. Those disputes, like this one, exist "solely because" the defendant in any particular case is a government official. *See* Pres. Br. 15 (emphasis omitted). But they still may proceed as individual-capacity cases. *See, e.g.*, *Vollette*, 937 F. Supp. 2d at 730. The President is thus wrong to argue that those aspects of this case mean that it must be brought only as an official-capacity suit.

Like these other constitutional provisions, the Emoluments Clauses do not apply to government officials in only one capacity or the other. The Clauses place restrictions on public officials—on the President only (for the Domestic Emoluments Clause), or on any "Person holding any Office of Profit or Trust" under the United States (for the Foreign Emoluments Clause). U.S. const. art. I § 9, cl. 8; art. II § 1, cl. 6. But a public official could violate these restrictions in both "official" contexts, such as an ambassador accepting a formal gift from a foreign sovereign, and "unofficial" ones, such as an officeholder performing a service for reimbursement in his or her spare time. *See, e.g.*, Mem. for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, O.L.C., Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales at 2–3, 5 (May 23, 1986), http://politi.co/2us47bu (noting that a "consulting fee from a foreign government would ordinarily be considered an 'emolument' within the meaning of the

constitutional prohibition," in a case where the relevant consulting took place on an employee's "own time").

The allegations in this case provide ample ground for an individual-capacity claim. As this Court observed at the January hearing on the government's motion to dismiss, one way to understand the nature of the alleged misconduct in this case is that the President is "personally benefiting as a private owner of a business," and his alleged violations include many "non-official acts." Hr'g Tr., Jan. 25, 2018 at 28–29. This Court's recent opinion on standing also observes that Maryland and the District "are challenging the President's acceptance of money taken through private transactions—something that has 'nothing to do with the President's service . . . as President.'" Standing Op. at 27 (quoting ECF No. 21-1 (Gov. Mot. Dismiss) at 30). As the Supreme Court has stated, where an officer "'is not doing the business which the sovereign has empowered him to do,'" "'a suit directed against that action is not a suit against the sovereign.'" Standing Op. at 27 (quoting *Larson*, 337 U.S. at 689). The President is therefore wrong to argue that this suit "may not be brought as an individual-capacity suit" because it "operates as a claim against the United States." Pres. Br. 15 (citation omitted).

This conclusion is reinforced by the nature of the relief that Maryland and the District seek. Maryland and the District seek only prospective relief, not damages. In actions against state-government officials, for example, the Supreme Court has been clear that "official-capacity actions for prospective relief are not treated as actions against the State." *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). And, as discussed above with respect to the plaintiffs' cause of action, the Court has held that the same *Ex Parte Young* theory that grounds injunctive relief against state officials also applies "with respect to violations of federal law by federal officials." *Armstrong*, 135 S. Ct. at 1384. Finally, as this Court noted in its standing opinion, *Larson v. Domestic & Foreign Commerce Corp.* affirms that in the federal context, suits "'for specific relief . . . directed against'" actions that are not taken

34

pursuant to official authority "'are not suits against the sovereign.'" Standing Op. at 27 (quoting *Larson*, 337 U.S. at 689). Although, as all parties agree, the plaintiffs have properly pursued this case as an action against the President in his official capacity, *see* Pres. Br. 2; DOJ Statement of Interest at 6, the allegations and applicable law also warrant suit against him in his individual capacity. Because this is a suit for specific injunctive relief, alleging misconduct in private financial transactions, it is appropriate for it to proceed against the President in his individual capacity as well.

Perhaps realizing this, the President claims that "[i]t is the Office of the President that would have to comply with whatever the Court decides the Emoluments Clauses require of the President." Pres. Br. 16. But he does not say why that is the case. At this early stage in the litigation, before facts have been established beyond the pleadings, it is difficult to know the precise contours of the remedy that will be necessary to effectuate relief. Suing the President in his individual capacity is therefore appropriate, if for no other reason, to foreclose the possibility that the President will attempt to maintain that any injunction in the suit does not constrain his conduct as an individual. *Cf. Kentucky v. Graham*, 473 U.S. at 167 (holding that a suit against a government official in one capacity "cannot lead to imposition" of liability against the official in a different capacity). If the Court were to conclude that the President's private conduct has led to violations of his constitutional responsibilities, the President should not be permitted to evade effective redress.

## CONCLUSION

The President's motion to dismiss should be denied.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Steven M. Sullivan
STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
LEAH J. TULIN
Federal Bar No. 20083
ltulin@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
T: (410) 576-6325
F: (410) 576-6955

NORMAN EISEN
NOAH D. BOOKBINDER*
nbookbinder@citizensforethics.org
STUART C. MCPHAIL*
smcphail@citizensforethics.org
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
455 Massachusetts Avenue, NW
Washington, DC 20001
T: (202) 408-5565
F: (202) 588-5020

KARL A. RACINE
Attorney General for the District of Columbia
NATALIE O. LUDAWAY
Chief Deputy Attorney General
Federal Bar No. 12533

/s/ Stephanie E. Litos
STEPHANIE E. LITOS*
Senior Counsel to the Attorney General
stephanie.litos@dc.gov
441 Fourth Street, NW
Washington, DC 20001
T: (202) 724-6650
F: (202) 741-0647

/s/ Deepak Gupta
DEEPAK GUPTA*
deepak@guptawessler.com
DANIEL TOWNSEND
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
T: (202) 888-1741
F: (202) 888-7792

/s/ Joseph Sellers
JOSEPH M. SELLERS
jsellers@cohenmilstein.com
CHRISTINE E. WEBBER*
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, NW
Washington, DC 20005
T: (202) 408-4600
F: (202) 408-4699

*admitted pro hac vice

May 18, 2018

Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on May 18, 2018, I electronically filed the foregoing brief with the Clerk of the Court of the District Court of Maryland by using the CM/ECF system. All participants are registered CM/ECF users, and will be served by the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta