# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

THE DISTRICT OF COLUMBIA, et al.,

*Plaintiffs,*

v.

No. 8:17-cv-1596-PJM

DONALD J. TRUMP, in his official capacity
as President of the United States and in his individual
capacity,

*Defendants.*

## REPLY IN SUPPORT OF MOTION TO DISMISS ON BEHALF OF DEFENDANT IN HIS INDIVIDUAL CAPACITY

William S. Consovoy (No. 20397)
Thomas R. McCarthy
Bryan K. Weir
Caroline A. Cook
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Blvd., Suite 700
Arlington, VA 22201
T: (703) 243-9423
F: (703) 243-8696
will@consovoymccarthy.com

Patrick N. Strawbridge
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, Massachusetts 02109
T: (617) 227-0548

May 25, 2018

*Attorneys for Defendant in his individual capacity*

# TABLE OF CONTENTS

ARGUMENT..................................................................................................................1

I.    There Is No Personal Jurisdiction or Venue in This District......................................1

    A.    Plaintiffs' Maryland-based Injury Is Not a Basis for Venue Under § 1391(b)(2)...................1

    B.    None of the Alleged Contacts Establish Personal Jurisdiction over the President in his Individual Capacity.........................................................................4

II.   Plaintiffs Cannot Maintain an Individual-Capacity Suit against the President.......................10

    A.    Plaintiffs' Theory of Individual Liability Ignores Centuries of Law Concerning the "Under Color of Federal Law" Requirement. .........................................................10

    B.    No Court Has Sustained An Individual-Liability Action for Equitable Relief....................14

III.  Plaintiffs Mischaracterize the President's Absolute Immunity Argument.................18

CONCLUSION............................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Alltech, Inc. v. Carter*, No. 08-00325, 2010 WL 988987 (E.D. Ky. Mar. 15, 2010) ..................................... 4

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707 (4th Cir. 2002) ......................................... 8, 9

*Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) .................................................. 15

*Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015) .............................. 11, 12, 14, 15

*Arocho v. Nafziger*, 367 Fed. App'x 942 (10th Cir. 2010) .............................................................. 15

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ........................................................................................... 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................. 14

*Birrane v. Master Collectors, Inc.*, 738 F. Supp. 167 (D. Md. 1990) ............................................... 7

*Bonenberger v. Plymouth Tp.*, 132 F.3d 20 (3d Cir. 1997) .............................................................. 12

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ....................................................................... 14

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ...................................................................... 8

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390 (4th Cir. 2003) ................. 5, 6

*Chambers v. Chambers*, No. 11-765, 2011 WL 3512140 (D. Md. Aug. 8, 2011) ............................. 3

*Ciena Corp. v. Jarrard*, 203 F.3d 312 (4th Cir. 2000) ....................................................................... 3

*Claasen v. Brown*, No. 94-cv-1018, 1996 WL 79490 (D.D.C. Feb. 16, 1996) ............................... 5

*Clapper v. Amnesty Int'l. USA*, 568 U.S. 398 (2013) ....................................................................... 13

*Clean Air Council v. Mallory*, 226 F. Supp. 2d 705 (E.D. Penn. 2002) ......................................... 17

*Clinton v. Jones*, 520 U.S. 681 (1997) .............................................................................................. 19

*Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273 (4th Cir. 2009) ....................................... 8

*DeLong v. IRS*, 908 F.2d 966, 1990 WL 101402 (4th Cir. 1990) .................................................. 12

*Dugan v. Rank*, 372 U.S. 609 (1963) ............................................................................................... 15

*Emp'rs Reinsurance Corp. v. Bryant*, 299 U.S. 374 (1937) .............................................................. 4

*Ex parte Young*, 209 U.S. 123 (1908) ...................................................................................... 11, 16, 17

*Farmer v. Perrill*, 275 F.3d 958 (10th Cir. 2001) ............................................................12

*Glynn v. EDO Corp.*, 536 F. Supp. 2d 595 (D. Md. 2008) ...............................................7

*Hafer v. Melo*, 502 U.S. 21 (1991) ....................................................................11, 12, 14

*Harris v. Parsons Brinckerhoff Quade & Douglas, Inc.*, No. 05-3355, 2006 WL 1892399 (D. Md. June 28, 2006) ...............................................................................................4

*Harte-Hanks Direct Mktg./Baltimore, Inc. v. Varilease Tech. Fin. Grp., Inc.*, 299 F. Supp. 2d 505 (D. Md. 2004) ...............................................................................................5

*Hughes v. Halifax Cty. Sch. Bd.*, 855 F.2d 183 (4th Cir. 1988) .....................................13

*J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011) .........................................5, 6

*Jeffers Handbell Supply, Inc. v. Schulmerich Bells, LLC*, No. 16-03918, 2017 WL 3582235 (D.S.C. Aug. 18, 2017) ...............................................................................................2

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ..................................................8

*Kentucky v. Graham*, 473 U.S. 159 (1985) .....................................................................11

*Land v. Dollar*, 330 U.S. 731 (1947) ..............................................................................16

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949).....................16, 18

*Martinez v. Colon*, 54 F.3d 980 (1st Cir. 1995) .............................................................13

*McBurney v. Cuccinelli*, 616 F.3d 393 (4th Cir. 2010) ..................................................17

*Miller v. Asensio*, 101 F. Supp. 2d 395 (D.S.C. 2000)......................................................4

*Mitrano v. Hawes*, 377 F.3d 402 (4th Cir. 2004) .............................................................1

*Monument Builders of Greater Kansas City, Inc. v. Am. Cemetery Ass'n of Kansas*, 891 F.2d 1473 (10th Cir. 1989) ...............................................................................................3

*NCAA v. Tarkanian*, 488 U.S. 179 (1988) .....................................................................14

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) ................................................................18, 20

*Planet Aid, Inc. v. Reveal, Ctr. for Investigative Reporting*, No. 16-cv-2974, 2017 WL 2778825 (D. Md. June 26, 2017) ...............................................................................8

*Pollack v. Hogan*, 703 F.3d 117 (D.C. Cir. 2012) .....................................................16, 18

*Ross v. Meese*, 818 F.2d 1132 (4th Cir. 1987) ...............................................................18

*Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999) ..................................................4

*S.C. Wildlife Fed. v. Limehouse*, 549 F.3d 324 (4th Cir. 2008) ....................................................17

*Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451 (4th Cir. 2013) ........................................12

*Screws v. United States*, 325 U.S. 91 (1945) ..................................................................................12

*Seidel v. Kirby*, No. 17-0292, __ F. Supp. 3d __, 2017 WL 4865486 (D. Md. Oct. 27, 2017) .................3

*Shelby Cty. v. Holder*, 570 U.S. 529 (2013) ...................................................................................13

*Shoppers Food Warehouse v. Moreno*, 746 A.2d 320 (D.C. 2000)...................................................9

*Solida v. McKelvey*, 820 F.3d 1090 (9th Cir. 2016) ......................................................................16

*Stafford v. Briggs*, 444 U.S. 527 (1980) ..........................................................................................6

*Stevens v. New York*, 691 F. Supp. 2d 392 (S.D.N.Y. 2009) ...........................................................18

*Thomas v. Salvation Army Southern Territory,* 841 F.3d 632 (4th Cir. 2016)..................................12

*Townsel v. Jamerson*, 240 F. Supp. 3d 894 (N.D. Ill. 2017) .........................................................13

*United Tactical Sys. LLC v. Real Action Paintball, Inc.*, 108 F. Supp. 3d 733 (N.D. Cal. 2015) .................3

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635 (2002) ...................................... 17, 18

*Victors v. Kronmiller*, 553 F. Supp. 2d 533 (D. Md. 2008) ...........................................................17

*Walden v. Fiore*, 134 S. Ct. 1115 (2014) ............................................................................... 5, 7, 8

*Whiting v. Hogan*, 855 F. Supp. 2d 1266 (D.N.M. 2012)...............................................................3

*Woodke v. Dahm*, 70 F.3d 983 (8th Cir. 1995) ..............................................................................2

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980).................................................5, 6

*Young Again Prods., Inc. v. Acord*, 459 Fed. App'x. 294 (4th Cir. 2011) ......................................3

## Constitutional Provisions and Statutes

U.S. Const. amend. XIII ................................................................................................................14

U.S. Const. amend. XXI ...............................................................................................................14

U.S. Const. Art. I, § 9, cl. 8..........................................................................................................14

U.S. Const. Art. II § 1, cl. 7 .........................................................................................................14

28 U.S.C. § 1391 ......................................................................................................................1, 4

**Other Authorities**

@BarackObama, Twitter (Jan. 23, 2008), http://bit.ly/2khBwD7 ........................................................10

14D Fed. Prac. & Proc. Juris. § 3806 (4th ed.) ............................................................................... 2

Andrew Shain, *President Obama Will Visit South Carolina for First Time*, Charlotte Observer
(March 1, 2015), http://bit.ly/2ID3Cax ..........................................................................................10

*Barack Obama's South Carolina Primary Speech*, N.Y. Times (Jan. 26, 2008),
http://nyti.ms/2KKfu72 ......................................................................................................................9

Bob Woodward & Robert Acosta, *In a Revealing Interview, Trump Predicts a 'Massive Recession'
But Intends to Eliminate the National Debt in 8 Years*, Washington Post (April 2, 2016),
http://wapo.st/2IG57EI .........................................................................................................................9

Michelle Norris, *Obama Shares Political Vision in "Audacity of Hope,"* NPR (Oct. 19, 2006),
http://n.pr/2J58gNE ...........................................................................................................................10

*President and First Lady Arrive at Joint Base Charleston*, Joint Base Charleston (June 26, 2015),
http://bit.ly/2IFgCbr ..........................................................................................................................10

Washington Post, *General Ad Rates* (2017), http://wapo.st/2IJQhJa .......................................................9

**ARGUMENT**

Plaintiffs Memorandum in Opposition ("Opp.") offers no basis for sustaining this individual-capacity suit. The Motion to Dismiss ("Mot.") should be granted.

**I.    There Is No Personal Jurisdiction or Venue in This District.**

    **A.    Plaintiffs' Maryland-based Injury Is Not a Basis for Venue Under § 1391(b)(2).**

Plaintiffs' venue argument misses the mark. They acknowledge that the Amended Complaint misidentified 28 U.S.C. § 1391(e) as the relevant venue provision, and that venue is appropriate only if their allegations against the President in his individual capacity meet § 1391(b)(2)'s requirements. Opp. 4 & n.3. Plaintiffs have not met (and cannot meet) those requirements here. *See* Mot. 4-8.

Plaintiffs argue that "'a substantial part of the events or omissions giving rise to their claim[s]' are ongoing in Maryland," Opp. 4 (quoting 28 U.S.C. § 1391(b)(2)), based on "'the entire sequence of events underlying the claim,'" *id.* (quoting *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004)). While Plaintiffs devote almost all of their attention to attempting to show that certain "events" occurred in Maryland, they scrupulously avoid grappling with just how demanding the "substantial part" aspect of the inquiry is. This is because it highlights the flaws in Plaintiffs' argument.

To try and solve this problem, Plaintiffs mischaracterize the Court's standing opinion. Opp. 4-6. To be sure, the Court held that the State of Maryland has suffered various injuries that satisfy Article III. *Id.* at 4-6. But here the issue is whether the "events and omissions" that produced the harm occurred in Maryland. On this point, the Court was clear: the events that have caused Maryland harm *all* occurred in the District of Columbia. *See* Mot. 6-7. Plaintiffs were unable to point to *any* relevant event that occurred outside of the District, *infra* at 2-3, and certainly nothing substantial. Had they done so, the Court would not have dismissed their claims for lack of standing "with respect to the operations of the Trump Organization and the President's involvement in the same outside the District of Columbia." Standing Op. 2. Plaintiffs argue that the Court was only explaining that events

occurring in "Florida or China were not linked to 'immediate or impending injury' in Maryland or the District of Columbia." Opp. 6 (quoting Standing Op. 38). But that only undermines Plaintiffs' argument further. The point was that because the President allegedly owned properties in Florida and China, it was at least possible (though unavailing) that relevant events occurred there. Plaintiffs do not allege, however, that the President owns *any* Maryland property.

The "Maryland-specific events or omissions" Plaintiffs point to, Opp. 5, are instead examples of the harm (both quasi-sovereign and competitive) the State and its citizens have suffered as a result of the President's alleged violations of the Emolument Clauses. But the locus of the harm is not an "event or omission" under § 1391(b)(2). *See* Mot. 7-8. Plaintiffs respond that "numerous courts have rejected the President's argument" and that one of the chief cases supporting that argument, *Woodke v. Dahm*, 70 F.3d 983 (8th Cir. 1995), has been "heavily criticized," including by a district court in this Circuit, Opp. 6-7 (citing *Jeffers Handbell Supply, Inc. v. Schulmerich Bells, LLC*, No. 16-03918, 2017 WL 3582235, at *7 (D.S.C. Aug. 18, 2017)). Plaintiffs are wrong twice over. The proposition that the locus of the harm cannot establish venue has been widely accepted—including in *Jeffers*.

While the court did not subscribe to all of the Eighth Circuit's reasoning, it did "not quibble with the apparent holding of *Woodke*, that transactional venue under § 1391(b)(2) is not established in a forum merely because the plaintiff resided in that forum at the time he was injured." *Jeffers*, 2017 WL 3582235, at *7. The court disagreed with *Woodke* that the focus of the § 1391(b)(2) inquiry is limited to the defendant's activities, *id.*, as have the other cases Plaintiffs point to, Opp. 8 (collecting cases). But that dispute is immaterial here because the only activities of their own that Plaintiffs can point to is the harm they have suffered. And in-state harm cannot provide the *exclusive* basis for venue. 14D Fed. Prac. & Proc. Juris. § 3806 (4th ed.) ("There is a tendency to conclude that suffering economic harm within a district is not by itself sufficient to warrant transactional venue there. This is probably

the correct view, because otherwise venue almost always would be proper at the place of the plaintiff's residence, an option that Congress abolished in the general venue statute in 1990.").[1]

Plaintiffs' reliance on the assertion that "business [has been] diverted from Maryland" is just an attempt to recast its locus-of-harm argument. Opp. 5. The cases Plaintiffs rely on are inapposite in any event. For example, *Monument Builders of Greater Kansas City, Inc. v. American Cemetery Association of Kansas*, was by its own terms "an unusual case." 891 F.2d 1473, 1479 (10th Cir. 1989). It was an antitrust conspiracy case that alleged concerted activity among Kansas and Missouri defendants in a market that covered districts in both Kansas and Missouri. *Id.* In concluding that venue existed in Kansas as to the Missouri defendants, the court placed great weight on the fact that the plaintiffs had alleged a conspiracy in a two-state market, attributing the in-forum activities of the (in-state) Kansas defendants to the (out-of-state) Missouri defendants. *Id. Monument Builders* thus is easily distinguishable. *See also United Tactical Sys. LLC v. Real Action Paintball, Inc.*, 108 F. Supp. 3d 733, 755 (N.D. Cal. 2015) (finding venue was proper for, *inter alia*, civil conspiracy, antitrust conspiracy, and unfair competition claims because "a substantial part of the events giving rise to the ... claims occurred in California"). Plaintiffs final case confirms that "damages suffered ... do not constitute a substantial part of the events giving rise to the claim." *Whiting v. Hogan*, 855 F. Supp. 2d 1266, 1286 (D.N.M. 2012).

But even if case law did not decisively resolve this issue, the text of the statute would. Plaintiffs concede that individual-capacity and official-capacity suits must be treated differently for purposes of

---

[1] Plaintiffs' cases are consistent with this understanding. *Young Again Products, Inc. v. Acord* held that "venue was proper because the contract at the center of [that] dispute was entered into in Maryland and because Appellants' company purposefully directed Internet traffic into and made sales in Maryland." 459 Fed. App'x. 294, 295 (4th Cir. 2011). *Ciena Corp. v. Jarrard* held that "[m]any of the events and facts central to [that] case concerned Jarrard's training, her access to and knowledge of trade secrets, and her job responsibilities, all of which [were] anchored in Maryland." 203 F.3d 312, 318 (4th Cir. 2000). *Chambers v. Chambers* was a defamation case in which the "Plaintiff's alleged injuries [arose] out of Defendants' Maryland-directed activities." No. 11-765, 2011 WL 3512140, at *5 (D. Md. Aug. 8, 2011). Moreover, in defamation cases "venue under section 1391(a)(2) is proper in the district where the injured party resides *and the defamatory statements were published.*" *Seidel v. Kirby*, No. 17-0292, __ F. Supp. 3d __, 2017 WL 4865486, at *6 (D. Md. Oct. 27, 2017) (emphasis added). Plaintiffs' allegations are nothing like those in these cases.

venue. In particular, § 1391(e)(1) provides for more expansive venue over officers in their official capacities than § 1391(b)(2) provides over other civil defendants, including officers in their individual capacities. *See* Mot. 7-8. Yet under Plaintiffs' argument both provisions would have the same reach. Though framed in terms of where the plaintiff felt the harm, venue would be proper in an individual-capacity suit "in any judicial district in which ... the plaintiff resides if no real property is involved in the action," 28 U.S.C. § 1391(e)(1)(C), given that is where plaintiffs always feel the harm. Plaintiffs' interpretation of § 1391 is textually indefensible.

Finally, pendent venue is unavailable. *See* Opp. 8. Even if it is a legitimate concept in some cases, pendent venue should apply only as to additional claims with respect to a defendant for whom venue is already established. *See Harris v. Parsons Brinckerhoff Quade & Douglas, Inc.*, No. 05-3355, 2006 WL 1892399, at *2 (D. Md. June 28, 2006); *Miller v. Asensio*, 101 F. Supp. 2d 395, 403 (D.S.C. 2000); *see also Alltech, Inc. v. Carter*, No. 08-00325, 2010 WL 988987, at *3 (E.D. Ky. Mar. 15, 2010) ("The doctrine of pendent venue applies to claims, not parties."). In this case, moreover, Congress has made pendent venue unavailable. Section 1391(e) may be relied upon only to establish venue over official-capacity defendants; venue over "[a]dditional persons" in "any such action" must be "in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party." 28 U.S.C. § 1391(e)(1). If the official-capacity defendant were not in this suit, there would be no valid venue to which individual-capacity venue could be appended.

**B.      None of the Alleged Contacts Establish Personal Jurisdiction over the President in his Individual Capacity.**

Personal jurisdiction is a critical hurdle for plaintiffs to overcome; it is "an essential element of jurisdiction of a district … court." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (quoting *Emp'rs Reinsurance Corp. v. Bryant*, 299 U.S. 374, 382 (1937)). "The Due Process Clause protects an individual's right to be deprived of life, liberty, or property only by the exercise of lawful power." *J.*

*McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 879 (2011). And the individual whose liberty interest the personal jurisdiction requirement is designed to protect is "the nonresident defendant—not the convenience of plaintiffs or third parties." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014). As a result, "the sovereign's exercise of power requires some act by which the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State.'" *J. McIntyre*, 564 U.S. at 880. This is true "[e]ven if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals [in] another State; even if the forum State has a strong interest in applying its law to the controversy; [and] even if the forum State is the most convenient location for litigation." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980). The Due Process Clause thus imposes strict requirements on the types of contacts with the forum state that can support personal jurisdiction, three of which are relevant here.

*First*, "[p]ersonal jurisdiction in this case must be based on [the President's] personal contacts with the state of Maryland, not his status as an officer, director, employee, and owner of [his] corporations." *Harte-Hanks Direct Mktg./Baltimore, Inc. v. Varilease Tech. Fin. Grp., Inc.*, 299 F. Supp. 2d 505, 514 (D. Md. 2004). That means that the Hotel's own contacts with Maryland are irrelevant. *See* Mot. 12-13. *Second*, the "plaintiffs' claims [must] arise out of those activities," *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003), because plaintiffs are not invoking general jurisdiction, Opp. 11 n.7. That means the President's contacts must be related to the "competitive disadvantage" Maryland allegedly suffers by the President "actively diverting business from Plaintiffs' entities" to the Hotel. Standing Op. 24; *see id.* at 20-29 (same). *Third*, only the President's contacts with Maryland in his individual capacity are relevant to whether the Court has jurisdiction over him in his individual capacity. *See, e.g.*, *Claasen v. Brown*, No. 94-cv-1018, 1996 WL 79490, at *2 (D.D.C. Feb. 16, 1996) ("In order to exercise personal jurisdiction over a federal official in an individual capacity, a court must find minimum contacts other than those arising from federal

5

employment or supervisory roles."); *see also Stafford v. Briggs*, 444 U.S. 527, 544 (1980). After all, a non-resident defendant's contacts must be intended to "invok[e] the benefits and protections of [the Forum State's] laws," *J. McIntyre*, 564 U.S. at 880 (citation omitted), and "such that he should reasonably anticipate being haled into court there," *World-Wide Volkswagen*, 444 U.S. at 297. A federal official acting in his official capacity is not invoking the forum state's benefits and protections in his individual capacity. Nor is it foreseeable that the defendant's official conduct would subject him to the jurisdiction in his individual capacity.

Plaintiffs attempt to obscure the importance of these requirements by commingling them. But that will not work. Each of the contacts upon which Plaintiffs rely fails to meet one or more of these preconditions to establishing personal jurisdiction. Specifically, Plaintiffs rely on the following contacts:

(1) The President attended campaign rallies, fundraisers, and political conferences in Maryland, many of which preceded his presidency, and made statements at those events about Maryland that were unrelated to the Hotel. Opp. 12-13, 16.

(2) The President's visits on official business to Camp David and to Joint Base Andrews to address troops and board flights on Air Force One. Opp. 13.

(3) The President's attendance at a CPAC conference in 2017 and 2018 at the Gaylord Hotel. Opp. 17-19.

(4) A single foreign official that attended the CPAC conference and visited the Hotel in the same week. Opp. 19.

(5) The Hotel's own contacts with Maryland vendors. Opp. 15-16.

(6) The President's tweets about the Hotel that may have been read by Maryland residents. Opp. 20.

(7) The President's statements to the Washington Post about the Hotel before taking office. Opp. 13-15, 16, 19-20.

The first three have nothing to do with this case and, consequently, plaintiffs' claims cannot "arise out of those activities." *Carefirst*, 334 F.3d at 397. The campaign rallies, fundraisers, and political conference were not related to the Hotel in any way. Nor were the President's visits to Camp David or his travel to and from Joint Base Andrews. *See, e.g., Glynn v. EDO Corp.*, 536 F. Supp. 2d 595, 605

(D. Md. 2008). And Plaintiffs' reliance on the President's visits to the Gaylord Hotel is strange. If the President draws a crowd, as Plaintiffs contend, a visit to a Maryland hotel would bring business to the State—not put Maryland businesses at a competitive disadvantage.

Plaintiffs thus latch on to a fourth activity: Nigel Farage traveling from the Gaylord to the Hotel during CPAC. Opp. 19. Absent from the Plaintiffs' recounting, however, is any allegation of the President's own conduct. Plaintiffs do not claim the President lobbied CPAC attendees (or Farage) to patronize the Hotel or, for that matter, to patronize the Hotel rather than the Gaylord. They instead highlight the unremarkable fact that one person visited the Hotel after an event at the Gaylord. But even if Farage's visit to the Hotel could support an Emoluments claim, that Farage decided to travel to the Hotel from Maryland does not make the President subject to personal jurisdiction in Maryland. That is not how personal jurisdiction works. "[T]he relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden*, 134 S. Ct. at 1122.[2] Relying on Farage's visit would "improperly attribute" his "forum connections to the [President]." *Id.* at 1125.

The fifth activity—the Hotel's contacts with Maryland vendors—cannot be attributed to the President. *See* Mot. 12-13; *see also* Standing Op. 3 ("the President does not actively manage the hotel"). As explained, "there is no basis whatsoever for holding that merely because a corporation transacts business in the state, contracts to supply goods or services in the state or has other substantial contacts with the state, an individual who is its principal should be deemed to have engaged in those activities personally." *Birrane v. Master Collectors, Inc.*, 738 F. Supp. 167, 169 (D. Md. 1990). That the Hotel serves Maryland crabs and oysters is irrelevant.

---

[2] Plaintiffs also suggest that the President's contacts with Maryland automatically "are related to plaintiffs' claims because Maryland is home to a substantial segment of the international community" and because "many countries have consulates or ambassador residents in the State." Opp. 20. For the same reason as Farage's conduct, the location of consulates and ambassadors does not support personal jurisdiction. Under Plaintiffs' theory, *every* State where a foreign government has a presence would have personal jurisdiction over the President in the context of the Emolument Clauses. That is untenable.

Plaintiffs know this, of course, so they try to tie one of the vendors to the President directly. Opp. 16. The linchpin is a statement made by a contractor's attorney that the President "actually called my client the day before the inauguration and they reached an agreement over the phone." Brockmyer Decl. 50; Ex. 49. To start, the article identifies the contractor as being "D.C.-based," not Maryland-based, *id.* and the statement is *quadruple* hearsay. But setting that aside, the lawyer later refused to "to clarify" the statement by confirming whether the President "actually called [his] client" or whether "he meant the president-elect or a different representative of the organization." *Id.* Such a "random" and "attenuated" contact is not "purposeful availment" of the jurisdiction. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985). But even if this were competent evidence, it bears no connection to the Plaintiffs' claims. The contractor's dispute with the Hotel is not the President "actively diverting business from Plaintiffs' entities" to the Hotel or otherwise causing Maryland's "competitive injuries." Standing Op. 24. If it happened at all, it was a private dispute, not a "contact[] with the forum state form[ing] the basis of the suit." *Consulting Eng'rs Corp. v. Geometric Ltd.,* 561 F.3d 273, 278-79 (4th Cir. 2009).

For the sixth activity, Plaintiffs, in passing, point to the President's promotion of the Hotel in "tweets that are regularly read by thousands of Marylanders." Opp. 20. Yet passive electronic activity such as the seven tweets Plaintiffs rely on—none of which even reference Maryland or were directed at Marylanders, *see* Brockmyer Decl. ¶¶ 41-47—cannot be "purposeful availment" of the forum. *See ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 714 (4th Cir. 2002); *see, e.g., Planet Aid, Inc. v. Reveal, Ctr. for Investigative Reporting,* No. 16-cv-2974, 2017 WL 2778825, at *8-10 (D. Md. June 26, 2017) (tweets directed at Marylanders could not support personal jurisdiction). The President's tweets did not "'deliberately exploit' a market in the forum State." *Walden,* 134 S. Ct. at 1122 (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 781 (1984)).

That leaves the seventh and final activity—the President's interviews with the Washington Post. That alleged contact, however, wilts under the slightest scrutiny. Plaintiffs point to two short

statements the President made during one of the interviews about the Hotel—that it was in "the best location in Washington" and that it would be "one of the great hotels in the world"—and contend the interviews were akin to advertisements targeted at Maryland. Opp. 14-15. That is untenable. Moreover, Plaintiffs plucked those two snippets from the online, 18,000-word transcript of one interview, which itself covered such broad-ranging topics as nuclear proliferation and the stock market. Brock Myer Decl. ¶ 37; Exhs. 36. Worse still, the cherry-picked statements were not even in the published article about the interview. *See* Bob Woodward & Robert Acosta, *In a Revealing Interview, Trump Predicts a 'Massive Recession' But Intends to Eliminate the National Debt in 8 Years*, Washington Post (April 2, 2016), http://wapo.st/2IG57EI. The Plaintiffs reliance on the Post's physical circulation, Opp. 14, is thus irrelevant given the statements apparently exist only online.[3] This contact is a far cry from the one in *Shoppers Food Warehouse v. Moreno*, in which an advertisement in the D.C.-based newspaper directed at D.C. residents supported jurisdiction in the District. 746 A.2d 320, 331 (D.C. 2000).

In sum, this attempt to patch together unrelated contacts to create personal jurisdiction fails, especially given its implications. For example, President Obama would have been subject to personal jurisdiction in South Carolina for a lawsuit concerning foreign officials purchasing his book "Audacity of Hope" based only on the following: he campaigned in South Carolina; he traveled to a military base in South Carolina on Air Force One; he visited South Carolina for a third party's event; he tweeted about South Carolina generally; and he gave an interview about his book to an out-of-state journalist that could reach South Carolinians. *See Barack Obama's South Carolina Primary Speech*, N.Y. Times (Jan. 26, 2008), http://nyti.ms/2KKfu72; *President and First Lady Arrive at Joint Base Charleston*, Joint Base

---

[3] Any suggestion that the interview's publication online supports personal jurisdiction in Maryland likewise fails. The Post's website receives 66 million unique visitors across the United States, *See* Washington Post, *General Ad Rates* (2017), http://wapo.st/2IJQhJa. If the interview establishes jurisdiction in Maryland, then it also establishes jurisdiction in all 50 States. The Post itself is not subject to personal jurisdiction in every state for publishing the interview, *see ALS Scan*, 293 F.3d at 714, much less the interviewee.

Charleston (June 26, 2015), http://bit.ly/2IFgCbr; Andrew Shain, *President Obama Will Visit South Carolina for First Time*, Charlotte Observer (March 1, 2015), http://bit.ly/2ID3Cax; @BarackObama, Twitter (Jan. 23, 2008), http://bit.ly/2khBwD7; Michelle Norris, *Obama Shares Political Vision in "Audacity of Hope*," NPR (Oct. 19, 2006), http://n.pr/2J58gNE. There is hardly a state in the Union that could not satisfy that criteria and, in turn, subject all sitting Presidents to nationwide jurisdiction in their individual capacity. That cannot be, and is not, the law.

## II.     Plaintiffs Cannot Maintain an Individual-Capacity Suit against the President.

### A.     Plaintiffs' Theory of Individual Liability Ignores Centuries of Law Concerning the "Under Color of Federal Law" Requirement.

Claims under the Emoluments Clauses must be brought against the President in his official capacity. *See* Mot. 14-16. Plaintiffs bury their response even though it is the only reason they amended their complaint in the first place. Opp. 31-35. That is no surprise given that, until recently, Plaintiffs agreed with Defendant, DOJ, and plaintiffs in similar litigation that an individual-capacity suit would be improper. *See* Mot. 14. Their change of heart was mistaken.

Plaintiffs' arguments clarify that they fundamentally misapprehend what an individual-capacity suit is and when one can be brought. In their view, an individual-capacity suit is available because their claims arise from the "President's unofficial actions." Opp. 27. In particular, these alleged "violations of the law ... arise out of his private actions in managing his personal finances and business." *Id.* at 3; *see id.* at 35 ("alleging misconduct in private financial transactions"). Amici agree that "the facts in the Amended Complaint only concern private conduct." Doc. 114-1, Brief for Scholar Seth Tillman et. al. at 2 ("Tillman Br."); *see id.* at 3 n.5 (noting that the "conduct ... consists *entirely* of personal commercial relationships that purportedly violate the Constitution's Foreign and Domestic Emoluments Clauses" (citation and quotations omitted)). As Plaintiffs recount, Opp. 34, the Court also suggested that the President is "personally benefiting as a private owner of a business," that the alleged violations involve "non-official acts," Hr'g Tr., Jan. 25, 2018 at 28–29, and that Plaintiffs are ultimately "challenging the

President's acceptance of money taken through private transactions—something that has 'nothing to do with the President's service … as President.'" Standing Op. 27 (citation omitted). The theory, in short, is that an individual-capacity suit is the way to challenge an officeholder's allegedly "private" actions. Plaintiffs' new assertion is wrong and fatal to *all* of their claims.

First, if what Plaintiffs now say is correct, their official-capacity claims must be dismissed. It is beyond question that official-capacity suits are limited to violations of governing law taken pursuant to *official* duties. An officeholder—whether he is the local constable, an FBI agent, or the President— can only be liable in his official capacity if the misdeeds were taken "under color of law." That is because, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the [government] entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Accordingly, "individuals who, as officers of the state, *are clothed with some duty in regard to the enforcement of the laws of the state*, and who threaten and are about to commence proceedings ... to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." *Ex parte Young*, 209 U.S. 123, 155-56 (1908) (emphasis added). "[S]ince *Ex parte Young*," then, "it has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law." *Hafer v. Melo*, 502 U.S. 21, 30 (1991) (citation and quotations omitted)). Because that rule applies to federal officials as well, *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015), Plaintiffs' contention that this lawsuit has "nothing to do with" the President's official duties is a concession that dictates dismissal of the official-capacity claims.

Plaintiffs also fail to appreciate that the "under color of law" requirement applies equally to *individual-capacity* suits. To sue a state official in his individual capacity, "a plaintiff must allege that he was deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Thomas v. Salvation Army Southern Territory*, 841

F.3d 632, 637 (4th Cir. 2016) (internal quotation omitted). Likewise, a plaintiff must allege "constitutional injuries attributable to individuals acting under the color of federal law" in order to bring an individual-capacity suit against a federal official. *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 459 n.1 (4th Cir. 2013). To be sure, this rule has been applied to *Bivens* claims. That is because *Bivens* is the only kind of claim that could be brought against a federal official in his individual capacity. *See infra* at 14-18. Yet even if this court were to expand individual-liability suits to include equitable relief, there would be no basis to deviate from the rule that only "victims of constitutional violations committed by federal agents *in the performance of their official duties*" are proper plaintiffs in such cases. *Farmer v. Perrill*, 275 F.3d 958, 960 n.4 (10th Cir. 2001) (emphasis added).

Plaintiffs' attempt to shoehorn their case into the individual-capacity category by alleging that the President's violations "arise out of his private actions in managing his personal finances and business," Opp. 3, is based on a serious error. "[T]he phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." *Hafer*, 502 U.S. at 26; *see DeLong v. IRS*, 908 F.2d 966, 1990 WL 101402, at *1 (4th Cir. 1990) (table op.) ("The only distinction … between personal-capacity and official-capacity suits is on whom the plaintiff is seeking to impose liability; in both cases, the official is acting under color of law."). The distinction is instead remedial. Official-capacity suits effectively enjoin the government (via its officials) from violating the Constitution. *Armstrong*, 135 S. Ct. at 1384. Individual-capacity actions compensate victims of officials who personally violate the Constitution in the course of their official duties if the "right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Either way, though, there must be an allegation that the officer acted "under 'pretense' of law." *Screws v. United States*, 325 U.S. 91, 111 (1945).

"Thus acts of officers in the ambit of their personal pursuits are plainly excluded." *Id.*; *see Bonenberger v. Plymouth Tp.*, 132 F.3d 20, 24 (3d Cir. 1997) ("[A] state employee who pursues purely

private motives and whose interaction with the victim is unconnected with his execution of official duties does not act under color of law."). Plaintiffs' analogy to the Fourth Amendment illustrates this point. Opp. 32-33. If an official *policy* violates the Fourth Amendment by, for example, authorizing the use of excessive force, the highest-ranking relevant official is subject to an equitable suit. *Cf. Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 401 (2013). If an officer, exercising his official duties, personally uses excessive force in violation of clearly established Fourth Amendment law, he is subject to suit in his individual capacity. *See, e.g.*, *Townsel v. Jamerson*, 240 F. Supp. 3d 894 (N.D. Ill. 2017). But "[p]rivate violence—even private violence engaged in by one who happens to work for the state—has different legal ramifications than violence attributable to state action." *Martinez v. Colon*, 54 F.3d 980, 985 (1st Cir. 1995) (citing *Hughes v. Halifax Cty. Sch. Bd.,* 855 F.2d 183, 186-87 (4th Cir. 1988)). For the official to be acting "under color of his public office," the excessive-force violation must occur in the "context of an arrest, interrogation, or similar maneuver, in which a differential exists between the victim and the officer precisely because of the latter's status as one empowered to enforce the law, coercively if necessary, against the former." *Martinez*, 54 F.3d at 985 (internal citation omitted).

Hence, Plaintiffs are arguing themselves out of their entire case. Plaintiffs originally sought, per *Armstrong*, an injunction against the President in official capacity. Doc. 90-1 at 2. Whether or not *Armstrong* extends to this context, that argument relied on the premise that the President was taking action pursuant to his official duties. But if Plaintiffs now believe the President's alleged misdeeds are "not related to the functions of the office," Opp. 25, they cannot meet the "color of law" requirement for either the official- or individual-capacity claims. In other words, Plaintiffs deprive themselves of any action against President Trump.

Amici's analogies to the 13th and 21st Amendments are just as erroneous. Tillman Br. 4-5. Amici are right that a government policy violating those amendment can be challenged in an official-capacity suit. *Cf. Shelby Cty. v. Holder*, 570 U.S. 529 (2013). And, officials who personally violate those

amendments in the course of their duties are liable in their individual capacity if the law is clearly established. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 675-76 (2009). But amici are wrong that an official violates the 13th Amendment "in his own home, with his own resources," or "brews beer in his bathtub at home and transports the beer into Maryland in his private vehicle" in violation of the 21st Amendment, in his "individual" capacity. Tillman Br. 5-6. The official would be liable *personally* because there would have been no "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law," *i.e.*, it would not have been "action taken 'under color of' state law." *NCAA v. Tarkanian*, 488 U.S. 179, 191 (1988) (quotation omitted); *Browning v. Clinton*, 292 F.3d 235, 250 (D.C. Cir. 2002) (same as to federal law).[4]

The problem, of course, is that a private citizen is not liable under the Emolument Clauses (unlike the 13th and 21st Amendments). The 13th Amendment provides that "slavery" shall not "exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII. The 21st Amendment provides that "transportation or importation into any state, territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI. By their terms, both amendments apply to all persons without limitation. In contrast, the Emolument Clauses apply to a "person holding any office of profit or trust," U.S. Const. Art. I, § 9, cl. 8, or "[t]he President," U.S. Const. Art. II § 1, cl. 7. A suit against a private citizen for violating the Emolument Clauses would fail as a matter of law.

### B.   No Court Has Sustained An Individual-Liability Action for Equitable Relief.

Injunctive relief is routinely available against federal officers in their official capacities for violations of federal law. *Armstrong*, 135 S. Ct. at 1384. But no court has ever recognized an equitable

---

[4] The "confusion" is understandable and has been sown by myriad decisions employing the terminology inexactly. *Hafer*, 502 U.S. at 25. Too often, courts refer to "official capacity" suits as "individual" suits because an individual officer is sued; they refer to "individual capacity" as "personal capacity" because an officer is personally liable; and they refer to "personal" suits as "private" suits because an officer is not sued due to the office he holds.

cause of action against a federal officer in his individual capacity. Indeed, Plaintiffs fail to cite a single case in which an officer has been held personally liable for the injunction of an unconstitutional law or government policy. That is because it is widely understood that "[i]f equitable relief rather than damages is sought from a federal official, it must be obtained against him in his official capacity." *Arocho v. Nafziger*, 367 Fed. App'x 942, 948 n.5 (10th Cir. 2010).

In *Armstrong*, the Supreme Court explained that the authority to enjoin federal officers from enforcing unconstitutional government action derives from common law. 135 S. Ct. at 1384. In so explaining, the Court relied on *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902). There, the plaintiffs sued the Postmaster General in his official capacity to enjoin the Postoffice Department's order halting the plaintiffs' mail service based on the Department's determination that the plaintiffs were engaged in mail fraud in violation of federal law. *Id.* at 95-99. A cause of action was available in equity to remedy "uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual." *Id.* at 110. After determining that the plaintiffs had not violated the mail-fraud statute, the Postmaster General was enjoined from enforcing the Department's arbitrary order against the plaintiffs. *Id.* at 111. Nothing in the Court's opinion purported to establish a cause of action against the Postmaster General in his "individual capacity" or to hold him somehow personally liable for a judgment enjoining the Postoffice Department's order. Rather, the injunction issued against him merely because he was the individual officer who "had jurisdiction over the subject-matter." *Id.* at 110.

Far more recently, the "individual capacity" legal fiction was developed to circumvent the sovereign immunity bar to awarding damages against federal officials. *See* Mot. 18-19. If an officer were sued in his official capacity for damages, the remedy would necessarily require drawing funds from the public fisc in violation of sovereign immunity. *Dugan v. Rank*, 372 U.S. 609, 620 (1963) ("The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the

public treasury… .'" (quoting *Land v. Dollar*, 330 U.S. 731, 738 (1947))). By fashioning a cause of action against an officer in his "individual capacity," the Court ensured that the officer would be personally liable to pay the money and, in turn, avoided a looming sovereign immunity problem. *See Solida v. McKelvey*, 820 F.3d 1090, 1094 (9th Cir. 2016).

Accordingly, an individual-capacity claim, by definition, is a damages claim. When injunctive relief is sought, there is no need for the individual-capacity suit because there is no immunity problem. An order enjoining a federal officer from engaging in unlawful government action does not require "affirmative action by the sovereign or the disposition of unquestionably sovereign property" the way a judgment for damages does. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949). The requested relief is "merely … the cessation of … conduct" that is unlawful and "beyond the officer's powers" and thus considered by courts to "not [be] the conduct of the sovereign." *Id.* at 689-91 & n.11. Under this "*Larson-Dugan* exception" to federal sovereign immunity, *see, e.g., Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012), suits to enjoin unconstitutional government action are properly brought against federal officers in their official capacities.

The state analogue to the *Larson-Dugan* exception, *Ex Parte Young*, similarly works around the Eleventh Amendment and is also limited to official-capacity suits. *Ex parte Young* recognized an equitable action against "individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten … to enforce against parties affected an unconstitutional act." 209 U.S. at 155-56. That is, when a plaintiff seeks to enjoin unconstitutional state action, he can sue the individual state officers charged with carrying out the unconstitutional conduct and seek to hold them liable "as officers of the state"—*viz.*, in their official capacities. While this suit is described as "subject[ing] … [the officer] to the consequences of his individual conduct," that does not mean that the officer is to be held personally liable for redressing the injuries in the way he would be in an individual-capacity suit. *Id.* at 160. Rather, because the claim is technically against

an individual officer for his role in enforcing an unconstitutional law, rather than against the state itself for enacting the law, the Eleventh Amendment does not bar suit. *Id.* at 159-60. This is because a state official whose conduct is unconstitutional is said to be "stripped of his official or representative character." *Id.* In other words, his individual unlawful conduct does not represent that of the sovereign for the purposes of the suit. Nevertheless, the remedy will effectively lie against the government through the individual defendant who is enjoined "as an officer" of the state. *Id.* at 159.

Courts, including the Supreme Court, have long understood "[t]he doctrine of *Ex parte Young*" to create a cause of action against "individual [officers] in their official capacities." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). In some cases, including those cited by Plaintiffs, courts have used imprecise language to describe the individual nature of the officer's role, confusing the capacity in which the officer carries out the challenged state action—as an individual officer— with the capacity in which the officer is liable for the relief sought—as an agent of the state. *See, e.g., McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010) (official-capacity suit) (citing *S.C. Wildlife Fed. v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008))[5]; *Clean Air Council v. Mallory*, 226 F. Supp. 2d 705, 712 (E.D. Penn. 2002) (official-capacity suit).[6] But not a single case relied on by Plaintiffs actually recognizes a cause of action for injunctive relief against federal officers in their individual capacities. That is because *Larson-Dugan* and "*Young* stand[] only for the proposition that [sovereign immunity] does not bar suits alleging an ongoing violation of federal law and seeking prospective (i.e., injunctive)

---

[5] *South Carolina Wildlife Federation v. Limehouse*, which the Fourth Circuit cites in *McBurney* for its "individual capacity" statement, does not use the term "individual capacity" but rather discusses the role of the officer as an "individual defendant," in what is clearly an effort to distinguish the officer from the sovereign. 549 F.3d at 333. That case, like *McBurney*, was an official-capacity suit.

[6] The other case cited by Plaintiffs, *Victors v. Kronmiller*, does not even address individual-capacity suits in the context of injunctive relief. 553 F. Supp. 2d 533, 550 (D. Md. 2008). Rather, the court merely confirmed the propriety of individual-capacity claims for damages. *Id.* ("[B]ecause plaintiffs sued State Defendants in their individual capacities, the Eleventh Amendment does not bar plaintiffs' § 1985 claim.").

relief, brought against … officials *in their official capacities*." *Stevens v. New York*, 691 F. Supp. 2d 392, 398 (S.D.N.Y. 2009) (citing *Verizon Md.*, 535 U.S. at 645).

In sum, the *Larson-Dugan* exception to federal sovereign immunity is limited to "only injunctive and declaratory relief." *Pollack*, 703 F.3d at 120 (citing *Larson*, 337 U.S. at 689). As Plaintiffs concede, Opp. 28, *Bivens* actions are limited to damages claims.[7] Together, these causes of action provide a comprehensive way for individuals whose rights are violated to circumvent the sovereign immunity bar and pursue a remedy, whether prospective or retroactive. There is no basis for a court to create a *third* exception to sovereign immunity when the two exceptions the Supreme Court has already created provide complete relief.

## III. Plaintiffs Mischaracterize the President's Absolute Immunity Argument.

Plaintiffs incorrectly claim "absolute immunity applies only to 'damages liability predicated on his *official* acts." Opp. 23 (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982) (emphasis added)). They deliberately ignore *Fitzgerald*'s discussion of "the scope of [the President's] absolute privilege," which distinguished absolute Presidential immunity from the absolute immunity available to other officials. 457 U.S. at 755. While other officials' absolute immunity "extend[s] only to acts in performance of particular functions of … office," the President's extends further: "[i]n view of the special nature of the President's constitutional office and functions," the Court recognized "absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility." *Id.* at 755-56.

---

[7] Amici claim that "[i]n the Fourth Circuit … injunctive relief is available for a *Bivens* action." Tillman Br. 13 n.36. But the case cited for this proposition, *Ross v. Meese*, 818 F.2d 1132 (4th Cir. 1987), does not support it. In fact, *Ross* was not even an individual-capacity suit. The case caption states that the Attorney General and agency officials were sued "in their official capacities." *Id.* at 1132. Moreover, *Ross* predates much of the Supreme Court's *Bivens* jurisprudence, so it was written without the benefit of important decisions clarifying *Bivens*. To be sure, the underlying constitutional claim resembled that of *Bivens* because it alleged that federal officials violated the plaintiff's Fourth Amendment rights—hence the language introducing the facts of the case as presenting a "*Bivens* type action." *Id.* at 1133 (footnote omitted). But it was not an individual-capacity suit and thus not a *Bivens* action. As explained above, the equitable action against a federal official in his official capacity—like the action in *Ross*—has existed since at least the turn of the twentieth century, long before *Bivens* was decided. Contrary to amici's assertion, the Fourth Circuit has never recognized an equitable cause of action against federal officials in their individual capacities.

These claims necessarily fall within the outer perimeter of the President's official responsibility. Again, individual-capacity claims are *only* available for acts taken "under color of law." In addition, the Emoluments Clauses expressly define official responsibility by imposing duties only on officeholders. The Domestic Emoluments Clause even targets the President specifically. Hence, as Plaintiffs have acknowledged, "the defendant's conduct is illegal by virtue of the fact that he is President," if it is illegal at all. Doc. 90-1 at 2 (citation and quotations omitted).

Plaintiffs thus cannot rely on *Clinton v. Jones*, 520 U.S. 681 (1997). *See* Opp. 23-27. Mr. Clinton was not sued in his capacity as President. He was sued based on misdeeds allegedly committed as Governor. *Jones*, 520 U.S. at 685-86. Because the case was about "actions prior to taking office," the Court described it as one about "unofficial conduct." *Id.* at 692-93. Had it been about official action, *i.e.*, action President Clinton took under color of federal law, the powerful interest in "enabling such officials to perform their designated functions effectively without fear that a particular decision may give rise to personal liability" would have been triggered. *Id.* at 693. In contrast, the allegations against President Trump must be based on the exercise of his "official duties," *id.* at 694 (quotation omitted), if Plaintiffs are intent on imposing official or individual liability on him. *See supra* at 10-14. Whatever the rule may be when the President seeks to be relieved of the "burdens of private litigation," *Jones*, 520 U.S. at 706, *Fitzgerald* controls when the dispute centers on actions the Executive, as here, has taken in the course of his "official duties as President of the United States," *id.* at 686. Although Plaintiffs now assert that their claims have "nothing at all to do with [the President's] official duties," Opp. 24 (quoting Standing Op. 27), they cannot have it both ways. If Plaintiffs' new claim is true, this action cannot proceed the President in his official or individual capacity. *See supra* at 10-14. If it is false, the individual-capacity claim falls within the scope of presidential immunity.

Nor is there any reason to limit the President's immunity here because Plaintiffs do not seek damages. It is unremarkable that *Fitzgerald* involved such claims because no court has ever held that

officials can be sued in their individual capacity for equitable relief. *See supra* at 14-18. Plaintiffs seem oblivious to (or at least are unwilling to admit to) the novelty of this lawsuit; yet they highlight the President's inability to find cases "in which the Supreme Court has extended the President's absolute immunity to a suit that, like this one, requested only injunctive relief rather than damages," Opp. 26, as if it undermines the claim of immunity instead of the theory of their action. In short, absolute immunity is only at issue because this would be the *first* court to allow an individual-capacity lawsuit where the complaint "includes no prayer for damages," *id.* at 24.

The pertinent question, then, is why absolute immunity should not be extended to this novel context as well. *See* Mot. 27 n.1. There is no answer. "Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Fitzgerald*, 457 U.S. at 751. "The need to defend damages suits would have the serious effect of diverting the attention of a President from his executive duties since defending a lawsuit today—even a lawsuit ultimately found to be frivolous—often requires significant expenditures of time and money, as many former public officials have learned to their sorrow." *Id.* at 763 (Burger, C.J., concurring). Plaintiffs' equitable claims against the President in his individual capacity raise these same concerns. The intrusive and time-consuming discovery they seek will be no less distracting than a damages claim brought by a single government employee. *See* Mot. 25. The relief requested also could impose enormous personal financial losses on the President—far exceeding the damages sought in *Fitzgerald*—which could not have arisen had he not taken office.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed as to the President in individual capacity.

Respectfully submitted,

/s/ William S. Consovoy
William S. Consovoy (No. 20397)
Thomas R. McCarthy
Bryan K. Weir
Caroline A. Cook
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Blvd., Suite 700
Arlington, VA 22201
T: (703) 243-9423
F: (703) 243-8696
will@consovoymccarthy.com

Patrick N. Strawbridge
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, Massachusetts 02109
T: (617) 227-0548

May 25, 2018                                    *Attorneys for Defendant in his individual capacity*

## **CERTIFICATE OF SERVICE**

I certify that on May 25, 2018, I electronically filed this document with the Clerk of Court for the U.S. District Court for the District of Maryland using the CM/ECF system, which will send notification of the filing to all counsel.

_/s/ William S. Consovoy_
William S. Consovoy

_Attorney for Defendant in his individual capacity_