**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| THE DISTRICT OF COLUMBIA, *et al.*,<br><br>　　　　　　*Plaintiffs*,<br><br>　　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States and in his individual capacity,<br><br>　　　　　　*Defendants*. | No. 8:17-cv-1596-PJM |

**MOTION OF THE PRESIDENT, IN HIS OFFICIAL CAPACITY, FOR CERTIFICATION OF THIS COURT'S MARCH 28 AND JULY 25, 2018 ORDERS PURSUANT TO 28 U.S.C. § 1292(b) AND FOR A STAY PENDING APPEAL**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 4

ARGUMENT ...................................................................................................................... 6

I.  THIS COURT SHOULD CERTIFY ITS MARCH 28 AND JULY 25 ORDERS FOR
    INTERLOCUTORY APPEAL ................................................................................................ 6

   A. The Court's March 28 and July 25 Orders Involve Controlling Questions of Law and
      Their Immediate Resolution May Materially Advance the Ultimate Termination of This
      Litigation ................................................................................................................................ 7

   B. There Is Substantial Ground for Difference of Opinion as to the Four Controlling
      Questions of Law Identified in This Motion .................................................................... 10

      1.  There is a substantial ground for difference of opinion as to the interpretation of the
          term "Emolument" in the Emoluments Clauses. ......................................................... 11

         i.  Text of the Emoluments Clauses .............................................................................. 11

         ii.  The Original Public Meaning of the Term "Emolument" ...................................... 15

         iii.  The Purpose of the Emoluments Clauses ............................................................. 17

         iv.  Executive Branch and Other Precedent ................................................................ 21

      2.  There is a substantial ground for difference of opinion as to whether Plaintiffs'
          economic interests are addressed by the Emoluments Clauses. .................................. 22

      3.  A substantial ground for difference of opinion exists as to whether Plaintiffs have
          sufficiently alleged Article III standing. .................................................................... 23

      4.  A substantial ground for difference of opinion exists as to the availability of the
          requested equitable relief against the President in his official capacity. .................... 24

II. IF THE COURT GRANTS § 1292(b) CERTIFICATION, IT SHOULD ALSO STAY
    PROCEEDINGS PENDING RESOLUTION OF THE INTERLOCUTORY APPEAL. ........ 25

CONCLUSION ................................................................................................................. 27

# TABLE OF AUTHORITIES

## CASES

*Ahrenholz v. Bd. of Trs.*,
  219 F.3d 674 (7th Cir. 2000) ..................................................... 6

*Al Maqaleh v. Gates*,
  620 F. Supp. 2d 51 (D.D.C. 2009) ........................................... 11

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in
  Amministrazione Straordinaria*,
  921 F.2d 21, 24 (2d Cir. 1990) .......................................... *passim*

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................... 8, 24

*Butler v. DirectSAT USA, LLC*,
  307 F.R.D. 445 (D. Md. 2015) ................................................. 7

*Cabell v. Markham*,
  148 F.2d 737 (2d Cir. 1945) .................................................. 16

*Cheney v. U.S. Dist. Ct. for D.C.*,
  542 U.S. 367 (2004) ..................................................... 3, 25, 26

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................ 24

*Clinton v. Jones*,
  520 U.S. 681 (1997) ........................................................ 3, 26

*Coal. For Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*,
  Civil No. CCB-06-2773, 2015 WL 4040425 (D. Md. June 29, 2015) ................ 8, 10

*CREW v. Trump*,
  276 F. Supp. 3d 174 (S.D.N.Y. 2017),
  *appeal pending* No. 18-474 (2d Cir. Feb. 16, 2018) .................... 2, 3, 22, 23

*Dist. of Columbia v. Heller*,
  554 U.S. 570 (2008) ...................................................... 15, 16

*Doe v. Trump*,
  Civ. No. 17-1597, --- F. Supp. 3d ---, 2018 WL 3736435 (D.D.C. Aug. 6, 2018) ............... 3, 25

*Fannin v. CSX Transp., Inc.*,
  873 F.2d 1438, 1989 WL 42583 (4th Cir. 1989) (unpublished) ............................... 7

*Fernandez-Roque v. Smith*,
   671 F.2d 426 (11th Cir. 1982) ............................................................ 10

*Flora v. United States*,
   362 U.S. 145 (1960) .......................................................................... 12

*Florida v. Thomas*,
   532 U.S. 774 (2001) ............................................................................ 8

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) .......................................................................... 24

*Gen. Tech. Applications, Inc. v. Exro Ltda*,
   388 F.3d 114 (4th Cir. 2004) ............................................................... 8

*Goodman v. Archbishop Curley High Sch., Inc.*,
   195 F. Supp. 3d 767 (D. Md. 2016) ................................................... 10

*Griffin v. United States*,
   935 F. Supp. 1 (D.D.C. 1995) ........................................... 6, 10, 16, 19

*In re Microsoft Corp. Antitrust Litig.*,
   274 F. Supp. 2d 741 (D. Md. 2003) ..................................................... 7

*In re Miedzianowski*,
   735 F.3d 383 (6th Cir. 2013) ............................................................. 25

*In re Trump*,
   874 F.3d 948 (6th Cir. 2017) ...................................................... *passim*

*In re United States*,
   138 S. Ct. 443 (2017) ....................................................................... 4, 9

*Int'l Refugee Assistance Project v. Trump*,
   857 F.3d 557 (4th Cir. 2017),
   *vacated as moot*, 138 S. Ct. 353 (Oct. 10, 2017) ............................. 24

*Kennedy v. Villa St. Catherine, Inc.*,
   No. PWG-09-3021 (WDQ), 2010 WL 9009364 (D. Md. June 16, 2010) ....................... 8, 9, 10

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936) ..................................................................... 25, 26

*Long v. Robinson*,
   432 F.2d 977 (4th Cir. 1970) ............................................................. 25

*Loving v. United States*,
   517 U.S. 748 (1996) .......................................................................... 26

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
　　485 U.S. 439 (1988) ................................................................. 26

*Lynn v. Monarch Recovery Mgmt., Inc.*,
　　953 F. Supp. 2d 612 (D. Md. 2013) ............................................. 7, 8, 10

*Mississippi v. Johnson*,
　　71 U.S. 475 (1867) ................................................................. 24, 25

*Mohawk Indus., Inc. v. Carpenter*,
　　558 U.S. 100 (2009) ................................................................. 1, 6

*Montesa v. Schwartz*,
　　836 F.3d 176 (2d Cir. 2016) ........................................................ 8

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
　　138 S. Ct. 617 (2018) ............................................................... 12

*Nixon v. Fitzgerald*,
　　457 U.S. 731 (1982) ................................................................. 3

*Nken v. Holder*,
　　556 U.S. 418 (2009) ................................................................. 25

*Reese v. BP Expl. (Alaska) Inc.*,
　　643 F.3d 681 (9th Cir. 2011) .................................................. 10, 22, 25

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
　　298 F. Supp. 3d 1304 (N.D. Cal. 2018) ......................................... 10

*Schlesinger v. Reservists Comm. to Stop the War*,
　　418 U.S. 208 (1974) ................................................................. 22

*Small v. United States*,
　　544 U.S. 385 (2005) ................................................................. 12

*Swan v. Clinton*,
　　100 F.3d 973 (D.C. Cir. 1996) ..................................................... 24

*United States ex rel. Michaels v. Agape Senior Cmty., Inc.*,
　　848 F.3d 330 (4th Cir. 2017) ...................................................... 6, 7

*United States v. Burr*,
　　25 F. Cas. 187 (CC Va. 1807) ..................................................... 25

*United States v. Hartwell*,
　　73 U.S. 385 (1867) ................................................................. 12

*United States v. Nixon*,
　418 U.S. 683 (1974) ........................................................................................... 26

*United States v. Richardson*,
　418 U.S. 166 (1974) ........................................................................................... 22

*United States v. Shell*,
　789 F.3d 335 (4th Cir. 2015) ............................................................................. 17

*Vidal v. Nielsen*,
　No. 16-cv-4756, 2018 WL 333515 (S.D.N.Y. Jan 18, 2018) ............................. 10

*Yamaha Motor Corp. v. Calhoun*,
　516 U.S. 199 (1996) ............................................................................................. 8

*Yates v. United States*,
　135 S. Ct. 1074 (2015) ................................................................................ 17, 19

*Youngstown Sheet & Tube Co. v. Sawyer*,
　343 U.S. 579 (1952) ........................................................................................... 27

*Zeneca, Inc. v. Shalala*,
　213 F.3d 161 (4th Cir. 2000) ............................................................................. 24

## STATUTES

5 U.S.C. § 7342(c)(1)(A) ......................................................................................... 19

18 U.S.C. § 201(b) ................................................................................................... 17

28 U.S.C. § 1292(b) ....................................................................................... *passim*

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 6, cl. 2 ..................................................................................... 13

U.S. Const. art. I, § 9, cl. 8 ..................................................................................... 11

U.S. Const. art. II, § 1, cl. 7 ................................................................................... 13

## CONGRESSIONAL MATERIALS

Office of Congressional Ethics, U.S. House of Representatives, Review No. 17-1147,
　*available at* https://oce.house.gov/sites/congressionalethics.house.gov/files/migrated/wp-
　content/uploads/2017/09/Referral-OCE-Rev.-17-1147-Bordallo_FINAL-FOR-
　REFERRAL.pdf ................................................................................................. 21

S. Rep. No. 85-2434, 1958 WL 3723 (1958) ............................................................. 9

**OFFICE OF LEGAL COUNSEL OPINIONS**

Applicability of the Emoluments Clause to Non-Gov't Members of ACUS,
     17 Op. O.L.C. 114 (1993) ...................................................................................... 21

Mem. Op. for the Chairman of ACUS from David J. Barron, Acting Assistant Attorney
     General, 2010 WL 2516024 (June 3, 2010), https://www.justice.gov/file/18411/download ... 21

**HISTORICAL MATERIALS**

Certificate for Lots Purchased in the District of Columbia,
     http://founders.archives.gov/documents/Washington/05-14-02-0074 ..................................... 20

Letter from George Washington to the Commissioners for District of
     Columbia (Mar. 14, 1794),
     http://founders.archives.gov/documents/Washington/ 05-15-02-0289 ................................... 20

3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption
     of the Federal Constitution* (2d ed. 1891) ................................................................ 15

*The Federalist* No. 73 (Jacob E. Cooke ed., 1961) ....................................................... 13

**SECONDARY AUTHORITIES**

16 Charles Alan Wright et al., Federal Practice and Procedure (3d ed. 2008) .................... 6, 7, 10

James Phillips & Sara White, *The Meaning of Emolument(s) in 18th-Century
     American English: A Corpus Linguistic Analysis of American English
     from 1760–1799*, 59 So. Texas L. Rev. __ (Forthcoming 2018),
     https://ssrn.com/abstract=3036938 .................................................................... 16, 17

John Mikhail, *The Definition of "Emolument" in English Language and Legal
     Dictionaries, 1523-1806* (July 13, 2017),
     https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2995693 ......................................... 15, 16

## INTRODUCTION

The President of United States, in his official capacity, respectfully seeks certification of this Court's March 28 and July 25, 2018 Orders, ECF Nos. 102, 124, for interlocutory appeal and a stay pending appeal.  The Orders involve "controlling question[s] of law as to which there is substantial ground for difference of opinion" and resolving them on immediate appeal "may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  As the Supreme Court has noted, a "district court[] should not hesitate to certify an interlocutory appeal" when its ruling "involves a new legal question or is of special consequence."  *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 110–11 (2009).  That is precisely the case here.  Indeed, it is hard to imagine a more compelling case warranting certification for interlocutory appeal.

Plaintiffs, the District of Columbia and the State of Maryland, brought this suit alleging that the President has violated the Foreign and Domestic Emoluments Clauses of the Constitution through his ownership interest in companies that conduct business with foreign, federal, and state instrumentalities.  On March 28, 2018, the Court found that Plaintiffs have standing to pursue their claims with respect to the operations of the Trump International Hotel in Washington, D.C. (the "Trump Hotel").  *See* March 28 Op., ECF No. 101.  On July 25, 2018, the Court further held that Plaintiffs have stated a claim under the Emoluments Clauses because the term "Emolument" expansively covers any non-*de minimis* profit, gain, or advantage the President receives through the Trump Hotel by virtue of government customers' patronage of the Hotel.  *See* July 25 Op., ECF No. 123.

The March 28 and July 25 Orders determined at least four controlling questions of law: (1) the correct interpretation of the term "Emolument" in the Emoluments Clauses and the scope of those Clauses; (2) whether the Plaintiffs have asserted interests addressed by the Clauses and have an equitable cause of action under them; (3) whether Plaintiffs have Article III standing to pursue their claims; and (4) whether this Court has jurisdiction to issue declaratory and injunctive relief against the President.  Resolution of any of these legal questions in the President's favor would either terminate this suit or at least substantially narrow the scope of this

litigation.  Specifically, that would be true if the Court of Appeals agrees with the President's view that to qualify as an "Emolument," the benefit must be a "profit arising from an office or employ."  And if Plaintiffs have not sufficiently alleged interests addressed by the Clauses or Article III standing, or if the Court cannot grant the requested relief to redress Plaintiffs' alleged injury, then this case would come to an end.

Moreover, there is a substantial ground for difference of opinion as to each of the four controlling questions.  Reasonable jurists could differ as to the proper interpretation of the Emoluments Clauses.  Not only is this Court the first court to interpret them, but the extensive analysis in the Court's 52-page opinion itself underscores the complexity of the interpretive task. The fact that the Court's interpretation arguably calls into doubt the conduct of public officials from President George Washington to President Barack Obama similarly confirms the complexity of the question.  Although the Court read into the Emoluments Clause a *de minimis* exception (or possibly an undue influence exception) to account for the anomalies arising from an expansive interpretation of the term "Emolument," that interpretation necessarily presents a significant ground for difference of opinion because the plain language of the Emoluments Clauses contains no such exception.

This Court is also the first to find that a business competitor of an officeholder has an equitable cause of action under the Emoluments Clauses to redress alleged competitive injury. Reasonable jurists already disagree as to whether business competitors are protected by the Clauses.  Judge George B. Daniels in the Southern District of New York found that the Clauses are designed instead to prevent foreign influence and ensure presidential independence and thus do not protect business competitors from "increased competition in the market for government business."  *See CREW v. Trump*, 276 F. Supp. 3d 174, 187–88 (S.D.N.Y. 2017), *appeal pending*, No. 18-474 (2d Cir. Feb. 16, 2018).  Although this Court concluded otherwise, this is a significant question of law that merits immediate resolution through interlocutory appeal.

Moreover, reasonable jurists disagree as to whether Plaintiffs can establish Article III standing by relying on an inference of competitive harm arising from alleged competition with

2

the Trump Hotel. This Court found that "economic logic" compels the conclusion that Plaintiffs are harmed by the competition. March 28 Op. at 24. Judge Daniels in the Southern District of New York concluded otherwise when considering the substantially similar theory of injury asserted by the hospitality plaintiffs in *CREW v. Trump*. 276 F. Supp. 3d at 188. By the same token, whether this Court can grant the requested equitable relief against the President in his official capacity also warrants interlocutory appeal, given the significant separation-of-powers concerns that would arise from such a grant of such relief. *See Doe v. Trump*, Civ. No. 17-1597, 2018 WL 3736435, at *2 (D.D.C. Aug. 6, 2018) (dismissing the President from suit challenging a presidential policy because "[s]ound separation-of-power principles counsel the Court against granting [declaratory and injunctive] relief against the President directly").

The practical consequences of the Court's March 28 and July 25 Orders cannot be overstated. Plaintiffs are now poised to attempt to conduct civil discovery against the sitting President, in his official capacity, which necessarily would be a distraction to the President's performance of his constitutional duties. Given the "long recognized . . . 'unique position in the constitutional scheme' that [the Office of the President] occupies," *Clinton v. Jones,* 520 U.S. 681, 698–99 (1997) (quoting *Nixon v. Fitzgerald,* 457 U.S. 731, 749 (1982)), the Supreme Court has taught that "the public interest requires that a coequal branch of Government afford Presidential confidentiality the greatest protection consistent with the fair administration of justice, and give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Cheney v. U.S. Dist. Ct. for D.C.,* 542 U.S. 367, 382 (2004) (citation omitted).

Indeed, just last year, a court of appeals recognized precisely these separation-of-powers considerations when, after certification by the district court, it permitted interlocutory appeal of an order denying the President's motion to dismiss a "state-law claim that present[ed] a novel question." *In re Trump*, 874 F.3d 948, 952 (6th Cir. 2017). The court observed that "[t]he practical and political consequences of such a case are readily apparent." *Id.* Noting also that the plaintiffs there had already attempted to take the President's deposition and request his tax

3

returns, among other things, the court concluded that a panel of that court "should ensure that the [state law] claim rests on a solid footing before permitting litigation to continue." *Id.* at 953; *see also In re United States*, 138 S. Ct. 443, 445 (2017) (vacating district court order requiring production of documents and directing district court to, among other things, consider whether to certify its ruling on the Government's threshold arguments). This case is even more compelling than *In re Trump* because of the importance and novelty of the constitutional claims and the fact that they are asserted against the sitting President in his official capacity. Accordingly, this Court should certify its March 28 and July 25 Orders for interlocutory appeal and stay proceedings pending appeal.

## BACKGROUND

Plaintiffs brought this suit on June 12, 2017, against the President, in his official capacity, for alleged violations of the Emoluments Clauses.[1] The President moved in his official capacity to dismiss pursuant to Rules 12(b)(1) and 12(b)(6), arguing that Plaintiffs (1) lack standing to bring their claims, (2) have no equitable cause of action under the Emoluments Clauses because, among other things, they have not alleged interests addressed by the Clauses, (3) have failed to state a claim under the Clauses, and (4) cannot obtain the requested equitable remedies against the President in his official capacity. Def.'s Mot. to Dismiss ("MTD"), ECF No. 21. The Court resolved the motion to dismiss in two separate orders.

The March 28 Order granted the President's motion in part and denied it in part, resolving only the jurisdictional and justiciability questions. The Court held that Plaintiffs have adequately alleged standing to pursue claims relating to "the involvement of the President with respect to the Trump International Hotel and its appurtenances and any and all operations of the Trump Organization with respect to the same" but that they could not challenge matters arising "outside the District of Columbia." March 28 Op. at 47. The Court also held that there are no

---

[1] Plaintiffs later amended the complaint to include an individual capacity claim against the President. ECF No. 95. The President's motion to dismiss that claim is pending before this Court. ECF No. 112.

constitutional or other "barrier[s] to its authority to grant either injunctive or declaratory relief" against the President and that the Plaintiffs are within the zone of interests of the Emoluments Clauses and could pursue an equitable cause of action under those Clauses. *Id.* at 34–36, 39–42.

The July 25 Order resolved the remainder of the President's motion to dismiss, holding that Plaintiffs have stated a claim under the Emoluments Clauses. The Court found that the term "Emolument" "extends to any profit, gain, or advantage, of more than *de minimis* value, received by [the President], directly or indirectly, from foreign, the federal, or domestic governments. This includes profits from private transactions, even those involving services given at fair market value." July 25 Op. at 47. In reaching that conclusion, the Court examined a variety of sources beyond the text of the relevant constitutional provisions (*id.* at 15–22): uses of the term "emolument" in various mid- to late-18th century dictionaries, treatises, and other writings, including those of Founding-era figures, *id.* at 22–30; the purpose of the Clauses, *id.* at 30–39; and written opinions by government offices interpreting the Clauses, along with the conduct of Executive Branch officials, *id.* at 39–45.

Construing the term "Emolument" as it did, the Court held that Plaintiffs have stated a claim for violation of the Foreign Emoluments Clause on the basis that "foreign governments or their instrumentalities have [allegedly] patronized the Trump International Hotel" and its restaurant and event spaces. *Id.* at 48–49. The Court also held Plaintiffs have stated a claim for violations of the Domestic Emoluments Clause by alleging (or by asserting in briefing) that (1) state governments have patronized the Trump Hotel, (2) the D.C. government has reduced the Hotel's tax bill, and (3) the General Services Administration conferred a benefit upon the President by its favorable interpretation of its lease with the entity that owns the Trump Hotel. *Id.* at 49–50.

**ARGUMENT**

## I.  THIS COURT SHOULD CERTIFY ITS MARCH 28 AND JULY 25 ORDERS FOR INTERLOCUTORY APPEAL

This Court may certify an order for interlocutory appeal if it involves "[1] a controlling question of law [2] as to which there is a substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  While the Fourth Circuit has cautioned that § 1292(b) should be strictly construed and sparingly used, *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017), the Supreme Court has explained that "district courts should not hesitate to certify an interlocutory appeal" when a decision "involves a new legal question or is of special consequence."  *Mohawk Indus., Inc*, 558 U.S. at 111.  One court of appeals also has "emphasize[d] the duty of the district court . . . to allow an immediate appeal to be taken when the statutory criteria are met."  *Ahrenholz v. Bd. of Trs.*, 219 F.3d 674, 677 (7th Cir. 2000).  And in determining whether to grant §1292(b) certification, the court should weigh, among other things, "[t]he difficulty and general importance of the question presented" and "the significance of the gains from reversal."  16 Charles Alan Wright et al., Federal Practice and Procedure § 3931 (3d ed. 2008).

As explained below, this Court's March 28 and July 25 Orders meet all three elements for § 1292(b) certification.  Moreover, those Orders present the kind of extraordinary circumstance that warrants interlocutory review.  The Court has interpreted two constitutional provisions—one governing all federal officials holding an "Office of Profit or Trust" and the other governing the President—never before interpreted by a federal court.[2]  It has done so in a case seeking equitable relief solely against a sitting President of the United States and in which Plaintiffs seek to subject the President to civil discovery in his official capacity.  Interlocutory appeal is not just appropriate, but manifestly and indisputably warranted in these circumstances.

---

[2] One district court opinion has addressed the temporal scope of the Domestic Emoluments Clause but not its meaning.  *See Griffin v. United States*, 935 F. Supp. 1, 5 (D.D.C. 1995) (holding that the Clause does not apply to Presidents after they leave office).

**A. The Court's March 28 and July 25 Orders Involve Controlling Questions of Law and Their Immediate Resolution May Materially Advance the Ultimate Termination of This Litigation.**

This Court's March 28 and July 25 Orders clearly present "controlling question[s] of law," the resolution of which "may materially advance the ultimate termination" of this case.  28 U.S.C. § 1292(b).  The Fourth Circuit has recognized that "it may be proper to conduct an interlocutory appeal review of an order presenting a 'pure question of law,' i.e., an abstract legal issue that the court of appeals can decide quickly and cleanly," *Agape Senior Cmty.*, 848 F.3d at 340 (citation omitted), such as "the meaning of a statutory or constitutional provision, regulation, or common law doctrine," *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 623 (D. Md. 2013).  In other words, "§ 1292(b) review may be appropriate" where the court "can rule on a pure, controlling question of law without having to delve beyond the surface of the record in order to determine the facts."  *Id.* 340–41.  "Among the categories of rulings that may be obviously suited for interlocutory appeal . . . are those rejecting . . . challenges to subject-matter jurisdiction [and] justiciability . . . ."  16 Fed. Prac. & Proc. Juris. § 3931 (footnotes omitted).

A question of law is "controlling" if its "resolution would be completely dispositive of the litigation, either as a legal or practical matter," *Butler v. DirectSAT USA, LLC*, 307 F.R.D. 445, 452 (D. Md. 2015),[3] or if it "control[s] many aspects of the proceedings in substantial respects, particularly the scope of the discovery," *In re Microsoft Corp. Antitrust Litig.*, 274 F. Supp. 2d 741, 742 (D. Md. 2003) (ruling on the preclusive effect of certain findings of fact entered in a separate case was controlling because it was "central" to the scope of proceedings going forward).  The analysis is substantially similar to determining whether an order's immediate appeal may materially advance the ultimate termination of the litigation.  The latter requirement is satisfied if the immediate appeal "could advance the litigation by ending it," *Coal.*

---

[3] *See also Fannin v. CSX Transp., Inc.*, 873 F.2d 1438, 1989 WL 42583, at *5 (4th Cir. 1989) (unpublished); *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990) (questions involving subject matter jurisdiction are appropriate for section 1292(b) review because "reversal of the district court's order would terminate the action").

*For Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, Civil No. CCB-06-2773, 2015 WL 4040425, at *7 (D. Md. June 29, 2015), even if "other possible outcomes exist," *Kennedy v. Villa St. Catherine, Inc*., No. PWG-09-3021 (WDQ), 2010 WL 9009364, at *4 (D. Md. June 16, 2010), or if it could "eliminate issues" for trial or "make discovery easier and less costly," *Lynn*, 953 F. Supp. 2d at 626.

Here, the Court's March 28 and July 25 Orders involve at least four controlling questions of law:  (1) the correct interpretation of the Emoluments Clauses; (2) whether the Plaintiffs have asserted interests addressed by the Clauses and have an equitable cause of action under those Clauses; (3) whether Plaintiffs have Article III standing to pursue their claims; and (4) whether this Court has jurisdiction to issue the requested declaratory and injunctive relief against the President.[4]  All four questions concern either the interpretation of constitutional provisions, justiciability doctrines, or the question of subject matter jurisdiction, precisely the kinds of "questions of law" appropriate for interlocutory review.  *See, e.g.*, *Montesa v. Schwartz*, 836 F.3d 176, 194 (2d Cir. 2016) (reviewing on § 1292(b) interlocutory appeal whether plaintiffs had standing to bring an Establishment Clause claim); *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 674–75 (2009) (holding that "[e]valuating the sufficiency of a complaint is not a '[f]act-based' question of law" but an "'abstract' legal question[]" appropriate for purposes of collateral-order review of denial of qualified-immunity defense; reviewing on interlocutory appeal whether plaintiffs' complaint stated a claim for purposeful and unlawful discrimination).

Moreover, immediate appeal of these issues may materially advance the termination of this litigation, either by ending it or, at the very least, by eliminating issues and substantially

---

[4] Once an order is certified pursuant to § 1292(b), the Court of Appeals "may address any issue fairly included within the certified order," *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996), after first determining that it has jurisdiction to proceed, *see Florida v. Thomas*, 532 U.S. 774, 777 (2001) ("[W]e must first consider whether we have jurisdiction to decide this case"); *Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 118 (4th Cir. 2004) ("We must first address jurisdiction.  Standing is a jurisdictional issue we must consider independently.").

narrowing this case.  That would be true if the Court of Appeals were to adopt the President's interpretation that an "Emolument" in the Emoluments Clauses is a "profit arising from an office or employ."  And if Plaintiffs are determined not to be relying on concerns addressed by the Emoluments Clauses and have no cause of action in equity under the Clauses, this case would come to an end, just as if the Court of Appeals were to find that this Court has no jurisdiction to issue the requested declaratory and injunctive relief against the President in his official capacity. Indeed, these threshold issues are especially well-suited for § 1292(b) certification because certification would serve the statutory purpose of seeking to conserve the parties' and the Court's resources.  *See* S. Rep. No. 85-2434, 1958 WL 3723 (1958) (citing these considerations in discussing example of a jurisdictional ruling, the certification of which would have avoided months of litigation had § 1292(b) certification been available); *Kennedy*, 2010 WL 9009364, at *1 (purpose behind § 1292(b) review is "to avoid unnecessary litigation").

The Supreme Court's recent decision in *In re United States*, 138 S. Ct. 443, is also instructive.  At issue there was the district court's order requiring the Government to produce an expansively construed "administrative record" that would have included sensitive materials, including materials from the White House.  The Supreme Court vacated the Ninth Circuit's denial of the Government's request for mandamus, holding that the district court should have first resolved the Government's two threshold arguments because either of those arguments, if accepted, likely would eliminate the need to review the administrative record.  *Id.* at 445. Moreover, the Supreme Court urged the district court to consider whether once entered, its ruling on the threshold issues should be certified for interlocutory appeal under § 1292(b).  *Id.*

The Supreme Court's guidance is unambiguous: in cases of significant constitutional import or extraordinary national significance, a district court should utilize the § 1292(b) mechanism, if appropriate, to avoid significant litigation burdens on litigants.  And indeed, the various district courts addressing the same issues presented in *In re United States* certified for

interlocutory appeal their denials of the Government's threshold arguments.[5]  *See also In re Trump*, 874 F.3d at 952 (granting permission for interlocutory appeal, where plaintiffs had sued the President in his personal capacity on a novel state law claim and had served discovery on him, because "[t]he practical and political consequences of such a case are readily apparent"); *Fernandez-Roque v. Smith*, 671 F.2d 426, 431 (11th Cir. 1982) (in case presenting "novel controversies" involving the rights of illegal aliens and "the scope of the constitutional powers of Congress and the President to conduct foreign affairs," court of appeals issued writ of mandamus requiring district court to first resolve the question of its jurisdiction and to certify that ruling for interlocutory appeal because the jurisdictional question is a "controlling question of national significance").

### B. There Is Substantial Ground for Difference of Opinion as to the Four Controlling Questions of Law Identified in This Motion.

Also satisfied is § 1292(b)'s requirement that a substantial ground for difference of opinion exists as to each of the four controlling legal questions identified here.  Courts have repeatedly recognized that a "novel issue" "on which fair-minded jurists might reach contradictory conclusions" "may be certified for interlocutory appeal without first awaiting development of contradictory precedent."  *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011); *see also In re Trump*, 874 F.3d at 952 (same); *Goodman v. Archbishop Curley High Sch., Inc.*, 195 F. Supp. 3d 767, 774 (D. Md. 2016) ("when a matter of first impression also had other grounds for difference of opinion, . . . district courts in this circuit have certified the issue for interlocutory appeal") (quoting *Kennedy*, 2010 WL 9009364, at *2); *Lynn*, 953 F. Supp. 2d at 624 (same).

Moreover, "'[t]he level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case."  *Coal. For Equity & Excellence*, 2015 WL 4040425, at *6 (quoting 16 Fed. Prac.

---

[5] *See, e.g.*, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 298 F. Supp. 3d 1304 (N.D. Cal. 2018); *Vidal v. Nielsen*, No. 16-cv-4756, 2018 WL 333515 (S.D.N.Y. Jan 18, 2018).

& Proc. Juris. § 3930); *see, e.g.*, *id.* (granting § 1292(b) certification in light of the "context of this extraordinarily important case," even though the court was "confident in the correctness" of its ruling); *Al Maqaleh v. Gates*, 620 F. Supp. 2d 51, 55 (D.D.C. 2009) (alien detainees in an active war zone overseas sought to invoke the Suspension Clause by petitioning for writ of habeas corpus; granting § 1292(b) certification given "the novelty of the issues" about which "courts could reasonably differ").  Here, the case presents the extraordinary circumstance of allegations that a sitting President is violating the Constitution, and a co-equal branch of the government is now poised to subject the Chief Executive to civil discovery in his official capacity.  This fact, by itself, counsels extreme restraint and warrants § 1292(b) certification.

### 1.  There is a substantial ground for difference of opinion as to the interpretation of the term "Emolument" in the Emoluments Clauses.

Even apart from the exceptional significance of the case, the interpretation of the Emoluments Clauses clearly presents an issue about which, at the very least, reasonable minds could differ.  The Court's 52-page opinion itself highlights the complexity of the interpretive task—whether "Emolument" in the context of the Emoluments Clauses has the broader definition of "profit, gain or advantage" as Plaintiffs contend or the narrower definition of "profit arising from office or employ" as the President contends.  Although the Court ultimately concluded that the broader definition applies, a reasonable jurist very well might analyze each category of materials differently to reach a contrary conclusion.  Indeed, the Court's own analysis of the text, history, and purpose of the Emoluments Clauses, and of non-judicial precedent indicates that none of the categories unequivocally supports the Court's interpretation.

### i.  Text of the Emoluments Clauses

In interpreting the Foreign Emoluments Clause, which provides that no officeholder shall "accept of *any* present, Emolument, Office, or Title, of *any kind whatever*, from any King, Prince or foreign State" without the consent of Congress, U.S. Const. art. I, § 9, cl. 8 (emphasis added), the Court found Plaintiffs' textual arguments more persuasive because, in the Court's view, the

italicized modifiers are intended to ensure that the Clause has a broad and expansive reach, and a narrow interpretation of the Clause would render the modifiers superfluous.  July 25 Op. at 18–19.  A reasonable jurist, however, very well could find that the modifiers do not by themselves determine that the broader rather than narrower definition applies but merely clarify that all instances of the narrower definition are included without exception.  *Cf. Small v. United States*, 544 U.S. 385, 388 (2005) (recognizing that the phrase "any sum," while a "catchall" phrase, does not "define what it catches") (quoting *Flora v. United States,* 362 U.S. 145, 149 (1960)); *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 629 (2018) (recognizing that whether the word "any" means the modified term "sweep[s] broadly" "necessarily depends on the statutory context," and holding that use of "any" before the phrase "effluent limitation or other limitation" "cannot expand the phrase 'other limitation' beyond those limitations" that it would otherwise be interpreted to cover in context).

For example, the modifiers would serve to ensure that every type of "Title" granted by a foreign government is included, but would not dictate the meaning of "Title" so as to include deeds to real property.  That is, the modifiers would not be rendered superfluous if the narrower definition of "Emolument" applies because they would serve the purpose of capturing all types of benefits a federal official receives from a foreign government arising from his official conduct or service rendered in a private employment-like relationship with the foreign government.  This is a reasonable reading because at the time of the Founding, federal officials were compensated in a number of different ways, including through fees for services rendered; commissions; shares of fines, penalties, and forfeitures; forage for horses; pay for servants; and, in some instances, salaries—collectively, emoluments.  *See* MTD at 31–32; Def.'s Reply in Supp. of Mot. to Dismiss ("MTD Reply") at 19, ECF No. 70; *see also United States v. Hartwell*, 73 U.S. 385, 393 (1867) (an office "embraces the ideas of tenure, duration, emolument, and duties").

Applying a similar reasoning, a court reasonably also could attribute the narrower definition to the term "Emolument" in the Domestic Emoluments Clause.  The Clause provides that the President shall receive "for his Services" a fixed "Compensation" during his tenure and

12

not "*any other* Emolument from the United States, or any of them."  U.S. Const. art. II, § 1, cl. 7 (emphasis added).  Although the Court found that the modifier "any other" firmly suggests that the broader definition applies, *see* July 25 Op. at 19, a reasonable jurist very well could find the modifier to merely distinguish the compensation fixed by Congress from any other compensation the President might receive from the Federal Government or state governments for his service as President.[6]  This understanding is reinforced by Alexander Hamilton's writing in *The Federalist* that under the Clause "[n]either the Union, nor any of its members, will be at liberty to give, nor will [the President] be at liberty to receive, any other emolument than that which may have been determined by the first act"—the "first act" being the statute setting the President's compensation when he takes office.  *The Federalist* No. 73, at 494 (Jacob E. Cooke ed., 1961). That is, "Emolument" and "Compensation" are intended to be read in parallel, with compensation (or the President's salary) being a species of emolument.

The Court's textual analysis also rejected the President's reliance on the Incompatibility Clause, which provides that no Member of Congress "shall, during the Time for which he was elected, be appointed to any civil Office . . . the Emoluments whereof shall have been encreased during such time."  U.S. Const. art. I, § 6, cl. 2.  The Court reasoned that "[i]f 'emolument' were always to be read as a synonym for salary or payment for official services rendered," it would have been unnecessary to use the word "whereof" to specify that "Emoluments" refers to

---

[6] The Court observed that even were it to qualify the term "Emolument" by the phrase "for his services," it would not help the President because payments received from domestic governments "in connection with the [Trump International] Hotel are in fact 'emoluments' to his salary as President."  July 25 Op. at 19–20.  With respect, the Court has misunderstood the definition of "profit arising from office or employ."  That definition necessarily depends on an official's *personal* services rendered pursuant to an office or employ—such as signing a treaty, implementing a policy, or serving as a consultant to a foreign or domestic government—given that the term's etymology is rooted in profits arising from labor.  *See* MTD at 35; MTD Reply at 19.  Coupled with the limitation in the Domestic Emoluments Clause that such personal services be rendered by the President in his capacity as such, the Clause would not cover business profits from the operation of the Trump Hotel by an entity in which the President simply has a financial interest.

compensation associated with particular civil offices—*i.e.*, those offices whose compensation was increased during the Senator's or Representative's tenure.  July 25 Op. at 20.

      With respect, the President does not contend that emolument is a synonym for compensation "for official services"; rather, he has argued that "emolument" refers to "'profit arising from an office or employ'—essentially, profit from labor."  MTD Reply at 16; *see also* MTD at 32–33 (discussing examples of private conduct covered by the President's definition).[7] Thus, the Incompatibility Clause uses the term "Emoluments whereof" to signify that its concern is with the compensation that Members of Congress might derive from particular civil offices. The Foreign Emoluments Clause, by contrast, has a broader ambit, restricting "Emoluments" that a federal officeholder may receive by virtue of his office or *any* employment or equivalent relationship with a foreign government.  *See* MTD Reply at 20.  That is, the Framers had a good reason to include the modifier "whereof" in the Incompatibility Clause and to omit it in the Foreign Emoluments Clause.

      Similarly, reasonable minds could differ as to whether the broader definition of "Emolument" subsumes the category "present" in the Foreign Emoluments Clause, rendering the latter redundant.  This Court found no redundancy, reasoning that "present" is something bestowed gratuitously, whereas "Emolument" would "reach private commercial transactions." July 25 Op. at 20–21.  But the relevant question is not whether one term has a broader reach than

---

[7] In the context of the Foreign Emoluments Clause, this means that the prohibition covers the "receipt of compensation for services rendered by an official in an official capacity *or* in an employment (or equivalent) relationship with a foreign government."  MTD at 31 (emphasis added).  Thus, benefits received by an officeholder in his private capacity would be prohibited if they are given in exchange for his or her personal service in an employment or employment-like relationship with the foreign government.  *Id.* at 32.  Opinions of the Office of Legal Counsel ("OLC") and Comptroller General are replete with examples of such benefits qualifying as "Emoluments."  *See id.* at 48 (citing examples of prohibited private conduct).  While the Domestic Emoluments Clause is, by contrast, limited to prohibiting benefits in exchange for the President's services as President, this limitation is *not* introduced by the term "Emolument" but by other words in that Clause.  *See* MTD Reply at 19–20 (Domestic Emoluments Clause's use of the term "Compensation" and the phrase "for his Services" indicates that the Clause is limited to compensation and other benefits arising from the President's service as President).

the other, but whether one is subsumed by the other.  Here, a gratuitous gift is undoubtedly a "gain" or "advantage."  The canon of avoiding surplusage, which applies with particular force to constitutional interpretation, *see* MTD at 36–37, would thus counsel in favor of the narrower definition of "Emolument," which is distinct from "present."

### ii.  The Original Public Meaning of the Term "Emolument"

There is also substantial ground for difference of opinion as to the original public meaning of the term "Emolument."  The Court excluded the narrower definition because it "was far less common" and "the Constitution was 'written to be understood by the voters.'" July 25 Op. at 22–23 (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 576 (2008)); *see also id.* at 26–30.  The method of constitutional interpretation identified in *Heller*, however, excludes only "secret or technical meanings that would not have been known to ordinary citizens in the founding generation," 554 U.S. at 577, which the narrower definition is not.  It was not a technical term of art, and no evidence suggests otherwise.  In fact, according to Professor John Mikhail, none of the ten *legal* dictionaries from 1523 to 1792 that he examined contained a definition for "emolument" at all.[8]  Moreover, the narrower definition was the first to be used in the English language, is closely related to the etymology of "emolument," and was commonly used to refer to all forms of compensation for a federal officeholder by the founding generation. *See* MTD at 31–32, 34–35.  George Mason, for example, used it during the Virginia ratifying convention when he warned about the possibility of the President receiving a pension from a foreign government.  *See* 3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* at 484 (2d ed. 1891) (Mason: "This very executive officer, may, by consent of Congress, receive a stated pension from European Potentates.  This is an idea not altogether new in America.  It is not many years ago—since the revolution—that a foreign power offered emoluments to persons holding offices under our government.").

---

[8] John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries, 1523-1806*, at App. B, Table 2 (July 13, 2017) [hereinafter *The Definition of "Emolument"*] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2995693.

Although the Court found it "highly remarkable" that "every English dictionary definition of 'emolument' from 1604 to 1806 relies on one or more of the elements" of the broader definition, July 25 Op. at 25 (quoting Mikhail, *The Definition of "Emolument"*, at A-6, A-7), the actual analysis by Professor Mikhail is not so sweeping.  Of the forty English language dictionaries examined by Professor Mikhail, three *do not* include the broader definition but contain *only* variations of "profit gotten by labor and cost,"[9] which is a close variation of the President's proposed definition.  In fact, a total of nine out of the forty dictionaries—nearly 25%, as opposed to the 8% posited by Plaintiffs—contain the President's proposed definition or its variation of "profit from labor."[10]  That statistic very well could lead a reasonable jurist to conclude that the President's proposed definition should not be excluded as a reasonable definition.  This is especially true when considering that the tallying of dictionaries necessarily does not account for context or frequency of usage, among others.  *See* MTD Reply at 17–18; *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir. 1945) ("one of the surest indexes of a mature and developed jurisprudence" is "not to make a fortress out of the dictionary") (Learned Hand, J.).

In contrast, an empirical analysis of how the word "emolument" was actually used by the Founding generation, in tens of thousands of texts from 1760 to 1799, found that where "the recipient of the emolument is an officer, regardless of the corpus [of documents analyzed], the narrower sense of *emolument* is the one overwhelmingly used."  MTD Reply at 17–18 (quoting James Phillips & Sara White, *The Meaning of Emolument(s) in 18th-Century American English: A Corpus Linguistic Analysis of American English from 1760–1799*, at 13, 59 So. Texas L. Rev. __ (Forthcoming 2018), https://ssrn.com/abstract=3036938).  This evidence is significant because the linguistic analysis was based in part on the writings of the Founders—specifically, George Washington, Benjamin Franklin, John Adams, Thomas Jefferson, Alexander Hamilton, and James Madison—from the National Archives' Founders Online collection.  *See id.* at 19–

---

[9] Mikhail, *The Definition of "Emolument"* at A-6, A-7 (dictionary definition numbers 4, 7 and 11).

[10] *Id.* at A-6, A-7, A-9 (dictionary definition numbers 4, 5, 7, 11, 15, 21, 23, 30, and 35).

21.[11]  Because the term "Emolument" is being used in the context of restricting the conduct of federal officeholders, the narrower definition very well could be the original public meaning. This is true even if other eighteenth century legal and economic treatises, correspondence, and other writings frequently used the broader meaning.  Again, "context matters."  *United States v. Shell*, 789 F.3d 335, 344 (4th Cir. 2015) (citing *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015)) ("In law as in life, [] the same words, placed in different contexts, sometimes mean different things.")).

### iii.  The Purpose of the Emoluments Clauses

Reasonable minds also could differ as to whether the anti-corruption purpose of the Emoluments Clauses compels the conclusion that the broader definition applies.  The Court found that it does because the narrower definition would reduce the Clauses to "little more than a prohibition of bribery," which is "already being addressed elsewhere in the Constitution."  July 25 Op. at 36.  The Court reasoned that bribery is a "very difficult crime to prove," and thus, the Framers "made it simple"—"[b]an the offerings altogether (unless in the foreign context at least, Congress sees fit to approve them)."  *Id.* at 36–37.  But the President's interpretation is broader than bribery; it does not require an "intent to influence any official act" or a showing that the official has been "influenced" in the performance of his official act, 18 U.S.C. § 201(b)(1), (2). Nor is it limited to official conduct in the context of the Foreign Emoluments Clause, as discussed before.  Given this interpretation, a reasonable jurist very well might find the President's proposed definition persuasive because it indisputably furthers the Clauses' purpose of preventing foreign influence and ensuring presidential independence.  At a minimum, the Court's misunderstanding of the President's position in this regard again highlights the complexity of the interpretive task here.

---

[11] The other two sources are (1) Evans Early American Imprint Series, which consists of nearly two-thirds of all books, pamphlets, and broadsides known to have been printed in this country from 1640 to 1821; and (2) Hein Online, which consists of legal materials.  Phillips & White, *The Meaning of Emolument(s) in 18th-Century American English*, at 19–21.

Citing the Clauses' anti-corruption purpose, the Court further rejected the President's argument that a broad reading of the Emoluments Clauses would lead to absurd consequences, including calling into doubt the prior conduct of certain officeholders. The President had cited, among others, former Commerce Secretary Penny Pritzker's ownership of a large quantity of stock in the Hyatt Hotels Corporation (which has establishments worldwide); Vice President Nelson A. Rockefeller's stock holdings in major corporations that conducted business globally; President Barack Obama's sale of books internationally; and retired military personnel's receipt of licenses, permits, and other benefits from foreign governments while living abroad. *See* MTD at 52–53. As for the Domestic Emoluments Clause, the President cited the examples of President Washington's purchase of public land from the Federal Government; President Reagan's receipt of retirement benefits from the State of California; and President Obama's investment in Treasury bills and notes. *Id.* at 43–44, 51 n.68.

The Court reasoned that the Framers were not concerned with "*de minimis* situations" that cannot "be reasonably construed as having the potential to unduly influence a public official," whereas profit from foreign governments' patronage of the Trump Hotel would not be *de minimis* and would "most definitively raise[] the potential for undue influence." July 25 Op. at 38–39. The Court also noted another possible exception to the Domestic Emoluments Clause—the retirement benefits President Reagan received from the State of California—were vested prior to taking office and thus not "the type that could potentially influence the President." July 25 Op. at 45; *see also id.* at 46.[12]

Aside from whether the President's examples of absurd consequences involve only *de minimis* benefits—with which the President respectfully disagrees—there is a substantial ground for difference of opinion as to whether the Emoluments Clauses allow a *de minimis* or "undue influence" exception. Plaintiffs' preferred dictionary definition has no carve-out for *de minimis*

---

[12] Under the President's interpretation of the Domestic Emoluments Clause, in contrast, the retirement benefits would not be "Emoluments" because they were not received in exchange for President Reagan's service as President. MTD Reply at 24.

benefits, nor does the plain language of the Emoluments Clauses, which unambiguously imposes blanket prohibitions, as the Court recognized elsewhere in the Order. *See, e.g.*, *id.* at 37 (noting that the Clauses "[b]an the offerings altogether (unless, in the foreign context at least, Congress sees fit to approve them)"); *id.* at 18–19 (finding that the modifiers "any" and "any kind whatever" are meant to give the Foreign Emoluments Clause the broadest reach). This reading is reinforced by the fact that Congress apparently saw the need to provide advance consent to federal officials' acceptance of *de minimis* gifts: "gift[s] of minimal value tendered and received as a souvenir or mark of courtesy." 5 U.S.C. § 7342(c)(1)(A). Similarly, whether a particular benefit has the potential for undue influence also would seem to be irrelevant given the blanket ban. To be sure, the Court reasoned that the fact that no one ever challenged the past conduct of the identified government officials "in no way establishes that Plaintiffs' interpretation of the term 'emolument' in the present case is erroneous." July 25 Op. at 39 n.36. In the Court's view, it is possible that the cited government officials could have been violating the Emoluments Clauses. *See id.* But when one of two possible interpretations would call into doubt the constitutionality of such conduct and the other would not, a reasonable jurist very well might choose the interpretation that would not.

At a minimum, the Supreme Court has taught that when interpreting the Constitution, the conduct of the Founders should be given "significant weight." *See* MTD at 30, 44. This is especially true with respect to the example of President Washington's purchase of several lots of federal land in a public sale from the Federal Government in September 1793, which public sale was conducted by the Commissioners of the District of Columbia and authorized by Washington himself. *See* MTD at 43–44. The Court reasoned that the "surrounding facts" of the transaction are "seriously incomplete (e.g. What sort of public auction was held? How was it advertised? How many bidders were involved?)." July 25 Op. at 46. However, under the Court's interpretation of the Domestic Emoluments Clause, none of those questions would be relevant— a real property transaction clearly fits within Plaintiffs' broader definition. And even accepting a *de minimis* exception, the value for the land Washington purchased was not *de minimis*; he paid

"one thousand and sixty six dollars & two thirds of a Dollar" for the land.  Certificate for Lots Purchased in the District of Columbia, http://founders.archives.gov/documents/Washington/05-14-02-0074; *see* MTD at 12 n.6.

The Court also reasoned that "Washington later made clear that he was 'ready to relinquish' the property if necessary, which itself calls into question the actual relevance of this transaction."  July 25 Op. at 46 (quoting Letter from George Washington to the Commissioners for District of Columbia (Mar. 14, 1794), http://founders.archives.gov/documents/Washington/ 05-15-02-0289, cited in MTD at 43 n.55).  But the Court's reasoning is premised on a factual error introduced by Plaintiffs.  *See* Pl.'s Opp'n at 45, ECF No. 46.  Washington did not offer to relinquish the property he purchased in September 1793, which potentially would have indicated his concern about the propriety of his purchase.  Rather, in the cited March 14, 1794 letter to the Commissioners of the District of Columbia, he was merely inquiring about his prospects of purchasing more lots.  Although he indicated he was "as ready to relinquish, as [he] was to imbibe the *idea*, of this purchase," he expressed no concern about the propriety of the proposed purchase.

To the contrary, Washington's letter evinces his belief that such purchase would be proper because he stood on the same footing as every other purchaser.  *See* Washington's March 14, 1794 Letter (stating that while it "certainly would be convenient for [him] to know if there is a probability of [him] being accommodated," "[he] had no desire at that time [when purchasing the lots in September 1793], nor ha[s] [he] any now, to stand on a different footing from every other purchaser").  This historical example is significant not only because it involved the conduct of President Washington, but also because one of the three D.C. Commissioners had attended the Constitutional Convention, and the other two had voted in the state ratification conventions.  *See* MTD at 43–44.  And yet, no concern was raised about a possible violation of the Domestic Emoluments Clause.  Reasonable jurists thus could disagree about whether this example should tip the scale in favor of the narrower interpretation of "Emolument."

### iv.  Executive Branch and Other Precedent

Finally, the body of government opinions on the Emoluments Clauses does not preclude the President's interpretation.  The Court observed that "the President [did] not cite[] a single Government opinion that conclusively supports his position."  July 25 Op. at 42.  But with only two possible exceptions, the published government opinions simply did not address the situation at hand—accordingly, they would not support Plaintiffs' interpretation, either.  As the President has explained, in every published OLC or Comptroller General opinion in which proposed conduct was determined to involve prohibited emoluments, the facts underlying those opinions already involved an employment or employment-like relationship between the federal officeholder and the foreign government—which, under the President's reading, is the predicate to having an emoluments violation.  MTD at 48; MTD Reply at 22–23.  As for the two possible exceptions, one involved the unique circumstance of services provided by law partners (which would have involved shared duty of loyalty to the firm's clients),[13] and the other, a report by the House ethics office, purported to interpret the House Ethics Manual's definition of "Emolument" that is actually consistent with the President's interpretation; the House's definition is "any 'profit, gain, or compensation *for services rendered*.'" [14]  These two government opinions thus at most show that there is a significant ground for difference of opinion as to the proper definition of the term "Emolument" in the Emoluments Clauses.

---

[13] *See Applicability of the Emoluments Clause to Non-Gov't Members of ACUS*, 17 Op. O.L.C. 114, 119 (1993) (non-paid, non-government members of the Administrative Conference of the United States ("ACUS") are prohibited from receiving a distribution from their law partnerships), *modified by* Mem. Op. for the Chairman of ACUS from David J. Barron, Acting Assistant Attorney General, 2010 WL 2516024 (June 3, 2010), https://www.justice.gov/file/ 18411/download (ACUS members are *not* subject to the Foreign Emoluments Clause because they do not hold "Office[s] of Profit or Trust").

[14] Office of Congressional Ethics, U.S. House of Representatives, Review No. 17-1147, at 12 (emphasis added), *available at* https://oce.house.gov/sites/congressionalethics.house.gov/files/migrated/wp-content/uploads/2017/09/Referral-OCE-Rev.-17-1147-Bordallo_FINAL-FOR-REFERRAL.pdf.

**2.   There is a substantial ground for difference of opinion as to whether Plaintiffs' economic interests are addressed by the Emoluments Clauses.**

Whether the Emoluments Clauses were intended to protect against competitive injuries to particular members of the public and whether a court may recognize an equitable cause of action by a private person to enforce the Clauses similarly presents novel questions of first impression "on which fair-minded jurists might reach contradictory conclusions." *Reese*, 643 F.3d at 688. This Court is the first ever to permit a party to pursue relief under the Clauses.  It reasoned that because "the Clauses clearly were and are meant to protect all Americans," and because Plaintiffs are "a subset of Americans" who allegedly have been injured by the President's purported violations of the Clauses, they are within the Clauses' zone of interests.  March 28 Op. at 41.  The Court also reasoned that under the President's interpretation, no one (save for Congress) would be able to enforce the Emoluments Clauses.  *Id.* at 41–42.

On the proper scope of the Clauses' protection, reasonable jurists have *already* disagreed. Judge Daniels in the Southern District of New York concluded that business competitors are not within the zone of interests of the Emoluments Clauses and thus, cannot invoke their protection. *CREW v. Trump*, 276 F. Supp. 3d at 187–88.  Indeed, consistent with the history of the Emoluments Clauses, the parties' briefing on the dismissal motion as well as this Court's July 25 Order all recognize the anti-corruption purpose of the Clauses.  *See, e.g.*, July 25 Op. at 33–36. All agree that the Clauses are intended to guard against the risk that federal officeholders might be influenced by foreign or domestic governments in their decision-making as officials.  And none points to any concern about protecting against competition from an officeholder's business. That is, nothing unambiguously precludes the President's position.

As for the Court's concern that under the President's interpretation no one (except for Congress) could seek to enforce the Emoluments Clauses, the Supreme Court has already explained long ago that: "Our system of government leaves many crucial decisions to the political processes.  The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservists Comm. to Stop the*

*War*, 418 U.S. 208, 227 (1974); *see also United States v. Richardson*, 418 U.S. 166, 179 (1974)

("the absence of any particular individual or class to litigate [constitutional claims] gives support

to the argument that the subject matter is committed to the surveillance of Congress, and

ultimately to the political process").  Thus, the Court's reasoning in this regard is also subject to

reasonable doubt.

### 3. A substantial ground for difference of opinion exists as to whether Plaintiffs have sufficiently alleged Article III standing.

Whether Plaintiffs have sufficiently alleged Article III standing to pursue their claims

under the Emoluments Clauses is another threshold legal issue subject to significant

disagreement.  For example, the Court found that Plaintiffs have "plausibly alleged they have

been subjected to increased competition as a result of the President's purported violations,"

March 28 Op. at 32, and concluded based on purportedly "fairly straightforward economic logic,

that the properties with which Plaintiffs do have a proprietary interest in are in fact

disadvantaged" by the President's ownership interest in the Trump Hotel, *id.* at 24.

In considering substantially similar allegations of competitive injury, Judge Daniels in the

Southern District of New York came to a different conclusion.  He found that the connection

between the hospitality plaintiffs' alleged competitive injury (arising from competition with the

Trump Hotel in New York) and the President's actions was "too tenuous to satisfy Article III's

causation requirement," because, among other things, "there are a number of reasons why

patrons may choose to visit Defendant's hotels and restaurants."  *CREW v. Trump*, 276 F. Supp.

3d at 186.  He further found that "[e]ven if it were determined that the Defendant personally

accepting any income from the Trump Organization's business with foreign and domestic

governments was a violation of the Emoluments Clauses, it is entirely 'speculative' . . . what

effect, if any, an injunction would have on the competition Plaintiffs claim they face."  *Id.*

Indeed, whether the Court could infer Article III injury-in-fact based on "economic logic"

in the context of hospitality competition is an issue about which reasonable minds could differ.

Among other things, the Fourth Circuit has never expressly endorsed the competitor standing

23

doctrine.[15]  As for the out-of-circuit courts that do recognize some form of the doctrine, none has applied it in the context of a diffused market in which competition depends on a large number of variables, as is the case here.  *See* MTD Reply at 9–14.  There is also a substantial risk that application of the doctrine here would swallow the Article III standing requirement that an injury-in-fact must be non-speculative and "certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted); *cf. Ashcroft*, 556 U.S. at 671–72, 679 (reviewing denial of motion to dismiss on qualified-immunity grounds where plaintiffs' complaint pled no more than "the *mere possibility* of misconduct," which was insufficient to state a claim) (emphasis added).

### 4. A substantial ground for difference of opinion exists as to the availability of the requested equitable relief against the President in his official capacity.

Finally, whether this Court has jurisdiction to issue the requested equitable relief against the President in his official capacity also presents a substantial question about which reasonable jurists could differ.  Supreme Court precedent holds that equitable relief against a sitting President is "extraordinary," and that federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties."  *Mississippi v. Johnson*, 71 U.S. 475, 501 (1867); *see also Franklin v. Massachusetts*, 505 U.S. 788, 802–803, 806 (1992) (plurality op.); MTD at 54.  Even as to equitable relief concerning the exercise of ministerial duties—which is not at issue here—at least one appellate court has recognized that it has "never attempted to exercise power to order the President to perform" such a duty and the separation-of-powers concerns that would be raised from such an order make it "painfully obvious" why courts should be "hesitant to grant such relief."  *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).  And in a decision that has since been rendered moot, the Fourth Circuit held that a district court had "erred in issuing an injunction against the President himself."  *Int'l Refugee Assistance Project v.*

---

[15] The only exception is a passing reference in a footnote in *Zeneca, Inc. v. Shalala*, 213 F.3d 161, 170 n.10 (4th Cir. 2000), which involved the government's regulation of new market entrants—a scenario that far more readily permits an inference of certainly impending injury than is shown here.

*Trump*, 857 F.3d 557, 605 (4th Cir. 2017), *vacated as moot*, 138 S. Ct. 353 (Oct. 10, 2017).

Relying on *Mississippi v. Johnson* and its progeny, the district court for the District of Columbia

also recently dismissed the President from a suit challenging a presidential policy because

"[s]ound separation-of-powers principles counsel the Court against granting [declaratory and

injunctive] relief against the President directly." *Doe v. Trump*, 2018 WL 3736435 at *2.

Indeed, in the 150 years since *Mississippi v. Johnson*, no court has issued permanent injunctive

relief against a President in his official capacity where he was the sole defendant.

Although this Court was unpersuaded by these considerations, *see* March 28 Op. at 36, its

conclusion that there is no "barrier to its authority to grant either injunctive or declaratory relief"

against the President is indisputably in significant tension with the cited precedent. *See id.*  In

any event, any equitable relief granted by this Court against the President in his official capacity

necessarily would implicate separation-of-powers concerns, requiring judicial restraint. *See*

*Cheney*, 542 U.S. at 381–82 (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (CC Va. 1807)

(No. 14,694) (Marshall, C.J.)) ("In no case . . . would a court be required to proceed against the

president as against an ordinary individual.").  That consideration alone warrants certification for

interlocutory review. *See*, *e.g.*, *In re Trump*, 874 F.3d at 953; *In re Miedzianowski*, 735 F.3d

383, 384 (6th Cir. 2013) (§ 1292(b) certification proper in light of separation-of-powers

considerations); *Reese*, 643 F.3d at 688; *Klinghoffer*, 921 F.2d at 25.

## II.  IF THE COURT GRANTS § 1292(b) CERTIFICATION, IT SHOULD ALSO STAY PROCEEDINGS PENDING RESOLUTION OF THE INTERLOCUTORY APPEAL.

If this Court grants certification for interlocutory appeal, the President respectfully

requests that the Court stay all proceedings pending resolution of the interlocutory appeal.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the

disposition of the causes on its docket with the economy of time and effort for itself, for counsel,

and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Long v. Robinson*, 432 F.2d

977, 979 (4th Cir. 1970) (applying a four-factor test); *see also Nken v. Holder*, 556 U.S. 418, 434

(2009) (same).  "Especially in cases of extraordinary public moment," the opposing party "may

be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted." *Landis*, 299 U.S. at 256.  Thus, for example, the "high respect that is owed to the office of the [President]" is a "matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery," and which may justify issuance of a stay pending appeal in a case to which a sitting President is a party.  *Jones*, 520 U.S. at 706–07.

As discussed before, not only does this case raise substantial legal issues about which reasonable minds could differ, but it also presents the unprecedented circumstance of civil discovery against the sitting President of the United States in his official capacity.  For the same reasons that § 1292(b) certification is appropriate because of significant separation-of-powers concerns that would arise from civil discovery against the President, a stay is proper pending the interlocutory appeal.  As the Supreme Court has repeatedly recognized, "[e]ven when a branch does not arrogate power to itself . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties."  *Loving v. United States*, 517 U.S. 748, 757 (1996); *see also Jones*, 520 U.S. at 701.  A stay would avoid implicating significant separation-of-powers concerns during the pendency of any interlocutory appeal.  *Cheney*, 542 U.S. at 389–90 (granting writ of mandamus and vacating district court orders that permitted discovery against the Vice President and other senior officials in the Executive Branch; stating that "'occasion[s] for constitutional confrontation between the two branches' should be avoided whenever possible" (quoting *United States v. Nixon*, 418 U.S. 683, 692 (1974))); *cf. Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

Moreover, the public interest is decidedly in favor of a stay because any discovery would necessarily be a distraction to the President's performance of his constitutional duties.  As Justice Jackson observed long ago, the Presidency concentrates executive authority "in a single head in whose choice the whole Nation has a part, making him the focus of public hopes and

26

expectations. In drama, magnitude and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring). Proceeding with discovery in this case while the controlling questions are being decided on interlocutory appeal would unnecessarily distract the Executive in a way that could be avoided if the President prevails on appeal. In contrast, Plaintiffs will not be prejudiced by a stay. While the Court found that Plaintiffs have standing to pursue their claims against the President, their injury is inferred from the competitor standing doctrine, not an actual showing of economic loss. Indeed, Plaintiffs quite conspicuously have not sought preliminary injunctive relief, despite the purported harm they face. Not only does their failure to seek preliminary injunctive relief underscore the speculative nature of their alleged harm, but it forecloses any argument that they would be substantially injured or irreparably harmed by a brief delay pending interlocutory appeal.

**CONCLUSION**

For these reasons, the Court should certify its March 28 and July 25, 2018 Orders for interlocutory appeal and stay proceedings pending resolution of the interlocutory appeal.

Dated: August 17, 2018     Respectfully Submitted:

         CHAD A. READLER
         Acting Assistant Attorney General

         BRETT A. SHUMATE
         Deputy Assistant Attorney General

         JENNIFER D. RICKETTS
         Director, Federal Programs Branch

         ANTHONY J. COPPOLINO
         Deputy Director

         */s/ Jean Lin*
         JEAN LIN
         Special Counsel
         JAMES R. POWERS
         Trial Attorney
         U.S. Department of Justice

27

Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20530
Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2018, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *Jean Lin*
JEAN LIN