## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| THE DISTRICT OF COLUMBIA, *et al.*,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States and in his individual capacity,<br><br>    *Defendants*. | No. 8:17-cv-1596-PJM |

## ANSWER OF THE PRESIDENT, IN HIS OFFICIAL CAPACITY

Defendant Donald J. Trump, in his official capacity as President of the United States, by and through his undersigned counsel, hereby answers Plaintiffs' Amended Complaint, ECF No. 95, as follows:

## I.

## NATURE OF THE ACTION

1.     This is an action against Donald J. Trump in his official capacity as President of the United States and in his individual capacity. The case involves unprecedented constitutional violations by the President that have injured and threaten to cause continuing injury to the District of Columbia ("the District") and the State of Maryland ("Maryland") and their respective residents, including direct injury to the plaintiffs' interests in properties located in the District, in Prince George's County, Maryland, and in Montgomery County, Maryland.

**Response:**  The first sentence of Paragraph 1 constitutes Plaintiffs' characterization of their Amended Complaint, to which no response is required, but to

the extent a response may be deemed required, it is admitted that Plaintiffs seek to bring this action against the President in both his official and individual capacities.  The remainder of this paragraph consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, the allegations are denied, except to state that the Defendant lacks knowledge or information sufficient to form a belief about the truth of the factual basis for the allegations in Paragraph 1 concerning injuries to Plaintiffs and their respective residents.

2.      The lawsuit alleges violations by the President of two distinct yet related provisions of the U.S. Constitution that seek to make certain that he faithfully serves the American people, free from compromising financial entanglements with foreign and domestic governments and officials. The first provision, the Foreign Emoluments Clause, prohibits any "Person holding any Office of Profit or Trust" from accepting "any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State," absent "the Consent of the Congress." U.S. Const. art. I, § 9, cl. 8. The second, the Domestic Emoluments Clause, entitles the President to receive a salary while in office and forbids him from "receiv[ing] within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. Together, these provisions help ensure that the President serves with undivided loyalty to the American people, and the American people only. Our republican form of government demands no less.

**Response:**  The first sentence of Paragraph 2 constitutes Plaintiffs' characterization of their Amended Complaint, to which no response is required.  The second and third sentences contain Plaintiffs' characterizations of the Foreign and Domestic Emoluments Clauses to which no response is required.  The remainder of Paragraph 2 consists of legal conclusions and legal arguments, to which no response is required.

3.      Vested by the Constitution with extraordinary power, the President is bound by oath to "faithfully execute" his office and "preserve, protect and defend the Constitution of the United States." Since 1789, each President, regardless of temperament or ideology, has sought, in his own way, to honor that solemn vow. Yet fundamental to a President's fidelity to that oath is the Constitution's demand that the President, as the highest officeholder in the land, disentangle his private finances from those of domestic and foreign powers. Never before has a President acted with such disregard for this constitutional prescription.

**Response:**  The first three sentences of Paragraph 3 consist of legal conclusions and legal arguments, to which no response is required.  The fourth sentence of Paragraph 3 also consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

4.      President Trump's continued ownership interest in a global business empire, which renders him deeply enmeshed with a legion of foreign and domestic government actors, violates the Constitution and calls into question the rule of law and the integrity of the country's political system. Whatever the sincerity of the persons involved, foreign and domestic officials are put in the position of considering whether offering benefits to businesses associated with the President is important to maintaining goodwill. And irrespective of whether such benefits affect the President's decision-making or shift his foreign or domestic policy, uncertainty about whether the President is acting in the best interests of the American people, or rather for his own ends or personal enrichment, inflicts lasting harm on our democracy. The Framers of the Constitution foresaw that possibility, and acted to prevent that harm.

**Response:**  Paragraph 4 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.  Moreover, except with respect to the Trump International Hotel in Washington,

D.C., this paragraph consists of allegations concerning claims that were dismissed by the Court's March 28, 2018 Order, and accordingly, no response to those allegations is required.

5.      The Emoluments Clauses are two critical, closely related anti-corruption provisions aimed at ensuring that the President faithfully serves *the people*, free from the distorting or compromising effects of financial inducements provided by foreign nations, their leaders, individual states in the Union, Congress, or other parts of the federal government. They ensure that Americans do not have to guess whether a President who orders their sons and daughters to die in foreign lands acts out of concern for his private business interests; they do not have to wonder if they lost their job due to trade negotiations in which the President has a personal stake; and they never have to question whether the President can sit across the bargaining table from foreign leaders and faithfully represent the world's most powerful democracy, unencumbered by fear of harming his own companies.

**Response:**  Paragraph 5 consists of legal conclusions and legal arguments, to which no response is required.

6.      With respect to the Foreign Emoluments Clause, the Framers were aware that entanglements between American officials and foreign powers could pose a creeping, insidious threat to the Republic. The theory underlying the clause, informed by English history and by the Framers' experience, is that a federal officeholder who receives something of value from a foreign government can be imperceptibly induced to compromise what the Constitution insists be his only loyalty: the best interest of the United States of America. And rather than address such corruption by punishing it after the fact, the Framers concluded that the best solution was to write a strict prophylactic rule into the Constitution itself, thereby guaranteeing that improper incentives never undo this important safeguard of American autonomy. Applied to President Trump's

diverse dealings, the text and purpose of the clause speak as one: absent the consent of Congress, private enrichment through the receipt of benefits from foreign governments is prohibited.

**Response:**  Paragraph 6 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

7.      The Domestic Emoluments Clause was also designed to protect the government from corruption. The Founders intended the clause to serve as a guarantee that Congress, other parts of the federal government, and the states "can neither weaken [the President's] fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice." The Framers further intended the clause to protect against self-dealing by ensuring that the President's service is remunerated only by the compensation fixed in advance by Congress.

**Response:**  Paragraph 7 consists of legal conclusions and legal arguments, to which no response is required.

8.      Relatedly, and in ways particularly important to the plaintiffs, the Domestic Emoluments Clause shields the states and the District of Columbia from undue pressure to provide emoluments to the President, and protects them from reprisal for any refusal to do so. In a similar vein, the provision safeguards the states and the District from unfair advantages certain states may enjoy from opportunities to curry favor from the President by providing emoluments that other states lack.

**Response:**  Paragraph 8 consists of legal conclusions and legal arguments, to which no response is required.

9.      President Trump, acting through companies he owns or controls, has violated both the Foreign Emoluments Clause and the Domestic Emoluments Clause by receiving millions of dollars in payments, benefits, and other valuable consideration

from foreign governments and persons acting on their behalf, as well as federal agencies and state governments. His repeated, ongoing violations include remuneration derived from: (a) leases of Trump properties held by foreign-government-owned entities; (b) purchase and ownership of condominiums in Trump properties by foreign governments or foreign-government-controlled entities; (c) other property interests or business dealings tied to foreign governments; (d) hotel accommodations, restaurant purchases, the use of venues for events, and purchases of other services and goods by foreign governments and diplomats at hotels, restaurants, and other domestic and international properties owned, operated, or licensed by President Trump; (e) continuation of the General Services Administration lease for President Trump's Washington, D.C. hotel despite his breach of the lease's terms, and potential provision of federal tax credits in connection with the same property; and (f) payments from foreign-government-owned broadcasters related to rebroadcasts and foreign versions of the television program "The Apprentice" and its spinoffs. Moreover, President Trump, by asserting that he will maintain the interests at issue, is poised to engage in similar constitutional violations for the duration of his presidency.

**Response:**  Paragraph 9 consists of legal conclusions and legal arguments to which no response is required, but to the extent a response may be deemed required, is denied.  Moreover, except with respect to the Trump International Hotel in Washington, D.C., this paragraph consists of allegations concerning claims that were dismissed by the Court's March 28, 2018 Order, and accordingly, no response to those allegations is required.

10.      These present and continuing violations of the Constitution's anti-corruption protections threaten the free and independent self-governance at the core of our democracy. The President is making decisions every day with profound and far-reaching effects on American life, from determining who can travel into the country to

deciding whether the United States will abandon global efforts to combat climate change; from proposing budgets to overseeing the federal workforce; from evaluating who will pay more in taxes to choosing how people will access health care. Yet Americans are left uncertain as to whether these decisions, with their sweeping impact on foreign and domestic policy, are driven solely by unyielding loyalty to the country's best interests, or rather are affected by self-interested motivations grounded in the international and domestic business dealings in which President Trump's personal fortune is at stake.

**Response:**  Paragraph 10 consists of legal conclusions and legal arguments to which no response is required, but to the extent a response may be deemed required, is denied.

11.     The President's violations of the Emoluments Clauses undermine the trust the American people are entitled to have in their government. It is fundamental to our system of self-governance that our duly elected Presidents and the governments over which they preside will always act in singular pursuit of our liberty, security, health, and well-being. President Trump's myriad international and domestic business entanglements make him vulnerable to corrupt influence and deprive the American people of trust in their chief executive's undivided loyalty.

**Response:**  Paragraph 11 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

12.     The District and Maryland have compelling interests in ensuring that the Foreign and Domestic Emoluments Clauses are enforced and protect their residents as designed. The President's disregard for these constitutional constraints has resulted in significant and ongoing harm to the District and to Maryland.

**Response:**  Paragraph 12 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

13.     The District and Maryland have other sovereign, quasi-sovereign, and proprietary interests in preventing the defendant's violations of the Emoluments Clauses. The defendant, his organization, and its affiliates have received presents or emoluments from foreign states or instrumentalities and federal agencies, and state and local governments in the form of payments to the defendant's hotels, restaurants, and other properties. The defendant has used his position as President to boost this patronage of his enterprises, and foreign diplomats and other public officials have made clear that the defendant's position as President increases the likelihood that they will frequent his properties and businesses.

**Response:**  The first sentence of Paragraph 13 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.  Except with respect to the Trump International Hotel in Washington, D.C., the allegations in the second and third sentences of Paragraph 13 concern claims dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to those allegations is required.  Otherwise, the second and third sentences of Paragraph 13 consist of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, are denied, except to state that the Donald J. Trump Revocable Trust indirectly owns all of the President's financial interest in the Hotel, that the trustees (Donald J. Trump, Jr. and Allen Weisselberg), in consultation with the Chairman of the Advisory Board of that Trust (Eric. F. Trump), control the Trust assets and their distribution, and that the President is the beneficiary of the Trust.  Defendant lacks knowledge or information sufficient to form a belief about

the truth of the third sentence of Paragraph 13 concerning what "foreign diplomats and other public officials have made clear."

14.     The defendant's ongoing constitutional violations harm the sovereign and quasi-sovereign interests of the District and Maryland. Maryland has an interest in preserving its role as a separate sovereign and securing observance of the terms under which it participates in the federal system. That interest is harmed by the defendant's violations of both Emoluments Clauses, but it carries particular force with respect to the Domestic Emoluments Clause, which exists (at least in part) for the protection of "the United States and any of them." Indeed, as government entities with authority to tax and regulate businesses and real estate, the District and Maryland are harmed by perceived and/or actual pressure to grant special treatment to the defendant and his extensive affiliated enterprises, or else be placed at a disadvantage vis-à-vis other states and governments that have granted or will grant such special treatment. In addition, the District and Maryland have an interest in protecting their economies and their residents, who, as the defendant's local competitors, are injured by decreased business, wages, and tips resulting from economic and commercial activity diverted to the defendant and his business enterprises due to his ongoing constitutional violations. Maryland is itself further injured by the reduction in tax revenue that flows from those violations.

**Response:** Paragraph 14 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied, except to state that Defendant lacks knowledge or information sufficient to form a belief about the truth of the factual basis for the allegations in Paragraph 14 concerning injuries to Plaintiffs, their economies, or their residents.  Furthermore, Paragraph 14's allegations of injury to Maryland's alleged sovereign interests concern claims that were dismissed by the Court's March 28, 2018 Order and, accordingly, no response to these allegations is required.

15.     The defendant's ongoing constitutional violations also harm the proprietary interests of the District and Maryland. The District and Maryland suffer direct financial harm in their capacity as proprietors of businesses that compete with the defendant's businesses, to the extent that businesses owned by him and/or his affiliated enterprises attract customers and divert them away from businesses that the District and Maryland own, license, or tax.

**Response:**  Paragraph 15 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied, except to state that Defendant lacks knowledge or information sufficient to form a belief about the truth of the factual basis for the allegations in the second sentence concerning injuries to Plaintiffs.

16.     The District of Columbia and Maryland bring this action to stop President Trump's violations of the Emoluments Clauses. As a direct result of those violations, the District and Maryland have been injured and will continue to be injured absent relief from this Court. To prevent these injuries, they request that this Court enter a declaratory judgment that President Trump has violated the Foreign and Domestic Emoluments Clauses and an injunction against violating these clauses further.

**Response:**  Paragraph 16 consists of Plaintiffs' characterization of their intent or purpose in bringing this lawsuit, their legal conclusions and legal arguments, and their requested relief, to which no response is required, but to the extent a response may be deemed required, the Defendant lacks knowledge or information sufficient to form a belief as to the truth of the factual basis for the allegations of Plaintiffs' injuries, and otherwise denies the remaining allegations.

## II.

## PARTIES, JURISDICTION, AND VENUE

17.     The plaintiffs are the District of Columbia and the State of Maryland.

**Response:**  Admitted.

18.     The District of Columbia is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest.

**Response:**  The first sentence of Paragraph 18 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, it is admitted that the District of Columbia is a plaintiff.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the remaining sentences in this paragraph.

19.     The State of Maryland is a sovereign state of the United States of America. The State is represented by and through its chief legal officer, the Attorney General of Maryland. He has general charge, supervision, and direction of the State's legal business, and acts as legal advisor and representative of all major agencies, boards, commissions, and official institutions of state government. The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern.

**Response:**  The first sentence of Paragraph 19 is admitted.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the remaining sentences in this paragraph.

20.     The defendant is Donald J. Trump, a natural person and the President of the United States of America. He is being sued in his official capacity and in his individual capacity.

**Response:**  The first sentence of Paragraph 20 is admitted.  The second sentence of Paragraph 20 constitutes Plaintiffs' characterization of their Amended Complaint, to which no response is required, but to the extent a response may be deemed required, it is admitted that Plaintiffs seek to bring this action against the President in both his official and individual capacities.

21.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201.

**Response:**  Paragraph 21 consists of a legal conclusion concerning jurisdiction, to which no response is required, but to the extent a response may be required, is denied.

22.     Venue is proper under 28 U.S.C. § 1391(e)(1) because the defendant is "an officer . . . of the United States . . . acting in his official capacity or under color of legal authority," and the District of Maryland is a "judicial district" in which "a substantial part of the events or omissions giving rise to the claim occurred," and (in any event) where one of "the plaintiff[s] resides."

**Response:**  Paragraph 22 consists of a legal conclusion concerning venue, to which no response is required.

### III.

### LEGAL BACKGROUND

23.     ***The Foreign Emoluments Clause.*** The origins of the Foreign Emoluments Clause go back to at least 1651, when the Dutch broke with traditional European diplomatic customs and prohibited their foreign ministers from accepting "any presents, directly or indirectly, in any manner or way whatever." The Framers also had the benefit of earlier thinking by those who drafted state constitutions, including Maryland's, and by those who crafted the Articles of Confederation, which contained the clause's predecessor: "[N]or shall any person holding any office of profit or trust under

the United States, or any of them, accept of any present, emolument, office, or title of any kind whatever, from any king, prince, or foreign State."

**Response:** Paragraph 23 consists of legal conclusions and legal arguments, to which no response is required.

24.     The Foreign Emoluments Clause was not included initially at the Constitutional Convention, but it was added without dissent at the request of Charles Pinckney, who "urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence."[7] Edmund Jennings Randolph confirmed the clause's anti-corruption purpose, stating: "It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states."[8] The Framers recognized the perils of foreign influence and corruption, even in situations subtler than *quid pro quo* bribery, and they therefore created a broad constitutional prophylactic rule applicable to anything of value given by any foreign government to anyone holding an "Office of Profit or Trust under the United States," including the President.

**Response:** Paragraph 24 consists of legal conclusions and legal arguments, to which no response is required.

25.     Consistent with the intent of the Framers, the Foreign Emoluments Clause is properly interpreted to cover monetary or nonmonetary transactions. Indeed, the text of the clause bars the receipt of both a "present" and an "Emolument," which together cover anything of value, including without limitation payments, transactions granting special treatment, and transactions above marginal cost. The clause also explicitly bars the receipt of "any present [or] Emolument . . . *of any kind whatever*," emphasizing the breadth of conduct covered under the provision.

**Response:** Paragraph 25 consists of legal conclusions and legal arguments, to which no response is required.

26.     The Foreign Emoluments Clause covers not only transfers of anything of value from a king, prince, or foreign state individually, but also any transfer from instrumentalities or agents of a foreign state. This is in keeping with the considered view of the Department of Justice's Office of Legal Counsel, whose constitutional interpretations are instructive, though not controlling.

**Response:**  Paragraph 26 consists of legal conclusions and legal arguments, to which no response is required.

27.     ***The Domestic Emoluments Clause.*** The Framers also intended to prevent the system of patronage, influence, and rent-extraction that predominated in the colonial governors' offices through a Domestic Emoluments Clause applying to just the President. The clause provides that the President's "Compensation" shall not be increased or decreased, and that he may not receive any "other Emolument from the United States, or any of them," during his term of office. The clause thus works to ensure that neither states nor the federal government can "weaken his fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice." And because the clause is specifically concerned with the federal government as well as the states, it does not allow for Congress to consent to the President's receipt of additional emoluments beyond his salary. This ban on additional emoluments, Alexander Hamilton wrote, would ensure that the President would have "*no pecuniary inducement to renounce or desert the independence intended for him by the Constitution.*" Further, as recognized by judicial authorities, the ban "addressed the Framers' concern that the President should not have the ability to convert his or her office for profit."

**Response:**  Paragraph 27 consists of legal conclusions and legal arguments, to which no response is required.

28.     The Domestic Emoluments Clause reflects the Framers' particular concern about making sure that the nation's powerful chief executive remains free from

distorting and corrupting influences that might hinder his ability to faithfully execute his office. The clause accordingly proscribes emoluments not only from states and the federal government, but also their respective instrumentalities and subdivisions.

**Response:**  Paragraph 28 consists of legal conclusions and legal arguments, to which no response is required.

## IV.

## RELEVANT FACTS

**A.       The defendant's Foreign Emoluments Clause violations**

29.       Following the defendant's inauguration, he continues to own and control hundreds of businesses throughout the world, including hotels and other properties. His business empire comprises a multitude of different corporations, limited-liability companies, limited partnerships, and other entities that he owns or controls, in whole or in part, operating in the United States and at least 20 foreign countries. His businesses are loosely organized under an umbrella known as the "Trump Organization," consisting of the Trump Organization LLC d/b/a The Trump Organization and The Trump Organization, Inc., both of which are owned solely by him. But his interests also include scores of other entities not directly owned by either Trump Organization entity but that he personally owns, owns through other entities, and/or controls. The defendant also has several licensing agreements that provide continuing flows of income. Through these entities and agreements, he personally benefits from business dealings, and is (and will be) enriched by any business in which the entities he owns or controls engage with foreign governments, instrumentalities, and officials.

**Response:**  Except with respect to the Trump International Hotel in Washington, D.C., Paragraph 29 consists of allegations concerning claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to those allegations is required.  With respect to the Hotel, the allegations in this paragraph are denied, except

to admit that the Donald J. Trump Revocable Trust indirectly owns all of the President's financial interest in the Hotel, that the trustees, in consultation with the Chairman of the Advisory Board of that Trust, control the Trust assets and their distribution, and that the President is the beneficiary of the Trust.

30.     On January 11, 2017, the defendant announced a plan to turn "leadership and management" of the Trump Organization over to his sons Eric Trump and Donald Trump Jr., as well as a longtime company executive. But the plan did not include relinquishing *ownership* of his businesses or establishing a blind trust.

**Response:**  The first sentence of Paragraph 30 is admitted.  The second sentence is denied, except to admit that the Donald J. Trump Revocable Trust directly or indirectly owns all of the President's investment and business assets, that the trustees, in consultation with the Chairman of the Advisory Board of that Trust, control the Trust assets and their distribution, and that the President is the beneficiary of the Trust.

31.     The defendant continues to own—and be well aware of the activities of— the Trump Organization and other corporations, limited-liability companies, limited partnerships, and other entities in which he retains an ownership interest. Although he formed a trust to hold his business assets, he may obtain distributions from his trust at any time.

**Response:**  Except with respect to the Trump International Hotel in Washington, D.C., Paragraph 31 consists of allegations concerning claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to those allegations is required.  With respect to the Hotel, the allegations in Paragraph 31 are denied, except to admit that the Donald J. Trump Revocable Trust directly or indirectly owns all of the President's investment and business assets, that the trustees, in consultation with the Chairman of the Advisory Board of that Trust, control the Trust assets and their distribution, and that the President is the beneficiary of the Trust.

32.     The defendant's son, Eric Trump (who is also an advisor to the defendant's trust), initially indicated that he would not communicate with his father concerning his business interests. Eric Trump has now acknowledged, however, that he will provide business updates to the President on at least a quarterly basis.

**Response:**  Except with respect to the Trump International Hotel in Washington, D.C., Paragraph 32 consists of allegations concerning claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to those allegations is required.  With respect to the Hotel, the allegations in Paragraph 32 are denied, except to admit that the Donald J. Trump Revocable Trust directly or indirectly owns all of the President's investment and business assets, that the trustees, in consultation with the Chairman of the Advisory Board of that Trust, control the Trust assets and their distribution, that Eric Trump is said Chairman, that the President is the beneficiary of the Trust, and that the Trust Agreement limits the information that the President receives regarding the Trust's assets to only total profit or loss and not an accounting of the performance of each individual business held by the Trust.

33.     The defendant has neither sought nor received "Consent of the Congress" with respect to his receipt of presents or emoluments from foreign government officials, entities, or instrumentalities.

**Response:**  Paragraph 33 consists of legal conclusions and legal arguments to which no response is required, but to the extent a response may be deemed required, is denied.

### The District of Columbia's Trump International Hotel

34.     The Trump International Hotel Washington, D.C. is located on Pennsylvania Avenue, N.W., just blocks from the White House. The defendant owns and controls this hotel through various entities.

**Response:**   The first sentence of Paragraph 34 is admitted.  The allegations in the second sentence of Paragraph 34 are denied, except to admit that the Donald J. Trump Revocable Trust indirectly owns all of the President's financial interest in the Hotel, that the trustees, in consultation with the Chairman of the Advisory Board of that Trust, control the Trust assets, and that the President is the beneficiary of the Trust.

35.      The defendant, through entities he owns, receives payments made to the Trump International Hotel by guests who stay in hotel rooms and patrons who use the hotel venues or other goods or services in the hotel.

**Response:**   The allegations in Paragraph 35 are denied.

36.      The restaurant BLT Prime is located in the Trump International Hotel. The defendant, through various business entities, owns the restaurant, licenses the name from BLT Prime, and pays BLT Prime to operate the restaurant.

**Response:**   The first sentence of Paragraph 36 is admitted.  The second sentence of Paragraph 36 is denied, except to admit that the Donald J. Trump Revocable Trust indirectly owns all of the President's financial interest in the Hotel, that the trustees, in consultation with the Chairman of the Advisory Board of that Trust, control the Trust assets, and that the President is the beneficiary of the Trust.

37.      Since the election, the Trump International Hotel has specifically marketed itself to the diplomatic community. On one occasion, barely a week after the election, it held an event where it pitched the hotel to about 100 foreign diplomats. The hotel also hired a "director of diplomatic sales" to facilitate business with foreign states and their diplomats and agents, luring the director away from a competing hotel in Washington.

**Response:**   The Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37.

38.     In addition, the defendant has repeatedly appeared at the hotel since his election, adding further media attention to the property and raising its public profile. Several figures in his administration, including Treasury Secretary Steve Mnuchin and Small Business Administration Administrator Linda McMahon, have also lived or continue to live in the hotel.

**Response:**  The President denies the allegations in the first sentence of Paragraph 38, except to admit that he has visited the Trump International Hotel in Washington, D.C. on multiple occasions since his election.  With respect to the second sentence, the Defendant admits that Secretary Mnuchin and Administrator McMahon have visited the Hotel but lacks information sufficient to form a belief about the details of their visits.

39.     Diplomats and their agents have voiced their intent to stay at (or hold events at) the Trump International Hotel. "Believe me, all the delegations will go there," one "Middle Eastern diplomat" told the *Washington Post* about the hotel. An "Asian diplomat" agreed: "Why wouldn't I stay at his hotel blocks from the White House, so I can tell the new president, 'I love your new hotel!' Isn't it rude to come to his city and say, 'I am staying at your competitor?'"

**Response:**  The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 39.

40.     These statements have become reality. The Embassy of Kuwait, a foreign state, held its National Day celebration at the Trump International Hotel on February 22, 2017. Upon information and belief, Kuwait paid for the venue, food, and other services provided in connection with the celebration. The cost has been estimated at $40,000 to $60,000. Before the election, a "save the date" reservation had been made with the Four Seasons hotel, where the event had previously been held.  According to one report, the Embassy of Kuwait moved the event under pressure from the Trump Organization (though Kuwait's ambassador to the United States denied being pressured). As a result,

the Trump International Hotel or its controlling entities have received one or more payments from Kuwait after 12:01 pm on January 20, 2017.

**Response:**  The Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40.

41.     Between January 23 and 26, 2017 and during February 2017, the Kingdom of Saudi Arabia, a foreign state, spent thousands of dollars on rooms, catering, and parking at the Trump International Hotel. In a Foreign Agents Registration Act report filed with the Department of Justice, an agent representing the Royal Embassy of the Kingdom of Saudi Arabia reported paying the hotel $190,272 for lodging, $78,204 for catering, and $1,568 for parking between October 1, 2016 and March 31, 2017, using money received from Saudi Arabia. Some of the payments were made after the defendant's inauguration as President. Upon information and belief, Saudi Arabia paid at least $250 per night for each of the rooms it rented through its agent between January 23 and 26, 2017, and paid the hotel for meals and other services provided in connection with the stay. Saudi Arabia paid for individuals to have dinner at the hotel on January 23 and both breakfast and dinner on January 24. Upon information and belief, at least one of the meals was provided by BLT Prime. Upon information and belief, Saudi Arabia paid the hotel through its agent for similar expenses associated with a visit in mid-February. As a result, the Trump International Hotel or its controlling entities have received one or more payments from Saudi Arabia, through its agent, after 12:01 pm on January 20, 2017.

**Response:**  The Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41, except to state that the second sentence cites and characterizes a report submitted pursuant to the Foreign Agents Registration Act, to which no response is required, and the Court is respectfully referred to the cited report for a complete and accurate statement of its contents.

42.     On or about April 6, 2017, Kaha Imnadze, the Ambassador and
Permanent Representative of Georgia to the United Nations, stayed at the Trump
International Hotel and then tweeted his compliments about the hotel. Upon information
and belief, the government of Georgia, a foreign state, paid the hotel for his room and
other services provided in connection with his stay. As a result, the Trump International
Hotel or its controlling entities have received one or more payments from Georgia after
12:01 pm on January 20, 2017.

**Response:**  The Defendant lacks knowledge or information sufficient to form a
belief as to the truth of the allegations in Paragraph 42.

43.     On information and belief, after 12:01 pm on January 20, 2017, the
Trump International Hotel or its controlling entities have received and will continue to
receive payments from other foreign states, instrumentalities of foreign states, or foreign
officials.

**Response:**  The Defendant lacks knowledge or information sufficient to form a
belief as to the truth of the allegations in Paragraph 43, except that he is aware of news
reports of a payment made by The Trump Organization to the U.S. Treasury on account
of receipts from foreign government patronage of the entities operated by The Trump
Organization, including the Trump International Hotel in Washington, D.C.

44.     On January 20, 2017, Trump Old Post Office LLC, the entity leasing the
building in which the Trump International Hotel is located and in which the defendant
has a beneficial interest, amended its governing agreement to provide that, during the
defendant's presidency, the company will not make any distributions of profits to any
entity in which the defendant has a beneficial interest and will credit these undistributed
profits to an unrecovered capital contribution account held for the benefit of the
designated entities that defendant controls. This amendment is immaterial to whether the
defendant has violated the Foreign Emoluments Clause. The defendant remains owner of

approximately 77.5% of the Trump Old Post Office LLC (the remaining shares are owned by three of his children), and thereby benefits from any amounts deposited into the unrecovered capital contribution account. He further may receive distribution from those amounts once he is no longer in office.

**Response:**   The first sentence of Paragraph 44 is denied; the Court is respectfully referred to the referenced document for a complete and accurate statement of its contents.  *See* https://www.gsa.gov/cdnstatic/Contracting_Officer_Letter_March_23__ 2017_Redacted_Version.pdf (second attachment of Exhibit 1.C, PDF page 39 of 166). The second sentence of this paragraph consists of legal conclusions and legal arguments to which no response is required, but to the extent a response may be deemed required, is denied.  The allegations in the third sentence of the paragraph are denied, except to admit that the Donald J. Trump Revocable Trust has ownership interests in entities that have ownership interests in Trump Old Post Office LLC.  The President lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 44, except to admit that the First Amendment to the Second Amended and Restated Limited Liability Company Agreement of Trump Old Post Office LLC governs the period of the President's term in office.

45.      Additionally, by providing that the defendant's contributions will be used by Trump Old Post Office LLC for business purposes, the amendment increased the value of one of his assets.

**Response:**   The Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45.

46.      Prior to taking office, President Trump's attorney promised that all profits earned from foreign governments would be donated to the U.S. Treasury. The Trump Organization later admitted, however, that it was not tracking all payments that it

received from foreign governments, and that it plans only to estimate, rather than calculate, such payments.

**Response:**  The allegations in the first sentence of Paragraph 46 are denied, except to admit that during a press conference on January 11, 2017, the President's attorney stated that the President planned to "voluntarily donate all profits from foreign government payments made to his hotel," i.e. the Trump International Hotel in Washington, D.C.  The allegations in the second sentence of Paragraph 46 are denied, except to admit that The Trump Organization has issued a document entitled Donation of Profits from Foreign Government Patronage.  *Available at* https://democrats-oversight.house.gov/sites/democrats.oversight.house.gov/files/ documents/Trump%20Org%20Pamphlet%20on%20Foreign%20Profits.pdf.

### New York's Trump Tower

47.     Trump Tower is a mixed-use skyscraper on Fifth Avenue in New York City. Through the use of various entities, the defendant owns and controls Trump Tower and, through entities he owns, receives payments made to Trump Tower by tenants.

**Response:**  The allegations in Paragraph 47 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

48.     One of the largest tenants of Trump Tower is the Industrial and Commercial Bank of China ("ICBC"), which is a Chinese majority-state-owned enterprise. As such, ICBC is an instrumentality of a foreign state.

**Response:**  The allegations in Paragraph 48 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

49.     After 12:01 pm on January 20, 2017, Trump Tower or its controlling entities have received one or more payments from ICBC under its lease. Trump Tower or

its controlling entities will continue to receive regular payments from ICBC under its lease agreement.

**Response:** The allegations in Paragraph 49 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

50.     The defendant has repeatedly referenced ICBC's Trump Tower lease in discussing his views of U.S.-China relations. During his presidential campaign in June 2015, for instance, the defendant stated: "I love China! The biggest bank in the world is from China. You know where their United States headquarters is located? In this building, in Trump Tower." Similarly, in March 2016, when asked about China's territorial claims in the South China Sea, the defendant told the *Washington Post*, "I do deals with them all the time. The largest bank in the world, 400 million customers, is a tenant of mine in New York, in Manhattan."

**Response:** The allegations in Paragraph 50 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

51.     The term of ICBC's Trump Tower lease runs until October 2019, before the end of the defendant's term. As a result, any negotiations for a renewal or extension of the lease will occur while he is serving as President.

**Response:** The allegations in Paragraph 51 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

52.     Trump Grill is a restaurant located inside Trump Tower that the defendant owns through various business entities. Upon information and belief, tenants of Trump Tower, including officials of China and other countries, have dined at Trump Grill as a result of their tenancy in the Tower and the foreign states themselves may host events

there. Accordingly, foreign states or their instrumentalities likely have paid or will pay for services at Trump Grill. The defendant has and will continue to receive payments from various foreign states through Trump Grill.

**Response:** The allegations in Paragraph 52 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

### New York's Trump World Tower

53.     Trump World Tower is a skyscraper on United Nations Plaza in New York City, containing condominium units. Through the use of various entities, the defendant manages and controls Trump World Tower and, through entities he owns, receives payments made by residents of the Trump World Tower for common charges and handles rental transactions involving condominium units.

**Response:** The allegations in Paragraph 53 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

54.     In 2001, the Kingdom of Saudi Arabia paid $4.5 million to purchase a floor of Trump World Tower. The annual common charges for building amenities for the floor totaled $85,585 at the time. As of 2003, the most recent year for which information is publicly available, the Kingdom of Saudi Arabia paid monthly common charges of about $7,398—or $88,781 per year. The floor currently belongs to the Kingdom of Saudi Arabia for use by the Saudi Mission to the United Nations, which upon information and belief continues to pay common charges to the defendant.

**Response:** The allegations in Paragraph 54 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

55.     In 2015, the defendant said about Saudi Arabia: "I get along great with all of them. They buy apartments from me." He further noted: "They spend $40 million, $50 million. Am I supposed to dislike them? I like them very much."

**Response:**  The allegations in Paragraph 55 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

56.     The Kingdom of Saudi Arabia is a foreign state, and the Saudi Mission to the United Nations is an instrumentality of a foreign state.

**Response:**  The allegations in Paragraph 56 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

57.     In 2002, the Permanent Mission of India to the United Nations, an instrumentality of a foreign state, paid $5.1 million to purchase two units in Trump World Tower from the defendant. As of 2003, the most recent year for which information is publicly available, the Mission paid monthly common charges of approximately $3,639—or $43,670 per year. The units continue to belong to the Mission, which upon information and belief continues to pay common charges to the defendant.

**Response:**  The allegations in Paragraph 57 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

58.     In 2009, the Permanent Mission of Afghanistan to the United Nations, an instrumentality of a foreign state, paid $4.235 million to purchase a unit in Trump World Tower. As of 2003, the most recent year for which information is publicly available, the common monthly charges for the unit purchased by the Mission were approximately $2,090 per month—or $25,085 per year. The unit continues to belong to the Mission, which upon information and belief continues to pay common charges to the defendant.

**Response:** The allegations in Paragraph 58 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

59.     In 2004, the Permanent Mission of Qatar to the United Nations, an instrumentality of a foreign state, paid $1,995,000 to purchase a unit in Trump World Tower, and in 2012, it paid $8.375 million to purchase two additional units in Trump World Tower. As of 2003, the most recent year for which information is publicly available, the common monthly charges for the units purchased by the Mission were a total of approximately $5,660 per month—or $67,920 per year. The units continue to belong to the Mission, which upon information and belief still pays common charges to the defendant.

**Response:**  The allegations in Paragraph 59 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

60.     The defendant, through entities he owns, receives payments made to Trump World Tower by tenants and owners of units in the building through their payment of common charges and other fees. On information and belief, these payments include management and other fees paid to the building's management company, an entity owned by the defendant.

**Response:**  The allegations in Paragraph 60 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

61.     Trump World Tower or its controlling entities will continue to receive regular common charge payments from Saudi Arabia, India, Afghanistan, and Qatar, and those payments will flow to the defendant.

**Response:**  The allegations in Paragraph 61 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

62.      The World Bar is a bar located in Trump World Tower.

**Response:**  The allegations in Paragraph 62 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

63.      Tenants of the Trump World Tower, including officials from Saudi Arabia, India, Afghanistan, and Qatar have patronized (or will patronize) the World Bar. Further, foreign states or agents or instrumentalities of these or other foreign states have hosted and will host events at the World Bar due to its location near the United Nations. By reason of his financial stake in Trump World Tower, the defendant will either receive payments from foreign states made to the World Bar, or the revenue that the World Bar receives, including from foreign states, affects the amount of rent that the defendant is able to charge the World Bar.

**Response:**  The allegations in Paragraph 63 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

**Chinese trademarks**

64.      The defendant began to seek trademark protection in China for the use of his name in connection with building construction services in 2006. His application was rejected by the Trademark Office, and he subsequently lost his appeals to the Trademark Review and Adjudication Board, the Beijing Intermediate People's Court, and the Beijing High People's Court. The defendant suffered his most recent court defeat in May 2015, the month before he declared his candidacy for President.

**Response:**  The allegations in Paragraph 64 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

65.     Three weeks after his election, on December 2, 2016, the defendant spoke directly with Taiwanese President Tsai Ing-wen. That conversation broke longstanding protocol and suggested that the defendant might end the "One China" policy that the United States had observed for decades. The defendant further indicated before taking office that he might end the One China policy unless some benefit were received in exchange.

**Response:**  The allegations in Paragraph 65 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

66.     On February 9, 2017, however, the defendant spoke with Chinese President Xi Jinping and pledged to honor the One China policy. Five days later, on February 14, 2017, China reversed its prior course and gave the defendant trademark protection.

**Response:**  The allegations in Paragraph 66 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

67.     Chinese law prohibits awarding trademarks that are "the same as or similar to the name of leaders of national, regional, or international political organizations."

**Response:**  The allegations in Paragraph 67 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

68.     Even though China had denied the defendant trademark protection for more than ten years, including in a ruling from an appellate court, and despite Chinese law barring the use of foreign leaders' names as trademarks, China reversed course and decided to grant the defendant the trademark he had sought and valued. But China did so only after he had been elected President, questioned the One China policy, was sworn in, and then re-affirmed the One China policy.

**Response:**  The allegations in Paragraph 68 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

69.     The trademarks have considerable value because they give the Trump Organization the sole right to profit from the Trump brand in China. China's granting of these trademarks constitutes a present or emolument provided to the defendant.

**Response:**  The allegations in Paragraph 69 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

70.     When asked why the defendant changed his position on the One China policy, and whether he had received something in exchange from China, White House Press Secretary Sean Spicer answered: "The President always gets something," but did not elaborate.

**Response:**  The allegations in Paragraph 70 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

**International versions and distribution of "The Apprentice" and its spinoffs**

71.     The defendant earns royalties and other payments from the distribution in other countries of the television program "The Apprentice" and its spinoffs (including "The Celebrity Apprentice" and "The New Celebrity Apprentice," for which he is still an

executive producer), and also from international versions of the programs produced in other countries. In some instances, these payments originate from foreign governments or their agents or instrumentalities. For instance, the defendant is paid for a version of the program "The Apprentice" that airs in the United Kingdom. The network that broadcasts "The Apprentice" and spinoff shows in the United Kingdom is an instrumentality of a foreign state.

**Response:** The allegations in Paragraph 71 concern claims that were dismissed by the Court's March 28, 2018 Order. Accordingly, no response to these allegations is required.

72.     After 12:01 pm on January 20, 2017, the defendant has received and will continue to receive payments from foreign states via their payments for "The Apprentice" or its spinoffs and international versions. Such payments constitute presents or emoluments that the defendant has accepted and will accept from a foreign state.

**Response:** The allegations in Paragraph 72 concern claims that were dismissed by the Court's March 28, 2018 Order. Accordingly, no response to these allegations is required.

**Other foreign connections, properties, and businesses**

73.     ***United Arab Emirates.*** The defendant's company is engaged in several real-estate projects in the United Arab Emirates, including Dubai's Trump International Golf Club, which opened on February 18, 2017. Upon information and belief, the defendant, through various business entities, has a branding-and-management contract with the property, and thereby possesses a financial interest in the Trump International Golf Club.

**Response:** The allegations in Paragraph 73 concern claims that were dismissed by the Court's March 28, 2018 Order. Accordingly, no response to these allegations is required.

74.     All services for the golf club, including electricity, water, and roads, "come at the discretion of the government," and the "club's bar will need government approvals to serve alcohol, not to mention other regulatory issues."

**Response:**  The allegations in Paragraph 74 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

75.     The golf club and other projects cannot be built or operated without permits, utility, and other services and approvals. These discretionary approvals accordingly confer value on the defendant, through his financial stake in the company receiving them, in violation of the Foreign Emoluments Clause.

**Response:**  The allegations in Paragraph 75 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

76.     *Indonesia.* The defendant's company is engaged in at least two real-estate projects in Indonesia, including redeveloping a resort in Bali. Upon information and belief, the defendant, through various business entities, has a licensing-and-management agreement with these projects, through which he possesses a financial interest in them.

**Response:** The allegations in Paragraph 76 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

77.     Completing the projects required or will require permits and approvals from the Indonesian government. The defendant will receive value from these discretionary permits and approvals through his financial stake in the company receiving them, in violation of the Foreign Emoluments Clause.

**Response:**  The allegations in Paragraph 77 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

78.     *Other.* The defendant also owns, operates, and licenses numerous other businesses throughout the United States and abroad, including other hotels, other properties for sale or lease, and golf courses and clubs. The defendant, through his financial stake in the company or companies receiving them, derives value from the foreign permits and approvals associated with the owning and operation of those businesses in violation of the Foreign Emoluments Clause. In addition, revenues from foreign states' patronage of his hotels, golf clubs, and other businesses may flow to the defendant. After 12:01 pm on January 20, 2017, the defendant, through at least one of his various businesses, properties, and other entities has received one or more presents or emoluments from foreign states and will continue to do so.

**Response:**  The allegations in Paragraph 78 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

B.     **The defendant's Domestic Emoluments Clause violations**

79.     As alleged above, the defendant owns and controls hundreds of businesses throughout the country, including hotels and other properties. The defendant personally benefits from the business dealings of these entities and agreements associated with them, and is and will be enriched by their business with state governments or federal agencies within the scope of the Domestic Emoluments Clause.

**Response:**  Except with respect to the Trump International Hotel in Washington, D.C., the allegations in this paragraph concern claims dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to those allegations is required.  With respect to the Hotel, the allegations of Paragraph 80 are denied, except to admit that the Donald

J. Trump Revocable Trust indirectly owns all of the President's financial interest in the Hotel, that the trustees, in consultation with the Chairman of the Advisory Board of that Trust, control the Trust assets and their distribution, and that the President is the beneficiary of the Trust.

### The District of Columbia's Trump International Hotel

80.     On August 5, 2013, Trump Old Post Office LLC, a business entity owned primarily by the defendant, signed a 60-year lease with the General Services Administration ("GSA")—an independent agency of the United States, whose administrator is appointed by the President—to open a hotel in the Old Post Office Building in the District of Columbia.

**Response:**  The allegations in Paragraph 80 are denied, except to admit that on August 5, 2013, the Trump Old Post Office LLC signed a 60-year lease with the General Services Administration, "an agency in the executive branch of the Federal Government," 40 U.S.C. § 301, to open a hotel in the Old Post Office Building in the District of Columbia.

81.     More than 76% of Trump Old Post Office LLC is owned by DJT Holdings LLC, which is in turn owned almost entirely by the Donald J. Trump Revocable Trust, of which the defendant is the sole beneficiary. The Trump International Hotel Washington, D.C. is located at this site. The defendant has not divested his interest in the lease since becoming President.

**Response:**  The first sentence of Paragraph 81 is admitted.  The allegations in the second sentence of this paragraph are denied, except to admit that the Trump International Hotel in Washington, D.C. is located at 1100 Pennsylvania Ave., NW, Washington, D.C.  The allegations in the third sentence are denied, except to admit that the Donald J. Trump Revocable Trust indirectly owns all of the President's financial interest in the Hotel, that the trustees, in consultation with the Chairman of the Advisory

Board of that Trust, control the Trust assets, and that the President is the beneficiary of the Trust.

82.      Section 37.19 of the Old Post Office lease states: "No . . . elected official of the Government of the United States . . . shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom." A violation of Section 37.19 is a non-monetary breach and a default unless it is remedied within 30 days after notice from the GSA. Accordingly, the defendant has been in breach of the lease with the GSA since 12:01 pm on January 20, 2017, when he became President.

**Response:**  The first two sentences of Paragraph 82 consist of Plaintiffs' description and quotation of the cited lease document and their legal conclusions and legal arguments concerning the same, to which no response is required; the Court is respectfully referred to that lease for a complete and accurate statement of its contents. The last sentence of Paragraph 82 consists of a legal conclusion to which no response is required, but to the extent a response may be deemed required, is denied.

83.      Before the defendant's inauguration, the GSA's Deputy Commissioner indicated to Representatives Elijah Cummings, Peter DeFazio, Gerald Connolly, and André Carson that the defendant would be in violation of the lease unless he "fully divests himself of all financial interests in the lease" for the Trump International Hotel, which he has not done. Shortly after the inauguration, Norman Dong, a GSA official appointed by former President Obama, became acting administrator. But less than a day later, the defendant replaced Mr. Dong with Tim Horne, who had coordinated the GSA's transition with the defendant's campaign.

**Response:**  The allegations in the first sentence of Paragraph 83 are denied.  The allegations in the second sentence are denied, except to admit that Norman Dong became the Acting Administrator of GSA on January 20, 2017 pursuant to GSA's order of succession as set forth in 40 U.S.C. § 302 and to further state that on January 20, 2017,

the President replaced Mr. Dong with Tim Horne, who had been the Federal Transition

Coordinator since February 2016, a position established by the Presidential Transition

Improvements Act of 2015 to coordinate transition planning across federal agencies.

84.     Several weeks later, on March 16, 2017, the defendant released a

proposed 2018 budget increasing GSA's funding, while cutting all (or nearly all) other

non-defense-related agencies' budgets. One week after that, on March 23, the GSA

issued a letter stating that— contrary to the lease's plain terms—Trump Old Post Office

LLC "is in full compliance with Section 37.19 [of the lease] and, accordingly, the lease

is valid and in full force and effect." A significant portion of the letter reviews the

purported financial benefits of the lease to the GSA and taxpayers—even though those

benefits are immaterial to the question of breach.

**Response:**  The first sentence Paragraph 84 is denied except to admit that the

Office of Management and Budget issued *America First: A Budget Blueprint to Make*

*America Great Again*, on March 16, 2017, to which the Court is respectfully referred for

a complete and accurate statement of its contents.  *Available at*

https://www.gpo.gov/fdsys/pkg/BUDGET-2018-BLUEPRINT/pdf/BUDGET-2018-

BLUEPRINT.pdf.  The remaining sentences of this paragraph contain Plaintiffs'

characterization of the GSA Contracting Officer's decision letter of March 23, 2017, and

their legal arguments concerning the same, to which no response is required, but to the

extent a response may be deemed required, are denied; the Court is respectfully referred

to the March 23, 2017 decision letter for a complete and accurate statement of its

contents.

85.     Attached to the March 23, 2017 letter was an amendment to the

agreement governing the business of Trump Old Post Office LLC. This amendment is

the basis of the GSA's position that the tenant is in compliance with the lease, but the

letter does not explain how the amendment brings the tenant into compliance. In fact, as

described above, the amendment does not prevent the defendant from receiving "any benefit" from the lease, and Trump Old Post Office LLC remains in breach of the lease.

**Response:**  The first sentence of Paragraph 85 refers to an attachment to a March 23, 2017 letter, to which the court is respectfully referred for a complete and accurate statement of its contents.  The remainder of this paragraph consists of Plaintiffs' legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

86.     In forbearing from enforcing the Old Post Office lease's default and termination procedures, despite the tenant's breach of its terms, and in cooperating with the tenant in attempting to create the appearance of compliance with the lease, the federal government has given the defendant an emolument in violation of the Domestic Emoluments Clause.

**Response:**  Paragraph 86 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

87.     Additionally, the defendant, through entities he owns, is seeking a $32 million historic-preservation tax credit for the Trump International Hotel. Approval of this credit is at the discretion of the National Park Service, an instrumentality of the federal government now under the defendant's authority. If approved, the tax credit would offset approximately 20% of the cost of rehabilitating the building in which the Trump International Hotel is operating.

**Response:**  The allegations in the first and second sentences of Paragraph 87 are denied, except to admit that the Trump Old Post Office LLC submitted a Historic Preservation Certification Application with the National Park Service, an entity within the Department of Interior, which is not responsible for approving tax credits.  The third sentence is a legal conclusion, to which no response is required.  *See* 26 U.S.C. § 47.

88.     On November 14, 2016, the defendant received approval from the National Park Service for the second phase of the three-step-approval process. If final approval is granted, it may constitute an emolument, in violation of the Domestic Emoluments Clause.

**Response:**  The allegations in Paragraph 88 are denied, except to admit that on November 14, 2016, the National Park Service approved the Trump Old Post Office LLC's Historic Preservation Certification Application Amendment (Part 2) and that on February 1, 2018, the National Park Service approved the Trump Old Post Office LLC's Historic Preservation Certification Application Part 3-Request for Certification of Completed Work.

### Mar-a-Lago Club

89.     The Mar-a-Lago Club is a private club and estate located in Palm Beach, Florida. It is comprised of 20 acres of land, with a main mansion of over 100 rooms, along with a beach club, pools, tennis courts, and a 20,000 square foot ballroom for private events. The estate itself was purchased by the defendant in 1985. A decade later, in 1995, the defendant opened the club as a hotel and resort for dues-paying members of the public. It is owned by the defendant directly or owned by entities that he directly controls.

**Response:**  The allegations in Paragraph 89 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

90.     The defendant, through entities he owns, receives payments made to the Mar-a-Lago Club by members and guests who join or visit the club, or rent space there, or pay for other goods or services at the club.

**Response:**  The allegations in Paragraph 90 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

91.     Membership in the Mar-a-Lago Club requires payment of an initiation fee of $200,000, plus tax, as well as $14,000 a year in annual dues. This fee was doubled following the defendant's election as President—an increase from $100,000 to $200,000. Since his election, the defendant has also attempted to capitalize on his office by advertising his private property to foreign governments and individuals.

**Response:**  The allegations in Paragraph 91 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

92.     The State Department and at least two U.S. Embassies—those located in the United Kingdom and Albania—have promoted the Mar-a-Lago estate and club on their respective websites by posting a 400-word blog post, originally written by Leigh Hartman for a State Department-managed website, "Share America," on April 4, 2017.

**Response:**  The allegations in Paragraph 92 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

93.     The State Department and embassies' actions have served to promote Mar-a-Lago as the defendant's "Florida estate" and claimed that it "has become well known as the president frequently travels there to work or host foreign leaders."

**Response:**  The allegations in Paragraph 93 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

94.     The State Department is an executive department within the federal government under the defendant's authority.

**Response:**  The allegations in Paragraph 94 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

95.     ShareAmerica, the blog for which the post was originally written, is specifically directed towards foreign individuals and governments.

**Response:**  The allegations in Paragraph 95 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

96.     This post advertising Mar-a-Lago has since been removed from the websites of the State Department and the embassies, but not before substantive, world-wide advertising of the defendant's private property, using government resources, had occurred.

**Response:**  The allegations in Paragraph 96 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

97.     The defendant has used his official position as President to promote his Mar-a-Lago property. He has designated Mar-a-Lago as the "Winter White House," and also refers to it as the "Southern White House." Since taking office, he has visited Mar-a-Lago on at least seven occasions, and has met with a number of foreign leaders there, including Japanese Prime Minister Shinzo Abe and the President of the People's Republic of China, Xi Jinping.

**Response:**  The allegations in Paragraph 97 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

98.     Upon information and belief, federal, state, and local governments, or their instrumentalities, have made and will continue to make payments for the use of

facilities owned or operated by the defendant for a variety of functions. The defendant will receive a portion of those payments, which constitute emoluments prohibited by the Domestic Emoluments Clause.

**Response:**  The allegations in Paragraph 98 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

99.     Although the exact extent of these emoluments is not currently known, examples of current or potential violations include "public pension funds in at least seven U.S. states"—but not the State of Maryland or the District of Columbia—that "have invested millions of dollars in an investment fund that owns a New York hotel and pays one of President Donald Trump's companies to run it, according to a Reuters review of public records."[64] And the defendant has received (or will likely receive) a host of other potential emoluments from federal, state, and/or local governments.

**Response:**  The allegations in Paragraph 99 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.  To the extent the allegation in the second sentence of Paragraph 99 concerns the Trump International Hotel in Washington, D.C., the allegation consists of a legal conclusion to which no response is required, but insofar as a response may be deemed required, is denied.

**C.     Post-inauguration premium for the defendant's goods and services**

100.     Since the defendant's inauguration as President, goods and services sold by his various Trump businesses have sold at a premium. The defendant's high office gives the Trump brand greater prominence and exposure. Moreover, these goods and services provide (or have the potential to provide) a unique benefit: access to, influence on, and the goodwill of the President of the United States.

**Response:**  Except with respect to the Trump International Hotel in Washington, D.C., Paragraph 100 consists of allegations concerning claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to those allegations is required.  With respect to the Hotel, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first two sentences of Paragraph 100 and further notes that the terms "premium," "prominence," and "exposure" are vague and ambiguous.  The allegations in the third sentence of Paragraph 100 are denied.

101.    Thus, for example, the starting rate for "guest rooms" at the defendant's Old Post Office hotel increased to $500 on most nights, up hundreds of dollars from when the hotel first opened shortly before the defendant's election.

**Response:**  The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 101.

102.    Further, as discussed earlier, the initiation fee for membership at defendant's Mara-Lago resort doubled from $100,000 to $200,000 shortly after he was elected.

**Response:**  The allegations in Paragraph 102 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

D.    **The plaintiffs' interests in this litigation**

103.    The plaintiffs' interests in this litigation are substantial. They are harmed by the defendant's constitutional violations in at least two distinct ways. *First*, they have suffered (and will continue to suffer) harm to their sovereign and/or quasi-sovereign interests, including Maryland's interest in preserving its rightful status within our federal system; the plaintiffs' interest in not being subjected to unfair competition by virtue of ongoing violations of constitutional provisions designed to guard against corruption and

to protect interests distinct to the states themselves; the plaintiffs' interest in protecting their economies and their residents from economic harm; and Maryland's interest in preserving its tax revenue. *Second*, the plaintiffs have suffered (and will continue to suffer) proprietary and other financial harms as a result of the defendant's ongoing constitutional violations. These injuries can be redressed by a declaration that the defendant is in violation of the Emoluments Clauses and an injunction preventing his continued violation of them.

**Response:**  Paragraph 103 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied, except to state that Defendant lacks knowledge or information sufficient to form a belief about the truth of the factual basis for the allegations in Paragraph 103 concerning injuries to Plaintiffs, their economies, or their residents.  Paragraph 103 also contains allegations concerning injuries to Maryland's alleged sovereign interests, claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

**Sovereign and quasi-sovereign injuries to the plaintiffs**

104.   ***Maryland's sovereign interest in enforcing the terms on which it agreed to enter the Union.*** Before adopting the federal Constitution, Maryland and its sister states were truly independent sovereigns. Many of these states—including Maryland— had incorporated protections against public corruption into their own legal codes and constitutions, with specific prohibitions on public officials accepting payments from federal, state, or foreign governments. The Maryland Declaration of Rights, adopted August 14, 1776, provides that "all persons invested with the legislative or executive powers of government are the trustees of the public," and contains a precursor to the U.S. Constitution's Emoluments Clauses. This precursor combines the concerns of the two clauses into a single prohibition: "That no person ought to hold, at the same time, more

than one office of profit, nor ought any person, in public trust, to receive any present from any foreign prince or state, or from the United States, or any of them, without the approbation of this State." The Maryland Constitution of 1776 further provided for banishment "forever" as a potential punishment for a governor sharing "directly or indirectly" in the profits of another office, and also prohibited the governor from receiving part of the profits of supplying the army and navy.

**Response:**  The allegations in Paragraph 104 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

105.    Maryland's historical prohibition against foreign and domestic emoluments is consistent with the constitutions adopted by the other colonies at the time. The Pennsylvania Constitution of 1776, which Benjamin Franklin helped draft, made clear "[t]hat government is, or ought to be, instituted for the common benefit, protection and security of the people, nation or community; and not for the particular emolument or advantage of any single man, family, or sett of men, who are a part only of that community." The South Carolina Constitution of 1776, and the Massachusetts Constitution of 1780, contained similar prohibitions against corruption of public officials.

**Response:**  The allegations in Paragraph 105 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

106.    The prohibitions contained in the Domestic and Foreign Emoluments Clauses were thus material inducements to the states entering the union. As a state sovereign, Maryland retains its power to bring suit to enforce those prohibitions today.

**Response:**  The allegations in Paragraph 106 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

107.     ***The plaintiffs' governmental interest in not being compelled to compete improperly for influence or favor.*** As explained above, the Domestic Emoluments Clause in particular reflects the Framers' deep concern that one or more of the states (or the federal government) might seek to buy off the President so that he would exercise power to their advantage and to the detriment of other states, thereby disrupting the balance of power in the federalist system. Thus, the Domestic Emoluments Clause aims to prevent "the United States, or any of them," from feeling compelled (or being compelled) to confer private financial benefits on the President in order to compete for influence and favor.

**Response:**  Paragraph 107 consists of legal conclusions and legal arguments, to which no response is required.

108.     The District and Maryland each have a governmental interest in the enforcement of their respective laws regarding taxation, environmental protection, zoning, and land use as they relate to real property that the defendant or the "Trump Organization" may own or seek to acquire. The defendant and his affiliated enterprises have a large and expanding portfolio of real-estate holdings, including a hotel in the District, and the defendant's Trump International Realty, otherwise known as T International Realty LLC, is registered to conduct business in Maryland.

**Response:**  Except with respect to the Trump International Hotel in Washington, D.C., the allegations in Paragraph 108 concern claims dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to those allegations is required.  With respect to the Hotel, this paragraph consists of legal conclusions and legal arguments to which no response is required, but to the extent a response may be deemed required, is denied,

except to admit that the Donald J. Trump Revocable Trust indirectly owns all of the President's financial interest in the Hotel, that the trustees, in consultation with the Chairman of the Advisory Board of that Trust, control the Trust assets, and that the President is the beneficiary of the Trust.

109.    Real-estate acquisition, ownership, and development implicate a range of legal requirements under the laws of the District and Maryland, including tax laws that generate revenue for the District, Maryland, and their instrumentalities. The defendant has boasted that he has achieved success in real-estate acquisition and development by using his financial clout and political connections to extract from governments maximum concessions, exemptions, waivers, and variances with respect to taxes and other requirements imposed by law. Indications to date suggest that this longstanding practice of the Trump Organization did not cease upon the defendant's election to the Presidency; rather, there is evidence that the defendant's ascendancy to the highest office in the land has enhanced his organization's ability to win concessions from governments with respect to his properties.

**Response:**  The first sentence of Paragraph 109 consists of legal conclusions and legal arguments, to which no response is required.  Except with respect to the Trump International Hotel in Washington, D.C., the remaining allegations of this paragraph concern claims dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to those allegations is required.  To the extent a response may be deemed required, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, which appear to rely on unspecified statements, "indications," and "evidence."

110.    The defendant's acceptance or receipt of presents and emoluments in violation of the Constitution presents the District and Maryland with an intolerable dilemma: either (1) grant the Organization's requests for concessions, exemptions,

waivers, variances, and the like and suffer the consequences, potentially including lost revenue and compromised enforcement of environmental protection, zoning, and land use regulations, or (2) deny such requests and be placed at a disadvantage vis-à-vis states and other government entities that have granted or will agree to such concessions. Either way, the result is the very type of injury that the Domestic Emoluments Clause was designed to prevent.

**Response:**  The Defendant lacks knowledge or information sufficient to form a belief as to the truth of allegations about Plaintiffs' subjective views, which make up part of the first sentence of Paragraph 110.  The remainder of Paragraph 110 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

111.    Moreover, the District and Maryland, which rank first and fourth, respectively, in per capita amount of federal government expenditures, are particularly susceptible to injury resulting from budgetary decisions that are subject to the corrupting influence of emoluments. Federal funds make up approximately 25% of the District's fiscal year 2018 budget, and Maryland is relying on federal funds for nearly 30% of the State government's budget for fiscal year 2018. Federal government spending accounted for more than 42% of the District's gross domestic product and more than 28% of Maryland's in fiscal year 2014. Both the District and Maryland are home to headquarters for federal agencies. Civilian federal agencies employ approximately 17% of the workforce in the District and 10% of Maryland's total workforce. Federal agencies annually have spent more than $21 billion for procurement in the District and more than $26 billion for procurement in Maryland. Given this significance of federal government spending and operations, and the President's significant role in determining how, when, and where federal funds are spent, the conflict of interest inherent in the defendant's receipt of emoluments directly and profoundly affects the District and Maryland.

**Response:**  The fourth sentence of Paragraph 111 is admitted.  Defendant lacks knowledge or information sufficient to form a belief as to the accuracy of the statistics cited in this paragraph except to refer the Court to the sources cited by Plaintiffs for a complete and accurate statement of their contents.  The remaining allegations in this paragraph consist of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, are denied.

112.    The plaintiffs seek to protect this distinct interest, and thereby vindicate their role as governments in our constitutional scheme.

**Response:**  The Defendant lacks knowledge or information sufficient to form a belief as to the truth of Paragraph 112's allegations of Plaintiffs' intent or purpose in bringing this lawsuit.  The remainder of Paragraph 112 consists of legal conclusions and legal arguments, to which no response is required.

113.    ***The plaintiffs' interest in preventing economic injury to their residents and their economies.*** The District is home to 680,000 residents, while the State of Maryland is home to over 6.1 million residents. Residents of both the District and Maryland participate in a thriving hospitality industry that comprises a substantial part of the plaintiffs' economies. For example, in 2014, visitors to the District generated approximately $6.81 billion in spending and drove $3.86 billion in wages for 74,570 employees in the District's hospitality industry. In Maryland, tourists and travelers spent nearly $17 billion in 2015, yielding $5.7 billion in wages for more than 140,000 employees, including more than 72,000 hospitality industry workers employed in the two Maryland counties that border the District of Columbia. Both the District and Maryland regulate competition and transparency in this industry through laws that prohibit anticompetitive or deceptive practices and protect consumers.

**Response:**  The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 113.

114.     Residents of the District and Maryland are injured by the payment of presents and emoluments to the defendant because it tilts the competitive playing field toward his businesses; causes competing companies and their employees to lose business, wages, and tips; and generates a range of market distortions that restrict and curtail opportunity, diminish revenues and earnings, and hamper competition.

**Response:**  Paragraph 114 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, the Defendant lacks knowledge or information sufficient to form a belief as to the truth of the factual basis for Plaintiffs' allegations of injuries and otherwise denies the remaining allegations.

115.     The District and Maryland have the authority and right to vindicate their interest in providing and preserving a level playing field in the hospitality industry, and in ensuring that their residents are free from the injuries and competitive disadvantages that flow from defendant's violations of the Emoluments Clauses.

**Response:**     Paragraph 115 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be required, is denied.

116.     ***Maryland's sovereign interests in tax revenues.*** The defendant's violations of the Emoluments Clauses also injure Maryland's interest in preserving tax revenue for the benefit of its residents. For example, National Harbor is a resort development with hotels, a casino, restaurants, entertainment, a marina, and shops located on the Potomac River in Prince George's County, Maryland. Although Maryland does not own National Harbor, the various hotels and other businesses in the complex generate significant tax revenue for state and local governments, through income tax assessed on the businesses and their employees, sales tax, hotel tax, and other taxes and fees.

49

**Response:**  The allegations in Paragraph 116 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

117.    The National Harbor development includes MGM National Harbor, a hotel, entertainment, shopping, and casino complex that is subject to a Community Benefit Agreement between MGM National Harbor, LLC, and the government of Prince George's County, a subdivision of the State of Maryland. The Community Benefit Agreement sets goals encouraging MGM National Harbor to hire Prince George's County residents, to contract with minority business enterprises and other businesses located in the County, and to create investment opportunities for County residents. The casino is operated under a gaming license granted by the Maryland Lottery and Gaming Control Commission, a state government entity. Under Maryland law, the state and local governments receive 56% of the proceeds generated by MGM National Harbor's video lottery terminals and 20% of the gross proceeds generated by its table games. In the first four months of 2017, MGM National Harbor's casino proceeds contributed more than $75 million in revenue to state and local government treasuries to fund various public purposes, including more than $55 million for the State's Education Trust Fund. Any circumstance that impairs National Harbor's ability to attract visitors and guests will diminish the revenues on which the state and local governments depend.

**Response:**  The allegations in Paragraph 117 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

118.    Trump International Hotel, located in the District of Columbia, is a direct competitor of National Harbor's hotels and other businesses, including MGM National Harbor. Those hotels and businesses suffer competitive harm by the defendants' ongoing constitutional violations, and Maryland's tax coffers, in turn, are diminished as a result.

**Response:**  The allegations in Paragraph 118 consist of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, are denied.  Moreover, allegations of injury to Maryland's tax coffers concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

### Proprietary and other financial injuries to the plaintiffs

119.   ***The District of Columbia.*** The District has a financial interest in properties, venues, and other enterprises located within the District as owner, lender, or landlord.

**Response:**  The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 119.

120.   The District owns the Walter E. Washington Convention Center. The Washington Convention and Sports Authority (also known as Events DC), is an instrumentality of the government of the District of Columbia. Events DC operates event and conference venues in the District, including the Walter E. Washington Convention Center, D.C. Armory, and Carnegie Library.

**Response:**  The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 120.

121.   The District, through Events DC, serves the diplomatic community and foreign and state governments by providing services that compete with those owned or controlled by the defendant or the Trump Organization.

**Response:**  The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 121.

122.   In fiscal year 2016, Events DC generated over $30 million in revenue from building rental and ancillary charges. A portion of Events DC's revenue is based on demand for the Convention Center, D.C. Armory, and Carnegie Library.

**Response:**  The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 122.

123.    On August 9, 2016, the Embassy of Colombia partnered with the U.S. Soccer Foundation to host an Olympic watch party at the Carnegie Library for the soccer match between the U.S. Women's National team and Colombia.

**Response:**  The President lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 123.

124.    On September 6, 2016, the Embassy of Tajikistan celebrated Tajikistan Independence Day at a reception held at the Carnegie Library.

**Response:**  The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 124.

125.    As discussed above, Trump International Hotel Washington, D.C., specifically markets its hotel rooms, event space, and food and beverage services to the diplomatic community and foreign governments.

**Response:**  The Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125.

126.    The defendant, his family, and other members of the defendant's administration have continued to promote his hotel properties, such as by making multiple appearances at those properties, including in connection with official business.

**Response:**  The Defendant denies the allegations in Paragraph 126, except to admit that the Defendant, his family, and members of the administration have visited the Trump International Hotel in Washington, D.C.  The Defendant lacks knowledge or information sufficient to form a belief about the details of visits by persons other than himself to the Hotel.

127.    Since the defendant's inauguration, foreign governments (including the Embassy of Kuwait and the Kingdom of Saudi Arabia) have held events at the hotel, and

public officials have stated that, since the defendant was elected president, they are more likely to pay for goods and services at the defendant's properties in an attempt to curry favor with him.

**Response:** The Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 127.

128.    The defendant's receipt or acceptance of presents or emoluments through the Trump International Hotel Washington, D.C. and other properties owned or controlled by the defendant or the Trump Organization has resulted in a competitive injury to the Walter E. Washington Convention Center, D.C. Armory, and Carnegie Library.

**Response:** Paragraph 128 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, the Defendant lacks knowledge or information sufficient to form a belief as to the truth of the factual basis for the allegations of Plaintiffs' injuries, and denies the remaining allegations.

129.    The District's interest is further injured by the loss of the economic value of its brands in comparison to defendant's brand, as foreign and state governments and their agents and instrumentalities favor his businesses for reasons related to the defendant's receipt or acceptance of presents or emoluments.

**Response:** Paragraph 129 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, the Defendant lacks knowledge or information sufficient to form a belief as to the truth of the factual basis for the allegations of Plaintiffs' injuries, and otherwise denies the remaining allegations.

130.    ***The State of Maryland.*** Maryland has a proprietary interest in properties, venues, and enterprises that directly compete with those owned or controlled by the

defendant or the Trump Organization. Maryland suffers economic loss because its enterprises are placed at a competitive advantage as the result of the defendant's ongoing violations of the Foreign and Domestic Emoluments Clauses.

**Response:**  Paragraph 130 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, the Defendant lacks knowledge or information sufficient to form a belief as to the truth of the factual basis for the allegations of Maryland's injuries, and otherwise denies the remaining allegations in this paragraph.

131.    Specifically, Maryland has a direct financial interest in the Montgomery County Conference Center, part of the Bethesda North Marriott Hotel and Conference Center located in Bethesda, Maryland. The site of the hotel and conference center is owned by the Montgomery County Revenue Authority, a public corporation established by Montgomery County, which is a subdivision of the State of Maryland. The County Revenue Authority leased the conference center portion of the site to Montgomery County and to the Maryland Stadium Authority, an instrumentality of the State, as equal tenants-in-common to develop the conference center. The development of the conference center was funded through bonds issued by the Maryland Stadium Authority, separate bonds issued by the County Revenue Authority, and direct contributions from Montgomery County. The County Revenue Authority also leased the hotel portion of the site to a consortium of private investors that funded the development of the hotel. The hotel and conference center are overseen by a management committee that includes representatives of Montgomery County and the Maryland Stadium Authority, and the facility is operated by Marriott Hotel Services, Inc., under an agreement with Montgomery County. The conference center offers approximately 39,000 square feet of meeting space. In fiscal year 2016, activities at the conference center generated, directly and indirectly, an estimated $45.9 million in spending, and yielded estimated tax

54

revenues of more than $2.7 million for the State and nearly $1 million for Montgomery County.

**Response:**  The Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 131.

132.    Furthermore, as explained above, the State of Maryland has suffered financial harm because it has a sovereign interest in the receipt of tax revenues from facilities (like the National Harbor) that are in competition with businesses owned by the defendant and/or his affiliated enterprises outside the State.

**Response:**  The allegations in Paragraph 132 concern claims that were dismissed by the Court's March 28, 2018 Order.  Accordingly, no response to these allegations is required.

133.    The declaratory and injunctive relief that the plaintiffs are seeking would remedy these injuries by eliminating the plaintiffs' competitive disadvantage vis-à-vis the defendant.

**Response:**  Paragraph 133 consists of legal conclusions and legal arguments to which no response is required, but to the extent a response may be deemed required, is denied.

## V.

## CLAIMS

## COUNT I

## Violations of the Foreign Emoluments Clause

## (Declaratory and Injunctive Relief)

134.    As discussed in detail above, the defendant has violated—and will continue to violate—the Foreign Emoluments Clause. The phrase "Person holding any Office of Profit or Trust," as used in the clause, includes the President. The phrases "present" and "Emolument . . . of any kind whatever" together cover anything of value,

55

including without limitation monetary and non-monetary gifts or transactions, transactions granting special treatment, and transactions above marginal cost. And the phrase "any King, Prince, or foreign State" includes any foreign government and any agent or instrumentality thereof.

**Response:** Paragraph 134 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

135.    The defendant has accepted "present[s]" or "Emolument[s]" directly from—or from agents or instrumentalities of—China, the United Arab Emirates, Kuwait, Indonesia, Saudi Arabia, Afghanistan, Qatar, India, Georgia, the United Kingdom, and other "foreign State[s]," without seeking or obtaining "the Consent of the Congress" as required by the Foreign Emoluments Clause.

**Response:** Paragraph 135 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

136.    As described more fully in paragraphs 29 to 78 herein, the defendant is committing or will commit these violations in connection with transactions involving the Trump International Hotel Washington, D.C., New York's Trump Tower and Trump World Tower, restaurants the defendant owns or that are located in his hotels or other properties, the television program "The Apprentice" and its spinoffs and international versions, and other business and property interests and transactions in the United States and abroad.

**Response:** Paragraph 136 references the allegations of Paragraphs 29 to 78 and the Defendant incorporates by reference his responses to those paragraphs as if fully set forth herein.  Moreover, this paragraph contains allegations concerning claims dismissed by the Court's March 28, 2018 Order, and accordingly, no response to those allegations

is required.  The remainder of Paragraph 136 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

137.    As a direct result of these violations of the Foreign Emoluments Clause, the plaintiffs, and their residents, have suffered significant harm. They also stand to suffer additional significant harm directly from the further occurrence of these violations.

**Response:**  Paragraph 137 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, the Defendant lacks knowledge or information sufficient to form a belief as to the truth of the factual basis for the allegations of Plaintiffs' harm, and otherwise denies the allegations.

138.    No plan announced by the defendant or his attorneys as of the date of this filing can make this conduct constitutional or otherwise remedy these constitutional violations.

**Response:**  Paragraph 138 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

139.    The District of Columbia and the State of Maryland are entitled to injunctive and declaratory relief to stop the above-mentioned Foreign Emoluments Clause violations and any other Foreign Emoluments Clause violations. This Court has the power to grant such relief pursuant to its inherent authority to grant equitable relief and 28 U.S.C. §§ 1331 and 2201.

**Response:**  Paragraph 139 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

## COUNT II

## Violations of the Domestic Emoluments Clause

## (Declaratory and Injunctive Relief)

140.    As discussed in detail above, the defendant has also violated—and will continue to violate—the Domestic Emoluments Clause. As President, he is the sole subject of the clause. The phrase "any other Emolument" under the clause covers remuneration beyond the President's "Compensation" as set by Congress, including monetary and non-monetary payments or transactions, transactions granting special treatment, and transactions above marginal cost. And the phrase "the United States, or any of them" includes any part of the federal government, any state government, any local government, and any agent or instrumentality thereof.

**Response:**  Paragraph 140 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

141.    The defendant is and will be accepting "any other Emolument" from "the United States, or any of them." As described more fully in paragraphs 79 to 99 herein, the defendant has committed violations of the Domestic Emoluments Clause, and without this Court's intervention he will continue violate the clause.

**Response:**  Paragraph 141 references the allegations of Paragraphs 79 to 99 and the Defendant incorporates by reference his responses to those paragraphs as if fully set forth herein.  Moreover, this paragraph contains allegations concerning claims dismissed by the Court's March 28, 2018 Order, and accordingly, no response to those allegations is required.  The remainder of Paragraph 141 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

142.     As a direct result of these violations of the Domestic Emoluments Clause, the plaintiffs, and their residents, have suffered significant harm. They also stand to suffer additional significant harm directly from the further occurrence of these violations.

**Response:**  Paragraph 142 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, the Defendant lacks knowledge or information sufficient to form a belief as to the truth of the factual basis for the allegations of Plaintiffs' harm, and otherwise denies the allegations.

143.     No plan announced by the defendant or his attorneys as of the date of this filing can make this conduct constitutional or otherwise remedy these constitutional violations.

**Response:**  Paragraph 143 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

144.     The District of Columbia and the State of Maryland are entitled to declaratory and injunctive relief to stop and prevent the above-mentioned Domestic Emoluments Clause violations and any other violations of the clause. This Court has the power to grant such relief pursuant to its inherent authority to grant equitable relief and 28 U.S.C. §§ 1331 and 2201.

**Response:**  Paragraph 144 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

## VI.

## PRAYER FOR RELIEF

WHEREFORE, the District of Columbia and the State of Maryland respectfully request that this Court enter a judgment in their favor and against the defendant, consisting of:

(a)      A declaratory judgment, stating that the defendant has violated and will continue to violate the Foreign and Domestic Emoluments Clauses, as construed by this Court;

(b)      injunctive relief, enjoining the defendant from violating the Foreign and Domestic Emoluments Clauses, as construed by this Court;

(c)      such other and further relief as this Court may deem just and proper.

**Response:**  This final section of the Amended Complaint consists of Plaintiffs' request for relief, to which no response is required, but to the extent a response may be deemed required, the Defendant denies that Plaintiffs are entitled to the relief requested or to any relief.

Each and every allegation of the Amended Complaint not heretofore expressly responded to is hereby denied.

### AFFIRMATIVE DEFENSES

1.      Plaintiffs do not have standing.

2.      The Court lacks jurisdiction to issue the relief requested.

3.      Plaintiffs have failed to state a claim.

Dated:  September 5, 2018                    Respectfully Submitted:

                                                     JOSEPH H. HUNT
                                                     Assistant Attorney General

                                                     BRETT A. SHUMATE
                                                     Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

/s/ *Jean Lin*
JEAN LIN
Special Counsel
JAMES R. POWERS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20530
Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 5, 2018, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *Jean Lin*
JEAN LIN