**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| THE DISTRICT OF COLUMBIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 8:17-cv-1596-PJM |
| DONALD J. TRUMP, in his official capacity as President of the United States and in his individual capacity, | |
| *Defendants*. | |

**REPLY OF THE PRESIDENT, IN HIS OFFICIAL CAPACITY, IN SUPPORT OF HIS MOTION FOR CERTIFICATION OF THIS COURT'S MARCH 28 AND JULY 25, 2018 ORDERS PURSUANT TO 28 U.S.C. § 1292(b) AND FOR A STAY PENDING APPEAL**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

I.   THIS COURT SHOULD CERTIFY ITS MARCH 28 AND JULY 25 ORDERS FOR
     INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292(b). ................................... 2

     A.  Plaintiffs Have Misconstrued the Standard for Interlocutory Appeal. .............................. 2

     B.  The Interpretation of the Emoluments Clauses Satisfies § 1292(b)'s Requirements for
         Interlocutory Appeal. ......................................................................................................... 7

         1.   The interpretation of the Emoluments Clauses is a controlling question of law, the
              immediate resolution of which may materially advance the ultimate termination of
              this case. ...................................................................................................................... 7

         2.   There is substantial ground for difference of opinion as to the interpretation of the
              Emoluments Clauses. ................................................................................................... 9

     C.  The Question Whether Plaintiffs' Interests Are Addressed by the Emoluments Clauses
         Satisfies § 1292(b)'s Requirements for Interlocutory Appeal. .......................................... 10

     D.  The Question Whether Plaintiffs Have Standing Satisfies § 1292(b)'s Requirements for
         Interlocutory Appeal. ......................................................................................................... 11

     E.  The Question Whether the Court Can Grant Equitable Relief Against the President
         Satisfies the Standard for Interlocutory Appeal. ............................................................... 14

II.  A STAY PENDING APPEAL IS APPROPRIATE IF THE COURT CERTIFIES EITHER
     OF ITS ORDERS FOR INTERLOCUTORY APPEAL. ....................................................... 15

CONCLUSION ........................................................................................................................... 17

# TABLE OF AUTHORITIES

## CASES

*Adams v. Watson*,
   10 F.3d 915 (1st Cir. 1993) ................................................................................. 12

*Al Maqaleh v. Gates*,
   620 F. Supp. 2d 51 (D.D.C. 2009) ........................................................................ 5

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982) ............................................................................................ 13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................................. 8

*Berry v. Reagan*,
   No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) .......................................... 15

*Boumediene v. Bush*,
   553 U.S. 723 (2008) ............................................................................................ 15

*Cheney v. U.S. Dist. Ct. for D.C.*,
   542 U.S. 367 (2004) ..................................................................................... *passim*

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................................................ 14

*Clinton v. City of N.Y.*,
   524 U.S. 417 (1998) ............................................................................................ 15

*Clinton v. Jones*,
   520 U.S. 681 (1997) ........................................................................................ 6, 17

*Coal. for Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*,
   No. CCB-06-2773, 2015 WL 4040425 (D. Md. June 29, 2015) ........................ 4, 5

*CREW v. Trump*,
   276 F. Supp. 3d 179 (S.D.N.Y. 2017),
   *appeal pending*, No. 18-474 (2d Cir. Feb. 16, 2018) ........................................... 13

*Doe v. Trump*,
   Civ. No. 17-1597, 2018 WL 3736435 (D.D.C. Aug. 6, 2018) ............................ 14

*Fernandez-Roque v. Smith*,
   671 F.2d 426 (11th Cir. 1982) .............................................................................. 5

*Goodman v. Archbishop Curley High Sch., Inc.*,
   195 F. Supp. 3d 767 (D. Md. 2016) ...................................................................... 4

*In re Baker & Getty Fin. Servs., Inc.*,
   954 F.2d 1169 (6th Cir. 1992) ................................................................. 3

*In re Cement Antitrust Litig.*,
   673 F.2d 1020 (9th Cir. 1981),
   *aff'd sub nom., Arizona v. Ash Grove Cement Co.*, 459 U.S. 1190 (1983) .............................. 3

*In re Microsoft Corp. Antitrust Litig.*,
   274 F. Supp. 2d 741 (D. Md. 2003) .......................................................... 3

*In re Miedzianowski*,
   735 F.3d 383 (6th Cir. 2013) ................................................................. 5

*In re Sealed Case*,
   121 F.3d 729 (D.C. Cir. 1997) ............................................................... 17

*In re Trump*,
   874 F.3d 948 (6th Cir. 2017) ........................................................... 4, 9, 10

*In re United States*,
   138 S. Ct. 443 (2018) ......................................................................... 5

*Inv. Co. Inst. v. Camp*,
   401 U.S. 617 (1971) ......................................................................... 12

*Johnson v. Burken*,
   930 F.2d 1202 (7th Cir. 1991) ................................................................. 3

*Katz v. Carte Blanche Corp.*,
   496 F.2d 747 (3d Cir. 1974) .................................................................. 3

*Kennedy v. Villa St. Catherine, Inc.*,
   No. PWG-09-3021, 2010 WL 9009364 (D. Md. June 16, 2010) .............................. 4

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in
   Amministrazione Straordinaria*,
   921 F.2d 21 (2d Cir. 1990) .................................................................... 4

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ......................................................................... 16

*Lynn v. Monarch Recovery Mgmt., Inc.*,
   953 F. Supp. 2d 612 (D. Md. 2013) ........................................................... 4

*Mackie v. Bush*,
   809 F. Supp. 144 (D.D.C. 1993),
   *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993) .............................. 15

*Mississippi v. Johnson*,
    71 U.S. 475 (1867) ................................................................................ 14

*Mohawk Industries, Inc. v. Carpenter*,
    558 U.S. 100 (2009) ........................................................................... 9, 10

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*,
    508 U.S. 656 (1993) ............................................................................. 12

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) ............................................................... 12

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ............................................................................... 6

*Reese v. BP Expl. (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) ................................................................. 4

*TrafficSchool.com, Inc. v. Edriver Inc.*,
    653 F.3d 820 (9th Cir. 2011) ............................................................... 12

*United States v. Burr*,
    25 F. Cas. 187 (C.C.D. Va. 1807) ....................................................... 15

*United States v. Nixon*,
    418 U.S. 708 (1974) .................................................................. 6, 15, 17

*Virginia ex rel. Cuccinelli v. Sebelius*,
    656 F.3d 253 (4th Cir. 2011) ..................................................... 2, 3, 16

## STATUTES

28 U.S.C. § 1292(b) ................................................................... *passim*

## OTHER AUTHORITIES

16 Fed. Prac. & Proc. Juris. § 3930 (3d ed. 2008) ................................... 3, 4

S. Rep. No. 85-2434, 1958 WL 3723 ........................................................ 3

## INTRODUCTION

The President demonstrated in his motion for certification that this Court's March 28 and July 25, 2018 Orders not only meet the statutory criteria for interlocutory review under 28 U.S.C. § 1292(b), but also present precisely the kind of extraordinary circumstance that § 1292(b) is designed to address.  The Court has interpreted two constitutional provisions never before interpreted by a federal court, in a 52 page opinion that amply demonstrates the complexity of the interpretive task.  It has done so in a case seeking equitable relief solely against a sitting President of the United States and in which Plaintiffs seek to subject the President to civil discovery in his official capacity—an extraordinary, if not unprecedented, scenario.  Even if the prospect of granting equitable relief against the President by itself is not enough to counsel restraint, Plaintiffs have indicated that they may seek discovery of Presidential communications, which necessarily would infringe on the Executive's Article II prerogatives and "push[] to the fore difficult questions of separation of powers and checks and balances."  *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389 (2004).  The Supreme Court has firmly instructed that such "occasion[s] for constitutional confrontation between the two branches should be avoided whenever possible."  *Id.* at 389–90.  Certification of the March 28 and July 25 Orders for interlocutory appeal would serve to avoid such potential confrontation because there are multiple ways that this case could be terminated on appeal: the Court of Appeals could conclude that Plaintiffs lack standing to pursue their claims; that Plaintiffs have not asserted interests addressed by the Emoluments Clauses to pursue an equitable cause of action thereunder; that Plaintiffs have failed to state a claim; or that this Court lacks jurisdiction to issue the requested equitable relief against the President.

The President's motion clearly establishes that both the March 28 and July 25 Orders are fit for interlocutory appeal because they resolve four "controlling question[s] of law" as to which there are "substantial ground[s] for difference of opinion" and an immediate appeal of those orders "may materially advance the ultimate termination of this litigation."  28 U.S.C. § 1292(b). The additional factors of the novelty of the constitutional issues, the separation of powers

concerns raised by the proceedings, and the national significance of the dispute all further weigh in favor of granting interlocutory appeal.

Plaintiffs' opposition brief fails to rebut the President's showing. Their brief applies a § 1292(b) standard that is contrary to the weight of authority and appears premised on the mistaken view that appellate review on interlocutory appeal would be limited to certified questions, rather than to all issues fairly encompassed within the district court's certified order. Moreover, Plaintiffs fail to identify any cognizable harm that would outweigh the public's interest in a temporary stay pending appeal if the Court grants certification. Whereas "the public interest requires that [the Judiciary] . . . give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties," *Cheney*, 542 U.S. at 382, Plaintiffs point only to their abstract interest as state and local governments in ensuring that their residents are not harmed by the President's alleged violation of the Constitution. Such generalized interest is insufficient to tip the balance against a stay, especially given the Fourth Circuit's admonition that States are not "roving constitutional watchdog[s]," *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 272 (4th Cir. 2011), and "the federal judiciary" is not a "forum for the vindication of a state's generalized grievances about the conduct of [the Federal] government," *id.* at 271. In sum, this Court should certify its March 28 and July 25 Orders for interlocutory appeal and grant a stay pending appeal.

## ARGUMENT

## I.   THIS COURT SHOULD CERTIFY ITS MARCH 28 AND JULY 25 ORDERS FOR INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292(b).

### A.  Plaintiffs Have Misconstrued the Standard for Interlocutory Appeal.

As an initial matter, Plaintiffs' opposition brief presents an interpretation of § 1292(b) that is inconsistent with its plain language, the weight of authority, and the fundamental precept that § 1292(b) is meant to be applied flexibly, taking into account "the difficulty and general importance of the question presented, the probability of reversal, the significance of the gains

from reversal, and the hardship on the parties in their particular circumstances." 16 Fed. Prac. & Proc. Juris. § 3930 (3d ed. 2008); *id.* ("Section 1292(b) is best used to inject an element of flexibility into the technical rules of appellate jurisdiction, established for final-judgment appeals . . . and for interlocutory appeals").

First, although referencing a less stringent standard in passing, Plaintiffs repeatedly rely on the proposition that a "controlling question of law" is one whose resolution would terminate the case. *See, e.g.*, Pls.' Opp'n to Def.'s Mot. ["Pls.' Opp'n"] at 10, ECF No. 133. The weight of the authority, however, is that a question of law is "controlling" within the meaning of § 1292(b) if it "control[s] many aspects of the proceedings in substantial respects, particularly the scope of the discovery." *In re Microsoft Corp. Antitrust Litig.*, 274 F. Supp. 2d 741, 742 (D. Md. 2003); *see also Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991) (observing that the standard for "controlling" questions "should be kept flexible" and acknowledging that "'controlling' means serious to the conduct of the litigation, either practically or legally'") (quoting *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974)); *In re Baker & Getty Fin. Servs., Inc.*, 954 F.2d 1169, 1172 n.8 (6th Cir. 1992) ("all that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of litigation in the district court") (quoting *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1981), *aff'd sub nom., Arizona v. Ash Grove Cement Co.*, 459 U.S. 1190 (1983)).

That authority makes sense, as any other interpretation would render superfluous the third element of § 1292(b), which allows an immediate appeal from an order that "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). A legal question that would eliminate complex issues or make discovery significantly easier if resolved could never satisfy Plaintiffs' criteria for interlocutory appeal. And such questions touch on precisely the sort of practical concerns about wasted expense and time that animated Congress in affording the flexibility of interlocutory appeals under § 1292(b). *See* S. Rep. No. 85-2434, 1958 WL 3723, *5256 (1958) (citing these considerations in discussing example of a jurisdictional ruling, as well as an order concerning the non-dispositive issue of joinder of a third party defendant); *Kennedy*

3

*v. Villa St. Catherine, Inc.*, No. PWG-09-3021, 2010 WL 9009364, at *1 (D. Md. June 16, 2010) (purpose behind § 1292(b) review is "to avoid unnecessary litigation"); *accord* 16 Fed. Prac. & Proc. Juris. § 3930. Congress did not limit § 1292(b) to questions whose resolution would themselves terminate the case, and this court should not either. But in any event, the request for certification encompasses a number of issues that plainly would terminate the case if the Court of Appeals decides them in the President's favor.

Second, Plaintiffs seem to argue that a novel question of law can never satisfy the requirement that there be a "substantial ground for difference of opinion" as to that question because only a disagreement *among the courts* suffices. *See, e.g.*, Pls.' Opp'n at 11; *see also id.* at 8. But again, the weight of the authority is that "a novel issue may be certified for interlocutory appeal without first awaiting development of contradictory precedent" if "fair-minded jurists might reach contradictory conclusions." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011); *see also In re Trump*, 874 F.3d 948, 952 (6th Cir. 2017) (same); *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 25 (2d Cir. 1990) (interlocutory appeal appropriate where issues were "difficult and of first impression"); *Goodman v. Archbishop Curley High Sch., Inc.*, 195 F. Supp. 3d 767, 774 (D. Md. 2016); *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 624 (D. Md. 2013); *Kennedy*, 2010 WL 9009364, at *2. To hold otherwise would deprive a district court of the flexibility inherent in § 1292(b), pursuant to which "[t]he level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case." *Coal. for Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, No. CCB-06-2773, 2015 WL 4040425, at *6 (D. Md. June 29, 2015) (quoting 16 Fed. Prac. & Proc. Juris. § 3930).

Finally, Plaintiffs' suggestion that § 1292(b)'s third element requires that there be "substantial doubt that the district court's order was correct," Pls.' Opp'n at 4, is in tension with both the statutory language and substantial authority holding that the standard is satisfied if "reasonable jurists might disagree on an issue's resolution." *Reese*, 643 F.3d at 688. A

controlling question of law may satisfy this requirement if: "(1) the question is difficult, novel and either a question on which there is little precedent or one whose correct resolution is not substantially guided by previous decisions; (2) the question is difficult and of first impression; (3) a difference of opinion exists within the controlling circuit; or (4) the circuits are split on the question." *In re Miedzianowski*, 735 F.3d 383, 384 (6th Cir. 2013).  Indeed, even where a court is "confident in the correctness" of its ruling on an issue of first impression—which is a far cry from there being substantial doubt—it may certify the ruling for interlocutory appeal in the context of an "extraordinarily important case." *Coal. for Equity & Excellence in Md. Higher Educ.*, 2015 WL 4040425, *6; *see also Al Maqaleh v. Gates*, 620 F. Supp. 2d 51, 55 (D.D.C. 2009) (granting § 1292(b) certification given "the novelty  of the issues" in a case involving whether alien detainees held in Afghanistan have a constitutional right to writ of habeas corpus).

Cases such as *In re United States*, 138 S. Ct. 443 (2018), and *Fernandez-Roque v. Smith*, 671 F.2d 426 (11th Cir. 1982), cited in the President's motion, confirm these propositions, including that a district court should certify interlocutory orders for immediate appeal in cases of significant constitutional import or national significance.  Plaintiffs attempt to distinguish *In re United States* and *Fernandez-Roque v. Smith* on the basis that the district courts in those cases failed to first rule on the threshold jurisdictional and justiciability questions, whereas this Court has thoroughly reviewed the President's jurisdictional arguments.  Pls.' Opp'n at 16–17.  That purported distinction is meritless.  *In re United States* involved suits to enjoin the rescission of the Deferred Action for Childhood Arrivals ("DACA") policy, 138 S. Ct. at 443, and *Fernandez-Roque* involved "novel controversies" concerning the rights of illegal aliens and "the scope of the constitutional powers of Congress and the President to conduct foreign affairs," 671 F.2d at 431.  The lesson of each of those cases is not only that district courts should resolve jurisdictional issues at the outset but also that they should certify for interlocutory appeal substantial threshold legal issues before proceeding with a case of extraordinary national significance.  The writ of mandamus issued in *Fernandez-Roque*, for example, explicitly required the district court to certify its still-pending jurisdictional ruling for interlocutory appeal

upon the request of any party.  671 F.2d at 432.  *See also In re United States*, 138 S. Ct. at 444

(directing the district court to consider whether to certify for interlocutory appeal its ruling on the

threshold issues once the ruling is made).  Moreover, neither the Supreme Court's instruction in

*In re United States*, nor the Eleventh Circuit's writ of mandamus in *Fernandez-Roque*, depended

on the district court issuing a preliminary injunction.  Contrary to Plaintiffs' suggestion (*see* Pls.'

Opp'n at 16–17), these cases were not relying on the purported efficiency gain of certifying an

interlocutory appeal where an appeal as of right could already be taken from the preliminary

injunction.

Plaintiffs further argue that *In re United States* and *Fernandez-Roque* are inapposite

because they involved the Judiciary's need to avoid interfering with the Executive Branch's

broad authority over immigration policy.  Pls.' Opp'n at 17.  But the separation-of-powers

concerns are far more compelling here given the '"unique position in the constitutional scheme'

that 'the [Office of the President] occupies."  *Clinton v. Jones,* 520 U.S. 681, 698–99 (1997)

(quoting *Nixon v. Fitzgerald,* 457 U.S. 731, 749 (1982)).  As the Supreme Court emphasized in

*Cheney*, "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that

should inform the conduct of the entire proceeding," and "the Executive's constitutional

responsibilities and status [are] factors counseling judicial deference and restraint in the conduct

of litigation against it."  542 U.S. at 385 (citations omitted).  "In no case . . . would a court be

required to proceed against the president as against an ordinary individual."  *Id.* at 382–93

(citation omitted).

These separation-of-powers considerations are particularly pronounced in this case,

where Plaintiffs have indicated that they may seek the President's communications with foreign

and domestic governments.  *See* Rule 26(f) Report at 4, ECF No. 132; Pls.' Opp'n at 24.  "It is

well established that 'a President's communications and activities encompass a vastly wider

range of sensitive material than would be true of any 'ordinary individual.'"  *Cheney*, 542 U.S. at

381 (quoting *United States v. Nixon*, 418 U.S. 708, 715 (1974)).  Thus, "special considerations

control when the Executive Branch's interests in maintaining the autonomy of its office and

safeguarding the confidentiality of its communications are implicated." *Id.* at 385. If the President is required to assert executive privilege, "coequal branches of the Government [would be] set on a collision course" and the Judiciary would then be "forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives." *Id.* at 389. Accordingly, the Supreme Court has cautioned that "[t]hese occasion[s] for constitutional confrontation between the two branches should be avoided whenever possible." *Id.* at 389–90 (citation omitted). Certifying the Court's threshold rulings for interlocutory review could avoid forcing the Court to grapple with such issues in this case.

In any event, applying the above discussed § 1292(b) standards, it is evident that all four legal questions identified by the President satisfy the requirements of § 1292(b), thus permitting the Court to certify both the March 28 and July 25 Orders for interlocutory appeal.

### B. The Interpretation of the Emoluments Clauses Satisfies § 1292(b)'s Requirements for Interlocutory Appeal.

#### 1. The interpretation of the Emoluments Clauses is a controlling question of law, the immediate resolution of which may materially advance the ultimate termination of this case.

The President's motion demonstrated that the interpretation of the Emoluments Clauses is a controlling question of law because it is a legal issue that the Court of Appeals can decide without having to delve beyond the surface of the record, and because its immediate resolution would either terminate or substantially narrow this case. President's Mot. for § 1292(b) Certification and for a Stay Pending Appeal ["Def.'s Mot."] at 8–9, ECF No. 127.

Perhaps recognizing that they cannot dispute the novelty and complexity of this question, Plaintiffs attempt to minimize the importance of resolving it, contending that they have stated a claim even under the President's interpretation of the Clauses. Pls.' Opp'n at 9. Plaintiffs are wrong. The Court denied the President's motion to dismiss for failure to state a claim by adopting in material respects Plaintiffs' definition of the term "Emolument" in the Emoluments Clauses. *See* July 25 Op. at 47, ECF No. 123. If the Court of Appeals agrees with the President's interpretation—"Emolument" refers to benefits arising from office or employ—

7

Plaintiffs would not have stated any claim.  The Amended Complaint alleges no foreign government benefits the President received in exchange for his personal service as President or in an employment (or equivalent) relationship with a foreign government.  Nor does it allege any state or federal government benefit the President received in exchange for his service as President.[1]

Plaintiffs cite the Court's observation that the Governor of Maine has patronized the Hotel using state funds and that on one occasion, the Governor and the President appeared at a news conference at which the President signed an executive order potentially favorable to Maine. *See* Pls.' Opp'n at 9–10.  This allegation is not in the Amended Complaint.  Although the Court found that it need not be specifically alleged because it was merely an example of the general allegation that state governments have patronized the Trump Hotel using state funds, *see* July 25 Op. at 48 n.45, the Amended Complaint does not contain a general allegation that state governments are patronizing the Hotel *in exchange for* the President's service as President.  This extra-pleading anecdote, therefore, is of no help to Plaintiffs if the President's interpretation prevails.  And even if the Court of Appeals were to read this anecdote into the Amended Complaint, the case would still be significantly narrowed, not to mention that the standing allegations would become particularly implausible if the claim were narrowed to this anecdote.

Plaintiffs also attempt to revise the President's interpretation of the Emoluments Clauses.  They claim that the benefits the President allegedly derives from the Trump Hotel in the District

---

[1] Plaintiffs' allegation concerning the General Services Administration ("GSA") lease for the Trump Hotel site fails to plausibly state such a claim because there is no allegation that any benefit provided by GSA was in exchange for the President's services as President.  The Amended Complaint merely alleges parallel conduct between the President's alleged increase in his budget request for GSA and GSA's purported forgiveness of the President's alleged breach of the lease.  *See* Am. Compl. ¶¶ 80–86, ECF No. 95; *cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) ("an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to state an antitrust claim).  And as a matter of public record, there was in fact no increase in the President's budget request for GSA from the prior fiscal year's request.  *See* Def.'s Reply in Supp. of Mot. to Dismiss ["Def.'s MTD Reply"] at 28–29, ECF No. 70.  But even if the issue about the GSA lease remained, the case would still be substantially narrowed.

of Columbia are within the definition of the term "employ" and thus, within the President's definition of "emolument" as "profit arising from office or employ."  Pls.' Opp'n at 10.  But that misapprehends the President's interpretation, which instead focuses on the President's provision of *personal* services pursuant to an office or employ, such as signing a treaty, implementing a policy, or serving as a consultant to a foreign government.  The Amended Complaint does not allege any such exchange involving foreign governments that would trigger the Foreign Emoluments Clause.  And, when coupled with the limitation in the Domestic Emoluments Clause that such personal services be rendered by the President in his capacity as President, the Domestic Emolument Clause would not cover profits from the operation of the Trump Hotel.

**2.   There is substantial ground for difference of opinion as to the interpretation of the Emoluments Clauses.**

The President's motion also demonstrated that the interpretation of the Emoluments Clauses is an issue about which fair-minded jurists might reach contradictory conclusions.  *See* Def.'s Mot. at 11–21.  Plaintiffs' only response is that the Court has already rejected all of the President's definitional arguments and there is no disagreement among courts on the matter because it is an issue of first impression.  *See* Pls.' Opp'n at 11–13.  But in every case seeking certification under § 1292(b), the Court will have already ruled against the movant on the underlying question of law.  And as already discussed above, the fact that a controlling question of law is an issue of first impression by no means disqualifies an order from being certified for interlocutory appeal.  Rather, the importance and complexity of the novel issue should weigh heavily in favor of interlocutory appeal.

Plaintiffs also quibble with the President's reliance on *In re Trump*, 874 F.3d 948 (6th Cir. 2017), and *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009), arguing that the court in both cases had already found that statutory criteria for interlocutory review were met before considering the prudential factors.  *See* Pls.' Opp'n at 14.  But the President does not argue that he need not meet the statutory criteria for certification simply because proceeding with the case would trigger separation-of-powers concerns or because the case presents important

issues of first impression.  To the contrary, he argues that the court's two orders plainly satisfy the statutory criteria, in addition to presenting a paradigmatic case of the type of exceptional circumstances that warrant interlocutory appeal.  *Mohawk Industries* and *In re Trump* support the latter proposition.  In *Mohawk Industries*, the Supreme Court urged that "district courts should not hesitate to certify an interlocutory appeal" if a ruling involves "a new legal question or is of special consequence," 558 U.S. at 110–11, and in *In re Trump*, the Sixth Circuit, in permitting interlocutory appeal, explicitly recognized the apparent "practical and political consequences" of a case asserting a novel state law claim against a sitting President, 874 F.3d at 951–52.  This case presents precisely the type of legal questions of special consequence appropriate for certification.

### C.  The Question Whether Plaintiffs' Interests Are Addressed by the Emoluments Clauses Satisfies § 1292(b)'s Requirements for Interlocutory Appeal.

The second question of law that satisfies § 1292(b) is whether "Plaintiffs have asserted interests addressed by the [Emoluments] Clauses" and have an equitable cause of action under those Clauses.  Def.'s Mot. at 1, 8.  Plaintiffs contend that the question is not "controlling" because they read the President's certification motion to focus only on their proprietary, "economic interests."  Pls.' Opp'n at 8.  But by "economic interests," the President clearly was referring to interests against "competitive injuries," Def.'s Mot. at 22, which would encompass both Plaintiffs' proprietary and asserted *parens patriae* interests because both allegedly arise from business competition with the Trump Hotel.  *See infra.*

In any event, the President's position is that the Clauses only "guard against the risk that federal officeholders might be influenced by foreign or domestic governments in their decision-making as officials."  Def.'s Mot. at 22.  When thus construed, none of Plaintiffs' asserted interests—whether proprietary, *parens patriae*, or in avoiding an "intolerable dilemma"—nor their residents' interests as Americans (*see* Pls.' Opp'n at 8) would give rise to an equitable cause of action based on the Clauses.  Resolution of this question on appeal could resolve the case.

Moreover, there is plainly substantial ground for difference of opinion on this question, even under Plaintiffs' narrow view of that requirement. *See* Pls.' Opp'n at 4 (contending that an issue presents a substantial ground for difference of opinion only if *courts* disagree on a controlling legal issue). Although Plaintiffs assert that there is no disagreement among the courts "as to what the law is," *id.* at 8, that is manifestly incorrect given Judge George Daniels' contrary ruling on this question in *CREW v. Trump*, 276 F. Supp. 3d 174, 187–88 (S.D.N.Y. 2017), *appeal pending*, No. 18-474 (2d Cir. Feb. 16, 2018). This Court is the first ever to permit a party to pursue relief under the Emoluments Clauses for alleged competitive injury—or for any injury for that matter—and a reasonable jurist has disagreed with this Court's ruling on this important constitutional question. The requirement that there is "substantial ground for difference of opinion" on this question is satisfied.

### D. The Question Whether Plaintiffs Have Standing Satisfies § 1292(b)'s Requirements for Interlocutory Appeal.

The question of Plaintiffs' standing to bring this lawsuit also meets the § 1292(b) standard. *See* Def.'s Mot. at 23–24. As with the question whether Plaintiffs have asserted cognizable interests addressed by the Emoluments Clause discussed above, Plaintiffs seek to evade certification by narrowly construing the President's certification motion. They contend that the President's motion challenged only their injuries based on asserted competitor standing, not injuries to Plaintiffs' *parens patriae* and quasi-sovereign interests, and therefore resolution of this issue would not necessarily lead to the end of the litigation. Pls.' Opp'n at 5–6. This is a curious argument because, like their alleged proprietary interests, Plaintiffs' *parens patriae* interest is premised on alleged competitive injury. *See* March 28 Op. at 25, ECF No. 101 ("[Plaintiffs] claim their residents are harmed . . . because the competitive playing field is illegally tilted towards the President's Hotel, resulting in competitive disadvantage to Plaintiffs' resident businesses, which in turn curtails the opportunities and diminishes the earnings of their residents.") (citing Am. Compl. ¶ 114); Pls.' Opp'n to Def.'s MTD at 26, ECF No. 46

(explaining that their *parens patriae* injury is rooted in "competitive disadvantage" faced by competitors of the Trump Hotel).

Moreover, although the President's certification motion cited competitor standing as an "example" of "whether Plaintiffs have Article III standing to pursue their claims," Def.'s Mot. at 1, 8, 23, appellate review of Plaintiffs' standing would not be limited to that example.  A certification under § 1292(b) is not a certification of particular questions of law but of an interlocutory order, and thus, the appellate court may review anything fairly encompassed within that order.  *See id.* at 8 n.4.  In addition, if the Court certifies either the March 28 or July 25 Order in this case, and the Court of Appeals permits interlocutory appeal, then the issue of standing would necessarily be presented *in toto* to the appellate court, which would be under an obligation to assess its own jurisdiction.  *Id.*  If the Court of Appeals determines that Plaintiffs have no standing to maintain this suit, then this case would end.

As for whether reasonable jurists could disagree as to whether Article III standing could be based on allegations of competitive injuries like those at issue here, Plaintiffs insist that competitor standing is "well-recognized" and "straightforward."  Pls.' Opp'n at 6–7.  But the cases they cite either recognize standing on such a basis in a context where the court could readily infer injury[2] or do not actually involve competitor standing.[3]  And although Plaintiffs cite this Court's observation that the Supreme Court has recognized standing of competitors, *id.*, the Supreme Court's cases on the subject concern government regulators permitting new market entrants—a circumstance that far more readily permits an inference of injury to cognizable interests than the one at issue here.  *See, e.g.*, *Inv. Co. Inst. v. Camp*, 401 U.S. 617, 620 (1971).

Far from being "well recognized," application of a notion of competitor standing to the context presented by this case—a diffused market in which the competition conditions are

---

[2] Def.'s MTD Reply at 12 (distinguishing *Adams v. Watson*, 10 F.3d 915 (1st Cir. 1993)).

[3] Def.'s MTD Reply at 11, 13 (discussing *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656 (1993); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 448–49 (6th Cir. 2007); *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011)).

dependent on numerous variables, including the subjective views of third parties not before this court—appears unprecedented.  *See* Def.'s MTD Reply at 9–14.  Indeed, this case is unlike the typical competitor-standing case because, even assuming that an asserted interest as a competitor would be cognizable under the Emoluments Clauses, there is no basis in economic logic to presume that the President's mere financial interest in a business inevitably confers a competitive advantage over Plaintiffs' and their residents' businesses.  Moreover, the only court to address standing on the basis of asserted competitive injury in a similar context, *CREW*, 276 F. Supp. 3d 179, disagreed with this Court's ruling.  Plaintiffs' attempt to distinguish *CREW* on the ground that it involved "different plaintiffs" and "different facts," Pls.' Opp'n at 7, is unavailing.  *CREW* involved a substantially similar theory of competitor standing; the hospitality plaintiffs in that case alleged injuries stemming from the competition between their establishments in New York City and the Trump-named hotels (and their restaurants) in that city.  *See* Pls.' Opp'n to Def.'s MTD at 9, 15, *CREW v. Trump*, No. 1:17-cv-458, 2017 WL 3444116 (S.D.N.Y. Aug. 4, 2017) (arguing that "the [President's] conduct has tilted the marketplace, resulting in competitor injury to the plaintiffs in the hotel and restaurant industries").  An individual plaintiff in *CREW* also alleged competitive injury arising from competing with the Trump International Hotel in Washington, D.C. for the business of foreign government representatives.  *Id.* at 14.  In short, reasonable jurists have already disagreed about the asserted competitor standing in this context.

Finally, there are substantial grounds for difference of opinion as to Plaintiffs' "intolerable dilemma" theory of injury, which Plaintiffs characterize as a "quasi-sovereign interest"—a novel use of that term of art, *see Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602 (1982) (explaining that "[q]uasi-sovereign interests . . . consist of a set of interests that the State has in the well-being of its populace").  The Court itself noted that it has "located no case that recognizes an 'intolerable dilemma' as the basis for establishing injury-in-fact for standing purposes."  March 28 Op. at 17.  That is not surprising.  Plaintiffs' theory is premised on their fear that if they do not provide favorable treatment to the President's businesses, they would be placed at a disadvantage as compared to jurisdictions that do.  That

13

theory is in tension with the Supreme Court's standing jurisprudence disapproving of theories predicated on "speculative fear[s]" or an "attenuated chain of possibilities."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).  Thus, at the least, reasonable jurists could disagree as to whether Plaintiffs' "intolerable dilemma" theory can satisfy the Article III standing requirement.

### E.  The Question Whether the Court Can Grant Equitable Relief Against the President Satisfies the Standard for Interlocutory Appeal.

Finally, on the question whether this Court has jurisdiction to issue equitable relief against the President in his official capacity—the fourth controlling question of law identified by the President, Def.'s Mot. at 8–9, 24–25—Plaintiffs apparently concede that it is a controlling question of law, as they only dispute that there is substantial ground for difference of opinion as to that question, Pls.' Opp'n at 18–19.  Despite an unbroken line of authority holding that equitable relief against a sitting President is extraordinary and that a court may not enjoin the President in the performance of official duties, *see* Def.'s MTD at 54–56; Def.'s MTD Reply at 29–30; Def.'s Mot. at 24–25; *see also Doe v. Trump*, Civ. No. 17-1597, 2018 WL 3736435, at *2 (D.D.C. Aug. 6, 2018) (dismissing the President from suit challenging a presidential policy because "[s]ound separation-of-power principles counsel the Court against granting [declaratory and injunctive] relief against the President directly"), Plaintiffs argue that this case is distinguishable because there are no subordinate officials to which this suit could be directed. But that distinction by no means obviates the separation of powers problem underlying the Supreme Court's finding of no jurisdiction in *Mississippi v. Johnson*, 71 U.S. 475 (1867); it simply heightens the stakes.

Plaintiffs insist that "courts have not shied away from granting relief against the President" where he is the only defendant.  Pls.' Opp'n at 19.  The authority Plaintiffs cite, however, falls far short of establishing that the Court has jurisdiction to issue permanent equitable relief against a sitting President in his official capacity.  The authority either involves district court decisions granting *temporary* relief to preserve the court's jurisdiction or the status

14

quo,[4] or compliance with a subpoena in a criminal case[5] (which the Supreme Court has said is of an entirely different "constitutional dimension[]" than a civil proceeding, *Cheney*, 542 U.S. at 384), or does not address the substantial jurisdictional issue raised in this case under *Mississippi v. Johnson*.[6]  In sum, reasonable jurists could reach contradictory conclusions on this question, and thus, certification of the March 28 Order is proper.

## II.  A STAY PENDING APPEAL IS APPROPRIATE IF THE COURT CERTIFIES EITHER OF ITS ORDERS FOR INTERLOCUTORY APPEAL.

The President has requested that if the Court certifies either the March 28 or July 25 Orders for interlocutory appeal, it also stay proceedings pending appeal.  *See* Def.'s Mot. at 25–27.  Plaintiffs argue that a stay would not serve judicial economy because any interlocutory appeal will not narrow the claims in the case or the scope of the discovery.  *See* Pls.' Opp'n at 22.  But that, of course, ignores that this Court would already have held otherwise if it certifies the case for interlocutory appeal.  As explained above, resolution of any of the four identified controlling questions of law is appropriate under § 1292(b) because it could terminate this case or substantially narrow the issues.  For example, if the Court of Appeals finds that Plaintiffs lack standing or that Plaintiffs have not asserted interests addressed by the Emoluments Clauses, then this case would be over.  If the Court of Appeals adopts the President's interpretation of the Emoluments Clauses, it may also conclude that Plaintiffs have failed to state a claim under the Clauses.  Even if the Court of Appeals were to adopt the President's interpretation but allow the case to continue, almost all discovery identified by Plaintiffs in the Rule 26(f) Report (at 3) would be foreclosed because any claims arising from foreign and domestic governments' alleged

---

[4] *Mackie v. Bush*, 809 F. Supp. 144, 146 (D.D.C. 1993) (temporary relief to preserve the Court's jurisdiction or status quo with no discussion of *Johnson*), *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993); *Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) (same).

[5] *Nixon*, 418 U.S. 683; *United States v. Burr*, 25 F. Cas. 187, 191 (C.C.D. Va. 1807) (No. 14,694).

[6] *Boumediene v. Bush*, 553 U.S. 723 (2008) (habeas action under the Suspension Clause); *Clinton v. City of N.Y.*, 524 U.S. 417 (1998) (declaring unconstitutional the Line Item Veto Act).

patronage of the Trump Hotel and BLT Prime Restaurant would not survive.  Judicial economy accordingly favors a stay.

The equities also plainly favor a stay.  Plaintiffs contend that the equities tip against a stay because "there is a public interest in governments, as representative of millions of citizens, timely protecting themselves and their citizens from constitutional abuses by the President." Pls.' Opp'n at 27.  But this type of general interest as state and local governments in ensuring that the federal government complies with the law is the very type of interest that is not judicially cognizable.  *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992) (no standing to assert a generalized "grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large"); *Virginia ex rel. Cuccinelli*, 656 F.3d at 267–68, 272 (states have no special right to serve as "roving constitutional watchdog," litigating any issue, "no matter how generalized or quintessentially political").  It is telling that, in discussing the equities of a stay, Plaintiffs' opposition says nothing about the alleged economic injuries that they actually assert, much less how they would be substantially injured or irreparably harmed on this basis by a stay of proceedings pending interlocutory appeal.  By contrast, the President would suffer significant harm from the continuation of this litigation, including discovery, pending an interlocutory appeal that could end the case in its entirety.

Indeed, Plaintiffs have no serious response to the President's showing that "the public interest requires that a coequal branch of Government afford Presidential confidentiality the greatest protection consistent with the fair administration of justice, and give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Cheney,* 542 U.S. at 382 (citation omitted).  Although they characterize their proposed discovery against the President as "unobtrusive," Pls.' Opp'n at 24, Plaintiffs have indicated that they may seek discovery of Presidential communications.  *See* Rule 26(f) Report at 4.  On its face, such discovery requests would trigger the "presumptive" Presidential communications privilege—one that is

16

"fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution."  *Nixon*, 418 U.S. at 708; *see In re Sealed Case*, 121 F.3d 729, 743 (D.C. Cir. 1997) (describing the privilege's "constitutional origins").

Ultimately, Plaintiffs fail to heed the Supreme Court's teaching that a "stay of either the trial or discovery might be justified" in cases to which the President is a party, given "[t]he high respect that is owed to the office of the Chief Executive."  *Clinton*, 520 U.S. at 706–07.  If the Court grants the President's motion for certification for interlocutory appeal, then it should also stay proceedings pending appeal because appellate review very well could avoid the distraction and intrusion on the President's official duties that continuation of this lawsuit may cause.

## CONCLUSION

For these reasons, the Court should certify its March 28 and July 25, 2018 Orders for interlocutory appeal and stay proceedings pending resolution of the interlocutory appeal.

Dated:  September 26, 2018

Respectfully Submitted:

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

/s/ *Jean Lin*
JEAN LIN
Special Counsel
JAMES R. POWERS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20530
Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2018, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

/s/ *Jean Lin*
JEAN LIN