# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**THE DISTRICT OF COLUMBIA**　　*
and **THE STATE OF MARYLAND,**　　*
　　　　　　　　　　　　　　　*
　　　　　　　Plaintiffs,　　　　*
　　　　　　　　　　　　　　　*
v.　　　　　　　　　　　　　　*　　　　　Civil No. **PJM 17-1596**
　　　　　　　　　　　　　　　*
**DONALD J. TRUMP,**　　　　　*
*in his official capacity as*　　　*
*President of the United States*,　　*
　　　　　　　　　　　　　　　*
　　　　　　　Defendant.　　　　*

## MEMORANDUM OPINION

## I.  Procedural Background

In a previous Opinion, the Court held that the District of Columbia and the State of Maryland have standing to challenge, in his official capacity, President Donald J. Trump based on his alleged violations of the Foreign and Domestic Emoluments Clauses of the U.S. Constitution.[1] The Court found that Plaintiffs had standing based on proprietary, quasi-sovereign, and *parens patriae* interests vis-a-vis the President's undisputed ownership interest in the Trump International Hotel in Washington.[2]

---

[1] *See* Opinion (March 28, 2018), ECF No. 101 (Standing Opinion).
[2] *Id.* at 12-29.

In a second Opinion, the Court considered the meaning of the term "emolument" as used in the Clauses. The Foreign Clause bans any person holding an office of profit or trust under the United States, (including, the Court found, the President) from accepting without Congressional approval "any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince or foreign State." U.S. Const. art. I, § 9, cl. 8. The Domestic Clause provides that "[t]he President shall… receive for his services, a compensation…and he shall not receive within that period any other emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. Based on those constitutional texts, as well as the virtually universal definition given the term "emolument" in dictionaries and literature contemporaneous to the enactment of the Clauses, the purpose of the Clauses, and ample historical evidence and executive branch precedent and practice, the Court determined that the word "emolument" refers to any "profit," "gain" or "advantage" of a more than *de minimis* nature.[3] Accordingly, the President's ownership interest in the Trump International Hotel and his apparent receipt of benefits from at least some foreign and state governments, as well as from the Federal Government itself, suggest that he has received "emoluments" in violation of the Constitution, giving rise to plausible causes of action against him brought by parties with standing.

---

[3] *See* Opinion (July 25, 2018), ECF No. 123 (Emoluments Opinion).

The President has filed a Motion for Leave to Appeal (Interlocutory) and for a Stay Pending Appeal the Court's rulings, ECF No. 127, which Plaintiffs oppose. As part of the relief he requests, the President asks the Court to stay any and all discovery pending his appeal, again over Plaintiffs' objection.

The Court has reviewed the President's Motion and, for the reasons that follow, will **DENY** it.   His Motion for a Stay pending any appeal will also be **DENIED**.

## II. Questions the President Seeks to Have Certified

Pursuant to 28 U.S.C. § 1292(b), the President has identified four (4) purportedly controlling questions of law decided by the Court in its previous two opinions that he believes are certifiable: (1) the correct interpretation of the term "emolument" in the Emoluments Clauses of the Constitution and the scope of those Clauses; (2) whether Plaintiffs have asserted interests addressed by those Clauses and have an equitable cause of action under them; (3) whether Plaintiffs have Article III standing to pursue their claims; and (4) whether the Court has jurisdiction to issue declaratory and injunctive relief against the President. Def's Mot. for Appeal at 1.

## III.  Statutory Standards

a.    *In general*

28 U.S.C. § 1292(b) provides that when a district judge believes an order "[1] involves a controlling question of law [2] as to which there is substantial ground for difference of opinion [3] and that an immediate appeal from the order may materially

advance the ultimate termination of the litigation," the Judge may certify it for interlocutory appeal, "[p]*rovided, however*, That application… shall not stay proceedings" unless ordered by the district judge or appellate court.

Although noting that the Fourth Circuit has cautioned that § 1292(b) should be used sparingly, the President argues that the "Supreme Court has explained that 'district courts should not hesitate to certify an interlocutory appeal' when a decision 'involves a new legal question or is of special consequence.'" *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 111 (2009). Indeed, the Seventh Circuit, says the President, has "emphasize[d] the duty of the district court… to allow an immediate appeal to be taken when the statutory criteria are met." *Ahrenholz v. Board of Trustees*, 219 F.3d 674, 677 (7th Cir. 2000). For the purposes of § 1292(b), a "question of law" is "the meaning of a statutory or constitutional provision, regulation, or common law doctrine." *Lynn v. Monarch Recovery Mgmt, Inc.,* 953 F. Supp. 2d 612, 623 (D. Md. 2013). Def's Mot. for Appeal at 6-7 (Aug. 17, 2018), ECF No. 127.

Plaintiffs, for their part, cite the "general rule[ ]that 'a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error… may be ventilated.'" *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 712 (1996), and that the "'narrow' exception" for interlocutory appeals under § 1292(b) "should stay that way and never be allowed to swallow the general rule, that a party is entitled to a single appeal." *Dig. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868

(1994). "[E]ven when the elements of section 1292(b) are satisfied," say Plaintiffs, "the district court retains 'unfettered discretion' to deny certification." *Garber v. Office of the Comm'r of Baseball*, 120 F. Supp. 3d 334, 337 (S.D.N.Y. 2014). Plaintiffs say further that, consistent with interlocutory appeals remaining a narrow exception, "[c]ertification under section 1292(b) is improper if it is simply 'to provide early review of difficult rulings in hard cases.'" Pls.' Resp. in Opp'n at 2-3 (Sept. 17, 2018), ECF No. 133 (quoting *Butler v. DirectSAT USA, LLC*, 307 F.R.D. 445, 452 (D. Md. 2015)).

A district court's decision not to certify an interlocutory appeal is final and unreviewable. This is said to be so because a case must be certified to be considered by the Fourth Circuit; lack of certification therefore ordinarily precludes appellate court jurisdiction. *In re Pisgah Contractors, Inc.*, 117 F.3d 133, 137 (4th Cir. 1997) (explaining that the Fourth Circuit did not have subject matter jurisdiction where the district court declined to certify an interlocutory order for appeal). Failing to meet even one of the statutory requirements will defeat a litigant's request for an interlocutory appeal. *See, e.g.*, *Cooke-Bates v. Bayer Corp.*, 2010 WL 4789838, at *2 n.4 (E.D. Va. Nov. 16, 2010) (denying interlocutory appeal, and not deciding whether issues presented were controlling questions of law that may advance the termination of the litigation, because a nevertheless novel question was not particularly difficult and therefore did not present substantial grounds for disagreement); *Butler*, 307 F.R.D. at 452 ("Unless *all* of

the statutory criteria are satisfied . . . 'the district court may not and should not certify its order . . . under section 1292(b).'") (internal citation omitted).

    b.    *Controlling Questions of Law*

The President argues that the Fourth Circuit has recognized that "it may be proper to conduct an interlocutory review of an order presenting 'a pure question of law,' i.e., 'an abstract legal issue that the court of appeals can decide quickly and cleanly.'" Def's Mot. for Appeal at 7 (quoting *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017) (internal citation omitted)). Accordingly, the President cites cases to the effect that a question of law is "controlling" if its "resolution would be completely dispositive of the litigation, either as a legal or practical matter." *Butler*, 307 F.R.D. at 452 (internal quotation omitted). A ruling can also be controlling if it "control[s] many aspects of the proceedings in substantial respects, particularly the scope of the discovery . . . ." *In re Microsoft Corp. Antitrust Litigation*, 274 F. Supp. 2d 741, 742 (D. Md. 2003). In that event, the court noted that concerns bearing on the scope of discovery are particularly likely to be weighty when the case at hand, as occurred there, involves multi-district litigation where multiple competitor cases will be affected by the challenged order, as was the situation in *In re Microsoft*, *id.* at 742-43.

Plaintiffs characterize a "controlling question of law" as "an issue that would, decided differently, terminate or substantially alter the suit." Pls.' Resp. in Opp'n at 3. For instance, "controlling questions . . . determine whether there should be any future

proceedings at all with respect to Plaintiffs' claims." *Moffett v. Comput. Scis. Corp.*, No. PJM 05-1547, 2010 WL 348701, at *2 (D. Md. Jan. 22, 2010). In his Reply, the President emphasizes that, although a question whose resolution may terminate the case is certainly one kind of controlling question, the standard for "controlling" questions "should be kept flexible*," Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991), and should include questions that control significant aspects of the proceedings, including discovery. Def's Reply (Sept. 26, 2018), ECF No. 134 at 3 (quoting *In re Microsoft Corp.*, 274 F. Supp. 2d at 742). Finally, a "controlling question of law" has been said to include orders that "if erroneous, would be reversible error on final appeal." *Lynn*, 953 F. Supp. at 623 (internal citation omitted).

      c.     *Substantial Ground for Difference of Opinion*

The second statutory requirement that must be present for a district court to certify an interlocutory appeal is that the relevant controlling question of law is one "as to which there is substantial ground for difference of opinion." 28 U.S.C. § 1292(b).

The President argues that "[c]ourts have repeatedly recognized" that a "'novel issue' 'on which fair-minded jurists might reach contradictory conclusions' 'may be certified for interlocutory appeal without first awaiting development of contradictory precedent.'" Def's Mot. for Appeal at 10 (citing *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011); *see also In re Trump*, 874 F.3d 948, 952 (6th Cir. 2017) (quoting the same). "When a matter of first impression also had other grounds for

difference of opinion . . ., district courts in this circuit have certified the issue for interlocutory appeal." *Goodman v. Archbishop Curley High Sch., Inc*., 195 F. Supp. 3d 767, 774 (D. Md. 2016) (quoting *Kennedy v. Villa St. Catherine, Inc.*, No. PWG-09-3021 (WDQ), 2010 WL 9009364, at *2 (D. Md. June 16, 2010)). Moreover, the President points out, "[t]he level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case." *Coal. For Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, No. CCB-06-2773, 2015 WL 4040425, at *6 (D. Md. June 29, 2015) (internal quotation omitted) (granting § 1292(b) certification in light of the "context of this extraordinarily important case"). The President believes that the present "case presents the extraordinary circumstance of allegations that a sitting President is violating the Constitution," and is now poised to be subject to "civil discovery in his official capacity." The President believes that this fact alone "counsels extreme restraint and warrants § 1292(b) certification." Def's Mot. for Appeal at 11.

Plaintiffs argue that there is only "substantial ground for difference of opinion" for § 1292(b) certification purposes when there is "substantial doubt that the district court's order was correct." *Goodman*, 195 F. Supp. 3d at 774 (internal citations omitted). They insist that a party's "own disappointment or disagreement with the outcome of an order does not rise to the level of substantial doubt." *See Lizarbe v. Rondon*, No. PJM 07-1809, 2009 WL 2487083, at *3 (D. Md. Aug. 12, 2009) (court found that where there was no

contrary authority other than party's own disagreement with controlling case law, there was no substantial ground for difference of opinion). In the same vein, "[a]n issue presents a substantial ground for difference of opinion if courts, as opposed to parties, disagree on a controlling legal issue." *Goodman*, 195 F. Supp. 3d at 774 (internal quotation omitted); Pls.' Resp. in Opp'n at 4.

Finally, the Court notes that the "mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *Lynn*, 953 F. Supp. 2d at 624 (quoting *In re Flor*, 79 F.3d 281, 284 (2d Cir.1996)). To be sure, however, questions of first impression have nevertheless been certified when they otherwise meet all statutory requirements for certification, novelty notwithstanding. *Id.* (quoting *Kennedy*, 2010 WL 9009364, at *2 (D. Md. June 16, 2010)).

    d.     *Likelihood of advancing the termination of the case*

The third and final statutory requirement for § 1292(b) certification purposes is that the controlling question of law as to which a substantial ground for difference of opinion exists is one where "an immediate appeal from the order may materially advance the ultimate termination of the litigation."

The President observes that the third and first statutory requirements for certification are interrelated. If an immediate appeal may materially advance the ultimate termination of the litigation, a question of law is necessarily "controlling" because it

"could advance the litigation by ending it," *Coal. For Equity & Excellence in Md. Higher Educ.*, 2015 WL 4040425, at *7, even if "other possible outcomes exist." *Kennedy*, 2010 WL 9009364, at *4.   The President further suggests that this third requirement is met where the appeal would "eliminate complex issues so as to simplify the trial, or []eliminate issues to make discovery easier and less costly." *Lynn*, 953 F. Supp. 2d at 626 (internal quotation omitted). Def's Mot. for Appeal at 7-8; *see* Pls.' Resp. in Opp'n at 4.

The President submits that an interlocutory appeal of the four questions he raises is warranted because the resolution of any one of them in his favor would "either terminate this suit or at least substantially narrow the scope of this litigation," and because there is a "substantial ground for difference of opinion as to each" question. Def's Mot. for Appeal at 1-2. He believes this is particularly true with regard to his "view that to qualify as an 'Emolument,' the benefit must be a 'profit arising from an office or employ.'" *Id.* The Court considers the President's arguments and Plaintiffs' responses.

Plaintiffs submit that none of the questions the President seeks to certify is likely to advance the termination of or the reduction of significant aspects of the case. Most centrally, even were the Court of Appeals to accept the President's cramped interpretation of the meaning of "emoluments," i.e. that they are only prohibited if given for actions taken by the President as President—there is clear evidence that some foreign governments have explicitly stated that they are patronizing the Trump International Hotel precisely because the President, in effect, owns it. Accordingly, say Plaintiffs,

discovery would proceed in the case even if the term "emoluments" is more narrowly defined.

      e.    *Court's interpretation of the term "Emolument"*

First and foremost, the President believes that the correct interpretation of the term "emolument" in the Emoluments Clauses and the scope of those Clauses is a controlling question of law because, if decided in his favor, this suit would be terminated or, at the very least, substantially narrowed in scope. Plaintiffs not only believe the Court's interpretation of the meaning of the term "emolument" is, by any analysis, correct; they argue that the issue is not even a controlling question of law. The Court agrees with Plaintiffs.

The President insists here, just as he did in his original brief, that his interpretation of what an "emolument" is– based on his reading of text, his review of contemporaneous definitions of the term, his understanding of the purpose of the Clauses, his take on historical evidence, and executive branch precedent and practice—is one as to which substantial grounds of disagreement exist, presumably in the sense that fair minded jurists might reasonably reach contradictory conclusions. The Court finds this a dubious proposition. Even now it remains unclear, as it did in connection with the President's original motion to dismiss, exactly how he came to his view of the meaning of "emolument."   What he said in his Motion to Dismiss and repeats now is that the President would have to receive payments for his services *as President* for the payments

-11-

to qualify as prohibited "emoluments;" in other words, over and above the salary he receives for his services as President, the Federal government, and foreign and state governments would have to make specific payments to him (or possibly provide non-monetary benefits) for Presidential acts before they would be constitutionally impermissible. *See, e.g.*, Def's Mot. for Appeal at 14. By every reasonable metric, this appears to describe what is tantamount to a bribe, so above all else the President's definition of the term "emolument" is exceedingly strained. To be sure, it may be a difference of opinion, ("emoluments… of any nature whatsoever"), but, in candor, as much as anything it appears to be little more than a lawyerly construct to establish a "difference of opinion," but not necessarily one as to which fair minded jurists might reach contradictory conclusions. *See* Emoluments Opinion at 31.

Plaintiffs, moreover, stress that "the President offers no authority demonstrating the disagreement *among courts* that is generally necessary to show substantial doubt as to the correctness of this Court's opinion." Pls.' Resp. in Opp'n at 11 (emphasis added) (citations omitted). They emphasize that the mere fact that the Court's ruling deals with an issue of first impression does not guarantee certification for purposes of interlocutory appeal. Indeed, say Plaintiffs, "[d]istrict judges have not been bashful about refusing to find substantial reason to question a ruling of law, even in matters of first impression." 16 Charles A. Wright, *Federal Practice and Procedure* § 3930 (3d ed. 2018). *See also Job v. Simply Wireless, Inc.*, No. 15-676, 2016 WL 8229037, at *2 (E.D. Va. Jan 19, 2016)

(rejecting defendants' argument that "an interlocutory appeal is warranted every time a district court interprets novel contractual language" as "plainly inconsistent with the strong policy favoring appeals only from final orders"); *In re Loy*, No. 07-51040-FJS, 2011 WL 2619253, at *9   (E.D. Va. 2011) (noting that the fact that a case involves "novel issues . . . is not conclusive that a substantial ground for difference of opinion exists"). Plaintiffs conclude that certification is particularly inapt in a situation where, as here, the "Court has unambiguously determined that *none* of the President's definitional arguments withstand scrutiny." Pls.' Resp. in Opp'n at 13.

Additionally, the Court finds no substantial ground for difference of opinion *among courts* as to the meaning of "emolument" that meets the § 1292(b) standard. The Court's own 52-page opinion on the subject, rather than "highlight[ing] the complexity of the interpretive task," as the President suggests, Def's Mot. for Appeal at 11, provides an extensive explanation of how and why the vast weight of textual, definitional, and historical evidence and executive branch precedent and practice justify the broader reading of the term "emolument" given by the Court than what the President puts forth.

It is clear that the President, unhappy with the Court's reasoning and conclusion, merely reargues that his interpretation of the Emoluments Clauses should apply instead of the one the Court gave.  He challenges the Court's interpretation of the text of the Clauses; the original definitions and public meaning of the term "emolument"; the purpose of the Emoluments Clauses; their historical context; and the consistent

interpretation that the executive branch offices have given the term or related terms over the years. The Court sees no point in stating again why it concluded as it did as to each of these issues. Clearly the President believes that the Court made incorrect holdings; it is another matter altogether, however, for him to establish the requisite "substantial difference of opinion" over the Court's rulings apart from that. He has not done so. Although the President cites to the decision of Judge Daniels in the *CREW* case as a court disagreeing over the purpose of the protection the Clauses offer, the fact is that Judge Daniels engaged in no analysis at all as to the meaning of the Emoluments Clauses. Rightly or wrongly, he dismissed the case on standing grounds. Any comment he may have made as to the meaning of the term were extraneous to the *ratio decidendi* of his decision. *See Citizens for Responsibility and Ethics in Washington v. Trump*, 276 F. Supp. 3d 174 (S.D.N.Y. Dec. 21, 2017) ("the CREW case").

The Court returns to the proposition that "a party's own disagreement with a district court's conclusion does not constitute 'substantial ground[s] for difference of opinion.'" *Al Maqaleh v. Gates*, 620 F. Supp. 2d 51, 55 (D.D.C. 2009) (internal quotation omitted). Furthermore, insofar as a question may arise for the first time, it has been held that while district courts may consider novelty as a determinative factor in certifying an order, they should do so only *where the other statutory requirements for certification are already met* and where the "matter of first impression also ha[s] other grounds for

-14-

difference of opinion." *Lynn*, 953 F. Supp. 2d at 624 (alteration in original) (quoting *Kennedy*, 2010 WL 9009364, at *2).

All this said, as the Court had occasion to point out in its earlier opinion, even accepting the President's proposed definition of "emolument," Plaintiffs have still plausibly stated a claim in this case. Emoluments Opinion at 19. For instance, insofar as foreign governments have expressly stated in the media that they are patronizing the President's hotel precisely because he is the President, and insofar as foreign governments such as Kuwait and Saudi Arabia have demonstrably done so, their payments could still constitute an "emolument" foursquare within the President's definition of the word, especially if, what appears likely, the payments to his hotel are being made with an expectation of favorable treatment by the President in matters of foreign policy. As a result, even if the appellate court were to disagree with this Court's definition of "emolument" and embrace the President's, Plaintiffs' claims in this case would still remain viable under the definition of "emolument" the President himself appears to embrace.

Finally, there is genuine concern on the part of Plaintiffs, indeed the Court shares it, that if the President is permitted to appeal the Court's decisions in piecemeal fashion, ultimate resolution of the case could be delayed significantly, perhaps for years, since it is quite likely the President would seek to appeal an adverse decision from the Fourth Circuit to the U.S. Supreme Court. That, as a matter of justice, cannot be countenanced.

There is no substantial disagreement over the meaning of the term "emolument" in the sense that reasonable jurists, much less courts, would disagree, nor would resolution of that question in favor of the President on appeal be likely to materially advance the ultimate termination of the proceedings or otherwise streamline the proceedings in any material respect. *See supra pp*. 10-11. The Court's ruling as to the meaning of "emolument" is not appropriate for certification.

      f.      *Whether Plaintiffs have interests addressed by the Emoluments Clauses and have an equitable cause of action under them*

The second question the President identifies for interlocutory appeal is whether the Plaintiffs have asserted interests addressed by the Emoluments Clauses and have an equitable cause of action under them. He disagrees with the Court that the Emoluments Clauses "were intended to protect against competitive injuries to particular members of the public" or that the Court "may recognize an equitable cause of action by a private person to enforce" them. Def's Mot. for Appeal at 22. He begins, as of course he must, by arguing the question of Plaintiffs' standing is a controlling question of law as to which there is substantial disagreement, which is to say, one that fair minded jurists disagree over or as to which diverse courts have opined. The Court has just rejected this argument.

But, further, Plaintiffs argue that their standing is not a controlling question of law because the Court found that they "have standing based on harms to their proprietary, *parens patriae*, and quasi-sovereign interests." Pls.' Resp. in Opp'n at 5. *See* Standing

Opinion at 20, 25, 29. On the other hand, the President, in his motion seeking certification for leave to appeal, only discusses the Court's ruling on the question of competitor standing. Again, therefore, Plaintiffs conclude, an appellate decision favorable to the President—i.e., were the Court to find that the Emoluments Clauses were not meant to protect competitors' economic interests—would still leave Plaintiffs free to proceed in their capacities as *parens patriae* and quasi-sovereigns. Pls.' Resp. in Opp'n at 6. The President has sought to salvage his argument in his Reply, suggesting that "by 'economic interests,' he was clearly referring to interests against 'competitive injuries,'… which would encompass both Plaintiffs' proprietary and asserted *parens patriae* interests." Def's Reply at 10. The President's reply gains him no ground.

As the Court explained in its Standing Opinion, the District of Columbia and the State of Maryland have standing as *parens patriae* in part because of the apparent competitive economic injuries sustained by their residents as a result of competitive advantages enjoyed by the Trump International Hotel. The Court also held that as *parens patriae* and by reason of the District and Maryland's quasi-sovereign positions, they are acting appropriately to protect their state economies and governance interests. Standing Opinion at 15. That is, on behalf of their citizens, Plaintiffs assert "public or governmental interests that concern the State as a whole." Standing Opinion at 25 n.14, 26 (citing *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007)). Although the President goes on at length, arguing that contrary to the Court's ruling, competitor standing does

not apply in this case, *see* Def's Mot. for Appeal 22-23; Def's Reply at 12-13, the Court agrees with Plaintiffs that even an appellate ruling in favor of the President on this point would not preclude Plaintiffs from pursuing their claims as *parens patriae* and quasi-sovereigns. In other words, resolving the President's question differently on appeal would not substantially narrow or terminate this litigation, and is not therefore a controlling question for the purposes of certification under § 1292(b). While this alone suffices to deny certification of this particular question, for the sake of completeness, the Court considers the President's further arguments on this issue.

The President points to Judge Daniels' decision in the *CREW* case as an instance of another court disagreeing over whether business competitors are within the Emoluments Clauses' zones of interest. Def's Mot. for Appeal at 22. To be sure, Judge Daniels did say that,

> [n]othing in the text or the history of the Emoluments Clauses suggests that the Framers intended these provisions to protect anyone from competition. The prohibitions contained in these Clauses arose from the Framers' concern with protecting the new government from corruption and undue influence."

276 F. Supp. 3d at 187.

The quoted language from Judge Daniel's decision, however, is pure dicta. After finding that plaintiffs there—a non-profit organization (CREW) and two private citizens—had failed to show injury-in-fact for standing purposes, Judge Daniels went on to opine that business competitor plaintiffs are not within the zone of interests of the

Emoluments Clauses and thus could not invoke their protection. Even as dicta, it is not clear why entities or persons affected by undue influence or corruption on the part of their business competitor somehow lie outside the zone of interests of the Clauses. In a broad sense, all Americans fall within the zones of interest of the Clauses. Nothing in the Constitution precludes business competitors—a sub-class of Americans—from challenging the improper receipt of emoluments by a President who is purportedly engaging in a business directly in competition with those businesses; especially given the particular allegations in the present case— that the President's business is specifically drawing business away from hotels, event spaces, and restaurants owned by the business competitors. Judge Daniel's decision in the *CREW* case, in short, does not represent a substantial different of opinion among courts as to standing, limited as it is to the question of standing of particular non-governmental plaintiffs. The Court agrees with Plaintiffs that the "President's reliance on the *CREW* decision reflects—at best—an instance of judges applying the law differently[. It] does not demonstrate, as is required for interlocutory appeal, that 'courts themselves disagree as to what the law is." Pls.' Resp. in Opp'n at 8 (quoting *In re Nichols*, No. TDC-14-0625, 2014 WL 4094340, at *3 (D. Md. Aug. 15, 2014)).

The more important point, in any event, is that by the President's analysis, no one (save perhaps Congress in cases involving emoluments paid by foreign governments) could ever bring an action to challenge the President's receipt of emoluments – even if

there were no dispute as to what the term meant—because no one, including the American people at large, could show that they were in the zone of the interests contemplated by the Clauses. Yet it is noteworthy that since the briefing on the certification of the standing question was completed, another federal court has held that some 200 members of Congress have standing to sue the President for failure to notify Congress of his receipt of foreign "emoluments" pursuant to the Foreign Clause. *See Blumenthal v. Trump*, No. 17-1154, 2018 WL 4681001, at *4-5. (D.D.C. Sept. 28, 2018). There Judge Emmet Sullivan of the United States District Court for the District of Columbia found that, even in light of the separation-of-powers concerns recited in that case, standing was appropriate in part because "plaintiffs have no adequate legislative remedy and this dispute is capable of resolution through the judicial process." *Id.* at *5. That is also the case here. The fact that another court has found standing in a cohort other than the full membership of Congress fortifies this Court's analysis as well.[4] The Governmental Plaintiffs in this case lie fully within the zones of interests of the Emoluments Clauses. Standing Opinion at 42.

_____

[4] While Congress can presumably legislate in the context of the Emoluments Clauses, *see* such initiatives as S. Con. Res. 8, 115th Cong. (2017) (among other things, declaring the President's dealings through his companies with foreign governments to be potential violations of the emoluments clause); H.R.J. Res. 16, 115th Cong. (2017) (denying congressional consent for the President to accept any foreign emolument during his Presidency), in order to prevent the President from accepting unconstitutional emoluments, it is, as the *Blumenthal* decision has suggested, the President's duty to seek the consent of Congress first. *Blumenthal*, 2018 WL 4681001 at *4 (also discussing, for standing purposes, the relevance of legislative remedy in legislator standing analyses).

g.     *Whether Plaintiffs have Article III standing to pursue their claims*

The third purportedly controlling question of law the President identifies is whether Plaintiffs have Article III standing to pursue their claims. The Court has just considered this question in connection with the previous question as to which the President seeks certification. The President challenges the Court's determination that the competitor standing doctrine yields the conclusion that Plaintiffs have suffered or will imminently suffer an injury-in-fact. But again Plaintiffs note that competitor standing is integral primarily to their proprietary claims, not those made in their *parens patriae* or quasi-sovereign capacities. For the same reasons that the Court rejects the President's claim that prudential standing considerations justify certification, *see supra* p. 17, the Court agrees with Plaintiffs that whether they have suffered injury-in-fact based on the competitor standing theory is not a controlling question. It is also worth considering the President's argument that there is "substantial ground for disagreement" on this point.

The President again points to *CREW v. Trump* as evidence that courts disagree over whether Plaintiffs have standing. Def's Mot. for Appeal at 23-24; Def's Reply at 13. He recites some of Judge Daniels' reasoning for finding that the plaintiffs in that case did not have standing. He then argues that "reasonable minds could differ" over whether the doctrine of competitive standing establishes Plaintiffs' injury-in-fact; the President submits that "the Fourth Circuit has never expressly endorsed the competitor standing doctrine" and that no court "has applied it in the context of a diffused market in which

competition depends on a large number of variables, as is the case here." Def's Mot. for Appeal at 23-24. The President also notes that "[t]his Court is the first ever to permit a party to pursue relief under the Emoluments Clauses for alleged competitive injury—or for any injury for that matter . . . ." Def's Reply at 11.

Again, Plaintiffs respond that even if this Court's ruling that competitive standing establishes an injury-in-fact for the Article III standing analysis were overturned, Plaintiffs would still be able to proceed based on their *parens patriae* and quasi-sovereign capacities. Under the latter theories, Plaintiffs share interests of "trying to protect a large segment of their commercial residents and hospitality industry employees from economic harm" and in "protect[ing] their position among . . . sister states." Pls.' Resp. in Opp'n at 5 (citing Standing Opinion at 15, 19, 29).

But Plaintiffs also point out that "even if the Fourth Circuit had not addressed the question [of competitor standing], it would be of no moment because . . . 'the *Supreme Court* has recognized that plaintiffs with an economic interest have standing to sue to prevent a direct competitor from receiving an illegal market benefit leading to an unlawful increase in competition.'" Pls.' Resp. in Opp'n at 6-7 (quoting Standing Opinion at 21). Plaintiffs conclude by pointing out that Judge Daniels' decision in *CREW v. Trump* was nothing more than a Judge applying essentially the same law to different facts, finding that "the private-party plaintiffs had not sufficiently alleged competitor standing against the President," but not showing disagreement about "what the law is."

Pls.' Resp. in Opp'n at 7 (internal quotation omitted). In other words, Judge Daniels was not disagreeing with this Court over what is required to establish standing. He employed the same three-part test this Court did. He simply found, with respect to the plaintiffs before him, all non-governmental persons or entities, that no injury-in-fact had been shown. Here, with more broadly based governmental entity plaintiffs before it, this Court found that, in contrast, they had indeed established injury-in-fact.

Beyond that, the President's statement that the Fourth Circuit has not addressed the question of competitor standing is somewhat misleading. While it may not have specifically decided a case involving the theory, the Fourth Circuit has in fact noted that "numerous cases have found that a firm has constitutional standing to challenge a competitor's entry into the market." *Zeneca, Inc. v. Shalala*, 213 F.3d 161, 170 n.10 (4th Cir. 2000) (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1074 (D.C. Cir. 1998)). There is thus a strong indication that the Fourth Circuit would embrace the competitor standing theory if and when squarely called upon to decide. But this is not that case.

Since the first two statutory factors for certification have not been met on the question of Article III standing via the competitor standing doctrine, the Court declines to certify this issue for appeal.

h.      *Whether the Court has jurisdiction to declare Declaratory and Injunctive relief against the President*

-23-

The fourth and final question the President identifies as certifiable is whether the Court has jurisdiction to issue declaratory and injunctive relief against him. He submits that if the Court's failure to grant his motions to dismiss on this point was erroneous, it would necessarily be reversible and dispositive on final appeal. Therefore, he says, this is a controlling issue of law. *See Butler*, 307 F.R.D. at 452. The Court considers first whether there is a substantial ground for a difference of opinion on this issue among courts.

The President argues that it is open to debate among courts whether equitable relief can be granted against a sitting president. Def's Mot. for Appeal at 24. He believes "Supreme Court precedent holds that equitable relief against a sitting President is 'extraordinary,' and that federal courts have 'no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" *Id.* (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866), *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (quoting same)). Thus the President says that the Court's conclusion that there is no "barrier to its authority to grant either injunctive or declaratory relief," *see* Standing Opinion at 36, is in "significant tension" with *Johnson* and other cited precedent. Def's Mot. for Appeal at 25.

Plaintiffs contend that the Court was correct in finding that "[p]recedent makes clear that a plaintiff may bring claims to enjoin unconstitutional actions by federal officials and that they may do so to prevent violation of a structural provision of the

-24-

Constitution." Standing Opinion at 42. They point out that in the two cases the President cites where the courts did not issue injunctive relief against the President, both courts noted that it was more appropriate in each case to enjoin a subordinate executive official to block the protested action. *See* Pls.' Resp. in Opp'n at 18. Here, where there is obviously no subordinate official against whom equitable relief would make sense—the suit has been filed against the President for actions benefitting him personally—the situation is significantly different. Moreover, instead of involving parties seeking to enjoin the President from enforcing an act of Congress, as was the case in *Johnson*[5], the present suit "involves [the President's] personal compliance with discrete constitutional prohibitions that foreclose any claim of Presidential authority." *Id.* at 19.

In its Standing Opinion rejecting the President's argument, the Court discussed this issue at length, and the issue needs no further elucidation here. *See* Standing Opinion at 42. The Court found there was ample authority suggesting that even the President – in his official capacity – can be the subject of equitable relief, especially given a situation such as the one at hand. While Plaintiffs may not have sought a preliminary injunction, that obviously would not diminish the force of their claim on the merits.

     i.     *Extraordinary Circumstances Justifying Certification*

---

[5] In *Johnson*, the State of Mississippi sought to enjoin the President from in any way carrying out the Reconstruction Acts, which the state alleged were unconstitutional. The Court took care to note that the single point it considered was whether the President could be enjoined from enforcing an allegedly unconstitutional law. 71 U.S. at 498.

The President relies heavily on the proposition that the Court's orders should be certified because they  present extraordinary circumstances dealing with issues of first impression—that a sitting President, representing an equal branch of the government, is accused of violating the Constitution and faces the prospect of civil discovery, a burdensome and distracting enterprise. *See, e.g.,* Def's Mot. for Appeal at 3, 6, 9, 25; Def's Reply at 1, 4, 6-7. The Court, however, reminds that even if the circumstances were truly extraordinary—and the Court does not believe they are[6]—that would favor certification only if all the criteria required by § 1292(b) are otherwise met. Here, as the Court has found, they are not.

Yet again, the Court notes that certification for appeal is not appropriate "to provide early review of difficult rulings in hard cases." *Butler*, 307 F.R.D. at 452 (internal quotation omitted). "[I]n a separation-of-powers case as in any other . . . . it is the role of the Judiciary to 'say what the law is' regarding the meaning of the Foreign Emoluments Clause and the President's compliance with it." *Blumenthal*, 2018 WL 4681001 at *17 (internal citation omitted) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). The President has not satisfied the several criteria for

---

[6] *See supra* pp. 12, 14 (discussing why it does not suffice for certification that the Orders present some issues of first impression); Standing Opinion at 41-42 (discussing the availability of equitable action against a President).

certification of the issues that concern him.[7] Accordingly, his Motion for Leave to Appeal (Interlocutory) (ECF No. 127) is **DENIED.**

## IV. Stay Pending Appeal

Independently of the denial of the President's request to certify, the Court **DENIES** his Motion to Stay All Discovery Pending Appeal.

When courts determine the appropriateness of staying proceedings in a given case, three factors must be taken into account: 1) the interest in judicial economy; 2) the hardship to the moving party if the action is not stayed; and 3) the potential damage or prejudice to the non-moving party. *International Refugee Assistance Project v. Trump*, 323 F. Supp. 726, 731 (D. Md. 2018). The movant "bears the burden of establishing its need" for a stay and does not enjoy an automatic stay as a right. *Clinton v. Jones*, 520 U.S. 681, 708 (1997).

Congress expressly established the availability of an interlocutory appeal under Section 1292(b) on the condition that it "shall not stay proceedings in the district court" unless the district court exercises its jurisdiction to so order. *See* Pls.' Resp. in Opp'n at

_____

[7] The President may be correct that if an Order is certified for appeal and the Fourth Circuit agrees to review it, issues "would necessarily be presented *in toto* to the appellate court," Def's Reply at 12, and the Fourth Circuit could then evaluate issues that the President did not explicitly address in his brief. *See Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 ("[A]ppellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court.") However, to warrant certification, the President must first demonstrate there is at least one controlling question of law as to which there is substantial ground for difference of opinion that could materially advance the termination of the litigation if decided differently. He has not done so here.

20. The presumption, then, is against a stay. *See* David G. Knibb, *Fed. Court of Appeals Manual* § 5:6 (6th ed. 2018). "[A] request to stay proceedings calls for an exercise of the district court's judgment to balance the various factors relevant to the expeditious and comprehensive disposition of the causes of action on the court's docket." *Maryland Universal Elections, Inc.*, 729 F.3d 370, 375 (4th Cir. 2013) (internal quotation omitted).

The requested stay in this case would not serve judicial economy for the simple reason that the President's success on appeal would neither terminate nor narrow the case nor would it foreclose discovery relevant to proving, to at least some extent, Plaintiffs' claimed injuries. *See supra* p. 14-15, 17, 21 (discussing why appealing the Court's decisions as to the meaning of "emolument" and prudential and competitive standing would not significantly narrow the scope of the case). Furthermore, if certified for appeal to the Fourth Circuit, it is highly likely that any decision—favorable or unfavorable to the President—would be appealed to the Supreme Court. All the issues raised by the President at present could just as cleanly be addressed on a final appeal. Judicial economy favors going forward with the case in this Court at this time.

As for hardship or inconvenience attending a stay, the most the President can say is that if he is required to respond to civil discovery, he would be ill-served. But as Plaintiffs point out, most of what they seek is discovery from third parties, e.g., the Trump International Hotel, which would seem unlikely to impose any meaningful burden on the President individually. *See* Report of Rule 26(f) Planning Meeting (Sept. 14,

-28-

2018), ECF No. 132. And, of course, "mere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay, are not enough." *Long v. Robinson*, 432 F.2d 977, 980 (4th Cir. 1970) (internal quotation omitted). The President's argument that he would be distracted would seem to apply to any litigant who has been sued. Yet Presidents have unquestionably responded to court orders, as in this case, and have also had extensive interactions with the court system. *See* Standing Opinion at 35-36; Pls.' Resp. in Opp'n at 18-19.

Apart from Plaintiffs' focus on discovery from third parties, there are numerous ways to limit the extent to which the President might be obliged to respond, e.g., he could do so by stipulation, by limited written discovery requests, or by other non-burdensome means. And of course, the Court is always available to limit given discovery to minimize an unusual impact.

It bears noting that the President himself appears to have had little reluctance to pursue personal litigation despite the supposed distractions it imposes upon his office. *See, e.g.*, Order, *Cohen v. United States*, No. 18-3161 (S.D.N.Y. Apr. 13, 2018) (granting the President's motion to intervene in litigation); *see also, e.g.*, Michael D. Shear & Eileen Sullivan, *Trump and Giuliani Taunt Brennan About Filing a Lawsuit*, N.Y. Times, Aug. 20, 2018 (President inviting lawsuit against himself), https://nyti.ms/2Mwj3De; Letter from Charles H. Harder to Steve Rubin & Michael Wolff (Jan. 4, 2018) (providing notice of potential legal action in connection with allegedly defamatory statements made

in upcoming publication), goo.gl/hwVLTZ; Steve Holland & Doina Chiacu, *Trump targets book, threatens ex-ally Bannon with legal action*, Reuters (Jan. 3, 2018) (reporting on cease-and-desist letter sent to Stephen K. Bannon and stating that President Trump's attorney Charles Harder "told Reuters that 'legal action is imminent' against Bannon"), https://reut.rs/2NhQCJG; Sarah Fitzpatrick & Tracy Connor, *Trump tries to move Stormy Daniels lawsuit to federal court, claims she owes him $20 million*, NBC News, March 16, 2018 (President's lawyer, with the consent of the President, files a notice of removal in lawsuit by Stephanie Clifford), https://goo.gl/E5zo9N.

Finally, Plaintiffs argue that a stay of all proceedings would cause substantial harm to them and the public, more particularly the residents of the State of Maryland and the District of Columbia, and that any inconvenience to the President does not outweigh the prejudice that delay would visit upon Plaintiffs and their constituents. Pls.' Resp. in Opp'n at 26-27. The inescapable fact remains that the President could, on the basis of piecemeal appeals, potentially delay resolution of a good part of this case for years. As the Supreme Court has pointed out, the President "errs by presuming that interactions between the Judicial Branch and the Executive, even quite burdensome interactions, necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions." *Clinton v. Jones*, 520 U.S. 681, 702 (1997).

The Court is satisfied that no stay of the proceedings, for discovery purposes or otherwise, is warranted.

## V. Conclusion

The President has failed to identify a controlling question of law decided by this Court as to which there is substantial ground for difference of opinion justifying appellate review that would materially advance the ultimate termination of the case or even the material narrowing of issues.   Nor is a stay warranted, even if the Court were to certify one or more of the President's proposed issues. Judicial economy would not be served, no hardship or equitable justification would result if the case were to go forward, and any inconvenience to the President if the proceeding is not stayed would not outweigh the prejudice that a delay would inflict on Plaintiffs and their constituents.

The President's Motion for Leave to Appeal (Interlocutory) and for a Stay (ECF No. 127) is DENIED.

Within twenty (20) days, Plaintiffs shall submit a specific discovery schedule to the Court consistent with that set out in the statement they previously submitted pursuant to FRCP 26(f), ECF No. 132.

A separate Order will issue.

November 2, 2018            _____/s/_____

                                  PETER J. MESSITTE
                          UNITED STATES DISTRICT JUDGE