# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In re DONALD J. TRUMP, in his official capacity as President of the United States,

        Petitioner.

No. 2018-_____

[No. 8:17-cv-1596-PJM ]

## PETITION FOR A WRIT OF MANDAMUS TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND AND MOTION FOR STAY OF DISTRICT COURT PROCEEDINGS PENDING MANDAMUS

JOSEPH H. HUNT
*Assistant Attorney General*

HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
MEGAN BARBERO
  (202) 532-4631
  Attorneys
  Appellate Staff, Civil Division
  U.S. Department of Justice
  950 Pennsylvania Ave., NW
  Washington, DC 20530

  *Attorneys for Petitioner*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

STATEMENT OF FACTS ................................................................. 5

ARGUMENT ............................................................................ 10

I.  THIS COURT SHOULD ISSUE A WRIT OF MANDAMUS
    DIRECTING THE DISTRICT COURT TO CERTIFY ITS
    ORDERS DENYING DISMISSAL OF PLAINTIFFS' COMPLAINT
    FOR IMMEDIATE APPELLATE REVIEW ........................................ 11

    A.  Mandamus Relief From The Denial Of § 1292(b)
        Certification Is Appropriate In Rare Circumstances .......................... 12

    B.  This Is A Rare Circumstance Where A District Court's
        Refusal To Certify An Immediate Appeal Warrants
        Mandamus Relief ................................................................. 15

        1.  This is a paradigmatic case for a § 1292(b) appeal ................... 16

        2.  The district court clearly abused its discretion in
            refusing to certify an interlocutory appeal under
            §1292(b) ...................................................................... 23

II. IN THE ALTERNATIVE, THIS COURT SHOULD ISSUE
    A WRIT OF MANDAMUS DIRECTING THE DISTRICT
    COURT TO DISMISS PLAINTIFFS' COMPLAINT OUTRIGHT ..................... 28

III. THIS COURT SHOULD STAY DISTRICT COURT PROCEEDINGS
     PENDING ITS CONSIDERATION OF THIS PETITION ............................. 30

CONCLUSION ........................................................................... 31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Ahrenholz v. Board of Trs. of the Univ. of Ill.*,
219 F.3d 674 (7th Cir. 2000) ....................................................... 12

*Armstrong v. Exceptional Child Ctr., Inc.*,
135 S. Ct. 1378 (2015) .......................................................... 17, 19

*Bennett v. Spear*,
520 U.S. 154 (1997)................................................................... 19

*Blumenthal v. Trump*,
No. 17-1154, 2018 WL 4681001 (D.D.C. Sept. 28, 2018) ............................................. 5

*In re Catawba Indian Tribe of S.C.*,
973 F.2d 1133 (4th Cir. 1992)................................................10-11

*Cheney v. United States Dist. Court. for D.C.*,
542 U.S. 367 (2004)........................................... 2, 10, 11, 13, 14, 28, 29

*Clarke v. Securities Indus. Ass'n*,
479 U.S. 388 (1987)................................................................... 19

*CREW v. Trump*,
276 F. Supp. 3d 174 (S.D.N.Y. 2017) *appeal docketed*,
No. 18-474 (2d Cir. Feb. 18, 2018) ........................................5, 8, 19

*Digital Equip. Corp. v. Desktop Direct, Inc.*,
511 U.S. 863 (1994)................................................................... 13

*Fannin v. CSX Transp.*,
873 F.2d 1438 (4th Cir. 1989)................................................16-17

*Fernandez-Roque v. Smith*,
671 F.2d 426 (11th Cir. 1982)...............................................2, 14

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)........................................................18, 29, 30

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010).................................................................................. 18

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   136 S. Ct. 1923 (2016) ......................................................................... 2, 12

*Holmes v. Jennison*,
   39 U.S. (14 Pet.) 540 (1840) ................................................................... 22

*Johnson v. Burken*,
   930 F.2d 1202 (7th Cir. 1991) ................................................................ 17

*Juliana v. United States*,
   No. 15-1517, 2018 WL 6303774, (D. Or. Nov. 21, 2018) ......................... 15

*Kennedy v. St. Joseph's Ministries, Inc.*,
   657 F.3d 189 (4th Cir. 2011)................................................................... 12

*Lance v. Coffman*,
   549 U.S. 437 (2007)................................................................................ 25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014)................................................................................ 19

*In re Lockheed Martin Corp.*,
   503 F.3d 351 (4th Cir. 2007)...............................................................28-29

*In re McClelland Eng'rs, Inc.*,
   742 F.2d 837 (5th Cir. 1984)................................................................... 14

*McFarlin v. Conseco Servs., LLC*,
   381 F.3d 1251 (11th Cir. 2004)............................................................... 17

*Michigan Corr. Org. v. Michigan Dep't of Corr.*,
   774 F.3d 895 (6th Cir. 2014)................................................................... 18

*In re Mills*,
   287 F. App'x 273 (4th Cir. 2008) ............................................................ 30

*Mississippi v. Johnson*,
   71 U.S. (4 Wall.) 475 (1867)........................................................18, 24, 30

*Mohawk Indus., Inc. v. Carpenter,*
    558 U.S. 100 (2009) ................................................................ 12, 13, 15

*Mountain States Legal Found. v. Glickman,*
    92 F.3d 1228 (D.C. Cir. 1996) ................................................ 25

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ................................................................ 29

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................ 30

*NLRB v. Noel Canning,*
    134 S. Ct. 2550 (2014) ............................................................ 23

*In re Pruett,*
    133 F.3d 275 (4th Cir. 1997) .................................................. 13, 28

*Raines v. Byrd,*
    521 U.S. 811 (1997) ................................................................ 18

*Reese v. BL Expl. (Alaska) Inc.,*
    643 F.3d 681 (9th Cir. 2011) .................................................. 17, 23

*In re Sewell,*
    690 F.2d 403 (4th Cir. 1982) .................................................. 29-30

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) .................................................................. 28

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ................................................ 18

*Swint v. Chambers Cty. Comm'n,*
    514 U.S. 35 (1995) .................................................................. 12

*Tenet v. Doe,*
    544 U.S. 1 (2005) .................................................................... 28

*Thompson v. North Am. Stainless, LP.,*
    562 U.S. 170 (2011) ................................................................ 25

*In re Trump,*
    874 F.3d 948 (6th Cir. 2017) ........................................................................ 23

*United States v. U.S. Dist. Court for Dist. of Or.,*
    139 S. Ct. 1 (2018) ...................................................................................... 15

*United States v. Ford,*
    703 F.3d 708 (4th Cir. 2013) ........................................................................ 25

*United States v. Myers,*
    593 F.3d 338 (4th Cir. 2010) ........................................................................ 23

*United States v. Richardson,*
    418 U.S. 166 (1974) ...................................................................................... 20

*United States v. (Under Seal),*
    757 F.2d 600 (4th Cir. 1985) ........................................................................ 30

*United States ex rel. Michaels v. Agape Senior Cmty., Inc.,*
    848 F.3d 330 (4th Cir. 2017) ........................................................................ 16

*Valley Forge Christian Coll. v. Americans United for*
    *Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) ...................................................................................... 19

*In re Virginia Elec. & Power Co.,*
    539 F.2d 357 (4th Cir. 1976) ........................................................................ 17

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017) .................................................................................. 17

## U.S. Constitution:

Art. I, § 6, cl. 2 ................................................................................................ 21

Art. I, § 9, cl. 8 .................................................................................................. 5

Art. II, § 1, cl. 7 ............................................................................................ 5, 21

**Statutes:**

28 U.S.C. § 1292(b)................................................................................ *passim*

28 U.S.C. § 1651 ............................................................................................ 1

28 U.S.C. § 1651(a) ..................................................................................... 10

**Rule:**

Fed. R. App. P. 21 ......................................................................................... 1

**Other Authorities:**

*Barclay's A Complete and Universal English Dictionary on a New Plan* (1774) ....................... 21

Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793),
    http://founders.archives.gov/documents/Washington/05-14-02-0074 ................. 22

3 Jonathan Elliot, *The Debates in the Second State Conventions on the Adoptation*
    *of the Federal Constitution* (2d ed. 1891) ............................................. 20

*The Federalist No. 73* (Alexander Hamilton) (Jacob E. Cooke ed., 1961) ....................... 20

Letter from Commissioners for the District of Columbia to
    George Washington (Sept. 16, 1793), https://founders.archives.gov/
    documents/Washington/05-14-02-0068 ....................................................... 22

Letter from Thomas Jefferson to William A. Burwell (Nov. 22, 1808), *in*
    11 *The Works of Thomas Jefferson* (Paul Leicester Ford ed., 1905) ................................ 23

Walter W. Skeat, *An Etymological Dictionary of the English Language* (1889) ....................... 21

*Ten Facts about the Gristmill*, George Washington's Mount Vernon, Fact 9,
    http://www.mountvernon.org/the-estate-gardens/gristmill/ten-facts-
    about-the-gristmill ............................................................................... 23

## INTRODUCTION AND SUMMARY OF ARGUMENT

In this extraordinary case, the State of Maryland and the District of Columbia have brought suit directly under the Constitution against the President of the United States for alleged violations of the Foreign and Domestic Emoluments Clauses—one of a parallel set of suits that are the first ever filed by any plaintiff seeking judicial enforcement of the Emoluments Clauses.  The complaint rests on a host of novel and fundamentally flawed constitutional premises, and litigating the claims would entail intrusive discovery into the President's personal financial affairs and the official actions of his Administration, including through third-party subpoenas to government agencies.  Despite this remarkable complaint, the district court treated this case as a run-of-the-mill commercial dispute.  Not only did it deny the President's motion to dismiss, but it refused even to certify for immediate appeal under 28 U.S.C. § 1292(b) its orders denying dismissal, instead insisting the case proceed to discovery.

Pursuant to 28 U.S.C. § 1651 and Federal Rule of Appellate Procedure 21, the President respectfully requests that this Court issue a writ of mandamus directing the district court either to certify for interlocutory appeal pursuant to § 1292(b) the court's March 28 and July 25, 2018 orders denying the President's motion to dismiss, or alternatively to dismiss the complaint outright.  In addition, we respectfully request that this Court promptly stay district court proceedings pending disposition of this petition.

A party seeking mandamus must demonstrate that it has a "clear and indisputable" right, there are "no other adequate means" of relief, and the writ is otherwise "appropriate under the circumstances." *Cheney v. United States Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004). We recognize that a district court normally has wide discretion to determine whether the criteria for certification under § 1292(b) are satisfied. But as the Supreme Court has stressed, "[d]iscretion is not whim," *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1931 (2016), and even broad discretion can be exercised in a manner that constitutes a "clear abuse of discretion" that "justif[ies] the invocation of th[e] extraordinary remedy" of mandamus, *Cheney*, 542 U.S. at 380. Mandamus is a necessary safety valve in the extraordinary situation here, where a district court has insisted on retaining jurisdiction over what all reasonable jurists would recognize is a paradigmatic case for certification of interlocutory appeal under § 1292(b). In short, "this case presents the truly 'rare' situation in which it is appropriate for [a circuit] court to require certification of a controlling issue of national significance." *Fernandez-Roque v. Smith*, 671 F.2d 426, 431 (11th Cir. 1982).

In denying the President's official-capacity motion to dismiss, the district court issued a pair of orders endorsing two critical premises of plaintiffs' complaint: (1) that plaintiffs may assert an implied equitable cause of action directly under the Constitution against the President for alleged violations of the Emoluments Clauses that purportedly cause them legally cognizable injuries unconnected to the President's official actions, and (2) that plaintiffs stated a claim because the Emoluments Clauses

2

prohibit the President from receiving essentially anything of value besides his salary from any government, including even proceeds from services rendered by private businesses in which he has a financial interest.  In refusing to certify those orders for immediate appeal under 28 U.S.C. § 1292(b), the district court asserted that there was neither a substantial basis for disagreement with its legal conclusions nor any reason to believe an immediate appeal would materially advance termination of the litigation.

The failure to dismiss the complaint was clear legal error, and the refusal to certify an interlocutory appeal was a manifest abuse of discretion.  Section 1292(b) provides that a district court "shall" certify an order that it determines involves a "controlling question of law as to which there is substantial ground for difference of opinion" if an immediate appeal "may materially advance the ultimate termination of the litigation."  Here, that standard is indisputably met:  The issues are purely legal threshold questions that, if resolved in the President's favor, would obviate (or at least significantly narrow) intrusive discovery into the President's personal financial affairs and the official actions of his Administration.  And among myriad reasons that the district court's adverse resolution of those novel constitutional questions is at the very least legally debatable, it is notable that the justiciability decision conflicts with the holding in one of the parallel suits that the Emoluments Clauses do not protect against increased market competition, and the merits decision is contrary to the Founding-era history concerning federal officers' private business ventures.  Yet the district court refused to grant certification, misconstruing the § 1292(b) standard and

3

thereby effectively usurping *this* Court's discretion under the statute to decide whether to conduct immediate appellate review of orders endorsing unprecedented legal theories that intrude on the separation of powers.

We therefore respectfully ask that this Court exercise its supervisory authority to direct the district court to certify its orders denying the motion to dismiss for interlocutory appeal, because there is no other adequate means to obtain immediate appeal of these controlling legal questions.  Alternatively, if the Court determines that the district court's certification discretion under § 1292(b) is sufficiently broad that mandamus relief is unwarranted even here, it should directly order the district court to grant the President's motion to dismiss, because there is no other adequate means to vindicate these dispositive legal arguments given the separation-of-powers problems with litigating the case to final judgment.

Likewise, this Court should promptly stay further district court proceedings pending consideration of this petition.  Plaintiffs have already propounded thirty-eight subpoenas to third parties, including to five federal agencies.  Many of those requests require a response by January 3, 2019, and the President respectfully requests a stay prior to that date.

## STATEMENT OF FACTS

**1.** In June 2017, Maryland and the District of Columbia filed this suit against the President in his official capacity alleging that he is violating the Constitution by receiving "Emolument[s]" from foreign and domestic governments, U.S. Const. art. I, § 9, cl. 8; *id.* art. II, § 1, cl. 7, due to his financial interests in his businesses, including the Trump Organization and the Trump International Hotel in Washington, D.C.  To the government's knowledge, this suit represents the first ever attempt by any plaintiff to judicially enforce the Emoluments Clauses against any federal officer (much less the President), other than two roughly contemporaneous suits filed against President Trump based on similar allegations.[1]

As relevant here, Plaintiffs allege that the Foreign and Domestic Emoluments Clauses are violated when government officials patronize the Hotel, and that the Domestic Emoluments Clause is violated by the federal government's lease of the Old Post Office Building for the Hotel and by tax credits associated with the Hotel.  Add. 151-54, 165-66.  Plaintiffs claim that, under their interpretation of the Emoluments Clauses, the President violates the Clauses whenever the Hotel (or the BLT Prime

---

[1] *CREW v. Trump*, 276 F. Supp. 3d 174 (S.D.N.Y. 2017), *appeal docketed*, No. 18-474 (2d Cir. Feb. 16, 2018); *Blumenthal v. Trump*, No. 17-1154, 2018 WL 4681001 (D.D.C. Sept. 28, 2018).

restaurant within it) receives "anything of value" from a foreign or domestic government.  Add. 139, 147-48, 150-55, 180-82.[2]

In September 2017, the President filed a motion in his official capacity to dismiss plaintiffs' complaint.  The President principally argued that plaintiffs lack Article III standing; have no cause of action under the Emoluments Clauses, including because they are outside the Clauses' zone of interests; may not obtain equitable relief against a sitting President; and fail to state a claim on the merits under the correct interpretation of "emolument."  Dkt. No. 21, 21-1.  The district court bifurcated its hearing and decision on (1) the standing and cause-of-action arguments and (2) the merits argument.

**2.**  On March 28, 2018, the district court denied in large part the President's motion to dismiss on Article III standing and cause-of-action grounds.  Add. 1-49. Although it rejected some of plaintiffs' theories of injury, the court held that plaintiffs had established a cognizable injury in fact to at least their proprietary interests in entities that compete economically with the Hotel, Add. 20-25, and that, for similar reasons, they had established an injury to assorted *parens patriae* interests in protecting

---

[2] Plaintiffs' amended complaint added an individual capacity claim against the President.  Add. 139, 146.  The President has retained private counsel for that claim and filed a separate motion to dismiss.  Dkt. No. 112.  As the district court has declined to rule on that motion for nearly seven months, the President in his individual capacity has treated the motion as constructively denied and filed a collateral-order appeal of the denial of his absolute-immunity defense.  Dkt. No. 147; *see also* Dkt. No. 148 at 1-2.

the economic welfare of their citizens, Add. 26-29.  The court separately held that plaintiffs had established a cognizable injury to quasi-sovereign interests because they had been or could feel pressured to grant special concessions to the Trump Organization and the Hotel.  Add. 18-20.

The district court also held that plaintiffs have an implied equitable cause of action under the Emoluments Clauses to sue the President for their alleged injuries in these circumstances.  Add. 42.  The court concluded that competitive injuries are within the zone of interests protected by the Clauses, which "were and are meant to protect all Americans."  Add. 41.  And the court found that injunctive relief was available against the President.  Add. 36.

On July 25, 2018, the district court issued a second opinion and order denying the President's motion to dismiss with respect to the meaning of "Emolument."  Add. 50-103.  Plaintiffs had urged an expansive reading to cover essentially anything of value, while the President had argued for a narrower definition:  a payment conferred and accepted as compensation for the official's services in an official capacity or employment relationship.  Accepting plaintiffs' broad definition, Add. 67-96, the court held that plaintiffs had stated plausible claims that patronage of the Hotel by government officials, the GSA lease, and tax concessions from the D.C. government violated the Emoluments Clauses.  Add. 97-100.

**3.**  On August 17, 2018, the President filed a motion in his official capacity asking the district court to certify its motion-to-dismiss orders pursuant to § 1292(b)

7

and to stay proceedings pending appeal.   Dkt. No. 127.   As relevant here, the

President sought certification of these orders based on the following controlling legal

questions: (1) whether plaintiffs had an implied equitable cause of action under the

Emoluments Clauses, including whether they had legally cognizable injuries falling

within the Clauses' zone of interests and could obtain relief against the President in

his official capacity; and (2) what is the correct interpretation of "Emolument."   *See id.*

The district court denied the motion for § 1292(b) certification on November

2, 2018.  Add. 104-35.  As to the meaning of the Emoluments Clauses, the district

court stated that there was no "substantial ground for difference of opinion *among*

*courts*" because no court has accepted the President's view of the Clauses on this

question of first impression for the judiciary.  Add. 116, 119.  The court reiterated its

earlier conclusions that relevant authorities support its interpretation of the Clauses.

Add. 117-18.  The court additionally opined that resolving the Clauses' meaning in the

President's favor would not materially advance the termination of the litigation

because—in the court's view—plaintiffs have stated plausible claims even under the

President's interpretation.  Add. 118.

As to whether plaintiffs have an equitable cause of action under the

Emoluments Clauses to sue the President for their alleged injuries, the court

determined again that there was no substantial difference of opinion among courts.

The court expressly disregarded the contrary decision in *CREW v. Trump*, 276 F.

Supp. 3d 174, 187 (S.D.N.Y. 2017), inaccurately describing the zone-of-interests

holding there as "pure dicta" given an alternative Article III holding.  Add. 121.  The

court restated its prior conclusion that "[i]n a broad sense, all Americans fall within

the zones of interest of the Clauses."  Add. 122.  Likewise, the court determined that

plaintiffs' Article III standing was neither an issue on which judges disagreed nor a

controlling question, because even if plaintiffs lack competitor standing, as the *CREW*

court held, they purportedly could proceed on a *parens patriae* or quasi-sovereign

theory of standing.  Add. 124.  Finally, the court held that the availability of equitable

relief against the President in his official capacity was not a sufficiently difficult

question as to warrant certification.  Add. 128.  The court distinguished this case from

contrary Supreme Court precedent by noting that "there is obviously no subordinate

official against whom equitable relief would make sense."  *Id.*  The district court

accordingly denied the motion to stay proceedings pending appeal.  Add. 130.

    **4.**  Plaintiffs' Rule 26(f) statement makes clear that they may seek what they

assert will be "limited" discovery "from President Trump in his official capacity on

the subject of his communications with foreign, state, and domestic government

officials," and may additionally "seek limited discovery from President Trump in his

individual capacity."  Dkt. No. 132, at 3-4.  While plaintiffs assert that they "plan to

focus discovery primarily on" discovery against third parties, including federal

agencies, even that discovery would be directed against the President's financial

interest in his businesses and "President Trump's receipt of funds" from those

business entities.  *Id.* at 2-3.

9

On December 3, the district court entered a discovery schedule contemplating six months of fact discovery.  Dkt. No. 145.  To date, plaintiffs have propounded thirty-eight subpoenas to third parties, including to the Trump Organization and five federal agencies.  Plaintiffs' subpoenas requested, inter alia, "[d]ocuments sufficient to show Donald J. Trump's or Trump Trust's current, historic, and future Financial Interest in the Trump International Hotel Washington, D.C." and "[d]ocuments sufficient to identify all Businesses doing business in the Washington D.C. metropolitan area in which Donald J. Trump or Trump Trust has a Financial Interest."  Subpoena to The Trump Organization Inc., Attach. A at 7-8, *District of Columbia v. Trump*, No. 8:17-cv-1596 (Dec. 4, 2018).  The subpoena recipients are required to respond beginning on January 3, 2019.

## ARGUMENT

An appellate court has the power under 28 U.S.C. § 1651(a) to issue a writ of mandamus directing the conduct of a district court where (1) the petitioner has a "clear and indisputable" right to relief; (2) there are "no other adequate means to attain the relief"; and (3) mandamus relief is otherwise "appropriate under the circumstances."  *Cheney v. United States Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004).  In short, only "exceptional circumstances amounting to a judicial 'usurpation of power'" or a "clear abuse of discretion" will "justify the invocation of this extraordinary remedy."  *Id.* at 380; *accord, e.g.*, *In re Catawba Indian Tribe of S.C.*, 973 F.2d

1133, 1136 (4th Cir. 1992).  Although the standard for mandamus is, and should be, a

high one, it is satisfied in the extraordinary circumstances presented here.

## I.     THIS COURT SHOULD ISSUE A WRIT OF MANDAMUS DIRECTING THE DISTRICT COURT TO CERTIFY ITS ORDERS DENYING DISMISSAL OF PLAINTIFFS' COMPLAINT FOR IMMEDIATE APPELLATE REVIEW

If the President has a "clear and indisputable right" to certification of an

interlocutory appeal of the denial of the motion to dismiss, the other two elements for

mandamus plainly are satisfied:  There is "no other adequate means to attain the

relief" of immediate appeal.  *Cheney*, 542 U.S. at 380.  And this is a manifestly

"appropriate" circumstance for mandamus relief because proceeding to discovery

"would threaten the separation of powers" in this suit directed against the President

himself.  *Id.* at 381 (cleaned up).  Indeed, it is particularly appropriate insofar as the

collateral-order appeal of the President's individual-capacity absolute-immunity

defense will already be pending before this Court.  *See supra* p. 6 n.2.

Accordingly, the sole remaining question is whether the President has a "clear

and indisputable right" to certification of an interlocutory appeal by the district court.

*See Cheney*, 542 U.S. at 381.  As demonstrated below, in these "exceptional

circumstances," he is entitled to mandamus to obtain that certification:  although a

district court has broad discretion in considering a § 1292(b) certification, the court

here committed such a "clear abuse of discretion" that its retention of jurisdiction

amounts to "a judicial 'usurpation of power.'"  *Id.* at 380-81.

A. **Mandamus Relief From The Denial Of § 1292(b) Certification Is Appropriate In Rare Circumstances**

Section 1292(b) provides that a district court "shall" certify its order for interlocutory appeal "[w]hen a district judge … shall be of the opinion" that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see also, e.g., Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 195 (4th Cir. 2011). A district court thus plainly has significant discretion in evaluating whether that standard is met. *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 47 (1995). Nevertheless, the statute's operative language is mandatory: the district court "shall" grant certification when it determines the statutory criteria are present. Thus, appellate courts have "emphasize[d] the duty of the district court … to allow an immediate appeal to be taken when the statutory criteria are met." *Ahrenholz v. Board of Trs. of the Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000); *see Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 110-11 (2009).

Moreover, as the Supreme Court has stressed in general, "[d]iscretion is not whim." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1931 (2016). "[A] motion to a court's discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *Id.* at 1932 (citation omitted). Accordingly, even where a statute confers broad discretion, the exercise of that

discretion can be reviewed for clear "abuse of discretion," especially where, as here, the Constitution's separation of powers cabins such discretion.

This fundamental principle of adjudication applies to certification decisions under § 1292(b) no less than to other discretionary district court orders that are subject to mandamus review for clear abuses of discretion, such as evidentiary privilege rulings. *See Mohawk Indus.*, 558 U.S. at 110-11. Indeed, it arguably applies more so, because a district court that clearly abuses its discretion in declining to certify an interlocutory appeal effectively usurps the appellate court's own discretion under § 1292(b) whether to accept jurisdiction over the case. Mandamus relief in such circumstances is, quite literally, "in aid of appellate jurisdiction." *Cheney*, 542 U.S. at 380.

The "safety valve" of appellate review under § 1292(b) is particularly important for cases like this one, which—in raising whether and when the President is subject to suit under the Emoluments Clauses—presents "serious legal questions taking the case out of the ordinary run." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 883 (1994). There is a corresponding need for the "safety valve" of mandamus relief here, where the district court clearly abused its discretion in denying interlocutory appeal and ordering the case to discovery. As this Court has made clear, an "exercise of what has been called [its] advisory or supervisory mandamus power" is particularly appropriate in circumstances presenting "an issue of first impression that involves the power of the district court." *In re Pruett*, 133 F.3d 275, 280-81 (4th Cir. 1997)

13

(granting mandamus relief where district court ordered ex parte discovery without authority).  An appellate court must possess the power in extraordinary circumstances to exercise the jurisdiction that Congress intended under § 1292(b), especially where continued litigation in trial court "would threaten the separation of powers." *Cheney*, 542 U.S. at 381.

Indeed, the Eleventh Circuit exercised its mandamus authority to compel § 1292(b) certification in circumstances similar to—and less extraordinary than—those presented here. *Fernandez-Roque v. Smith*, 671 F.2d 426, 432 (11th Cir. 1982). There, the appellate court required the district court to rule on the threshold question whether it had subject matter jurisdiction to adjudicate the asylum claims of refugees and immediately to certify that order for interlocutory appeal "pursuant to 28 U.S.C. § 1292(b)," before conducting a hearing on the merits of asylum claims that the government contended "would violate the separation of powers." *Id.* at 431-32.  The Eleventh Circuit concluded that the case "present[ed] the truly 'rare' situation in which it is appropriate for this court to require certification of a controlling issue of national significance." *Id.* at 431; *cf. In re McClelland Eng'rs, Inc.*, 742 F.2d 837, 839 (5th Cir. 1984) ("request[ing]" that district court "certify its interlocutory order for appeal").

Similarly, the government recently sought mandamus in the Ninth Circuit of, among other things, a district court's refusal to certify under § 1292(b) its summary-judgment denial in a wide-ranging challenge to the United States' alleged inaction on

climate change.  The Ninth Circuit issued an order stating that the district court

should "promptly resolve petitioners' motion to reconsider the denial of the request

to certify [its] orders for interlocutory review."  Order at 2, *In re United States*, No. 18-

73014 (9th Cir. Nov. 8, 2018).  That order pointedly noted that the Supreme Court

had observed in an earlier order that "the justiciability of plaintiffs' claims 'presents

substantial grounds for difference of opinion.'"  *Id.* (quoting *United States v. United*

*States Dist. Court for Dist. of Or.*, 139 S. Ct. 1 (2018)).  Before the Ninth Circuit took

further action on the mandamus petition, the district court reconsidered and certified

an interlocutory appeal.  *Juliana v. United States*, No. 6:15-cv-1517, 2018 WL 6303774

(D. Or. Nov. 21, 2018).

As demonstrated below, the President is entitled to at least as much judicial

solicitude in obtaining appellate review of threshold legal defenses that would avoid

subjecting both him and third parties (including government agencies) to litigation

based on his public office, including wide-ranging discovery into his personal finances

and the official actions of his Administration.

### B.     This Is A Rare Circumstance Where A District Court's Refusal To Certify An Immediate Appeal Warrants Mandamus Relief

Because the statutory "preconditions for § 1292(b) review" are indisputably

satisfied in this case, which additionally "involves a new legal question" and "is of

special consequence," the district court "should not [have] hesitate[d] to certify an

interlocutory appeal."  *Mohawk Indus.*, 558 U.S. at 110-11.  The court's refusal to grant

15

certification is such a clear abuse of discretion and usurpation of jurisdiction that it warrants an exercise of this Court's mandamus authority.

### 1.    This is a paradigmatic case for a § 1292(b) appeal

In allowing this unprecedented lawsuit to proceed, the district court answered two legal questions on which it rests:  (1) Do plaintiffs have an implied equitable cause of action directly under the Emoluments Clauses to sue the President based on asserted injuries that are unconnected to the President's official actions and are alleged to be legally cognizable regardless?  (2) Do they state a claim that the Emoluments Clauses prohibit payments by governmental customers for services rendered by businesses in which the President has a financial interest?  When an order presents these types of questions, Congress intended a district court to certify under § 1292(b).[3]

*First*, these are clearly "controlling question[s] of law" for § 1292(b) purposes. Each is a "pure question of law, *i.e.*, an abstract legal issue that the court of appeals can decide quickly and cleanly" without the need "to delve beyond the surface of the record in order to determine the facts."  *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340-41 (4th Cir. 2017) (cleaned up).  Each is "controlling"

---

[3] The President's motion to dismiss and request for § 1292(b) certification raised the additional question of whether plaintiffs even adequately alleged the injury to competition on which they principally rely for Article III standing.  This petition does not focus on that fact-intensive question, but an interlocutory appeal on the motion-to-dismiss denial will necessarily present that jurisdictional question.

because interlocutory review may be "completely dispositive of the litigation," *Fannin v. CSX Transp.*, 873 F.2d 1438 (4th Cir. 1989) (mem.), or at least "serious to the conduct of the litigation" by significantly narrowing the scope of the case and saving "time and expense for the litigants" and the courts. *Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991).

*Second*, immediate appellate review clearly would "materially advance the ultimate termination of the litigation" within § 1292(b)'s meaning. Again, the resolution of the President's threshold defenses "would serve to avoid a trial or otherwise substantially shorten the litigation." *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004); *see In re Virginia Elec. & Power Co.*, 539 F.2d 357, 364 (4th Cir. 1976).

*Finally*, it is clear that § 1292(b)'s requirement of a "substantial ground for difference of opinion" is satisfied for each question. A "novel issue may be certified for interlocutory appeal" if "fair-minded jurists might reach contradictory conclusions." *Reese v. BL Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011). That, at a minimum, is the case here, for the reasons discussed below.

**a.** To begin, neither the Constitution nor any statute provides an express cause of action for alleged violations of the Emoluments Clauses. And this is not "a proper case" for courts to provide the "judge-made remedy" of an implied cause of action in equity to enjoin unconstitutional action by public officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *cf. Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857

(2017).  Equitable suits against the government traditionally have been recognized where a party seeks *preemptively to assert a defense* that would otherwise be available to it in an anticipated enforcement action by the government.  *See, e.g., Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 487, 491 n.2 (2010); *Michigan Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014).  This is a particularly inappropriate context to recognize a non-traditional equitable claim in an *affirmative enforcement suit* against the government, because there is neither a proper defendant nor a proper plaintiff.

As to the defendant, equitable relief against the President in his official capacity is contrary to the fundamental principle, rooted in the separation of powers, that federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866); *see also Franklin v. Massachusetts*, 505 U.S. 788, 802-03, 806 (1992) (plurality op.). As the D.C. Circuit has explained, "the President, like Congress, is a coequal branch of government, and for the President to be ordered to perform particular executive … acts at the behest of the Judiciary, at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) (cleaned up).

As for the plaintiffs, their "alleged injur[ies]" are not "legally and judicially cognizable" under the Emoluments Clauses. *Raines v. Byrd*, 521 U.S. 811, 819 (1997). The Supreme Court "has required that the plaintiff's complaint fall within the zone of

interests to be protected or regulated by the statute or constitutional guarantee in question." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (cleaned up).  In the familiar context of the APA's "generous review provisions," the zone-of-interests limitation asks only whether "the plaintiff's interests are so marginally related to or inconsistent with the purposes" of the provision that they are not even "arguably" covered.  *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 395, 399-400 (1987).  But the zone-of-interests requirement is not limited to the APA context, because it is a "requirement of general application" that is "presumed" to apply to all causes of action unless "expressly negated," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014), and the "breadth of the zone of interests varies according to the provisions of law at issue," *Bennett v. Spear*, 520 U.S. 154, 163 (1997).  Of central importance, the Supreme Court has explained that the zone-of-interests limitation applies more strictly where a plaintiff seeks to sue directly under the Constitution rather than the APA, essentially equating the test in that context to the stringent requirements for implying "a private right of action under a statute."  *Clarke*, 479 U.S. at 400 n.16; *cf. Armstrong*, 135 S. Ct. at 1383-85 (rejecting implied right of action directly under the Supremacy Clause).

As the district court in *CREW* correctly held, "[n]othing in the text or the history of the Emoluments Clauses suggests that the Framers intended these provisions to protect anyone from competition" in "the market for government business."  276 F. Supp. 3d at 187-88.  Instead, as the court here acknowledged (Add.

19

82-84), the Emoluments Clauses were intended as prophylactic protection for the people generally against the potentially *corrupting influence* from the acceptance of emoluments *on official actions*. As Edmund J. Randolph explained, the Foreign Emoluments Clause "is provided to prevent corruption." 3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 465-66 (2d ed. 1891). Likewise, Alexander Hamilton explained that the Domestic Emoluments Clause ensures the President has "no pecuniary inducement to renounce or desert the independence intended for him by the Constitution." *The Federalist No. 73*, at 493-94 (Jacob E. Cooke ed., 1961). Plaintiffs, however, do not allege any cognizable injury resulting from any official action taken by the President because of his alleged acceptance of Emoluments.

The interest plaintiffs assert in being free from increased competition with the President's businesses is so marginally related to the Emoluments Clauses' zone of interests that it would fail even the generous APA test, and does not remotely establish the type of private right needed under the constitutional test. Moreover, regardless of whether the Clauses would provide a basis of their own force to challenge an official action taken because of acceptance of a prohibited Emolument, plaintiffs here, shorn of their unavailing competitive injuries, are asserting only a generalized grievance shared by all members of the public in having an official comply with constitutional provisions adopted for the benefit of the public generally. *United States v. Richardson*, 418 U.S. 166, 176-78 (1974).

20

The district court thus clearly erred in holding that plaintiffs may sue the President directly under the Emoluments Clauses for their alleged injuries, and at a minimum it was a clear abuse of discretion for the court to deny the substantive grounds for disagreement and to deprive this Court of the opportunity to exercise jurisdiction over orders presenting this novel and important constitutional question.

**b.**   So too for the merits question of the correct meaning of "Emolument." Although space does not permit a full treatment of this significant question, it is simple enough to show that the district court clearly erred by refusing to dismiss or even certify for interlocutory appeal.

The President urged the definition "profit arising from office or employ."  This definition is supported by the etymology of the term, Walter W. Skeat, *An Etymological Dictionary of the English Language* 189 (1888) ("profit, what is gained by labour"); by contemporaneous dictionaries, *see, e.g.*, *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774); and by intra-textual comparison with the Domestic Emoluments Clause itself, which focuses on the President's "services," U.S. Const. art. II, § 1, cl. 7, and the Incompatibility Clause, which treats an "Emolument" as an aspect of an "Office" and thus ties it to the official's employment, *id.* art. I, § 6, cl. 2.

But the district court rejected this well-supported interpretation and instead construed the term broadly to encompass "anything more than *de minimis* profit, gain, or advantage offered to a public official."  Add. 88.  That reading cannot be correct because interpreting the term "Emolument" to reach essentially anything of value

renders entirely superfluous the Foreign Emoluments Clause's prohibition on receipt

of any "present."  *See Holmes v. Jennison*, 39 U.S. (14 Pet.) 540, 570-71 (1840) ("no word

[in the Constitution] was unnecessarily used, or needlessly added").  The court's "*de

minimis*" exception also lacks any textual basis and was created to explain away

inconvenient examples like President Obama's likely royalties from book sales to

foreign governments.  Dkt. No. 21-1, at 52 & n.69 (Motion to Dismiss, citing

sources).

Indeed, the court's reading of the Emoluments Clauses is belied by Founding-

era history and context.  Most notably, George Washington directly transacted

business with the federal government while he was President.  For example, he

bought several lots of federal land in the then-Territory of Columbia in a public sale,

and he himself authorized the public sale, which was conducted by the Territory's

Commissioners.[4]  No concern was raised that such transactions conferred a benefit,

and thus (on plaintiffs' view) a prohibited emolument, on the President.  Similarly,

several early Presidents owned plantations and continued to export cash crops

overseas while in office, including Washington, who exported flour and cornmeal to

"England, Portugal, and the island of Jamaica," and Thomas Jefferson, who exported

---

[4] *See* Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793), http://founders.archives.gov/documents/Washington/05-14-02-0074; Letter from Commissioners for the District of Columbia to George Washington (Sept. 16, 1793), https://founders.archives.gov/documents/Washington/05-14-02-0068.

tobacco to Great Britain.[5]  Yet there is no evidence that they took steps to ensure that

foreign governments were not among their customers.  These actions of the Founders

are entitled to considerable weight in construing the term "Emoluments."  *See NLRB*

*v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014).

### 2.      The district court clearly abused its discretion in refusing to certify an interlocutory appeal under § 1292(b)

**a.**  At the outset, the district court misunderstood the inquiry under § 1292(b),

which asks whether there is "substantial ground for difference of opinion," 28 U.S.C.

§ 1292(b).  The court interpreted that inquiry to require a pre-existing judicial

disagreement.  *Compare* Add. 116 (relying on lack of disagreement "*among courts*"), *with*

*Reese*, 643 F.3d at 688 ("A substantial ground for difference of opinion exists where

reasonable jurists might disagree on an issue's resolution, not merely where they have

already disagreed."); *see United States v. Myers*, 593 F.3d 338, 347 (4th Cir. 2010) ("novel

privilege ruling" may warrant certification).  In short, in a case like this, where "novel

legal issues are presented, on which fair-minded jurists might reach contradictory

conclusions, a novel issue may be certified for interlocutory appeal without first

awaiting development of contradictory precedent."  *Reese*, 643 F.3d at 688; *accord In re*

*Trump*, 874 F.3d 948, 952 (6th Cir. 2017).

---

[5] *See Ten Facts about the Gristmill*, George Washington's Mount Vernon, Fact 9, http://www.mountvernon.org/the-estate-gardens/gristmill/ten-facts-about-the-gristmill; Letter from Thomas Jefferson to William A. Burwell (Nov. 22, 1808), *in* 11 *The Works of Thomas Jefferson* 75-76 (Paul Leicester Ford ed., 1905).

Even apart from that threshold error, the district court's analysis of § 1292(b) certification is fundamentally flawed.  The court denied certification principally because it disagreed with the government's legal arguments on the merits.  Particularly in a case in which the plaintiffs' complaint rests on an unprecedented legal theory, however, that is hardly a reason to deny § 1292(b) certification.  If anything, as demonstrated below, the court's opinion underscores the existence of controlling legal questions about which there is substantial disagreement.

**b.**  On the justiciability question, the district court never addressed the President's argument that implied equitable causes of action traditionally operate as preemptive defenses against government enforcement action rather than as affirmative enforcement suits against the government.  *Supra* pp. 17-18.  Moreover, on the President's specific argument that he is not a proper defendant in this case, the district court merely asserted a factual distinction from *Mississippi* and *Franklin*—that there is "no subordinate official against whom equitable relief would make sense." Add. 128.  But that distinction is not relevant to the reasoning there that federal courts simply have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi*, 71 U.S. (4 Wall.) at 501.

Likewise, on the President's specific argument that the plaintiffs assert no legally or judicially cognizable interests under the Clauses, the district court erroneously dismissed the contrary zone-of-interests decision in *CREW* as "pure dicta" because that court had also held that plaintiffs lacked Article III standing.  Add.

24

121.  This reasoning is doubly mistaken.  First, *CREW*'s zone-of-interests conclusion was not "dicta," but an "alternative holding[]."  *United States v. Ford*, 703 F.3d 708, 711 n.2 (4th Cir. 2013).  Second, the question under § 1292(b) is not whether courts have issued contradictory *holdings*, but whether there exists "substantial ground for difference of *opinion*."

The district court's reasoning is also fundamentally flawed on its own terms. The court declared that, "[i]n a broad sense, all Americans fall within the zones of interest of the [Emoluments] Clauses," and that "[n]othing in the Constitution precludes business competitors—a sub-class of Americans" from bringing suit under the Clauses.  Add. 122.  Yet there is no support for the proposition that the Clauses were intended to protect the public against competition from a government official's privately owned businesses, let alone to protect "all Americans" from any injury resulting from an alleged violation of those Clauses no matter how unrelated to their purposes.  *Cf. Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 176-77 (2011) (noting "absurd consequences" of similarly boundless theory that "any person injured" by a legal violation has a right to sue).  Moreover, "the injury within the requisite 'zone of interests'" "must be *the same*" as "the injury that supplies constitutional standing," *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) (emphasis added), and the alleged injury to "all Americans" from violations of the Emoluments Clauses is "only a generally available grievance … [that] does not state an Article III [injury]," *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam).

25

Finally, the district court erroneously suggested that resolving the cause-of-action question in the President's favor would not terminate or even substantially narrow the litigation because plaintiffs could still sue based on their "quasi-sovereign[]" injuries even if they could not on competitive injuries.  Add. 121.  That reasoning ignores the President's more general arguments that this is not a proper case to imply an equitable cause of action for *any* injuries and that the President is not a proper defendant *at all*.  But even as to the zone-of-interests argument, the district court's reasoning is fundamentally flawed.  Plaintiffs' asserted quasi-sovereign injuries are both inherently speculative and affirmatively inconsistent with an interest in preventing corruption in official decisionmaking:  plaintiffs claim that the alleged competition for the President's favor from other governments pressures plaintiffs *to provide allegedly unlawful emoluments* in the form of concessions to the Trump Organization and patronage of the Hotel.  *See* Add. 17-19.  And regardless, it would narrow the scope of the case considerably to limit it to alleged emoluments provided by the plaintiffs or their alleged governmental competitors.

**c.**  On the meaning-of-"Emoluments" question, the district court principally declared that there was "no point" responding to the President's anti-surplusage and historical arguments concerning the meaning of the Clauses.  Add. 116-17.  To the extent the court engaged with the President's arguments, it incorrectly found that his definition was unduly narrow as it was "tantamount to a bribe."  Add. 115.  Not true: while bribes certainly would be prohibited, the Foreign Emoluments Clause also

26

would prohibit, for example, an official from accepting separate employment with another nation.  But that is a far cry from prohibiting the official from receiving "anything of value" from foreign governments, even indirectly as a result of patronage of a private business in which the official has a financial interest.  *See* Add. 90.

The district court was equally wrong in concluding that the meaning of "Emolument" is not a controlling question that would materially advance the termination of the litigation because, even under the President's own interpretation, he would lose "if, [as] appears likely, the payments to his hotel [by foreign governments] are being made with an expectation of favorable treatment by the President in matters of foreign policy."  Add. 118.  A foreign government's mere subjective hope that its payments for services furnished by the Hotel might influence the President does not mean that his derivative financial interest in the Hotel's commercial profits are transformed into prohibited emoluments of his office.  And the court did not and could not seriously dispute that, on this understanding, plaintiffs' claims would fail or, at the very least, be substantially narrowed.

*     *     *

Accordingly, the district court clearly abused its discretion and usurped this Court's jurisdiction to decide whether to hear an interlocutory appeal under § 1292(b).  This Court should issue a writ of mandamus directing certification of the orders denying the motion to dismiss, so that it can resolve the merits of the motion to dismiss in the ordinary course of an interlocutory appeal.

27

## II.   IN THE ALTERNATIVE, THIS COURT SHOULD ISSUE A WRIT OF MANDAMUS DIRECTING THE DISTRICT COURT TO DISMISS PLAINTIFFS' COMPLAINT OUTRIGHT

Even if this Court were to conclude that the district court's certification discretion under § 1292(b) was sufficiently broad that a writ of mandamus directing certification is unwarranted despite this extraordinary suit against the President, it nevertheless should grant mandamus directing the district court to dismiss plaintiffs' complaint.  Whether the complaint should have been dismissed is a purely legal question.  And for the reasons discussed, the President has a "clear and indisputable" right to dismissal on the grounds that plaintiffs assert no legally and judicially cognizable interests protected by the Emoluments Clauses and that he may not be sued for equitable relief; mandamus to direct such a dismissal is "appropriate under the circumstances" given the separation-of-powers concerns at stake.  *Cheney*, 542 U.S. at 381; *see In re Pruett*, 133 F.3d at 281 (mandamus warranted where petition presents legal "issue[s] of first impression that involve[] the power of the district court").[6]

To be sure, mandamus generally may "not be used as a substitute for the regular appeals process."  *Cheney*, 542 U.S. at 381-82; *accord In re Lockheed Martin Corp.*,

---

[6] The President here seeks dismissal via mandamus solely on the two grounds asserted above because this Court may dismiss on those grounds without first having to resolve all aspects of plaintiffs' allegations of Article III standing.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 92, 97 n.2 (1998) ("statutory standing"—*i.e.*, the zone-of-interests inquiry—may be determined before Article III standing); *cf. Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) (same for the applicability of a public-policy bar on certain suits against the United States).

503 F.3d 351, 353 (4th Cir. 2007).  But in these rare circumstances, litigating this case

through discovery to final judgment, followed by an appeal in the ordinary course, is

not an "adequate means" of obtaining relief.  *Cheney*, 542 U.S. at 380.

In an official-capacity suit such as this, there should be "Presidential immunity

from judicial process" given that, ultimately, "no court has authority to direct the

President to take an official act."  *Franklin*, 505 U.S. at 826 (Scalia, J., concurring in

part and in the judgment).  In light of "the constitutional tradition of the separation of

powers," "it is incompatible with [the President's] constitutional position that he be

compelled personally to defend his executive actions before a court," for many of the

same reasons there is "an absolute Presidential immunity from civil damages for

official acts."  *Id.* at 827-28 (citing *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982)).

Moreover, in the specific context of mandamus, *Cheney* itself "g[ave] recognition to

the paramount necessity of protecting the Executive Branch from vexatious litigation

that might distract it from the energetic performance of its constitutional duties."  542

U.S. at 382.  Such separation-of-powers considerations are manifested by the intrusive

discovery that has already begun.  *Supra* pp. 9-10.

Notably, this Court has held it is consistent with the bedrock principle that

"mandamus cannot be used as a substitute for interlocutory appeal" that mandamus

may issue to address the type of "judicial usurpation of power" that occurs where a

district court's refusal to dismiss a case creates a "conflict between the exercise of the

district court's jurisdiction and that of an administrative agency."  *In re Sewell*, 690 F.2d

29

403, 406-07 (4th Cir. 1982) (citation omitted). *A fortiori*, mandamus is appropriate where, as here, the district court disregards that it "has no jurisdiction of a bill to enjoin the President in the performance of his official duties," *Franklin*, 505 U.S. at 802-03 (plurality op.) (quoting *Mississippi*, 71 U.S. (4 Wall.) at 501), much less at the behest of plaintiffs who assert no interests protected by the constitutional provisions they seek to judicially enforce against the President.

## III. THIS COURT SHOULD STAY DISTRICT COURT PROCEEDINGS PENDING ITS CONSIDERATION OF THIS PETITION

This Court has previously granted stays of district court proceedings pending disposition of a petition for a writ of mandamus. *See, e.g.*, *In re Mills*, 287 F. App'x 273, 276 (4th Cir. 2008); *United States v. (Under Seal)*, 757 F.2d 600, 602 (4th Cir. 1985). A stay is likewise appropriate here. *See Nken v. Holder*, 556 U.S. 418, 425-26 (2009) (standard for stay pending appeal). As discussed above, the President is likely to obtain mandamus, and he is likely to suffer irreparable injury in the interim from the intrusive discovery into his personal finances and the official actions of his Administration (including through third-party subpoenas of government agencies).

No countervailing harm will result from the stay. Even setting aside that plaintiffs' alleged injuries are not cognizable, they are almost all financial in nature (directly or indirectly) and thus do not come close to outweighing the significant separation-of-powers defects in this suit against the President. Indeed, plaintiffs have not even sought a preliminary injunction, which underscores that they face no

immediate harm sufficient to outweigh the harm to the President.  The government thus requests that this Court promptly issue a stay of district court proceedings.

## CONCLUSION

This Court should issue a writ of mandamus directing the district court to certify for interlocutory appeal under 28 U.S.C. § 1292(b) the March 28 and July 25, 2018 orders denying the President's motion to dismiss, or alternatively to dismiss the suit.  Additionally, this Court should stay district court proceedings, pending resolution of this petition, prior to the first discovery deadline of January 3, 2019.

Respectfully submitted.

JOSEPH H. HUNT
  *Assistant Attorney General*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
*/s/ Megan Barbero*
MEGAN BARBERO
  (202) 532-4631
  Attorneys
  Appellate Staff, Civil Division
  U.S. Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C.  20530

  *Attorneys for Petitioner*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing petition for a writ of mandamus complies with the requirements of Fed. R. App. P. 21(d) and 32(c)(2).  The petition is prepared in 14-point Garamond font, a proportionally spaced typeface; it is double-spaced; and it does not exceed 7,702 words, exclusive of certificates and documents required by Rule 21(a)(2)(C).

*/s/ Megan Barbero*
MEGAN BARBERO

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 21(a)(1), I hereby certify that on December 17, 2018, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system.  Service on counsel for all parties in the district court has been accomplished via notice filed through the district court's CM/ECF system attaching a copy of this filing.  The district court has also been provided with a paper copy of this filing through hand delivery to the district court clerk's office.

/s/ Megan Barbero
MEGAN BARBERO

**ADDENDUM**

# TABLE OF CONTENTS

**Record Materials:**

District Court Opinion, Dkt. No. 101 (March 28, 2018) ..........................................Add. 1

District Court Order, Dkt. No. 102 (March 28, 2018) ...........................................Add. 48

District Court Opinion, Dkt No. 123 (July 25, 2018)..............................................Add. 50

District Court Order, Dkt. No. 124 (July 25, 2018)...............................................Add. 102

District Court Memorandum Opinion, Dkt. No. 135 (November 2, 2018)......Add. 104

District Court Order, Dkt. No. 136 (November 2, 2018) ...................................Add. 135

Amended Complaint, Dkt. No 95 (February 23, 2018) ........................................Add. 136

**Constitutional and Statutory Provisions:**

U.S. Const. art. I, § 9, cl. 8 ......................................................................Add. 185

U.S. Const. art. II, § 1, cl. 7......................................................................Add. 185

28 U.S.C. § 1292 .......................................................................................Add. 186

28 U.S.C. § 1651 .......................................................................................Add. 187

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **THE DISTRICT OF COLUMBIA** | * | |
| and **THE STATE OF MARYLAND,** | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. **PJM 17-1596** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| *individually and in his official capacity* | * | |
| *as President of the United States*, | * | |
| | * | |
| Defendant. | * | |

## OPINION

    This suit alleges that President Donald J. Trump has violated the Foreign and Domestic

Emoluments Clauses of the U.S. Constitution.[1] Plaintiffs, the District of Columbia and the State of

Maryland, submit that the President is violating these Clauses because the Trump Organization, in

which he has an ownership interest and from which he derives financial benefits, owns and

operates a global business empire, including hotels, restaurants, and event spaces. The President's

receipt of these benefits is said to offend the sovereign, quasi-sovereign, proprietary, and *parens

patriae* interests of the State of Maryland and the District of Columbia. Plaintiffs seek declaratory

relief establishing their rights *vis-à-vis* the President's actions as well as injunctive relief

prohibiting him from further violating the Clauses.

---

[1] The Foreign Emoluments Clause, U.S. Const. art. I, § 9, cl. 8, provides that "no person holding any office of profit or trust under them, shall, without the consent of the Congress, accept of any present, emolument, office, or title, of any kind whatever, from any king, prince, or foreign state." The Domestic Emoluments Clause, U.S. Const. art. II, § 1, cl. 7, provides: "The President shall, at stated times, receive for his services, a compensation, which shall neither be increased nor diminished during the period for which he shall have been elected, and he shall not receive within that period any other emolument from the United States, or any of them."

Case 8:17-cv-01596-PJM Document 101 Filed 03/28/18 Page 44 of 229

The President has filed a Motion to Dismiss, arguing, *inter alia*, that Plaintiffs lack standing to pursue the litigation, i.e., that they have shown no injury-in-fact, fairly traceable to his acts, or likely to be redressed by any court order. Plaintiffs reject all these propositions. Although the parties have briefed other arguments pertaining to the viability *vel non* of Plaintiffs' suit,[2] the Court held oral argument limited to the issue of standing and advised the parties that it would address that issue in a stand-alone Opinion and Order. This is that Opinion and Order.

For the reasons that follow, the Court **DENIES-IN-PART** the Motion to Dismiss and finds that Plaintiffs do have standing to challenge the actions of the President with respect to the Trump International Hotel and its appurtenances in Washington, D.C., as well as the operations in the Trump Organization with respect to them. It **GRANTS-IN-PART WITHOUT PREJUDICE** the Motion to Dismiss as to Plaintiffs' standing with respect to the operations of the Trump Organization and the President's involvement in the same outside the District of Columbia. The Court **DEFERS** ruling on other arguments in the Motion to Dismiss pending further oral argument.[3]

## I.    FACTUAL BACKGROUND

The basic facts are not in dispute.

### A.  The Parties

Plaintiffs are the District of Columbia and the State of Maryland. The District of Columbia is a municipal corporation and the local government for the territory constituting the seat of the

---

[2] One of those arguments pertains to the meaning of the word "emolument" in the Clauses. For the sole purpose of determining the standing question, the Court will assume that "emolument" covers "anything of value," as alleged in the Amended Complaint. Am. Compl. ¶¶ 25-27, ECF No. 95. The Court will address the President's arguments pertaining to the meaning of the term in a separate Opinion pending further oral argument.

[3] *See* note 2, *supra*.

Federal Government. Am. Compl. ¶ 18. The State of Maryland is a sovereign State of the United

States. *Id.* ¶ 19.

Donald J. Trump is the President of the United States, originally sued in his official

capacity, subsequently added as a Defendant in his individual capacity.[4] Am. Compl. ¶ 20. He is

the sole owner of both the Trump Organization LLC and The Trump Organization, Inc.

(collectively, the Trump Organization), an umbrella organization under which many, if not all, of

his corporations, limited-liability companies, limited partnerships, and other entities are loosely

organized. *Id.* ¶ 29. Through these various business entities, the President owns and receives

payments from a number of properties, hotels, restaurants, and event spaces in the United States

and abroad. *Id.* Of particular importance in the present suit is the President's ownership, through

the Trump Organization, of the Trump International Hotel in Washington, D.C. (the Hotel).

The Hotel is a five-star, luxury hotel located on Pennsylvania Avenue, N.W., in

Washington, near the White House. *Id.* ¶ 34. While the President does not actively manage the

Hotel, through the Trump Organization, he owns and purportedly controls the Hotel as well as the

bar and restaurant, BLT Prime, and the event spaces located within the establishment. *Id.* ¶¶ 29,

34-36. Directly or indirectly, the President shares in the revenues that the Hotel and its appurtenant

restaurant, bar, and event spaces generate. *Id.*

---

[4] On February 23, 2018, without objection by Defendant, Plaintiffs filed a Motion for Leave to File an Amended
Complaint which adds the President as a Defendant in his individual capacity. On March 12, 2018, the Court granted
the Motion, accepting the proposed Amended Complaint that had accompanied the Motion. Mem. Order (Mar. 12,
2018), ECF No. 94. The parties have agreed that the Court should apply the arguments in the President's pending
Motion to Dismiss (ECF No. 21) to the Amended Complaint with respect to Plaintiffs' official capacity claims. *See*
Mem. Order (Mar. 12, 2018). The President has indicated that he wishes to file a Motion to Dismiss with respect to
Plaintiffs' individual capacity claims. Def.'s Resp. at 2 (Mar. 8, 2018), ECF No. 93. He will be permitted to do so. The
Court will deal with the viability of the individual capacity claims in a subsequent Opinion and Order.

**B. The Alleged Violations**

On January 11, 2017, shortly before his inauguration, the President announced that he would be turning over the "leadership and management" of the Trump Organization to his sons, Eric Trump and Donald Trump, Jr. *Id.* ¶ 30. Prior to taking office, he also announced that all profits earned from foreign governments would be donated to the U.S. Treasury. *Id.* ¶ 46. The Trump Organization stated that it would not be tracking all payments it might receive from foreign governments and only planned to make an estimate with regard to such payments. *Id.* As of the date of the filing of this action, the President had made no such "donations" to the U.S. Treasury.[5] *See* Am. Compl. ¶¶ 46, 138. Despite these announcements, Plaintiffs allege that the President continues to own and know about the activities of the Trump Organization. *Id.* ¶ 31. Indeed, according to Plaintiffs, one of the President's sons has stated that he would be providing business updates to the President regarding the Organization on a quarterly basis and, although the President has formed a trust to hold his business assets, it appears that he remains able to obtain distributions from this trust at anytime. *Id.* ¶¶ 31-32.

Since the President's election, a number of foreign governments have patronized or expressed a definite intention to patronize the Hotel, some of which have indicated that they are doing so precisely because of the President's association with it. *Id.* ¶¶ 39-43. For example, the Amended Complaint alleges that the Kingdom of Saudi Arabia spent thousands of dollars at the Hotel between October 1, 2016, and March 31, 2017. *Id.* ¶ 41. Plaintiffs also cite a statement from

---

[5] According to a recent press report, the President has stated that he has now paid to the U.S. Treasury the profits the Hotel has received from foreign governments. No details with respect to such payments, however, have been provided, viz., how the payments were calculated, who verified the calculations, how much was calculated over what period of time, and which foreign payor(s) were involved. *See* David A. Fahrenthold & Jonathan O'Connell, *Trump Organization Says It Has Donated Foreign Profits to U.S. Treasury, but Declines to Share Details*, Wash. Post (Feb. 26, 2018),
https://www.washingtonpost.com/politics/trump-organization-says-it-has-donated-foreign-profits-to-us-treasury-but-declines-to-share-details/2018/02/26/747522e0-1b22-11e8-ae5a-16e60e4605f3_story.html?utm_term=.d8a282e07ec0.

a Middle Eastern diplomat who told the *Washington Post*, "Believe me, all the delegations will go there." *Id.* ¶ 39. An Asian diplomat allegedly agreed, explaining "Isn't it rude to come to [the President's] city and say, 'I'm staying at your competitor?'" *Id.*

Plaintiffs further allege that at least some foreign governments have withdrawn their business from other hotels in the area not affiliated with the President and have transferred it to the Hotel. As an example, they assert that the Embassy of Kuwait held its National Day celebration at the Hotel on February 22, 2017, despite having made a prior "save the date reservation with the Four Seasons hotel." *Id.* ¶ 40.

Plaintiffs also contend that the President has been more than a passive actor with respect to the Hotel. Since his election, the Hotel has specifically sought to market itself to diplomats by hiring a "director of diplomatic sales" and by hosting an event where it pitched the Hotel to approximately 100 foreign diplomats. *Id.* ¶ 37. The President himself has appeared at the Hotel on several occasions, while a number of members of his administration continue to live there. *Id.* ¶ 38. As a result, Plaintiffs allege that goods and services at the Hotel have been marketed at a premium level since the election. *Id.* ¶ 100. A portion of benefits, particularly expenditures by foreign governments, is said to have been passed along to the President through the Trump Organization. *Id.* ¶ 29.

In addition, at least one State—the State of Maine—patronized the Hotel when its Governor, Paul LePage, visited Washington to discuss official business with the Federal Government, including discussions with the President. Pls.' Opp'n. at 8, ECF No. 46. Indeed, on one of those trips, the President and Governor LePage appeared together at a news conference at which the President signed an executive order to review orders of the prior administration that established national monuments within the National Park Service, which could apply to a park and

Add. 5

national monument in Maine, which President Obama had established over LePage's objections in 2016. *Id.*

Plaintiffs submit that the President's receipt of benefits from these sources violates both the Foreign and Domestic Emoluments Clauses.

## C. Plaintiffs' Alleged Injuries

The District of Columbia and Maryland claim they have been harmed by the President's alleged violations in several ways.

First, Maryland alleges injuries to its **sovereign interests**.[6] It claims a special interest in "enforcing the terms on which it agreed to enter the Union," Am. Compl. ¶ 104, stating that the Emoluments Clauses were "material inducements" to its decision to enter the Union and that it retains the power to enforce those provisions today. *Id.* ¶ 106. Maryland also claims injury to its sovereign interests in that it receives tax revenues from comparable hotels, bars, restaurants and event spaces within the State of Maryland located nearby the Hotel, which it has lost and will continue to lose because patrons choose to avail themselves of the Hotel as opposed to comparable establishments in Maryland. *Id.* ¶¶ 116-118.

Second, both Plaintiffs submit that their **quasi-sovereign interests** are harmed in that the President's violations have placed them in an "intolerable dilemma." *Id.* ¶ 110. In particular, they claim a governmental interest in the enforcement of their respective laws pertaining to taxation, zoning, and land use involving real property that the President may own or seek to acquire. *Id.* ¶ 108. They allege that the President's receipt of emoluments from other States of the United States, in violation of the Domestic Emoluments Clause, forces them, on the one hand, to choose between granting requests for exemptions or waivers by the Trump Organization for activities

---

[6] The District of Columbia concedes that it cannot allege injury to a sovereign interest because it is not a sovereign. *See* Pls.' Opp'n at 6 n.1; Hr'g Tr. at 180:24-25, Jan. 25, 2018, ECF No. 92 (Hr'g Tr.).

conducted within Maryland and the District of Columbia and losing revenue or, on the other hand,

denying such requests by the President's organization and risk being placed at a disadvantage

*vis-à-vis* other States that have agreed to grant the Organization such concessions. *Id.* ¶ 110.[7]

Third, Plaintiffs assert injuries to their own **proprietary interests**. The District of

Columbia states that it directly owns building and land interests in properties in the District of

Columbia that directly compete with the Hotel, and which are either losing business to the Hotel or

which face the imminent prospect of losing such business by virtue of the President's continuing

involvement in the Hotel. Am. Compl. ¶¶ 119-129. Specifically, the District of Columbia claims it

possess an ownership or financial interest in the Walter E. Washington Convention Center

(Washington Convention Center), the Washington Convention Center and Sports Authority (also

known as Events D.C.), and the Carnegie Library. *Id.* ¶¶ 120-122.

The State of Maryland maintains that it has a direct financial interest in the Montgomery

County Conference Center, which is part of the Bethesda North Marriott Hotel located in

Bethesda, Maryland, (approximately thirteen miles from the Hotel)[8] as well as in the gambling

proceeds it receives from the casino at the MGM Hotel in the National Harbor, located

approximately ten miles from the Hotel across the Potomac River in lower Prince George's

County, Maryland. Am. Compl. ¶¶ 117, 131-32; Pls.' Opp'n at 16, 23. Maryland argues that, like

the District of Columbia, it is harmed because these entities compete with the Hotel for the

business of both foreign and domestic governments and that the President's violations of the

Emoluments Clauses have illegally skewed the hospitality market in his favor. Am. Compl. ¶ 130.

---

[7] The *Washington Post*, for example, has reported that the District of Columbia Office of Tax and Revenue granted substantial tax reductions to the Hotel of approximately $1 million. *See* Jonathan O'Connell, *Tax Official Reduce Trump's Tax Bill on D.C. Hotel by Nearly $1 Million*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/news/business/wp/2018/01/12/tax-officials-reduce-trumps-tax-bill-on-d-c-hotel-by-nearly-1-million/?utm_term=.6b527c071c30.
[8] *See* Def.'s Mot. Dismiss at 23, ECF No. 21-1.

Finally, the District of Columbia and the State of Maryland assert that they are entitled to pursue this litigation on behalf of their respective residents as **parens patriae**.[9] As *parens patriae*, they allege that the President's violations cause competing companies and their employees within the respective jurisdictions to lose business, wages, and tips, which in turn generate a range of market distortions that restrict and curtail opportunity, diminish revenues and earnings, and hamper competition. Am. Compl. ¶¶ 113-115.

The President disputes all these purported injuries and seeks dismissal of the suit, *inter alia*, on the ground that Plaintiffs have not shown that they have standing to pursue it. ECF No. 21.

## II.    LEGAL STANDARDS

### A. Motion to Dismiss

A party may move for dismissal of a suit pursuant to Federal Rule of Civil Procedure 12(b)(1) where the court lacks subject matter jurisdiction over the claims alleged in the complaint. Fed. R. Civ. P. 12(b)(1).  "Article III gives federal courts jurisdiction only over 'cases and controversies,' U.S. Const. art. III, § 2, cl. 1, and the doctrine of standing identifies disputes appropriate for judicial resolution." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471–76 (1982)). As the party asserting jurisdiction, the plaintiff bears the burden of proving that the district court has subject matter jurisdiction. *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). In considering whether to dismiss for lack of jurisdiction, the court may consider "evidence outside of the pleadings without

---

[9] *Parens Patriae* standing is a "judicial construct that does not lend itself to a simple or exact definition." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). It means literally "parent of the country" and has its roots in common law, and literally refers to a State's right as sovereign to step into litigation as guardian of persons under legal disability. *Id.* at 600. It has developed in American law to be a theory of standing by virtue of which a State may assert a quasi-sovereign interest on behalf of its citizens in general. *Id.* at 600-01, 607. The term is discussed further *infra*.

converting the proceeding into one for summary judgment." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (quoting *Richmond, Fredericksburg & Potomac R.R. Co.*, 945 F.2d at 768).

A motion to dismiss for failure to state a claim under Rule 12(b)(6) will be granted if the allegations in a complaint do not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and quotation marks omitted). "[I]n evaluating a Rule 12(b)(6) motion to dismiss, a court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

### B. Article III Standing

To establish "the irreducible constitutional minimum of standing," a plaintiff must "clearly . . . allege facts demonstrating" that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). An "injury-in-fact" has been defined as "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). The injury must be "legally and judicially cognizable," and the dispute must be one that "is traditionally thought to be capable of resolution through the judicial process." *Raines v. Byrd*, 521 U.S. 811, 819 (1997)

-9-

Add. 9

(quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

Of particular relevance to this proceeding, States are not "normal litigants for the purposes of invoking federal jurisdiction" and are entitled to "special solicitude" in the standing analysis. *Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007). Indeed, the invasion of three types of unique State interests justifying standing were identified by the Supreme Court in *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, being (a) sovereign interests; (b) nonsovereign interests; and (c) quasi-sovereign interests. 458 U.S. at 601-02 .

Thus, States have a sovereign interest in "the power to create and enforce a legal code, both civil and criminal" as well as in the "demand of recognition from other sovereigns," such as in the recognition of borders. *Id.* at 601.

However, "[n]ot all that a State does . . . is based on its sovereign character." *Id.* Like private parties, a State may "have a [nonsovereign] variety of proprietary interests," which a State may pursue in court, including its ownership of land or participation in a business venture. *Id*. at 601-02.

The *Snapp* Court recognized two distinct categories of quasi-sovereign interests held by States. First, "a State has a quasi-sovereign-interest in not being discriminatorily denied its rightful status within the federal system." *Id*. at 607. Second, a State has an interest in the "health and well-being—both physical and economic—of its residents." *Id*. In these actions, the State is said to sue in its capacity as *parens patriae.* When suing in that particular capacity, the State must be more than a nominal party and must allege more than an "injury to an identifiable group of individual

residents." *Id.* The injury must be of the type "that the State, if it could, would likely attempt to address through its sovereign lawmaking power." *Id.* If so, the State likely is deemed to have standing as *parens patriae* to bring the suit. *Id.*

## III.   STANDING

### A. Injury-in-Fact

The first requirement for Article III standing is that the plaintiff articulate an injury-in-fact, "which helps to ensure the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). While hypothetical or conjectural injuries will not suffice, an allegation of future injury may be sufficient if the threatened injury is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401, 409 (2013). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, [since] on a motion to dismiss [the court] presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citation and quotation marks omitted). At the same time, it has been said that "[i]njury-in-fact is not Mount Everest." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (Alito, J.).

Plaintiffs submit that their injuries are sufficiently concrete and imminent to satisfy the requirement of injury-in-fact. It should be noted, however, that, during oral argument, Plaintiffs clarified that their alleged competitive injuries—namely, Maryland's claimed injuries to its sovereign interest in taxes, to both parties' proprietary interests, and, to some extent, to both parties' *parens patriae* interests—centered almost exclusively around the District of Columbia-based Trump International Hotel and its appurtenant restaurant, bar, and event space,

whereas the alleged injuries to their sovereign and certain of their quasi-sovereign interests were said to have "no boundaries." Hr'g Tr. at 62-63.

The President disputes that any of Plaintiffs' alleged injuries, bounded or not, in fact exist much less that they satisfy the standard for injury-in-fact.

The Court finds that Maryland has suffered no injury to its sovereign interests[10] but that both Plaintiffs have stated cognizable injuries to their quasi-sovereign, proprietary, and *parens patriae* interests.

1) *Maryland's Sovereign Interests.*

The State of Maryland asserts two distinct sovereign interests.

i.     Detrimental Reliance in Joining the Union.

First, Maryland claims a sovereign interest in enforcing the terms upon which it entered the Union. Am. Compl. ¶¶ 104-106. It argues that because its 1776 Declaration of Rights contained a precursor to the United States Constitution's Emoluments Clauses, the Court should infer that Maryland felt strongly about preventing corruption when it joined the Union and therefore has standing to enforce these terms. Pls.' Opp'n at 14.

The President counters that this injury is not judicially cognizable because Maryland is essentially asking the Court to adjudicate "abstract questions of political power," which is beyond its authority under Article III. Def.'s Mot. Dismiss at 10, ECF No. 21-1 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 484-84 (1923)); Hr'g Tr. at 69. In any event, says the President, even if Maryland's alleged detrimental reliance were cognizable, the Amended Complaint contains no plausible allegation to support a claim that Maryland's present-day interpretation of "emolument" induced it to join the Union. Def.'s Mot. Dismiss at 11-12.

---

[10]  Again, the District of Columbia has no sovereign interest to be offended. *See* note 6, *supra*.

-12-

Add. 12

The Court is unaware of any legal support for the proposition that a State may establish injuries to its sovereign interest, by alleging reliance on the expectation that one of its own constitutional provisions pre-dating the federal Constitution would be carried forward to the federal Constitution when it joined the Union, when a comparable provision was in fact carried forward but is not at some later time being enforced to that State's satisfaction. As the President suggests, States may not serve as "roving constitutional watchdog[s]" raising any issue "no matter how generalized or quintessentially political." *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 272 (4th Cir. 2011). Lack of legal precedent aside, more fatal to Maryland's argument is the highly doubtful historical proposition that a causal connection existed between the inclusion of the Emoluments Clauses in the federal Constitution and Maryland's decision to ratify it. Even the most casual student of American history would likely conclude that Maryland would have ratified the federal Constitution for a myriad of reasons with or without inclusion of the Clauses and, if carried forward, without regard to the strictness with which over time they would be enforced. The inclusion of a "precursor" to the Emoluments Clauses in Maryland's pre-Union Declaration of Rights and the State's alleged frustration that the Clauses are not being appropriately enforced today establishes no injury-in-fact to Maryland's sovereign interests for standing purposes.

-13-

ii.     Tax Revenues.

Maryland, as sovereign, relying on the Supreme Court's decision in *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992), also argues that it has suffered a "direct injury in the form of a loss of specific tax revenues," Pls.' Opp'n at 14. Maryland invites the Court's attention to the revenue it receives from the sales and room-rental taxes on Maryland hotels, restaurants, and event spaces that compete with the Hotel for government business. Pls.' Opp'n at 18-19. Because this is a competitive injury, Maryland asserts, for standing purposes, it is not required to submit actual lost tax or sales data. *Id.*; Hr'g Tr. at 59-60.

The President argues that Maryland's supposed tax revenue injury is too general to qualify as an injury-in-fact. In contrast to *Wyoming*, he says, where there was "unrebutted evidence" of a specific loss of revenue by reason of a tax on coal going back several years, Maryland is engaged in extreme speculation about potential future tax loss of general hospitality revenues. Def.'s Mot. Dismiss at 13 (citing *Wyoming*, 502 U.S. at 445, 447-50); Hr'g Tr. at 34, 76-77. He submits that it is altogether improbable that Maryland's tax coffers will suffer any injury at all. Def.'s Mot. Dismiss at 14.

The Court agrees with the President. Though Maryland looks to the competitor standing theory in support of its lost tax revenue injury, in marked contrast to the losses to its proprietary interests, as will be discussed *infra*, the case law indicates that a plaintiff has the burden of showing "a direct injury in the form of a loss of specific tax revenues." *Wyoming*, 502 U.S. at 448. A "decline in general tax revenues" is not enough. *Id.* (citing *Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976)). As the President points out, in *Wyoming*, the Supreme Court was satisfied that a direct injury was shown because there was "[u]nrebutted evidence demonstrat[ing] that, since the effective date of the [applicable] Act, Wyoming ha[d] lost severance taxes" every year

-14-

for a period of almost three years. *Id*. at 445-46. Though Maryland points out that *Wyoming* was decided at the summary judgment stage, that would seem to make little difference at the Motion to Dismiss stage. Just to get through the gate at this point, Maryland has to demonstrate with at least some measure of specificity how much tax revenue it may have lost to the Hotel. It has not done so. As distinguished from the other competitive injuries to be discussed presently, Maryland's suggestion of loss of tax revenue is too speculative for the Court to find that it constitutes injury-in-fact for standing purposes. *See Florida v. Mellon*, 273 U.S. 12, 17-18 (1927) (claimed loss of tax revenue was too speculative, remote and indirect to establish standing).

The Court finds that neither claimed injury to Maryland's sovereign interests satisfies the injury-in-fact prong of the standing test.

2) *District of Columbia's and Maryland's Quasi-Sovereign Interests.*[11]

Both Plaintiffs assert injury to their quasi-sovereign interests.

With respect to the President's alleged violations of the Domestic Emoluments Clause, Plaintiffs argue that they have been placed in an "intolerable dilemma" in that, on the one hand, they are forced to choose between granting the Trump Organization's requests for special concessions, exemptions, waivers, and the like, thereby losing revenue, and, on the other hand, denying such requests and risk being placed at a disadvantage *vis-à-vis* other States that already have been or may in the future be constrained to grant such concessions. Am. Compl. ¶¶ 107-112. Because this dilemma supposedly violates the "fundamental principle of *equal* sovereignty among the States," Pls.' Opp'n at 7-8 (quoting *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2623 (2013)), Plaintiffs claim injury-in-fact, hence standing, to protect their "position among . . . sister States." *Id*. at 9 (quoting *Georgia v. Pennsylvania Railroad*, 324 U.S. 439, 451 (1945)).

---

[11] The District of Columbia, as a United States territory, is "similarly situated to a State in this respect" and may assert quasi-sovereign interests in federal court. *See Snapp*, 458 U. S. at 608 n.15.

As to the Foreign Emoluments Clause, Plaintiffs allege that the President's violations deny them their "rightful status in the federal system" because the Federal Government becomes responsive to the desires of foreign governments rather than to those of the States. *Id.* (citing *Snapp*, 458 U.S. at 607). Since these injuries supposedly occur each time the President receives an emolument from any location, Plaintiffs argue they have been injured in the past and continue to be injured by the President's actions. *Id.* at 11-12.[12] They claim standing under *Snapp* to vindicate their interests in "securing observance of the terms under which [they] participate[] in the federal system." *Snapp*, 458 U.S. at 607-08.

The President's position is that these claimed injuries are again based on a "speculative chain of possibilities," such that they cannot be deemed "certainly impending." Def.'s Mot. Dismiss at 17 (citing *Clapper*, 568 U.S. at 410, 414). To start, the President points out that Maryland has not alleged that it is faced with any threatened need to grant concessions to him or his Organization. In fact, he says, the Amended Complaint does not even allege that the Trump Organization or the President do any business in Maryland. Though the District of Columbia is home to the Hotel, the President argues that, as to it, any hypothetical special treatment of the Hotel, were the District to provide such treatment, would be a self-inflicted injury. *Id.* at 17-18. Further, he maintains that it is purely conjectural that other States would grant favors or concessions to the President's businesses in violation of their own laws. He submits that it requires even greater speculation to say that he would retaliate against Plaintiffs if they failed to grant such concessions. *Id.* at 18. At best, the President says, Plaintiffs' alleged injuries are an "abstract threat to federalism," not an injury-in-fact cognizable for standing purposes under Article III. Def.'s Reply at 5, ECF No. 70.

---

[12] It is through these claimed injuries that Plaintiffs seek to encompass the President's other business activities beyond the Washington-based Hotel, both national and global. Hr'g Tr. at 62-63.

This issue requires careful parsing. The Court has located no case that recognizes an "intolerable dilemma" as the basis for establishing injury-in-fact for standing purposes, whether suffered by a State, a business, or an individual litigant. Yet what cannot be denied is that Trump Organization hotels and, through it, the President have reportedly been accorded substantial tax concessions by at least the District of Columbia and the State of Mississippi. *See* Steve Eder & Ben Protess, *Hotel Carrying New Trump Brand Secures $6 Million Tax Break*, N.Y. Times (Feb. 21, 2018), https://www.nytimes.com/2018/02/21/business/trump-hotel-scion-mississippi-tax-rebate.html; O'Connell, *Tax Official Reduce Trump's Tax Bill on D.C. Hotel by Nearly $1 Million*, note 7, *supra*. At the time of the briefing in this case, the Trump Organization had merely applied for these District of Columbia concessions. Since then, however, the District's tax authorities, according to a report in the *Washington Post*, in fact granted the Hotel a reduction in its 2018 tax bill for a savings of $991,367.00. *See* O'Connell, *Tax Official Reduce Trump's Tax Bill on D.C. Hotel by Nearly $1 Million*, note 7, *supra*.

Tax authorities in the District of Columbia have declared (and those in Mississippi would presumably take the same position) that these concessions were routine and that no favoritism was involved. But, while ordinarily there may be a presumption of regularity as far as the decisions of the tax authorities are concerned, the fact remains that Trump Organization hotels, from which the President allegedly derives substantial illegal profits, have been the beneficiaries of these decisions. Nor can the mere say-so of the tax authorities—at least in the District of Columbia—be taken as the final word that its tax concessions were merely "routine." As has been reported in the press and as noted in the Amended Complaint and confirmed at oral argument, almost immediately after the President took office, federal regulations were amended so that the former U.S. Post Office, which is the site of the Trump International Hotel, which could not previously be leased to

someone associated with the Federal Government, suddenly could be leased to someone despite that someone's connection with the Federal Government. *See* Am. Compl. ¶¶ 80-88; Hr'g Tr. at 150-51; Bryon Tau, *GSA Says Trump Hotel Not in Violation of Lease*, Wall Street J. (Mar. 23, 2017), https://www.wsj.com/articles/gsa-says-trump-hotel-not-in-violation-of-lease-1490315114. This abrupt administrative about-face at a minimum gives pause before accepting any claim that the tax concessions given to the Hotel by the District of Columbia tax authorities were "routine." Given these circumstances, there is a decent possibility, at least as far as the Hotel in Washington is concerned, that the District of Columbia may have felt itself effectively "coerced" into granting special concessions to the Hotel and that Maryland may feel itself under pressure to respond in similar fashion.

There is yet another consideration Plaintiffs find concerning. As reported in the press, Governor Paul LePage of the State of Maine stayed at the Hotel on an official visit to Washington during the spring of 2017, met with the President, and not long after appeared with the President at a news conference at which the President signed an executive order to review national monuments that are part of the National Park Service, which could apply to a park and national monument in Maine, which President Obama had established over LePage's objections in 2016. *See* Pls.' Opp'n at 8 (citing Miller & Thistle, *Luxury hotels, fine dining for LePage on taxpayers' dime*, Portland Press Herald (July 23, 2017), https://goo.gl/xPxeeP; Sambides, *Leaked report advises Trump to open Maine monument to commercial forestry*, Bangor Daily News (Sept. 18, 2017), https://goo.gl/Un5cmK); *see also* Scott Thistle, *LePage Joins Trump for Signing of Order to Review Designations of National Monuments*, Portland Press Herald (Apr. 27, 2017), https://www.pressherald.com/2017/04/26/lepage-joins-trump-for-executive-order-signing-ceremony/. Leaving aside how Maine's citizens may have felt about the propriety of their

-18-

Governor living large at the Hotel while on official business in Washington, the fact that States other than Maryland or the District of Columbia (while, not a State) might patronize the Hotel while on official business in Washington rather clearly suggests that Maryland and the District of Columbia may very well feel themselves obliged, i.e., coerced, to patronize the Hotel in order to help them obtain federal favors.

In the Court's view, these circumstances do not, as the President maintains, involve numerous inferential leaps to demonstrate injury to the quasi-sovereign interests of Maryland and the District of Columbia insofar as the President's purported violations of the Domestic Emoluments Clause are concerned. At least with respect to the D.C.-based Hotel's operations, Plaintiffs have adequately demonstrated that their quasi-sovereign interests in this particular way have been injured-in-fact.

That said, the Court finds it is considerably more difficult to conclude that Plaintiffs' quasi-sovereign interests have been offended by Trump Organization operations outside the District of Columbia. There appears to be no "actual or imminent" injury to either Plaintiff, for example, with respect to the decision of the State of Florida or any other State to patronize the Trump Organization's Mar-a-Lago facility in Palm Beach. In that respect, any alleged injury to Maryland or the District of Columbia seems much more "hypothetical and conjectural," not "concrete and particularized." To be sure, while Florida or other States in which Trump Organization operations are located may be able to successfully establish their own injury-in-fact for standing purposes were they to bring Emoluments Clause suits with respect to those operations, Plaintiffs here cannot. The Court holds that Plaintiffs' injuries-in-fact to their quasi-sovereign interests for standing purposes have been shown, but only as to the Trump Organization and the

Hotel operations in the District of Columbia and the President's involvement with respect to the same.

   3) *District of Columbia's and Maryland's Proprietary Interests.*

      Both Plaintiffs allege that they have proprietary interests in entities that compete with the Hotel. Specifically, the District of Columbia owns the Washington Convention Center, located within the District, which it argues competes directly with the Hotel for similar events involving both foreign and domestic governments. Pls.' Opp'n at 22-23. Maryland, as both a landlord and through its management authority in overseeing the activities of the Bethesda Marriott Conference Center, submits that it has a direct financial interest in the Conference Center, which competes with the Hotel for foreign and domestic business. Am. Compl. ¶ 131; Hr'g Tr. at 169. Maryland also claims a proprietary interest in the gambling proceeds it receives from the MGM National Harbor casino pursuant to Maryland law. Pls.' Opp'n at 23 (citing Md. Code. Ann., State Gov't § 9-1A-26(a)(1)). Because the casino is integrated into the MGM Hotel and adjacent to the Gaylord Hotel, Maryland says its proprietary interests are directly affected when an individual or, more to the point, a foreign or domestic government, chooses to stay at the President's Hotel instead of the MGM or Gaylord, because Maryland suffers a loss to its income stream. *Id.* at 24.

      Plaintiffs thus argue that the President's violations of both the Foreign and Domestic Clauses have left them with an "inability to compete on an equal footing" with the Hotel. *Id.* It is this loss of the "opportunity to compete," they claim, that establishes an alternative injury sufficient for Article III standing. *Id*. at 24-25 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993)). Relying on this theory of "competitor standing," Plaintiffs again argue that they are not obliged to provide "a balance sheet with 'lost sales data' they can link directly to the President." *Id.* at 25 (quoting *TrafficSchool.com*

*Inc. v. Edriver Inc.*, 658 F.3d 820, 825 (9th Cir. 2011)). Rather, they submit that they have shown

injury-in-fact because their position "in the relevant market place is affected adversely." *Id.* (citing

*Adams v. Watson*, 10 F.3d 915, 922 (1st Cir. 1993)).

Once again, the President argues that Plaintiffs' alleged injuries, this time to their

proprietary interests, are highly speculative—far from "certainly impending" in nature. Def.'s

Reply at 8 (citing *Clapper*, 568 U.S. at 409). It is not enough, says the President, for Plaintiffs to

merely allege that they compete with the Hotel. They must show an "actual or imminent increase

in competition, which increase . . . will almost certainly cause an injury-in-fact." *Id.* at 9 (quoting

*Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010)). The President disputes that any of the

entities in which Plaintiffs claim a proprietary interest are comparable to the Hotel. Given the

substantial differences between the venues and the "diffuse and competitive" hospitality market in

the area, he says, Plaintiffs have not met their burden. *Id.* at 10-11.

While the Court has agreed with the President as to certain of Maryland's claims of injury

to its sovereign interests, it finds that Plaintiffs have met their burden as to their claims with respect

to injuries to at least some of their proprietary interests.[13]

The Supreme Court has recognized that plaintiffs with an economic interest have standing

to sue to prevent a direct competitor from receiving an illegal market benefit leading to an

unlawful increase in competition. *See, e.g., Inv. Co. Inst. v. Camp*, 401 U.S. 617, 620-21 (1971)

(concluding that an association of open-end investment companies and several individual

companies had standing to challenge a regulatory decision allowing national banks to operate

---

[13] Maryland's claim of injury based on the purported loss of proceeds from gambling at the MGM facility is, in the Court's view, too attenuated to establish injury-in-fact to its proprietary interests, just as its claim of lost tax revenues from the MGM or Gaylord operations could not sustain a claim of injury-in-fact to its sovereign interest. In fact, as the Court elicited at oral argument, the Trump International Hotel does not even offer casino gambling. But Maryland's claim of injury to its proprietary interest is sustained with respect to its participation in the Bethesda Marriott Conference Center.

collective investment funds because they were sufficiently injured by the competition the

regulation authorized); *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 151-52, 158

(1970) (holding an association of data processing service providers had standing to challenge a

regulation allowing banks to provide such services because they had an injury in the form of future

lost profits). In such cases, a plaintiff must show that it is "sufficiently injured by the competition

. . . to create a case or controversy." *Inv. Co. Inst.*, 401 U.S. at 620.

Several courts have interpreted a sufficient competitive disadvantage to mean that a

plaintiff must show that it "personally competes in the same arena" with the party that has received

an illegal benefit. *See, e.g.*, *Ctr. for Reprod. Law v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002); *Becker*

*v. FEC*, 230 F.3d 381, 387 n.5 (1st Cir. 2000); *Gottlieb v. FEC*, 143 F.3d 618, 621 (D.C. Cir.

1998); *In re U.S. Catholic Conf.*, 885 F.2d 1020, 1029 (2d Cir. 1989). "Because increased

competition almost surely injures a seller in one form or another, [a plaintiff] need not wait until

'allegedly illegal transactions . . . hurt [it] competitively.'" *Sherley*, 610 F.3d at 72 (quoting *La.*

*Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)). Thus, in competitor

standing cases, lost sales data are not required to prove a competitive injury; instead basic

economic logic will permit a finding that a plaintiff will suffer an injury-in-fact. *See, e.g.*, *Traffic*

*School.com*, 653 F.3d at 825 ("A plaintiff who can't produce lost sales data may therefore establish

an injury by creating a chain of inferences showing how defendant's false advertising could harm

plaintiff's business."); *Sherley*, 610 F.3d at 74 (noting that, although it was not certain how likely

the plaintiffs would lose funding to the challenged projects, "having been put into competition

with those projects, the [plaintiffs] face a substantial enough probability to deem the injury to them

imminent").

In the present case, Plaintiffs have attached to their Opposition to the Motion to Dismiss declarations of experts stating that the entities in which Plaintiffs claim a proprietary interest in fact compete in the same arena as the Hotel for certain customers and events. *See generally* Rachel J. Roginsky Decl., ECF No. 47; Christopher C. Muller Decl., ECF No. 48. Roginsky, a private consultant with expertise in assessing competition in the hotel industry, indicates that both the Washington Convention Center and the Hotel host events and meetings for up to 1,200 people and offer overlapping services for such events, including high-end catering and customized menu planning. Roginsky Decl. ¶ 31. Because of their close proximity—less than one mile apart—both the Washington Convention Center and the Hotel are equally accessible to federal agencies, law firms, and large businesses that would seek to use the spaces. *Id.* ¶ 30. She also concludes that both facilities are of "similar class and image." *Id.* ¶ 32. Additionally, Events D.C., a District of Columbia-controlled entity, caters to both foreign and domestic governments and a portion of its revenue is based on demand for use of the Washington Convention Center. Am. Compl. ¶¶ 120-22; Hr'g Tr. at 105:6-10 (noting that the Washington Convention Center has previously hosted the Food and Drug Administration, the Treasury Department, and the Department of Commerce).

Maryland submits that its proprietary interests are also comparable to and compete in the same arena with the Hotel. While the State of Maryland does not have a proprietary interest in the hotel attached to the Bethesda Marriott Conference Center, the Conference Center itself, in which the State does have such an interest, has 39,000 square feet of meeting and event space, which compete directly with the Hotel's 38,000 square feet of meeting and event space. Am. Compl. ¶ 131; Hr'g Tr. at 105; Roginsky Decl. ¶ 41. The Conference Center has a large ballroom, has hosted embassy events in the past, and, compared with the Hotel, is essentially equidistant from many foreign embassies. Hr'g Tr. at 105.

-23-

Importantly, and contrary to the President's assertions, Plaintiffs allege that they are more than just competitors in the same arena as the Hotel. They argue they have been placed at a competitive disadvantage because the President, by virtue of the pre-eminence of his office, is unfairly skewing the hospitality market in favor of his Hotel. He is not merely a market participant, they say; he is actively diverting business from Plaintiffs' entities. In fact, Plaintiffs cite specific instances of foreign governments foregoing reservations at other hotels in the arena and moving them to the President's Hotel. *See* Pls.' Opp'n at 17 (noting that both Kuwait and Bahrain moved events from the Four Seasons and Ritz Carlton to the Hotel after the President was elected). Statements from foreign diplomats have confirmed that they will almost certainly be doing likewise. *See* Am. Compl. ¶ 39. Plaintiffs further allege that, since the President's election, the Hotel has raised its prices to premium levels and has increased its profits. *See id.* ¶¶ 100-01 (alleging that the starting rate for "guest rooms" at the Hotel increased to $500 on most nights, which is hundreds of dollars more than when the Hotel first opened shortly before the presidential election); Pls.' Opp'n at 18 (noting the Trump Organization, the Hotel's parent company, turned a $1.97 million profit during the first four months of 2017 despite having predicted a loss of $2.1 million for the same period).

Though the President emphasizes that the Four Seasons and Ritz Carlton hotels are not Plaintiffs' properties, the Court concludes, based on fairly straightforward economic logic, that the properties which Plaintiffs do have a proprietary interest in are in fact disadvantaged in much the same way as those two hotels have been. *See Massachusetts v. EPA*, 549 U.S. at 525 n.23 ("Even a small probability of injury is sufficient to create a case or controversy.") (quoting *Village of Elk Grove Village v. Evans,* 997 F.2d 328, 329 (7th Cir. 1993)). In other words, Plaintiffs have alleged sufficient facts to show that the President's ownership interest in the Hotel has had and almost

certainly will continue to have an unlawful effect on competition, allowing an inference of impending (if not already occurring) injury to Plaintiffs' proprietary interests. *Sherley*, 610 F.3d at 72 (citing *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002)); *see also TrafficSchool.com, Inc.*, 653 F.3d at 825-26 ("Evidence of direct competition is strong proof that plaintiffs have a stake in the outcome of the suit, so their injury isn't 'conjectural' or 'hypothetical.'").

The Court finds Plaintiffs have successfully articulated injury-in-fact to at least some of their proprietary interests.

### 4) *District of Columbia's and Maryland's Parens Patriae Interests.*

In addition to claiming injury to their sovereign, quasi-sovereign, and proprietary interests, Plaintiffs also assert, as *parens patriae*, injury to the economic welfare of their residents.[14] Specifically, Plaintiffs allege that their residents participate in a "thriving hospitality industry that comprises a substantial part of [their] economies." Am. Compl. ¶ 113. They claim their residents are harmed by the President's alleged violations of both Emoluments Clauses because the competitive playing field is illegally tilted towards the President's Hotel, resulting in competitive disadvantage to Plaintiffs' resident businesses, which in turn curtails the opportunities and diminishes the earnings of their residents. *Id.* ¶ 114.[15]

While acknowledging that in certain instances States have been precluded from bringing a *parens patriae* suit against the Federal Government, Plaintiffs nevertheless submit that *parens*

---

[14] *See* note 9, *supra*. As indicated there, *parens patriae* refers to the theory of standing by which a State may assert a quasi-sovereign interest, i.e., "public or governmental interests that concern the State as a whole," on behalf of its citizens. *Massachusetts v. EPA*, 549 U.S. at 520 n.17 (quoting *Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907)); *see also Snapp,* 458 U.S. at 600-01, 607. Though the District of Columbia is not a sovereign State, the Supreme Court has recognized that U.S. territories may sue as *parens patriae* and assert quasi-sovereign interests. *See Snapp*, 458 U.S. at 608 n.15; *see also* note 11, *supra*.

[15] Maryland's interest as *parens patriae* does extend to, among other residents, the MGM and Gaylord Hotel facilities in the National Harbor in Prince George's County.

*patriae* standing is proper here because they are "assert[ing] [their] rights under federal law," rather than attempting to nullify a federal law. Pls.' Opp'n at 27 (citing *Massachusetts v. EPA*, 549 U.S. at 520 n.17). Moreover, they say, the competitive injury impacts a significant sector of their economies, in consequence of which Plaintiffs come to court as more than nominal parties. *Id.* at 26, 28.

The President argues that Plaintiffs cannot avail themselves of *parens patriae* standing for two distinct reasons. First, he challenges Plaintiffs' characterization of this as a *parens patriae* suit. This is precisely the type of *parens patriae* action, he says, that the Supreme Court prohibited in *Massachusetts v. Mellon*, because a suit against the President in his official capacity is effectively a suit against the United States. Def.'s Mot. Dismiss at 19-20 (citing *Mellon*, 262 U.S. at 485-86). In any event, the President argues, even if Plaintiffs could bring this suit against the Federal Government, *parens patriae* standing would still fail because Plaintiffs have not alleged a concrete injury, and to bring a *parens patriae* action, the State must be "more than a nominal party," it must allege an injury suffered by a "substantial segment of its population." *Id.* at 21 (citing *Snapp*, 458 U.S. at 607). According to the President, the Amended Complaint does not plausibly allege such an injury, positing instead a general injury caused by a single Hotel to no more than an "identifiable group of individual residents," which is not sufficient. *Id.*

It is true that this suit was originally filed against the President in his official capacity. And it is also true that, ordinarily, with respect to actions actively taken in a government official's "official capacity," the suit ordinarily amounts to a suit against the United States. But a suit against a Federal Government official is not necessarily the equivalent of a suit against the United States, where, as here, despite the "official capacity" styling of the suit, the challenged actions by the Government official fall well outside his "official duties." *Cf. Larson v. Domestic & Foreign*

*Commerce Corp.*, 337 U.S. 682, 689 (1949) ("There may be, of course, suits for specific relief against officers of the sovereign which are not suits against the sovereign. If the officer purports to act as an individual and not as an official, a suit directed against that action is not a suit against the sovereign. . . . The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are *ultra vires* his authority and therefore may be made the object of specific relief."). It remains to be seen whether the President should be in this case in his individual capacity[16] in addition to or in lieu of his official capacity. But looking beyond the simple denomination of his status at this point, it is clear that the gist of the Amended Complaint is that the President's purported receipt of emoluments, as previously defined, has nothing at all to do with his "official duties." As the President himself concedes, Plaintiffs are challenging the President's acceptance of money taken through private transactions—something that has "nothing to do with the President's service . . . as President," Def.'s Mot. Dismiss at 30.

The Court is satisfied that Plaintiffs may properly bring this action against the President in his official capacity without running afoul of *Mellon*. As clarified by the Supreme Court in *Massachusetts v. EPA*, "there is a critical difference between allowing a State to protect her citizens from the operation of federal statutes (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." 549 U.S. at 520 n.17 (citation and quotation marks omitted). Indeed, the cases the President urges this Court to look to involve States attempting to "nullify federal law" or to challenge the operation of a federal statute. *See, e.g.*, *Virginia ex rel. Cuccinelli*, 656 F.3d at 270 (challenging the constitutionality of the individual mandate in the Affordable Care Act by alleging it conflicted with a later enacted State

---

[16] *See* note 4, *supra*.

statute); *Hodges v. Abraham*, 300 F.3d 432, 436-37 (4th Cir. 2002) (noting that challenging the constitutionality of a Department of Energy action taken pursuant to the National Environment Protection Act on behalf of the State's citizens would be an improper *parens patriae* suit). In contrast, in the present case the District and Columbia and Maryland are asserting that their rights under the Emoluments Clauses of the U.S. Constitution are being violated by the President's private profiteering. This distinguishes the *parens patriae* standing in the present case from both *Cuccinelli* and *Hodges*, where it was not found, and comes within the type of *parens patriae* suit contemplated by *Massachusetts v. EPA*.

Despite the President's attempt to distinguish *Massachusetts v. EPA*, the fact that Congress had granted a procedural right to bring actions challenging the Environmental Protection Agency's actions in that case does not affect the outcome here. In determining that Massachusetts had standing to bring the suit there, the Supreme Court did not rely on this procedural right alone; it also emphasized the "special position and interest" of Massachusetts as a sovereign State and its "stake in protecting its quasi-sovereign interests." *Massachusetts v. EPA*, 549 U.S. at 518, 520. Similar considerations are present here.

The Court is also satisfied that both the District of Columbia and Maryland are more than nominal parties. They allege competitive injuries affecting a large segment of their populations. The Amended Complaint alleges that in 2014, visitors to the District of Columbia generated approximately $6.81 billion in spending and drove $3.86 billion in wages for 74, 570 employees engaged in the hospitality industry. Am. Compl. ¶ 113. In Maryland, of more than 140,000 employees in the hospitality industry around the State, more than 72,000 work in the counties that border the District of Columbia.[17] Am. Compl. ¶ 113. Further, there are at least 15 "high-end"

---

[17] *Compare Snapp*, 458 U.S. at 609 (concluding Puerto Rico had a substantial interest, hence standing, to pursue a

restaurants and hotels in Maryland and 32 in the District of Columbia that can be said to either directly compete with the Hotel's restaurant, BLT Prime, or with the Hotel itself, for event and meeting spaces. Roginsky Decl. ¶ 24; Muller Decl. ¶¶ 24–26. Plaintiffs allege that the bottom lines of all of these businesses are directly influenced by the President's purported violations. Pls.' Opp'n at 28.

In the Court's view, that is enough. It can hardly be gainsaid that a large number of Maryland and District of Columbia residents are being affected and will continue to be affected when foreign and state governments choose to stay, host events, or dine at the Hotel rather than at comparable Maryland or District of Columbia establishments, in whole or in substantial part simply because of the President's association with it. The Court concludes that Plaintiffs are not attempting to "stand in the shoes" of a limited number of businesses as the President suggests, Hr'g Tr. at 34, 83; they are, quite plausibly, trying to protect a large segment of their commercial residents and hospitality industry employees from economic harm.

Finally, as discussed in relation to Plaintiffs' proprietary interests, the competitor standing line of cases also confirms that Plaintiffs have alleged more than a speculative possibility of future injury to their quasi-sovereign interests. *See* Section III.A.3, *supra*.

The Court finds that Plaintiffs have sufficiently stated a concrete injury-in-fact to their *parens patriae* interests in protecting the economic welfare of their residents.

## B. Traceability

In addition to demonstrating an injury-in-fact in order to establish Article III standing, Plaintiffs must show a "causal connection between the injury and the conduct complained of,"

---

*parens patriae* suit despite the fact that only 787 jobs were affected).

such that it is fairly traceable to the defendant's actions. *Lujan*, 504 U.S. at 560 (citing *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, (1976)).

Plaintiffs argue that the injuries they have sustained to their various interests easily satisfy the traceability requirement under the competitor standing theory. *See* Pls.' Opp'n at 21-22 (citing *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 212 (D.C. Cir. 2013)); Hr'g Tr. at 140-42. They analogize their situation to *Northeastern Florida Chapter of Associated General Contractors v. Jacksonville*, 508 U.S. 656 (1993), where the Supreme Court held the petitioner had standing to challenge the City of Jacksonville's ordinance granting preferential treatment to certain minority-owned businesses in the awarding of city contracts under the Equal Protection Clause. In so holding, the Supreme Court clarified that the claimed injury in issue was the inability of plaintiffs to compete on an equal footing, not the loss of the contract. *Id.* at 666. Accordingly, the Supreme Court found that it followed that the ordinance had caused the petitioner's injury. *Id.* at 666 n.5. Similarly, Plaintiffs here argue that the Court should apply basic economic logic to find the traceability prong for standing satisfied. The Court should do so, they contend, because Plaintiffs are harmed when their competing facilities lose the business of foreign or domestic states attracted to the President's Hotel simply because it is the President's Hotel. The presence of third parties, say Plaintiffs, does not change the ultimate conclusion. Pls.' Opp'n at 20-21.

The President makes much of the proposition that third party actors beyond his control are involved in the challenged transactions. *See* Def.'s Mot. Dismiss at 15-16; Hr'g Tr. at 153-55. He cites several Fourth Circuit cases that discuss the difficulty of showing causation when third parties "must act in order for an injury to arise or be cured." Def.'s Mot. Dismiss at 15 (citing *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013); *Frank Krasner Enterprises, Ltd. v. Montgomery County*, 401 F.3d 230, 236 (4th Cir. 2005)). Because individuals choose to stay at

hotels, eat at restaurants, and stage events at a certain location for a wide variety of reasons, the

President argues, it is altogether speculative to suggest that foreign or domestic government

officials are choosing to stay at the Hotel in order to confer benefits on him, as opposed to the

many other reasons which may motivate their decisions. *Id.* at 16; Hr'g Tr. at 154.

The Court is not persuaded by the President's arguments.

In the first place, as the Court suggested at oral argument, accepting the President's third

party argument would render impossible any effort to ever engage in Foreign or Domestic

Emoluments Clause analysis because action by a foreign or domestic government, i.e., by a third

party, is always present by definition.

In the second place, none of the cases cited by the President are competitor standing cases.

*Frank Krasner*, for example, a case upon which the President relied heavily at oral argument,

involved a gun show promoter's challenge to a county law that denied public funding to venues

that displayed guns. 401 F.3d at 232, 233. As a result of the county law, a venue that had been

leased to the plaintiff for prior gun shows refused to lease to him for an upcoming gun show. The

plaintiff sued the county, challenging the law under the First and Fourteenth Amendments as well

as Maryland law. *Id.* at 233. In determining that the plaintiff lacked standing to sue the county, the

Supreme Court noted that "importantly" the private venue was not a party to the lawsuit and that it

stood directly in the way between the plaintiff and the county's challenged conduct. *Id.* at 233,

236. The case at bar is quite different. Here, the government official himself is the one allegedly

receiving illegal benefits, not a third party not before the Court. Indeed, when the injury is the loss

of an opportunity to fairly compete rather than the loss of the benefit itself, the presence of third

party actors in the marketplace has been found not to destroy traceability. *See, e.g.*, *Ne. Fla.*

*Chapter of Associated General Contractors*, 508 U.S. at 666 n.5 (causation was present even

though there was no showing that any petitioner would have received the contract absent the ordinance); *Int'l Bhd. of Teamsters*, 724 F.3d at 212 (noting that the causation and redressability requirements were "easily satisfied" because absent the challenged program, the petitioners would not have been subject to increased competition). The more relevant question, then, is whether the *increase of competition* can be fairly traced through the third party's intervening action back to the President. The Court is satisfied that it can.

Plaintiffs have plausibly alleged they have been subjected to increased competition as a result of the President's purported violations. Their allegation is bolstered by explicit statements from certain foreign government officials indicating that they are clearly choosing to stay at the President's Hotel, because, as one representative of a foreign government has stated, they want him to know "I love your new hotel," a sentiment the President appears to suggest he likes "very much." *See* Am. Compl. ¶¶ 39, 55 (alleging that in 2015, the President said about Saudi Arabia: "They buy apartments from me . . . . They spend $40 million, $50 million. Am I supposed to dislike them? I like them very much."). Again, since the election, foreign governments have indisputably transferred business from the Four Seasons and Ritz Carlton hotels in the District to the President's Hotel. *See* Pls.' Opp'n at 17.

The President's argument that these facilities are not Plaintiffs' facilities fails to persuade for at least two reasons. First, these examples fairly suggest that the entities in which Plaintiffs do have a proprietary interest are suffering comparable detriment. Second, even though not directly owned by Plaintiffs, the Ritz Carlton and Four Seasons hotels are part of the District of Columbia industry encompassed within the District's *parens patriae* interest, as well, it may be said, are all the members of the hospitality industry in nearby Maryland to the extent they are within the scope of Maryland's *parens patriae* interest.

-32-

As for the injury-in-fact to Plaintiffs' quasi-sovereign interests insofar as they may be constrained to grant favors to the Trump Organization or patronize the Hotel in order to obtain federal benefits on a par with certain other States, traceability is also easily satisfied.

The Court finds the injuries to Plaintiffs' quasi-sovereign, proprietary, and *parens patriae* interests to be fairly traceable to the President's alleged violations.

## C.  Redressability

The third and last prong of the Article III standing inquiry requires Plaintiffs to show that their injury-in-fact, if traceable to the President, is also likely to be redressed by a favorable court decision.

In their Amended Complaint, Plaintiffs request both injunctive and declaratory relief, which they allege will appropriately redress their injuries. They argue that even if foreign or domestic state governments continue to patronize the Hotel, a court order enjoining the President from receiving "emoluments," as defined for present purposes, "would certainly 'reduce[] to some extent'" their competitive disadvantage. Pls.' Opp'n at 22 (quoting *Massachusetts v. EPA*, 549 U.S. at 526). That is, if the President is prohibited from personally receiving emoluments from these sources in the future, the likelihood is that their patronage of the Hotel will be "reduced to some extent," and in consequence all the competitive businesses in the District and Maryland will be placed on a more equal footing with the Hotel. Hr'g Tr. at 174; Pls.' Opp'n at 22.

Plaintiffs submit the Court has the authority to impose both declaratory and injunctive relief against the President, noting that the Supreme Court has "long held" that federal courts "ha[ve] the authority to determine whether [the President] has acted within the law." Pls.' Opp'n at 56 (quoting *Clinton v. Jones*, 520 U.S. 681, 703 (1997)). This includes "the power to restrain unconstitutional presidential action" through injunctive and declaratory relief. *Id.* (citing *Franklin*

*v. Massachusetts*, 505 U.S. 788, 803 (1992); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584 (1952)). According to Plaintiffs, the fact that the President is the sole defendant in this case does not change the analysis, since this is "one of those rare instances when only injunctive relief against the President himself will redress [the plaintiffs'] injury." *Id.* (quoting *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996)). While acknowledging that in different contexts the Supreme Court has stated that courts may not enjoin the President in the performance of "official duties," Plaintiffs note that it has distinguished ministerial duties—involving simple, non-discretionary actions—where injunctive relief may be appropriate. *Id.* at 58-59 (citing *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1867)). In a similar vein, if injunctive relief were granted in this case, Plaintiffs argue that no official duties would be implicated. Rather, the injunction would simply prevent the President from receiving monies to which, under the Constitution, he is not entitled to and which he is receiving through his private businesses—something not even "colorably within the powers of the President." Hr'g Tr. at 168. In any event, Plaintiffs emphasize that the requested declaratory relief is capable of providing sufficient redress, Pls.' Opp'n at 57, "by resolving the quintessential controversy the Declaratory Judgments Acts was intended to remedy." Hr'g Tr. at 16. In short, Plaintiffs say the Court is able to resolve this controversy merely by declaring which of the parties is correct on the law. *Id.*

The President maintains that Plaintiffs' alleged injuries are not "likely to be redressed" by a court order: First because it is highly speculative that third-party government consumers would stop patronizing the Hotel even if Plaintiffs prevailed on their claims. Any hypothetical injunction, therefore, would not cure the competition of which Plaintiffs complain. Def.'s Mot. Dismiss at 16. Second, the President submits that the Court lacks authority to issue an injunction against him in the performance of his official duties. *Id.* at 54 (citing *Mississippi v. Johnson*, 71 U.S. (4 Wall.)

-34-

475 (1867); *Franklin v. Massachusetts*, 505 U.S. 788 (1992)). While the President concedes that

the Supreme Court has left open the question of whether a court may enjoin the President in the

performance of ministerial duties, he maintains that the requested relief is far afield of ministerial.

An injunction regarding the President's finances, he says, would require significant judgment,

planning, and discretion. Def.'s Reply at 29. And even assuming his actions were only ministerial

in nature, he says, no court has ever issued an injunction against a President in his official capacity

when he was the sole defendant. *Id.* He urges the Court to exercise similar restraint here.

The President also argues the Court lacks authority to issue a declaratory judgment. In

support of this proposition, he relies primarily on a statement in Justice Scalia's *concurring*

opinion in *Franklin v. Massachusetts*. *See* 505 U.S. 788, 829 (1992) (Scalia, J., concurring) ("[The

Court] cannot remedy appellees' asserted injury without ordering declaratory or injunctive relief

against appellant President Bush, and since [the Court] ha[s] no power to do that," the "appellees'

constitutional claims should be dismissed."). Apart from the unconstitutionality of the relief

Plaintiffs seek, the President says, if the Court were to only issue declaratory relief, it would

amount to an impermissible advisory opinion. Hr'g Tr. at 100, 171.

The Court does not believe that the requested injunctive or declaratory relief would violate

the separation of powers doctrine. Language from later Supreme Court cases runs directly contrary

to the quoted statement of Justice Scalia in *Franklin*. Six years after Justice Scalia's statement in

*Franklin,* in *Clinton v. New York*, the Supreme Court expressly stated that a declaratory judgment

against the President could redress the plaintiff's injuries. *See Clinton v. New York*, 524 U.S. 417,

433 n.22 (1998) (noting that, having found an injury-in-fact, traceability and redressability were

"easily satisfied" because "each injury is traceable to the President's cancellation of [certain act

provisions], and [it] would be redressed by a declaratory judgment that the cancellations are

invalid."); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 780-81 (1982) (White, J., dissenting) ("Neither can there be a serious claim that the separation-of-powers doctrine insulates Presidential action from judicial review or insulates the President from judicial process. No argument is made here that the President, whatever his liability for money damages, is not subject to the courts' injunctive powers. . . . Indeed, . . . it is the rule, not the exception, that executive actions—including those taken at the immediate direction of the President—are subject to judicial review. Regardless of the possibility of money damages against the President, then, the constitutionality of the President's actions or their legality under the applicable statutes can and will be subject to review.") (internal footnote and citations omitted).

The Court also disagrees that the President's status as the sole defendant changes this analysis, given that no official other than he could be sued to enforce the purported violations at issue. "[I]t would be exalting form over substance if the President's acts were held to be beyond the reach of judicial scrutiny when he himself is the defendant, but held within judicial control when he and/or the Congress has delegated the performance of duties to federal officials subordinate to the President and one or more of them can be named as a defendant." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 613 (D.C. Cir. 1974). While the Court is not prepared to say at this juncture what precise form injunctive relief, if any, could take, what seems entirely plausible is that an appropriate injunction of some sort could be fashioned, were Plaintiffs to succeed on the merits. *See* Hr'g Tr. at 149-52 (discussing possible injunction options).

In any event, it is entirely possible, as Plaintiffs suggest, that a declaratory judgment alone could redress the injury, leaving it to the President to determine in good faith how he might comply with it. The Court sees no barrier to its authority to grant either injunctive or declaratory relief.

There is yet another observation to be made with respect to the redressability argument. As the Supreme Court reiterated in *Massachusetts v. EPA*, if the injury can be "reduced to some extent," then a plaintiff has met the redressability prong for standing. *Massachusetts v. EPA*, 549 U.S. at 525-26 & n. 23. Again, it is true that the Court cannot prevent any and all third party foreign or domestic government actors from patronizing the Hotel, but that continues to miss the point. The ultimate issue is not a flat prohibition against such patronage by foreign or domestic states, but whether "to some extent" their incentive to cater to the President will be reduced if he can no longer receive the benefits which, through the Hotel, he currently derives. All of this is to say that Plaintiffs' injuries are likely to be redressed by a favorable court decision.

\* \* \*

Summarizing the Court's holding as to Article III standing, Plaintiffs have alleged injuries-in-fact to their quasi-sovereign, proprietary, and *parens patriae* interests that are concrete and particularized, actual and imminent. Those injuries are fairly traceable to the President's purported conduct and are likely to be redressed by the Court through appropriate injunctive and declaratory relief if Plaintiffs succeed on the merits.

Plaintiffs have successfully cleared the first and primary hurdle for Article III standing.

Even so, an important question remains: What is it exactly that Plaintiffs have standing to challenge?

Plaintiffs assert that the President's actions have violated the Emoluments Clauses in many ways, not only with respect to the operations of the Hotel in the District of Columbia, but also through Trump Organization operations all over the United States, indeed around the world. But because Plaintiffs have to establish standing as to all claims made, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), the Court specifically inquired at oral argument which claims the

-37-

Plaintiffs believe extend beyond the Hotel. Plaintiffs conceded that their competitive injuries (i.e., to their proprietary and *parens patriae* interests) were limited to the District of Columbia-based Hotel. Hr'g Tr. at 62-63. But they went on to contend their sovereign and quasi-sovereign interests were essentially boundless, *id*., the implication being that the injury to these interests was sustained on the basis of Trump Organization operations everywhere and anywhere, e.g., whether in the District of Columbia, in Florida, in China, or elsewhere. *See id.*

 The Court finds that Plaintiffs' claims sweep too broadly. There is good reason why their standing should be recognized *vis-à-vis* the Hotel in Washington D.C., given the immediate impact on Plaintiffs in respect to the Hotel's operations. It is a considerable stretch, however, to find the requisite injury-in-fact to these particular Plaintiffs that is traceable to the Trump Organization's or, through it, the President's conduct outside the District of Columbia. How indeed, for instance, have Maryland or the District of Columbia suffered and how are they suffering immediate or impending injury as a result of whatever benefits the President might be deriving from foreign and state government patronage at the Trump Organization's Mar-a-Lago property in Florida or in the grant of patents to the Trump Organization or Trump relatives by China? In this respect, the Court, quite simply, sees neither immediate nor impending harm to Plaintiffs. Hence, the Court finds that these particular Plaintiffs lack standing to challenge the operations of the Trump Organization or the benefits the President may receive from its operations outside the District of Columbia. But to be perfectly clear: The Court reaches this conclusion only with respect to these Plaintiffs and the particular facts of the present case. This is in no way meant to say that other States or other businesses or individuals immediately affected by the same sort of violations alleged in the case at bar, e.g., a major hotel competitor in Palm Beach (near Mar-a-Lago) or indeed a hotel competitor

anywhere in the State of Florida, might not have standing to pursue litigation similar to that which is in process here.

## IV. PRUDENTIAL STANDING

In addition to the Article III requirements, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc*., 454 U.S. 464, 474 (1982). Prudential standing is a doctrine "not exhaustively defined," but includes "the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches" and "the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004)).

The President argues that these prudential standing requirements bar Plaintiffs' claims, even if they arguably satisfy Article III.

### A. Zone of Interests

Whether a plaintiff comes within the "zone of interests" protected by the law invoked "is an issue that requires [the court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id*. at 1387; *see also Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1307 (2017). Though first formulated in a case brought under the Administrative Procedure Act, the Supreme Court has since made clear "that it applies to all statutorily created causes of action." *Lexmark*, 134 S. Ct. at 1388. However, "[t]he test is not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

As an initial matter, Plaintiffs question whether the test even continues to exist, following the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.,* 134 S. Ct. 1377 (2014), where the court termed the label prudential standing "inapt." Pls.' Opp'n at 53.

In any event, Plaintiffs argue that, if the test does apply, they fall squarely within the zone of interests of the Emoluments Clauses. *Id.* at 53-54. The Domestic Clause, they say, specifically mentions the "United States" and "any of them." Maryland and by implication the District of Columbia are clearly within the zone of interests of that Clause. The Foreign Emoluments Clause is meant to preserve presidential independence and prevent corruption. Their claims, they say, are at the "heart" of what both Clauses are intended to protect, and if for any reason they would be deemed not to fall within the zone of interests of the Clauses, then it is likely no one ever would—a conclusion they urge this Court to reject. *Id.* at 54.

Finally, Plaintiffs argue that they are entitled to pursue an equitable action under the Emoluments Clauses. They submit that courts have long allowed suits to enjoin unconstitutional actions by public officials even where plaintiffs are not preemptively asserting a defense to a pre-enforcement action. *Id.* at 51. This is true, they contend, with respect to allegations of violations of the Constitution's structural provisions. *Id.* at 52 (citing *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010)).

The President disputes any suggestion that *Lexmark* abrogated the zone of interests test, citing cases in which courts have continued to apply the test post-*Lexmark*. Def.'s Reply at 15-16. He urges the Court to adopt the interpretation set forth by Judge Daniels in *CREW et al. v. Trump*, No. 17-cv-458 (S.D.N.Y. Dec. 21, 2017), namely that the history of the Emoluments Clauses indicates that they were not meant to protect commercial competitors so that a plaintiff asserting

-40-

Add. 40

such a competitive injury necessarily falls outside the zone. Hr'g Tr. at 125-126. But, says the President, to the extent the Emoluments Clauses "could be seen to create a private right," Plaintiffs fall outside the zone of interests, which "serve[s] to limit the role of the courts in resolving public disputes" by asking "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." Def.'s Mot. Dismiss at 28 (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

Further, while conceding that the Supreme Court has not limited equitable causes of action against federal officers solely to the pre-enforcement context, the President submits that this case is not a proper suit for the grant of equitable relief. *Id*. at 26-27; Def.'s Reply at 14. He disputes that Plaintiffs are not preemptively asserting a defense to a potential enforcement action. Def.'s Mot. Dismiss at 27. Plaintiffs, he says, are not "exposed to regulation or enforcement action by the President's alleged receipt of prohibited emoluments." Def.'s Reply at 15.

The Court need not engage the issue of whether the zone of interests test has been abandoned. Assuming it has not been, the Court finds that Plaintiffs fall within the zone of interests of the Emoluments Clauses. The Court disagrees with the conclusion reached by Judge Daniels in *CREW et al. v. Trump*, No. 17-cv-458, that the draftsmen of the Constitution did not have competitors in mind when they composed the Emoluments Clauses, with the implication that no competitors anywhere are ever within the zone of interests of the Clauses. But the Emoluments Clauses clearly were and are meant to protect all Americans. The President concedes as much. Hr'g Tr. at 126-27. That being so, there is no reason why Plaintiffs, a subset of Americans who have demonstrated present injury or the immediate likelihood of injury by reason of the President's purported violations of the Emoluments Clauses, should be prevented from challenging what might be the President's serious disregard of the Constitution. Under the

President's interpretation, it would seem that no one—save Congress which, as discussed momentarily, may never undertake to act—would ever be able to enforce these constitutional provisions.

The Court sees no problem in invoking its equitable jurisdiction here. Precedent makes clear that a plaintiff may bring claims to enjoin unconstitutional actions by federal officials and that they may do so to prevent violation of a structural provision of the Constitution. *See, e.g.*, *Bond v. United States*, 564 U.S. 211, 225-26 (2011) ("[W]here the litigant is a party to an otherwise justiciable case or controversy, she is not forbidden to object that her injury results from disregard of the federal structure of our Government."); *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (noting that the Government offered no reason or authority for why an Appointments Clause or separation of powers claim should be treated differently than any other constitutional claim in granting equitable relief) (citing *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 74 (2001) ("[E]quitable relief 'has long been recognized as the proper means for preventing entities from acting unconstitutionally.'")). Though the President attempts to draw a distinction based on the cases exposing a plaintiff to a potential enforcement action, he cites no support for the proposition to the effect that equitable relief is limited solely to that context. Indeed, to the contrary, the Court sees a strong parallel between cases where "Congress allegedly exceeded the limits on its legislative power in a manner that exposed plaintiffs to injurious regulation," Def.'s Reply at 14, and the present case, where the President is allegedly violating constitutional provisions in a way that exposes Plaintiffs to injurious illegal economic competition.

The Court finds that Plaintiffs fall within the zone of interests of the Emoluments Clauses for prudential standing purposes.

-42-

### B. Political Question

The "political question" doctrine provides another "narrow exception" to the rule that the "[j]udiciary has a responsibility to decide cases properly before it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-195 (2012). A case "involves a political question . . . where there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Id.* at 195 (quoting *Nixon v. United States,* 506 U.S. 224, 228 (1993)). In such cases, a "court lacks authority to decide the dispute" even if a plaintiff meets other standing requirements. *Id.*

Plaintiffs say the political question doctrine does not apply and that the Court may properly resolve this case. Initially, they point out that only the Foreign Emoluments Clause mentions Congress, whereas the Domestic Emoluments Clause contains no such provision. Pls.' Opp'n at 54. To the extent the Domestic Emoluments Clause gives States a cause of action, it is direct. Congress has no role to play. And, say Plaintiffs, even though the Foreign Emoluments Clause allows Congress to approve receipt of emoluments, this does not remove the issue from the scope of judicial review, citing several cases the Supreme Court has decided which involved similar consent-of Congress provisions. *See id.* (citing *Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 6 (2009) (Tonnage Clause); *Dep't of Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341, 342-43 (1964) (Export-Import Clause); *Canton R. Co. v. Rogan*, 340 U.S. 511 (1951) (same)). The President's reading of the Foreign Emoluments Clause, Plaintiffs argue, would turn the Clause "on its head," by essentially allowing the President to receive an unending stream of "emoluments" until such time, if ever, Congress might stir to action and ban them. *Id.* at 55. The mere potential for Congressional action, they say, should not warrant a departure from the rule that "a federal

court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id.* (citing *Susan B. Anthony List*, 134 S. Ct. at 2347).

The President maintains that Congress is better equipped to address whether his actions violate the Foreign Emoluments Clause since the Constitution specifically vests in Congress the power to waive Foreign Emoluments Clause restrictions. Def.'s Mot. Dismiss at 29. With regard to the Domestic Emoluments Clause he argues that "[e]quity counsels restraint in abrogating centuries-long tradition of resolving emoluments-related issues through these political processes." *Id.*

On this issue, Plaintiffs prevail. The political question doctrine does not impede court action in this case.

First, of course, the Domestic Emoluments Clause clearly does not assign any oversight role to Congress or any other entity. Insofar as a State has a right to pursue a violation of the Clause, it may do so directly and Congress has nary a say about it.

As for the Foreign Emoluments Clause granting Congress the power to consent to receipt of certain "emoluments," the language of the Clause is not "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Zivotofsky*, 566 U.S. at 195. If that were so, the Supreme Court would not have decided other cases involving constitutional provisions containing similar consent-of Congress provisions. *See, e.g., Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 6 (2009) (reaching the merits of a Tonnage Clause challenge); *Dep't of Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341, 342–43 (1964) (holding that the tax in question violated the Export-Import Clause). The President cites no authority to the contrary.

Also absent in this case is "a lack of judicially discoverable and manageable standards for resolving" this issue, which might otherwise call into play the political question doctrine.

*Zivotofsky*, 566 U.S. at 195. It is well settled that courts have authority to determine whether the President "has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. at 753–54 ("It is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States"). A plain reading of the Foreign Emoluments Clause compels the conclusion that receiving emoluments, as have been provisionally defined here, is impermissible unless and until Congress consents.[18] Accordingly, in absence of Congressional approval, this Court holds that it may review the actions of the President to determine if they comply with the law. The Court is satisfied that this case "requires careful examination of the textual, structural, and historical evidence put forward by the parties," which, after all is "what courts do." *Zivotofsky*, 566 U.S. at 201.

The political question doctrine does not bar judicial review in this case.

## V.     CONCLUSION

Plaintiffs have sufficiently alleged that the President is violating the Foreign and Domestic Emoluments Clauses of the Constitution by reason of his involvement with and receipt of benefits from the Trump International Hotel and its appurtenances in Washington, D.C. as well as the operations of the Trump Organization with respect to the same. Plaintiffs have demonstrated their standing to challenge those purported violations because they have shown injury-in-fact, fairly traceable to the President's acts, and that the injury is likely redressable by the Court. Neither prudential considerations of standing nor the political question doctrine preclude this conclusion. The Court, however, given the particular allegations of this suit, finds that Plaintiffs lack standing to challenge possible constitutional violations by the President involving operations of the Trump

---

[18] The thrust of the President's argument that only Congress can act is particularly concerning. Suppose a majority (simple? two-thirds?) of Congress (the House? the Senate? both?) is controlled by one party—that of the President. And suppose the Congress never undertakes to approve or disapprove the President's receipt of such "emoluments." The President could continue to receive unlimited "emoluments" from foreign and state governments without the least oversight and with absolute impunity.

-46-

Organization outside the District of Columbia from which the President may receive personal benefits.

For the foregoing reasons, the President's Motion to Dismiss the suit is **DENIED-IN-PART** insofar as it disputes Plaintiffs' standing to challenge the involvement of the President with respect to the Trump International Hotel in Washington, D.C. and its appurtenances and any and all operations of the Trump Organization with respect to the same. The Motion to Dismiss is **GRANTED-IN-PART WITHOUT PREJUDICE** as to the operations of the Trump Organization and the President's involvement in the same outside the District of Columbia. The Court's ruling on Defendant's Motion to Dismiss is **DEFERRED-IN-PART** in that the Court has yet to rule on the remaining arguments regarding the meaning of the Emoluments Clauses and whether Plaintiffs have otherwise stated claims under the Clauses.

A further hearing to consider the President's remaining arguments will be set in consultation with counsel.

A separate Order will **ISSUE.**

_____
/s/
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**March 28, 2018**

-47-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **THE DISTRICT OF COLUMBIA** | * | |
| and **THE STATE OF MARYLAND**, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. **PJM 17-1596** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| *individually and in his official capacity* | * | |
| *as President of the United States*, | * | |
| | * | |
| Defendant. | * | |

## ORDER

Having considered Defendant's Motion to Dismiss (ECF No. 21) and Plaintiffs'

Opposition thereto, following oral argument, it is, for the reasons stated in the accompanying

Opinion, this 28th day of March, 2018,

**ORDERED:**

1. Defendant's Motion to Dismiss (ECF No. 21) is **DENIED-IN-PART** insofar

   as it disputes Plaintiffs' standing to challenge the involvement of the President

   with respect to the Trump International Hotel and all its appurtenances in

   Washington, D.C. and any and all operations of the Trump Organization with

   respect to the same;

2. Defendant's Motion to Dismiss (ECF No. 21) is **GRANTED-IN-PART**

   **WITHOUT PREJUDICE** as to the operations of the Trump Organization

   and the President's involvement in the same outside the District of Columbia;

3. The Court's ruling on Defendant's Motion to Dismiss is **DEFERRED-IN-**

   **PART** in that the Court has yet to rule on Defendant's remaining arguments

Add. 48

regarding the meaning of the Emoluments Clauses of the U.S. Constitution and whether Plaintiffs have otherwise stated claims under the Emoluments Clauses;

4.  A further hearing to consider the remaining arguments in Defendant's Motion to Dismiss will be set in consultation with counsel.

_/s/_
_____

**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**THE DISTRICT OF COLUMBIA**            \*
and **THE STATE OF MARYLAND,**        \*
                                          \*
            Plaintiffs,               \*
                                          \*
v.                                    \*            Civil No. **PJM 17-1596**
                                          \*
**DONALD J. TRUMP,**                 \*
*individually and in his official capacity*   \*
*as President of the United States*,      \*
                                          \*
            Defendant.              \*

## OPINION

In a previous Opinion[1] the Court held that Plaintiffs, the District of Columbia and the State of Maryland, have standing to challenge actions of President Donald J. Trump, in his official capacity,[2] that they believe violate the Foreign and Domestic Emoluments Clauses of the U.S. Constitution.[3]

---

[1] *See* Opinion (Mar. 28, 2018), ECF No. 101 (Standing Opinion).

[2] On February 23, 2018, without objection by the President, Plaintiffs filed a Motion for Leave to File an Amended Complaint which would add him as a Defendant in his individual capacity. On March 12, 2018, the Court granted the Motion, accepting the proposed Amended Complaint that accompanied the Motion. Mem. Order (Mar. 12, 2018), ECF No. 94. The Court, however, decided to proceed on the official capacity claims separately so that its Standing Opinion addressed only the standing arguments raised by the President in his official capacity. On May 1, 2018, the President, in his individual capacity, filed a separate Motion to Dismiss. Def.'s Mot. Dismiss (May 1, 2018), ECF No. 112 (Individual Capacity Motion).The Court will address the individual capacity claims and the arguments to dismiss them in a separate Opinion. The present Opinion addresses only those arguments pertaining to the President's official capacity as set forth in his Motion to Dismiss.

[3] The **Foreign Emoluments Clause**, U.S. Const. art. I, § 9, cl. 8, provides that "no Person holding any Office of Profit or Trust under them [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."

The **Domestic Emoluments Clause**, U.S. Const. art. II, § 1, cl. 7, provides: "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them."

Plaintiffs have alleged that the violations consist of the President's actual or potential receipt, directly or indirectly, of payments by foreign, the federal, and state governments (or any of their instrumentalities) in connection with his and the Trump Organization's ownership of the Trump International Hotel in Washington, D.C.[4] They seek declaratory relief establishing their rights *vis-à-vis* the President's actions as well as injunctive relief prohibiting him from further violating the Clauses.

The President has moved to dismiss the Amended Complaint for failure to state a claim. Although the President made this argument in his Motion to Dismiss and the parties addressed the issue in their briefs in support of and in opposition to the President's Motion, the Court deferred deciding the meaning and applicability of the Clauses until the issue of standing was resolved. Having decided that issue in favor of Plaintiffs, the Court turns to the issue of what the Clauses mean and whether Plaintiffs have otherwise stated claims under them.

For the reasons that follow, the Court determines that Plaintiffs have convincingly argued that the term "emolument" in both the Foreign and Domestic Emoluments Clauses, with slight refinements that the Court will address, means any "profit," "gain," or "advantage" and that accordingly they have stated claims to the effect that the President, in certain instances, has violated both the Foreign and Domestic Clauses. The Court **DENIES** the Motion to Dismiss in that respect.

---

[4] Both the original and Amended Complaint alleged violations going well beyond those involving the Hotel in the District of Columbia. The Court, in its Standing Opinion, found that Plaintiffs had demonstrated the requisite injury-in-fact for standing purposes only with respect to the Hotel and to the activities of the Trump Organization relating to it. It held that, while the President's and the Trump Organization's operations outside the District of Columbia might at some other time and/or some other place be the subject of a lawsuit or lawsuits, they were not part of the present one.

# I.    FACTUAL AND PROCEDURAL BACKGROUND

A full account of the facts alleged in this case is set out in the Court's Standing Opinion.[5] For present purposes, the Court briefly recapitulates the facts necessary to consider the issue at hand.

Many facts are undisputed or essentially undisputed. Donald J. Trump is the President of the United States and the sole or a substantial owner of both the Trump Organization LLC and The Trump Organization, Inc. (collectively, the Trump Organization), umbrella organizations under which many, if not all, of the President's various corporations, limited-liability companies, limited partnerships, and other entities are loosely organized. Am. Compl. ¶¶ 20, 29 (Mar. 12, 2018), ECF No. 95. Of particular importance in the present suit is the President's ownership, through the Trump Organization, of the Trump International Hotel in Washington, D.C. (the Hotel).

The Hotel is a five-star, luxury hotel located on Pennsylvania Avenue, N.W., in Washington, near the White House. *Id.* ¶ 34. While the President does not actively manage the Hotel, through the Trump Organization, he continues to own and purportedly controls the Hotel as well as the bar and restaurant, BLT Prime, and the event spaces located within the establishment. *Id.* ¶¶ 29, 34-36. Directly or indirectly, the President actually or potentially shares in the revenues that the Hotel and its appurtenant restaurant, bar, and event spaces generate. *Id.*

On January 11, 2017, shortly before his inauguration, the President announced that he would be turning over the "leadership and management" of the Trump Organization to his sons, Eric Trump and Donald Trump, Jr. *Id.* ¶ 30. Prior to taking office, he also announced that all profits earned from foreign governments would be donated to the U.S. Treasury. *Id.* ¶ 46. The Trump Organization stated that it would not be tracking all payments it might receive from foreign

---

[5] For a more detailed discussion of the facts alleged in the Amended Complaint, see the Court's Standing Opinion. Standing Op. at 2-7.

governments and only planned to make an estimate with regard to such payments. *Id.* However, following his inauguration and, as of the date of the filing of this action, June 12, 2017, the President had made no such "donations" to the U.S. Treasury.[6] *See* Am. Compl. ¶¶ 46, 138. Despite these pronouncements, Plaintiffs allege that the President continues to own and have intimate knowledge of the activities of the Trump Organization. *Id.* ¶ 31. Indeed, according to Plaintiffs, at the outset of his Presidency one of his sons stated that he would be providing business updates to the President regarding the Organization on a quarterly basis and, although the President may have formed a trust to hold his business assets, it appears that he remains able to obtain distributions from this trust at anytime and may have actually received such payments from time to time. *Id.* ¶¶ 29, 31-32.[7]

Since the President's election, a number of foreign governments or their instrumentalities have patronized or have expressed a definite intention to patronize the Hotel, some of which have indicated that they are doing so precisely because of the President's association with it. Am. Compl. ¶¶ 39-43. The President has at no time sought the consent of Congress for him to accept the

---

[6] According to a February 2018 press report, the President stated that he had paid to the U.S. Treasury profits the Hotel had received from foreign governments. No details with respect to such payments, however, were provided, viz., when the payments were made, which governments or their instrumentalities made them, how much each paid, how the amounts each paid were calculated, who verified the calculations, and how much was calculated over what period of time. *See* David A. Fahrenthold & Jonathan O'Connell, *Trump Organization Says It Has Donated Foreign Profits to U.S. Treasury, but Declines to Share Details*, Wash. Post (Feb. 26, 2018), https://www.washingtonpost.com/politics/trump-organization-says-it-has-donated-foreign-profits-to-us-treasury-but-declines-to-share-details/2018/02/26/747522e0-1b22-11e8-ae5a-16e60e4605f3_story.html?utm_term=.d8a282e07ec0. Nor is there any indication as to whether the President has made any such payments since the payments reported in February 2018.

[7] The Court notes that, as reported by the press, the President's trust allows him to withdraw money from any business at any time, and that the trustees "shall distribute net income or principal to Donald J. Trump at his request," or whenever they "deem appropriate." The trustees of the trust are Donald Trump, Jr. and the Trump Organization Chief Financial Officer Allen Weisselberg. Drew Harwell, *Trump Can Quietly Draw Money from Trust Whenever He Wants, New Documents Show*, Wash. Post. (Apr. 3, 2017), https://www.washingtonpost.com/politics/trump-can-quietly-draw-money-from-trust-whenever-he-wants-new-documents-show/2017/04/03/7f4c0002-187c-11e7-9887-1a5314b56a08_story.html?utm_term=.b2e411341812.

-4-

Add. 53

revenues the Hotel receives or could potentially receive from these foreign governments, nor has Congress ever approved the receipt of such revenues. *Id.* ¶ 33.

In addition, at least one State—Maine—patronized the Hotel when its Governor, Paul LePage, and his entourage visited Washington to discuss official business with the Federal Government, including discussions with the President. Pls.' Opp'n. at 8 (Nov. 7, 2017), ECF No. 46.

Plaintiffs further allege that the Hotel has received a benefit, which they say is an "emolument," from the Federal Government by virtue of the General Services Administration (GSA) Lease which governs the Trump Organization's use of the Old Post Office Building, the site of the Hotel. Am. Compl. ¶¶ 80-86. Thus Section 37.19 of the Old Post Office Lease states: "No . . . elected official of the Government of the United States . . . shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom." *Id.* ¶ 82.   Despite a previous statement from a GSA official that the President would be in violation of the Lease unless he fully divested himself of all financial interest in the Lease, following the President's inauguration, the GSA reversed its position, determining that the President was in fact in compliance with the Lease. *Id.* ¶¶ 83-84. Since then, the Trump Organization and through it the President have enjoyed the benefits of the Lease.

Plaintiffs allege that these actions of the President, through the Trump Organization, violate both the Foreign and Domestic Emoluments Clauses.

The issue before the Court at this juncture is whether Plaintiffs' allegations state viable claims for relief with respect to the President's purported violations of the Foreign and Domestic Emoluments Clauses.

The key dispute the parties have is over the meaning of the term "emolument"[8] in the Clauses, although more can and will be said about other terms within the Clauses.

Plaintiffs submit that the President's actions clearly offend the Clauses. An "emolument," they say, citing among other things the definition of the term in a considerable number of dictionaries contemporaneous with the Constitutional Convention, as well as the purpose of the Clauses to prevent against possible undue influence upon the federal official, is any "profit," "gain" or "advantage." Am. Compl. ¶¶ 23-28; Pls.' Opp'n at 29-30. Accordingly, say Plaintiffs, the Clauses were framed so as to flatly bar the receipt by anyone holding office under the authority of the United States, including the President, of any profit, gain, or advantage of any nature or kind whatsoever from any foreign, the federal, or state government. Pls.' Opp'n at 29. No exception exists, Plaintiffs continue, even if the foreign, federal, or domestic donor receives a *quid pro quo* from the officeholder in connection with the officeholder's private undertakings. It is enough that the President directly or indirectly receives money from foreign, the federal, and domestic government officials who patronize his Hotel; the Emoluments Clauses are violated.

The President argues that the Emoluments Clauses do not apply to his actions at all—citing (albeit fewer) other dictionary definitions more or less contemporaneous with the adoption of the Clauses to the effect that an "emolument" refers to a "profit arising from an office or employ." Def.'s Mot. Dismiss at 32 (Sept. 29, 2017), ECF No. 21-1. Based on this definition and what he argues is the purpose and historical context of the Clauses, the President submits that an "emolument" pertains only to a payment made in connection with a particular employment over and above one's salary as, say, President of the United States, so that payments to a federal official for any independent services rendered, such as for the rental of hotel rooms or event spaces

---

[8] The President does not appear to dispute that, under Plaintiffs' interpretation of the term, the Amended Complaint would state a claim or claims for relief.

privately owned by the officeholder, or payments for meals at his restaurants, privately owned, are payments entirely separate and apart from an "emolument" paid to the President qua President. *Id.* at 31-32. Accordingly, the Amended Complaint, in the President's view, does not state plausible claims for relief. He urges the Court to dismiss it on these grounds.

Although the President himself does not make the argument, as a preliminary matter one of the *Amici Curiae* suggests that the President is not covered by the Foreign Emoluments Clause at all because his elective office does not "arise under the authority" of the United States. *See* Br. for Scholar Seth Barrett Tillman & The Judicial Education Project as *Amici Curiae* in Support of Def. (Oct. 6, 2017), ECF No. 27-1 (Professor Tillman). The Court deals briefly with this latter argument at the outset.

## II.     STANDARDS FOR CONSTITUTIONAL INTERPRETATION

The Court begins with a review of the standards for judicial interpretation of a clause in the Constitution.

Although there has been much public debate, especially in recent years, over which theory or theories should be applied in interpreting constitutional provisions —ranging from strict constructionism,[9] originalism[10] and original meaning[11] to the purposive approach[12] and the

---

[9] Strict constructionism, referred to sometimes as "strict originalism," is the theory that constitutional interpretation requires following the literal text and specific intent of the Constitution's drafters. *See, e.g.,* Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 19 (3d ed. 2006).

[10] While the distinction between strict constructionism and more moderate originalism is not always clear, originalism is "more concerned with the adopters' general purposes than with their intentions in a very precise sense." In other words, originalism focuses on the Framers' general concepts when drafting a particular constitutional provision rather than their specific intent at the time. *See id.*

[11] Original meaning is yet another variation on originalism propounded by Justice Antonin Scalia which looks to historical practices and the understanding at the time of the drafting of the Constitution to determine the original meaning of a particular constitutional provision. *See id.* at 20.

[12] The purposive approach seeks to interpret a constitutional provision within the context of its purpose. "Purposive Construction," *Black's Law Dictionary* (9th ed. 2009).

Living Constitution,[13] with perhaps shadings in-between—the parties do not lock horns over this. Both sides embrace a blend of original meaning and purposive analysis (i.e., relying on external aids, especially dictionary definitions more or less contemporaneous with the Constitutional debates and, insofar as possible, the intent of the Framers) in support of their view that the Emoluments Clauses should or should not apply to the President and, if applicable, to which of his actions they should apply.[14]

Supreme Court precedent confirms that a blend of textualism and purposivism should guide the Court's approach.

The meaning of a Constitutional provision "begin[s] with its text." *City of Boerna v. Flores*, 521 U.S. 507, 519 (1997). Where the text is clear, "there is no room for construction and no excuse for interpolation or addition." *United States v. Sprague*, 282 U.S. 716, 731–32 (1931) (citing, *inter alia*, *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304 (1816)). Moreover, in interpreting the text, the Court is "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (quoting *Sprague*, 282 U.S. at 731). "Normal meaning may of course include an idiomatic

---

[13] Those who promote the theory of a "Living Constitution" argue that the Constitution must be able to adapt to current needs and attitudes that have changed since the original drafting. In other words, the Constitution does not have one fixed meaning but is a dynamic document the meaning of which can change over time. *See, e.g.*, Kermit Roosevelt, *Originalism and the Living Constitution: Reconciliation* at 1 (July 2007), https://www.acslaw.org/sites/default/files/Kermit%20Roosevelt%20Vanderbilt%20Paper%207-2007.pdf.

[14] Although the parties' briefs now and again seem to suggest that their interpretation of the Emoluments Clauses and especially the meaning of the term "emolument" are self-evident almost to the point of evoking the Plain Meaning Rule, neither side of course goes that far. But this is perhaps a convenient starting place to question the logic of the President's view that an "emolument" has to be employment-related and therefore when he receives emoluments from foreign states, *e.g.*, for private services rendered, his actions are not covered by the Emoluments Clauses. Accepting the President's argument *arguendo*, why doesn't logic suggest that the foreign and domestic government payments he receives in connection with the Hotel are in fact an "emolument" to his salary as President? Especially when foreign governments are on record as saying that they have been or will be patronizing the Hotel precisely because the President is the President? And what if the foreign and state governments pay a premium over market to patronize the Hotel? In other contexts, padded contracts have been held to cover illegitimate payments over and above otherwise legitimate payments for services rendered.

-8-

meaning, but it excludes secret or technical meaning that would not have been known to ordinary

citizens in the founding generation." *Id.* at 576-77. To determine the original public meaning, the

Supreme Court has looked to founding-era dictionaries and other contemporaneous sources. *See*

*NLRB v. Noel Canning*, 134 S. Ct. 2550, 2561 (2014) (discussing founding-era dictionary

definitions and the Framers' use of the word "recess" in the Constitution's Recess Appointments

Clause); *Heller*, 554 U.S. at 581-86 (looking to founding-era dictionaries, William Blackstone's

*Commentaries on the Laws of England*, and State constitutions to determine the meaning of the

Second Amendment).

When a constitutional provision is ambiguous, however, the Court has recognized the need

"to consider the Clause's purpose and historical practice." *Noel Canning*, 134 S. Ct. at 2559, 2568

("[I]n interpreting the Clause, we put significant weight upon historical practice.") (emphasis

omitted); *id.* at 2559 ("[L]ong settled and established practice is a consideration of great weight in

a proper interpretation of constitutional provisions regulating the relationship between Congress

and the President.") (citation and quotation marks omitted); *see also Heller*, 554 U.S. at 592 ("This

meaning is strongly confirmed by the historical background of the [provision].").  Importantly,

moreover, the Supreme Court has treated executive practice and precedent "as an interpretive

factor even when the nature or longevity of that practice is subject to dispute, and even when that

practice began after the founding era." *Noel Canning*, 134 S. Ct. at 2560, 2562-63 (evaluating past

historical practice and discussing Government ethics opinions to inform the Court's determination

"of what the law is").

### III.    THE EMOLUMENTS CLAUSES

Because one of the *Amici Curiae* has suggested that the Foreign Emoluments Clause does not apply to the President at all, the Court briefly addresses this issue before turning to the meaning of the term "emolument" itself.[15]

### A.  "Office of Profit or Trust under [the United States]"

*Amicus Curiae* Professor Seth Barrett Tillman of the Maynooth University Department of Law argues that the Foreign Emoluments Clause does not extend to the President because the Presidency does not qualify as an "Office of Profit or Trust under [the United States]." The Framers, he says, distinguished between different federal offices and drafted different rules for these distinct federal positions. Tillman Br. at 2, 4. Specifically, Professor Tillman argues that an office "under the United States," which is the language used in the Foreign Emoluments Clause, refers to a federal *appointed* position that "is created, regularized, or defeasible by statute." *Id.* at 7. According to Professor Tillman, the Clause does not reach elected positions; to the contrary, he says, only express language can reach the Presidency.

Professor Tillman claims that this conclusion is supported by both the text and history of the Constitution. He submits, for example, that in the Colonial Period the phrase "Office under the Crown" was a commonly-used drafting convention that referred only to appointed—not elected— positions, a distinction that he suggests remains operative in the United Kingdom today. *Id.* at 8-9. The Framers of the Constitution and the First Congress, he continues, adhered to this drafting convention. He points to an anti-bribery statute enacted in 1790 in which Congress declared that a defendant convicted of bribing a federal judge "shall forever be disqualified to hold any office of honor, trust, or profit under the United States." *Id.* at 13 (citing An Act for the Punishment of

---

[15]  There is no dispute that the President is covered by the Domestic Emoluments Clause. He is named in the text and is the sole subject of the Clause. *See* U.S. Const. art. II, § 1, cl. 7 ("The President shall. . . .").

Certain Crimes, ch. 9, 1 Stat. 112, 117 (1790)). Professor Tillman argues that this statute could not have been understood to include the Presidency because Congress does not have the power to add new qualifications for federal elected positions. *Id.* In further support of his theory, he points out that, in 1792, the Senate directed President George Washington's Secretary of the Treasury, Alexander Hamilton, to draft a financial statement listing the "emoluments" of every person holding "any civil office or employment under the United States." *Id.* at 15 (citing 1 Journal of the Senate of the U.S.A. 441 (1820) (May 7, 1792 entry)). Since Hamilton's response did not include the President, Vice President, Senators, or Representatives, *Amicus* says this is a further indication that the founding-era generation did not consider the phrase "office under the United States" to extend to elected positions. *Id.* at 15-16.

Despite *Amicus*' citations to a select number of historical examples, the Court finds that the text, history, and purpose of the Foreign Emoluments Clause, as well as executive branch precedent interpreting it, overwhelmingly support the conclusion that the President holds an "Office of Profit or Trust under [the United States]" within the meaning of the Foreign Emoluments Clause.

*1) Text*

Beginning with the text of the Clause, the only logical conclusion, when read with the rest of the Constitution, is that the President holds an "Office of Profit or Trust under [the United States]." The Constitution repeatedly refers to the President as holding an "office." *See, e.g.*, U.S. Const. art. II § 1, cl. 1 ("[The President] shall hold his Office during the Term of four Years[.]"); *id.*, cl. 5 (eligibility requirements for the "Office of President"); *id.* cl. 8 (requiring the President take an oath to "faithfully execute the Office of President of the United States."). And if text is to be given its plain meaning, the "Office of the President" is surely one of both profit and trust. *See*

*Sprague*, 282 U.S. at 731–32 (stating that the Constitution's "words and phrases were used in their normal and ordinary" meaning). The President receives compensation for his services (profit) and is entrusted with the welfare of the American people (trust). *See, e.g.*, Deborah Sills, *The Foreign Emoluments Clause: Protecting Our National Security Interests,* 26 Brooklyn J. L. & Pol'y 63, 81 ("The term 'Office of Profit' refers to an office in which a person in office receives a salary, fee, or compensation. The term 'Office of Trust,' refers to offices involving 'duties of which are particularly important.'") (citing *Application of the Emoluments Clause to a Member of the President's Council on Bioethics*, 29 Op. O.L.C. 55, 61-62 (2005)).[16]

The text also indicates that the President's "Office of Profit or Trust" is one "under the United States." As the Domestic Emoluments Clause illustrates, the term "United States" is used in the Constitution to distinguish between the federal and state governments. *See* U.S. Const. art. II, § 1, cl. 7 (forbidding emoluments from the United States or "any of them," referring to the States). As a federal office holder, then, the President holds his office "under the United States."

Indeed, reading the phrase "Office of Profit or Trust under [the United States]" to exclude the President would lead to an essentially absurd result. Consider Article I, Section 3, cl. 7 of the Constitution, which provides that an impeached official shall be disqualified from holding "any Office of honor, Trust or Profit under the United States." U.S. Const. art. I, § 3, cl. 7. As a

---

[16] The OLC or Office of Legal Counsel is an office within the Department of Justice that drafts legal opinions for the Attorney General and provides its own written opinions and other advice in response to requests from the Counsel to the President, the various agencies of the Executive Branch, and other components of the Department of Justice. *See* "Office of Legal Counsel," The United States Department of Justice, https://www.justice.gov/olc. Although not binding on courts, OLC opinions are entitled to considerable weight because they "reflect[] the legal position of the executive branch" and "provid[e] binding interpretive guidance for executive agencies." *United States v. Arizona*, 641 F.3d 339, 385 n.16 (9th Cir. 2011) (Bea, J., concurring) (quoting Congressional Research Service, Authority of State and Local Police to Enforce Federal Immigration Law, Sept. 17, 2010, http://www.ilw.com/immigrationdaily/news/2010, 1104–crs.pdf), *aff'd in part, rev'd in part*, 567 U.S. 387 (2012)); *see also Cherichel v. Holder*, 591 F.3d 1002, 1016 & n.17 (8th Cir. 2010) ("We note, however, that while OLC opinions are generally binding on the Executive branch, the courts are not bound by them.") (citations omitted); *N.Y. Times Co. v. U.S. Dep't of Justice*, 138 F. Supp. 3d 462, 478 (S.D.N.Y. 2015); *Public Citizen v. Burke*, 655 F. Supp. 318, 321–22 (D.D.C. 1987).

Memorandum issued by the Brookings Institution highlights, "[i]f the President did not hold an office 'under the United States,' a disgraced former official would be forbidden from every federal office in the land, but could be President." Norman Eisen, Richard Painter, & Laurence Tribe, *The Emoluments Clause: Its Text, Meaning, and Application to Donald J. Trump* at 8, Brookings Institution (Dec. 16, 2016), https://www.brookings.edu/wp-content/uploads/2016/12/gs_121616_emoluments-clause1.pdf (Brookings Memorandum).[17]

In all, reading the Constitution as a complete document rather than piecemeal establishes that the President holds an "Office of Profit or Trust under [the United States]."

*2) Original Public Meaning & Purpose*

Even if the text were ambiguous, the historical context and purpose of the Foreign Emoluments Clause confirm that the Framers understood the Presidency to be an "Office of Profit or Trust under [the United States]." As one historical scholar has noted, when the totality of founding-era evidence is considered, "an avalanche buries [Tillman's] fanciful claims." Prakash, *supra* note 17, at 147.

To start, the Federalist Papers on numerous occasions refer to the President as the occupier of an "office." *See, e.g.*, The Federalist No. 39 (James Madison) ("The President of the United States is impeachable at any time during his continuance in *office*.") (emphasis added); The Federalist Nos. 66 (Alexander Hamilton) ("It will be the *office* of the President . . ." (emphasis added), 68 ("the *office* of President") (emphasis added)). Though Professor Tillman places great emphasis on the conduct of Washington and Hamilton, he curiously fails to explain why both these

---

[17] For further examples of the "bizarre consequences" resulting from the interpretation advanced by Professor Tillman, see the Brookings Memorandum's discussion at pages 8-9. *Id*. (noting that under Professor Tillman's interpretation, the President could simultaneously hold a seat in Congress, sit in the Electoral College, and be subject to a religious test); *see also* Saikrishna Prakash, *Why the Incompatibility Clause Applies to the Office of the President*, 4 Duke J. Const. L. & Pub. Pol'y 143, 148-51 (2009).

individuals on other occasions also refer to the "*office* of President." *See, e.g.*, Letter from George

Washington to Solomon Bush (Nov. 24, 1789), Library of Congress Digital Collection,

https://www.loc.gov/collections/george-washington-papers/?fa=segmentof%3Amgw2.022%2F&

sp=3&st=slideshow&sb=shelf-id (referring to his election to the "Office of President of the United

States"); Letter from Alexander Hamilton to George Washington (Sept. 1788),

https://founders.archives.gov/documents/Hamilton/01-05-02-0037 (discussing Washington's

"acceptance of the office of President").

Moreover, in light of the purpose of the Foreign Emoluments Clause, as discussed in

greater detail below,[18] the "office" of the President was explicitly understood to be one of "Profit

or Trust under [the United States]." The few discussions surrounding the Clause indicate that the

Framers were extremely concerned about possible improper and undue influences on the President

in particular. *See* pages 34-36, *infra*. Edmond Randolph, at the Virginia Ratification Convention,

expressly described the Clause as applying to the President. 3 Jonathan Elliot, *The Debates in the

Several State Conventions on the Adoption of the Federal Constitution, as Recommended by the

General Convention at Philadelphia, in 1787* 486 (2d ed. 1891) (stating that the Clause protects

against the threat of the "*President* receiving emoluments from foreign powers") (emphasis

added). Insofar as that is so, the Framers must have understood him to hold an "Office of Profit or

Trust under [the United States]."

Professor Tillman's argument that the First Congress must have understood the phrase

"Office of Profit or Trust under [the United States]" to exclude the President because of the

existence of the 1790 anti-bribery statute is especially perplexing. That Congress would have

---

[18] *See* discussion in Section III.B.3, *infra*.

intended a person convicted of bribing a federal judge to be banned from holding every federal office *except* the office of President is, in the Court's view, altogether unlikely.

### 3) Executive Branch Precedent and Practice

Finally, if the foregoing considerations were not in and of themselves dispositive of Professor Tillman's argument, consistent executive branch practice and precedent over the years have definitively put his thesis to rest. As the OLC stated in 2009, "[t]he President surely "hold[s] an[] Office of Profit or Trust[.]" *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, 33 Op. O.L.C. 1, 4 (2009). This statement was fully consistent with prior OLC opinions that had applied the Foreign Emoluments Clause to the President. *See, e.g.*, *Proposal That the President Accept Honorary Irish Citizenship*, 1 Supp. Op. O.L.C. 278, 278 (1963) ("I believe that acceptance by the President of honorary Irish citizenship would fall within the spirit, if not the letter, of [the Foreign Emoluments Clause].").

The Court concludes that the President holds an "Office of Profit or Trust under [the United States]" and, accordingly, is subject to the restrictions contained in the Foreign Emoluments Clause.

The question remains: What are those restrictions?

## B. "Emolument"

Having determined that both Emoluments Clauses apply to the President, the Court must now decide what the term "emolument" within them means.

### 1) Text

While both parties begin with the text of the Clauses, they offer significantly different textual interpretations.

Plaintiffs argue that the text indicates a clear intention that a broad definition of "emolument," applies, that it means any "profit," "gain," or "advantage." Not only was this definition more common at the time of the drafting,[19] they say. This definition best accords with the surrounding text of the Clauses. Indeed, Plaintiffs continue, both Clauses contain expansive modifiers. The Foreign Emoluments Clause bans "*any*" "Emolument . . . of *any kind whatever*." Pls.' Opp'n at 33. Similarly, the Domestic Emoluments Clause prohibits the President's receipt of "*any other* Emolument." In Plaintiffs' view, these modifiers indicate that the term was meant to have the widest possible scope and applicability. *Id.* at 35.

These expansive modifiers, Plaintiffs argue, stand in marked contrast to the only other place in the Constitution where the term "emolument" appears, the Incompatibility Clause, which restricts increases in the compensation of members of Congress.[20] That clause contains a restrictive modifier, limiting its applicability to the "Emoluments *whereof*," suggesting its limited applicability to the office of Congressmen alone. Plaintiffs dispute that any meaningful comparison can be made between the Incompatibility Clause and the Emoluments Clauses since neither of the latter two contains such a restrictive modifier. Pls.' Opp'n at 41 n.28.

Despite the President's argument to the contrary, Plaintiffs say that interpreting "emolument" to cover essentially anything of value would not create redundancies within the Foreign Emoluments Clause's separate ban on "presents." Rather, they submit, the term "present" in the Foreign Clause was likely intended to ensure that the acceptance of any unsolicited, unreciprocated "gift" given merely as a sign of gratitude would be covered, whereas the prohibition against receipt of an "emolument" would reach payments made with the more obvious

---

[19] *See* the discussion regarding the original public meaning of the term in Section III.B.2, *infra*.

[20] The Incompatibility Clause, U.S. Const. art. I, § 6, cl. 2, provides: "No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the *Emoluments* whereof shall have been encreased during such time." (emphasis added).

intention to influence. *Id.* at 34-35 n.22. The point is that both types of payments would be covered.

The President, while acknowledging that the broader definition of "emolument" advanced by Plaintiffs also existed during the founding era, asserts that this should be of no importance because the term has to be read in context with the rest of the words of the Emoluments Clauses under the familiar rule of construction known as *noscitur a sociis*.[21] Doing so, he submits, supports his position that an "emolument" is only a payment made as compensation for official services.

The President claims that this narrower definition of "emolument" is more consistent with the nature of the other prohibited categories in the Foreign Clause. "Present," "office," and "title" are all things personally conferred or bestowed upon a U.S. official. Def.'s Mot. Dismiss at 33. The terms "any" and "any kind whatever," he says, are included in the Clauses simply to ensure that every type of identified compensation, e.g., "present," "office," "title", is captured by the Clause. This is not, he claims, a basis to choose whether "emolument" has a separate meaning. Def.'s Reply at 19 (Dec. 1, 2017), ECF No. 70.

The President argues that his position is further bolstered by the text of the Domestic Emoluments Clause where, he says, "compensation" is qualified by "for his services," meaning that "any other Emolument" must also be qualified by "for his services." Def.'s Mot. Dismiss at 33. In effect, the President argues that the Domestic Emoluments Clause should read: "The President shall, at stated Times, receive for his Services, a Compensation, . . . and he shall not receive [for his services] within that Period any other Emolument[.]"

---

[21] *Noscitur a sociis* "is a rule of construction applicable to all written instruments" and applies to terms "the meaning naturally attaching to them from their context." *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893); *see also* "*Noscitur a sociis*," *Black's Law Dictionary* (9th ed. 2009).

-17-

Further, referring to the Constitution as a whole, the President maintains that the Incompatibility Clause actually supports his argument that "emolument" refers to compensation for an officeholder's services. Def.'s Reply at 20. In his view, because the Incompatibility Clause treats an "emolument" as an aspect of an office that cannot be increased, it expressly ties an emolument to an official's employment and duties, which suggests the same meaning for the term in the Emoluments Clauses. *Id*. Acknowledging that the Incompatibility Clause contains a restrictive modifier, the President dismisses this as a result of the fact that it deals with a specific office—i.e., the civil office for which salary has been increased—whereas the Foreign Emoluments Clause does not include any such office-related limitation. *Id*. In other words, because the Foreign Emoluments Clause does not reference a specific office, it supposedly has a broader reach than the Incompatibility Clause. It regulates not only compensation or benefits for jobs held by former Senators or Congressmen; it extends to benefits payable to any federal official in his capacity as a federal official. *Id.* The term "emolument" is not meant to have a broader scope.

Finally, says the President, interpreting "emolument" to cover anything of value would create unnecessary redundancies within the Foreign Clause because it would include within its scope the term "present," which necessarily has a separate and undisputed meaning. Interpreting a term to create such a redundancy, he continues, runs counter to Supreme Court precedent, which states that "every word must have its due force, and appropriate meaning" because "it is evident" that "no word was unnecessarily used, or needlessly added." Def.'s Mot. Dismiss at 36 (quoting *Holmes v. Jennison*, 39 U.S. 540, 570-71 (1840)).

The Court agrees with the parties that the term "emolument" must be read in harmony with the surrounding text of the Emoluments Clauses. But ultimately it finds Plaintiffs' arguments more

persuasive. The text of both Clauses strongly indicates that the broader meaning of "emolument" advanced by Plaintiffs was meant to apply. As Plaintiffs point out, the Foreign Clause bans, without Congressional approval, "*any* present, Emolument, Office, or Title, of *any kind whatever*, from any King, Prince or foreign State." U.S. Const. art. I, § 9, cl. 8 (emphasis added). Use of such expansive modifiers significantly undermines the President's argument that this Clause was meant to prohibit only payment for official services rendered in an employment-type relationship. If there were any doubt as to the limits of the Foreign Clause, the Framers used the word "any" twice, ensuring a broad and expansive reach. The President's argument that these modifiers merely ensure that the Foreign Clause bans receipt of every type of "present," "emolument," "office," or "title" is unconvincing. Even without the inclusion of the modifier "of any kind whatever" in the Foreign Clause, it would still ban every type of prohibited category because it provides no exceptions. If "no word was unnecessarily used," as the President argues, Def.'s Mot. Dismiss at 36, his own position runs aground. The more logical conclusion is the one that Plaintiffs urge: The use of "any kind whatever" was intended to ensure the broader meaning of the term "emolument."

The phrase "*any other* Emolument" in the Domestic Emoluments Clause suggests the same broad interpretation of the term. The Court does not read the Clause to qualify "emolument" by the words "for his services." The use of "any other" in the Clause once again points firmly in Plaintiffs' direction. The Court, in effect, construes the Clause to read: "The President shall . . . receive for his Services, a Compensation, . . . and he shall not receive [for any reason] within that Period any other Emolument [of any kind]." But ultimately, even allowing that the term "emolument" might be qualified by the words "for his services" in the Domestic Clause, this amounts to no silver bullet for the President. Logic equally suggests that the payments, direct or indirect, that he receives from domestic governments in connection with the Hotel are in fact

"emoluments" to his salary as President. Again, it has been alleged that the State of Maine

patronized the Hotel when its Governor, Paul LePage, and his staff visited Washington to discuss

official business with the Federal Government, including holding discussions with the President as

President, Pls.' Opp'n. at 8, and when, on at least one of those trips, Governor LePage and the

President appeared together at a news conference at which the President signed an executive order

to review actions of the prior administration that established national monuments within the

National Park Service, which could apply to a park and national monument in Maine, which

President Obama had established over Governor LePage's objections in 2016. *Id.*

      Equally unpersuasive is the President's argument that the meaning of the term

"emoluments" in the Incompatibility Clause somehow undermines Plaintiffs' claims. As Plaintiffs

point out, unlike the Emoluments Clauses, the Incompatibility Clause contains a restrictive

modifier limiting the "Emoluments whereof" mentioned there to an expressly referenced office,

viz. the office for which compensation has been increased by Congress. It most assuredly weighs

in favor of Plaintiffs' argument that the Framers felt the need to include such a modifier. If

"emolument" were always to be read as a synonym for salary or payment for official services

rendered, this modifier in the Incompatibility Clause would have been unnecessary.

      Nor does interpreting "emolument" to mean "profit," "gain," or "advantage," as the

President suggests, render the term "present" in the Foreign Emoluments Clause redundant. As the

President himself concedes, a "present" in the founding era was defined then, as it is today, as

something "bestowed on another without price or exchange." Def.'s Mot. Dismiss at 37. It has

been noted that historically unsolicited gifts, i.e. presents, were commonly given by European

heads of state as a matter of custom. *See* Zephyr Teachout, *Corruption in America: From

Benjamin Franklin's Snuff Box to Citizens United* 1-5 (2014). In contrast, the term "emolument,"

-20-

used in reference to a "profit," "gain," or "advantage" from any kind of exchange[22] enables the Foreign Clause to reach private commercial transactions that would not be covered by the term "present." Thus, even if the term "emolument" was sometimes used synonymously with the term "present," its use in the Foreign Emoluments Clause would ensure that the Clause covered all types of financial transactions—solicited or unsolicited, reciprocated or unreciprocated, official or private.

On the other hand, the President's cramped interpretation of the term would seem to create its own concerning redundancies within the Constitution. Characterizing an "emolument" as "the receipt of compensation for services rendered by an official in an official capacity," Def.'s Mot. Dismiss at 31, is tantamount to defining the transaction as nothing less than one of federal bribery, a crime which prohibits a federal public official from, directly or indirectly, receiving or accepting "anything of value" in return for "being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2). Given that Article II, Section 4 of the Constitution already addresses the crime of bribery, making it an impeachable offense,[23] there would have been little need to include two additional and distinct Emoluments Clauses prohibiting the acceptance of money from foreign or state governments for official services rendered. Moreover, it seems highly unlikely that the Framers would have intended bribery to be both an impeachable offense and, at the same time, an activity Congress could consent to when a foreign government donor is involved. The President makes no attempt to come to terms with this anomaly.

---

[22] *See* Section III.B.2, *infra*, for a more detailed discussion on the ordinary use of the term.

[23] U.S. Const. art. II, § 4 provides: "The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors."

Accordingly, given the text of both Clauses, the Court begins with a strong presumption that the term "emolument" should be interpreted broadly to mean "profit," "gain," or "advantage," essentially covering anything of value.[24]

### 2) Original Public Meaning

Because the Constitution was "written to be understood by the voters," *Heller*, 554 U.S. at 576, it is important to consider the meaning of the term "emolument" against the backdrop of what ordinary citizens at the time of the Nation's founding would have understood it to mean. Though the parties apparently agree that the term "emolument" had at least two meanings at the time of the Constitutional Convention, they diverge as to its ordinary, common usage by the founding generation.

Plaintiffs contend that the most common definition of emolument at the time was "profit," "gain," or "advantage." Pls. Opp'n at 31 (citing 1 Johnson, *A Dictionary of the English Language* (6th ed. 1785); Bailey, *An Universal Etymological English Dictionary* (20th ed. 1763)). Indeed, they cite an article by Professor John Mikhail of Georgetown University Law Center in which, following exhaustive research, he concluded that "every English dictionary definition of 'emolument' from 1604 to 1806" includes Plaintiffs' broader definition. *Id.* (citing John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries, 1523–1806*, 1–2 (June 30, 2017), https://ssrn.com/abstract=2995693). Moreover, say Plaintiffs, the word was often used in this broad sense by drafters of State constitutions, by Blackstone, by Supreme Court Justices, and by the Framers themselves. *Id.* at 31-32 (citing Pa. Const., art. V (1776)

---

[24]  At various times Plaintiffs use the term "anything of value," which the President argues leads to absurd consequences. Hr'g Tr. at 7:8- 8:13, 26:20-28:8, 41:20-25, June 11, 2018 (Hr'g Tr.). The Court relies on the dictionary definitions of the period of "profit," "gain," or "advantage," see the discussion in Section III.B.2, *infra*, which the Court reads in most contexts as essentially synonymous with the words "anything of value." However, to the extent these terms may differ, the Court interprets the term "emolument" consistent with the dictionary definitions, i.e., "profit," "gain," or "advantage."

("[G]overnment is. . . instituted . . . not for the particular emolument or advantage of any single man."); John Mikhail, *"Emoluments" in Blackstone's Commentaries*, Balkinization, May 28, 2017, https://balkin.blogspot.com/2017/05/emolument-in-blackstones-commentaries.html (listing instances in which Blackstone used the word to mean "family inheritance, private employment, and private ownership of land"); John Mikhail, *A Note on the Original Meaning of "Emolument,"* Balkinization, Jan. 18, 2017, https://balkin.blogspot.com/2017/01/a-note-on-original-meaning-of-emolument.html (providing examples of the Framers—including Jefferson, Washington, and Madison—using the word to refer to "the consequences of ordinary business dealings"); *Himley v. Rose*, 9 U.S. (5 Cranch) 313, 318–19 (1809) (Johnson, J.) ("profits and advantages" from land ownership)).

On the other hand, Plaintiffs submit that the definition advanced by the President— "profit arising from an office or employ"—was far less common. Citing the Mikhail article, Plaintiffs assert that while the definition they advance can be found in virtually every founding-era dictionary, the President's definition appears in less than 8% of these dictionaries. *Id*. at 32 (citing Mikhail, *The Definition of "Emolument," supra,* at 1–2). This, according to Plaintiffs, confirms that the President's narrow definition was not the ordinary meaning of the term "emolument" that voters of the time would have understood.

In response, the President invites the Court's attention to alternate sources that he claims define "emolument" as a "profit arising from an office or employ." Def.'s Mot. Dismiss at 34 (citing *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774); 1 John Trusler, *The Difference, Between Words, Esteemed Synonymous, in the English Language; And, the Proper Choice of Them Determined* 154–55 (1766)). The President submits that the use of the term to refer to receipt of value for one's services rendered in an official capacity is consistent with

-23-

these particular contemporaneous dictionary definitions. *Id.* at 34-35. In fact, he cites examples from the Oxford English Dictionary as far back as 1480,1650, and 1743, providing as one of two definitions: "[p]rofit or gain arising from station, office, or employment; dues; reward, remuneration, salary." *Id.* (citing Oxford English Dictionary, Oxford University Press, *Emolument*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/61242).

The President also criticizes Plaintiffs' "mechanical counting of dictionaries," noting that the Mikhail article fails to account for frequency of usage. Def.'s Reply at 17. He argues that at the time of the Nation's founding, an "emolument" was a common characteristic of federal office, described by the Supreme Court as "every species of compensation or pecuniary profit derived from a discharge of the duties of office." Def.'s Mot. Dismiss at 31 (quoting *Hoyt v. United States*, 51 U.S. 109, 135 (1850)). In light of this view of contemporaneous common usage, the President asserts that his definition is more likely the original public meaning of the term.

His narrower definition, the President says, is also closely related to the etymology of the word "emolument," which references "profit from labor" or "profit from grinding corn." *Id.* at 35 (citing Walter W. Skeat, *An Etymological Dictionary of the English Language* 189 (1888) (emolument: "profit, what is gained by labour"); *The Barnhart Dictionary of Etymology* 326 (1988) (emolument: "*n.* profit from an office or position. 1435, *in Proceedings of the Privy Council*; borrowed through Middle French *émolument*, and directly from Latin *émolumentum* profit, gain, (originally) payment to a miller for grinding corn, from *émolere* grind out (*é*-out + *molere* to grind; see MEAL grain)")). Because Plaintiffs, and the Mikhail article upon which they rely, ignore dictionaries that include variations of this etymologically rooted definition, the President claims they significantly understate the percentage of dictionaries supporting his position. Def.'s Reply at 18-19.

-24-

The President argues that Plaintiffs "expansive construction is further undermined by a proposed constitutional amendment that would have extended the prohibitions of the Foreign Emoluments Clause to all private citizens." Def.'s Mot. Dismiss at 44. Specifically, the amendment, which was proposed in 1810, would have prohibited any citizen of the United States from accepting, without the consent of Congress, "any present, pension, office or emolument of any kind whatever, from any emperor, king, prince or foreign power." Def.'s Mot. Dismiss at 44-45 (citing Proposing an Amendment to the Constitution, S.J. Res. 2, 11th Cong., 2 Stat. 613 (1810)). The consequence of doing so, under the proposed amendment, would have been revocation of one's citizenship. *Id.* While acknowledging that no debates were held on this proposed amendment, the President contends that it is "implausible" that the amendment would have been understood to revoke the citizenship of anyone who might be engaged in commerce with foreign governments or their instrumentalities. *Id.* at 45. The original public meaning of "emolument," he concludes, could not therefore be as broad as Plaintiffs propose.

Again, in the Court's view, Plaintiffs carry the day.

The clear weight of the evidence shows that an "emolument" was commonly understood by the founding generation to encompass any "profit," "gain," or "advantage." Though the Court agrees that mere counting of dictionaries may not be dispositive, it nonetheless remains highly remarkable that "every English dictionary definition of 'emolument' from 1604 to 1806 relies on one or more of the elements of the broad definition DOJ rejects in its brief." Mikhail, *The Definition of "Emolument," supra*, at 1-2.[25] Moreover, "92% of these dictionaries define 'emolument' exclusively in these terms, with no reference to 'office' or 'employment.'" *Id.* No

---

[25] In writing his article, Professor Mikhail looked at "how 'emolument' is defined in English language dictionaries published from 1604 to 1806, as well as in common law dictionaries published from 1523 to 1792. To document its primary claims, the article includes over 100 original images of English and legal dictionaries published between 1523 and 1806." *Id.*

less important is the fact that even the few sources that do reference an office or employment as part of their definition of "emolument," include as well the definitions of "gain, or advantage," a point the President fails to address in his pleadings. *Id.* at 8 n.26 (noting that Barclay's full definition of "emolument" is "profit arising from profit or employ; *gain or advantage*." (emphasis added)). Further, the President relies heavily on two pre-Constitutional Convention sources, Barclay (1774) and Trusler (1776), despite the fact that, as Professor Mikhail points out, there is "little to no evidence" that either of these two dictionaries "were owned, possessed, or used by the founders." Mikhail, *The Definition of "Emolument," supra*, at 13 (noting that "neither of these dictionaries is mentioned in the more than 178,000 searchable documents in the Founders Online database, which makes publicly available the papers of the six most prominent founders."). On the other hand, in the four dictionaries which have been deemed by Justice Antonin Scalia and Bryan A. Garner as "'the most useful and authoritative' English dictionaries from 1750-1800,"[26] "emolument," consistent with Plaintiffs' view, is variously defined as "profit," "gain," or "advantage." *Id.* at 18 (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 419 (2012)).

In addition to its broad meaning in a far greater number of founding-era dictionaries, the term "emolument" was also used in a broad sense in eighteenth century legal and economic treatises. As Professor Mikhail points out, in his *Commentaries on the Laws of England*, Blackstone uses the word "emolument" on at least sixteen occasions, the majority of those not tied to the performance of official duties or public office. *See* Mikhail, *"Emolument" in Blackstone's Commentaries, supra*, (listing examples). Blackstone, for example, refers to the benefits of

---

[26] Those dictionaries are: Samuel Johnson, *A Dictionary of The English Language* (1755); Nathan Bailey, *A Universal Etymological English Dictionary* (1721); Thomas Dyche & William Pardon, *A New General English Dictionary* (1735); and John Ash, *The New And Complete Dictionary Of The English Language* (1775). *See* Mikhail, *The Definition of "Emolument," supra*, at 14-18.

third-party beneficiaries as "the emolument of third persons," discusses the "emoluments arising

from inheritance," and references "pecuniary emoluments" in the context of bankruptcy. 2

William Blackstone, *Commentaries on the Laws of England* *30 ("The thing given in lieu of tithes

must be beneficial to the parson, and not for the *emolument* of third persons only") (emphasis

added); *76 ("The heir, on the death of his ancestor, if of full age, was plundered of the first

*emoluments* arising from his inheritance, by way of relief and primer seisin; and, if under age, of

the whole of his estate during infancy.") (emphasis added); *472 ("[W]hereas the law of

bankrupts, taking into consideration the sudden and unavoidable accidents to which men in trade

are liable, has given them the liberty of their persons, and some pecuniary *emoluments*, upon

condition they surrender up their whole estate to be divided among their creditors[.]") (emphasis

added).[27]

Similarly, Adam Smith in his *The Wealth of Nations*—a treatise which the Framers were

unquestionably well aware of[28]—used the term "emolument" twice to refer to instances involving

private market transactions. *See* 1 Adam Smith, *Inquiry into the Nature and Causes of the Wealth*

*of Nations* 92 (9th ed. 1799) ("The monopolists, by keeping the market constantly under-stocked .

---

[27] *See also id.* App. §§ 1, 2 (discussing conveyances of land together with all "privileges, profits, easements, commodities, advantages, *emoluments*, hereditaments, and appurtenances whatsoever") (emphasis added); 1 Blackstone, *106 ("[W]hereby the whole island and all its dependencies, so granted as aforesaid, (except the landed property of the Atholl family, their manorial rights and *emoluments*, and the patronage of the bishopric and other ecclesiastical benefices) are unalienably vested in the crown, and subjected to the regulations of the British excise and customs.") (emphasis added); *id.* *470 ("At the original endowment of parish churches, the freehold of the church, the churchyard, the parsonage house, the glebe, and the tithes of the parish, were vested in the then parson by the bounty of the donor, as a temporal recompence to him for his spiritual care of the inhabitants, and with intent that the same *emoluments* should ever afterwards continue as a recompense for the same care.") (emphasis added); 4 Blackstone, *430 ("emolument of the exchequer").

[28] Benjamin Franklin, James Madison, Robert Morris, and James Wilson were all known to have referenced Smith's book. *See, e.g.*, Brief of *Amici Curiae* by Certain Legal Historians on Behalf of Pls. at 7 n.19 (Nov. 28, 2017), ECF No. 69 (Legal Historians Br.) (citing 23 *The Papers of Benjamin Franklin* 241-43 (1983) (W. B. Willcox, ed.) (noting that "Smith's Wealth of Nations" was sent to Franklin); 6 *The Papers of James Madison* 62-115 (W. T. Hutchinson & W. M. E. Rachal, eds., 1969) (including "Smith on the Wealth of Nations" in his book list); David Lefer, *The Founding Conservatives* 245-246 (2013) (Morris "found Smith's thought so persuasive . . . that he gave out copies to members of Congress"); 1 *Collected Works of James Wilson* 60-79, 73-74 (K.L. Hall & M.D. Hall eds., 2007) (quoting Smith's remarks on banking)); Mikhail, *The Definition of "Emolument," supra*, at 12 (same).

. . sell their commodities much above the natural price, and raise their *emoluments*, whether they consist in wages or profit, greatly above their natural rate.") (emphasis added); 2 Smith, *id.*, at 234 ("[The bank] makes a profit likewise by selling bank money at five per cent agio, and buying it in at four. These different *emoluments* amount to a good deal more than what is necessary for paying the salaries of officers, and defraying the expense of management.") (emphasis added).

Though the President cites to a Supreme Court decision in support of his claim that his narrow definition was more commonly used, his reliance on the Court's language in *Hoyt v. United States*, in this Court's view, is misplaced. In *Hoyt*, the Supreme Court was interpreting an 1802 statute referring to "the annual emoluments of any collector" of the customs. *Hoyt v. United States*, 51 U.S. 109, 135 (1850) (citing 2 Stat. 172, § 3 (1802)). Given that the term was tied to a particular office in that context, *Hoyt* has no broader teaching for understanding the term "emolument" in the present case.[29]

There is, moreover, a substantial body of evidence suggesting that the founding generation used the word "emolument" in a variety of contexts reaching well beyond payments tied to official duties.

Starting with the debates leading up to and during the Constitutional Convention, there are several instances of delegates discussing "emoluments" in a sense that cannot logically be read to mean simply payment for services rendered in an official capacity. For example, during the debates in the Continental Congress on the Articles of Confederation, George Walton, a delegate

---

[29] In fact, as Ms. Sills, a Non-Resident Fellow at Georgetown University Law Center, notes, in contrast to *Hoyt*, "other Supreme Court opinions reflect an understanding that the meaning of the term extends beyond compensation associated with a governmental office." Sills, *supra*, at 93 (citing *Charles River Bridge v. Warren Bridge*, 36 U.S. 420, 586 (1837) ("The proprietors have, under these grants, ever since continued to possess and enjoy the emoluments arising from the tolls taken for travel over the bridge; and it has proved a very profitable concern."); *Town of East Hartford v. Hartford Bridge Co.*, 51 U.S. 511, 516 (1850) ("That with the exception of the time when the bridge of the petitioners has been impassable, and said town of Hartford has by law been compelled to keep up said ferry, the said town of Hartford has not made any use of said ferry as a franchise, or derived any benefit or emolument therefrom, since the year 1814.")).

-28-

from Georgia, stated: "The Indian trade is of no essential service to any Colony . . . . The *emoluments* of the trade are not a compensation for the expense of donations." "[July 1776]," *Founders Online,* National Archives, last modified April 12, 2018, http://founders.archives.gov/documents/Adams/01-02-02-0006-0008 (emphasis added). Later on, at the Virginia Ratification Convention, Edmond Randolph, when discussing the purpose of the Foreign Emoluments Clause, used the term in a broad sense, stating "[a]ll men have a natural inherent right of receiving *emoluments* from any one, unless they be restrained by the regulations of the community . . . ." 3 Elliot, *supra*, at 465 (emphasis added). A logical reading of both sentences clearly reflects an understanding that "emolument" covers private market transactions, not merely official ones.

George Washington himself used the term "emolument" frequently in private commercial contexts consistent with Plaintiffs' interpretation. *See, e.g.,* ''Proclamation on Intercourse with British Warships, 29 April 1776," *Founders Online*, National Archives, last modified November 26, 2017, http://founders.archives.gov/documents/Washington/03-04-02-0132 (referring to "wicked Persons, preferring their own, present private *Emolument* to their Country's Weal") (emphasis added); "Virginia Nonimportation Resolutions, 22 June 1770," *Founders Online*, National Archives, last modified November 26, 2017, http://founders.archives.gov/documents/Jefferson/01-01-02-0032 (calling for a boycott of sellers of British and European goods who "have preferred their own private *emolument*, by importing or selling articles prohibited by this association, to the destruction of the dearest rights of the people of this colony." (emphasis added).[30] As President Trump himself notes, Washington's conduct "has been accorded significant weight." Def.'s Mot. Dismiss at 44 (citing Akhil Amar, *America's*

---

[30] For more examples of Washington's use of the term "emolument," *see* Mikhail, *The Definition of "Emolument," supra*, at 19-20 n.117; Legal Historians Br. at 23 n.68.

-29-

*Unwritten Constitution* 309 (2012) ("Washington set precedents from his earliest moments [as President] . . . . Over the ensuing centuries, the constitutional understandings that crystallized during the Washington administration have enjoyed special authority over a wide range of issues.")).

In fact, it seems that when the founding generation intended "emolument" to refer only to an official salary or payments tied to holding public office, they did so expressly. For example, The Federalist Papers, understood to have been penned by Hamilton and Madison, refer to "emoluments *of office*." The Federalist No. 55 (emphasis added). Washington also used this phrase in his correspondence. *See* Letter from George Washington to Joseph Jones (Dec. 14, 1782), Library of Congress Digital Collection, https://www.loc.gov/resource/mjm.01_0833_0835/?sp=2 ("if both were to fare equally alike with respect to the emoluments *of office*") (emphasis added).

Ignoring this large accumulation of historical evidence, the President places considerable emphasis on the failed constitutional amendment proposed in 1810, which sought to revoke the citizenship of any individual who accepted or retained "emoluments" from a foreign government. For a proposal that never became law, and apparently underwent virtually no debate by the Framers, it is doubtful that much, if any weight should be accorded to it. But if nothing else, insofar as the bill enjoyed any support, it was at the very least reflective of the extreme concern of its proponents over the potentially corrupting influence of payments from foreign governments.

In the Court's view, the decisive weight of historical evidence supports the conclusion that the common understanding of the term "emolument" during the founding era was that it covered any profit, gain, or advantage, including profits from private transactions. Consideration of the purpose of both Emoluments Clauses confirms the broad interpretation of the term suggested by Plaintiffs.

### 3) Constitutional Purpose

Plaintiffs argue that even if the meaning of the term "emolument" is deemed ambiguous, the constitutional purpose of the Clauses indicates that it was Plaintiffs' broader definition that was intended. Pls.' Opp'n at 32 (citing *Noel Canning*, 134 S. Ct. at 2561). As to the Foreign Emoluments Clause, Plaintiffs argue that the purpose of the Clause was to prevent the least possibility of undue influence and corruption being exerted upon the President by foreign governments. *Id.* at 34. That is, the Framers created a prophylactic rule to prevent the slightest chance of such influence. *Id.* Plaintiffs assert that the President's narrow interpretation, which they emphasize essentially boils down to the equivalent of a prohibition against bribery, would completely erode this aim. Bribery as a crime is very difficult to establish, they point out, and any requirement that a *quid pro quo* for official services has to be established would be easy to circumvent while at the same time difficult to prove. *Id.* at 42-43. It therefore seems highly unlikely that the Framers would have wanted to leave a large loophole that would preclude the Clause from accomplishing any meaningful purpose. *Id.*

As to the Domestic Emoluments Clause, Plaintiffs argue that it reflects a similar intention to "eliminate any pecuniary inducement the President might have to betray his constitutional duty in solely serving the People of the United States." *Id.* at 35. Citing The Federalist Papers, Plaintiffs assert that the Framers worried about any state government or its officials being able to tempt the President and cause him "to surrender" his "judgment to their inclinations," while forcing states to compete with each other to "appeal[] to his avarice." *Id.* (citing The Federalist No. 73 (Alexander Hamilton)).Thus, say Plaintiffs, it makes sense to infer that the Framers intended the term "emolument" to sweep broadly. *Id.* Moreover, because the Domestic Clause only covers "emoluments" and not "presents" as the Foreign Clause does, Plaintiffs point out that the

President's narrow definition of "emoluments," insofar as it would only cover payments for official services (i.e., bribery), would permit large—possibly unlimited—cash payments from the federal and state governments, so long as the payments were made for non-official personal services or so long as they are characterized simply as non-*quid pro quo* "presents." *Id.* at 43-44. These concerns, Plaintiffs argue, warrant interpreting "emolument" to encompass essentially "anything of value."

The President disputes that either the Foreign or Domestic Clause was intended to have the broad reach Plaintiffs advocate. Rather than being "comprehensive conflict-of-interest provisions covering every conceivable type of activity," he argues that the Clauses were only intended to prohibit receipt of specifically identified categories of compensation. Def.'s Reply at 21. For example, he says, the Foreign Emoluments Clause was adopted against the backdrop of a prevailing custom among European sovereigns to bestow valuable presents upon the conclusion of treaties. In his view, this concern was reflected in Edmond Randolph's speech at the Virginia Ratification Convention where he discussed an incident in which King Louis XVI of France bestowed gifts on American diplomats. Def.'s Mot. Dismiss at 38-39 (citing 3 Elliot, *supra*, at 465–66; Thomas Jefferson, Notes of Presents Given to American Diplomats by Foreign Governments, ca. 1791). The President submits that it is more likely that the Framers wanted to prevent incidents such as these rather than to prevent federal officials from maintaining private businesses. *Id.*

Similarly, according to the President, the Domestic Emoluments Clause was adopted to ensure that the President's compensation would remain unaltered during his tenure, not to prevent him from acting on the same terms as every other citizen in transacting private business. *Id.* at 40.

-32-

The President claims that these narrower intentions are supported by the fact that it was common at the time of the founding for federal officials to maintain their own private businesses. Def.'s Reply at 21. He argues that, had the Farmers intended to encompass benefits from private commercial transactions, they surely would have raised this issue. Yet, the President notes, the debates reflect no concern over constraints on private business. *Id.*; Def.'s Mot. Dismiss at 40-41.

The President also argues that Plaintiffs' interpretation would create absurd consequences today. Def.'s Mot. Dismiss at 51-52. For example, he claims that if the Court were to adopt Plaintiffs' interpretation, it would mean that a federal official's stock holdings in a global company would violate the Foreign Emoluments Clause if some of that company's earnings could be traced to foreign governments. *Id.* at 52. In light of extremes such as this, the President urges the Court to reject Plaintiffs' broad interpretation.

Notwithstanding the parade of horribles the President calls up, the Court does not see how the historical record reflects anything other than an intention that the Emoluments Clauses function as broad anti-corruption provisions.

The Foreign Emoluments Clause was unquestionably adopted against a background of profound concern on the part of the Framers over possible foreign influence upon the President (and, to be sure, upon other federal officials). It is true that European heads of state before 1787 frequently conferred gifts on foreign statesmen, undoubtedly in many instances for the express purpose of currying favor with them. *See* Teachout, *Corruption in America, supra*, at 1-5. For example, Charles Coteworth Pinckney, a delegate to the Constitutional Convention from South Carolina who is credited with providing the final language for the Foreign Emoluments Clause, when speaking later at the South Carolina Ratification Convention, referred to the bribe of "Charles II., who sold Dunkirk to Louis XIV." *See* 4 Elliot, *supra,* at 264 (Pinckney discussing the

susceptibility of the President to bribes). By the time of the Constitutional Convention, the delegates were "deeply concerned that foreign interests would try to use their wealth to tempt public servants and sway the foreign policy decisions of the new government." Zephyr Teachout, *The Anti-Corruption Principle*, 94 Cornell L. Rev. 341, 361 (2009); *see also* Sills, *supra*, at 72 (noting that Madison recorded that "15 delegates used the term 'corruption'; no less than 54 times" during the Constitutional Convention) (citing James D. Savage, *Corruption and Virtue at the Constitutional Convention*, 56 J. Pol'y 174, 174–76, 181–82 (1994)).

Interestingly, during the Convention, the Framers did not include a Foreign Emoluments Clause in the first drafts of the Constitution. But the omission was soon perceived as being inconsistent with the Articles of Confederation, which had provided that: "[N]or shall any person holding any office of profit or trust under the United States, or any of them, accept any present, emolument, office or title of any kind whatever from any King, Prince or foreign State." Articles of Confederation of 1781, art.VI. This provision in the Articles, without a doubt, was drastic. Apparently in the view of some at the time, such a flat prohibition against any such offerings by foreign governments could prove needlessly insulting to the foreign powers that only intended by their offering to express some sort of gratitude to representatives of the United States. Accordingly, there was a sense that a more flexible provision was needed. And very soon it came about. In general, federal officials would be prohibited from receiving any such benefits from foreign governments but, in appropriate circumstances, Congress would still be able to approve such offerings. *See* Sills, *supra*, at 69-71. Once the Foreign Emoluments Clause incorporated this compromise, it appears to have sailed through the Constitutional Convention. Pinckney introduced what would become the final language of the Clause on August 23, 1787. As reported by James Madison, Pinckney's rationale was to establish "the necessity of preserving foreign Ministers &

other officers of the U.S. independent of external influence." 2 Max Farrand, *The Records of the Federal Convention of 1787* 389 (Max Farrand ed., Yale Univ. Press 1911). Joseph Story would later explain that the Foreign Emoluments Clause was adopted to protect against "foreign influence of *every sort*." Joseph Story, 3 *Commentaries of the Constitution* 215-16 (1833) (emphasis added).

These concerns were carried forward to the ratification debates in the States. For example, during the Virginia Ratification Convention, in conjunction with a debate over Presidential elections, Edmond Randolph explained the purpose of the Foreign Emoluments Clause as a restriction "provided to prevent corruption." *See* 3 Elliot, *supra*, 465. At the same Convention, George Mason responded, expressing concern that it would be "difficult to know whether [the executive] receives emoluments from foreign powers or not" and that "the great powers of Europe" would "be interested in having a friend in the President of the United States." *Id.* at 484.

These anti-corruption concerns spilled over as well into discussion of the Domestic Emoluments Clause. Alexander Hamilton, in The Federalist No. 73, wrote that power over the President's salary would allow the legislature to "tempt him by largesses, to surrender at [his] discretion his judgment to their inclinations." Hamilton went on to say that "power over a man's support is a power over his will." *Id.* To combat this potential influence over the President, Hamilton emphasized that the Domestic Emoluments Clause should be applied broadly to protect the President's independence:

> They can neither weaken his fortitude by operating on his
> necessities, nor corrupt his integrity by appealing to his avarice.
> Neither the Union, nor any of its members, will be at liberty to
> give nor will he be at liberty to receive, any other emolument
> than that which may have been determined by the first act. He
> can, of course, have no pecuniary inducement to renounce or
> desert the independence intended for him by the Constitution.

-35-

*Id*. Hamilton's statements most assuredly reflect a broader concern than merely "ensuring that a President's compensation remained unaltered during tenure." Def.'s Mot. Dismiss at 39.

Given these fundamental preoccupations, the President's interpretation of the limited meaning of the Emoluments Clauses cannot be the correct one. Yet again, his narrow interpretation of the word "emolument" would reduce the Clauses to little more than a prohibition of bribery which, in addition to already being addressed elsewhere in the Constitution,[31] is, as Plaintiffs argue, a very difficult crime to prove. The recent Supreme Court case *McDonnell v. United States*, 136 S. Ct. 2355 (2016), which involved receipt by the Governor of Virginia of numerous cash and in-kind benefits from a constituent, demonstrates the difficulty of determining precisely what constitutes an "official act" sufficient to establish a criminal *quid pro quo*. After *McDonnell*, "[t]o qualify as an 'official act,' the public official must make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." *Id.* at 2372. Merely "setting up a meeting, talking to another official, or organizing an event" is not sufficient. *Id.* How difficult would it be, then, to demonstrate which payments made to the President by foreign, the federal, or domestic governments were being offered to him in an official capacity? As Professor Teachout has noted, "[c]orruption, in the American tradition, does not just include blatant bribes and theft from the public till, [it] encompasses many situations where politicians and public institutions serve private interests at the public's expense." Teachout, *Corruption in America*, *supra*, at 2. Where, for example, a President maintains a premier hotel property that generates millions of dollars a year in profits, how likely is it that he will not be swayed, whether consciously or subconsciously, in any or all of his dealings with foreign or

---

[31] U.S. Const. art. II, § 4 provides: "The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors."

domestic governments that might choose to spend large sums of money at that hotel property?[32]

How, indeed, could it ever be proven, in a given case, that he had actually been influenced by the

payments? The Framers of the Clauses made it simple. Ban the offerings altogether (unless, in the

foreign context at least, Congress sees fit to approve them).[33]

       Contrary to the President's assertion that the history surrounding the Clauses' adoption is

"devoid of concern about private commercial business arrangements," several State constitutions

adopted prior to the Convention were specifically designed to prevent public officials from placing

their private commercial interests over their duties to the American people. *See, e.g.*, Pa. Const. art.

V (1776) ("That government is, or ought to be, instituted for the common benefit, protection and

security of the people, nation or community; and not for the particular *emolument* or advantage of

any single man, family, or set of men, who are a part only of that community.") (emphasis added);

Virginia Declaration of Rights, art. IV (1776) ("That no man, or set of men, are entitled to

exclusive or separate *emoluments* or privileges from the community, but in consideration of public

services . . . .") (emphasis added). Though the President places much emphasis on the fact that

---

[32] As recently reported in the press, the President's Hotel in Washington "is one of [his] best performing properties." The President's recent financial disclosure listed the revenue of the Hotel at $40.4 million for the 2017 calendar year. Steve Eder, Eric Lipton, & Ben Protess, *Trump Discloses Cohen Payment Raising Questions About Previous Omission*, N.Y. Times (May 16, 2018), https://www.nytimes.com/2018/05/16/us/politics/trump-financial-disclosure.html. It remains to be seen how much of that revenue comes from foreign, federal, and domestic governments.

[33] Recognizing the possibility of foreign influence on the actions of federal officials in general, Congress enacted the Foreign Gifts and Decorations Act, 5 U.S.C. § 7342, which prevents federal employees, including the President, from accepting any more than a *de minimis* "gift or decoration," except in accordance with certain proscribed provisions. Those provisions require federal officials to file reports of such offerings with their respective agencies, which then review the filings for compliance with the Act. *Id.* § 7342(f).

The statute holds interesting implications for the present case. It applies to a "gift" from a foreign government—essentially synonymous with the term "present" in the Foreign Emoluments Clause—but does not cover "emoluments." This seems to suggest that, in enacting the statute, Congress understood that "emolument" had a meaning separate and distinct from "present" (i.e., gift) in the Foreign Clause.

Further, the statute establishes a procedure for obtaining the approval Congress is required to give under the Foreign Clause, delegating to various agencies the actual authority to approve a foreign "gift" (i.e., "present"). Any other "profit," "gain," or "advantage" received from a foreign government—as Plaintiffs have appropriately defined "emolument"—would be left to Congressional approval on a case-by-case basis.

-37-

many of the Framers and early Presidents maintained private businesses that "likely" transacted with foreign and domestic governments, he offers no evidence confirming this in fact to have been so. In any event, it must be remembered that the Emoluments Clauses only prohibit profiting from transactions with foreign, the federal, or domestic *governments*; they do not prohibit all private foreign or domestic transactions on the part of a federal official. Absent the least evidence that early Presidents maintained businesses involving foreign and domestic *governments*, the President's argument in this regard, even if theoretically relevant, is based wholly on speculation.

Finally, the Court does not accept the President's argument that construing the term "emolument" broadly would result in the absurd consequences of which he warns. The historical record demonstrates that the Framers were fundamentally concerned with transactions that could potentially influence the President's decisions in his dealings with specific foreign or domestic governments, not with *de minimis* situations.[34] Clearly "emoluments" such as mutual funds or "mere stock holdings by a covered official in companies that conduct business globally," Def.'s Mot. Dismiss at 52, of the sort that could be traced to a foreign or domestic *government* are *de minimis*. It is highly doubtful that instances such as these could be reasonably construed as having the potential to unduly influence a public official.[35]  On the other hand, sole or substantial ownership of a business that receives hundreds of thousands or millions of dollars a year in revenue from one of its hotel properties where foreign and domestic governments are known to stay (often with the express purpose of cultivating the President's good graces) most definitely

---

[34]  Yet another very familiar Latin precept to the fore: *De minimis non curat lex* ("The law takes no note of trifles.").

[35]  If, however, the federal official owned a majority stake in a company that transacted extensive business with foreign or domestic governments or if it could be shown that a foreign or domestic government was using the company as a conduit to improperly influence the federal official, this would almost certainly no longer be *de minimis*.

-38-

raises the potential for undue influence, and would be well within the contemplation of the Clauses.[36]

The Court is satisfied, consistent with the text and the original public meaning of the term "emolument," that the historical record reflects that the Framers were acutely aware of and concerned about the potential for foreign or domestic influence of any sort over the President. An "emolument" within the meaning of the Emoluments Clauses was intended to reach beyond simple payment for services rendered by a federal official in his official capacity, which in effect would merely restate a prohibition against bribery. The term was intended to embrace and ban anything more than *de minimis* profit, gain, or advantage offered to a public official in his private capacity as well, wholly apart from his official salary.

### 4)  Executive Branch Precedent and Practice

In further support of their position, Plaintiffs emphasize that the Office of Legal Counsel (OLC) and the Comptroller General of the United States[37] have consistently interpreted the term "emolument" to cover "any profits" accepted from a foreign or domestic government. Pls.' Opp'n at 36 (citing *Applicability of the Emoluments Clause to Non-Gonverment Members of ACUS,* 17 Op. O.L.C. 114, 119 (1993)). The Government has reached this conclusion, Plaintiffs emphasize, even in the absence of "direct personal contact or relationship between the [federal officer] and a

---

[36]  The President has argued that former Secretary of Commerce Penny Pritzker's stock holdings in Hyatt Hotels, which foreign and presumably state governments may have patronized, could constitute Emoluments Clause violations under Plaintiffs' interpretation. Similarly, counsel has suggested that President Obama's book sales to a foreign government, from which he presumably received royalties, could be prohibited based on Plaintiffs' interpretation of what constitutes "emoluments." Hr'g Tr. at 27:5-17; 33:2-21. The Court obviously does not have sufficient facts before it as to those transactions to be able to hypothesize whether or not they involved Emoluments Clause violations. As far as the Court can tell, no one ever raised such challenges. In any event, the fact that no one may have challenged these transactions in no way establishes that Plaintiffs' interpretation of the term "emolument" in the present case is erroneous.

[37]  As to the OLC, see note 16, *supra.* The Comptroller General heads the Government Accountability Office, an agency within the legislative branch of the federal government. It carries out audit, evaluative, and investigative assignments, provides legal analyses to Congress, and issues legal decisions. "Office of the Comptroller General," U.S. Government Accountability Office, https://www.gao.gov/about/workforce/ocg.html.

-39-

foreign government." Pls.' Opp'n at 36, 47 (citing 17 Op. O.L.C. at 117-119 (concluding that the Foreign Emoluments Clause applied to federal officers who were also partners in law firms that did business with foreign governments)). Plaintiffs cite a recent opinion of the Office of Congressional Ethics (OCE)[38] which they claim is directly on point. *Id.* at 37 (citing OCE Report, Review No. 17-1147 (June 2, 2017)). In that opinion, the OCE determined that a federal officeholder's acceptance of profits derived from the rental of rooms to a foreign government violated the Foreign Emoluments Clause. *Id.* Plaintiffs urge the Court to give considerable weight to these Government opinions, noting that the President has cited no precedent from any of these agencies applying his narrower definition of "emolument." *Id.*

Notwithstanding his inability to cite opinions squarely in his favor, the President insists that his position is not inconsistent with the Government opinions Plaintiffs cite. Indeed, he says, the facts underlying many of the opinions on which Plaintiffs rely in fact involved proposed employment relationships between a federal official and a foreign government. Def.'s Reply at 22. For example, he says, two of the OLC opinions cited by Plaintiffs concerned the prospective rendering of personal services by the federal official to the foreign government. *Id.* (citing *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 156-57 (1982) (a Nuclear Regulatory Commission employee could not "on his leave time" work for an American consulting firm on a project for the Mexican government where the firm secured the contract based solely on the employee's expertise and would pay the employee using foreign funds); Memorandum from H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, O.L.C., *Re: Emoluments*

---

[38] The Office of Congressional Ethics (OCE) of the U.S. House of Representatives is an independent, non-partisan entity charged with reviewing allegations of misconduct against Members, officers, and staff of the U.S. House of Representatives. "Learn about the Office of Congressional Ethics," Office of Congressional Ethics, https://oce.house.gov/.

*Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales*, at 1 (May 23, 1986), *available at* https://www.politico.com/f/?id=00000158-b547-db1e-a1f9-ff7f60920001 (Foreign Emoluments Clause could apply to NASA scientist accepting a fee for providing consulting services to a foreign university)). Thus, he claims, the Government opinions upon which Plaintiffs rely are distinguishable from the instant case.

The President also cites a 1981 OLC opinion and a 1983 Comptroller General decision, both relating to President Ronald Reagan's retirement benefits from the State of California, which he contends, implicitly at least, run counter to Plaintiffs' position. Def.'s Reply at 24; Def.'s Mot. Dismiss at 47-48 (citing *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, (1981); Comp. Gen. B-207467, 1983 WL 27823 (1983)). In those decisions, both Government entities determined that while in office, President Reagan could continue to receive retirement benefits from the State of California, where he had served as Governor, without violating the Domestic Emoluments Clause. Def.'s Mot. Dismiss at 47. According to President Trump, these decisions cannot be squared with Plaintiffs' definition of "emolument," since retirement benefits surely fall within "anything of value." Def.'s Reply at 24.

Historical practice, the President says, supports his position. He points to a business transaction President Washington had with the Federal Government wherein, as a private citizen, he purchased several lots of public land at a public sale. Though Washington himself had authorized the sale and the sale was conducted by the Commissioners of the District of Columbia, President Trump notes that no one at the time voiced Domestic Emoluments Clause concerns. This, he claims, indicates that private commercial transactions were not thought as being within the scope of the Clause. Def.'s Mot. Dismiss at 43 (citing Certificate for Lots Purchased in the

-41-

District of Columbia (Sept. 18, 1793),

http://founders.archives.gov/documents/Washington/05-14-02-0074). This is especially

important, he submits, because President Washington's conduct has been accorded great weight in

constitutional interpretation. Def.'s Reply at 26.

Moreover, the President notes, President Washington's conduct was hardly unique. The

President highlights the fact that many early Presidents engaged in private commerce, suggesting

that it is reasonable *to infer* that at least some of their transactions must have been with foreign or

state government entities. *Id.*

The Court finds executive branch precedent and practice overwhelmingly consistent with

Plaintiffs' expansive view of the meaning of the term "emolument." The President has not cited a

single Government opinion that conclusively supports his position. He simply submits that his

proposed definition is "not inconsistent" with existing precedent. That sort of argument clearly

does not make the grade. OLC pronouncements repeatedly cite the broad purpose of the Clauses

and the expansive reach of the term "emolument." *See, e.g.*, *Applicability of Emoluments Clause to

Proposed Service of Government Employee on Commission of International Historians*, 11 Op.

O.L.C. 89, 90 (1987) ("Consistent with its expansive language and underlying purpose, the

[Foreign Emoluments Clause] has been interpreted as being 'particularly directed against every

kind of influence by foreign governments upon officers of the United States, based upon historic

policies as a nation.'" (quoting 24 Op. Att'y Gen. 116, 117 (1902) (emphasis omitted));

*Applicability of the Emoluments Clause to Nongovernment Members of ACUS*, 17 Op. O.L.C. 114,

121 (1993) ("The language of the Emoluments Clause is both sweeping and unqualified.");

Memorandum for Andrew F. Oehmann, Office of the Attorney General, from Norbert A. Schlei,

Assistant Attorney General, Office of Legal Counsel, *Re: Invitation by Italian Government to*

*officials of the Immigration & Naturalization Service & a Member of the White House Staff* at 2
(Oct. 16, 1962), https://www.justice.gov/olc/ page/file/935741/download (noting "the sweeping
nature of the constitutional prohibition and the fact that in the past it has been strictly construed,
being directed against every possible kind of influence by foreign governments over officers of the
United States."); *see also* Sills, *supra*, at 84-85 ("Longstanding OLC and DOJ opinions dating
back to1902 have embraced this definition."). The main takeaway from executive precedent stands
in bold relief: The Emoluments Clauses are intended to protect against any type of potentially
improper influence by foreign, the federal, and state governments upon the President.

Further, in line with the purposive analysis when deciding whether a particular
arrangement is constitutional, Government officials have carefully considered the extent to which
the arrangement at issue contains the potential for improper influence.[39] When that potential has
been determined to exist, the Government has found Emoluments Clause violations. Take, for
instance, the 1993 OLC opinion cited by Plaintiffs that concerned members of the Administrative
Conference of the United States (ACUS),[40] who were also lawyers at private law firms. The
question was whether they could receive partnership distributions from their firms where the firms
received fees from foreign government clients. The OLC concluded that this was prohibited even
though the lawyers "did not personally represent a foreign government, and indeed where they had
no personal contact with that client of the firm." 17 Op. O.L.C. at 119. In reaching this conclusion,
the OLC stated:

---

[39] The purposive analysis effectively brings down the President's argument that "absurd consequences" would result
from Plaintiffs' interpretation of the term. None of the hypotheticals he cites are of the sort that would suggest the
possibility of improper influence over the President. *See* discussion in Section III.B.3, *supra*.

[40] ACUS is a nonpartisan, independent federal agency charged with convening expert representatives from the public
and private sectors to recommend improvements to administrative process and procedure. "About," Administrative
Conference of the United States, https://www.acus.gov/.

> Because the amount the Conference member would receive
> from the partnership's profits would be a function of the amount
> paid to the firm by the foreign government, the partnership
> would in effect be a conduit for that government. Thus, some
> portion of the member's income could fairly be attributed to a
> foreign government. We believe that acceptance of that portion
> of the member's partnership share would constitute a prohibited
> emolument.

*Id.* This language directly contradicts the President's suggestion that there can be no violation of the Foreign Clause if the federal official is receiving benefits in a private capacity.[41]

One of the OCE's more recent opinions leaves little doubt that official action is not required before there can be an Emoluments Clause violation. In a June 2, 2017, opinion, the OCE directly addressed the question of whether a federal official's acceptance of profit derived from the rental of rooms to a foreign government runs afoul of the Foreign Emoluments Clause. The OCE concluded that "the term 'emoluments' is not limited to payments from a foreign government that result from an individual's official duties" but that "the receipt of profit from a foreign government for rental property may implicate the constitutional prohibition against receipt of 'any emolument' of 'any kind whatever' from a foreign state." *See* OCE Report, Review No. 17-1147 at 12-13 (June 2, 2017), https://ethics.house.gov/sites/ethics.house.gov/files/OCE%20Report%20and%20Findings_6.pdf.

The President falls back on the Government opinions concerning President Reagan's California retirement funds, but the Court finds those decisions easily distinguishable. As Plaintiffs suggest, both the OLC and the Comptroller General reached the conclusion that there were no was no Domestic Emoluments Clause violation after determining that the retirement

---

[41] Though the OLC subsequently reconsidered its conclusion in this case on the ground that the private members of the ACUS were not in fact officials within the meaning of the Foreign Emoluments Clause, it did not revise its previous analysis that the monies were in fact "emoluments" covered by the Clause. *Applicability of the Emoluments Clause to Nongovernmental Members of ACUS*, 34 Op. O.L.C. (June 3, 2010), https://www.justice.gov/sites/default/files/olc/opinions/2010/06/31/acus-emoluments-clause_0.pdf.

benefits from his time as Governor Reagan of California had become "vested rights" before he took office as President Reagan of the United States. *See President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 187–88 (1981) (stating the benefits were "vested rights" rather than "gratuities which the State is free to withdraw."); Comp. Gen. B-207467, 1983 WL 27823, at *3 (1983) (reaching the same conclusion because the benefits were "previously earned," "fully vested," and "set by statute"). Both decisions place great emphasis on whether the benefits at issue would be the type that could potentially influence the President. Given the vested nature of the retirement benefits prior to Governor Reagan's ascendancy to the Presidency, both the OLC and Comptroller General determined that they were not likely to have any effect. *See* 5 Op. O.L.C. at 192 (concluding that state pension "benefits are not emoluments in the constitutional sense," and their "receipt does not violate the spirit of the Constitution because they do not subject the President to any improper influence."); Comp. Gen. B-207467, 1983 WL 27823, at *3 (finding it "highly unlikely that the President could be swayed in his dealings with the State of California by the prospect of having his pension diminished or rescinded by the State."). On the other hand, profits received from foreign or domestic governments that patronize the Trump International Hotel for the express purpose of potentially currying favor with a sitting President present a stark contrast to the fully vested retirement benefits that then-Governor Reagan earned from the State of California which the State of California was not free to withdraw.

President Trump's appeal to historical practice does not aid his argument. As noted previously, he has provided no evidence—none—that any trading partners of the early Presidents actually were either foreign or domestic *governments*. Though he relies heavily on a purported potential Domestic Emoluments Clause violation by President Washington—the surrounding facts

of which are seriously incomplete (e.g., What sort of public auction was held? How was it advertised? How many bidders were involved?)—as Plaintiffs note, Washington later made clear that he was "ready to relinquish" the property if necessary, which itself calls into question the actual relevance of this transaction. *See* Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), *Founders Online,* National Archives, last modified November 26, 2017, http://founders.archives.gov/documents/Washington/05-15-02-0289. In any event, even indulging the inference that President Trump urges the Court to make regarding President Washington's purchase of public land, the Court would not find this single example substantial enough, when weighed against the vast amount of historical evidence, textual support, and executive branch precedent to the contrary, to support the President's narrow construction of the term "emolument."

Executive branch precedent and practice have clearly and consistently held, apart from *de minimis* instances,[42] that both Emoluments Clauses prohibit Presidents from receiving any profit, gain, or advantage from foreign, the federal, or domestic governments, except in the case of the Foreign Clause, where Congress approves. Based on precedent from the OLC and Comptroller General, there would be an exception, at least under the Domestic Emoluments Clause, where the thing of value received by the federal office holder, after the fashion of the Reagan-California pension precedent, was fully vested and indefeasible before the federal official became a federal official, the rationale being that the benefit would lack any potential to influence the federal office-holder in his decision-making.[43]

\* \* \*

---

[42] *Cf.* note 33, *supra*, regarding the Foreign Gifts and Decorations Act, 5 U.S.C. § 7342.

[43] *See* pages 45-46, *supra*.

For the foregoing reasons, the Court finds the President is subject to both Emoluments Clauses of the Constitution and that the term "emolument" in both Clauses extends to any profit, gain, or advantage, of more than *de minimis* value, received by him, directly or indirectly, from foreign, the federal, or domestic governments. This includes profits from private transactions, even those involving services given at fair market value.[44]  In the case of the Foreign Emoluments Clause, unless Congress approves, receipt of the emolument is prohibited. In the case of the Domestic Clause, receipt of any emolument is flatly prohibited.

## IV. THE PRESIDENT'S MOTION TO DISMISS

### A. Legal Standard

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) will be granted if the allegations in a complaint do not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and quotation marks omitted). "[I]n evaluating a Rule 12(b)(6) motion to dismiss, a court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

---

[44] But again there is the matter of private services compensated at a level above fair market value. If the President's definition of "emolument" is accepted, i.e., that it applies only to payments made to him qua President, what is to be made of payments to the Hotel by foreign, federal, or state governments at a premium over market? *See* note 14, *supra*. According to the President's attorney at oral argument, the answer is there is nothing to be done. *See* Hr'g Tr. at 33:22-34:10 (stating that this would not be an Emoluments Clause violation because "[i]t's just more profit").

**B.  The Applicability of the Emoluments Clauses**

Based on the foregoing, the Court finds that the Amended Complaint states plausible claims against the President under both the Foreign and Domestic Emoluments Clauses.[45]

*1)  Foreign Emoluments Clause Violations*

With respect to the Foreign Emoluments Clause, Plaintiffs have alleged that foreign governments or their instrumentalities have patronized the Trump International Hotel, spending government funds to stay at the Hotel, eat at its restaurant, and sponsor events in the Hotel's event spaces. Am. Compl. ¶¶ 39-43. They have done so in some cases with the express intention to cater to the good graces of the President. For example, the Amended Complaint alleges that the Kingdom of Saudi Arabia spent thousands of dollars at the Hotel between October 1, 2016, and March 31, 2017, and that the Embassy of Kuwait, moving from another private hotel in the District, held its National Day celebration at the Hotel on February 22, 2017. *Id*. ¶¶ 40-41. Plaintiffs allege that the President has received or potentially could receive the profits derived from these foreign governments through his ownership of the Hotel through the Trump

---

[45]  During oral argument, the President's counsel claimed that only two alleged violations are before the Court: 1) Hotel stays by foreign governments; and 2) the General Services Administration (GSA) Lease. Hr'g Tr. at 6:7-15; 43:23-25. However, in the course of their pleadings, Plaintiffs have asserted at least two other possible violations of the Domestic Emoluments Clause. One pertains to the issue of State government patronage of the Hotel and the other to tax subsidies granted to the Hotel by the District of Columbia. These allegations do not specifically appear in the Amended Complaint. *But see* Am. Compl. ¶ 98 ("Upon information and belief, federal, state, and local governments, or their instrumentalities, have made and will continue to make payments for the use of facilities owned or operated by the defendant for a variety of functions. The defendant will receive a portion of those payments, which constitute emoluments prohibited by the Domestic Emoluments Clause."). Even so, the Court notes that the President is already on fair notice as to these two additional allegations by reason of Plaintiffs' subsequent pleadings. The overarching purpose of Plaintiffs' case is to pursue the extent to which any precluded entities may have unduly bestowed actual or potential benefits upon the President through their patronage of the Trump International Hotel. The specific examples cited in the Amended Complaint are no more than that—examples. They do not limit Plaintiffs' ability to inquire only into the specific examples alleged. It is therefore inaccurate to say that only two possible violations are before the Court. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests' . . . . [It] does not need detailed factual allegations.") (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Here, Plaintiffs have sufficiently identified the possibility of these additional potential violations through their pleadings, which should at least permit them to be further explored on discovery. That said, at some point if need be, the Court will entertain a motion to further amend the Amended Complaint to embrace these and other appropriately "specific" alleged violations.

-48-

Organization. *Id.* ¶¶ 29, 34-36. Finally, Plaintiffs allege (and the President does not contest) that he has not received consent of Congress to receive such monies from foreign governments. *Id.* ¶ 33.

The Court finds that these allegations plausibly state a claim under the Foreign Emoluments Clause.

### 2) Domestic Emoluments Clause Violations

Plaintiffs make several claims with respect to the Domestic Emoluments Clause.

#### i. The GSA Lease

Plaintiffs allege that the Hotel received an emolument from the Federal Government in the form of the GSA Lease, which governs the Hotel's use of the Old Post Office Building in the District of Columbia, where the Hotel is situated. Section 37.19 of the Old Post Office Lease states: "No. . . elected official of the Government of the United States . . . shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom." Am. Compl. ¶ 82. Plaintiffs allege that, before the President's inauguration, the then-Deputy Commissioner of the GSA indicated that the President would be in violation of the Lease unless he fully divested himself of all financial interests in it. *Id.* ¶ 83. Shortly after his inauguration, the President replaced the Acting Administrator of the GSA. *Id.* Plaintiffs allege that several weeks later, on March 16, 2017, less than two months into his term, the President released a proposed budget for 2018 that increased the GSA's funding, while cutting back on other the funding of other agencies. *Id.* ¶ 84. On March 23, 2017, the GSA issued a letter determining that the President and the Hotel were not in violation of the Lease. *Id.* Plaintiffs allege that the GSA's abrupt about-face position was and is in direct contradiction of the plain terms of the Lease and that, by determining that the Hotel was and is in compliance with the Lease, the Federal Government bestowed upon the President an emolument in violation of the Domestic Emoluments Clause. *Id.* ¶ 86.

-49-

These allegations plausibly state a claim under the Domestic Emoluments Clause.

     ii.    <u>Patronage of the Hotel by State Governments</u>

In addition to foreign governments patronizing the Hotel, Plaintiffs claim that at least one State—Maine—has patronized the Hotel, spending state funds for its Governor and his entourage to stay at the Hotel and to frequent its facilities during an official visit of those officials to Washington, including an encounter with the President where Presidential action of interest to the Governor took place. Pls.' Opp'n. at 8. Plaintiffs allege on information and belief other States may have done likewise. *See* Am. Compl. ¶ 98.

These allegations plausibly state a claim under the Domestic Emoluments Clause.

     iii.    <u>Tax Concessions from the D.C. Government</u>

Plaintiffs further claim that, in connection with the Hotel, the President has received substantial tax concessions from the District of Columbia. Pls.' Opp'n at 12 (noting that "just one week after the election, the President's company re-filed a previously dismissed lawsuit against the District, seeking a reduction in its tax bill for the Hotel."). At the time of the briefing in this case, the Trump Organization had only applied for District of Columbia tax concessions. Since then, the District's tax authorities, according to a report in the *Washington Post*, after dismissal of a previously filed lawsuit, in fact granted the Hotel a reduction in the Organization's 2018 tax bill, for a savings of $991,367.00.[46]

These allegations plausibly state a claim under the Domestic Emoluments Clause.

---

[46] *See* Jonathan O'Connell, *Tax Official Reduce Trump's Tax Bill on D.C. Hotel by Nearly $1 Million*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/news/business/wp/2018/01/12/tax-officials-reduce-trumps-tax-bill-on-d-c-hotel-by-nearly-1-million/?utm_term=.6b527c071c30.

As with their Foreign Emoluments Clause claim, Plaintiffs allege that the President has received all the foregoing benefits on account of his ownership of the Hotel. Am. Compl. ¶¶ 29, 34-36.[47]

The Court finds that these allegations, depending on the evidence adduced, would fairly establish Plaintiffs' claims challenging the President's receipt of emoluments from the federal and state governments under the Domestic Emoluments Clause.

## V.    CONCLUSION

In sum, Plaintiffs have plausibly alleged that the President has been receiving or is potentially able to receive "emoluments" from foreign, the federal, and state governments in violation of the Constitution: They have stated viable claims for relief under both the Foreign and Domestic Emoluments Clauses.

Accordingly, the President's Motion to Dismiss is **DENIED** insofar as it pertains to the claims which the Court has determined Plaintiffs have standing to pursue, viz., that the President may have violated the Foreign and Domestic Emoluments Clauses of the Constitution insofar as he is involved, directly or indirectly, with the Trump International Hotel in Washington, D.C.

The Court **DIRECTS** the parties to promptly consult and within twenty-one (21) days submit a Joint Recommendation suggesting the next steps to be taken in the case, including whether any further amendment of the Amended Complaint is necessary, what the time for the President to file an Answer herein should be, what the general outline of any proposed discovery should be, and any other matter the parties deem appropriate to bring to the attention of the Court.

The Court will address the President's Motion to Dismiss the individual capacity claims against him in a subsequent Opinion.

---

[47] Congress is not mentioned in the Domestic Emoluments Clause. Consequently, it has no role to approve or disapprove the acceptance of any "emoluments" a federal official may receive from the federal or state governments.

Add. 100

A separate Order will **ISSUE.**

_/s/_
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**July 25, 2018**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **THE DISTRICT OF COLUMBIA** | * | |
| and **THE STATE OF MARYLAND,** | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. **PJM 17-1596** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| *individually and in his official capacity* | * | |
| *as President of the United States,* | * | |
| | * | |
| Defendant. | * | |

## ORDER

Having considered Defendant's Motion to Dismiss (ECF No. 21) and Plaintiffs'

Opposition thereto, following oral argument, it is, for the reasons stated in the accompanying

Opinion, this 25th day of July, 2018,

**ORDERED:**

1. Defendant's Motion to Dismiss (ECF No. 21) is **DENIED** insofar as it seeks

   to dismiss Plaintiffs' claims against the President in his official capacity that

   the President and the Trump International Hotel and all its appurtenances in

   Washington, D.C. and any and all operations of the Trump Organization with

   respect to the same have violated the Foreign and Domestic Emoluments

   Clauses of the U.S. Constitution. Plaintiffs have stated viable causes of action

   as to those claims.

2. The Court **DIRECTS** the parties to consult and submit a Joint

   Recommendation to the Court suggesting the next steps to be taken in the

   case, including whether any further amendment of the Amended Complaint is

necessary, what the time for the President to file an Answer herein should be, what the general outline of any proposed discovery should be, and any other matter the parties deem appropriate to bring to the attention of the Court.

a.  The Joint Recommendation shall be submitted within twenty-one (21) days hereof.

3.  The Court **DEFERS** ruling on the President's Motion to Dismiss the individual capacity claims against him (ECF No. 112).

4.  Any further hearing to consider the arguments in Defendant's Individual Capacity Motion to Dismiss will be set in consultation with counsel.

_____/s/_____
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **THE DISTRICT OF COLUMBIA** | * | |
| and **THE STATE OF MARYLAND,** | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. **PJM 17-1596** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| *in his official capacity as* | * | |
| *President of the United States*, | * | |
| | * | |
| Defendant. | * | |

## <u>MEMORANDUM OPINION</u>

### I.  Procedural Background

In a previous Opinion, the Court held that the District of Columbia and the State of Maryland have standing to challenge, in his official capacity, President Donald J. Trump based on his alleged violations of the Foreign and Domestic Emoluments Clauses of the U.S. Constitution.[1] The Court found that Plaintiffs had standing based on proprietary, quasi-sovereign, and *parens patriae* interests vis-a-vis the President's undisputed ownership interest in the Trump International Hotel in Washington.[2]

---

[1] *See* Opinion (March 28, 2018), ECF No. 101 (Standing Opinion).
[2] *Id.* at 12-29.

-1-

In a second Opinion, the Court considered the meaning of the term "emolument"
as used in the Clauses. The Foreign Clause bans any person holding an office of profit or
trust under the United States, (including, the Court found, the President) from accepting
without Congressional approval "any present, Emolument, Office, or Title, of any kind
whatever, from any King, Prince or foreign State." U.S. Const. art. I, § 9, cl. 8. The
Domestic Clause provides that "[t]he President shall… receive for his services, a
compensation…and he shall not receive within that period any other emolument from the
United States, or any of them." U.S. Const. art. II, § 1, cl. 7. Based on those constitutional
texts, as well as the virtually universal definition given the term "emolument" in
dictionaries and literature contemporaneous to the enactment of the Clauses, the purpose
of the Clauses, and ample historical evidence and executive branch precedent and
practice, the Court determined that the word "emolument" refers to any "profit," "gain"
or "advantage" of a more than *de minimis* nature.[3] Accordingly, the President's
ownership interest in the Trump International Hotel and his apparent receipt of benefits
from at least some foreign and state governments, as well as from the Federal
Government itself, suggest that he has received "emoluments" in violation of the
Constitution, giving rise to plausible causes of action against him brought by parties with
standing.

---

[3] *See* Opinion (July 25, 2018), ECF No. 123 (Emoluments Opinion).

The President has filed a Motion for Leave to Appeal (Interlocutory) and for a Stay Pending Appeal the Court's rulings, ECF No. 127, which Plaintiffs oppose. As part of the relief he requests, the President asks the Court to stay any and all discovery pending his appeal, again over Plaintiffs' objection.

The Court has reviewed the President's Motion and, for the reasons that follow, will **DENY** it.   His Motion for a Stay pending any appeal will also be **DENIED**.

## II. Questions the President Seeks to Have Certified

Pursuant to 28 U.S.C. § 1292(b), the President has identified four (4) purportedly controlling questions of law decided by the Court in its previous two opinions that he believes are certifiable: (1) the correct interpretation of the term "emolument" in the Emoluments Clauses of the Constitution and the scope of those Clauses; (2) whether Plaintiffs have asserted interests addressed by those Clauses and have an equitable cause of action under them; (3) whether Plaintiffs have Article III standing to pursue their claims; and (4) whether the Court has jurisdiction to issue declaratory and injunctive relief against the President. Def's Mot. for Appeal at 1.

## III.  Statutory Standards

a.    *In general*

28 U.S.C. § 1292(b) provides that when a district judge believes an order "[1] involves a controlling question of law [2] as to which there is substantial ground for difference of opinion [3] and that an immediate appeal from the order may materially

advance the ultimate termination of the litigation," the Judge may certify it for interlocutory appeal, "[*p*]*rovided, however*, That application… shall not stay proceedings" unless ordered by the district judge or appellate court.

Although noting that the Fourth Circuit has cautioned that § 1292(b) should be used sparingly, the President argues that the "Supreme Court has explained that 'district courts should not hesitate to certify an interlocutory appeal' when a decision 'involves a new legal question or is of special consequence.'" *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 111 (2009). Indeed, the Seventh Circuit, says the President, has "emphasize[d] the duty of the district court… to allow an immediate appeal to be taken when the statutory criteria are met." *Ahrenholz v. Board of Trustees*, 219 F.3d 674, 677 (7th Cir. 2000). For the purposes of § 1292(b), a "question of law" is "the meaning of a statutory or constitutional provision, regulation, or common law doctrine." *Lynn v. Monarch Recovery Mgmt, Inc.,* 953 F. Supp. 2d 612, 623 (D. Md. 2013). Def's Mot. for Appeal at 6-7 (Aug. 17, 2018), ECF No. 127.

Plaintiffs, for their part, cite the "general rule[ ]that 'a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error… may be ventilated.'" *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 712 (1996), and that the "'narrow' exception" for interlocutory appeals under § 1292(b) "should stay that way and never be allowed to swallow the general rule, that a party is entitled to a single appeal." *Dig. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868

-4-

(1994). "[E]ven when the elements of section 1292(b) are satisfied," say Plaintiffs, "the district court retains 'unfettered discretion' to deny certification." *Garber v. Office of the Comm'r of Baseball*, 120 F. Supp. 3d 334, 337 (S.D.N.Y. 2014). Plaintiffs say further that, consistent with interlocutory appeals remaining a narrow exception, "[c]ertification under section 1292(b) is improper if it is simply 'to provide early review of difficult rulings in hard cases.'" Pls.' Resp. in Opp'n at 2-3 (Sept. 17, 2018), ECF No. 133 (quoting *Butler v. DirectSAT USA, LLC*, 307 F.R.D. 445, 452 (D. Md. 2015)).

A district court's decision not to certify an interlocutory appeal is final and unreviewable. This is said to be so because a case must be certified to be considered by the Fourth Circuit; lack of certification therefore ordinarily precludes appellate court jurisdiction. *In re Pisgah Contractors, Inc.*, 117 F.3d 133, 137 (4th Cir. 1997) (explaining that the Fourth Circuit did not have subject matter jurisdiction where the district court declined to certify an interlocutory order for appeal). Failing to meet even one of the statutory requirements will defeat a litigant's request for an interlocutory appeal. *See, e.g.*, *Cooke-Bates v. Bayer Corp.*, 2010 WL 4789838, at *2 n.4 (E.D. Va. Nov. 16, 2010) (denying interlocutory appeal, and not deciding whether issues presented were controlling questions of law that may advance the termination of the litigation, because a nevertheless novel question was not particularly difficult and therefore did not present substantial grounds for disagreement); *Butler*, 307 F.R.D. at 452 ("Unless *all* of

-5-

the statutory criteria are satisfied . . . 'the district court may not and should not certify its order . . . under section 1292(b).'") (internal citation omitted).

  b. *Controlling Questions of Law*

  The President argues that the Fourth Circuit has recognized that "it may be proper to conduct an interlocutory review of an order presenting 'a pure question of law,' i.e., 'an abstract legal issue that the court of appeals can decide quickly and cleanly.'" Def's Mot. for Appeal at 7 (quoting *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017) (internal citation omitted)). Accordingly, the President cites cases to the effect that a question of law is "controlling" if its "resolution would be completely dispositive of the litigation, either as a legal or practical matter." *Butler*, 307 F.R.D. at 452 (internal quotation omitted). A ruling can also be controlling if it "control[s] many aspects of the proceedings in substantial respects, particularly the scope of the discovery . . . ." *In re Microsoft Corp. Antitrust Litigation*, 274 F. Supp. 2d 741, 742 (D. Md. 2003). In that event, the court noted that concerns bearing on the scope of discovery are particularly likely to be weighty when the case at hand, as occurred there, involves multi-district litigation where multiple competitor cases will be affected by the challenged order, as was the situation in *In re Microsoft*, *id.* at 742-43.

  Plaintiffs characterize a "controlling question of law" as "an issue that would, decided differently, terminate or substantially alter the suit." Pls.' Resp. in Opp'n at 3. For instance, "controlling questions . . . determine whether there should be any future

-6-

proceedings at all with respect to Plaintiffs' claims." *Moffett v. Comput. Scis. Corp.*, No. PJM 05-1547, 2010 WL 348701, at *2 (D. Md. Jan. 22, 2010). In his Reply, the President emphasizes that, although a question whose resolution may terminate the case is certainly one kind of controlling question, the standard for "controlling" questions "should be kept flexible*," Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991), and should include questions that control significant aspects of the proceedings, including discovery. Def's Reply (Sept. 26, 2018), ECF No. 134 at 3 (quoting *In re Microsoft Corp.*, 274 F. Supp. 2d at 742). Finally, a "controlling question of law" has been said to include orders that "if erroneous, would be reversible error on final appeal." *Lynn*, 953 F. Supp. at 623 (internal citation omitted).

c.      *Substantial Ground for Difference of Opinion*

The second statutory requirement that must be present for a district court to certify an interlocutory appeal is that the relevant controlling question of law is one "as to which there is substantial ground for difference of opinion." 28 U.S.C. § 1292(b).

The President argues that "[c]ourts have repeatedly recognized" that a "'novel issue' 'on which fair-minded jurists might reach contradictory conclusions' 'may be certified for interlocutory appeal without first awaiting development of contradictory precedent.'" Def's Mot. for Appeal at 10 (citing *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011); *see also In re Trump*, 874 F.3d 948, 952 (6th Cir. 2017) (quoting the same). "When a matter of first impression also had other grounds for

-7-

difference of opinion . . ., district courts in this circuit have certified the issue for interlocutory appeal." *Goodman v. Archbishop Curley High Sch., Inc.*, 195 F. Supp. 3d 767, 774 (D. Md. 2016) (quoting *Kennedy v. Villa St. Catherine, Inc.*, No. PWG-09-3021 (WDQ), 2010 WL 9009364, at *2 (D. Md. June 16, 2010)). Moreover, the President points out, "[t]he level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case." *Coal. For Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, No. CCB-06-2773, 2015 WL 4040425, at *6 (D. Md. June 29, 2015) (internal quotation omitted) (granting § 1292(b) certification in light of the "context of this extraordinarily important case"). The President believes that the present "case presents the extraordinary circumstance of allegations that a sitting President is violating the Constitution," and is now poised to be subject to "civil discovery in his official capacity." The President believes that this fact alone "counsels extreme restraint and warrants § 1292(b) certification." Def's Mot. for Appeal at 11.

Plaintiffs argue that there is only "substantial ground for difference of opinion" for § 1292(b) certification purposes when there is "substantial doubt that the district court's order was correct." *Goodman*, 195 F. Supp. 3d at 774 (internal citations omitted). They insist that a party's "own disappointment or disagreement with the outcome of an order does not rise to the level of substantial doubt." *See Lizarbe v. Rondon*, No. PJM 07-1809, 2009 WL 2487083, at *3 (D. Md. Aug. 12, 2009) (court found that where there was no

-8-

contrary authority other than party's own disagreement with controlling case law, there was no substantial ground for difference of opinion). In the same vein, "[a]n issue presents a substantial ground for difference of opinion if courts, as opposed to parties, disagree on a controlling legal issue." *Goodman*, 195 F. Supp. 3d at 774 (internal quotation omitted); Pls.' Resp. in Opp'n at 4.

Finally, the Court notes that the "mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *Lynn*, 953 F. Supp. 2d at 624 (quoting *In re Flor*, 79 F.3d 281, 284 (2d Cir.1996)). To be sure, however, questions of first impression have nevertheless been certified when they otherwise meet all statutory requirements for certification, novelty notwithstanding. *Id.* (quoting *Kennedy*, 2010 WL 9009364, at *2 (D. Md. June 16, 2010)).

   d.     *Likelihood of advancing the termination of the case*

The third and final statutory requirement for § 1292(b) certification purposes is that the controlling question of law as to which a substantial ground for difference of opinion exists is one where "an immediate appeal from the order may materially advance the ultimate termination of the litigation."

The President observes that the third and first statutory requirements for certification are interrelated. If an immediate appeal may materially advance the ultimate termination of the litigation, a question of law is necessarily "controlling" because it

-9-

"could advance the litigation by ending it," *Coal. For Equity & Excellence in Md. Higher Educ.*, 2015 WL 4040425, at *7, even if "other possible outcomes exist." *Kennedy*, 2010 WL 9009364, at *4. The President further suggests that this third requirement is met where the appeal would "eliminate complex issues so as to simplify the trial, or []eliminate issues to make discovery easier and less costly." *Lynn*, 953 F. Supp. 2d at 626 (internal quotation omitted). Def's Mot. for Appeal at 7-8; *see* Pls.' Resp. in Opp'n at 4.

The President submits that an interlocutory appeal of the four questions he raises is warranted because the resolution of any one of them in his favor would "either terminate this suit or at least substantially narrow the scope of this litigation," and because there is a "substantial ground for difference of opinion as to each" question. Def's Mot. for Appeal at 1-2. He believes this is particularly true with regard to his "view that to qualify as an 'Emolument,' the benefit must be a 'profit arising from an office or employ.'" *Id.* The Court considers the President's arguments and Plaintiffs' responses.

Plaintiffs submit that none of the questions the President seeks to certify is likely to advance the termination of or the reduction of significant aspects of the case. Most centrally, even were the Court of Appeals to accept the President's cramped interpretation of the meaning of "emoluments," i.e. that they are only prohibited if given for actions taken by the President as President—there is clear evidence that some foreign governments have explicitly stated that they are patronizing the Trump International Hotel precisely because the President, in effect, owns it. Accordingly, say Plaintiffs,

discovery would proceed in the case even if the term "emoluments" is more narrowly defined.

e.    *Court's interpretation of the term "Emolument"*

First and foremost, the President believes that the correct interpretation of the term "emolument" in the Emoluments Clauses and the scope of those Clauses is a controlling question of law because, if decided in his favor, this suit would be terminated or, at the very least, substantially narrowed in scope. Plaintiffs not only believe the Court's interpretation of the meaning of the term "emolument" is, by any analysis, correct; they argue that the issue is not even a controlling question of law. The Court agrees with Plaintiffs.

The President insists here, just as he did in his original brief, that his interpretation of what an "emolument" is– based on his reading of text, his review of contemporaneous definitions of the term, his understanding of the purpose of the Clauses, his take on historical evidence, and executive branch precedent and practice—is one as to which substantial grounds of disagreement exist, presumably in the sense that fair minded jurists might reasonably reach contradictory conclusions. The Court finds this a dubious proposition. Even now it remains unclear, as it did in connection with the President's original motion to dismiss, exactly how he came to his view of the meaning of "emolument."   What he said in his Motion to Dismiss and repeats now is that the President would have to receive payments for his services *as President* for the payments

-11-

to qualify as prohibited "emoluments;" in other words, over and above the salary he receives for his services as President, the Federal government, and foreign and state governments would have to make specific payments to him (or possibly provide non-monetary benefits) for Presidential acts before they would be constitutionally impermissible. *See, e.g.*, Def's Mot. for Appeal at 14. By every reasonable metric, this appears to describe what is tantamount to a bribe, so above all else the President's definition of the term "emolument" is exceedingly strained. To be sure, it may be a difference of opinion, ("emoluments… of any nature whatsoever"), but, in candor, as much as anything it appears to be little more than a lawyerly construct to establish a "difference of opinion," but not necessarily one as to which fair minded jurists might reach contradictory conclusions. *See* Emoluments Opinion at 31.

Plaintiffs, moreover, stress that "the President offers no authority demonstrating the disagreement *among courts* that is generally necessary to show substantial doubt as to the correctness of this Court's opinion." Pls.' Resp. in Opp'n at 11 (emphasis added) (citations omitted). They emphasize that the mere fact that the Court's ruling deals with an issue of first impression does not guarantee certification for purposes of interlocutory appeal. Indeed, say Plaintiffs, "[d]istrict judges have not been bashful about refusing to find substantial reason to question a ruling of law, even in matters of first impression." 16 Charles A. Wright, *Federal Practice and Procedure* § 3930 (3d ed. 2018). *See also Job v. Simply Wireless, Inc.*, No. 15-676, 2016 WL 8229037, at \*2 (E.D. Va. Jan 19, 2016)

(rejecting defendants' argument that "an interlocutory appeal is warranted every time a district court interprets novel contractual language" as "plainly inconsistent with the strong policy favoring appeals only from final orders"); *In re Loy*, No. 07-51040-FJS, 2011 WL 2619253, at *9 (E.D. Va. 2011) (noting that the fact that a case involves "novel issues . . . is not conclusive that a substantial ground for difference of opinion exists"). Plaintiffs conclude that certification is particularly inapt in a situation where, as here, the "Court has unambiguously determined that *none* of the President's definitional arguments withstand scrutiny." Pls.' Resp. in Opp'n at 13.

Additionally, the Court finds no substantial ground for difference of opinion *among courts* as to the meaning of "emolument" that meets the § 1292(b) standard. The Court's own 52-page opinion on the subject, rather than "highlight[ing] the complexity of the interpretive task," as the President suggests, Def's Mot. for Appeal at 11, provides an extensive explanation of how and why the vast weight of textual, definitional, and historical evidence and executive branch precedent and practice justify the broader reading of the term "emolument" given by the Court than what the President puts forth.

It is clear that the President, unhappy with the Court's reasoning and conclusion, merely reargues that his interpretation of the Emoluments Clauses should apply instead of the one the Court gave. He challenges the Court's interpretation of the text of the Clauses; the original definitions and public meaning of the term "emolument"; the purpose of the Emoluments Clauses; their historical context; and the consistent

-13-

interpretation that the executive branch offices have given the term or related terms over the years. The Court sees no point in stating again why it concluded as it did as to each of these issues. Clearly the President believes that the Court made incorrect holdings; it is another matter altogether, however, for him to establish the requisite "substantial difference of opinion" over the Court's rulings apart from that. He has not done so. Although the President cites to the decision of Judge Daniels in the *CREW* case as a court disagreeing over the purpose of the protection the Clauses offer, the fact is that Judge Daniels engaged in no analysis at all as to the meaning of the Emoluments Clauses. Rightly or wrongly, he dismissed the case on standing grounds. Any comment he may have made as to the meaning of the term were extraneous to the *ratio decidendi* of his decision. *See Citizens for Responsibility and Ethics in Washington v. Trump*, 276 F. Supp. 3d 174 (S.D.N.Y. Dec. 21, 2017) ("the CREW case").

The Court returns to the proposition that "a party's own disagreement with a district court's conclusion does not constitute 'substantial ground[s] for difference of opinion.'" *Al Maqaleh v. Gates*, 620 F. Supp. 2d 51, 55 (D.D.C. 2009) (internal quotation omitted). Furthermore, insofar as a question may arise for the first time, it has been held that while district courts may consider novelty as a determinative factor in certifying an order, they should do so only *where the other statutory requirements for certification are already met* and where the "matter of first impression also ha[s] other grounds for

-14-

difference of opinion." *Lynn*, 953 F. Supp. 2d at 624 (alteration in original) (quoting *Kennedy*, 2010 WL 9009364, at *2).

All this said, as the Court had occasion to point out in its earlier opinion, even accepting the President's proposed definition of "emolument," Plaintiffs have still plausibly stated a claim in this case. Emoluments Opinion at 19. For instance, insofar as foreign governments have expressly stated in the media that they are patronizing the President's hotel precisely because he is the President, and insofar as foreign governments such as Kuwait and Saudi Arabia have demonstrably done so, their payments could still constitute an "emolument" foursquare within the President's definition of the word, especially if, what appears likely, the payments to his hotel are being made with an expectation of favorable treatment by the President in matters of foreign policy. As a result, even if the appellate court were to disagree with this Court's definition of "emolument" and embrace the President's, Plaintiffs' claims in this case would still remain viable under the definition of "emolument" the President himself appears to embrace.

Finally, there is genuine concern on the part of Plaintiffs, indeed the Court shares it, that if the President is permitted to appeal the Court's decisions in piecemeal fashion, ultimate resolution of the case could be delayed significantly, perhaps for years, since it is quite likely the President would seek to appeal an adverse decision from the Fourth Circuit to the U.S. Supreme Court. That, as a matter of justice, cannot be countenanced.

There is no substantial disagreement over the meaning of the term "emolument" in the sense that reasonable jurists, much less courts, would disagree, nor would resolution of that question in favor of the President on appeal be likely to materially advance the ultimate termination of the proceedings or otherwise streamline the proceedings in any material respect. *See supra pp*. 10-11. The Court's ruling as to the meaning of "emolument" is not appropriate for certification.

> f.     *Whether Plaintiffs have interests addressed by the Emoluments Clauses*
>
> *and have an equitable cause of action under them*

The second question the President identifies for interlocutory appeal is whether the Plaintiffs have asserted interests addressed by the Emoluments Clauses and have an equitable cause of action under them. He disagrees with the Court that the Emoluments Clauses "were intended to protect against competitive injuries to particular members of the public" or that the Court "may recognize an equitable cause of action by a private person to enforce" them. Def's Mot. for Appeal at 22. He begins, as of course he must, by arguing the question of Plaintiffs' standing is a controlling question of law as to which there is substantial disagreement, which is to say, one that fair minded jurists disagree over or as to which diverse courts have opined. The Court has just rejected this argument.

But, further, Plaintiffs argue that their standing is not a controlling question of law because the Court found that they "have standing based on harms to their proprietary, *parens patriae*, and quasi-sovereign interests." Pls.' Resp. in Opp'n at 5. *See* Standing

-16-

Opinion at 20, 25, 29. On the other hand, the President, in his motion seeking certification for leave to appeal, only discusses the Court's ruling on the question of competitor standing. Again, therefore, Plaintiffs conclude, an appellate decision favorable to the President—i.e., were the Court to find that the Emoluments Clauses were not meant to protect competitors' economic interests—would still leave Plaintiffs free to proceed in their capacities as *parens patriae* and quasi-sovereigns. Pls.' Resp. in Opp'n at 6. The President has sought to salvage his argument in his Reply, suggesting that "by 'economic interests,' he was clearly referring to interests against 'competitive injuries,'… which would encompass both Plaintiffs' proprietary and asserted *parens patriae* interests." Def's Reply at 10. The President's reply gains him no ground.

As the Court explained in its Standing Opinion, the District of Columbia and the State of Maryland have standing as *parens patriae* in part because of the apparent competitive economic injuries sustained by their residents as a result of competitive advantages enjoyed by the Trump International Hotel. The Court also held that as *parens patriae* and by reason of the District and Maryland's quasi-sovereign positions, they are acting appropriately to protect their state economies and governance interests. Standing Opinion at 15. That is, on behalf of their citizens, Plaintiffs assert "public or governmental interests that concern the State as a whole." Standing Opinion at 25 n.14, 26 (citing *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007)). Although the President goes on at length, arguing that contrary to the Court's ruling, competitor standing does

not apply in this case, *see* Def's Mot. for Appeal 22-23; Def's Reply at 12-13, the Court agrees with Plaintiffs that even an appellate ruling in favor of the President on this point would not preclude Plaintiffs from pursuing their claims as *parens patriae* and quasi-sovereigns. In other words, resolving the President's question differently on appeal would not substantially narrow or terminate this litigation, and is not therefore a controlling question for the purposes of certification under § 1292(b). While this alone suffices to deny certification of this particular question, for the sake of completeness, the Court considers the President's further arguments on this issue.

The President points to Judge Daniels' decision in the *CREW* case as an instance of another court disagreeing over whether business competitors are within the Emoluments Clauses' zones of interest. Def's Mot. for Appeal at 22. To be sure, Judge Daniels did say that,

> [n]othing in the text or the history of the Emoluments Clauses suggests that the Framers intended these provisions to protect anyone from competition. The prohibitions contained in these Clauses arose from the Framers' concern with protecting the new government from corruption and undue influence."

276 F. Supp. 3d at 187.

The quoted language from Judge Daniel's decision, however, is pure dicta. After finding that plaintiffs there—a non-profit organization (CREW) and two private citizens—had failed to show injury-in-fact for standing purposes, Judge Daniels went on to opine that business competitor plaintiffs are not within the zone of interests of the

-18-

Emoluments Clauses and thus could not invoke their protection. Even as dicta, it is not clear why entities or persons affected by undue influence or corruption on the part of their business competitor somehow lie outside the zone of interests of the Clauses. In a broad sense, all Americans fall within the zones of interest of the Clauses. Nothing in the Constitution precludes business competitors—a sub-class of Americans—from challenging the improper receipt of emoluments by a President who is purportedly engaging in a business directly in competition with those businesses; especially given the particular allegations in the present case— that the President's business is specifically drawing business away from hotels, event spaces, and restaurants owned by the business competitors. Judge Daniel's decision in the *CREW* case, in short, does not represent a substantial different of opinion among courts as to standing, limited as it is to the question of standing of particular non-governmental plaintiffs. The Court agrees with Plaintiffs that the "President's reliance on the *CREW* decision reflects—at best—an instance of judges applying the law differently[. It] does not demonstrate, as is required for interlocutory appeal, that 'courts themselves disagree as to what the law is." Pls.' Resp. in Opp'n at 8 (quoting *In re Nichols*, No. TDC-14-0625, 2014 WL 4094340, at *3 (D. Md. Aug. 15, 2014)).

The more important point, in any event, is that by the President's analysis, no one (save perhaps Congress in cases involving emoluments paid by foreign governments) could ever bring an action to challenge the President's receipt of emoluments – even if

-19-

there were no dispute as to what the term meant—because no one, including the American people at large, could show that they were in the zone of the interests contemplated by the Clauses. Yet it is noteworthy that since the briefing on the certification of the standing question was completed, another federal court has held that some 200 members of Congress have standing to sue the President for failure to notify Congress of his receipt of foreign "emoluments" pursuant to the Foreign Clause. *See Blumenthal v. Trump*, No. 17-1154, 2018 WL 4681001, at *4-5. (D.D.C. Sept. 28, 2018). There Judge Emmet Sullivan of the United States District Court for the District of Columbia found that, even in light of the separation-of-powers concerns recited in that case, standing was appropriate in part because "plaintiffs have no adequate legislative remedy and this dispute is capable of resolution through the judicial process." *Id.* at *5. That is also the case here. The fact that another court has found standing in a cohort other than the full membership of Congress fortifies this Court's analysis as well.[4] The Governmental Plaintiffs in this case lie fully within the zones of interests of the Emoluments Clauses. Standing Opinion at 42.

---

[4] While Congress can presumably legislate in the context of the Emoluments Clauses, *see* such initiatives as S. Con. Res. 8, 115th Cong. (2017) (among other things, declaring the President's dealings through his companies with foreign governments to be potential violations of the emoluments clause); H.R.J. Res. 16, 115th Cong. (2017) (denying congressional consent for the President to accept any foreign emolument during his Presidency), in order to prevent the President from accepting unconstitutional emoluments, it is, as the *Blumenthal* decision has suggested, the President's duty to seek the consent of Congress first. *Blumenthal*, 2018 WL 4681001 at *4 (also discussing, for standing purposes, the relevance of legislative remedy in legislator standing analyses).

g.    *Whether Plaintiffs have Article III standing to pursue their claims*

The third purportedly controlling question of law the President identifies is whether Plaintiffs have Article III standing to pursue their claims. The Court has just considered this question in connection with the previous question as to which the President seeks certification. The President challenges the Court's determination that the competitor standing doctrine yields the conclusion that Plaintiffs have suffered or will imminently suffer an injury-in-fact. But again Plaintiffs note that competitor standing is integral primarily to their proprietary claims, not those made in their *parens patriae* or quasi-sovereign capacities. For the same reasons that the Court rejects the President's claim that prudential standing considerations justify certification, *see supra* p. 17, the Court agrees with Plaintiffs that whether they have suffered injury-in-fact based on the competitor standing theory is not a controlling question. It is also worth considering the President's argument that there is "substantial ground for disagreement" on this point.

The President again points to *CREW v. Trump* as evidence that courts disagree over whether Plaintiffs have standing. Def's Mot. for Appeal at 23-24; Def's Reply at 13. He recites some of Judge Daniels' reasoning for finding that the plaintiffs in that case did not have standing. He then argues that "reasonable minds could differ" over whether the doctrine of competitive standing establishes Plaintiffs' injury-in-fact; the President submits that "the Fourth Circuit has never expressly endorsed the competitor standing doctrine" and that no court "has applied it in the context of a diffused market in which

-21-

competition depends on a large number of variables, as is the case here." Def's Mot. for Appeal at 23-24. The President also notes that "[t]his Court is the first ever to permit a party to pursue relief under the Emoluments Clauses for alleged competitive injury—or for any injury for that matter . . . ." Def's Reply at 11.

Again, Plaintiffs respond that even if this Court's ruling that competitive standing establishes an injury-in-fact for the Article III standing analysis were overturned, Plaintiffs would still be able to proceed based on their *parens patriae* and quasi-sovereign capacities. Under the latter theories, Plaintiffs share interests of "trying to protect a large segment of their commercial residents and hospitality industry employees from economic harm" and in "protect[ing] their position among . . . sister states." Pls.' Resp. in Opp'n at 5 (citing Standing Opinion at 15, 19, 29).

But Plaintiffs also point out that "even if the Fourth Circuit had not addressed the question [of competitor standing], it would be of no moment because . . . 'the *Supreme Court* has recognized that plaintiffs with an economic interest have standing to sue to prevent a direct competitor from receiving an illegal market benefit leading to an unlawful increase in competition.'" Pls.' Resp. in Opp'n at 6-7 (quoting Standing Opinion at 21). Plaintiffs conclude by pointing out that Judge Daniels' decision in *CREW v. Trump* was nothing more than a Judge applying essentially the same law to different facts, finding that "the private-party plaintiffs had not sufficiently alleged competitor standing against the President," but not showing disagreement about "what the law is."

-22-

Pls.' Resp. in Opp'n at 7 (internal quotation omitted). In other words, Judge Daniels was not disagreeing with this Court over what is required to establish standing. He employed the same three-part test this Court did. He simply found, with respect to the plaintiffs before him, all non-governmental persons or entities, that no injury-in-fact had been shown. Here, with more broadly based governmental entity plaintiffs before it, this Court found that, in contrast, they had indeed established injury-in-fact.

Beyond that, the President's statement that the Fourth Circuit has not addressed the question of competitor standing is somewhat misleading. While it may not have specifically decided a case involving the theory, the Fourth Circuit has in fact noted that "numerous cases have found that a firm has constitutional standing to challenge a competitor's entry into the market." *Zeneca, Inc. v. Shalala*, 213 F.3d 161, 170 n.10 (4th Cir. 2000) (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1074 (D.C. Cir. 1998)). There is thus a strong indication that the Fourth Circuit would embrace the competitor standing theory if and when squarely called upon to decide. But this is not that case.

Since the first two statutory factors for certification have not been met on the question of Article III standing via the competitor standing doctrine, the Court declines to certify this issue for appeal.

h.      *Whether the Court has jurisdiction to declare Declaratory and Injunctive relief against the President*

-23-

The fourth and final question the President identifies as certifiable is whether the Court has jurisdiction to issue declaratory and injunctive relief against him. He submits that if the Court's failure to grant his motions to dismiss on this point was erroneous, it would necessarily be reversible and dispositive on final appeal. Therefore, he says, this is a controlling issue of law. *See Butler*, 307 F.R.D. at 452. The Court considers first whether there is a substantial ground for a difference of opinion on this issue among courts.

The President argues that it is open to debate among courts whether equitable relief can be granted against a sitting president. Def's Mot. for Appeal at 24. He believes "Supreme Court precedent holds that equitable relief against a sitting President is 'extraordinary,' and that federal courts have 'no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" *Id.* (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866), *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (quoting same)). Thus the President says that the Court's conclusion that there is no "barrier to its authority to grant either injunctive or declaratory relief," *see* Standing Opinion at 36, is in "significant tension" with *Johnson* and other cited precedent. Def's Mot. for Appeal at 25.

Plaintiffs contend that the Court was correct in finding that "[p]recedent makes clear that a plaintiff may bring claims to enjoin unconstitutional actions by federal officials and that they may do so to prevent violation of a structural provision of the

-24-

Constitution." Standing Opinion at 42. They point out that in the two cases the President cites where the courts did not issue injunctive relief against the President, both courts noted that it was more appropriate in each case to enjoin a subordinate executive official to block the protested action. *See* Pls.' Resp. in Opp'n at 18. Here, where there is obviously no subordinate official against whom equitable relief would make sense—the suit has been filed against the President for actions benefitting him personally—the situation is significantly different. Moreover, instead of involving parties seeking to enjoin the President from enforcing an act of Congress, as was the case in *Johnson*[5], the present suit "involves [the President's] personal compliance with discrete constitutional prohibitions that foreclose any claim of Presidential authority." *Id.* at 19.

In its Standing Opinion rejecting the President's argument, the Court discussed this issue at length, and the issue needs no further elucidation here. *See* Standing Opinion at 42. The Court found there was ample authority suggesting that even the President – in his official capacity – can be the subject of equitable relief, especially given a situation such as the one at hand. While Plaintiffs may not have sought a preliminary injunction, that obviously would not diminish the force of their claim on the merits.

    i.    *Extraordinary Circumstances Justifying Certification*

---

[5] In *Johnson*, the State of Mississippi sought to enjoin the President from in any way carrying out the Reconstruction Acts, which the state alleged were unconstitutional. The Court took care to note that the single point it considered was whether the President could be enjoined from enforcing an allegedly unconstitutional law. 71 U.S. at 498.

-25-

The President relies heavily on the proposition that the Court's orders should be certified because they present extraordinary circumstances dealing with issues of first impression—that a sitting President, representing an equal branch of the government, is accused of violating the Constitution and faces the prospect of civil discovery, a burdensome and distracting enterprise. *See, e.g.,* Def's Mot. for Appeal at 3, 6, 9, 25; Def's Reply at 1, 4, 6-7. The Court, however, reminds that even if the circumstances were truly extraordinary—and the Court does not believe they are[6]—that would favor certification only if all the criteria required by § 1292(b) are otherwise met. Here, as the Court has found, they are not.

Yet again, the Court notes that certification for appeal is not appropriate "to provide early review of difficult rulings in hard cases." *Butler*, 307 F.R.D. at 452 (internal quotation omitted). "[I]n a separation-of-powers case as in any other . . . . it is the role of the Judiciary to 'say what the law is' regarding the meaning of the Foreign Emoluments Clause and the President's compliance with it." *Blumenthal*, 2018 WL 4681001 at *17 (internal citation omitted) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). The President has not satisfied the several criteria for

---

[6] *See supra* pp. 12, 14 (discussing why it does not suffice for certification that the Orders present some issues of first impression); Standing Opinion at 41-42 (discussing the availability of equitable action against a President).

certification of the issues that concern him.[7] Accordingly, his Motion for Leave to Appeal (Interlocutory) (ECF No. 127) is **DENIED.**

## IV. Stay Pending Appeal

Independently of the denial of the President's request to certify, the Court **DENIES** his Motion to Stay All Discovery Pending Appeal.

When courts determine the appropriateness of staying proceedings in a given case, three factors must be taken into account: 1) the interest in judicial economy; 2) the hardship to the moving party if the action is not stayed; and 3) the potential damage or prejudice to the non-moving party. *International Refugee Assistance Project v. Trump*, 323 F. Supp. 726, 731 (D. Md. 2018). The movant "bears the burden of establishing its need" for a stay and does not enjoy an automatic stay as a right. *Clinton v. Jones*, 520 U.S. 681, 708 (1997).

Congress expressly established the availability of an interlocutory appeal under Section 1292(b) on the condition that it "shall not stay proceedings in the district court" unless the district court exercises its jurisdiction to so order. *See* Pls.' Resp. in Opp'n at

---

[7] The President may be correct that if an Order is certified for appeal and the Fourth Circuit agrees to review it, issues "would necessarily be presented *in toto* to the appellate court," Def's Reply at 12, and the Fourth Circuit could then evaluate issues that the President did not explicitly address in his brief. *See Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 ("[A]ppellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court.") However, to warrant certification, the President must first demonstrate there is at least one controlling question of law as to which there is substantial ground for difference of opinion that could materially advance the termination of the litigation if decided differently. He has not done so here.

-27-

20. The presumption, then, is against a stay. *See* David G. Knibb, *Fed. Court of Appeals Manual* § 5:6 (6th ed. 2018). "[A] request to stay proceedings calls for an exercise of the district court's judgment to balance the various factors relevant to the expeditious and comprehensive disposition of the causes of action on the court's docket." *Maryland Universal Elections, Inc.*, 729 F.3d 370, 375 (4th Cir. 2013) (internal quotation omitted).

The requested stay in this case would not serve judicial economy for the simple reason that the President's success on appeal would neither terminate nor narrow the case nor would it foreclose discovery relevant to proving, to at least some extent, Plaintiffs' claimed injuries. *See supra* p. 14-15, 17, 21 (discussing why appealing the Court's decisions as to the meaning of "emolument" and prudential and competitive standing would not significantly narrow the scope of the case). Furthermore, if certified for appeal to the Fourth Circuit, it is highly likely that any decision—favorable or unfavorable to the President—would be appealed to the Supreme Court. All the issues raised by the President at present could just as cleanly be addressed on a final appeal. Judicial economy favors going forward with the case in this Court at this time.

As for hardship or inconvenience attending a stay, the most the President can say is that if he is required to respond to civil discovery, he would be ill-served. But as Plaintiffs point out, most of what they seek is discovery from third parties, e.g., the Trump International Hotel, which would seem unlikely to impose any meaningful burden on the President individually. *See* Report of Rule 26(f) Planning Meeting (Sept. 14,

2018), ECF No. 132. And, of course, "mere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay, are not enough." *Long v. Robinson*, 432 F.2d 977, 980 (4th Cir. 1970) (internal quotation omitted). The President's argument that he would be distracted would seem to apply to any litigant who has been sued. Yet Presidents have unquestionably responded to court orders, as in this case, and have also had extensive interactions with the court system. *See* Standing Opinion at 35-36; Pls.' Resp. in Opp'n at 18-19.

Apart from Plaintiffs' focus on discovery from third parties, there are numerous ways to limit the extent to which the President might be obliged to respond, e.g., he could do so by stipulation, by limited written discovery requests, or by other non-burdensome means. And of course, the Court is always available to limit given discovery to minimize an unusual impact.

It bears noting that the President himself appears to have had little reluctance to pursue personal litigation despite the supposed distractions it imposes upon his office. *See, e.g.*, Order, *Cohen v. United States*, No. 18-3161 (S.D.N.Y. Apr. 13, 2018) (granting the President's motion to intervene in litigation); *see also, e.g.*, Michael D. Shear & Eileen Sullivan, *Trump and Giuliani Taunt Brennan About Filing a Lawsuit*, N.Y. Times, Aug. 20, 2018 (President inviting lawsuit against himself), https://nyti.ms/2Mwj3De; Letter from Charles H. Harder to Steve Rubin & Michael Wolff (Jan. 4, 2018) (providing notice of potential legal action in connection with allegedly defamatory statements made

-29-

in upcoming publication), goo.gl/hwVLTZ; Steve Holland & Doina Chiacu, *Trump targets book, threatens ex-ally Bannon with legal action*, Reuters (Jan. 3, 2018) (reporting on cease-and-desist letter sent to Stephen K. Bannon and stating that President Trump's attorney Charles Harder "told Reuters that 'legal action is imminent' against Bannon"), https://reut.rs/2NhQCJG; Sarah Fitzpatrick & Tracy Connor, *Trump tries to move Stormy Daniels lawsuit to federal court, claims she owes him $20 million*, NBC News, March 16, 2018 (President's lawyer, with the consent of the President, files a notice of removal in lawsuit by Stephanie Clifford), https://goo.gl/E5zo9N.

Finally, Plaintiffs argue that a stay of all proceedings would cause substantial harm to them and the public, more particularly the residents of the State of Maryland and the District of Columbia, and that any inconvenience to the President does not outweigh the prejudice that delay would visit upon Plaintiffs and their constituents. Pls.' Resp. in Opp'n at 26-27. The inescapable fact remains that the President could, on the basis of piecemeal appeals, potentially delay resolution of a good part of this case for years. As the Supreme Court has pointed out, the President "errs by presuming that interactions between the Judicial Branch and the Executive, even quite burdensome interactions, necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions." *Clinton v. Jones*, 520 U.S. 681, 702 (1997).

The Court is satisfied that no stay of the proceedings, for discovery purposes or otherwise, is warranted.

## V. Conclusion

The President has failed to identify a controlling question of law decided by this Court as to which there is substantial ground for difference of opinion justifying appellate review that would materially advance the ultimate termination of the case or even the material narrowing of issues.  Nor is a stay warranted, even if the Court were to certify one or more of the President's proposed issues. Judicial economy would not be served, no hardship or equitable justification would result if the case were to go forward, and any inconvenience to the President if the proceeding is not stayed would not outweigh the prejudice that a delay would inflict on Plaintiffs and their constituents.

The President's Motion for Leave to Appeal (Interlocutory) and for a Stay (ECF No. 127) is DENIED.

Within twenty (20) days, Plaintiffs shall submit a specific discovery schedule to the Court consistent with that set out in the statement they previously submitted pursuant to FRCP 26(f), ECF No. 132.

A separate Order will issue.

November 2, 2018 _____/s/_____
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

-31-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **THE DISTRICT OF COLUMBIA** | * | |
| and **THE STATE OF MARYLAND**, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. **PJM 17-1596** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| *in his official capacity* | * | |
| *as President of the United States*, | * | |
| | * | |
| Defendant. | * | |

# O R D E R

Having considered Defendant Donald J. Trump's Motion for Leave to Appeal (Interlocutory), and for a Stay Pending Appeal (ECF No. 127) it is, for the reasons set forth in the accompanying Memorandum Opinion this 2nd day of November, 2018

**ORDERED**:

1) The President's Motion for Leave to Appeal and for a Stay Pending Appeal (ECF No. 127) is **DENIED**;

2) Plaintiffs **SHALL** submit within twenty (20) days a proposed Schedule of Discovery, consistent with the Schedule set out in the earlier Joint Report made to the Court pursuant to F.R.C.P. 26(f) (ECF No. 132).

_____/s/_____
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

| | |
|---|---|
| THE DISTRICT OF COLUMBIA<br>441 Fourth Street, N.W.<br>Washington, D.C. 20001,<br><br>and<br><br>THE STATE OF MARYLAND<br>200 Saint Paul Place, 20th Floor<br>Baltimore, Maryland 21202,<br><br>     Plaintiffs,<br><br>     v.<br><br>DONALD J. TRUMP,<br>President of the United States of America, in<br>his official capacity and in his individual<br>capacity<br><br>1600 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20500,<br><br>     Defendant. | Civil Action No. 8:17-cv-1596-PJM |

**AMENDED COMPLAINT**

BRIAN E. FROSH
Attorney General of Maryland

STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
PATRICK B. HUGHES
Federal Bar No. 19492
phughes@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
T: (410) 576-6325
F: (410) 576-6955

KARL A. RACINE
Attorney General for the District of Columbia

NATALIE O. LUDAWAY
Chief Deputy Attorney General
Federal Bar No. 12533
Natalie.ludaway@dc.gov
STEPHANIE E. LITOS*
Senior Counsel to the Attorney General
stephanie.litos@dc.gov
441 Fourth Street, N.W.
Washington D.C. 20001
T: (202) 724-6650
F. (202) 741-0647

NORMAN L. EISEN
Federal Bar No. 09460
neisen@citizensforethics.org
NOAH D. BOOKBINDER*
nbookbinder@citizensforethics.org
STUART C. MCPHAIL*
smcphail@citizensforethics.org
Citizens for Responsibility and Ethics
   in Washington
455 Massachusetts Avenue, N.W.
Washington, D.C. 20001
T: (202) 408-5565
F: (202) 588-5020

DEEPAK GUPTA*
deepak@guptawessler.com
JONATHAN E. TAYLOR*
Gupta Wessler PLLC
1900 L Street, N.W.
Washington, D.C. 20009
T: (202) 888-1741

JOSEPH M. SELLERS
Federal Bar No. 06284
jsellers@cohenmilstein.com
CHRISTINE E. WEBBER*
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
T: (202) 408-4600


*admitted pro hac vice

## TABLE OF CONTENTS

I. Nature of the action ................................................................................................ 2

II. Parties, jurisdiction, and venue ............................................................................. 8

III. Legal background.................................................................................................. 9

IV. Relevant facts...................................................................................................... 12

      A.   The defendant's Foreign Emoluments Clause violations.......................... 12

      B.   The defendant's Domestic Emoluments Clause violations....................... 26

      C.   Post-inauguration premium for the defendant's goods and services ........ 32

      D.   The plaintiffs' interests in this litigation................................................. 32

V. Claims .................................................................................................................. 43

VI. Prayer for relief.................................................................................................. 45

# I.
## NATURE OF THE ACTION

1.    This is an action against Donald J. Trump in his official capacity as President of the United States and in his individual capacity.[1] The case involves unprecedented constitutional violations by the President that have injured and threaten to cause continuing injury to the District of Columbia ("the District") and the State of Maryland ("Maryland") and their respective residents, including direct injury to the plaintiffs' interests in properties located in the District, in Prince George's County, Maryland, and in Montgomery County, Maryland.

2.    The lawsuit alleges violations by the President of two distinct yet related provisions of the U.S. Constitution that seek to make certain that he faithfully serves the American people, free from compromising financial entanglements with foreign and domestic governments and officials. The first provision, the Foreign Emoluments Clause, prohibits any "Person holding any Office of Profit or Trust" from accepting "any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State," absent "the Consent of the Congress." U.S. Const. art. I, § 9, cl. 8. The second, the Domestic Emoluments Clause, entitles the President to receive a salary while in office and forbids him from "receiv[ing] within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. Together, these provisions help ensure that the President serves with undivided loyalty to the American people, and the American people only. Our republican form of government demands no less.

3.    Vested by the Constitution with extraordinary power, the President is bound by oath to "faithfully execute" his office and "preserve, protect and defend the Constitution of the United States." Since 1789, each President, regardless of temperament or ideology, has sought, in his own

---

[1] For ease of reference, Plaintiffs use the honorific "President" or the word "defendant" to refer to Donald J. Trump in his official capacity and his individual capacity.

way, to honor that solemn vow. Yet fundamental to a President's fidelity to that oath is the Constitution's demand that the President, as the highest officeholder in the land, disentangle his private finances from those of domestic and foreign powers. Never before has a President acted with such disregard for this constitutional prescription.

4.      President Trump's continued ownership interest in a global business empire, which renders him deeply enmeshed with a legion of foreign and domestic government actors, violates the Constitution and calls into question the rule of law and the integrity of the country's political system. Whatever the sincerity of the persons involved, foreign and domestic officials are put in the position of considering whether offering benefits to businesses associated with the President is important to maintaining goodwill. And irrespective of whether such benefits affect the President's decision-making or shift his foreign or domestic policy, uncertainty about whether the President is acting in the best interests of the American people, or rather for his own ends or personal enrichment, inflicts lasting harm on our democracy. The Framers of the Constitution foresaw that possibility, and acted to prevent that harm.

5.      The Emoluments Clauses are two critical, closely related anti-corruption provisions aimed at ensuring that the President faithfully serves *the people*, free from the distorting or compromising effects of financial inducements provided by foreign nations, their leaders, individual states in the Union, Congress, or other parts of the federal government. They ensure that Americans do not have to guess whether a President who orders their sons and daughters to die in foreign lands acts out of concern for his private business interests; they do not have to wonder if they lost their job due to trade negotiations in which the President has a personal stake; and they never have to question whether the President can sit across the bargaining table from foreign

3
Add. 140

leaders and faithfully represent the world's most powerful democracy, unencumbered by fear of harming his own companies.

6.     With respect to the Foreign Emoluments Clause, the Framers were aware that entanglements between American officials and foreign powers could pose a creeping, insidious threat to the Republic. The theory underlying the clause, informed by English history and by the Framers' experience, is that a federal officeholder who receives something of value from a foreign government can be imperceptibly induced to compromise what the Constitution insists be his only loyalty: the best interest of the United States of America. And rather than address such corruption by punishing it after the fact, the Framers concluded that the best solution was to write a strict prophylactic rule into the Constitution itself, thereby guaranteeing that improper incentives never undo this important safeguard of American autonomy. Applied to President Trump's diverse dealings, the text and purpose of the clause speak as one: absent the consent of Congress, private enrichment through the receipt of benefits from foreign governments is prohibited.[2]

7.     The Domestic Emoluments Clause was also designed to protect the government from corruption. The Founders intended the clause to serve as a guarantee that Congress, other parts of the federal government, and the states "can neither weaken [the President's] fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice."[3] The Framers further intended the clause to protect against self-dealing by ensuring that the President's service

---

[2]     Norman L. Eisen, Richard Painter & Laurence H. Tribe, *The Emoluments Clause: Its Text, Meaning, and Application to Donald J. Trump* (Dec. 16, 2016), http://brook.gs/2hGIMbW; *see also* Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities, 18 Op. O.L.C. 13, 18 (1994) ("Those who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty. That judgment might be biased, and that loyalty divided, if they received financial benefits from a foreign government.").

[3]     The Federalist No. 73 (Alexander Hamilton).

is remunerated only by the compensation fixed in advance by Congress.

8.      Relatedly, and in ways particularly important to the plaintiffs, the Domestic Emoluments Clause shields the states and the District of Columbia from undue pressure to provide emoluments to the President, and protects them from reprisal for any refusal to do so. In a similar vein, the provision safeguards the states and the District from unfair advantages certain states may enjoy from opportunities to curry favor from the President by providing emoluments that other states lack.

9.      President Trump, acting through companies he owns or controls, has violated both the Foreign Emoluments Clause and the Domestic Emoluments Clause by receiving millions of dollars in payments, benefits, and other valuable consideration from foreign governments and persons acting on their behalf, as well as federal agencies and state governments. His repeated, ongoing violations include remuneration derived from: (a) leases of Trump properties held by foreign-government-owned entities; (b) purchase and ownership of condominiums in Trump properties by foreign governments or foreign-government-controlled entities; (c) other property interests or business dealings tied to foreign governments; (d) hotel accommodations, restaurant purchases, the use of venues for events, and purchases of other services and goods by foreign governments and diplomats at hotels, restaurants, and other domestic and international properties owned, operated, or licensed by President Trump; (e) continuation of the General Services Administration lease for President Trump's Washington, D.C. hotel despite his breach of the lease's terms, and potential provision of federal tax credits in connection with the same property; and (f) payments from foreign-government-owned broadcasters related to rebroadcasts and foreign versions of the television program "The Apprentice" and its spinoffs. Moreover, President Trump,

5

by asserting that he will maintain the interests at issue, is poised to engage in similar constitutional violations for the duration of his presidency.

10.     These present and continuing violations of the Constitution's anti-corruption protections threaten the free and independent self-governance at the core of our democracy. The President is making decisions every day with profound and far-reaching effects on American life, from determining who can travel into the country to deciding whether the United States will abandon global efforts to combat climate change; from proposing budgets to overseeing the federal workforce; from evaluating who will pay more in taxes to choosing how people will access health care. Yet Americans are left uncertain as to whether these decisions, with their sweeping impact on foreign and domestic policy, are driven solely by unyielding loyalty to the country's best interests, or rather are affected by self-interested motivations grounded in the international and domestic business dealings in which President Trump's personal fortune is at stake.

11.     The President's violations of the Emoluments Clauses undermine the trust the American people are entitled to have in their government. It is fundamental to our system of self-governance that our duly elected Presidents and the governments over which they preside will always act in singular pursuit of our liberty, security, health, and well-being. President Trump's myriad international and domestic business entanglements make him vulnerable to corrupt influence and deprive the American people of trust in their chief executive's undivided loyalty.

12.     The District and Maryland have compelling interests in ensuring that the Foreign and Domestic Emoluments Clauses are enforced and protect their residents as designed. The President's disregard for these constitutional constraints has resulted in significant and ongoing harm to the District and to Maryland.

13.     The District and Maryland have other sovereign, quasi-sovereign, and proprietary

6

interests in preventing the defendant's violations of the Emoluments Clauses. The defendant, his organization, and its affiliates have received presents or emoluments from foreign states or instrumentalities and federal agencies, and state and local governments in the form of payments to the defendant's hotels, restaurants, and other properties. The defendant has used his position as President to boost this patronage of his enterprises, and foreign diplomats and other public officials have made clear that the defendant's position as President increases the likelihood that they will frequent his properties and businesses.

14.     The defendant's ongoing constitutional violations harm the sovereign and quasi-sovereign interests of the District and Maryland. Maryland has an interest in preserving its role as a separate sovereign and securing observance of the terms under which it participates in the federal system. That interest is harmed by the defendant's violations of both Emoluments Clauses, but it carries particular force with respect to the Domestic Emoluments Clause, which exists (at least in part) for the protection of "the United States and any of them." Indeed, as government entities with authority to tax and regulate businesses and real estate, the District and Maryland are harmed by perceived and/or actual pressure to grant special treatment to the defendant and his extensive affiliated enterprises, or else be placed at a disadvantage vis-à-vis other states and governments that have granted or will grant such special treatment. In addition, the District and Maryland have an interest in protecting their economies and their residents, who, as the defendant's local competitors, are injured by decreased business, wages, and tips resulting from economic and commercial activity diverted to the defendant and his business enterprises due to his ongoing constitutional violations. Maryland is itself further injured by the reduction in tax revenue that flows from those violations.

15.     The defendant's ongoing constitutional violations also harm the proprietary

7

Add. 144

interests of the District and Maryland. The District and Maryland suffer direct financial harm in their capacity as proprietors of businesses that compete with the defendant's businesses, to the extent that businesses owned by him and/or his affiliated enterprises attract customers and divert them away from businesses that the District and Maryland own, license, or tax.

16.     The District of Columbia and Maryland bring this action to stop President Trump's violations of the Emoluments Clauses. As a direct result of those violations, the District and Maryland have been injured and will continue to be injured absent relief from this Court. To prevent these injuries, they request that this Court enter a declaratory judgment that President Trump has violated the Foreign and Domestic Emoluments Clauses and an injunction against violating these clauses further.

## II.
## PARTIES, JURISDICTION, AND VENUE

17.     The plaintiffs are the District of Columbia and the State of Maryland.

18.     The District of Columbia is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest.

19.     The State of Maryland is a sovereign state of the United States of America. The State is represented by and through its chief legal officer, the Attorney General of Maryland. He has general charge, supervision, and direction of the State's legal business, and acts as legal advisor and representative of all major agencies, boards, commissions, and official institutions of state

Add. 145

government. The Attorney General's powers and duties include acting on behalf of the State and

the people of Maryland in the federal courts on matters of public concern.

20.     The defendant is Donald J. Trump, a natural person and the President of the United

States of America. He is being sued in his official capacity and in his individual capacity.

21.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201.

22.     Venue is proper under 28 U.S.C. § 1391(e)(1) because the defendant is "an officer

. . . of the United States . . . acting in his official capacity or under color of legal authority," and

the District of Maryland is a "judicial district" in which "a substantial part of the events or

omissions giving rise to the claim occurred," and (in any event) where one of "the plaintiff[s]

resides."

### III.
### LEGAL BACKGROUND

23.     ***The Foreign Emoluments Clause.*** The origins of the Foreign Emoluments Clause

go back to at least 1651, when the Dutch broke with traditional European diplomatic customs and

prohibited their foreign ministers from accepting "any presents, directly or indirectly, in any

manner or way whatever."[4] The Framers also had the benefit of earlier thinking by those who

drafted state constitutions, including Maryland's,[5] and by those who crafted the Articles of

Confederation, which contained the clause's predecessor: "[N]or shall any person holding any

---

[4]     5 John Bassett Moore, *A Digest of International Law* § 651 (1906) (quoting Dutch Republic regulation).

[5]     *See* Md. Declaration of Rights of 1776, art. 32 ("That no person ought to hold, at the same time, more than one office of profit, nor ought any person, in public trust, to receive any present from any foreign prince or state, or from the United States, or any of them, without the approbation of this State.").

9

office of profit or trust under the United States, or any of them, accept of any present, emolument, office, or title of any kind whatever, from any king, prince, or foreign State."[6]

24.     The Foreign Emoluments Clause was not included initially at the Constitutional Convention, but it was added without dissent at the request of Charles Pinckney, who "urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence."[7] Edmund Jennings Randolph confirmed the clause's anti-corruption purpose, stating: "It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states."[8] The Framers recognized the perils of foreign influence and corruption, even in situations subtler than *quid pro quo* bribery, and they therefore created a broad constitutional prophylactic rule applicable to anything of value given by any foreign government to anyone holding an "Office of Profit or Trust under the United States," including the President.

25.     Consistent with the intent of the Framers, the Foreign Emoluments Clause is properly interpreted to cover monetary or nonmonetary transactions. Indeed, the text of the clause bars the receipt of both a "present" and an "Emolument," which together cover anything of value, including without limitation payments, transactions granting special treatment, and transactions above marginal cost. The clause also explicitly bars the receipt of "any present [or] Emolument . . . *of any kind whatever*," emphasizing the breadth of conduct covered under the provision.

26.     The Foreign Emoluments Clause covers not only transfers of anything of value from a king, prince, or foreign state individually, but also any transfer from instrumentalities or

---

[6]     Articles of Confederation of 1781, art. VI, § 1.

[7]     2 Farrand, *The Records of the Federal Convention of 1787*, at 389.

[8]     3 Farrand, *The Records of the Federal Convention of 1787*, at 327.

agents of a foreign state. This is in keeping with the considered view of the Department of Justice's Office of Legal Counsel, whose constitutional interpretations are instructive, though not controlling.[9]

27.    ***The Domestic Emoluments Clause.*** The Framers also intended to prevent the system of patronage, influence, and rent-extraction that predominated in the colonial governors' offices through a Domestic Emoluments Clause applying to just the President. The clause provides that the President's "Compensation" shall not be increased or decreased, and that he may not receive any "other Emolument from the United States, or any of them," during his term of office. The clause thus works to ensure that neither states nor the federal government can "weaken his fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice."[10] And because the clause is specifically concerned with the federal government as well as the states, it does not allow for Congress to consent to the President's receipt of additional emoluments beyond his salary. This ban on additional emoluments, Alexander Hamilton wrote, would ensure that the President would have "*no pecuniary inducement to renounce or desert the independence intended for him by the Constitution.*"[11] Further, as recognized by judicial authorities, the ban "addressed the Framers' concern that the President should not have the ability to convert his or her office for profit."

28.    The Domestic Emoluments Clause reflects the Framers' particular concern about making sure that the nation's powerful chief executive remains free from distorting and corrupting influences that might hinder his ability to faithfully execute his office. The clause accordingly

---

[9]    Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize, 33 Op. O.L.C. 8 (2009).

[10]    The Federalist No. 73 (Alexander Hamilton).

[11]    *Id.* (emphasis added).

proscribes emoluments not only from states and the federal government, but also their respective instrumentalities and subdivisions.

## IV.
## RELEVANT FACTS

**A.    The defendant's Foreign Emoluments Clause violations**

29.    Following the defendant's inauguration, he continues to own and control hundreds of businesses throughout the world, including hotels and other properties. His business empire comprises a multitude of different corporations, limited-liability companies, limited partnerships, and other entities that he owns or controls, in whole or in part, operating in the United States and at least 20 foreign countries.[12] His businesses are loosely organized under an umbrella known as the "Trump Organization," consisting of the Trump Organization LLC d/b/a The Trump Organization and The Trump Organization, Inc., both of which are owned solely by him. But his interests also include scores of other entities not directly owned by either Trump Organization entity but that he personally owns, owns through other entities, and/or controls.[13] The defendant also has several licensing agreements that provide continuing flows of income. Through these entities and agreements, he personally benefits from business dealings, and is (and will be) enriched by any business in which the entities he owns or controls engage with foreign governments, instrumentalities, and officials.

30.    On January 11, 2017, the defendant announced a plan to turn "leadership and management" of the Trump Organization over to his sons Eric Trump and Donald Trump Jr., as

---

[12]    Marilyn Geewax & Maria Hollenhorst, *Trump's Businesses And Potential Conflicts: Sorting It Out*, NPR (Dec. 5, 2016), http://n.pr/2g2xZDP.

[13]    U.S. Office of Gov't Ethics, Donald J. Trump, 2016 Executive Branch Personnel Public Financial Disclosure Report (May 16, 2016), http://bit.ly/2gBUwIV.

well as a longtime company executive.[14] But the plan did not include relinquishing *ownership* of his businesses or establishing a blind trust.

31.     The defendant continues to own—and be well aware of the activities of—the Trump Organization and other corporations, limited-liability companies, limited partnerships, and other entities in which he retains an ownership interest. Although he formed a trust to hold his business assets, he may obtain distributions from his trust at any time.[15]

32.     The defendant's son, Eric Trump (who is also an advisor to the defendant's trust), initially indicated that he would not communicate with his father concerning his business interests. Eric Trump has now acknowledged, however, that he will provide business updates to the President on at least a quarterly basis.[16]

33.     The defendant has neither sought nor received "Consent of the Congress" with respect to his receipt of presents or emoluments from foreign government officials, entities, or instrumentalities.

**The District of Columbia's Trump International Hotel**

34.     The Trump International Hotel Washington, D.C. is located on Pennsylvania Avenue, N.W., just blocks from the White House. The defendant owns and controls this hotel through various entities.

---

[14]     *Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan. 11, 2017), http://nyti.ms/2jkFUPK.

[15]     David Kravitz & Al Shaw, *Trump Lawyer Confirms President Can Pull Money From His Businesses Whenever He Wants*, ProPublica (Apr. 4, 2017), http://bit.ly/2o1OM1C.

[16]     Jennifer Calfas, *Eric Trump Says He'll Give the President Quarterly Updates on Business Empire*, Fortune (Mar. 24, 2017), http://for.tn/2n2MRXa; Maggie Haberman & Glenn Thrush, *Trump Reaches Beyond West Wing for Counsel*, N.Y. Times (Apr. 22, 2017), http://nyti.ms/2rsFqvk.

13

35.     The defendant, through entities he owns, receives payments made to the Trump International Hotel by guests who stay in hotel rooms and patrons who use the hotel venues or other goods or services in the hotel.

36.     The restaurant BLT Prime is located in the Trump International Hotel. The defendant, through various business entities, owns the restaurant, licenses the name from BLT Prime, and pays BLT Prime to operate the restaurant.[17]

37.     Since the election, the Trump International Hotel has specifically marketed itself to the diplomatic community. On one occasion, barely a week after the election, it held an event where it pitched the hotel to about 100 foreign diplomats.[18] The hotel also hired a "director of diplomatic sales" to facilitate business with foreign states and their diplomats and agents, luring the director away from a competing hotel in Washington.[19]

38.     In addition, the defendant has repeatedly appeared at the hotel since his election, adding further media attention to the property and raising its public profile. Several figures in his administration, including Treasury Secretary Steve Mnuchin and Small Business Administration Administrator Linda McMahon, have also lived or continue to live in the hotel.[20]

39.     Diplomats and their agents have voiced their intent to stay at (or hold events at) the Trump International Hotel. "Believe me, all the delegations will go there," one "Middle Eastern

---

[17]     Jessica Sidman, *How Donald Trump Lost His DC Restaurants*, Washingtonian (Oct. 23, 2016), http://bit.ly/2htYzq9.

[18]     Jonathan O'Connell & Mary Jordan, *For foreign diplomats, Trump hotel is place to be*, Wash. Post (Nov. 18, 2016), http://wapo.st/2qukIgh.

[19]     *Id.*

[20]     Julie Bykowicz, *Trump Hotel May be Political Capital of the Nation's Capital*, Associated Press (Mar. 5, 2017), http://apne.ws/2n2Rxfs.

14

Add. 151

diplomat" told the *Washington Post* about the hotel.[21] An "Asian diplomat" agreed: "Why wouldn't I stay at his hotel blocks from the White House, so I can tell the new president, 'I love your new hotel!' Isn't it rude to come to his city and say, 'I am staying at your competitor?'"[22]

40.     These statements have become reality. The Embassy of Kuwait, a foreign state, held its National Day celebration at the Trump International Hotel on February 22, 2017.[23] Upon information and belief, Kuwait paid for the venue, food, and other services provided in connection with the celebration. The cost has been estimated at $40,000 to $60,000.[24] Before the election, a "save the date" reservation had been made with the Four Seasons hotel, where the event had previously been held.[25] According to one report, the Embassy of Kuwait moved the event under pressure from the Trump Organization (though Kuwait's ambassador to the United States denied being pressured).[26] As a result, the Trump International Hotel or its controlling entities have received one or more payments from Kuwait after 12:01 pm on January 20, 2017.

41.     Between January 23 and 26, 2017 and during February 2017, the Kingdom of Saudi Arabia, a foreign state, spent thousands of dollars on rooms, catering, and parking at the Trump

---

[21]     *Id.*

[22]     *Id.*

[23]     Jonathan O'Connell, *Kuwaiti Embassy is latest to book Trump D.C. hotel, but ambassador says he felt 'no pressure'*, Wash. Post (Dec. 20, 2016), http://wapo.st/2pMtw21; Jackie Northam, *Kuwait Celebration At Trump Hotel Raises Conflict of Interest Questions*, NPR (Feb. 25, 2017), http://n.pr/2lavPoB.

[24]     Julia Harte, *Kuwait could pay up to $60,000 for party at Trump Hotel in Washington*, Reuters (Feb. 27, 2017), http://reut.rs/2oFztKa.

[25]     Jackie Northam, *Kuwait Celebration At Trump Hotel Raises Conflict of Interest Questions*.

[26]     Judd Legum & Kira Lerner, *Under political pressure, Kuwait cancels major events at Four Seasons, switches to Trump's D.C. hotel*, ThinkProgress (Dec. 19, 2016), http://bit.ly/2rssRzM.

15

International Hotel. In a Foreign Agents Registration Act report filed with the Department of
Justice, an agent representing the Royal Embassy of the Kingdom of Saudi Arabia reported paying
the hotel $190,272 for lodging, $78,204 for catering, and $1,568 for parking between October 1,
2016 and March 31, 2017, using money received from Saudi Arabia.[27] Some of the payments were
made after the defendant's inauguration as President.[28] Upon information and belief, Saudi Arabia
paid at least $250 per night for each of the rooms it rented through its agent between January 23
and 26, 2017,[29] and paid the hotel for meals and other services provided in connection with the
stay. Saudi Arabia paid for individuals to have dinner at the hotel on January 23 and both breakfast
and dinner on January 24.[30] Upon information and belief, at least one of the meals was provided
by BLT Prime. Upon information and belief, Saudi Arabia paid the hotel through its agent for
similar expenses associated with a visit in mid-February.[31] As a result, the Trump International
Hotel or its controlling entities have received one or more payments from Saudi Arabia, through
its agent, after 12:01 pm on January 20, 2017.

---

[27]     MSLGROUP Americas Inc. d/b/a Qorvis MSLGROUP, Supplemental Statement
Pursuant to the Foreign Agents Registration Act of 1938, as amended, for six month period ending
3/31/2017, filed May 31, 2017, http://bit.ly/2rAQjgE; Chuck Ross, *Saudis Spent $270K At Trump
Hotel In Lobbying Campaign Against 9/11 Bill*, Daily Caller (June 4, 2017), http://bit.ly/2sSKB7F.

[28]     Byron Tau & Rebecca Ballhaus, *Trump Hotel Received $270,000 From Lobbying
Campaign Tied to Saudis*, Wall Street Journal (June 6, 2017), http://on.wsj.com/2s42HH9.

[29]     Isaac Arnsdorf, *Saudis foot tab at Trump hotel*, POLITICO (Feb. 9, 2017),
http://politi.co/2kZa6mS.

[30]     Operations Order from Jason E. Johns, President of NMLB Veterans Advocacy
Group, to Fly-In Veterans regarding the Justice Against Sponsors of Terrorism Act (Jan. 23-26,
2017), http://bit.ly/2oiBdIp.

[31]     Ross, *Saudis Spent $270K At Trump Hotel In Lobbying Campaign Against 9/11
Bill*.

42. On or about April 6, 2017, Kaha Imnadze, the Ambassador and Permanent Representative of Georgia to the United Nations, stayed at the Trump International Hotel and then tweeted his compliments about the hotel.[32] Upon information and belief, the government of Georgia, a foreign state, paid the hotel for his room and other services provided in connection with his stay. As a result, the Trump International Hotel or its controlling entities have received one or more payments from Georgia after 12:01 pm on January 20, 2017.

43. On information and belief, after 12:01 pm on January 20, 2017, the Trump International Hotel or its controlling entities have received and will continue to receive payments from other foreign states, instrumentalities of foreign states, or foreign officials.

44. On January 20, 2017, Trump Old Post Office LLC, the entity leasing the building in which the Trump International Hotel is located and in which the defendant has a beneficial interest, amended its governing agreement to provide that, during the defendant's presidency, the company will not make any distributions of profits to any entity in which the defendant has a beneficial interest and will credit these undistributed profits to an unrecovered capital contribution account held for the benefit of the designated entities that defendant controls. This amendment is immaterial to whether the defendant has violated the Foreign Emoluments Clause. The defendant remains owner of approximately 77.5% of the Trump Old Post Office LLC (the remaining shares are owned by three of his children), and thereby benefits from any amounts deposited into the unrecovered capital contribution account. He further may receive distribution from those amounts once he is no longer in office.

---

[32] Kaha Imnadze (@kahaimnadze), Twitter (Apr. 6, 2017, 8:49 AM), http://bit.ly/2oiF8Fd.

17

45.     Additionally, by providing that the defendant's contributions will be used by Trump Old Post Office LLC for business purposes, the amendment increased the value of one of his assets.

46.     Prior to taking office, President Trump's attorney promised that all profits earned from foreign governments would be donated to the U.S. Treasury. The Trump Organization later admitted, however, that it was not tracking all payments that it received from foreign governments, and that it plans only to estimate, rather than calculate, such payments.[33]

**New York's Trump Tower**

47.     Trump Tower is a mixed-use skyscraper on Fifth Avenue in New York City. Through the use of various entities, the defendant owns and controls Trump Tower and, through entities he owns, receives payments made to Trump Tower by tenants.

48.     One of the largest tenants of Trump Tower is the Industrial and Commercial Bank of China ("ICBC"), which is a Chinese majority-state-owned enterprise.[34] As such, ICBC is an instrumentality of a foreign state.

49.     After 12:01 pm on January 20, 2017, Trump Tower or its controlling entities have received one or more payments from ICBC under its lease. Trump Tower or its controlling entities will continue to receive regular payments from ICBC under its lease agreement.

50.     The defendant has repeatedly referenced ICBC's Trump Tower lease in discussing his views of U.S.-China relations. During his presidential campaign in June 2015, for instance, the defendant stated: "I love China! The biggest bank in the world is from China. You know where

---

[33]     Ari Melber, et al., *Trump Failing to Track Foreign Cash at His Hotels*, NBC News (May 24, 2017), http://nbcnews.to/2qWzv3x.

[34]     Caleb Melby, et al., *When Chinese Bank's Trump Lease Ends, Potential Conflict Begins*, Bloomberg (Nov. 28, 2016), https://bloom.bg/2oQ07T4.

their United States headquarters is located? In this building, in Trump Tower."[35] Similarly, in March 2016, when asked about China's territorial claims in the South China Sea, the defendant told the *Washington Post*, "I do deals with them all the time. The largest bank in the world, 400 million customers, is a tenant of mine in New York, in Manhattan."[36]

51.     The term of ICBC's Trump Tower lease runs until October 2019, before the end of the defendant's term. As a result, any negotiations for a renewal or extension of the lease will occur while he is serving as President.[37]

52.     Trump Grill is a restaurant located inside Trump Tower that the defendant owns through various business entities. Upon information and belief, tenants of Trump Tower, including officials of China and other countries, have dined at Trump Grill as a result of their tenancy in the Tower and the foreign states themselves may host events there. Accordingly, foreign states or their instrumentalities likely have paid or will pay for services at Trump Grill. The defendant has and will continue to receive payments from various foreign states through Trump Grill.

**New York's Trump World Tower**

53.     Trump World Tower is a skyscraper on United Nations Plaza in New York City, containing condominium units. Through the use of various entities, the defendant manages and controls Trump World Tower and, through entities he owns, receives payments made by residents of the Trump World Tower for common charges and handles rental transactions involving condominium units.

---

[35]     *Id.*

[36]     *Id.*

[37]     *Id.*

54.     In 2001, the Kingdom of Saudi Arabia paid $4.5 million to purchase a floor of Trump World Tower.[38] The annual common charges for building amenities for the floor totaled $85,585 at the time. As of 2003, the most recent year for which information is publicly available, the Kingdom of Saudi Arabia paid monthly common charges of about $7,398—or $88,781 per year. The floor currently belongs to the Kingdom of Saudi Arabia for use by the Saudi Mission to the United Nations, which upon information and belief continues to pay common charges to the defendant.[39]

55.     In 2015, the defendant said about Saudi Arabia: "I get along great with all of them. They buy apartments from me." He further noted: "They spend $40 million, $50 million. Am I supposed to dislike them? I like them very much."[40]

56.     The Kingdom of Saudi Arabia is a foreign state, and the Saudi Mission to the United Nations is an instrumentality of a foreign state.

57.     In 2002, the Permanent Mission of India to the United Nations, an instrumentality of a foreign state, paid $5.1 million to purchase two units in Trump World Tower from the defendant.[41] As of 2003, the most recent year for which information is publicly available, the Mission paid monthly common charges of approximately $3,639—or $43,670 per year. The units

---

[38]     Stephen R. Brown, *Donald Trump made millions from Saudi Arabia, but trashes Hillary Clinton for Saudi donations to Clinton Foundation*, N.Y. Daily News (Sept. 4, 2016), http://nydn.us/2bNEAq2.

[39]     *Id.*

[40]     *Id.*

[41]     N.Y.C. Dep't of Finance, Office of the City Registrar, Condo. Unit Deed: 845 U.N. Ltd. P'ship To The Permanent Mission of India to the U.N. (Dec. 23, 2002), http://on.nyc.gov/2pb8Obx.

continue to belong to the Mission, which upon information and belief continues to pay common charges to the defendant.

58.  In 2009, the Permanent Mission of Afghanistan to the United Nations, an instrumentality of a foreign state, paid $4.235 million to purchase a unit in Trump World Tower.[42] As of 2003, the most recent year for which information is publicly available, the common monthly charges for the unit purchased by the Mission were approximately $2,090 per month—or $25,085 per year. The unit continues to belong to the Mission, which upon information and belief continues to pay common charges to the defendant.

59.  In 2004, the Permanent Mission of Qatar to the United Nations, an instrumentality of a foreign state, paid $1,995,000 to purchase a unit in Trump World Tower, and in 2012, it paid $8.375 million to purchase two additional units in Trump World Tower. As of 2003, the most recent year for which information is publicly available, the common monthly charges for the units purchased by the Mission were a total of approximately $5,660 per month—or $67,920 per year. The units continue to belong to the Mission, which upon information and belief still pays common charges to the defendant.

60.  The defendant, through entities he owns, receives payments made to Trump World Tower by tenants and owners of units in the building through their payment of common charges and other fees. On information and belief, these payments include management and other fees paid to the building's management company, an entity owned by the defendant.

---

[42]  Max Abelson, *Afghanistan Buys $4.2 M. Trump Condo (with 'Peacefulness and Views')*, Observer (Sept. 11, 2009), http://bit.ly/2oQ74n3.

61.     Trump World Tower or its controlling entities will continue to receive regular common charge payments from Saudi Arabia, India, Afghanistan, and Qatar, and those payments will flow to the defendant.

62.     The World Bar is a bar located in Trump World Tower.

63.     Tenants of the Trump World Tower, including officials from Saudi Arabia, India, Afghanistan, and Qatar have patronized (or will patronize) the World Bar. Further, foreign states or agents or instrumentalities of these or other foreign states have hosted and will host events at the World Bar due to its location near the United Nations. By reason of his financial stake in Trump World Tower, the defendant will either receive payments from foreign states made to the World Bar, or the revenue that the World Bar receives, including from foreign states, affects the amount of rent that the defendant is able to charge the World Bar.

**Chinese trademarks**

64.     The defendant began to seek trademark protection in China for the use of his name in connection with building construction services in 2006. His application was rejected by the Trademark Office, and he subsequently lost his appeals to the Trademark Review and Adjudication Board, the Beijing Intermediate People's Court, and the Beijing High People's Court.[43] The defendant suffered his most recent court defeat in May 2015, the month before he declared his candidacy for President.

65.     Three weeks after his election, on December 2, 2016, the defendant spoke directly with Taiwanese President Tsai Ing-wen.[44] That conversation broke longstanding protocol and

---

[43]     Erika Kinetz, *With Trump's win in China, will Trump toilets get flushed?* Associated Press (Feb. 14, 2017), http://apne.ws/2mfcK9N.

[44]     Jordan Fabian & Neetzan Zimmerman, *Trump makes history with phone call to Taiwan leader*, The Hill (Dec. 2, 2016), http://bit.ly/2prWnYu.

suggested that the defendant might end the "One China" policy that the United States had observed for decades. The defendant further indicated before taking office that he might end the One China policy unless some benefit were received in exchange.[45]

66.     On February 9, 2017, however, the defendant spoke with Chinese President Xi Jinping and pledged to honor the One China policy.[46] Five days later, on February 14, 2017, China reversed its prior course and gave the defendant trademark protection.

67.     Chinese law prohibits awarding trademarks that are "the same as or similar to the name of leaders of national, regional, or international political organizations."[47]

68.     Even though China had denied the defendant trademark protection for more than ten years, including in a ruling from an appellate court, and despite Chinese law barring the use of foreign leaders' names as trademarks, China reversed course and decided to grant the defendant the trademark he had sought and valued. But China did so only after he had been elected President, questioned the One China policy, was sworn in, and then re-affirmed the One China policy.

69.     The trademarks have considerable value because they give the Trump Organization the sole right to profit from the Trump brand in China. China's granting of these trademarks constitutes a present or emolument provided to the defendant.

---

[45]     Jordan Fabian & Evelyn Rupert, *Trump promises Chinese president he'll honor 'one China' policy*, The Hill (Feb. 9, 2017), http://bit.ly/2pbgZUW; Laurel Raymond & Judd Legum, *Trump's trademark tests Chinese law*, Think Progress (Feb. 18, 2017), http://bit.ly/2pXHZTZ.

[46]     Fabian & Rupert, *Trump promises Chinese president he'll honor 'one China' policy*.

[47]     Raymond & Legum, *Trump's trademark tests Chinese law*.

70.     When asked why the defendant changed his position on the One China policy, and whether he had received something in exchange from China, White House Press Secretary Sean Spicer answered: "The President always gets something," but did not elaborate.[48]

**International versions and distribution of "The Apprentice" and its spinoffs**

71.     The defendant earns royalties and other payments from the distribution in other countries of the television program "The Apprentice" and its spinoffs (including "The Celebrity Apprentice" and "The New Celebrity Apprentice," for which he is still an executive producer), and also from international versions of the programs produced in other countries. In some instances, these payments originate from foreign governments or their agents or instrumentalities. For instance, the defendant is paid for a version of the program "The Apprentice" that airs in the United Kingdom.[49] The network that broadcasts "The Apprentice" and spinoff shows in the United Kingdom is an instrumentality of a foreign state.

72.     After 12:01 pm on January 20, 2017, the defendant has received and will continue to receive payments from foreign states via their payments for "The Apprentice" or its spinoffs and international versions. Such payments constitute presents or emoluments that the defendant has accepted and will accept from a foreign state.

**Other foreign connections, properties, and businesses**

73.     ***United Arab Emirates.*** The defendant's company is engaged in several real-estate projects in the United Arab Emirates, including Dubai's Trump International Golf Club, which

---

[48]     Madeline Conway, *Spicer on Trump's 'One China' agreement: 'The president always gets something'*, POLITICO (Feb. 27, 2017), http://politi.co/2prZpf7.

[49]     Madeline Berg, *Here's How Much Donald Trump Will Earn From Producing 'Celebrity Apprentice'*, Forbes (Dec. 13, 2016), http://bit.ly/2pY0S9h.

opened on February 18, 2017.[50] Upon information and belief, the defendant, through various business entities, has a branding-and-management contract with the property, and thereby possesses a financial interest in the Trump International Golf Club.

74.     All services for the golf club, including electricity, water, and roads, "come at the discretion of the government," and the "club's bar will need government approvals to serve alcohol, not to mention other regulatory issues."[51]

75.     The golf club and other projects cannot be built or operated without permits, utility, and other services and approvals. These discretionary approvals accordingly confer value on the defendant, through his financial stake in the company receiving them, in violation of the Foreign Emoluments Clause.

76.     *Indonesia.* The defendant's company is engaged in at least two real-estate projects in Indonesia, including redeveloping a resort in Bali.[52] Upon information and belief, the defendant, through various business entities, has a licensing-and-management agreement with these projects, through which he possesses a financial interest in them.

77.     Completing the projects required or will require permits and approvals from the Indonesian government. The defendant will receive value from these discretionary permits and

---

[50]     Sudarsan Raghavan, *Trump's sons get red carpet treatment at Dubai golf club opening*, Wash. Post (Feb. 18, 2017), http://wapo.st/2pY20tL.

[51]     Jon Gambrell, *Golf Club Shows Pitfalls of His Presidency*, Associated Press (Jan. 3, 2017), http://apne.ws/2j0gOVk.

[52]     Ian Jarrett, *Pan Pacific makes way for Trump in Bali*, Travel Weekly (Feb. 17, 2017), http://bit.ly/2nU3ANN; Richard C. Paddock & Eric Lipton, *Trump's Indonesia Projects, Still Moving Ahead, Create Potential Conflicts*, N.Y. Times (Dec. 31, 2016), http://nyti.ms/2kKSKLp; Russ Choma, *Trump's Indonesian Business Partner Brags About His Access*, Mother Jones (Feb. 10, 2017), http://bit.ly/2kujqMC.

approvals through his financial stake in the company receiving them, in violation of the Foreign Emoluments Clause.

78.     ***Other.*** The defendant also owns, operates, and licenses numerous other businesses throughout the United States and abroad, including other hotels, other properties for sale or lease, and golf courses and clubs.[53] The defendant, through his financial stake in the company or companies receiving them, derives value from the foreign permits and approvals associated with the owning and operation of those businesses in violation of the Foreign Emoluments Clause. In addition, revenues from foreign states' patronage of his hotels, golf clubs, and other businesses may flow to the defendant. After 12:01 pm on January 20, 2017, the defendant, through at least one of his various businesses, properties, and other entities has received one or more presents or emoluments from foreign states and will continue to do so.

**B.     The defendant's Domestic Emoluments Clause violations**

79.     As alleged above, the defendant owns and controls hundreds of businesses throughout the country, including hotels and other properties. The defendant personally benefits from the business dealings of these entities and agreements associated with them, and is and will be enriched by their business with state governments or federal agencies within the scope of the Domestic Emoluments Clause.

**The District of Columbia's Trump International Hotel**

80.     On August 5, 2013, Trump Old Post Office LLC, a business entity owned primarily by the defendant, signed a 60-year lease with the General Services Administration ("GSA")—an

---

[53]     U.S. Office of Gov't Ethics, Donald J. Trump, 2016 Executive Branch Personnel Public Financial Disclosure Report (May 16, 2016), http://bit.ly/2gBUwIV.

independent agency of the United States, whose administrator is appointed by the President—to open a hotel in the Old Post Office Building in the District of Columbia.

81.     More than 76% of Trump Old Post Office LLC is owned by DJT Holdings LLC, which is in turn owned almost entirely by the Donald J. Trump Revocable Trust, of which the defendant is the sole beneficiary. The Trump International Hotel Washington, D.C. is located at this site. The defendant has not divested his interest in the lease since becoming President.

82.     Section 37.19 of the Old Post Office lease states: "No . . . elected official of the Government of the United States . . . shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom." A violation of Section 37.19 is a non-monetary breach and a default unless it is remedied within 30 days after notice from the GSA. Accordingly, the defendant has been in breach of the lease with the GSA since 12:01 pm on January 20, 2017, when he became President.

83.     Before the defendant's inauguration, the GSA's Deputy Commissioner indicated to Representatives Elijah Cummings, Peter DeFazio, Gerald Connolly, and André Carson that the defendant would be in violation of the lease unless he "fully divests himself of all financial interests in the lease" for the Trump International Hotel, which he has not done. Shortly after the inauguration, Norman Dong, a GSA official appointed by former President Obama, became acting administrator. But less than a day later, the defendant replaced Mr. Dong with Tim Horne, who had coordinated the GSA's transition with the defendant's campaign.[54]

84.     Several weeks later, on March 16, 2017, the defendant released a proposed 2018 budget increasing GSA's funding, while cutting all (or nearly all) other non-defense-related

---

[54]     Isaac Arnsdorf, *Trump Picks Leader for Federal Agency Overseeing His D.C. Hotel*, POLITICO (Jan. 26, 2017), http://politi.co/2psgMfU.

agencies' budgets.[55] One week after that, on March 23, the GSA issued a letter stating that—contrary to the lease's plain terms—Trump Old Post Office LLC "is in full compliance with Section 37.19 [of the lease] and, accordingly, the lease is valid and in full force and effect."[56] A significant portion of the letter reviews the purported financial benefits of the lease to the GSA and taxpayers—even though those benefits are immaterial to the question of breach.

85.    Attached to the March 23, 2017 letter was an amendment to the agreement governing the business of Trump Old Post Office LLC. This amendment is the basis of the GSA's position that the tenant is in compliance with the lease, but the letter does not explain how the amendment brings the tenant into compliance. In fact, as described above, the amendment does not prevent the defendant from receiving "any benefit" from the lease, and Trump Old Post Office LLC remains in breach of the lease.

86.    In forbearing from enforcing the Old Post Office lease's default and termination procedures, despite the tenant's breach of its terms, and in cooperating with the tenant in attempting to create the appearance of compliance with the lease, the federal government has given the defendant an emolument in violation of the Domestic Emoluments Clause.

87.    Additionally, the defendant, through entities he owns, is seeking a $32 million historic-preservation tax credit for the Trump International Hotel. Approval of this credit is at the discretion of the National Park Service, an instrumentality of the federal government now under

---

[55]    Office of Mgmt. & Budget, Exec. Office of the President, America First, A Budget Blueprint to Make America Great Again (2017), http://bit.ly/2nvjrBO.

[56]    Letter from Kevin M. Terry, Contracting Officer, United States Gen. Servs. Admin., to Donald J. Trump, Jr. (Mar. 23, 2017), http://bit.ly/2nhKfaB.

the defendant's authority.[57] If approved, the tax credit would offset approximately 20% of the cost of rehabilitating the building in which the Trump International Hotel is operating.

88.     On November 14, 2016, the defendant received approval from the National Park Service for the second phase of the three-step-approval process. If final approval is granted, it may constitute an emolument, in violation of the Domestic Emoluments Clause.

**Mar-a-Lago Club**

89.     The Mar-a-Lago Club is a private club and estate located in Palm Beach, Florida. It is comprised of 20 acres of land, with a main mansion of over 100 rooms, along with a beach club, pools, tennis courts, and a 20,000 square foot ballroom for private events. The estate itself was purchased by the defendant in 1985. A decade later, in 1995, the defendant opened the club as a hotel and resort for dues-paying members of the public. It is owned by the defendant directly or owned by entities that he directly controls.

90.     The defendant, through entities he owns, receives payments made to the Mar-a-Lago Club by members and guests who join or visit the club, or rent space there, or pay for other goods or services at the club.

91.     Membership in the Mar-a-Lago Club requires payment of an initiation fee of $200,000, plus tax, as well as $14,000 a year in annual dues. This fee was doubled following the defendant's election as President—an increase from $100,000 to $200,000.[58] Since his election, the defendant has also attempted to capitalize on his office by advertising his private property to foreign governments and individuals.

---

[57]     Eric Levitz, *Trump Won the Presidency, Then Approval on a Tax Subsidy for His Hotel,* New York Mag. (Nov. 30, 2016), http://nym.ag/2oFF1o9.

[58]     Robert Frank, *Mar-a-Lago Membership Fee Doubles to $200,000*, CNBC (Jan. 25, 2017), http://cnb.cx/2kjIc2j.

92.     The State Department and at least two U.S. Embassies—those located in the United Kingdom and Albania—have promoted the Mar-a-Lago estate and club on their respective websites by posting a 400-word blog post, originally written by Leigh Hartman for a State Department-managed website, "Share America," on April 4, 2017.[59]

93.     The State Department and embassies' actions have served to promote Mar-a-Lago as the defendant's "Florida estate" and claimed that it "has become well known as the president frequently travels there to work or host foreign leaders."[60]

94.     The State Department is an executive department within the federal government under the defendant's authority.

95.     ShareAmerica, the blog for which the post was originally written, is specifically directed towards foreign individuals and governments.[61]

96.     This post advertising Mar-a-Lago has since been removed from the websites of the State Department and the embassies, but not before substantive, world-wide advertising of the defendant's private property, using government resources, had occurred.

97.     The defendant has used his official position as President to promote his Mar-a-Lago property. He has designated Mar-a-Lago as the "Winter White House," and also refers to it as the "Southern White House."[62] Since taking office, he has visited Mar-a-Lago on at least seven

---

[59]     Darren Samuelsohn, *State Department, U.S. Embassies Promoting Trump's Mar-a-Lago*, POLITICO (Apr. 24, 2017), http://politi.co/2peC7Jb.

[60]     *Mar-a-Lago: The winter White House*, http://bit.ly/2paWtRK (blog post subsequently removed; former blog post shown at Dan Merica, *State Department removes Mar-a-Lago blog post*, CNN (Apr. 25, 2017), http://cnn.it/2pdRu2x).

[61]     *About Us*, ShareAmerica, https://share.america.gov/about-us/ (last visited June 9, 2017).

[62]     *See, e.g.*, Press Briefing by Press Secretary Sean Spicer (Feb. 2, 2017) ("Luckily, for those of you who are going to be joining the President down to Florida this weekend, you'll

---

occasions, and has met with a number of foreign leaders there, including Japanese Prime Minister Shinzo Abe and the President of the People's Republic of China, Xi Jinping.[63]

98.     Upon information and belief, federal, state, and local governments, or their instrumentalities, have made and will continue to make payments for the use of facilities owned or operated by the defendant for a variety of functions. The defendant will receive a portion of those payments, which constitute emoluments prohibited by the Domestic Emoluments Clause.

99.     Although the exact extent of these emoluments is not currently known, examples of current or potential violations include "public pension funds in at least seven U.S. states"—but not the State of Maryland or the District of Columbia—that "have invested millions of dollars in an investment fund that owns a New York hotel and pays one of President Donald Trump's companies to run it, according to a Reuters review of public records."[64] And the defendant has received (or will likely receive) a host of other potential emoluments from federal, state, and/or local governments.

---

get some time to get a glimpse of summer at the 'Winter White House' in Mar-a-Lago."), http://bit.ly/2k5Q3lZ; Remarks by President Trump in Listening Session with the National Association of Manufacturers (Mar. 31, 2017) ("The President: . . . As you know the President of China is coming to Florida. We're having a meeting—big meeting—at Mar-a-Lago. We call it the Southern White House, which it actually is. It was originally built as the Southern White House, a lot of people don't know."), http://bit.ly/2rUH0ZI.

[63]     *See* Background Briefing by Senior Administration Officials on the Visit of President Xi Jinping of the People's Republic of China (Apr. 4, 2017) ("SENIOR ADMINISTRATION OFFICIAL: . . . I'm certain it was President Trump's invitation that they meet outside of Washington, D.C.—. . . you know, you've heard people refer to it as the 'winter White House.' It's a place where he feels comfortable and at home, and where he can break the ice with Xi Jinping without the formality, really, of a Washington meet-up."), http://bit.ly/2nVQy26.

[64]     Julia Harte, *Exclusive: A New York hotel deal shows how some public pension funds help to enrich Trump*, Reuters (Apr. 26, 2017), http://reut.rs/2oIONEp.

### C.     Post-inauguration premium for the defendant's goods and services

100.    Since the defendant's inauguration as President, goods and services sold by his various Trump businesses have sold at a premium. The defendant's high office gives the Trump brand greater prominence and exposure. Moreover, these goods and services provide (or have the potential to provide) a unique benefit: access to, influence on, and the goodwill of the President of the United States.

101.    Thus, for example, the starting rate for "guest rooms" at the defendant's Old Post Office hotel increased to $500 on most nights, up hundreds of dollars from when the hotel first opened shortly before the defendant's election.[65]

102.    Further, as discussed earlier, the initiation fee for membership at defendant's Mar-a-Lago resort doubled from $100,000 to $200,000 shortly after he was elected.[66]

### D.     The plaintiffs' interests in this litigation

103.    The plaintiffs' interests in this litigation are substantial. They are harmed by the defendant's constitutional violations in at least two distinct ways. *First*, they have suffered (and will continue to suffer) harm to their sovereign and/or quasi-sovereign interests, including Maryland's interest in preserving its rightful status within our federal system; the plaintiffs' interest in not being subjected to unfair competition by virtue of ongoing violations of constitutional provisions designed to guard against corruption and to protect interests distinct to the states themselves; the plaintiffs' interest in protecting their economies and their residents from economic harm; and Maryland's interest in preserving its tax revenue. *Second*, the plaintiffs have suffered (and will continue to suffer) proprietary and other financial harms as a result of the

---

[65]    The Associated Press, *Trump Hotel May Be Political Capital of Nation's Capital*, Fortune (Mar. 5, 2017), http://for.tn/2rsCsXl.

[66]    Robert Frank, *Mar-a-Lago membership fee doubles to $200,000*.

defendant's ongoing constitutional violations. These injuries can be redressed by a declaration that the defendant is in violation of the Emoluments Clauses and an injunction preventing his continued violation of them.

**Sovereign and quasi-sovereign injuries to the plaintiffs**

104. ***Maryland's sovereign interest in enforcing the terms on which it agreed to enter the Union.*** Before adopting the federal Constitution, Maryland and its sister states were truly independent sovereigns. Many of these states—including Maryland—had incorporated protections against public corruption into their own legal codes and constitutions, with specific prohibitions on public officials accepting payments from federal, state, or foreign governments. The Maryland Declaration of Rights, adopted August 14, 1776, provides that "all persons invested with the legislative or executive powers of government are the trustees of the public," and contains a precursor to the U.S. Constitution's Emoluments Clauses.[67] This precursor combines the concerns of the two clauses into a single prohibition: "That no person ought to hold, at the same time, more than one office of profit, nor ought any person, in public trust, to receive any present from any foreign prince or state, or from the United States, or any of them, without the approbation of this State."[68] The Maryland Constitution of 1776 further provided for banishment "forever" as a potential punishment for a governor sharing "directly or indirectly" in the profits of another office, and also prohibited the governor from receiving part of the profits of supplying the army and navy.[69]

---

[67] Md. Declaration of Rights of 1776, art. 4 (Aug. 14, 1776).

[68] *Id.*, art. 32.

[69] Md. Const. of 1776, arts. 33 and 53.

105. Maryland's historical prohibition against foreign and domestic emoluments is consistent with the constitutions adopted by the other colonies at the time. The Pennsylvania Constitution of 1776, which Benjamin Franklin helped draft, made clear "[t]hat government is, or ought to be, instituted for the common benefit, protection and security of the people, nation or community; and not for the particular emolument or advantage of any single man, family, or sett of men, who are a part only of that community."[70] The South Carolina Constitution of 1776,[71] and the Massachusetts Constitution of 1780,[72] contained similar prohibitions against corruption of public officials.

106. The prohibitions contained in the Domestic and Foreign Emoluments Clauses were thus material inducements to the states entering the union. As a state sovereign, Maryland retains its power to bring suit to enforce those prohibitions today.

107. ***The plaintiffs' governmental interest in not being compelled to compete improperly for influence or favor.*** As explained above, the Domestic Emoluments Clause in particular reflects the Framers' deep concern that one or more of the states (or the federal government) might seek to buy off the President so that he would exercise power to their advantage and to the detriment of other states, thereby disrupting the balance of power in the federalist

---

[70] Const. of Pa., Declaration of the Rights of the Inhabitants of the Commonwealth or State of Pennsylvania, art. V; *see also id*. at § 36 ("As every freeman to preserve his independence, (if without a sufficient estate) ought to have some profession, calling, trade or farm, whereby he may honestly subsist, there can be no necessity for, nor use in establishing offices of profit, the usual effects of which are dependence and servility unbecoming freemen, in the possessors and expectants; faction, contention, corruption, and disorder among the people. But if any man is called into public service; to the prejudice of his-private affairs, he has a right to a reasonable compensation: And whenever an office, through increase of fees or otherwise, becomes so profitable as to occasion many to apply for it, the profits ought to be lessened by the legislature.").

[71] S.C. Const. of 1776, art. X.

[72] Mass. Const., ch. II, art. XIII.

34

system. Thus, the Domestic Emoluments Clause aims to prevent "the United States, or any of them," from feeling compelled (or being compelled) to confer private financial benefits on the President in order to compete for influence and favor.

108.    The District and Maryland each have a governmental interest in the enforcement of their respective laws regarding taxation, environmental protection, zoning, and land use as they relate to real property that the defendant or the "Trump Organization" may own or seek to acquire. The defendant and his affiliated enterprises have a large and expanding portfolio of real-estate holdings, including a hotel in the District, and the defendant's Trump International Realty, otherwise known as T International Realty LLC, is registered to conduct business in Maryland.[73]

109.    Real-estate acquisition, ownership, and development implicate a range of legal requirements under the laws of the District and Maryland, including tax laws that generate revenue for the District, Maryland, and their instrumentalities. The defendant has boasted that he has achieved success in real-estate acquisition and development by using his financial clout and political connections to extract from governments maximum concessions, exemptions, waivers, and variances with respect to taxes and other requirements imposed by law.[74] Indications to date suggest that this longstanding practice of the Trump Organization did not cease upon the defendant's election to the Presidency; rather, there is evidence that the defendant's ascendancy to

---

[73]    Md. State Dep't of Assessments and Taxation, Md. Business Express, Registration for Trump International Realty, http://bit.ly/2qXZWpQ.

[74]    Geraldine Baum, Tom Hamburger & Michael J. Mishak, *Trump has thrived with government's generosity*, L.A. Times (May 11, 2011), http://lat.ms/1UGMtc8; Jillian Kay Melchior, *Donald Trump Has Mastered the Art of the Tax Break*, National Review (Aug. 19, 2015) ("Trump has long sought subsidies, tax breaks, and other preferential treatment from the government."), http://bit.ly/1rher3Y.

35

the highest office in the land has enhanced his organization's ability to win concessions from governments with respect to his properties.[75]

110.    The defendant's acceptance or receipt of presents and emoluments in violation of the Constitution presents the District and Maryland with an intolerable dilemma: either (1) grant the Organization's requests for concessions, exemptions, waivers, variances, and the like and suffer the consequences, potentially including lost revenue and compromised enforcement of environmental protection, zoning, and land use regulations, or (2) deny such requests and be placed at a disadvantage vis-à-vis states and other government entities that have granted or will agree to such concessions. Either way, the result is the very type of injury that the Domestic Emoluments Clause was designed to prevent.

111.    Moreover, the District and Maryland, which rank first and fourth, respectively, in per capita amount of federal government expenditures, are particularly susceptible to injury resulting from budgetary decisions that are subject to the corrupting influence of emoluments.[76] Federal funds make up approximately 25% of the District's fiscal year 2018 budget,[77] and Maryland is relying on federal funds for nearly 30% of the State government's budget for fiscal year 2018.[78] Federal government spending accounted for more than 42% of the District's gross

---

[75]    Michael LaForgia & Steve Eder, *When That Feisty Neighbor Becomes the President*, N.Y. Times (May 6, 2017), http://nyti.ms/2qXUxPw.

[76]    U.S. Dept. of Commerce, *Consolidated Federal Funds Report for Fiscal Year 2010* (Sept. 2011) at 23, 32, http://bit.ly/2r6mJRe.

[77]    Council of the District of Columbia, Committee of the Whole, *Report on Bill 22-241, the "Fiscal Year 2018 Federal Portion Budget Request Act of 2017"* (May 30, 2017) at 2, http://bit.ly/2s0x6Fz.

[78]    Md. Dept. of Legislative Services, *The 90 Day Report: A Review of the 2017 Legislative Session* at A-3, A-28, http://bit.ly/2r6gIEs.

domestic product and more than 28% of Maryland's in fiscal year 2014.[79] Both the District and

Maryland are home to headquarters for federal agencies. Civilian federal agencies employ

approximately 17% of the workforce in the District[80] and 10% of Maryland's total workforce.[81]

Federal agencies annually have spent more than $21 billion for procurement in the District and

more than $26 billion for procurement in Maryland.[82] Given this significance of federal

government spending and operations, and the President's significant role in determining how,

when, and where federal funds are spent, the conflict of interest inherent in the defendant's receipt

of emoluments directly and profoundly affects the District and Maryland.

112. The plaintiffs seek to protect this distinct interest, and thereby vindicate their role

as governments in our constitutional scheme.

113. ***The plaintiffs' interest in preventing economic injury to their residents and their***

***economies.*** The District is home to 680,000 residents, while the State of Maryland is home to over

6.1 million residents. Residents of both the District and Maryland participate in a thriving

hospitality industry that comprises a substantial part of the plaintiffs' economies. For example, in

2014, visitors to the District generated approximately $6.81 billion in spending[83] and drove $3.86

---

[79]    Pew Charitable Trusts, *Issue Brief: Federal Spending in the States 2005 to 2014* (Mar. 3, 2016) at 6, http://bit.ly/1QIOq43.

[80]    Office of Personnel Management, Data, Analysis & Documentation: Federal Employment Reports (Sept. 2015), http://bit.ly/2qZWcRE; District of Columbia, Wage and Salary Employment by Industry and Place of Work (Dec. 2015), http://bit.ly/2raFJhF.

[81]    John Fritze, *Trump's Budget Suggests Major Changes in Md.*, Baltimore Sun (Mar. 16, 2017), http://bsun.md/2r6n1Yk.

[82]    U.S. Dept. of Commerce, *Consolidated Federal Funds Report for Fiscal Year 2010* (Sept. 2011) at 37, 48, http://bit.ly/2r6mJRe.

[83]    Office of the Deputy Mayor for Planning and Economic Development, *Hospitality and Tourism*, https://dmped.dc.gov/page/hospitality-and-tourism.

37

billion in wages[84] for 74,570 employees in the District's hospitality industry.[85] In Maryland, tourists and travelers spent nearly $17 billion in 2015, yielding $5.7 billion in wages for more than 140,000 employees,[86] including more than 72,000 hospitality industry workers employed in the two Maryland counties that border the District of Columbia.[87] Both the District and Maryland regulate competition and transparency in this industry through laws that prohibit anticompetitive or deceptive practices and protect consumers.

114.     Residents of the District and Maryland are injured by the payment of presents and emoluments to the defendant because it tilts the competitive playing field toward his businesses; causes competing companies and their employees to lose business, wages, and tips; and generates a range of market distortions that restrict and curtail opportunity, diminish revenues and earnings, and hamper competition.

115.     The District and Maryland have the authority and right to vindicate their interest in providing and preserving a level playing field in the hospitality industry, and in ensuring that their residents are free from the injuries and competitive disadvantages that flow from defendant's violations of the Emoluments Clauses.

116.     ***Maryland's sovereign interests in tax revenues.*** The defendant's violations of the Emoluments Clauses also injure Maryland's interest in preserving tax revenue for the benefit of its residents. For example, National Harbor is a resort development with hotels, a casino,

---

[84]     *Id.*

[85]     *Id.*

[86]     Md. Tourism Development Board, *FY 2016 Tourism Development Annual Report* (Jan. 4, 2017) at 3, http://bit.ly/2r0k3Ra.

[87]     Md. Dept. of Commerce, *Montgomery County, Md.: Brief Economic Facts* (2017) at 2, http://bit.ly/2rFHvG2; Md. Dept. of Commerce, *Prince George's County, Md.: Brief Economic Facts* (2017) at 2, http://bit.ly/2sY6P8e.

restaurants, entertainment, a marina, and shops located on the Potomac River in Prince George's County, Maryland. Although Maryland does not own National Harbor, the various hotels and other businesses in the complex generate significant tax revenue for state and local governments, through income tax assessed on the businesses and their employees, sales tax, hotel tax, and other taxes and fees.

117.    The National Harbor development includes MGM National Harbor, a hotel, entertainment, shopping, and casino complex that is subject to a Community Benefit Agreement between MGM National Harbor, LLC, and the government of Prince George's County, a subdivision of the State of Maryland.[88] The Community Benefit Agreement sets goals encouraging MGM National Harbor to hire Prince George's County residents, to contract with minority business enterprises and other businesses located in the County, and to create investment opportunities for County residents. The casino is operated under a gaming license granted by the Maryland Lottery and Gaming Control Commission, a state government entity. Under Maryland law, the state and local governments receive 56% of the proceeds generated by MGM National Harbor's video lottery terminals and 20% of the gross proceeds generated by its table games.[89] In the first four months of 2017, MGM National Harbor's casino proceeds contributed more than $75 million in revenue to state and local government treasuries to fund various public purposes, including more than $55 million for the State's Education Trust Fund.[90] Any circumstance that

---

[88]    *See* County Council of Prince George's County, Md., Resolution No. CR-68-2014 (July 23, 2014) (approving Community Benefit Agreement), http://bit.ly/2rotRaS.

[89]    Md. Code Ann., State Gov't § 9-1A-27; Md. Lottery and Gaming Control Agency, *Maryland Casinos Generate $135.7 Million in Revenue During April*, http://bit.ly/2s8zSsD.

[90]    *Id.*

impairs National Harbor's ability to attract visitors and guests will diminish the revenues on which the state and local governments depend.

118.    Trump International Hotel, located in the District of Columbia, is a direct competitor of National Harbor's hotels and other businesses, including MGM National Harbor. Those hotels and businesses suffer competitive harm by the defendants' ongoing constitutional violations, and Maryland's tax coffers, in turn, are diminished as a result.[91]

**Proprietary and other financial injuries to the plaintiffs**

119.    ***The District of Columbia.*** The District has a financial interest in properties, venues, and other enterprises located within the District as owner, lender, or landlord.

120.    The District owns the Walter E. Washington Convention Center. The Washington Convention and Sports Authority (also known as Events DC), is an instrumentality of the government of the District of Columbia. Events DC operates event and conference venues in the District, including the Walter E. Washington Convention Center, D.C. Armory, and Carnegie Library.

121.    The District, through Events DC, serves the diplomatic community and foreign and state governments by providing services that compete with those owned or controlled by the defendant or the Trump Organization.

122.    In fiscal year 2016, Events DC generated over $30 million in revenue from building rental and ancillary charges. A portion of Events DC's revenue is based on demand for the Convention Center, D.C. Armory, and Carnegie Library.

---

[91]    Benjamin Freed, *MGM Says Its National Harbor Resort Will 'Blow Away' Donald Trump's DC Hotel*, Washingtonian (Jan. 20, 2016), http://bit.ly/2qXV7g6.

123. On August 9, 2016, the Embassy of Colombia partnered with the U.S. Soccer Foundation to host an Olympic watch party at the Carnegie Library for the soccer match between the U.S. Women's National team and Colombia.[92]

124. On September 6, 2016, the Embassy of Tajikistan celebrated Tajikistan Independence Day at a reception held at the Carnegie Library.[93]

125. As discussed above, Trump International Hotel Washington, D.C., specifically markets its hotel rooms, event space, and food and beverage services to the diplomatic community and foreign governments.

126. The defendant, his family, and other members of the defendant's administration have continued to promote his hotel properties, such as by making multiple appearances at those properties, including in connection with official business.

127. Since the defendant's inauguration, foreign governments (including the Embassy of Kuwait and the Kingdom of Saudi Arabia) have held events at the hotel, and public officials have stated that, since the defendant was elected president, they are more likely to pay for goods and services at the defendant's properties in an attempt to curry favor with him.

128. The defendant's receipt or acceptance of presents or emoluments through the Trump International Hotel Washington, D.C. and other properties owned or controlled by the defendant or the Trump Organization has resulted in a competitive injury to the Walter E. Washington Convention Center, D.C. Armory, and Carnegie Library.

---

[92]     Olympic Watch Party, US Soccer Foundation website (last visited June 10, 2017), http://bit.ly/2auRNlm.

[93]     *Tajik Independence*, Washington Diplomat Facebook page (last visited June 10, 2017), http://bit.ly/2rMR3z8.

129.    The District's interest is further injured by the loss of the economic value of its brands in comparison to defendant's brand, as foreign and state governments and their agents and instrumentalities favor his businesses for reasons related to the defendant's receipt or acceptance of presents or emoluments.

130.    ***The State of Maryland.*** Maryland has a proprietary interest in properties, venues, and enterprises that directly compete with those owned or controlled by the defendant or the Trump Organization. Maryland suffers economic loss because its enterprises are placed at a competitive advantage as the result of the defendant's ongoing violations of the Foreign and Domestic Emoluments Clauses.

131.    Specifically, Maryland has a direct financial interest in the Montgomery County Conference Center, part of the Bethesda North Marriott Hotel and Conference Center located in Bethesda, Maryland. The site of the hotel and conference center is owned by the Montgomery County Revenue Authority, a public corporation established by Montgomery County, which is a subdivision of the State of Maryland. The County Revenue Authority leased the conference center portion of the site to Montgomery County and to the Maryland Stadium Authority, an instrumentality of the State,[94] as equal tenants-in-common to develop the conference center. The development of the conference center was funded through bonds issued by the Maryland Stadium Authority, separate bonds issued by the County Revenue Authority, and direct contributions from Montgomery County. The County Revenue Authority also leased the hotel portion of the site to a consortium of private investors that funded the development of the hotel. The hotel and conference center are overseen by a management committee that includes representatives of Montgomery County and the Maryland Stadium Authority, and the facility is operated by Marriott Hotel

---

[94]    Md. Code Ann., Econ. Dev. § 10-604 (2008 Repl. Vol.).

Services, Inc., under an agreement with Montgomery County. The conference center offers approximately 39,000 square feet of meeting space. In fiscal year 2016, activities at the conference center generated, directly and indirectly, an estimated $45.9 million in spending, and yielded estimated tax revenues of more than $2.7 million for the State and nearly $1 million for Montgomery County.[95]

132.    Furthermore, as explained above, the State of Maryland has suffered financial harm because it has a sovereign interest in the receipt of tax revenues from facilities (like the National Harbor) that are in competition with businesses owned by the defendant and/or his affiliated enterprises outside the State.

133.    The declaratory and injunctive relief that the plaintiffs are seeking would remedy these injuries by eliminating the plaintiffs' competitive disadvantage vis-à-vis the defendant.

## V.
## CLAIMS

### COUNT I
### Violations of the Foreign Emoluments Clause
### (Declaratory and Injunctive Relief)

134.    As discussed in detail above, the defendant has violated—and will continue to violate—the Foreign Emoluments Clause. The phrase "Person holding any Office of Profit or Trust," as used in the clause, includes the President. The phrases "present" and "Emolument . . . of any kind whatever" together cover anything of value, including without limitation monetary and non-monetary gifts or transactions, transactions granting special treatment, and transactions above marginal cost. And the phrase "any King, Prince, or foreign State" includes any foreign government and any agent or instrumentality thereof.

---

[95]    *Montgomery County Conference Center Economic and Fiscal Impact Analysis FY 2016, Final Report* (Jan. 2017) at 1-2.

135.     The defendant has accepted "present[s]" or "Emolument[s]" directly from—or from agents or instrumentalities of—China, the United Arab Emirates, Kuwait, Indonesia, Saudi Arabia, Afghanistan, Qatar, India, Georgia, the United Kingdom, and other "foreign State[s]," without seeking or obtaining "the Consent of the Congress" as required by the Foreign Emoluments Clause.

136.     As described more fully in paragraphs 29 to 78 herein, the defendant is committing or will commit these violations in connection with transactions involving the Trump International Hotel Washington, D.C., New York's Trump Tower and Trump World Tower, restaurants the defendant owns or that are located in his hotels or other properties, the television program "The Apprentice" and its spinoffs and international versions, and other business and property interests and transactions in the United States and abroad.

137.     As a direct result of these violations of the Foreign Emoluments Clause, the plaintiffs, and their residents, have suffered significant harm. They also stand to suffer additional significant harm directly from the further occurrence of these violations.

138.     No plan announced by the defendant or his attorneys as of the date of this filing can make this conduct constitutional or otherwise remedy these constitutional violations.

139.     The District of Columbia and the State of Maryland are entitled to injunctive and declaratory relief to stop the above-mentioned Foreign Emoluments Clause violations and any other Foreign Emoluments Clause violations. This Court has the power to grant such relief pursuant to its inherent authority to grant equitable relief and 28 U.S.C. §§ 1331 and 2201.

## COUNT II
## Violations of the Domestic Emoluments Clause
### (Declaratory and Injunctive Relief)

140.     As discussed in detail above, the defendant has also violated—and will continue to violate—the Domestic Emoluments Clause. As President, he is the sole subject of the clause.

44

The phrase "any other Emolument" under the clause covers remuneration beyond the President's "Compensation" as set by Congress, including monetary and non-monetary payments or transactions, transactions granting special treatment, and transactions above marginal cost. And the phrase "the United States, or any of them" includes any part of the federal government, any state government, any local government, and any agent or instrumentality thereof.

141.     The defendant is and will be accepting "any other Emolument" from "the United States, or any of them." As described more fully in paragraphs 79 to 99 herein, the defendant has committed violations of the Domestic Emoluments Clause, and without this Court's intervention he will continue violate the clause.

142.     As a direct result of these violations of the Domestic Emoluments Clause, the plaintiffs, and their residents, have suffered significant harm. They also stand to suffer additional significant harm directly from the further occurrence of these violations.

143.     No plan announced by the defendant or his attorneys as of the date of this filing can make this conduct constitutional or otherwise remedy these constitutional violations.

144.     The District of Columbia and the State of Maryland are entitled to declaratory and injunctive relief to stop and prevent the above-mentioned Domestic Emoluments Clause violations and any other violations of the clause. This Court has the power to grant such relief pursuant to its inherent authority to grant equitable relief and 28 U.S.C. §§ 1331 and 2201.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, the District of Columbia and the State of Maryland respectfully request that this Court enter a judgment in their favor and against the defendant, consisting of:

(a)     A declaratory judgment, stating that the defendant has violated and will continue to violate the Foreign and Domestic Emoluments Clauses, as construed by this Court;

(b)      injunctive relief, enjoining the defendant from violating the Foreign and Domestic

Emoluments Clauses, as construed by this Court;

(c)      such other and further relief as this Court may deem just and proper.

Dated: February 23, 2018

THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General for the District of
Columbia

NATALIE O. LUDAWAY*
Chief Deputy Attorney General

/s/ Stephanie E. Litos
STEPHANIE E. LITOS*
Senior Counsel to the Attorney General
stephanie.litos@dc.gov
441 Fourth Street, N.W.
Washington D.C.  20001
T: (202) 724-6650
F. (202) 741-0647

NORMAN L. EISEN
Federal Bar No. 09460
neisen@citizensforethics.org
NOAH D. BOOKBINDER*
nbookbinder@citizensforethics.org
STUART C. MCPHAIL*
smcphail@citizensforethics.org
Citizens for Responsibility and Ethics
   in Washington
455 Massachusetts Avenue, N.W.
Washington, D.C. 20001
T: (202) 408-5565
F: (202) 588-5020

DEEPAK GUPTA*
deepak@guptawessler.com
JONATHAN E. TAYLOR*
Gupta Wessler PLLC
1900 L Street, N.W.
Washington, D.C. 20009
T: (202) 888-1741

THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General of Maryland

/s/ Steven M. Sullivan
STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
PATRICK B. HUGHES
Federal Bar No. 19492
phughes@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, MD  21202
T: (410) 576-6325
F: (410) 576-6955

JOSEPH M. SELLERS
Federal Bar No. 06284
jsellers@cohenmilstein.com
CHRISTINE E. WEBBER*
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
T: (202) 408-4600


*admitted pro hac vice

47

**U.S. Const. art. I, § 9, cl. 8 (Foreign Emoluments Clause)**

No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

**U.S. Const. art. II, § 1, cl. 7 (Domestic Emoluments Clause)**

The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

**28 U.S.C. § 1292**

**§ 1292. Interlocutory Decisions**

* * *

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

* * *

**28 U.S.C. § 1651**

**§ 1651. Writs**

(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

(b) An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction.